IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE, DR. THOMAS CAMERON, DR. KAREN M. SOLT, and Dr. KATHY CABAI, | ) ) ) ) ) | |
| Defendants, | ) | |

Plaintiff American Center For Excellence In Surgical Assisting Inc. (collectively, "ACE") complains of Defendants Community College District 502 (the "District"), College Of Dupage ("COD"), Dr. Thomas Cameron (Cameron"), Dr. Karen M. Solt ("Solt"), and Dr. Kathy Cabai ("Cabai") (collectively, "Defendants") as follows:

## I. PARTIES

1. Plaintiff ACE is a Colorado corporation with its principal place of business in Colorado.

2. Defendant District is one of the community college districts created by the Illinois Community College Act, 11 ILCS 850, et seq. which divides the State of Illinois into 39 public community college districts, each having its own Board of Trustees. The Act states that "…the board of each community college is a body politic and corporate by the name 'Board of Trustees of Community College District…' and by that name may sue and be sued in all courts and places where judicial proceedings are had …..". The District is located in Glen Ellyn, Illinois.

3. Defendant COD is a community college located in Glen Ellyn, Illinois and is the community college created for District 502.

4. Defendant Cameron is the Dean of Health and Sciences Division of COD.

5. Defendant Solt is Associate Dean of Health and Sciences Division of COD.

6. Defendant Cabai is the Program Director, Health and Science Center at COD.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8. No Plaintiff is a citizen of the same state as any Defendant.

9. This Court has personal jurisdiction over Defendants pursuant to ILCS 5/2-209, because Defendants have transacted business within Illinois and entered into contracts substantially connected to Illinois, including the contract that is the subject of this lawsuit.

10. Venue is proper in this district under 28 U.S.C. §§ 1391(a) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in this district, Defendants are subject to personal jurisdiction in this district,

## III. INTRODUCTION

11. This case arises out of an attempt by COD by and through Cameron, Solt and Cabai to provide a Surgical Assistant Program (the "Program") to qualified prospective students that would be approved and accredited by the American Board of Surgical Assistants (ABSA) in conjunction with ACE who has an ABSA approved Program with a curriculum (distance-learning, hands-on lab, and clinical internship) and the expertise required to operate and maintain the Program. Ace's duties were to provide COD with an ABSA approved, distance-learning Surgical Assistant Program, provide documentation needed for the students to progress through the Program, provide presentation materials for the Program and provide a member of the ACE staff to coordinate this program with a designated

member of the COD staff. COD's duties were to receive and process applications for admission, maintain student records and transcripts, grant certificates or degrees documenting satisfactory completion of the educational program; collect tuition and fees from all students; provide, classroom space for the Program; designate a qualified member of COD Faculty to be Program Director to coordinate local activities of the Program; secure and maintain contractual relationships with the appropriate number of hospitals and surgicenters to allow all enrolled students to obtain and complete the required clinical experience to successfully complete the Program; collect student surveys with sufficient information to assess the Program; and pay any and all initial Program approval/accreditation application and maintenance fees and all associated expenses related to approval/accreditation. Because COD did not have the Program, they relied exclusively on ACE to help them build the Program. ACE fulfilled all its duties by providing the course and the curriculum, as well as a copy of a Self Study proposal. However, after 10 months of collaboration, COD abruptly terminated the relationship with ACE and instituted its own Program using the materials that ACE provided to them.

## IV. FACTS

12. An exhaustive collaboration between COD and ACE to initiate COD's Program began in November, 2013. Because COD did not have the expertise to implement the Program, assistance was required.

13. In early November 2013, a meeting was proposed with Cabai, COD and ACE and was scheduled for November 19, 2013. A follow up meeting was held on November 20, 2013 which led to Keith Bump of ACE ("Bump") sending Cabai and Solt a proposal outlining how ACE would implement the Program. See Nov. 21, 2013 email attached as Exhibit A.

14. On December 8, 2013, a Skype meeting was held with Cabai, Solt and Cameron in which Solt affirmed COD was ready "…to move forward on our part." See 12/9/13 emails attached as Exhibit B.

15. On December 12, 2013, Solt informed Bump that COD wanted ACE to use Blackboard to teach the ACE classes remotely. Blackboard is a classroom management system used by COD to teach students remotely. Even though ACE did not own or use that system, they contacted Blackboard to begin ACE's integration with COD's Blackboard. See Ex. C 12-12-13 emails attached.

16. As part of the implementation of the Program, Cabai began work on submitting a Form 20 New Curriculum Form to the Illinois Community College Board ("ICCB") in December, 2013. See ICCB Form 20 attached as Ex. D. Cabai used the ACE curriculum to write COD's curriculum and communicated with Bump regarding some of the specifics of the curriculum required for the Program. See Ex. E 12-27-13 emails with curriculum attached.

17. On February 17, 2014, Cabai informed ACE that the curriculum based on the ACE model passed curriculum review. ACE was then invited to come to the Advisory Committee Meeting on March 20, 2014 to present the curriculum and the books to be used to teach the Program. See 2-17-14 emails attached as Exhibit F.

18. On February 27, 2014 Cabai requested that Kyle Black with YEHSS - who was assisting ACE with implementing COD's project - help her with the budget for the Program, which included costing per student and cost related to labs required. See 2-27-14 email attached as Exhibit F-1.

19. On March 13, 2014 Cabai scheduled her attendance for the ACE skill lab in Denver, Colorado in July 2014 as part of her training to teach the skill lab part of the Program. See Ex. G 3-13-14 email re lab for Cabai.

20. On March 17, 2014, Cabai sent an email to Keith Bump stating that ICCB wanted justification for hourly requirements for certain of the curriculum courses. Cabai requested that ACE come up with a statement of justification because the curriculum presented was the ACE curriculum. See Ex. H, 3-17-14 email re ICCB issues.

21. On April 23, 2014, Cabai informed ACE that the new Program curriculum had been accepted by the ICCB and COD and they were ready to begin the class. See 14-04-23 email from Cabai confirming attached as Exhibit I.

22. After being informed that COD would begin the class, Cabai asked ACE to scan its Self-Study (see Ex. J 5-5-14 email from Cabai) prepared by ACE for its successful accreditation with the Commission on Accreditation of Allied Health Professionals (See Ex. K ACE Self Study proposal) that COD could use as a template for accrediting the course ACE would be providing. The Self Study was a rather lengthy document which is highly proprietary in nature and which COD completely lacked any wherewithal to put together without ACE's assistance.

23. On May 29, 2014, Solt confirmed that ACE was set up with Blackboard which is required to teach the course. ACE responded that, based on going forward with teaching the Program at COD, Blackboard was scheduled to be installed. Ex. L 5-59-14 email.

24. In July, 2014, Cabai attended the Denver lab as planned. Though certain concerns were raised after Cabai attended the lab at ACE, the implementation of Blackboard proceeded at ACE and the concerns were addressed.

25. On Sept 8, 2014 ACE received an email stating that COD decided not to move forward with this relationship because it was unrealistic that Bump would be ready to teach the course for students starting January 2015. This was the first indication that the Program with ACE was not moving forward. See Ex. M, 8-9-14 email from Solt declining to participate in program.

26. Despite the exhaustive details and applications required to get a course started, in April 2015 COD announced the new Surgical Assistance Course. See Ex. N, College announces new degree.

27. In offering the Program, COD published the course requirements in their catalogue. See Ex. O, College Surgical assistant course description. In the course description, COD duplicated the course numbers and course content given to COD by ACE. See Ex. P, ACE course description.

28. A Demand and Notice of Claim letter was made by Counsel for ACE on December 23, 2014. See Notice of Claim attached as Ex. Q.

29. Counsel for COD responded on March 27, 2015, erroneously refuting many of the facts contained in the Demand letter. See Ex. R., response to notice of claim corresp..

## COUNT I
## BREACH OF CONTRACT AS TO COLLEGE OF DUPAGE

30. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-29 above.

31. Plaintiff and COD entered into a Contract whereby Plaintiff would provide all of the materials and teaching in conjunction with faculty at COD for the Program. This was confirmed in an email from Cabai to ACE on April 23, 2014 attached hereto as Exhibit I.

32. ACE performed all their duties under the contract, providing Program materials, instruction on how to staff and run the Program, and providing COD with all the information they needed to have the Program accredited.

33. ACE memorialized the terms of the Contract in a Consortium Agreement signed by Dan Bump, which states that ACE was to receive $4,100.00 per student from COD for a period of two years. Consortium Agreement attached as Ex. S.

34. COD breached the Contract when they terminated their relationship with ACE on September 8, 2014.

35. ACE suffered damages from COD's breach in an amount equal to two years' lost profits, costs spent on implementing the Program details, plus costs and fees for pursuing this case.

## COUNT II
## UNJUST ENRICHMENT AS TO COLLEGE OF DUPAGE

36. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-29 above.

37. ACE provided COD valuable proprietary information as follows:

    a. The ACE Program catalogue and curriculum (Ex. A)

    b. How the ACE labs would function for the Program (Ex. E)

    c. The ACE text books (Ex. F)

    d. The budgeting for the Program from ACE's experience (Ex. F-1)

    f. Attendance at the ACE lab workshop (Ex.G)

    g. The Self Study Report used for accreditation (Ex. K)

All of this information was unique to ACE (the "Proprietary Information") which COD did not have because they had little or no expertise in matters relating to the Program.

38. ACE provided this Proprietary Information with the understanding that COD would use the information in conjunction with the Program to be produced by ACE.

39. COD received, took possession of, and utilized the Proprietary Information provided by ACE and then used it for their own benefit without providing ACE any consideration.

40. When ACE gave COD the Proprietary Information, COD assumed the duty to work in conjunction with ACE to produce the Program and pay ACE for that service.

41. COD did not provide any consideration to ACE for the receipt of the Proprietary Information, used that Proprietary Information for their own benefit, and did not form a consortium with ACE to put on the Program that would have provided ACE with remuneration on a per student basis.

42. COD continues to be in possession of the Proprietary Information and did not provide AE with any consideration for that proprietary information.

43. Because COD continues to be in possession of and to utilize the Proprietary Information given to them by ACE, and has not paid for the Proprietary Information nor formed a consortium with

ACE in which ACE would be paid on a per student basis for providing services, COD was unjustly enriched and benefited at the expense of ACE.

WHEREFORE, ACE demands judgment against COD in excess of $75,000, including pre-judgment and post-judgment interest and the costs of this suit and for such other and further relief as this Court sees fit to grant.

## COUNT III
## FRAUD AS TO ALL DEFENDANTS

44. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-43 above.

45. COD, Cabai, Solt and Cameron (collectively referred to as the "Defendants") initially proposed to ACE that COD would work with ACE based on the Proprietary Information that ACE provided as to how to organize the Program to allow ACE to promote and run the Program at COD.

46. As a result of the Defendants' representations that ACE would conduct the Program at COD, ACE provided the Proprietary Information to the Defendants which was then utilized to put together the Program for COD.

47. The representations made by Defendants that AE would perform the Program at COD and receive payment on a per student basis were in fact false in that the Defendants could not and did not allow ACE to put on the Program.

48. The representations of Defendants were part of a scheme in which they used ACE's knowledge and expertise as well as their Proprietary Information to build their own Surgical Assistant Program that did not include ACE's participation nor would it allow ACE to receive payment for their efforts in putting together and conducting the Program.

49. When the Defendants made the representation about ACE conducting the Program, they knew those representations to be false and had no intention of performing them. This was part of a scheme to defraud ACE into giving Defendants the Proprietary Information without paying for it.

50. The representations that ACE would be able to conduct the Program at COD in return for payment on a per student basis were made by Defendants with the intent to defraud and deceive ACE and with the intent to induce ACE to act in the manner herein alleged. This was a scheme to induce ACE to give Defendants the Proprietary Information they needed to produce their own Surgical Assistant Program.

51. ACE, at the time these representations were made by Defendants and at the time Plaintiff took the actions herein described, was ignorant of the falsity of Defendants' representations and believed them to be true.

52. In reliance on Defendants' representations, ACE provided the Defendants with the Proprietary Information, then executed a new Note calling for $3,000.00 per month payments instead of $5,000.00 per month.

53. As a proximate result of Defendants' fraud and deceit and the facts herein alleged, ACE was damaged.

WHEREFORE, ACE requests that this Court issue judgment against Defendants, in a sum in excess of $75,000; for punitive damages; for costs of suit incurred herein; and for such other and further relief as the court may deem proper.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS

**(Against All Defendants)**

54. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-53 above.

54. The ACE Proprietary Information constituted trade secrets and confidential information, as set forth individually and collectively in the preceding paragraphs of the Complaint, and are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

55. At all times, ACE took reasonable measures to protect the ACE Proprietary Information including requesting that COD sign a non-disclosure statement. ACE derives economic value and competitive advantage from such information not being generally known to the public or trade.

56. There exists the threatened or actual misappropriation of trade secrets by the Defendants, acting individually and in concert, to acquire, disclose and/or use, by improper means, the ACE Proprietary Information for their own benefit and/or the benefit of others without or exceeding ACE's authorization and consent.

57. ACE sustained and will continue to sustain damages, and Defendants were and will continue to be unjustly enriched in an amount to be proven at trial, as a direct result of Defendants' threatened or actual misappropriation of the ACE Proprietary Information.

58. Defendants' threatened or actual misappropriation of the ACE Proprietary Information was willful and malicious and entitles ACE to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

59. ACE also is entitled to injunctive relief to prevent the threatened or actual misappropriation of the ACE Proprietary Information by Defendants pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

WHEREFORE, Plaintiff respectfully requests that this Court enter the following relief against Defendants:

    a.    enter judgment in favor of ACE on Count Four;

    b.    both preliminary and permanent relief pursuant to 765 ILCS 1065/1, et seq. restraining and enjoining COD and the Defendants from the threatened or actual misappropriation of the ACE Proprietary Information;

c. both preliminary and permanent relief pursuant to 765 ILCS 1065/1, et seq. restraining and enjoining COD and the Defendants from the threatened or actual misappropriation of the ACE Proprietary Information;

d. a finding that Defendants' acts and conduct constitute the actual or threatened misappropriation of trade secrets in violation of 765 ILCS 1065/1, et seq., and that such acts and conduct are and have been willful and malicious;

e. For such other relief as this Court sees fit to grant.

## COUNT V
## CONVERSION

60. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-59 above.

61. ACE has clear legal ownership and right to the Proprietary Information.

62. Defendants wrongfully misappropriated the Proprietary Information for their own benefit by using it to establish the Program which the Defendants could not have established without the Proprietary Information, all to ACE's detriment, and in violation of ACE s property rights.

63. As a proximate result of Defendants' acts of conversion, ACE was deprived of their property rights and suffered damages in excess of $500,000, or in an amount to be proved at trial.

64. The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

WHEREFORE, ACE respectfully requests that this Court enter judgment against Defendants for compensatory damages, in an amount to be determined at trial; for prejudgment interest at the highest legal rate from the date of the conversion; and for such other relief as this Court sees fit to grant.

## COUNT VI
## PROMISSORY ESTOPPEL

65. ACE re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-64 above.

66. The Defendants induced ACE to provide COD with the Proprietary Information based upon the Defendants' representation that they would establish the Program at COD and that ACE would teach the Program and receive a per student fee for those services.

67. In providing the Proprietary Information to the Defendants, ACE reasonably relied upon the Defendants promises to their significant detriment.

68. As a consequence of their reasonable reliance on the Defendants promises, ACE has been damaged in an amount to be determined at trial.

WHEREFORE, ACE respectfully requests that this Court enter judgment against Defendants for compensatory damages, in an amount to be determined at trial; for prejudgment interest at the highest legal rate from the date of the conversion; and for such other relief as this Court sees fit to grant.

    Respectfully Submitted
    American Center For Excellence In Surgical Assisting Inc.
    By: *Michael J. Davis*
        One of Their Attorneys

Michael J. Davis
BKN Murray LLP
1500 Eisenhower Ln., #800
Lisle, Ill. 60532
630-915-3999
mdavis@bknmurray.com