UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC., | ) ) ) | 15 C 7290 |
| Plaintiff, | ) ) | Judge Feinerman |
| vs. | ) ) | |
| COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE, THOMAS CAMERON, KAREN M. SOLT, and KATHY CABAI, | ) ) ) ) | |
| Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

American Center for Excellence in Surgical Assisting Inc. ("ACE") brought this diversity

suit against Community College District 502 ("District 502" or "District"), College of DuPage

("College" or "COD"), Thomas Cameron, Karen Solt, and Kathy Cabai for matters arising from

the College's efforts to establish an accredited surgical assistant certificate program. Doc. 1.

The complaint alleges breach of contract (Count I) and unjust enrichment (Count II) against the

College, and fraud (Count III), misappropriation of trade secrets under the Illinois Trade Secrets

Act ("ITSA"), 765 ILCS 1065/1 *et seq*. (Count IV), conversion (Count V), and promissory

estoppel (Count VI) against all Defendants. *Ibid*. Defendants have moved under Federal Rule of

Civil Procedure 12(b)(6) to dismiss the complaint. Doc. 20. The motion is granted with respect

to the unjust enrichment, conversion, and promissory estoppel claims, and otherwise is denied.

**Background**

In considering a Rule 12(b)(6) motion, the court assumes the truth of the complaint's

factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815

F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the

complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in ACE's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015). The facts are set forth as favorably to ACE as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). In so doing, the court does not vouch for the accuracy of those facts. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.,* 610 F.3d 382, 384 (7th Cir. 2010).

ACE operates a surgical assistant training program that is approved and accredited by the American Board of Surgical Assistants ("ABSA"). Doc. 1 at ¶¶ 1, 11. The program includes distance-learning, laboratory, and clinical internship components. *Id*. at ¶ 11. District 502 is an Illinois community college district created by the Illinois Public Community College Act, 11 ILCS 805/1 *et seq*. *Id*. at ¶ 2. The District operates the College, which is located in Glen Ellyn, Illinois. *Id*. at ¶ 3. Cameron, Solt, and Cabai are employees of the College; they are, respectively, Dean of the Health and Sciences Division, Associate Dean of the Health and Sciences Division, and Program Director in the Health and Science Center. *Id*. at ¶¶ 4-6.

In November 2013, seeking to create an ABSA-accredited surgical assistant program, the College contacted ACE. *Id*. at ¶ 12. On November 19 and 20, 2013, Cabai and Solt met with Keith Bump, ACE's National Enrollment Manager. *Id*. at ¶ 13; Doc. 1-1 at 1. On November 21, 2013, Bump emailed Cabai and Solt a "Consortium Proposal" for ACE's and the College's joint implementation of a surgical assistant program, along with a "program catalog, consortium agreement, and … syllabus." Doc. 1 at ¶ 13; Doc. 1-1. In response, Solt expressed interest in arranging a "Skype conference call" among various representatives of the College and ACE.

Doc. 1-2 at 1.  The Skype call, which included Cabai, Solt, Cameron, and representatives from ACE, took place on December 8, 2013.  Doc. 1 at ¶ 14.  On December 9, 2013, Bump and Solt exchanged emails.  Doc. 1 at ¶ 14; Doc. 1-2 at 2-3.  In her email, Solt said that the College was "ready to move forward on [its] part," which "consist[ed] of putting the curriculum through our college process and then on to the state's approval system."  Doc. 1-2 at 2.

Cabai used the standard ACE curriculum to write a proposed curriculum for the College, and during the process she communicated with and sought advice from Bump.  Doc. 1 at ¶ 16; Doc. 1-5.  On February 17, 2014, Cabai informed Bump that the "division curriculum committee" had approved the College's curriculum and that, though several levels of review remained, "[w]ord is already out we are offering" the surgical assistant program.  Doc. 1 at ¶ 17; Doc. 1-6 at 1.  On March 13, 2014, Cabai asked Bump and Kyle Black (an ACE consultant) for a statement justifying the credit hour requirements for certain courses in the curriculum, as the Illinois Community College Board ("ICCB") required it for curriculum approval.  Doc. 1 at ¶¶ 16, 18, 20; Doc. 1-9 at 1.  On April 23, 2014, Cabai informed ACE that the ICCB had approved the curriculum and that "we are ready to go."  Doc. 1 at ¶ 21; Doc. 1-10 at 1.

During the course of curriculum development, the College and ACE had several other contacts.  On December 12, 2013, Solt told Bump that the College would prefer that ACE use Blackboard, an online classroom management system, to teach students remotely.  Doc. 1 at ¶ 15; Doc. 1-3 at 1.  Bump replied that ACE did not typically use Blackboard but that it was "willing to do what it takes to make it work for" the College.  Doc. 1 at ¶ 15; Doc. 1-3 at 2.  Bump added that after the College expressed a desire to use Blackboard, ACE contacted Blackboard for assistance.  Doc. 1 at ¶ 15; Doc. 1-3 at 2.  Several months later, on May 29, 2014, Solt confirmed that ACE was prepared to use Blackboard, and Bump told Solt that it was soon to

3

be installed.  Doc. 1 at ¶ 23; Doc. 1-13.  ACE proceeded with the implementation and integration of Blackboard over Summer 2014.  Doc. 1 at ¶ 24.

In the meantime, on February 27, 2014, Cabai asked Black for help in preparing the budget for the College's surgical assistant program.  Doc. 1 at ¶ 18; Doc. 1-7.  On May 5, 2014, Cabai, noting that "all of the additional help you can provide will make [my] life easier," asked ACE to scan and send her its "Self-Study Report," a document prepared by ACE for its accreditation by the Commission on Accreditation of Allied Health Professionals.  Doc. 1 at ¶ 22; Doc. 1-11; Doc. 1-12.  That document is proprietary, and the College would not have been able to replicate it or create its own without ACE's assistance.  Doc. 1 at ¶ 22.  The same day, ACE sent the College a "Consortium Agreement" memorializing the terms of their relationship.  Doc. 1 at ¶ 33; Doc. 1-20.  (The agreement says on its face that it was "made and entered into on" May 5, 2013, Doc. 1-20 at 1, but because the College did not contact ACE until November 2013, and because the signature on the document is dated May 5, 2014, *id*. at 5, the court uses that date.)  From July 14-19, 2014, Cabai attended a "Surgical SkillLab," the laboratory portion of the ACE program, in Colorado.  Doc. 1 at ¶¶ 19, 24; Doc. 1-8.

On September 8, 2014, Solt emailed Keith Bump and Dan Bump, an executive at ACE and ACE's designated instructor for the distance learning portion of the College's program, to inform ACE that the College had "deci[ded] to decline to partner with ACE Surgical Assisting for" the program.  Doc. 1 at ¶ 25; Doc. 1-14.  Solt cited concerns that Dan Bump would not have time to receive "sufficient preparation for this delivery mode" and that the College was seeking "a contemporary curriculum."  *Ibid*.  Solt concluded that the program would not be ready for students in January 2015, and she thanked ACE "for the opportunity to consider this relationship."  *Ibid*.

4

In April 2015, the College announced that it would begin offering an online surgical assistance program. Doc. 1 at ¶ 26; Doc. 1-15. The course numbers for and content of the program duplicated the course numbers and content that ACE had provided to the College. Doc. 1 at ¶ 27; Doc. 1-16; Doc. 1-17 at 1-3. ACE numbered two of its courses 2501 and 2502, as ACE had. Doc. 1-16; Doc. 1-17. Those courses' content included basic surgical assisting principles, as the ACE courses did. Doc. 1-16; Doc. 1-17. The College's third course, "Surgical Assisting Research and Laboratory Practicum," replicated the ACE SkillLab that Cabai attended in Colorado. Doc. 1-16. The fourth course, "Surgical Assisting Clinical Internship," duplicated the clinical component of the ACE program. *Ibid.*

On December 23, 2014, having learned that the College planned to offer the program, ACE sent a demand letter and claim notice asserting that the College's proposed curriculum used ACE's proprietary information. Doc. 1 at ¶ 28; Doc. 1-18. On March 27, 2015, the College responded, denying ACE's claims and contending that that it would "offer a surgical assistant training program that is based on its own original curriculum and materials." Doc. 1 at ¶ 29; Doc. 1-19. On August 19, 2015, ACE filed this suit. Doc. 1.

### Discussion

Defendants argue that ACE has not pleaded viable contract and ITSA claims, and that ITSA preempts the other four claims. To survive a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Stapleton v. Advocate Health Care Network*, 817 F.3d 517, 521 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)); *see also Defender Security Co.*, 803 F.3d at 335 ("[A] plaintiff must provide only enough detail to give the defendant a fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is

plausible, rather than merely speculative, that he is entitled to relief.") (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Roberts v. City of Chicago*, 817 F.3d 561, 564-65 (7th Cir. 2016). "[A]ll this means is that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015) (internal quotation marks omitted). Because neither party raises a conflict of law issue, Illinois law governs. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014) ("Because the district court was sitting in diversity, it was obligated to apply the substantive law of the forum state."); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.") (internal quotation marks omitted).

## I.      Breach of Contract Claim (Count I)

"Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach of contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [the defendant] breached the contract by failing to adhere to its terms."). Defendants challenge only the first element, arguing that because the complaint neither attaches a contract signed by both

ACE and the College nor alleges that such a document exists, it does not adequately plead the existence of a valid and enforceable contract.  Doc. 20 at 9-10; Doc. 25 at 5-6.

To "have a valid contract … in Illinois, the only things necessary are an offer, an acceptance, and consideration."  *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 936 (7th Cir. 2011).  "No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance."  *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007). "The question of the existence of a contract is a matter of law for determination by the court." *Id*. at 849 (internal quotation marks omitted).  In determining whether a contract exists, a court's duty "is to give effect to the parties' intentions."  *Hess*, 784 F.3d at 1159 (internal quotation marks omitted); *see also A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 157 (7th Cir. 1989) ("Under Illinois law, courts focus on the parties' intention to determine whether an enforceable contract comes into being during the course of negotiations, or whether some type of formalization of the agreement is required before it becomes binding.").

The complaint alleges that ACE and the College "entered into a Contract whereby [ACE] would provide all of the materials and teaching in conjunction faculty at COD for the" surgical assistant program. Doc. 1 at ¶ 31.  To support this allegation, ACE refers to an April 23, 2014 email from Cabai to Black and Keith Bump informing them that the ICCB approved the College's proposed curriculum and that the program was "ready to go."  Doc. 1-10.  Defendants respond that because Cabai's email "does not outline any terms or conditions of a contract," it cannot constitute acceptance.  Doc. 20 at 9.

But the complaint also alleges that the May 5, 2014 Consortium Agreement, Doc. 1-20,

memorialized the terms of an earlier contract that ACE and the College had reached, including

that the College was to pay ACE $4,100.00 per student in the program for a period of two years.

Doc. 1 at ¶ 33. The copy of the Consortium Agreement attached to the complaint is signed on

ACE's behalf by Dan Bump but is not signed by any representative of the College. Doc. 1-20 at

5. According to Defendants, this renders the Consortium Agreement doubly problematic: first,

because there is no evidence that the College accepted its terms; and second, because even if

Cabai's April 23, 2014 email constituted the acceptance of a *previous* contract, the Consortium

Agreement was an attempt to modify the original contract, and ACE has not pleaded that the

College accepted the modified terms. Doc. 20 at 9-10.

Although Defendants "cannot be liable for breaching a contract that [they] did not make,"

*Hammarquist*, 809 F.3d at 952, their arguments fail to persuade. The complaint alleges in

extensive detail the terms of what ACE alleges to be its contract with the College:

> Ace's duties were to provide COD with an ABSA approved, distance-learning
> Surgical Assistant Program, provide documentation needed for the students to
> progress through the Program, provide presentation materials for the Program
> and provide a member of the ACE staff to coordinate this program with a
> designated member of the COD staff. COD's duties were to receive and
> process applications for admission, maintain student records and transcripts,
> grant certificates or degrees documenting satisfactory completion of the
> educational program; collect tuition and fees from all students; provide[]
> classroom space for the Program; designate a qualified member of COD
> Faculty to be Program Director to coordinate local activities of the Program;
> secure and maintain contractual relationships with the appropriate number of
> hospitals and surgicenters to allow all enrolled students to obtain and
> complete the required clinical experience to successfully complete the
> Program; collect student surveys with sufficient information to assess the
> Program; and pay any and all initial Program approval/accreditation
> application and maintenance fees and all associated expenses related to
> approval/accreditation.

Doc. 1 at ¶ 11; *see also id*. at ¶¶ 31-32. As noted above, the complaint further alleges that the

Consortium Agreement "memorialized"—not modified—that agreement. *Id*. at ¶ 33. ACE's

allegation that Cabai's email constituted acceptance of agreement and that the Consortium Agreement memorialized the agreement's terms is plausible, and it therefore sufficiently pleads the existence of a contract at the pleading stage.

Although the analysis could stop here, it bears mention that acceptance may have occurred even earlier. The sequence between November 21, 2013—when Keith Bump sent Cabai and Solt the consortium proposal, program catalog, consortium agreement, and syllabus (the offer)—and December 9, 2013—when Solt said that the College "was ready to move forward" (the acceptance)—by itself "provide[s] the factual 'grounds'" for ACE's claim that a contract was formed. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 547 (2007)). That is sufficient for ACE's "right to relief" for breach of contract to rise "above the speculative level," which is all that *Twombly* and *Iqbal* require. *See Bravo v. Midland Credit Mgmt.*, 812 F.3d 599, 601-02 (7th Cir. 2016).

"[I[n examining the facts and matching them up with the stated legal claims," the court gives "the plaintiff the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Bissessur*, 581 F.3d at 602-03 (internal quotation marks omitted). Construing all facts in ACE's favor, the parties' actions from their initial contact in November 2013 until the College's termination of the relationship on September 8, 2014 strongly suggest that a contract was formed and that both parties performed. Throughout those ten months, the College made demands of ACE, including that it integrate with Blackboard, aid the College in curriculum development, supply a statement justifying the credit hours in the proposed program that the College could submit to the ICCB, and provide the College with its proprietary Self-Study Report as the College prepared to seek accreditation. Doc. 1 at ¶¶ 15-16, 20, 22-23; Doc. 1-3 at 1-2; Doc. 1-9 at 1; Doc. 1-11; Doc. 1-12; Doc. 1-13. The College also kept ACE abreast of

developments in the approval process for the program, seeking input along the way.  Doc. 1 at

¶¶ 16-17, 21; Doc. 1-6 at 1; Doc. 1-10 at 1.  ACE provided information when requested or

required and incurred expense in pursuing related initiatives, including Blackboard.  The

complaint gives no reason to believe that ACE was aiding the College out of altruism.

As for the May 5, 2014 Consortium Agreement, the complaint not only alleges that it

memorialized rather than modified the parties' previously reached agreement, but also gives rise

to the reasonable inference that the parties operated by its terms for several months, until the

College terminated it in September 2014.  Doc. 1 at ¶¶ 33-34.  During that period, Solt confirmed

that ACE was integrated with Blackboard, Cabai attended the ACE SkillLab, ACE continued to

implement Blackboard, and the College communicated concerns about that implementation to

ACE, which ACE addressed.  *Id*. at ¶¶ 23-24; Doc. 1-13.  Thus, whether the Consortium

Agreement memorialized or modified the terms of the College's and ACE's contract, the alleged

"actions of the principals both during and after" ACE sent it to the College suggest that the

parties intended to and did form a contract.  *A/S Apothekernes Laboratorium*, 873 F.2d at 157.

That alone distinguishes this case from *Razor Capital v. Antaal*, 972 N.E.2d 1238 (Ill. App.

2012), which the College cites, Doc. 20 at 9; Doc. 25 at 5; the complaint in that case "include[d]

no allegations or documents reflecting" the defendant's acceptance of the terms of a "generic

agreement" attached to the complaint.  *Id*. at 1247.

As ACE has adequately alleged the formation of a valid contract, and because Defendants

have not challenged any other element of ACE's contract claim, the claim survives dismissal.

**II.      ITSA Misappropriation of Trade Secrets Claim (Count IV)**

"To prevail on a claim for misappropriation of a trade secret under" ITSA, ACE "must

demonstrate that the information at issue was a trade secret, that it was misappropriated, and that

it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342

F.3d 714, 721 (7th Cir. 2003). ITSA defines "trade secret" as follows:

> (d) "Trade secret" means information, including but not limited to, technical
> or non-technical data, a formula, pattern, compilation, program, device,
> method, technique, drawing, process, financial data, or list of actual or
> potential customers or suppliers, that:
>
>> (1) is sufficiently secret to derive economic value, actual or potential,
>> from not being generally known to other persons who can obtain
>> economic value from its disclosure or use; and
>>
>> (2) is the subject of efforts that are reasonable under the circumstances
>> to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). "The second requirement, that the plaintiff take reasonable efforts to

maintain the secrecy of the information, prevents a plaintiff who takes no affirmative measures

to prevent others from using its proprietary information from obtaining trade secret protection."

*Learning Curve Toys*, 342 F.3d at 722.

The complaint alleges that Defendants misappropriated "ACE Proprietary Information,"

which the complaint defines as "trade secrets and confidential information" that "are statutory

'trade secrets' protected by" ITSA. Doc. 1 at ¶ 54. The term is defined to include the ACE

program catalogue and curriculum, information about how ACE laboratories would function for

the College's program, ACE text books, budgeting for a surgical assistant program based on

ACE's experience, Cabai's attendance at the ACE SkillLab, and the Self-Study Report for

accreditation. *Id*. at ¶ 37. The complaint further alleges that ACE "took reasonable measures to

protect the ACE Proprietary Information[,] including requesting that COD sign a non-disclosure

statement," and that "ACE derives economic value and competitive advantage from such

information not being generally known to the public or trade." *Id*. at ¶ 55.

Defendants contend that the ITSA claim fails because ACE "has alleged that it did

nothing to protect its Proprietary Information" other than asking the College to sign a non-

11

disclosure statement, because ACE has not alleged that any defendant signed a non-disclosure statement, and because the complaint does not attach a copy of the non-disclosure statement. Doc. 20 at 12. Defendants also argue that an unsigned non-disclosure statement is not evidence of reasonable measures of protection under the ITSA. *Ibid*. (citing *Gillis v. Associated Indus., Inc. v. Cari-All, Inc.*, 564 N.E.2d 881, 886 (Ill. App. 1990)).

Defendants' arguments fail at the pleading stage. "[O]nly in an extreme case can what is a 'reasonable' precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Learning Curve Toys*, 342 F.3d at 725 (internal quotation marks omitted); *see also Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Typically, what [protective] measures are reasonable in a given [trade secret] case is an issue for a jury."). Moreover, in addition to requesting the non-disclosure statement, the College repeatedly had to request information from ACE—about the curriculum, budgeting for the program, and the Self-Study Report. This suggests that ACE's precautions were reasonable, as a potential competitor interested enough in the program to invest considerable time and money in replicating it could not obtain the information other than from ACE directly, and ACE did not provide the College with these items except upon specific request. The Consortium Agreement also provides that the College "shall not copy or reproduce anything provided by ACE without ACE's written permission." Doc. 1-20 at 3. Those facts, taken together, plausibly allege that ACE took reasonable measures to protect its trade secrets. *See Learning Curve Toys*, 342 F.3d at 725-26 (holding that an oral confidentiality agreement constituted a reasonable effort to protect trade secrets); *Alpha Sch. Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1146-47, 1154 (Ill. App. 2009) (same for a plaintiff who "'repeatedly' demanded" that the defendants "return the information upon termination of their employment"); *Elmer*

*Miller, Inc. v. Landis*, 625 N.E.2d 338, 342 (Ill. App. 1993) (same for a business that provided files only to a small number of employees and stressed to them the confidentiality of those files); *Jones v. Ulrich*, 95 N.E.2d 113, 117-18 (Ill. App. 1950) (same for an inventor who shared drawings of a phosphate spreader upon the defendant's request, explaining that "[w]hile there was no express agreement that defendant was to hold the information so disclosed as a confidential matter … such an agreement was implied"); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) ("The mere fact that Rockwell gave piece part drawings to vendors—that is, disclosed its trade secrets to a limited number of outsiders for a particular purpose—did not forfeit trade secret protection.") (internal quotation marks omitted).

As Defendants challenge no other element of the ITSA claim, the claim survives dismissal.

## III.    ITSA Preemption of the Remaining Claims

Defendants contend that ITSA preempts ACE's four remaining claims: unjust enrichment, fraud, conversion, and promissory estoppel. Doc. 20 at 3-8; Doc. 25 at 1-5. ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). However, ITSA does not preempt "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8(b)(1)-(2). Under ITSA, common law "claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005); *see also id.* at 405 ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public

record.").  Although "ITSA mostly codifies rather than modifies the common law doctrine that preceded it," *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995), a plaintiff cannot plead in the alternative to avoid ITSA preemption.  As the Seventh Circuit recently held, citing *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (Ill. App. 1998): "Illinois courts have read the preemptive language in the ITSA to cover claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." *Spitz*, 759 F.3d at 733.

ACE urges this court not to follow the standard articulated in *Spitz*, arguing that "Illinois courts have declined to follow *Pope*," the Illinois case upon which *Spitz* relied.  Doc. 24 at 3-4, 6.  In support, ACE cites *Miller UK Ltd. v. Caterpillar Inc.*, 859 F. Supp. 2d 941 (N.D. Ill. 2012).  As a federal district court decision, *Miller* has only persuasive, not precedential, value.  *See Hecny*, 430 F.3d at 404 ("Decisions of federal district courts on state law have neither authoritative nor precedential force.").  And *Miller*'s persuasive value is nil, given that it predates the Seventh Circuit's reliance on *Pope* in *Spitz*.  This court is bound to and will follow *Spitz*.  *See Luna v. United States*, 454 F.3d 631, 636 (7th Cir. 2006) ("the district court [when applying state law] should not be making contrary predictions when this court has ruled squarely on the matter").

ACE also argues that the ITSA preemption standard articulated in *Spitz* cannot be reconciled with the Seventh Circuit's prior decision in *Hecny*.  Doc. 24 at 3-5.  But there is no dissonance between the two decisions.  *Hecny* holds that ITSA preempts only claims that rest on misappropriation of trade secrets, not other common law claims that would lie even if no trade secrets were at issue.  430 F.3d at 404-05.  *Spitz* restates the same principle with more

specificity, noting that the ITSA preempts unjust enrichment claims that are "based on misappropriation of a trade secret." 759 F.3d at 733. The two decisions are congruent.

As noted, the complaint defines ACE Proprietary Information as "trade secrets and confidential information" that are "statutory 'trade secrets' protected by the Illinois Trade Secrets Act." Doc. 1 at ¶ 54. The term includes the ACE program catalogue and curriculum, information about how ACE laboratories would function for the College's program, ACE text books, budgeting for a surgical assistant program based on ACE's experience, Cabai's attendance at the ACE SkillLab, and the Self-Study Report for accreditation. *Id.* at ¶ 37. Each of ACE's non-contract common law claims incorporates this definition. *Id.* at ¶¶ 36-37, 44-46, 60-62, 65-67. The pertinent question, then, is whether those claims would stand even if the ACE Proprietary Information was not alleged to be a trade secret. *See Hecny*, 430 F.3d at 404-05; *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015 WL 3637740, at *16 (N.D. Ill. June 12, 2015); *SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, at *7 (N.D. Ill. Feb. 7, 2014); *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *7 (N.D. Ill. Nov. 11, 2013); *Charles Schwab & Co., Inc. v. Carter*, 2005 WL 2369815, at *4 (N.D. Ill. Sept. 27, 2005) (collecting cases). Put another way: are ACE's common law claims solely "based on misappropriation of a trade secret," *Spitz*, 759 F.3d at 733, or do they "seek[] recovery for wrongs beyond the mere misappropriation," *Charles Schwab*, 2005 WL 2369815, at *4 (internal quotation marks omitted)?

### A.      Unjust Enrichment Claim (Count II)

Under Illinois law, unjust enrichment "is a remedy that lies where a defendant has unjustly retained a benefit to the plaintiff's detriment and the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Blythe Holdings,*

*Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (alteration and internal quotation marks omitted). The complaint alleges that ACE furnished the College with the Proprietary Information, but that the College "did not provide any consideration to ACE for the receipt of the Proprietary Information, used that Proprietary Information for [its] own benefit, and did not form a consortium with ACE to put on the Program that would have provided ACE with remuneration on a per student basis." Doc. 1 at ¶¶ 36-38, 41. The claim does not allege or even suggest that Defendants were unlawfully enriched through ACE's knowledge, expertise, or anything beyond the Proprietary Information; it is thus predicated entirely on ACE's ownership of the Proprietary Information. ACE's opposition brief does not argue or suggest otherwise, thus forfeiting the point. *See G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a discrete issue ….") (citations omitted).

It follows that the unjust enrichment claim essentially restates ACE's claim for misappropriation of trade secrets. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) ("Illinois has abolished all common law theories of misuse of [secret] information. Unless defendants misappropriated a (statutory) trade secret, they did no

16

legal wrong.") (citation omitted).   Because "unjust enrichment … claims, when based on misappropriation of a trade secret, have been replaced under Illinois law by" ITSA, ITSA preempts the unjust enrichment claim.  *Spitz*, 759 F.3d at 733; *see also ibid*. ("Because unjust enrichment [claims] … are essentially claims for restitution, Spitz's claim fails.") (citing *Pope*, 694 N.E.2d at 619); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1297-98 (11th Cir. 2003) (holding that the Georgia Trade Secrets Act, which like ITSA is based on the Uniform Trade Secrets Act of 1985, superseded an unjust enrichment claim founded on misappropriation of a trade secret).  As noted above, this is so regardless of whether the Proprietary Information actually is a trade secret.  *See Spitz*, 759 F.3d at 733.

### B.  Fraud Claim (Count III)

"A claim of common-law fraud under Illinois law requires proof of five elements: (1) a false statement of material fact, (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from the reliance on the statement." *Massuda v. Panda Express, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) (internal quotation marks omitted).  Count III alleges that the College, Cabai, Solt, and Cameron knowingly misrepresented their interest in and the terms of their collaboration with ACE, which in turn led ACE to provide Defendants with ACE's "knowledge and expertise[,] *as well as* their Proprietary Information."  Doc. 1 at ¶ 48 (emphasis added); *see id*. at ¶¶ 45-52.

Defendants contend that ACE's fraud claim amounts only "to a claim that Defendants misrepresented, concealed, and lied about taking and using the Proprietary Information."  Doc. 20 at 6-7.  But as the emphasized test in the above-quoted allegation suggests, ACE's fraud claim is not limited to the Proprietary Information.  Defendants' alleged misrepresentation induced and

17

deceived ACE into providing not only its Proprietary Information, but also its knowledge and expertise, which may encompass and be related to but also extends beyond the allegedly misappropriated trade secrets. Put another way, Defendants' alleged fraud was not only a scheme to misappropriate ACE's trade secrets, but also led ACE to expend labor and cash in reliance on Defendants' misrepresentations. For example, because Defendants allegedly represented that integration with Blackboard was necessary for the parties' partnership to continue, ACE incurred considerable time and expense embarking on the integration. In short, ACE's allegation that Defendants induced ACE to provide its knowledge and expertise to help build the College's own surgical assistance program while representing that it would partner with ACE would state a fraud claim even if ACE had not provided Defendants with its Proprietary Information. *See Hecny*, 430 F.3d at 404-05; *Abanco Int'l, Inc. v. Guestlogix Inc.*, 486 F. Supp. 2d 779, 781-82 (N.D. Ill. 2007) (holding that a complaint alleging that the plaintiff provided the defendant with information "including" trade secrets did "not restrict its claims to the misappropriation of trade secrets," because it "potentially include[d] other" information as well). It follows that ITSA does not preempt the fraud claim.

### C. Conversion Claim (Count V)

"To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008) (internal quotation marks omitted); *see also Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (same). ACE alleges that it legally owns the Proprietary Information, that Defendants "wrongfully misappropriated" it, and that the College's

establishment of its own surgical assistant program as a result of the wrongful misappropriation violated ACE's property rights. Doc. 1 at ¶¶ 61-62. ACE does not assert that any of the Proprietary Information's physical manifestations (such as text books, *id*. at ¶ 37) are relevant to the claim; nor does it allege in the complaint or argue in its brief that Defendants converted any non-proprietary information or any property other than the Proprietary Information. As a result, the conversion claim, as its language ("wrongful misappropriation") suggests, restates the claim for misappropriation of trade secrets and is preempted by ITSA. *See Spitz*, 759 F.3d at 733; *Hecny*, 403 F.3d at 404-05; *CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567223, at *3 (N.D. Ill. Feb. 27, 2008) (holding that although ITSA did not preempt a conversion claim that relied on physical misappropriation of cardiac outpatient kits, the claim was "preempted to the extent it alleges conversion of confidential, proprietary, and trade secret information derived from the contents of the … kits," because "[t]his aspect of [the] claim [was] merely a restatement of its trade secret misappropriation claim."); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) ("Count 11 is a conversion claim, alleging that defendants assumed unauthorized control over plaintiff's property. The property in question, however, is software and design plans. These are among the trade secrets that were allegedly misappropriated …. This claim is really just another way of charging that defendants took AutoMed's secret information, for which ITSA is the exclusive remedy.").

### D. Promissory Estoppel (Count VI)

Under Illinois law, a promissory estoppel plaintiff must allege that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (quoting *Newton*

*Tractor Sales, Inc. v. Kubota Tractor Corp.,* 906 N.E.2d 520, 523-24 (Ill. 2009)) (internal

quotation marks omitted). The complaint alleges that Defendants "induced ACE to provide

COD with the Proprietary Information based upon the Defendants' representation that they

would establish the Program at COD and that ACE would teach the Program and receive a per

student fee for those services." Doc. 1 at ¶ 66. As a result, "[i]n providing the Proprietary

Information to the Defendants, ACE reasonably relied upon the Defendants['] promises to

[ACE's] significant detriment." *Id*. at ¶ 67. The promissory estoppel claim does not allege that

ACE suffered damages for any reason other than its reasonable reliance on Defendants'

promises, and it does allege that such reliance manifested itself only in ACE's furnishing

Defendants with its Proprietary Information. Like the unjust enrichment and conversion claims,

then, the promissory estoppel claim restates the claim for misappropriation of trade secrets.

      In response, ACE makes two arguments, both of which fail. First, ACE reiterates its

meritless argument that this court should follow *Miller* rather than *Spitz*. Doc. 24 at 3-5.

Second, ACE contends that ITSA "does not preclude common law claims for defalcations of

property and interests not deemed to be trade secrets." *Id*. at 5. That accurately states the law,

but it does not accurately describe ACE's promissory estoppel (or unjust enrichment or

conversion) claim, because the claim rests solely on "conduct that it said to misappropriate trade

secrets." *Hecny*, 430 F.3d at 404-05. As a result, ITSA preempts the promissory estoppel claim.

*See Lucini Italia Co. v. Grappolini*, 2003 WL 1989605, at *22 (N.D. Ill. Apr. 28, 2003) (holding

that ITSA preempted a promissory estoppel claim for which "[a]ll facts [were] part of the same

trade secret theft" as a misappropriation of trade secret claim); *Top Agent Network, Inc . v.

Zillow, Inc.*, 2015 WL 7709655, at *6-7 (N.D. Cal. Apr. 23, 2015) (holding that the California

Uniform Trade Secrets Act preempted a promissory estoppel claim "based on disclosure of

unspecified 'confidential information'"); *Indigo Moon Prods., LLC v. Hasbro, Inc.*, 2006 WL 3375356, at *5 (W.D. Ky. Nov. 17, 2006) (holding that the Kentucky Uniform Trade Secrets Act preempted a promissory estoppel claim in which the plaintiffs "wishe[d] to recover from a promise made by the Defendants that induced them into turning over their trade secrets"). Any other arguments ACE might have asserted to defend its promissory estoppel claim are forfeited. *See G&S Holdings*, 697 F.3d at 538; *Milligan*, 686 F.3d at 386; *Alioto*, 651 F.3d at 721.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to the unjust enrichment (Count II), conversion (Count V), and promissory estoppel (Count VI) claims, and otherwise is denied. The unjust enrichment, conversion, and promissory estoppel claims are dismissed without prejudice. If ACE wishes to replead those claims, it has until June 22, 2016 to do so. If ACE repleads any or all of those claims, Defendants will have until July 6, 2016 to answer or otherwise plead to the repleaded claims and to answer the other claims. If ACE does not replead any of the dismissed claims, Defendants will have until June 29, 2016 to answer the surviving portions of the complaint.

June 7, 2016

_____
United States District Judge