1       IN THE UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF ILLINOIS

3          EASTERN DIVISION

4

5  AMERICAN CENTER FOR     )
   EXCELLENCE IN SURGICAL   )
6  ASSISTING INC.,       )
       Plaintiff,     )
7   vs.             )  No. 1:15-CV-07290
   COMMUNITY COLLEGE     )
8  DISTRICT 502, COLLEGE OF )
   DUPAGE, DR. THOMAS    )
9  CAMERON, DR. KAREN M.   )
   SOLT, and DR. KATHY    )
10 CABAI,             )
       Defendants.    )
11       The continued deposition of DANIEL BUMP,

12 called for examination pursuant to the Rules of

13 Civil Procedure for the United States District

14 Courts pertaining to the taking of depositions,

15 taken before Patricia L. Wangler, Certified

16 Shorthand Reporter in the State of Illinois, at

17 180 North Stetson Avenue, Chicago, Illinois, on

18 April 5, 2017, commenced at the hour of 10:12 a.m.,

19 and terminated at the hour of 12:27 p.m.

20

21             SESSION II

22

23 Reported By:  Patricia L. Wangler, CSR

24 License No.:  084-002417



1    APPEARANCES:

2        DLG LAW GROUP,  by

3        MR.  MICHAEL J.  DAVIS

4        2777 Finley Road, Suite 12

5        Downers Grove, Illinois  60515

6        (303) 758-5100

7        mdavis@dlglaw.net

8            Representing the Plaintiff,

9

10       SCHUYLER,  ROCHE & CRISHAM, P.C., by

11       MR.  MICHAEL T.  ROCHE

12       180 North Stetson Avenue, Suite 3700

13       Chicago, Illinois  60601

14       (312) 565-2500

15       mtroche@srcattorneys.com

16           Representing the Defendants.

17

18

19

20

21

22

23

24



```
 1                    I N D E X

 2   WITNESS                        EXAMINATION

 3   DANIEL BUMP

 4        By Mr. Roche                  258

 5

 6

 7                  E X H I B I T S

 8   NUMBER                        MARKED FOR ID

 9   D. Bump Deposition

10        Exhibit No. 34               259

11        Exhibit No. 35               267

12        Exhibit No. 36               277

13        Exhibit No. 37               296

14        Exhibit No. 38               297

15        Exhibit No. 39               299

16        Exhibit No. 40               300

17        Exhibit No. 41               306

18        Exhibit No. 42               322

19        Exhibit No. 43               323

20        Exhibit No. 44               324

21

22        (EXHIBITS RETAINED BY MR. ROCHE)

23

24
```



1    MR. ROCHE:  Let the record reflect that this is

2    the continued deposition of Dan Bump.  It was

3    continued from yesterday until today.

4          Mike, at the end of yesterday's

5    deposition, I asked the court reporter Gina to

6    identify to me how much time I have left.

7    MR. DAVIS:  Okay.

8    MR. ROCHE:  She said 80 minutes.

9    MR. DAVIS:  Okay.

10   MR. ROCHE:  My thought is I probably only have

11   depending on how the testimony goes, about a

12   half hour to 45 minutes.

13   MR. DAVIS:  Okay.

14   MR. ROCHE:  And then we can move over into the

15   corporate 30(b)(6).

16   MR. DAVIS:  Well, as we discussed yesterday you

17   have already done a lot of the 30(b)(6) in terms of

18   those questions.

19   MR. ROCHE:  Well, assuming -- yes, we have

20   covered a substantial amount of the topics

21   identified.  That is true.  However, there are some

22   topics that at least Mr. Bump yesterday represented

23   that he does not have sufficient knowledge to

24   testify to.



1          So unless Mr. Bump has spent the last

2    12 hours or so educating himself on certain of the

3    topics, we are going to have to, you know, probably

4    have Keith Bump serve as a corporate rep for those

5    topics.

6          MR. DAVIS:   That's fine.

7          MR. ROCHE:   And we can get to that when we

8    start the corporate representative deposition.

9          MR. DAVIS:   To the extent that those are

10   corporate topics at all so --

11         MR. ROCHE:   That were identified in the notice.

12         MR. DAVIS:   Right.

13         MR. ROCHE:   Yes.

14                    DANIEL BUMP,

15   called as a witness herein, having been previously

16   duly sworn, was examined and testified as follows:

17                    EXAMINATION

18   BY MR. ROCHE:

19     Q.    We left off yesterday, Mr. Bump, with

20   testimony from you on the Nondisclosure Agreement

21   that was sent to the College of DuPage in May of

22   2014.   Do you recall that testimony?

23     A.    Yes.

24     Q.    Okay.



1    MR. ROCHE:   This will be Exhibit No. 34.

2                        (Whereupon, D. Bump Deposition

3                        Exhibit No. 34 was marked for

4                        identification.)

5    BY MR. ROCHE:

6        Q.    Do you see what has been marked as No. 34

7    to your deposition, Mr. Bump?

8        A.    Yes.

9        Q.    It's an email dated June 26 -- well, at

10   least the top of the first -- the most recent email

11   thread on this email thread is June 26, 2014.   Do

12   you see that, Mr. Bump?

13       A.    Yes.

14       Q.    Okay.   I direct your attention to the one

15   immediately below from Kathy Cabai to Keith Bump.

16   Do you see that?

17       A.    I thought that's the one you had -- were

18   alluding to.

19       Q.    The initial one was from Keith forwarding

20   the email to you.

21       A.    The one on top?

22       Q.    Yes.

23       A.    Okay.

24       Q.    Do you recall receiving and reviewing this



1    email?

2         A.    Yes.

3         Q.    Now, below that from Keith Bump to Kathy

4    and Karen Solt, that email is dated

5    June 25th, 2014?

6         A.    Yes.

7         Q.    By that time had the College of DuPage

8    signed the May 5th Consortium Agreement?

9         A.    No.

10        Q.    Six weeks had passed.  Were you personally

11   getting nervous that the College of DuPage was not

12   going to sign a Consortium Agreement?

13        A.    As I testified before, I was already

14   acting under the assumption that we had an

15   agreement.

16        Q.    Agreement that was consummated on

17   December 9th, 2013?

18        A.    Yes.  In my mind the written agreement, if

19   we ever got one, was going to be just a formality.

20        Q.    Were you nervous as of June 26, 2014, that

21   the College of DuPage was not going to sign a

22   written Consortium Agreement?

23        A.    No.  I was -- the only time I became

24   nervous is when Kathy Cabai came to the lab and



Daniel Bump 04/05/2017

1    started behaving the way she was.

2         Q.    If you look at the email from Kathy to

3    Keith on Bates stamp ACE0364, in the middle of that

4    document, Kathy notes that Karen is out of town

5    until July 14th.  I will forward this to Tom also.

6    Do you know what this -- do you know what Kathy was

7    referring to when she said this?

8         A.    I assume the previous email.

9         Q.    Kathy goes on to write I know legal here

10   can sometimes take a little while.  You testified

11   yesterday that Miss Cabai told you that legal had

12   to approve the written contract?

13        A.    Right.

14        Q.    Okay.  Is it fair to say then that you

15   were aware all along that Kathy Cabai on her own

16   did not have the authority to bind the College of

17   DuPage to any written contract?

18        A.    Well, I know that everybody else I have

19   ever dealt with while they could approve a

20   contract, they had to get the imfamatur [sic] of

21   their legal department.

22        Q.    I am sorry, the what?

23        MR. DAVIS:  Imprimatur.

24        THE WITNESS:  I probably said that wrong.



1   Sorry.

2        MR. DAVIS:  You should know what that means.

3        MR. ROCHE:  How do you know I am Catholic?

4        MR. DAVIS:  Because your name is Roche.  You

5   are from Chicago.  Come on.

6   BY MR. ROCHE:

7        Q.   Approval, is that --

8        A.   They had to rubber stamp it.  In fact, I

9   believe in one of the previous emails it was even

10  said legal has to rubber stamp this contract.

11       Q.   The word -- the phrase "rubber stamp" was

12  used in a previous email?

13       A.   Yes.

14       Q.   Is this an email that we discussed

15  yesterday?

16       A.   It's -- I saw it yesterday in one of the

17  emails.  We didn't discuss it.

18       Q.   If you don't mind, if you could go through

19  and look at the previous exhibits where that said

20  that.

21       MR. DAVIS:  Surely you have a program that can

22  do that; can't you?

23       MR. ROCHE:  I do.  And I don't recall ever

24  coming across an email to the effect that Mr. Bump



Daniel Bump 04/05/2017

1    just testified to.

2    BY MR. ROCHE:

3        Q.    Mr. Bump, could it be the Keith Black memo

4    of February 21st?

5        A.    I don't remember which memo it was.

6        Q.    I will show you this.

7            I am sorry, if I said Keith Black, I meant

8    the Kyle Black memo.

9            Mr. Bump.

10        A.    That's -- looks exactly what I saw.

11        Q.    Does it state in that, which is

12    Exhibit 19, that the legal department approval

13    would be a rubber stamp process?

14        A.    The curriculum committee review.  It

15    mentions it a couple times.  It seems like it's --

16    I don't know if it is all over.  But it is

17    mentioned at least two times that a process.  And I

18    don't know if it was legal process.

19        Q.    Does it state the legal approval process

20    would be a rubber stamp?

21        A.    It doesn't specifically say those words,

22    no.

23        Q.    Did Kathy Cabai author the memo that is

24    appended as Exhibit 19 to your deposition?



1     A.    Which one is 19?

2     Q.    That one.

3     A.    This one?  Could you reask the question,

4  please.

5                        (Whereupon, the record was

6                        read as requested.)

7     THE WITNESS:   No, it was from Kyle Black.

8  BY MR. ROCHE:

9     Q.    Okay.  In your past dealings with other

10 prospective consortium partners, I think you

11 mentioned that it was -- you were aware that legal

12 oftentimes had to review and approve the proposed

13 agreement?

14    A.    Well, that was a discussion between me and

15 Keith.  I don't know if Keith was just saying what

16 usually occurs or if he had specific conversation

17 with those people and was relating it to me.

18    Q.    Keith would be the one with the most

19 knowledge as to ACE's understanding of the approval

20 process with other third parties?

21    A.    No, I'm not saying that.  I'm just saying

22 he expressed his opinion that he would probably

23 have to go through the legal department.

24    Q.    For the College of DuPage?



1    A.    No, for the other -- I thought we were

2  talking about the other --

3    Q.    I'm sorry.  And had there ever been any

4  instances to your knowledge where the written

5  proposal that was transmitted to a third party was

6  sent to legal and reviewed and then came back with

7  changes?

8    A.    We have never gone through that process in

9  a consortium relationship before.  This would be

10  the first time.

11    Q.    Had you gone through the process in other

12  relationships aside from a consortium relationship?

13    A.    With hospitals, for clinical affiliation

14  agreements.

15    Q.    And how would that process work?  What is

16  your understanding of how that process would work?

17    A.    Well, it depends on the hospital we are

18  working for.  Some were more emphatic that it had

19  to go through the legal department to get it

20  approved.  Others, they could just sign it, and it

21  would be fine.

22    Q.    For the ones that were emphatic that it

23  had to go through the legal department, were there

24  instances to the best of your recollection in which



Daniel Bump 04/05/2017

1    the contract that came back had changes from the

2    legal department?

3         A.    Rarely.

4         Q.    But it has happened before?

5         A.    It was usually their contract so --

6         Q.    It has happened before though?

7         A.    It would -- I can't remember specific

8    instances except that, yes, it sometimes does come

9    back with changes, specifically if it was our

10   contract and they were reviewing our contract.

11            The difference here being that a clinical

12   affiliation agreement can't be verbal contracts.

13   The contract had to be in writing according to

14   approval and accreditation processes.

15        Q.    Was it your understanding in ACE's

16   relationship with the College of DuPage that the

17   College of DuPage had the ability to enter into a

18   verbal contract?

19        A.    I never gave it any thought until it

20   actually happened, and then I didn't question that

21   at all.  It felt strong to me, like there was -- it

22   was part of their process.

23        Q.    Getting back to this email, was it ever

24   communicated to you, Mr. Bump, who was going to



1    sign the May 5th Consortium Agreement?

2         A.    No.    That was never made clear.

3         Q.    Were you ever advised that someone in the

4    legal department at the College of DuPage would be

5    signing the Consortium Agreement?

6         A.    No.    It was made clear that was just a

7    review process.

8                        (Whereupon, D. Bump Deposition

9                         Exhibit No. 35 was marked for

10                        identification.)

11   BY MR. ROCHE:

12        Q.    I show you what has been marked as

13   Exhibit No. 35 to your deposition.    This is an

14   email thread.    The most recent email on this thread

15   being July 8th, 2014.    I direct your attention,

16   Mr. Bump, to Miss Cabai's email to Keith at

17   9:04 a.m. on the first page of this exhibit.    In

18   this email Kathy states that it will not be signed

19   prior to me coming to the lab.    Do you know what it

20   is being referred to?

21        A.    The clinical -- I mean the Consortium

22   Agreement.

23        Q.    Were you made aware from Keith or anyone

24   else at ACE that ACE would not have a signed



1    written contract from the College of DuPage prior

2    to Kathy attending the Denver Skills Lab?

3        A.    Yes.

4        Q.    What was your reaction upon hearing that

5    news?

6        A.    I don't really recall.  It might not have

7    been great.

8        Q.    What do you mean by that?

9        A.    Because I would have liked everything to

10   have been not only with a verbal contract but

11   finalized since we were moving in that direction to

12   getting a final written contract in addition to the

13   verbal version.

14       Q.    Were you concerned at all that the College

15   of DuPage would not actually sign the written

16   document that was submitted on May 5th, 2014?

17       A.    Well, I had no indication at that time

18   that -- other than just my desire to have

19   everything in writing, I had no concern up until

20   the point where Kathy came to the lab and started

21   behaving as though -- in a much different way than

22   she had been before to raise my -- you know,

23   questions in my mind.

24       Q.    As of this date nearly -- actually over



Danrel Bump 04/05/2017

```
 1    two months had passed since ACE submitted the
 2    Nondisclosure Agreement to the college for the
 3    college's signature.  And as of July 8, 2014, the
 4    College of DuPage had not signed the Nondisclosure
 5    Agreement.  Do you recall your state of mind as of
 6    July 8, 2014, as it pertains to the fact that the
 7    college had not signed a Nondisclosure Agreement?
 8         A.    Just the same, all the formalities having
 9    covered those, my main concern.
10         Q.    Was it your belief at this time that the
11    college had agreed to sign the Nondisclosure
12    Agreement?
13         A.    No.  They -- their only response was that
14    it's in the legal department for review.  And Kathy
15    in one of -- I will have to look through them all
16    again, but Kathy made the response that things can
17    take a little bit of time in legal.  And that was
18    her ongoing response.
19              And Kathy -- I mean you have met Kathy.
20    She at least comes across as though she has great
21    authority.  And whether or not that's true as I
22    look back on it, I don't know.  But at the time it
23    seemed like she was running the show.
24         Q.    What do you mean by running the show?  Can
```



1   you elaborate?

2       A.   What she said goes.

3       Q.   Did she ever represent directly to you

4   that she had the ability to sign the Consortium

5   Agreement on behalf of the College of DuPage?

6       A.   No.

7       Q.   Did Miss Cabai ever represent to you

8   throughout in 2013 and 2014 that she had the legal

9   authority or the ability to sign the Nondisclosure

10  Agreement on behalf of the College of DuPage?

11      MR. DAVIS:   Asked and answered.   He just said

12  no.

13      MR. ROCHE:   I asked about the Consortium

14  Agreement.

15      THE WITNESS:   So --

16  BY MR. ROCHE:

17      Q.   This question pertains to the

18  Nondisclosure Agreement.

19      A.   So the question you are asking to me is

20  very -- it's the same as if you were asking me if

21  Kathy Cabai as the CEO of the company had the

22  ability to sign.   That's how I felt about her

23  abilities, the same as if she were the CEO or

24  the -- the head of her department has the ability



Daniel Bump 04/05/2017

1    to sign contracts in representation of her
2    organization.
3        Q.    I understand the analogy.  What I am
4    trying to discover is whether Miss Cabai ever made
5    any representations to you that she had the ability
6    to contractually bind the College of DuPage to
7    legal obligations.  Did Miss Cabai ever make any
8    such representation?
9        A.    She never made representations in a verbal
10   form saying specifically I have the ability to sign
11   this document.  However, her every action was
12   filled with the idea that she had any authority she
13   needed to have.  That's how she portrayed herself
14   without saying it in so many words.
15       Q.    However, in Exhibit -- in the exhibit that
16   I previously showed you wherein Miss Cabai states I
17   know legal here can sometimes take a while and the
18   exhibit presently before you she states I did talk
19   with Tom and Tom said that nothing would be
20   happening prior to Karen returning to the office
21   and she also explains to Keith Bump that the
22   contract, it will not be signed to me prior -- to
23   me -- it will not be signed prior to me coming to
24   the lab.  Was your impression that maybe at this



Daniel Bump 04/05/2017

1  time Miss Cabai did not have the authority as a CEO

2  of a company would have to contractually and

3  legally bind the College of DuPage?

4       A.   No.   The routine was to -- whether they

5  had the authority or not to sign a document, it was

6  to pass it through their legal department to make

7  sure that there wasn't anything untoward in the

8  document itself, not, not to -- for the legal

9  department to say you can go into this consortium

10  relationship or not.

11       The other thing I'd like to say looking

12  back on it, at this point looking forward I was

13  still good with how this consortium arrangement was

14  going.   A little slow in the legal department, but

15  we were both functioning still as though we had an

16  agreement, and we were moving forward on that

17  basis.

18       And looking back, however, the comment --

19       MR. DAVIS:   Don't --

20       MR. ROCHE:   Let the witness finish.   You can't

21  interrupt the witness.

22       MR. DAVIS:   He is speculating now so -- go

23  ahead.

24       THE WITNESS:   Looking back, it appears to me



1  that that might have been --

2      MR. DAVIS:  Was there a question now?  Is he

3  answering a question?

4      MR. ROCHE:  What was the question?

5      MR. DAVIS:  Well, first of all, it was -- I was

6  about to object to the question because it was a

7  compound question in that you were referring to

8  three different documents.  But he answered the

9  question anyway so -- but if you want to repeat the

10 question.  It was you are referring to three

11 different emails, did he still feel like the --

12 like Kathy Cabai had the authority to be able to

13 sign the contract.

14 BY MR. ROCHE:

15     Q.  Upon --

16     MR. DAVIS:  And he answered the question so --

17 BY MR. ROCHE:

18     Q.  Okay, upon your -- based on your present

19 recollection -- or present analysis of the email

20 communications that we have discussed over the past

21 few days and what other due diligence you have done

22 in connection with prosecuting the action, what is

23 your opinion now as to Miss Cabai's authority to

24 contractually bind the College of DuPage?



 1          MR. DAVIS:  Objection.  Calls for a legal

 2     opinion.

 3     BY MR. ROCHE:

 4          Q.    You can go ahead and answer.

 5          MR. DAVIS:  Well, if he is giving a legal

 6     opinion, he is prevented from answering the

 7     question.  So if you are asking -- if you want to

 8     rephrase the question, go ahead.  But he can't --

 9     he can't opine on a legal opinion.  He is not a

10     lawyer.

11          MR. ROCHE:  I'm not going to rephrase the

12     question.  It's a proper question.

13     BY MR. ROCHE:

14          Q.    Do you understand the question, Mr. Bump,

15     that was presented to you?

16          A.    Could you say it again because now with

17     all this.

18                          (Whereupon, the record was

19                           read as requested.)

20          MR. DAVIS:  And this is limited to your

21     opinion.

22          THE WITNESS:  Okay.

23          MR. DAVIS:  Okay.

24          THE WITNESS:  I still have the opinion that she



Danrer Bump 04/05/2017

 1   had the legal ability to contractually obligate the
 2   College of DuPage on the matter of this consortium.
 3           What I was going to say as far as my
 4   analysis is concerned that looking back on these
 5   emails when Kathy Cabai, before she attended the
 6   lab said -- reiterated basically how long it takes
 7   things to get through the legal department.
 8           It appears to me now, not then, that they
 9   had already made a decision not to bind themselves
10   legally to us and yet they still appeared at the
11   lab.
12   BY MR. ROCHE:
13       Q.   With respect to the exhibit in front of
14   you, were you aware as of July 8, 2014, Mr. Bump,
15   that the legal department had to approve the
16   contract that was submitted to the College of
17   DuPage on May 5th, 2014?
18       A.   They had to approve the legal contract as
19   a valid legal contract, make sure the wording is
20   correct and there were no provisions in the
21   contract that were not in COD's best interests.
22           They were not in the business of saying,
23   yes, you can form a relationship with ACE or not.
24       Q.   Were you thus aware that Miss Cabai at



1  this point in time could not sign the contract that

2  was submitted on May 5th, 2014, absent approval

3  from the legal department?

4      A.    She could -- my impression was that the

5  legal department could say this needs to be changed

6  or that needs to be changed, the wording of this or

7  that to conform about their legal processes.

8  However, it was not in their purview to tell Kathy

9  Cabai whether she could have a contractual

10  relationship with ACE or not.

11      Q.    Did you know as of July 8, 2014, that

12  Kathy Cabai could not sign the Consortium Agreement

13  dated May 5th without approval from the legal

14  department?

15      MR. DAVIS:  You just asked that question.  I

16  object on the grounds that it has been asked and

17  answered.

18      MR. ROCHE:  The witness didn't answer the

19  question.

20      MR. DAVIS:  Well, that's a different -- you can

21  say the witness didn't answer the question but --

22      MR. ROCHE:  This question is different.  I'm

23  asking for the witness's knowledge.  I asked him

24  did you know as of July 8, 2014, that Kathy Cabai



1    could not sign the May 5th Consortium Agreement

2    absent approval from the legal department.

3         THE WITNESS:   I am aware that she did want to,

4    that she was going to.

5    BY MR. ROCHE:

6         Q.    Did you know that she could not absent

7    legal approval?

8         A.    No.

9         Q.    You did not know?

10        A.    Did not know that.

11                            (Whereupon, D. Bump Deposition

12                            Exhibit No. 36 was marked for

13                            identification.)

14   BY MR. ROCHE:

15        Q.    I show you what has been marked as

16   Deposition Exhibit No. 36.   This is an email dated

17   the same date we are discussing, July 8, 2014.   I

18   direct your attention, Mr. Bump, to the middle

19   portion of the first page of this exhibit in which

20   Kathy Cabai tells Keith, I did talk to Tom and he

21   is not comfortable signing anything without having

22   legal approved nor with Karen out of town.   Do you

23   recall being advised of Miss Cabai's statement that

24   she made to Keith?



1    A.    I don't recall it specifically.  However,

2    I agree that it was done.

3    Q.    You were aware at this time that Kathy

4    Cabai had a boss?

5    A.    Of course.

6    Q.    Who was the boss?

7    A.    As far as I know it was Karen, her direct

8    boss.

9    Q.    Did you know if Tom was a supervisor of

10   Kathy's as well?

11   A.    I never thought about him like that.  I

12   thought he was maybe like a dean or something.

13   Q.    And -- but you knew Kathy was a professor?

14   A.    Yes.

15   Q.    Let's talk about the Denver lab that Kathy

16   attended.  I believe she attended the lab from

17   July 11th to the 14th.  Does that --

18   A.    That sounds right.

19   Q.    Okay.  And -- let's just go over the lab

20   again.  How many people at least for this -- for

21   the Denver Skills Lab, how many people do you

22   recall being present for that lab?

23   A.    It was somewhere between 9 and 12.  It was

24   closer to 12 I think.



1     Q.    Were you the instructor for that

2  particular lab?

3     A.    Yes.

4     Q.    Have you ever -- excuse me.

5          Has ACE ever had -- strike that.

6          Has ACE ever conducted a skills lab in

7  which you did not serve as the moderator of the

8  lab?

9     A.    It was beyond that.  Yes, there were

10  other -- one other instructor.

11     Q.    And was there another instructor at the

12  Denver Skills Lab that Kathy attended?

13     A.    No.

14     Q.    Who from ACE was present for this lab

15  aside from yourself?

16     A.    You mean who was in the same building?

17  Because all our people were in the same building,

18  but nobody else was teaching the lab.

19     Q.    Who was in the room I guess?

20     A.    Just me and the other students.

21     Q.    Was Maggie Parrish in the lab do you

22  remember?

23     A.    No.

24     Q.    Never?



1    A.    I can't say that for sure because she

2  sometimes comes into the lab during the end of the

3  week just to update students on what they need to

4  do after this to get -- to start their clinical

5  internship.

6    Q.    How many days was the Denver Skills Lab

7  that Kathy attended?

8    A.    Six.

9    Q.    And correct me if I'm wrong, but I believe

10  you testified yesterday that the first two days are

11  composed of suture time training?

12    A.    I don't think I did testify to that, but

13  there are two days.  And there is a surgery that we

14  do in between the two days.  So we did suture and

15  tying, a total abdominal hysterectomy.  The rest is

16  suture and tying.

17    Q.    And how long does a lab last on average

18  for each particular day?

19    A.    Each day, ten hours with an hour lunch in

20  between.

21    Q.    What was your impression of Kathy's skills

22  at the lab?

23    A.    Her skills were pretty good.

24    Q.    Compared to the other students at the lab?



1    A.    Right.

2    Q.    Were her skills superior, inferior, above

3  average?  How would you characterize?

4    A.    Superior to the other people in the lab.

5  I mean that's when the lab started.  People kind of

6  caught up afterwards.

7    Q.    When you are teaching the lab, how do you

8  go about evaluating the students in their

9  abilities?

10    A.    It's -- they are shown a technique.  I

11  come around and help them to -- to fine-tune their

12  techniques and everything.  It is kind of

13  evaluation on the spot with written thereafter.

14    Q.    How do you show them the technique?  Do

15  you personally do a display, or is it video?  How

16  does it work?

17    A.    I'm trying to remember how we did it then.

18  Right now we do it with video.  At some point we

19  were doing it live, live demonstrations.  I

20  believe at that point we were doing video

21  demonstrations.

22    Q.    And then the students are evaluated by you

23  I presume?

24    A.    Uh-huh.



1    Q.   In writing?  There is a written document?

2    A.   Yes.

3    Q.   Evaluating the particular student?

4    A.   Uh-huh.

5    Q.   Was Kathy one of the best students you had

6    ever had before, observed or --

7    A.   No, I wouldn't say that she was the best.

8    She was -- if my memory serves right, she was the

9    best in that lab -- or at least she picked up the

10   skills quicker than most would.

11   Q.   You were evaluating her -- well, strike

12   that.

13        Were you evaluating her during her time at

14   the lab to see if she was competent enough to teach

15   the lab for the ACE COD consortium?

16   A.   I was evaluating her on the same basis I

17   would evaluate any of the other students.  In

18   addition to that, I was taking note of what

19   would -- how would we have to supplement her

20   training to be able to qualify to be an ACE

21   instructor.

22   Q.   What training would need to be

23   supplemented to qualify her as an ACE instructor if

24   you recall?



1    A.    From that -- from the basis of her

2    performance there she just needed a little work on

3    a few things.  I need to maybe spend a week or so

4    with her going over the details of everything,

5    not -- just that she would know everything in

6    general.  She would know the details of the

7    specific techniques that we are utilizing and our

8    specific teaching methods for that technique, what

9    can go wrong with different students in my

10   experience over the years and how do you deal with

11   that kind of thing.

12         And then spend one or two times evaluating

13   her actual performance as a teacher in a teacher

14   setting.

15   Q.    Was it ever communicated to the best of

16   your recollection, Mr. Bump, that Miss -- was it

17   ever communicated to the best of your recollection

18   to Miss Cabai that she would need an additional

19   week with you to perfect the training?

20         A.    Well, at the lab itself I made the comment

21   that, wow, I didn't expect, you know, this level of

22   performance from you from the very beginning.  So

23   what I had planned to teach you how to be an ACE

24   instructor, I think we can near cut that in half



1    is basically the gist of my communication with

2    her.

3        Q.    At this time in 2014 how many instructors

4    were employed at ACE aside from yourself?

5        A.    Just me.

6        Q.    Had you ever trained an instructor who

7    became an ACE instructor prior to Miss Cabai's

8    potential affiliation with ACE?

9        A.    At this point in ACE I had not.  I had

10   trained instructors in other organizations like

11   NIFA that I was telling you about and the

12   organization that I was associated with before,

13   that Colorado Surgical Assisting.

14       Q.    After Miss Cabai, the relationship with

15   Miss Cabai ended, have you or anyone at ACE trained

16   another instructor to become an ACE instructor?

17       A.    I have.

18       Q.    And how many was that?

19       A.    How many instructors?

20       Q.    Yes.

21       A.    Just one.

22       Q.    What's his or her name?

23       A.    His name is James Bell.  He is not with us

24   anymore not because he wasn't a good instructor.



Danrer Bump 04/05/2017

1    He was an excellent instructor.  It was just

2    because we were having financial issues that we

3    needed to cut back on staff.

4        Q.    Okay.  Bell, B-E-L-L, is his name?

5        A.    B-E-L-L.

6        Q.    During this lab or after this lab --

7        A.    It was after.

8        Q.    Okay.

9        A.    I am sorry, I assumed your question.

10        Q.    During this lab did Miss Cabai express any

11    concerns that she had about the Denver Skills Lab?

12        A.    She expressed a lot of concerns.  This is

13    when I started thinking, wow, she is not really on

14    board the way I thought she was.

15        Q.    What were the concerns that Miss Cabai

16    expressed?

17        A.    The ones that I remember didn't have

18    anything to do with the concerns you were

19    expressing the other day, didn't have anything to

20    do with the concerns you expressed the other day

21    with the kind of lab materials that are utilized by

22    College of DuPage compared with ACE.

23            They mostly had concerns to do -- the big

24    one that she expressed was she was sitting right



1    next to a nurse practitioner who was -- when she

2    graduated she was going to be working with an

3    orthopedic surgeon, and we don't have very much

4    orthopedics in the class, and that student knew

5    that before they signed up.

6           But Kathy was kind of ginning up her

7    irritation with that fact over that time.

8    Q.    Did Miss Cabai express any other concerns

9    that you can recollect?

10   A.    No, that's the one that stands out in my

11   mind.  But it seems like she was at least taking

12   that one concern and kind of spreading discontent

13   among the lab students.

14   Q.    How so?

15   A.    I mean they talked to each other all the

16   time in breaks and after the lab is over.  And

17   we -- I just became aware that there was grumbling.

18   Q.    Do you recall any personal conversations

19   that you had with Miss Cabai about her concerns of

20   the Denver Skills Lab?

21   A.    While she was at the lab?

22   Q.    Yes.

23   A.    Just general discontent with that one

24   student in particular, but I think I was left with



Daniel Bump 04/05/2017

1     the impression that she didn't appreciate that it

2     wasn't as high tech as she thought it would be.

3         Q.   Do you recall a conversation you had with

4     Miss Cabai in the parking lot after one of the

5     labs?

6         A.   It's -- I believe that I'm expressing what

7     was the conversation out in the parking lot as we

8     speak.

9         Q.   Got you.

10             Were you concerned after hearing

11    Miss Cabai's concerns that the College of DuPage

12    may not go ahead with the proposed consortium with

13    ACE?

14        A.   Yes, that's when I became concerned with

15    that whole thing.

16        Q.   Did you ever communicate to Miss Cabai

17    that a contract was already in place?

18        A.   I don't recall any such conversation.

19        Q.   During the time that Miss Cabai was in

20    Denver for the skills lab, did you ever communicate

21    to Miss Cabai that the knowledge and techniques

22    that she would learn at the lab was confidential

23    information to ACE?

24        A.   I don't recall such a conversation.



1     Q.    Do you recall any conversations to the

2  effect that the information and techniques that

3  Miss Cabai would learn at this Denver Skills Lab

4  was ACE's trade secret information?

5     A.    Only through the document that we had

6  introduced to them and once again became part of

7  our verbal agreement.

8     Q.    The Nondisclosure --

9     A.    Nondisclosure Agreement, yes.

10    Q.    How did the Nondisclosure Agreement become

11  part of the verbal agreement?

12    A.    Well, the verbal agreement as it first

13  started was amended a couple of times as you

14  realize.  It was amended based upon what Kathy was

15  or wasn't going to do for the lab.  It was amended

16  how much College of DuPage was going to pay us.

17  And now it was amended to include a Nondisclosure

18  Agreement.

19    MR. ROCHE:  Could you read that answer back for

20  me, please.

21                        (Whereupon, the record was

22                         read as requested.)

23  BY MR. ROCHE:

24    Q.    Let's talk about this, the initial verbal



1   agreement occurred on or about December 9, 2013 --

2       A.   Correct.

3       Q.   -- is that right?

4            Who on behalf of the College of DuPage

5   verbally agreed on or about December 9th, 2013?

6       A.   I believe, if I remember the email

7   correctly, it was Kathy.

8       Q.   Are you referring to the Karen Solt email,

9   we are good to go -- or we are ready to move

10  forward on our part?

11      A.   The December 9th email?

12      Q.   Yes.  I can show you the exhibit.

13      A.   Yes, I think I need to know whether it was

14  Karen or Kathy.  I believe it was Kathy but --

15      Q.   Exhibit 14.

16      A.   Yeah, it appears this was Karen, not

17  Kathy, which is Kathy's boss.  At least that was my

18  opinion that was her boss.

19      Q.   What was the verbal agreement that ACE

20  offered the College of DuPage --

21      A.   It was a verbal agreement --

22      Q.   -- on or about --

23      A.   -- encapsulated in the written agreement

24  that we presented at that time, the first written



Danrer Bump 04/05/2017

```
 1    agreement.
 2        Q.    The first Consortium Agreement?
 3        A.    Uh-huh.
 4        Q.    That was ACE's offer?  Is that your --
 5        A.    And --
 6        Q.    -- testimony?
 7        A.    -- it was the basis on which we all moved
 8    forward.
 9        Q.    With respect to the amended verbal
10    agreement relating to Kathy Cabai and whether or
11    not she would teach the lab, who on behalf of the
12    College of DuPage verbally accepted ACE's offer?
13        A.    That Kathy would teach the lab instead of
14    us?
15        Q.    Yes.
16        A.    That might have been Karen too.
17        Q.    Did Karen accept ACE's amended offer in
18    writing or verbally?
19        A.    Verbally.
20        Q.    And did she directly accept it to you or
21    to anyone else at ACE?
22        A.    Well, the way I recall it is that she
23    offered Kathy to be the instructor, and we accepted
24    it.
```



1    Q.    Who on behalf of ACE accepted the offer

2    that Kathy would teach the lab?

3    A.    Me.

4    Q.    You?

5    A.    Uh-huh.

6    Q.    And was that discussion --

7    A.    Well, I had the final decision on it

8    anyway.

9    Q.    Was that discussion in which you accepted

10   the offer, that Kathy would teach the lab, verbal

11   or over the phone -- or in writing?

12   A.    Verbal.

13   Q.    And who did you communicate that

14   acceptance that Kathy would teach the lab to?

15   A.    I communicated it to Keith and he

16   forwarded it to whoever.

17   Q.    What do you mean by Keith forwarded?  Did

18   Keith forward an email or --

19   A.    I believe he talked to them on the phone.

20   Q.    Do you know who Keith spoke with?

21   A.    I can only say either Kathy or Karen.

22   Q.    And do you know when this communication

23   occurred?

24   A.    Not specifically.  We have a whole train



1    of emails where that whole subject I was at least

2    at first a little upset with until I calmed down

3    and thought it through.

4         Q.   With respect to the -- this amendment to

5    the verbal agreement relating to payments, is that

6    right?

7         A.   Uh-huh.

8         Q.   Can you describe your understanding of

9    this verbal amendment relating to the payments, who

10   offered to make this amendment, who accepted,

11   et cetera?

12        A.   Well, Keith at first, when they were

13   talking about that -- and I believe they first

14   asked, well, what can we -- how can you discount

15   the amount that you are going to take based on the

16   fact that Kathy will be teaching the labs.

17             And so Keith had a discussion with me.

18   And I offered a certain price.  And as far as I can

19   remember it was actually he that tried to talk me

20   down from that price until we -- so he went to a

21   low 4,000, and then he wanted me to go even further

22   than that based upon some other logistics he was

23   looking at.  And we eventually ended up with that

24   mid 3,000 figure.



Daniel Bump 04/03/2017

1    Q.    When did ACE offer the low $3,000 figure
2  that you just mentioned?
3    A.    The date should be on that last contract,
4  consortium contract that you gave me.
5    Q.    The May 5th, 2014?
6    A.    Uh-huh.  Well, if that was the date.
7    Q.    Well, okay, the most recent Consortium
8  Agreement --
9    A.    Yes.
10   Q.    -- that has been produced in this case?
11   A.    Yes.
12   Q.    Who communicated that offer, the low 3,000
13 for the payment on behalf of ACE?
14   A.    That was a recommendation that Keith made
15 I agreed to somewhat reluctantly and he forwarded
16 that agreement to either Kathy or Karen.
17   Q.    Who on behalf of the College of DuPage
18 accepted that offer?
19   A.    Either Kathy or Karen.
20   Q.    How did they communicate the acceptance of
21 the offer to ACE?
22   A.    Back to Keith.  And then he referred that
23 to me.
24   Q.    And was that acceptance to Keith



1    communicated verbally or in writing?

2         A.    Verbally.

3         Q.    Aside from the May 5th, 2014, Consortium

4    Agreement, the most recent Consortium Agreement

5    that's been produced in this case, are you aware of

6    any other writing in which the College of DuPage or

7    anyone acting on behalf of the College of DuPage

8    communicates acceptance of the lower payment for

9    the ACE COD consortium?

10        A.    No.  But from there on we both were moving

11   ahead full steam towards the finalization of the

12   terms of the contract.

13        Q.    So the terms of the contract had not been

14   finalized at this point in time; is that your

15   testimony?

16        A.    No.  I said the terms were finalized, but

17   we were moving forward to the completion of the

18   terms of the contract that had been finalized.

19        Q.    What do you mean by moving forward towards

20   the completion?  What did that entail?

21        A.    On our side we were moving forward by

22   having Kathy attend the six-day lab.  And as far as

23   I know they were moving towards getting things

24   moving through the legal department and whatever



Danrer Bump 04/05/2017

 1    else they were doing on their side.  I felt like I

 2    had the good sense that there was motion on their

 3    side in the direction of us getting this thing

 4    done.

 5         Q.   All right.  Last question on this -- or

 6    line of questioning on this, the Nondisclosure

 7    Agreement, you referenced -- or you testified, I

 8    believe, earlier that that was another amendment to

 9    the verbal agreement --

10         A.   Correct.

11         Q.   -- is that right?  Okay.

12              Who on behalf of the College of DuPage

13    agreed to the terms of the Nondisclosure

14    Agreement?

15         A.   It's the same answer with the regular

16    agreement.  Every agreement we sent their way,

17    their answer was it has to get the final

18    approval -- the contract terms or how it is written

19    has to be approved by the legal department, but we

20    are going to move forward.

21         Q.   And that was communicated to ACE back in

22    December of 2013?

23         A.   Yeah, every communication we had in a

24    relationship with the written contract went about



1    that way.

2         Q.    With respect to the Nondisclosure

3    Agreement, do you recall who on behalf of the

4    college told ACE that they agreed to the terms of

5    the Nondisclosure Agreement?

6         A.    No.

7         Q.    Do you know if anyone on behalf of the

8    College of DuPage communicated to ACE that they

9    would agree to the terms of the Nondisclosure

10   Agreement?

11        A.    I don't recall specifically about that.

12                     (Whereupon, D. Bump Deposition

13                     Exhibit No. 37 was marked for

14                     identification.)

15   BY MR. ROCHE:

16        Q.    Showing you what's been marked as

17   Exhibit No. 37 to your deposition, Mr. Bump, these

18   are simply a series of email communications about

19   trying to arrange a meeting I believe via

20   telephone.  My question to you simply is do you

21   recall participating in any sort of telephonic

22   conference or video or in person, any meeting

23   whatsoever with representatives of the College of

24   DuPage between the time period of when the Denver



1    Skills Lab that Miss Cabai attended ended, so

2    July 19th or so, and August 11th, 2014?

3         A.    So this meeting would have taken place

4    after the lab, right?

5         Q.    Yes.  Well, my question is -- my question

6    is do you recall participating in a meeting with

7    representatives of the College of DuPage between

8    July 20th and August 11th of 2014?

9         A.    I recall a meeting where they said they

10   wanted to terminate our relationship.

11        Q.    All right.  Do you recall any other

12   meetings aside from the initial SKYPE conference

13   that we discussed yesterday?

14        A.    No.

15                      (Whereupon, D. Bump Deposition

16                      Exhibit No. 38 was marked for

17                      identification.)

18   BY MR. ROCHE:

19        Q.    Showing you what has been marked as

20   Exhibit No. 38 to your deposition, Mr. Bump,

21   another email thread between Keith Bump, Kathy

22   Cabai, and yourself.  I direct your attention to

23   the bottom of the first page of this, defendant's

24   production, 002762, the second main paragraph,



Daniel Bump 04/05/2017

```
 1    Mr. Keith Bump writes to Kathy Cabai, On our side
 2    we are targeting to get started on the Blackboard
 3    integration this week but really need to have a
 4    fully executed contract in place before investing
 5    in that project.
 6            What is your recollection of ACE's
 7    attempts up until this time -- strike that.
 8            Had ACE to the best of your recollection
 9    as of August 11th, 2014, advanced any investment,
10    financial pecuniary investment for the Blackboard
11    learning management system?
12        A.    No.
13        Q.    ACE had paid no money to Blackboard as of
14    August 11th?
15        MR. DAVIS:   Asked and answered.
16        MR. ROCHE:   2014.
17        MR. DAVIS:   You just asked that question.   You
18    asked him if there was any financial pecuniary, and
19    now you asked if he invested any money.   It's the
20    same question so --
21    BY MR. ROCHE:
22        Q.    You can answer.
23        A.    That's correct, we haven't invested any.
24
```



1                              (Whereupon, D. Bump Deposition

2                              Exhibit No. 39 was marked for

3                              identification.)

4    BY MR. ROCHE:

5         Q.   Exhibit 39, another email thread --

6    actually I will combine it with Exhibit 30, but I

7    just want to direct your attention to the bottom of

8    the first page of this exhibit.  It's an email from

9    Karen Solt to you and your brother Keith.  Kathy is

10   having some family health concerns right now so in

11   the event that she was not able to send you the

12   attached, I'm forwarding to you our concerns about

13   the collaboration.

14        Do you recollect Kathy Cabai having any

15   family health issues on or around this?

16        A.   I believe I do, yes.

17        Q.   Do you recall what those family health

18   issues were?

19        A.   I -- no, I can't remember exactly what was

20   going on, but it had something to do with her

21   mother.

22        Q.   And Miss Solt states that she is sending

23   you our concerns about the collaboration?

24        A.   Uh-huh.



Daniel Bump 04/05/2017

```
 1                        (Whereupon, D. Bump Deposition
 2                        Exhibit No. 40 was marked for
 3                        identification.)
 4   BY MR. ROCHE:
 5        Q.   Exhibit 40 is a letter that was sent to
 6   ACE Surgical Assisting.  Do you recollect,
 7   Mr. Bump -- do you recall if this letter that's
 8   Exhibit 40 is the letter that Miss Solt attached to
 9   the email thread as part of Exhibit 39?
10        A.   I believe so, yes.
11        Q.   Do you recall reviewing this letter,
12   Mr. Bump?
13        A.   Yes.
14        Q.   What was your reaction, if you remember,
15   upon reviewing this letter?
16        A.   Well, my impression was the same as -- the
17   impression I got after the lab was that I think we
18   are in a downward spiral here.  And that was
19   sudden.  I can't believe that anything listed on
20   here they didn't already know before she came to
21   the lab.
22        Q.   Had --
23        A.   Much of this is related to, you know, the
24   Distance Learning which they had already had access
```



1  to long before that.

2      Q.    Do you remember who on behalf of ACE

3  granted access to the College of DuPage for the

4  online Distance Learning aspect of ACE's

5  curriculum?

6      A.    I didn't say anybody did.

7      Q.    I thought you just said they, COD, had

8  access to the online --

9      A.    They had access to our master curriculum

10  which is basically an outline of our Distance

11  Learning.

12      Q.    But COD did not have access to the

13  pretests and unit tests for the online modules?

14      A.    Not that I was aware of.

15      Q.    COD did not have access to the ACE

16  workbook that you authored; is that right?

17      A.    Not that I am aware of.  I would not have

18  denied them that, and I think everybody knew that.

19  So somebody else might have granted that to them

20  without me knowing about it.

21      Q.    I direct your attention to the second

22  page of this letter.  About halfway through the

23  first paragraph it provides, There is concern that

24  with a program that has been functioning for



Danref Bump 04/05/2017

1    ten years that there are -- that there is still not

2    significant teaching learning tools in place which

3    would improve student success.  A partial but not

4    all inclusive list includes handouts, step-by-step

5    procedural pages, visuals, audio tools, module

6    specific homework, et cetera.

7            In July of 2014 did ACE provide handouts

8    to its students?

9        A.   At the lab there were handouts.

10       Q.   Were there handouts through the online

11   distance program, the SurgiNet?

12       A.   Well, just the regular handouts that would

13   pertain to their learning, their reading

14   assignments and stuff like that.

15       Q.   At the lab what handouts were disseminated

16   to the students if you remember?

17       A.   Just related to the lab itself.  So they

18   are handouts that had to do with the specific

19   techniques that were being taught and in some cases

20   diagrams and step-by-step ways of performing those

21   techniques.  There was a -- in the beginning there

22   is an expansion of the acronym good assist which

23   each letter means something that would be important

24   for the good assistant to know and perform.



1      Q.    In July 2014 did ACE have step by step
2   procedural pages?
3      A.    Not in detail.  There was a lab manual
4   that said step by step what would be done in the
5   surgical part of the manual.  So that they got a
6   video and then they could refer back to the lab
7   manual if they forgot anything from the video or
8   they could call me over.
9      Q.    In July 2014 did ACE provide visual
10  demonstrations to its students aside from the
11  skills lab that you taught?
12     A.    Like I said before, it was either video
13  which I believe was the case.
14     Q.    The skills lab?
15     A.    But sometimes before we started doing the
16  video, we had live demonstrations.
17     Q.    But --
18     A.    So it is either video or live
19  demonstrations.
20     Q.    For the online the SurgiNet, did ACE have
21  any visual video demonstrations?
22     A.    No.
23     Q.    In July 2014 did ACE provide audio tools
24  to its students?



1    A.    Like an audiotape or something like that?

2    Q.    Yes.

3    A.    No.

4    Q.    July 2014 did ACE provide specific

5  homework for the online modules aside from the

6  textbook reading materials?

7    A.    This was a research assignment that they

8  had.

9    Q.    The next paragraph points out that in an

10  online learning environment an instructor is

11  responsible to be present on the board a minimum of

12  four times a week which needs to include one

13  weekend day.

14          In July 2014 was there an online

15  instructor available to answer questions students

16  may have about the ACE online program four times a

17  week?

18    A.    We made sure that our students had access

19  to our instructor through email or through phone,

20  but we didn't have access to Blackboard at the

21  time.

22    Q.    Was --

23    A.    There was no form available.

24    Q.    Was an instructor of the -- for the



Daniel Bump 04/05/2017

1    SurgiNet course available to answer questions

2    students may have four times a week?

3        A.    Five times a week.

4        Q.    So your answer is yes?

5        A.    Not on a board.

6        Q.    But available?

7        A.    Yes.

8        Q.    Okay.  How about the weekend, was an ACE

9    instructor available on a weekend, one weekend day

10   to answer questions about the online materials that

11   students may have had?

12       A.    Not officially.  I would often answer

13   questions a student had over the weekend, but it

14   wasn't official availability.

15       Q.    And in July 2014 for the online

16   instructors, were there any online instructors

17   aside from yourself?

18       A.    I was the only instructor through that

19   whole period.

20       Q.    How would you answer questions, Mr. Bump,

21   if you had to be teaching a skills lab, how would

22   you answer questions about the online content that

23   students may have had?

24       A.    Well, we didn't offer availability to the



1    instructor through like a chat line where there was

2    instant access.  They'd email their questions.  I'd

3    get to it during breaks or after the lab was over.

4         Q.   Let's move on towards the bottom of this.

5    You see the statement contractual concerns and then

6    there is a few of these concerns identified by the

7    college of the contract.  Is this -- is it your

8    understanding that the contractual concerns the

9    college had was with respect to the contract dated

10   May 2014 or the one that was sent in December of

11   2013?

12        A.   It would have been the latest, the

13   May one.  But the contracts were essentially the

14   same other than Kathy was going to be teaching and

15   the price that we were going to receive.

16                        (Whereupon, D. Bump Deposition

17                         Exhibit No. 41 was marked for

18                         identification.)

19   BY MR. ROCHE:

20        Q.   I show you what has been marked as

21   Exhibit 41.  Do you recall sending this email,

22   Mr. Bump --

23        A.   Yes.

24        Q.   -- to Karen cc'd to Kathy and Keith on or



1    about August 13, 2014?

2        A.    Yes.

3        Q.    The second paragraph states, I have also

4    attached the most recent Consortium Agreement.  It

5    appears that some of your concerns may have had --

6    may have come from a template agreement that we

7    sent you in order to start our negotiations.

8             What template agreement are you referring

9    to if you recall?

10       A.    That would have been the very first one we

11   sent them.

12       Q.    The one that was sent on or about

13   November 21, 2013?

14       A.    I -- if that was the very first one.

15       Q.    We can look at the exhibit --

16       A.    We had discussed December the 9th.  I

17   thought that's the one.  So I guess we would have

18   sent one right before then, yeah.

19       Q.    Do you remember -- do you recall what you

20   meant by template agreement?

21       A.    It's the one we put together that would

22   show the terms of the agreement and the original

23   price that we were looking at and what would have

24   to be done by the college and by ACE.



Daniel Bump 04/03/2017

1    Q.    Was that agreement to the best of your

2    recollection, the template agreement, sent to any

3    other hospitals or --

4    A.    We didn't send any.

5    Q.    No?

6    A.    This was the first time.

7    Q.    What did you mean by to start our

8    negotiations?

9    A.    Well, I would send it over there, and if

10   you needed to specifically disagree with any of

11   those -- with any of those terms, then that would

12   be your chance to do so.

13   Q.    It then goes on to state, The attached --

14   your email, The attached agreement is the one that

15   was modified to take our negotiations into account

16   and sent to you later for your consideration.  What

17   did you mean by that statement?

18   A.    The negotiations were the -- the

19   negotiations we went through to amend the original

20   contract.

21   Q.    This email -- you are referring -- I'm

22   sorry, with respect to your last question, are you

23   referring to the issues relating to who was going

24   to teach the lab and how much ACE was going to be



1    charged and the Nondisclosure Agreement?

2        A.    Correct.

3        Q.    Okay.  Were there any others -- as you sit

4    here now, were there any other additional

5    negotiations about other issues?

6        A.    Those are the ones that stand out in my

7    mind.  I don't recall any other issues.

8        Q.    Could there have been other issues?

9        A.    Not any that would stand out to me.  So

10   they would be very minor if there was any.

11       Q.    Okay.  Let's go through this.  You will

12   note, Mr. Bump, that your response appears to be in

13   red type.

14       A.    Right.

15       Q.    Red font.  And it appears to be almost a

16   play-by-play response to each of the items

17   identified in the College of DuPage's letter as

18   of -- July 30, 2014, letter; do you see that?

19       A.    Yes.

20       Q.    I direct your attention to the ACE0112,

21   your opening statement in response to the letter

22   that's in the red font.  Just see the third

23   paragraph, just the first sentence, What we may

24   have neglected over the years is an ongoing



Daniel Bump 04/05/2017

 1   improvement of the process.   Do you recall what you

 2   meant by that statement?

 3        A.    Not specifically, but that's -- that's

 4   what they were accusing us of.   So while they may

 5   have moved on to videos, audios, and YouTube videos

 6   and whatever else they had in mind, we had not done

 7   that.

 8        Q.    In the last paragraph here you state, We

 9   also may have what appears to be differences of

10   opinion on processes.   I want to assure you that I

11   haven't read anything in your concerns that we

12   wouldn't be willing to implement for the sake of

13   our relationship if not in the interest of further

14   improving the training we offer our mutual

15   students.

16        Do you recall at this time the concerns

17   raised by COD to require a substantial revision of

18   the online portion of the ACE's surgical assisting

19   program?

20        A.    Well, they weren't looking at having us

21   revise content or anything like that.   They were

22   looking at adding audios, videos, and YouTube

23   videos.

24        Q.    Would you agree that COD was looking to



1    revise the delivery of the content of ACE's

2    SurgiNet program?

3         A.    Yes.

4         Q.    The second page, ACE0113, the first part

5    of your response that's in the red font, you state,

6    I learned a lot in a recent phone conference with

7    Kathy about some of the concerns she expressed.  Do

8    you recall that phone conference, Mr. Bump, at all?

9         A.    Not really phone conference.  I agree this

10   is a response to a conversation I had with Kathy,

11   but I don't specifically remember that phone

12   conference.

13        Q.    Do you recall if anyone else aside from

14   you and Kathy participated in that phone

15   conference?

16        A.    I don't remember the phone conference.

17        Q.    All right.  Let's move on to the next

18   page.  It's -- the bullet points at the top are

19   discussing replay of online videos.  Do you see the

20   general discussion about that that you said?

21        A.    The first bullet point on this page?

22        Q.    Yes.

23        A.    That was related, I believe, to videos,

24   what we were going to put up on our website



1    relating to the specific techniques that were

2    learned in the lab so that once the lab was over or

3    even in the evening while the students were trying

4    to practice the techniques that they had learned

5    during that day, they could observe a video.

6         Q.    Has that capability been implemented at

7    ACE?

8         A.    Yes.

9         Q.    When was that implemented?

10        A.    Well, sometime after this.  Maybe a couple

11   of years.

12        Q.    All right.  Your last bullet point here at

13   the top of this page, you state after the videos

14   have been fully edited, my next program improvement

15   is to revise the notebook handouts.  Has that

16   occurred for ACE?

17        A.    Yes.  I don't know what specific revisions

18   she was hoping for, but definitely have.  I had

19   some ideas about revisions that were needed at the

20   time anyway.

21        Q.    Okay.  Let's go to the next page,

22   Contractual Concerns.  This is your response to --

23   your responses to several of the concerns expressed

24   in the July 30, 2014, letter by the College of



1    DuPage.   In response to the first contractual

2    concern, ACE Responsibilities Item No. 4, you state

3    it is a concern here that they'd feel if COD

4    requires an ACE employee to travel to Illinois for

5    an on-site visit, ACE should do that at their own

6    expense.   I think also that COD must have an older

7    template of the agreement because the language,

8    quote, under the terms of the adjunct faculty

9    compensation, closed quote, does not appear in the

10   agreement formulated for them.   I have attached the

11   most recent agreement.

12           The agreement that you attached -- well,

13   let me ask the question.   If we go back to

14   Exhibit No. 32, Mr. Bump, is this the agreement

15   that was attached to your email dated

16   August 13, 2014?

17       A.    Yes.

18       Q.    And if you note in that exhibit under

19   ACE Responsibilities, paragraph 4, that was

20   modified from the earlier template agreement.   Why

21   don't I get you, before you answer, I provide you

22   with the earlier template agreement, Exhibit 11.

23   Is there a change in paragraph 1 -- or, excuse me,

24   Roman numeral I4 under ACE Responsibilities?



1    A.    There is a change, but it doesn't seem to

2    be a change that's referred to here.  Where in this

3    document are we looking at again?

4    Q.    The first page -- oh, I'm sorry, yeah, I'm

5    discussing Exhibit 32.

6    A.    Okay.  So this is word for word verbatim

7    what it says in the older agreement, but I think I

8    was trying to -- I'm not even sure I was referring

9    back to this agreement.  I'm not exactly sure

10   exactly what I had in mind, but it seems to me,

11   according to what I have written here, that I

12   was -- either read specifically or I thought I had

13   read that this would be at ACE's expense, this

14   visit would be at ACE's expense, whereas the

15   agreement that was currently on the table, the

16   written agreement that was currently on the table

17   said that would be at the college's expense.

18   Q.    The Consortium Agreement identified in

19   Exhibit 32 under Roman numeral I4, the last

20   sentence in that exhibit is different from the

21   Consortium Agreement identified as Exhibit 11 to

22   your deposition; is that right?

23   A.    Yes.  The reason that specific change was

24   made in this newer version of the written version



Danter Bump 04/05/2017

1    of the written contract because this was an older

2    term and it refers to a provision in the contract

3    that was no longer there.

4        Q.   Was this term in the most recent

5    consortium, which is Exhibit No. 32, changed in

6    response to the July 30, 2014, letter that -- in

7    which COD expressed concerns about this particular

8    term?

9        A.   What particular term were they expressing?

10       Q.   Roman numeral I4.  If you look at

11   ACE1115.

12       A.   It appears to me that they didn't express

13   what their concern was with that item, just they

14   said here are concerns and just wrote out the

15   statement --

16       Q.   And then did you --

17       A.   -- and the term.

18       Q.   Did you recall if you or anyone at ACE

19   modified Exhibit 32 in response to that concern

20   that was articulated by the college in July -- on

21   July 30 -- well, in the July 30, 2014, letter?

22       A.   No.  It was my impression the concern had

23   already been addressed long before that with this

24   newer version of the document.



1      Q.    How about Item No. 5, in connection with

2   under the term and termination provisions of the

3   contract items No. 1 and No. 4, would you agree

4   that in this letter, the July 30, 2014, letter that

5   the College of DuPage is expressing a concern about

6   the idea, or at least the term in the proposed

7   agreement, that ACE has a right to contract with

8   other colleges for the same or similar related

9   programs yet under the term and termination

10  provision the agreement between ACE and COD would

11  be in place for 24 months and COD has to wait

12  24 months upon termination of the agreement to

13  start its own program?  Would you agree that that

14  was a concern that was expressed by the College of

15  DuPage?

16      A.    Only in this document.  They hadn't

17  expressed it at any time before that.

18      Q.    In the letter that was dated

19  July 30, 2014?

20      A.    Uh-huh.

21      Q.    In Exhibit No. 32 the Consortium

22  Agreement --

23      A.    Which one of these is 32?

24      Q.    That's 32.   Are those terms in that



Danrer Bump 04/05/2017

1    exhibit changed from the initial Consortium

2    Agreement which is identified as Exhibit 11?

3        A.    All these are new concerns that happened

4    after this and after -- at least I believe -- yes,

5    after they had already decided not to work with us

6    anyway which happened sometime before Kathy

7    attended the lab.

8        MR. ROCHE:  I'm sorry, could you repeat that

9    back.  I wasn't paying attention.

10                        (Whereupon, the record was

11                         read as requested.)

12   BY MR. ROCHE:

13       Q.    Is it your belief that the College of

14   DuPage had decided internally not to pursue

15   consortium with ACE before Kathy attended the

16   Denver Skills Lab?

17       A.    That's my belief looking back as we

18   already discussed.

19       Q.    Got you.   Okay.

20             Anyway, back to this, you provide in

21   Item No. 5 you say the way this is stated in the

22   most recent agreement is as follows, and you

23   indicate among other things here that ACE will

24   not -- during the duration of the agreement they



1    will not contract with other colleges of higher

2    learning within a 50-mile radius of the college.

3        A.   Yes.

4        Q.   Was this change to the Consortium

5    Agreement implemented in response to the concern

6    that COD expressed to ACE on or about

7    July 30, 2014, in this letter?

8        A.   This to my knowledge is the latest version

9    of the Consortium Agreement which was before this.

10   This was an expression of what the new one was

11   going to look like.  And soon thereafter we had a

12   conversation about not moving forward anyway.

13       Q.   Is it your view that the concerns outlined

14   in the July 30, 2014, letter by the College of

15   DuPage had already been addressed in the most

16   recent Consortium Agreement that was sent on or

17   about May 5th, 2014?

18       A.   This is -- this would be the changes that

19   were -- that were made immediately in our verbal

20   agreement that would later follow up in written

21   form.

22       Q.   Were these concerns in the July 30, 2014,

23   letter communicated to ACE before July 30, 2014?

24       A.   I believe -- I believe I remember a



1    conversation.  I don't remember if it was by phone

2    or if Kathy communicated to me at the lab.  I don't

3    remember.  But they were concerned about at least

4    when the program first started they wanted to have

5    an exclusive area.

6              They didn't think they needed that

7    forever.  But they would at least like -- like to

8    have that at the beginning because there were other

9    surgical assistant programs in the area.

10             There was one specifically in Rockville I

11   think or Rockford.  I can't remember exactly where

12   it was but --

13        Q.    Okay.  So these concerns were -- strike

14   that.

15             Okay, last question then on this exhibit.

16   If you turn to ACE01118 under Item No. 8, Other

17   Rights and Joint Responsibilities, this COD letter

18   states -- well, COD letter provides that this

19   concerns College of DuPage if we are entering

20   into -- excuse me, this concerns College of DuPage

21   if we are entering a Consortium Agreement.

22             Do you recall reading that specific

23   sentence that was communicated to you by COD in the

24   letter?



1     A.    Yes.

2     Q.    Do you recall what your reaction upon

3  reading that was?

4     A.    You mean other than my written reaction?

5     Q.    Yes.  Were you concerned that there was no

6  actual agreement in place at this time?

7     A.    No.  I was never, never once in doubt of

8  that.  I was in doubt of whether they were going to

9  follow through on their side of the agreement.  And

10  that started right at the lab.

11     Q.    All right.

12     A.    And thereon after.

13     Q.    It appears that ACE tweaked the language

14  in the Consortium Agreement and put in, It is

15  agreed that the curriculum and associated materials

16  and simulators are proprietary in nature and are

17  the exclusive property of ACE.  College shall not

18  copy or reproduce anything by ACE without ACE's

19  permission.

20          Was that change in -- made by ACE in

21  response to the concerns expressed in the

22  July 30, 2014, letter?

23     A.    Is Item 8 in the contract, or is it

24  just --



1    Q.    In Exhibit 32?

2    A.    -- their concern?

3    Q.    Well, why don't you --

4    A.    Their concerns are --

5    Q.    Why don't you turn to Exhibit 32.

6    A.    And it is under Other Joint Rights and

7    Joint Responsibilities? Okay. Right. What's the

8    question related to that?

9    Q.    Was that agreement, Exhibit 32,

10   modified -- strike that.

11           Was that provision that we are discussing

12   Item 8 in Joint Responsibilities, was that

13   provision modified in Exhibit 32 in response to the

14   concern expressed by COD in its July 30, 2014,

15   letter?

16   A.    No.   This was previous to that. I can't

17   remember what our concern -- I don't believe there

18   was any specific concern that we were getting from

19   the COD camp related to this. It just became an

20   obvious term of the agreement that should be in

21   there.

22   Q.    Okay. Please go to the first page of this

23   exhibit. And tell me what the subject heading was

24   of the email.



Danrel Bump 04/05/2017

1    A.    Response to COD concerns?

2    Q.    Okay.

3                        (Whereupon, D. Bump Deposition

4                        Exhibit No. 42 was marked for

5                        identification.)

6   BY MR. ROCHE:

7    Q.    Exhibit 42, this is an -- Exhibit 42 is an

8   email from you to Karen Solt, Kathy Cabai, and

9   Keith Bump.  Simply states that Dan Bump would like

10  to recall the message response to COD concerns.  Do

11  you remember trying to recall that email message

12  that you previously sent to the College of DuPage?

13   A.    No.  And, in fact, this could potentially

14  just be a mistake hitting the wrong button in the

15  email.

16   Q.    Mistake on your part or --

17   A.    In other words, I could have hitten [sic]

18  the wrong button which is close to other buttons I

19  have to hit.

20   Q.    After you sent the first email?

21   A.    Apparently it wouldn't have gone before or

22  at the same time.

23   Q.    Okay.

24   A.    I don't recall having done this at all.



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

322

1    Q.    Okay.

2                        (Whereupon, D. Bump Deposition

3                        Exhibit No. 43 was marked for

4                        identification.)

5    BY MR. ROCHE:

6    Q.    I show you what has been marked as

7    Exhibit 43.  This is a compilation of email

8    communications that appears to be with people on

9    behalf of both the College of DuPage and ACE trying

10   to arrange for a discussion of the surgical

11   assistant program.

12        My question simply is do you recall in

13   August or September having a telephone conversation

14   with representatives of the College of DuPage?

15   A.    I only recall one where they decided not

16   to work with us anymore.

17   Q.    Do you recall when that conversation

18   occurred?

19   A.    It seemed --

20   Q.    Did it occur in August of 2014?

21   September?

22   A.    Not specifically.  I could stand fairly

23   firm on August and September, sometime in that

24   arena.



Daniel Bump 04/05/2017

1      Q.    All right.  I just want to try to as best
2  we can to get a date of when this telephone call or
3  conversation occurred.

4                      (Whereupon, D. Bump Deposition
5                      Exhibit No. 44 was marked for
6                      identification.)

7  BY MR. ROCHE:

8      Q.    Last exhibit, 44, this is an email dated
9  September 8, 2014.  It's from Miss Solt to
10  yourself, Keith.  And Miss Cabai and Mr. Cameron
11  are copied on this email.  Do you recall receiving
12  this email, Mr. Bump?

13     A.    I definitely remember either an email or a
14  discussion along this line.

15     Q.    The discussion, who was -- do you remember
16  who was present -- was the discussion over the
17  phone?

18     A.    This sounds very much like the discussion
19  we had as part of the discussion when they were
20  saying they didn't want to work with us anymore.

21     Q.    So they told you they didn't want to work
22  with ACE over the phone at some point in time?

23     A.    Yes.

24     Q.    Okay.  Who was present during that



1    discussion?  It occurred over the phone?

2         A.    Yeah, it seemed like, if I am recalling

3    this correctly, that Kathy, Karen, and Tom were

4    there.

5         Q.    Was Keith on the phone if you remember?

6         A.    I think so.

7         Q.    Kyle, do you recall a Kyle Black?

8         A.    I doubt that he would be in on that

9    conversation.

10        Q.    All right.  And do you remember who

11   informed you and Keith if Keith was indeed on the

12   call?  Who informed ACE that the College of DuPage

13   was no longer going to partner with ACE?

14        A.    Who specifically on the phone call?

15        Q.    Yes.

16        A.    I don't even think Kathy had much to say

17   at all, if anything, during that conversation.  It

18   would have been Karen and maybe reiterated by Tom.

19        Q.    Do you recall how long this telephone

20   conference lasted?

21        A.    It was painful.  I wouldn't let it go on

22   that long.  Maybe 15 minutes.

23        Q.    What was your reaction, if you remember,

24   upon learning that the College of DuPage no longer



Daniel Bump 04/05/2017

1    wanted to proceed forward with ACE?

2         A.    Well, at this point one of the big things

3    that they had for the reason why they didn't want

4    to continue is because of my lack of experience or

5    training in their kind of online training.

6              And they actually had a training program

7    which I said, okay, I will take it.  And they said,

8    it will take too long, and we don't really want to

9    start from the beginning and whatever else he said.

10        Q.    What was your reaction when you discovered

11   that the College of DuPage no longer wanted to

12   partner with ACE?

13        A.    I don't think my reaction was all that --

14   it definitely wasn't bad over the phone.  In other

15   words, I didn't show any displeasure or anger over

16   the phone and not much thereafter either because I

17   was kind of expecting it anyway.

18        Q.    It did not -- did it come as a surprise to

19   you --

20        A.    No.

21        Q.    -- that the College of DuPage no longer

22   wanted to partner with ACE?

23        A.    It is like everything that happened from

24   the lab on after was pointing in that direction



1   anyway.  And I was just trying to save it somehow.

2       Q.   Did you or anyone else who was on the call

3   on behalf of ACE mention anything about the

4   existence of a contract between ACE and COD?

5       A.   I don't recall that.

6       Q.   Do you recall any discussion between ACE

7   and the College of DuPage about the trade secrets

8   and confidential information that ACE had provided

9   to the college?

10      A.   I don't recall that conversation.

11      Q.   Do you recall if you or Keith asked anyone

12  at COD to return ACE's confidential information

13  that it sent to the College of DuPage?

14      A.   Not during that conversation.

15      Q.   Do you recall subsequent to that

16  conversation either you or Keith ever asking the

17  College of DuPage to return the program catalogue

18  and master syllabi?

19      A.   No.  It was pretty soon after that that we

20  contacted a lawyer.  And I don't recall even after

21  that that anything like that was said.  I don't

22  have a specific conversation of my lawyer to you or

23  whoever was representing the college at that time.

24      Q.   What about the Self-Study, do you recall



1  any attempts by ACE to demand the return of the
2  Self-Study that College of DuPage was in possession
3  of, ACE's Self-Study?

4      A.   No, I haven't.  And looking back, maybe I
5  just didn't see the point because they could have
6  returned one and kept a copy.  So I don't know that
7  I would have thought that that would be an
8  effective approach anyway.

9      Q.   What about the budgetary information that
10 ACE transmitted to the College of DuPage, did
11 anyone to your knowledge on behalf of ACE ask the
12 College of DuPage to return that -- the budgetary
13 information?

14     A.   No.

15     Q.   Did anyone at ACE or on behalf of ACE
16 demand the destruction of the email if any hard
17 copies existed of the budgetary information?

18     A.   No.

19     Q.   Did anyone on behalf of ACE demand the
20 destruction of the Self-Study that ACE provided to
21 the College of DuPage?

22     A.   No.

23     Q.   Did anyone on behalf of ACE demand the
24 destruction of the program catalogue that ACE sent

1    to College of DuPage?

2        A.    No.    How would we have verified that any

3    of that took place?

4        Q.    That wasn't my question.    My question

5    simply was did ACE make that demand upon COD.

6        A.    No.

7        Q.    Did ACE make any demand upon COD to the

8    best of your knowledge that the College of DuPage

9    destroy the curriculum that ACE provided the

10   college?

11       A.    No.

12       MR. DAVIS:    Anything else?

13       MR. ROCHE:    No.

14       MR. DAVIS:    You probably could have covered

15   those six questions in one, but, you know --

16       MR. ROCHE:    I'm trying to be clean because you

17   objected on compound a little bit ago; so I was

18   trying to --

19       MR. DAVIS:    So let's go off the record for a

20   second.

21                    (Discussion off the record.)

22       MR. ROCHE:    Counsel for plaintiff and defendant

23   are discussing Mr. Bump's upcoming corporate

24   representative deposition.



1     MR. DAVIS:   And according to the discussion

2     that we had yesterday you were not sure that he

3     was.   And after he began to testify and you found

4     out that he was the sole shareholder and president,

5     we then agreed that he was the 30(b)(6)

6     representative.

7             And I have now covered with you all of the

8     topics that a 30(b)(6) representative could testify

9     to.   And he has testified to every single one of

10    these topics.   So is it your intention to go over

11    each one page of these topics again?

12    MR. ROCHE:   That's not what we agreed to.   In

13    fact, about 20 minutes into the deposition

14    yesterday of Mr. Bump, which clearly and

15    unequivocally states on the record that was the

16    deposition of Mr. Bump and his individual capacity,

17    I pulled you aside and explained to you that

18    Mr. Bump, what he had just testified to, he would

19    be unable to serve as a corporate representative

20    for certain of these topics.

21            For example, I -- one of the topics for

22    discussion for the corporate representative

23    deposition is the allegation, the allegations in

24    ACE's complaint.



1      Mr. Bump testified yesterday that he did

2  not review the complaint in connection with

3  preparing for his deposition yesterday and that he

4  may have reviewed the complaint back in 2015 when

5  it was filed in August of 2015.

6      The federal rules require the corporate

7  representative -- they require the corporation to

8  adequately prepare the corporate representative to

9  testify on the topics that are identified and set

10  forth in the notice of deposition.

11      It's an obligation that ACE has.  And

12  it -- unless Mr. Bump reviewed the complaint last

13  night and the exhibits to the complaint as he

14  stands right now, as he sits here right now based

15  on his prior testimony, he is not prepared to

16  testify as to the allegations in ACE's complaint.

17      MR. DAVIS:  Well, did you not --

18      MR. ROCHE:  What we -- what we --

19      MR. DAVIS:  Did you not ask him on the record

20  if he was the sole shareholder and president of the

21  corporation?

22      MR. ROCHE:  Yes.

23      MR. DAVIS:  Okay.  And he answered yes to those

24  questions.  Is that correct?



1     MR. ROCHE:   Yes.

2     MR. DAVIS:   Okay.  And didn't you in the hall

3  outside say, well, I guess he is the sole

4  shareholder and the president of the corporation;

5  so he must be the 30(b)(6) rep?

6     MR. ROCHE:   No.  I said because he is the sole

7  shareholder and owner of the corporation, his

8  statements made during his individual -- or his

9  deposition in his individual capacity bind the

10 corporation because he is a managing agent.

11 All right?

12    MR. DAVIS:   Even though he is the president and

13 the sole shareholder?

14    MR. ROCHE:   By virtue of his -- exactly,

15 ownership.

16    MR. DAVIS:   Exactly what are you insisting on

17 in terms of additional time that you haven't

18 covered so far?

19    MR. ROCHE:   When we were off the record, as I

20 explained to you, the financial performance of ACE

21 from 2011 to the present.  I would like to ask

22 ACE's corporate representative a few more questions

23 other than -- about ACE's financial performance

24 other than what I asked Mr. Bump yesterday which



1    pertained almost to the enrollment figures that

2    occurred.

3        MR. DAVIS:  Which is part of the financial

4    performance.

5        MR. ROCHE:  Part, but not all of it.  That's

6    what I am getting at.

7        MR. DAVIS:  What else?

8        MR. ROCHE:  Well, No. 2, the relationships ACE

9    has had with other academic institutions.  By

10   virtue of Mr. Bump's testimony yesterday, he cannot

11   serve as a corporate rep to discuss that because

12   Keith Bump was the one who had the interaction with

13   the two academic institutions that apparently were

14   at issue.  But I am not --

15       MR. DAVIS:  Did you ask him the questions

16   yesterday?

17       MR. ROCHE:  Yes.  He said --

18       MR. DAVIS:  Did he answer them?

19       MR. ROCHE:  He said talk to Keith.  Keith would

20   know.

21       MR. DAVIS:  He said none.  The answer was none.

22   You can go back in the record and check.  He said

23   clearly none.

24           There are no other relationships that ACE



1    has had with other academic institutions.

2        MR. ROCHE:    But in response to the questioning

3    about what information that was sent to these two

4    perspective academic institutions, Dan Bump said --

5    effectively testified that Keith would know, Keith

6    would have been the one that would have sent that

7    material.  So I intend on asking Keith that

8    question.  I'm not going to ask --

9        MR. DAVIS:    Okay, what else?

10       MR. ROCHE:    -- Dan that question at his

11   corporate deposition this afternoon.

12       MR. DAVIS:    This afternoon?  We are not

13   staying.

14       MR. ROCHE:    Or --

15       MR. DAVIS:    For how long it takes.

16       MR. ROCHE:    After this break.

17       MR. DAVIS:    Okay.  ACE's attempts to maintain

18   the secrets of the trade secrets, asked and

19   answered.

20       MR. ROCHE:    No.  For example, Mike, first of

21   all, I am talking about probably four minutes of

22   questioning.  I need to know whether there are

23   policies and procedures in place, employee

24   handbooks, that type of stuff.  Those are the



1    questions I want to ask.

2         MR. DAVIS:  Trade secret --

3         MR. ROCHE:  And I did not ask them to Mr. Bump

4    yesterday.

5         MR. DAVIS:  Okay.  What else?

6         MR. ROCHE:  This is another one that's

7    probably -- my view is ACE is going to have to

8    designate Keith Bump to testify to, on behalf of

9    the corporation, No. 6, ACE's compliance with the

10   defendant's discovery requests.

11           Mr. Bump -- Dan Bump testified yesterday

12   that Keith -- Keith and I think Maggie were the two

13   primary ACE employees who were in charge.

14        MR. DAVIS:  Where is that on the Exhibit A,

15   30(b)(6)?

16        MR. ROCHE:  No. 6.

17        MR. DAVIS:  ACE's performance under the

18   contract between ACE and defendants?  That's what I

19   have got as an Exhibit A to the subpoena.

20        MR. ROCHE:  No. 6?

21        MR. DAVIS:  No. 6 is ACE's performance under

22   the contract between ACE and defendants.  It's

23   attached to your subpoena, Exhibit A, 30(b)(6).

24        MR. ROCHE:  Can I see what you are looking at?



1    MR. DAVIS:  Yes.  Here is the notice of
2  deposition of plaintiff, Exhibit A.
3    MR. ROCHE:  Scroll up.  That's the one that was
4  sent last fall I believe.  Yeah, October 6.
5    MR. DAVIS:  Well, what's the difference between
6  that 30(b)(6)?
7    MR. ROCHE:  Because the more recent one I sent
8  you -- here.
9    MR. DAVIS:  You sent a second subpoena?
10    MR. ROCHE:  A second notice.  I don't need to
11  send a subpoena.  It is a 30(b)(6) dep of a party.
12    MR. DAVIS:  ACE's compliance with defendant's
13  discovery request.  So Keith Bump is going to
14  answer that?
15    MR. ROCHE:  Right.  I believe.  Well, you tell
16  me.  The corporation is required to produce a
17  witness who can competently testify to the topics.
18    MR. DAVIS:  The discussions ACE had with the
19  defendants in November and December, covered.  The
20  discussions ACE had with defendants in 2014,
21  covered.  The terms of the alleged contract between
22  ACE and defendants, covered.  ACE's potential
23  merger with Your Hands, Your Extra Hands Surgical
24  Services.  Okay.  ACE's performance under the



```
 1    alleged contract between ACE and defendants,
 2    covered.
 3         MR. ROCHE:  May I -- I'd like -- I'd like to
 4    respond to some of these.
 5         MR. DAVIS:  Well, what have you not asked about
 6    ACE's --
 7         MR. ROCHE:  Look, look, like, Mike, Mike,
 8    Mike --
 9         MR. DAVIS:  There is a reason.
10         MR. ROCHE:  Hold on.
11         MR. DAVIS:  There is a reason --
12         MR. ROCHE:  Hold on.
13         MR. DAVIS:  -- why you only have seven hours.
14    And the reason why is because you need to craft
15    your deposition so that you do it in seven hours,
16    not craft your deposition so that you do it in 14
17    which you are claiming that you have which you
18    don't.
19         MR. ROCHE:  It's my experience that -- and we
20    have researched the case law, and I believe the
21    case law supports the view, that Mr. Bump's
22    testimony in his individual capacity I am allowed
23    under the federal rules to question him and examine
24    him and probe his recollection and insight and
```



```
 1    knowledge in his individual capacity.  This is a

 2    corporate deposition --

 3        MR. DAVIS:  On areas that you have already

 4    covered?

 5        MR. ROCHE:  -- which has been noticed up for

 6    today.  And the corporation is under an obligation

 7    subject to the threat of sanctions for -- to make

 8    sure that the deponent who is going to serve as the

 9    corporate representative has adequately prepared

10    and has the knowledge or learns the knowledge

11    through preparation to testify to the topics

12    identified in the corporate notice.

13            Yesterday during Mr. Bump's deposition he

14    testified, Dan Bump's deposition, Dan Bump

15    testified that Keith Bump was on the ground, I

16    believe is what his testimony said, in terms of the

17    discussions ACE had with the defendants in

18    November, December 2013 and also 2014.

19            Accordingly, it's my view that for today's

20    deposition ACE is required to produce Dan Bump --

21    or excuse me, Keith Bump for -- to testify on those

22    subjects.

23            Now, we also know that we discovered last

24    week that Keith has a medical ailment that is
```



Daniel Bump 04/05/2017

 1    preventing him from testifying today.  Keith was
 2    initially supposed to be the corporate rep, and due
 3    to this medical ailment he was unable to testify.
 4    And the parties have jointly moved to extend his
 5    deposition, extend the deadline to take his
 6    deposition.  And I am entirely fine with that.
 7         MR. DAVIS:   Okay.
 8         MR. ROCHE:   And I do not intend during the
 9    corporate dep to ask Dan Bump any more questions
10    about the discussions that ACE had with the College
11    of DuPage in 2013, 2014.  I agree with you, I have
12    adequately probed his memory.  I don't need to talk
13    about that and nor do I intend to discuss that.
14         MR. DAVIS:   So, again, back to the list.
15         MR. ROCHE:   Yes, let's go back to the list.
16    The terms of the --
17         MR. DAVIS:   The representations that form the
18    basis for ACE's fraud claim against defendants.
19         MR. ROCHE:   I want to discuss questioning about
20    that, limited though.
21         MR. DAVIS:   Okay.
22         MR. ROCHE:   Not --
23         MR. DAVIS:   Even though he has already
24    testified to that?  So you have additional



```
1   questions about the representations that form the
2   basis for ACE's fraud claim?
3       MR. ROCHE:  Yes, but I would also note that --
4   because Dan Bump has not reviewed the complaint
5   since 2015, I don't know if Dan Bump is going to be
6   competent to serve as a corporate rep to testify as
7   to the basis of ACE's fraud claim which is in the
8   complaint that he hasn't read.  So maybe Keith
9   Bump needs to be that individual.
10      MR. DAVIS:  No. 14, ACE's reliance --
11      MR. ROCHE:  Let's go back.  I want to go back
12  to a couple things here.  Let's go to 9, the terms
13  of the alleged contract between ACE and defendants.
14  I believe I have adequately explored that.  I don't
15  believe I am going to testify much -- or ask
16  Mr. Bump, Dan Bump, that many questions because his
17  statements, particularly this morning, I think bind
18  the corporation anyway.
19          ACE's potential merger with Your Extra
20  Hands Surgical Services, I don't intend to discuss.
21          ACE's performance under the alleged
22  contract between ACE and defendants, I have an area
23  of questioning on that.
24      MR. DAVIS:  You have --
```



Daniel Bump 04/05/2017

1    MR. ROCHE:   Oh, yeah.

2    MR. DAVIS:   -- an area of questioning on their

3    performance under the alleged contract that you

4    haven't covered up until this point in time in the

5    last eight hours?

6    MR. ROCHE:   Yes.

7    MR. DAVIS:   Even though you have spent almost

8    eight hours talking about that?

9    MR. ROCHE:   Yes.

10    MR. DAVIS:   Really?

11    MR. ROCHE:   I do.

12         The damages suffered by ACE as a result of

13    the conduct complained of in ACE's complaint, I

14    have questioning on that.

15         The representations that form the basis

16    for ACE's fraud claim, we have discussed.  I don't

17    even know if Dan Bump is competent today on that

18    because he hasn't read the complaint.

19         ACE's reliance on the representations that

20    form the basis for ACE's fraud claim against the

21    defendants, I don't believe I have any questioning

22    on that.

23         ACE's understanding of the approval

24    process defendants had to obtain for the surgical



1   assistant program, I don't have any question on

2   that.  I have adequately explored Dan Bump's

3   memory.  I do intend to ask Keith Bump that

4   question -- questioning -- questions.  Sorry.

5           The accreditations ACE has obtained

6   between 2006 to the present, I have adequately

7   asked explored that area of inquiry.

8           The history surrounding ACE's

9   accreditation with CAAHEP, that has been adequately

10  explored.

11          The negotiations between ACE and

12  defendants about entering into a partnership, I

13  believe Keith Bump based on Dan Bump's testimony

14  will be the one who needs to testify on behalf of

15  the corporation on that.

16          Discussions with Blackboard, I have

17  adequately explored Dan Bump's recollection of

18  that; so I don't intend to ask any questions on

19  that.

20      MR. DAVIS:  So the areas that you -- the areas

21  that you have questions on are No. 11 --

22      MR. ROCHE:  No. 1.

23      MR. DAVIS:  No. 1, No. 11, No. 12 --

24      MR. ROCHE:  No. 1, No. 5 --



```
1          MR.  DAVIS:   And briefly because you have asked
2    so many questions about that.
3          MR.  ROCHE:   -- No.  11, No.  12.   I have
4    questions about ACE's trade secrets that I
5    personally believe that Dan Bump is the one who
6    ought to testify that I have not previously asked.
7          MR.  DAVIS:   That you have not asked, even
8    though in the last question that you asked, you
9    broke it down into six specific areas.   You asked
10   questions about six specific trade secrets, sorry,
11   sorry, six specific trade secrets and you have more
12   questions about that?
13         MR.  ROCHE:   Yeah.
14         MR.  DAVIS:   Like, for instance --
15         MR.  ROCHE:   I haven't even -- Dan Bump hasn't
16   even reviewed, for example, the Self-Study, COD's
17   Self-Study.
18         MR.  DAVIS:   You have already used it as --
19         MR.  ROCHE:   I identified it as an exhibit, but
20   Dan Bump hasn't reviewed it in detail.   And I'm not
21   going to -- I don't intend, Mike, to go through
22   page by page --
23         MR.  DAVIS:   So how much longer do you intend to
24   do this?   How much longer?
```



```
 1          MR.  ROCHE:   A couple hours.

 2          MR.  DAVIS:   Two hours.

 3          MR.  ROCHE:   I'm not going to agree to

 4     two hours.  I think I am entitled --

 5          MR.  DAVIS:   You agreed to three yesterday.

 6          MR.  ROCHE:   I think I am entitled under the

 7     rule to seven.

 8          MR.  DAVIS:   Well, you are not getting seven,

 9     okay?  So if it is not done in two hours, we are

10     leaving, and we will take it up with the judge

11     because I am quite certain once he gets a copy of

12     the transcripts and sees the amount of time that

13     you have shuffled between exhibits, that you have

14     delayed questions, that you have asked questions

15     that have been related before, I'm sure that that

16     will delete whatever extra time you are going for.

17          You have seen me take a deposition.  What

18     you need to do is if you are going to do it within

19     the time you are allotted, you need to pick it up.

20          MR.  ROCHE:   Mike --

21          MR.  DAVIS:   So let's take a break at that point

22     in time --

23          MR.  ROCHE:   Let's keep the record open.  I am

24     not required under the federal rules nor any
```



Daniel Bump 04/05/2017

```
1   ethical rules to follow your lead in how you take
2   depositions.
3        MR. DAVIS:  No.  But you are required to do it
4   within a certain period of time which is why they
5   put a limit on it.  They put a limit on it so that
6   somebody can't prolong the amount of deposition
7   that you take by having unnecessary compound
8   questions, by taking too much time to ask the
9   question, by asking a repeated question for
10  information that you already know, et cetera,
11  et cetera.  That's why they put a limit on the
12  time.
13       MR. ROCHE:  I noticed the corporate deposition
14  up for today.  I am entitled to seven hours under
15  the corporate deposition.
16       MR. DAVIS:  We already discussed it yesterday.
17       MR. ROCHE:  I am entitled to seven hours under
18  the subpoena that I issued to Dan Bump.
19       MR. DAVIS:  Yesterday was the corporate
20  deposition of Dan Bump.  And we have agreed to
21  allow you a couple of extra hours, okay?
22       MR. ROCHE:  That is simply categorically,
23  undeniably false.
24       MR. DAVIS:  It is absolutely correct.  He is
```



1   the sole shareholder and president.  How could he

2   not be the 30(b)(6) rep?

3        MR. ROCHE:  Then I will move for sanctions

4   because he clearly was not prepared to testify on

5   several of these topics that were identified in the

6   corporate -- the notice of corporate deposition.

7        MR. DAVIS:  You have already agreed --

8        MR. ROCHE:  So you are telling me -- you are

9   telling me, Mike, that you submit a witness who is

10  incompetent to testify to several of these topics

11  and now you are claiming that I am no longer -- I

12  am precluded from having a full seven hours with

13  this witness when you don't -- when ACE does not

14  comply with its obligations to produce a witness

15  who can testify as to the allegations in ACE's

16  complaint as opposed to a witness who says he

17  hasn't read the complaint in a year and a half or

18  almost two years?

19       MR. DAVIS:  You are not precluded from asking

20  questions of the party that knows the answer to the

21  questions.  But it's not inconceivable that a

22  30(b)(6) rep wouldn't be able to answer every

23  single question under the sun about the case, okay?

24  So a 30(b)(6) rep answers questions in his



 1  corporate capacity which you have been asking,

 2  okay?

 3          If a corporate representative doesn't

 4  know, then you ask the party -- the occurrence

 5  witness that knows the answer.  It's that simple.

 6  So 30(b)(6) reps aren't required to know absolutely

 7  everything, but you are allowed to ask the

 8  applicable party that does know what the question

 9  is.

10       MR. ROCHE:  30(b)(6) witnesses are required to

11  educate themselves on the topics identified in the

12  corporate dep notice.  During yesterday's

13  deposition it became quite clear and evident that

14  Dan Bump was not prepared to testify as to several

15  of the topics identified in the corporate

16  representative notice.

17       MR. DAVIS:  Where --

18       MR. ROCHE:  I don't want to -- we are wasting

19  time.  I think we made our objections.  I think

20  they are quite clear for the record.  Let's take a

21  break and start with 30(b)(6).

22       MR. DAVIS:  We have already -- we are finishing

23  the 30(b)(6), okay?  So whatever you have got left

24  on the list, you can ask it.  That would be our



Daniel Bump 04/03/2017

1    position.   And let's take a break, and you can

2    start asking.

3         MR. ROCHE:    Fine.

4                        (Deposition concluded at

5                        12:27 o'clock p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    AMERICAN CENTER FOR          )
     EXCELLENCE IN SURGICAL       )
6    ASSISTING INC.,              )
               Plaintiff,         )
7        vs.                      )  No. 1:15-CV-07290
     COMMUNITY COLLEGE            )
8    DISTRICT 502, COLLEGE OF     )
     DUPAGE, DR. THOMAS           )
9    CAMERON, DR. KAREN M.        )
     SOLT, and DR. KATHY          )
10   CABAI,                       )
               Defendants.        )
11              this is to certify that I have read the

12   transcript of my deposition taken in the

13   above-entitled cause by Patricia L. Wangler,

14   Certified Shorthand Reporter, on April 5, 2017, and

15   that the foregoing transcript accurately states the

16   questions asked and the answers given by me as they

17   now appear.

18        _____

19                   DANIEL BUMP

20   SUBSCRIBED AND SWORN TO

21   Before me this _____ day

22   of _____ 2017.

23   _____

24      Notary Public



1    STATE OF ILLINOIS  )

2                       )   SS:

3    COUNTY OF COOK     )

4          I, Patricia L. Wangler, an Officer of the

5    Court, do hereby certify that heretofore, to-wit,

6    on April 5, 2017, personally appeared before me, at

7    180 North Stetson Avenue, Chicago, Illinois, DANIEL

8    BUMP, in a cause now pending and undetermined in

9    the United States District Court Northern District

10   of Illinois, Eastern Division, wherein AMERICAN

11   CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC.,

12   is the Plaintiff, and COMMUNITY COLLEGE DISTRICT

13   502, COLLEGE OF DUPAGE, DR. THOMAS CAMERON, DR.

14   KAREN M. SOLT, and DR. KATHY CABAI, are the

15   Defendants.

16         I further certify that the said witness

17   was first duly sworn to testify the truth, the

18   whole truth and nothing but the truth in the cause

19   aforesaid; that the testimony then given by said

20   witness was reported stenographically by me in the

21   presence of the said witness, and afterwards

22   reduced to typewriting by Computer-Aided

23   Transcription, and the foregoing is a true and

24   correct transcript of the testimony so given by



1    said witness as aforesaid.

2         I further certify that the signature to

3    the foregoing deposition was not waived by counsel

4    for the respective parties.

5         I further certify that the taking of this

6    deposition was pursuant to notice, and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9         I further certify that I am not counsel

10   for nor in any way related to the parties to this

11   suit, nor am I in any way interested in the outcome

12   thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto set

14   my verified digital signature this

15   17th day of April, 2017.

16

17

18

19

20   _____

21   ILLINOIS CERTIFIED SHORTHAND REPORTER

22   LIC. NO. 084-002417

23

24



1   McCorkle Litigation Services, Inc.
    200 N. LaSalle Street, Suite 2900
2        Chicago, Illinois 60601-1014

3

4   April 17, 2017
    Mr. Michael J. Davis
5   DLG Law Group
    2777 Finley Road, Suite 12
6   Downers Grove, Illinois  60515

7   IN RE:  American Center v. Community College
    NUMBER:  1:15-CV-07290
8   DATE TAKEN:  April 5, 2017
    DEPONENT:  Daniel Bump
9

    Dear Mr. Davis,
10

    Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause.  Also enclosed are additional signature
12  pages, if applicable, and errata sheets.

13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must be
    made on the errata sheets, not on the transcript
15  itself.  All errata sheets should be signed and all
    signature pages need to be signed and notarized.
16
    After the deponent has completed the above, please
17  return all signature pages and errata sheets to me
    at the above address, and I will handle
18  distribution to the respective parties.

19  If you have any questions, please call me at the
    phone number below.
20

21  Sincerely,

22  Cindy Alicea              Patricia L. Wangler
    Signature Department      Court Reporter
23
    cc:  Mr. Roche.
24



**$**

$3,000
293:1

**0**

002762
297:24

**1**

1
313:23 316:3
342:22,23,24
11
313:22 314:21 317:2
342:21,23 343:3
11th
278:17 297:2,8
298:9,14
12
258:2 278:23,24
342:23 343:3
12:27
348:5
13
307:1 313:16
14
289:15 337:16
340:10
14th
261:5 278:17
15
325:22
19
263:12,24 264:1
19th
297:2

**2**

2
333:8
20
330:13
2006
342:6
2011
332:21
2013
260:17 270:8 289:1,
5 295:22 306:11
307:13 338:18
339:11
2014
258:22 259:11
260:5,20 267:15
268:16 269:3,6
270:8 275:14,17
276:2,11,24 277:17
284:3 293:5 294:3
297:2,8 298:9,16
302:7 303:1,9,23
304:4,14 305:15
306:10 307:1 309:18
312:24 313:16
315:6,21 316:4,19
318:7,14,17,22,23
320:22 321:14
323:20 324:9 336:20
338:18 339:11
2015
331:4,5 340:5
20th
297:8
21
307:13

**21st**
263:4
24
316:11,12
25th
260:5
26
259:9,11 260:20

**3**

3,000
292:24 293:12
30
299:6 309:18 312:24
315:6,21 316:4,19
318:7,14,22,23
320:22 321:14
30(b)(6)
257:15,17 330:5,8
332:5 335:15,23
336:6,11 346:2,22,
24 347:6,10,21,23
32
313:14 314:5,19
315:5,19 316:21,23,
24 321:1,5,9,13
34
259:1,3,6
35
267:9,13
36
277:12,16
37
296:13,17
38
297:16,20
39
299:2,5 300:9

**4**

4
313:2,19 316:3
4,000
292:21
40
300:2,5,8
41
306:17,21
42
322:4,7
43
323:3,7
44
324:5,8
45
257:12

**5**

5
316:1 317:21 342:24
50-mile
318:2
5th
260:8 267:1 268:16
275:17 276:2,13
277:1 293:5 294:3
318:17

**6**

6
335:9,16,20,21
336:4

**8**

8
269:3,6 275:14
276:11,24 277:17
319:16 320:23
321:12 324:9
80
257:8
8th
267:15

**9**

9
278:23 289:1 340:12
9:04
267:17
9th
260:17 289:5,11
307:16

**A**

a.m.
267:17
abdominal
280:15
abilities
270:23 281:9
ability
266:17 270:4,9,22,
24 271:5,10 275:1
absent
276:2 277:2,6
absolutely
345:24 347:6
academic
333:9,13 334:1,4
accept
290:17,20
acceptance
291:14 293:20,24
294:8
accepted
290:12,23 291:1,9
292:10 293:18
access
300:24 301:3,8,9,12,
15 304:18,20 306:2
account
308:15
accreditation
266:14 342:9
accreditations
342:5
accusing
310:4
ACE
267:24 269:1 275:23
276:10 279:5,6,14
282:15,20,23 283:23
284:4,7,8,9,15,16
285:22 287:13,23
289:19 290:21 291:1
293:1,13,21 294:9
295:21 296:4,8
296:13 300:6
301:2,15 302:7
303:1,9,20,23 304:4,
16 305:8 307:24
308:24 312:7,16
313:2,4,5,19,24
315:18 316:7,10
317:15,23 318:6,23
320:13,17,18,20
323:9 324:22
325:12,13 326:1,12,
22 327:3,4,6,8
328:1,10,11,15,19,

20,23,24 329:5,7,9
331:11 332:20
333:8,24 335:7,13,
18,22 336:18,20,22
337:1 338:17,20
339:10 340:13,22
341:12 342:5,11
346:13
ACE's
264:19 266:15 288:4
290:4,12,17 298:6
301:4 310:18 311:1
314:13,14 320:18
327:12 328:3 330:24
331:16 332:22,23
334:17 335:9,17,21
336:12,22,24 337:8
339:18 340:2,7,10,
19,21 341:13,16,19,
20,23 342:8 343:4
346:15
ACE01118
319:16
ACE0112
309:20
ACE0113
311:4
ACE0364
261:3
ACE1115
315:11
acronym
302:22
acting
260:14 294:7
action
271:11 273:22
actual
283:13 320:6
adding
310:22
addition
268:12 282:18
additional
283:18 309:4 332:17
339:24
addressed
315:23 318:15
adequately
331:8 338:9 339:12
340:14 342:2,6,9,17
adjunct
313:8
advanced
298:9
advised
267:3 277:23
affiliation
265:13 266:12 284:8
afternoon
334:11,12
agent
332:10
agree
278:2 296:9 310:24
311:9 316:3,13
339:11 344:3
agreed
269:11 289:5 293:15
295:13 296:4 320:15
330:5,12 344:5
345:20 346:7
agreement
258:20 260:8,12,15,
16,18,22 264:13
266:12 267:1,5,22
269:2,5,7,12 270:5,
10,14,18 272:16
276:12 277:1 288:7,
9,10,11,12,18 289:1,
19,21,23 290:1,2,10

292:5 293:8,16
294:4 295:7,9,14,16
296:3,5,10 307:4,6,
8,20,22 308:1,2,14
309:1 313:7,10,11,
12,14,20,22 314:7,9,
15,16,18,21 316:7,
10,12,22 317:2,22,
24 318:5,9,16,20
319:21 320:6,9,14
321:9,20
agreements
265:14
ahead
272:23 274:4,8
287:12 294:11
ailment
338:24 339:3
allegation
330:23
allegations
330:23 331:16
346:15
alleged
336:21 337:1
340:13,21 341:3
allotted
344:19
allowed
337:22 347:7
alluding
259:18
amend
308:19
amended
288:13,14,15,17
290:9,17
amendment
292:4,9,10 295:8
amount
257:20 292:15
344:12 345:6
analogy
271:3
analysis
273:19 275:4
anger
326:15
answering
277:3 274:6
answers
346:24
anymore
284:24 323:16
324:20
apparently
322:21 333:13
appeared
275:10
appears
272:24 275:8 289:16
307:5 309:12,15
310:9 315:12 320:13
appended
263:24
applicable
347:8
approach
328:8
approval
262:7 263:12,19
264:19 266:14
276:2,13 277:2,7
278:13 341:23
approve
261:12,19 264:12
275:15,18
approved
265:20 277:22
295:19

area
319:5,9 340:22
341:2 342:7
areas
338:3 342:20 343:9
arena
323:24
arrange
296:19 323:10
arrangement
272:13
articulated
315:20
aspect
301:4
assignment
304:7
assignments
302:14
assist
302:22
assistant
302:24 319:9 323:11
342:1
assisting
284:13 300:6 310:18
assume
261:8
assumed
285:9
assuming
257:19
assumption
260:14
assure
310:10
attached
299:12 300:8 307:4
308:13,14 313:10,
12,15 335:23
attempts
298:7 328:1 334:17
attend
294:22
attended
275:5 278:16 279:12
280:7 297:1 317:7,
15
attending
268:2
attention
259:14 267:15
277:18 297:22 299:7
301:21 309:20 317:9
audio
302:5 303:23
audios
310:5,22
audiotape
304:1
August
297:2,8 298:9,14
307:1 313:16
323:13,20,23 331:5
author
263:23
authored
301:16
authority
261:16 269:21 270:9
271:12 272:1,5
273:12,23
availability
305:14,24
average
280:17 281:3
aware
261:15 264:11
267:23 275:14,24
277:3 278:3 286:17



294:5 301:14,17

**B**

**B-E-L-L**
285:4,5
**back**
265:6 266:1,9,23
269:22 272:12,18,24
275:4 285:3 288:19
293:22 295:21 303:6
313:13 314:9 317:9,
17,20 328:4 331:4
333:22 339:14,15
340:11
**bad**
326:14
**based**
273:18 288:14
292:15,22 331:14
342:13
**basically**
275:6 284:1 301:10
**basis**
272:17 282:16 283:1
290:7 339:18 340:2,
7 341:15,20
**Bates**
261:3
**began**
330:3
**beginning**
283:22 302:21 319:8
326:9
**behalf**
270:5,10 289:4
290:11 291:1
293:13,17 294:7
295:12 296:3,7
301:2 323:9 327:3
328:11,15,19,23
335:8 342:14
**behaving**
261:1 268:21
**belief**
269:10 317:13,17
**Bell**
284:23 285:4
**big**
285:23 326:2
**bind**
261:16 271:6 272:3
273:24 275:9 332:9
340:17
**bit**
269:17 329:17
**Black**
263:3,7,8 264:7
325:7
**Blackboard**
298:2,10,13 304:20
342:16
**board**
285:14 304:11 305:5
**boss**
278:4,6,8 289:17,18
**bottom**
297:23 299:7 306:4
**break**
334:16 344:21
347:21 348:1
**breaks**
286:16 306:3
**briefly**
343:1
**broke**
343:9
**brother**
299:9
**budgetary**
328:9,12,17

**building**
279:16,17
**bullet**
311:18,21 312:12
**Bump**
257:2,22 258:1,4,14,
19 259:2,7,12,15
260:3 262:24 263:3,
9 266:24 267:8,16
271:21 274:14
275:14 277:11,18
283:16 286:12,17
297:15,20,21 298:1
299:1 300:1,7,12
305:20 306:16,22
309:12 311:8 313:14
322:3,9 323:2 324:4,
12 330:14,16,18
331:1,12 332:24
333:12 334:4 335:3,
8,11 336:13 338:14,
15,20,21 339:9
340:4,5,9,16 341:17
342:3,13 343:5,15,
20 345:18,20 347:14
**Bump's**
329:23 333:10
337:21 338:13,14
342:2,13,17
**business**
275:22
**button**
322:14,18
**buttons**
322:18

**C**

**CAAHEP**
342:9
**Cabai**
259:15 260:24
261:11,15 263:23
270:7,21 271:4,7,16
272:1 273:12 275:5,
24 276:9,12,24
277:20 278:4 283:18
284:14,15 285:10,15
286:8,19 287:4,16,
19,21 288:3 290:10
297:1,22 298:1
299:14 322:8 324:10
**Cabai's**
267:16 273:23
277:23 284:7 287:11
**call**
303:8 324:2 325:12,
14 327:2
**called**
258:15
**Calls**
274:1
**calmed**
292:2
**Cameron**
324:10
**camp**
321:19
**capability**
312:6
**capacity**
330:16 332:9 337:22
338:1 347:1
**case**
293:10 294:5 303:13
337:20,21 346:23
**cases**
302:19
**catalogue**
327:17 328:24

**categorically**
345:22
**Catholic**
262:3
**caught**
281:6
**cc'd**
306:24
**CEO**
270:21,23 272:1
**cetera**
322:11 302:6
345:10,11
**chance**
308:12
**change**
313:23 314:1,2,23
318:4 320:20
**changed**
276:5,6 315:5 317:1
**characterize**
281:3
**charge**
335:13
**charged**
309:1
**chat**
306:1
**check**
333:22
**Chicago**
262:5
**claim**
339:18 340:2,7
341:16,20
**claiming**
337:17 346:11
**class**
286:4
**clean**
329:16
**clear**
267:2,6 347:13,20
**clinical**
265:13 266:11
267:21 280:4
**close**
322:18
**closed**
313:9
**closer**
278:24
**COD**
282:15 294:9 301:7,
12,15 310:17,24
313:3,6 315:7
316:10,11 318:6
319:17,18,23
321:14,19 322:1,10
327:4,12 329:5,7
**COD's**
275:21 343:16
**collaboration**
299:13,23
**college**
258:21 260:7,11,21
261:16 264:24
266:16,17 267:4
268:1,14 269:2,4,7,
11 270:5,10 271:6
272:3 273:24 275:2,
16 285:22 287:11
288:16 289:4,20
290:12 293:17
294:6,7 295:12
296:4,8,23 297:7
301:3 306:7,9
307:24 309:17
312:24 315:20
316:5,14 317:13
318:2,14 319:19,20

310:17 322:12
323:9,14 325:12,24
326:11,21 327:7,9,
13,17,23 328:2,10,
12,21 329:1,8,10
339:10
**college's**
269:3 314:17
**colleges**
316:8 318:1
**Colorado**
284:13
**combine**
299:6
**comfortable**
277:21
**comment**
272:18 283:20
**committee**
263:14
**communicate**
287:16,20 291:13
293:20
**communicated**
268:24 283:15,17
291:15 293:12 294:1
295:21 296:8 318:23
319:2,23
**communicates**
294:8
**communication**
284:1 291:22 295:23
**communications**
273:20 296:18 323:8
**company**
270:21 272:2
**compared**
280:24 285:22
**compensation**
313:9
**competent**
282:14 340:6 341:17
**competently**
336:17
**compilation**
323:7
**complained**
341:13
**complaint**
330:24 331:2,4,12,
13,16 340:4,8
341:13,18 346:16,17
**completion**
294:17,20
**compliance**
335:9 336:12
**comply**
346:14
**composed**
280:11
**compound**
273:7 329:17 345:7
**concern**
268:19 269:9 286:12
301:23 313:2,3
315:13,19,22 316:5,
14 318:5 321:2,14,
17,18
**concerned**
268:14 275:4
287:10,14 319:3
320:5
**concerns**
285:11,12,15,18,20,
23 286:8,19 287:11
299:10,12,23 306:5,
6,8 307:5 310:11,16
311:7 312:22,23
315:7,14 317:3
318:13,22 319:13,
19,20 320:21 321:4

322:1,10
**concluded**
348:4
**conduct**
341:13
**conducted**
279:6
**conference**
296:22 297:12
311:6,8,9,12,15,16
325:20
**confidential**
287:22 327:8,12
**conform**
276:7
**connection**
273:22 316:1 331:2
**consideration**
308:16
**consortium**
260:8,12,22 264:10
265:9,12 267:1,5,21
270:4,13 272:9,13
275:2 276:12 277:1
282:15 287:12 290:2
293:4,7 294:3,4,9
307:4 314:18,21
315:5 316:21 317:1,
15 318:4,9,16
319:21 320:14
**consummated**
260:16
**contacted**
327:20
**content**
305:22 310:21 311:1
**continue**
326:4
**continued**
257:2,3
**contract**
261:12,17,20 262:10
266:1,5,10,13,18
268:1,10,12 271:22
273:13 275:16,18,
19,21 276:1 287:17
293:3,4 294:12,13,
18 295:18,24 298:4
306:7,9 308:20
315:1,2 316:3,7
318:1 320:23 327:4
335:18,22 336:21
337:1 340:13,22
341:3
**contracts**
266:12 271:1 306:13
**contractual**
276:9 306:5,8
312:22 313:1
**contractually**
271:6 272:2 273:24
275:1
**conversation**
264:16 287:3,7,18,
24 311:10 318:12
319:1 323:13,17
324:3 325:9,17
327:10,14,16,22
336:1,5,9,18
337:5,9,11,13 338:3
339:7,14,17,21,23
340:10,24 341:2,7,
10 342:20,23 343:1,
7,14,18,23 344:2,5,
8,21 345:3,16,19,24
346:7,19 347:17,22
**copied**
324:11
**copies**
328:17
**copy**
320:18 328:6 344:11
**corporate**
257:15 258:4,8,10
329:23 330:19,22
331:6,8 332:22
333:11 334:11

338:2,9,12 339:2,9
340:6 345:13,15,19
346:6 347:1,3,12,15
**corporation**
331:7,21 332:4,7,10
335:9 336:16 338:6
340:18 342:15
**correct**
275:20 280:9 289:2
295:10 298:23 309:2
331:24 345:24
**correctly**
289:7 325:3
**Counsel**
329:22
**couple**
263:15 288:13
312:10 340:12 344:1
345:21
**court**
257:5
**covered**
257:20 269:9 329:14
330:7 332:18
336:19,21,22 337:2
338:4 341:4
**craft**
337:14,16
**curriculum**
263:14 301:5,9
320:15 329:9
**cut**
283:24 285:3

**D**

**damages**
341:12
**Dan**
257:2 322:9 334:4,
10 335:11 338:14,20
339:9 340:4,5,16
341:17 342:2,13,17
343:5,15,20 345:18,
20 347:14
**DANIEL**
258:14
**date**
268:24 277:17
293:3,6 324:2
**dated**
259:9 260:4 276:13
277:16 306:9 313:15
316:18 324:8
**DAVIS**
257:7,9,13,16 258:6,
9,12 261:23 262:2,4,
21 270:11 272:19,22
273:2,5,16 274:1,5,
20,23 276:15,20
298:15,17 329:12,
14,19 330:1 331:17,
19,23 332:2,12,16
333:3,7,15,18,21
334:9,12,15,17
335:2,5,14,17,21
336:1,5,9,12,18
337:5,9,14 338:3
339:7,14,17,21,23
340:10,24 341:2,7,
10 342:20,23 343:1,
7,14,18,23 344:2,5,
8,21 345:3,16,19,24
346:7,19 347:17,22
**day**
280:18,19 285:19,20
304:13 305:9 312:5
**days**
273:21 280:6,10,13,
14



deadline
339:5
deal
283:10
dealings
264:9
dealt
261:19
dean
278:12
December
260:17 289:1,5,11
295:22 306:10
307:16 336:19
338:18
decided
317:5,14 323:15
decision
275:9 291:7
defendant
329:22
defendant's
297:23 335:10
336:12
defendants
335:18,22 336:19,
20,22 337:1 338:17
339:18 340:13,22
341:21,24 342:12
delayed
344:14
delete
344:16
delivery
311:1
demand
328:1,16,19,23
329:5,7
demonstrations
281:19,21 303:10,
16,19,21
denied
301:18
Denver
268:2 278:15,21
279:12 280:6 285:11
286:20 287:20 288:3
296:24 317:16
dep
336:11 339:9 347:12
department
261:21 263:12
264:23 265:19,23
266:2 267:4 269:14
270:24 272:6,9,14
275:7,15 276:3,5,14
277:2 294:24 295:19
depending
257:11
depends
265:17
deponent
338:8
deposition
257:2,5 258:8 259:2,
7 263:24 267:8,13
277:11,16 296:12,17
297:15,20 299:1
300:1 306:16 314:22
322:3 323:2 324:4
329:24 330:13,16,23
331:3,10 332:9
334:11 336:2
337:15,16 338:2,13,
14,20 339:5,6
344:17 345:6,13,15,
20 346:6 347:13
348:4
depositions
345:2

describe
292:8
designate
335:8
desire
268:18
destroy
329:9
destruction
328:16,20,24
detail
303:3 343:20
details
283:4,6
diagrams
302:20
difference
266:11 336:5
differences
310:9
diligence
273:21
direct
259:14 267:15
277:18 278:7 297:22
299:7 301:21 309:20
direction
268:11 295:3 326:24
directly
270:3 290:20
disagree
308:10
discontent
286:12,23
discount
292:14
discover
271:4
discovered
326:10 338:23
discovery
335:10 336:13
discuss
262:17 333:11
339:13,19 340:20
discussed
257:16 262:14
273:20 297:13
307:16 317:18
341:16 345:16
discussing
277:17 311:19 314:5
321:11 329:23
discussion
264:14 291:6,9
292:17 311:20
323:10 324:14,15,
16,18,19 325:1
327:6 329:21 330:1,
22
discussions
336:18,20 338:17
339:10 342:16
display
281:15
displeasure
326:15
disseminated
302:15
distance
300:24 301:4,10
302:11
document
261:4 268:16 271:11
272:5,8 282:1 288:5
314:3 315:24 316:16
documents
273:8
doubt
320:7,8 325:8

downward
300:18
due
273:21 339:2
duly
258:16
Dupage
258:21 260:7,11,21
261:17 264:24
266:16,17 267:4
268:1,15 269:4
270:5,10 271:6
272:3 273:24 275:2,
17 285:22 287:11
288:16 289:4,20
290:12 293:17
294:6,7 295:12
296:8,24 297:7
301:3 313:1 316:5,
15 317:14 318:15
319:19,20 322:12
323:9,14 325:12,24
326:11,21 327:7,13,
17 328:2,10,12,21
329:1,8 339:11
Dupage's
309:17
duration
317:24

## E

earlier
295:8 313:20,22
edited
312:14
educate
347:11
educating
258:2
effect
262:24 288:2
effective
328:8
effectively
334:5
elaborate
270:1
email
259:9,10,11,20
260:1,4 261:2,8
262:12,14,24 266:23
267:14,16,18 273:19
277:16 289:6,8,11
291:18 296:18
297:21 299:5,8
300:9 304:19 306:2,
21 308:14,21 313:15
321:24 322:8,11,15,
23 323:7 324:8,11,
12,13 328:16
emails
262:9,17 273:11
275:5 292:1
emphatic
265:18,22
employed
284:4
employee
313:4 334:23
employees
335:13
encapsulated
289:23
end
257:4 280:2
ended
284:15 292:23 297:1
enrollment
333:1

entail
294:20
enter
266:17
entering
319:19,21 342:12
entitled
344:4,6 345:14,17
environment
304:10
essentially
306:13
ethical
345:1
evaluate
282:17
evaluated
281:22
evaluating
281:8 282:3,11,13,
16 283:12
evaluation
281:13
evening
312:3
event
299:11
eventually
292:23
evident
347:13
EXAMINATION
258:17
examine
337:23
examined
258:16
excellent
285:1
exclusive
319:5 320:17
excuse
279:4 313:23 319:20
338:21
executed
298:4
exhibit
259:1,3 263:12,24
267:9,13,17 271:15,
18 275:13 277:12,
16,19 289:12,15
296:13,17 297:16,20
299:2,5,6,8 300:2,5,
8,9 306:17,21
307:15 313:14,18,22
314:5,19,20,21
315:5,19 316:21
317:1,2 319:15
321:1,5,9,13,23
322:4,7 323:3,7
324:5,8 335:14,19,
23 336:2 343:19
exhibits
262:19 331:13
344:13
existed
328:17
existence
327:4
expansion
302:22
expect
283:21
expecting
326:17
expense
313:6 314:13,14,17
experience
283:10 326:4 337:19

explained
330:17 332:20
explains
271:21
explored
340:14 342:2,7,10,
17
express
285:10 286:8 315:12
expressed
264:22 285:12,16,
20,24 311:7 312:23
315:7 316:14,17
318:6 320:21 321:14
expressing
285:19 287:6 315:9
316:5
expression
318:10
extend
339:4,5
extent
258:9
extra
336:23 340:19
344:16 345:21

## F

fact
262:8 269:6 286:7
292:16 322:13
330:13
faculty
313:8
fair
261:14
fairly
323:22
fall
336:4
false
345:23
family
299:10,15,17
February
263:4
federal
331:6 337:23 344:24
feel
273:11 313:3
felt
266:21 270:22 295:1
figure
292:24 293:1
figures
333:1
filed
331:5
filled
271:12
final
268:12 291:7 295:17
finalization
294:11
finalized
268:11 294:14,16,18
financial
285:2 298:10,18
332:20,23 333:3
fine
258:6 265:21 339:6
348:3
fine-tune
281:11
finish
272:20
finishing
347:22

firm
323:23
follow
318:20 320:9 345:1
font
309:15,22 311:5
forever
319:7
forgot
303:7
form
271:10 275:23
304:23 318:21
339:17 340:1
341:15,20
formalities
269:8
formality
260:19
formulated
313:10
forward
261:5 272:12,16
289:10 290:8 291:18
294:17,19,21 295:20
318:12 326:1
forwarded
291:16,17 293:15
forwarding
259:19 299:12
found
330:3
fraud
339:18 340:2,7
341:16,20
front
275:13
full
294:11 346:12
fully
298:4 312:14
functioning
272:15 301:24

## G

gave
266:19 293:4
general
283:6 286:23 311:20
Gina
257:5
ginning
286:6
gist
284:1
giving
274:5
good
272:13 280:23
284:24 289:9 295:2
302:22,24
graduated
286:2
granted
301:3,19
great
268:7 269:20
ground
338:15
grounds
276:16
grumbling
286:17
guess
279:19 307:17 332:3



**H**

half 257:12 283:24 346:17
halfway 301:22
hall 332:2
handbooks 334:24
handouts 302:4,7,9,10,12,15, 18 312:15
Hands 336:23 340:20
happened 266:4,6,20 317:3,6 326:23
happening 271:20
hard 328:16
head 270:24
heading 321:23
health 299:10,15,17
hearing 268:4 287:10
high 287:2
higher 318:1
history 342:8
hit 322:19
hitten 322:17
hitting 322:14
Hold 337:10,12
homework 302:6 304:5
hoping 312:18
hospital 265:17
hospitals 265:13 308:3
hour 257:12 280:19
hours 258:2 280:19 337:13,15 341:5,8 344:1,2,4,9 345:14, 17,21 346:12
hysterectomy 280:15

**I**

I4 313:24 314:19 315:10
idea 271:12 316:6
ideas 312:19
identification 259:4 267:10 277:13 296:14 297:17 299:3 300:3 306:18 322:5 323:4 324:6
identified 257:21 258:11 306:6

309:17 314:18,21 317:2 331:9 338:12 343:19 346:5 347:11,15
identify 257:6
Illinois 313:4
imfamatur 261:20
immediately 259:15 318:19
implement 310:12
implemented 312:6,9 318:5
important 302:23
impression 271:24 276:4 280:21 287:1 300:16,17 315:22
Imprimatur 261:23
improve 302:3
improvement 310:1 312:14
improving 310:14
include 288:17 304:12
includes 302:4
inclusive 302:4
incompetent 346:10
inconceivable 346:21
indication 268:17
individual 330:16 332:8,9 337:22 338:1 340:9
inferior 281:2
information 287:23 288:2,4 327:8,12 328:9,13, 17 334:3 345:10
informed 325:11,12
initial 259:19 288:24 297:12 317:1
initially 339:2
inquiry 342:7
insight 337:24
insisting 332:16
instance 343:14
instances 265:4,24 266:8
instant 306:2
institutions 333:9,13 334:1,4
instructor 279:1,10,11 282:21, 23 283:24 284:6,7, 16,24 285:1 290:23 304:10,15,19,24 305:9,18 306:1
instructors 284:3,10,19 305:16

integration 298:3
intend 334:7 339:8,13 340:20 342:3,18 343:21,23
intention 330:10
interaction 333:12
interest 310:13
interests 275:21
internally 317:14
internship 280:5
interrupt 272:21
introduced 288:6
invested 298:19,23
investing 298:4
investment 299:8,10
irritation 286:7
issue 333:14
issued 345:18
issues 285:2 299:15,18 308:23 309:5,7,8
item 313:2 315:13 316:1 317:21 319:16 320:23 321:12
items 309:16 316:3

**J**

James 284:23
Joint 319:17 321:6,7,12
jointly 339:4
judge 344:10
July 261:5 267:15 269:3, 12 275:14 276:11,24 277:17 278:17 297:2,8 302:7 303:1, 9,23 304:4,14 305:15 309:18 312:24 315:6,20,21 316:4,19 318:7,14, 22,23 320:22 321:14
June 259:9,11 260:5,20

**K**

Karen 260:4 261:4 271:20 277:22 278:7 289:8, 14,16 290:16,17 291:21 293:16,19 299:9 306:24 322:8 325:3,18
Kathy 259:15 260:3,24 261:2,4,6,9,15 263:23 267:18

268:2,20 269:14,16, 19 270:21 273:12 275:5 276:8,12,24 277:20 278:3,13,15 279:12 280:7 282:5 286:6 288:14 289:7, 14,17 290:10,13,23 291:2,10,14,21 292:16 293:16,19 294:22 297:21 298:1 299:9,14 306:14,24 311:7,10,14 317:6, 15 319:2 322:8 325:3,16
Kathy's 278:10 280:21 289:17
Keith 258:4 259:15,19 260:3 261:3 263:3,7 264:15,18 267:16,23 271:21 277:20,24 291:15,17,18,20 292:12,17 293:14, 22,24 297:21 298:1 299:9 306:24 322:9 324:10 325:5,11 327:11,16 333:12,19 334:5,7 335:8,12 336:13 338:15,21,24 339:1 340:8 342:3, 13
kind 281:5,12 283:11 285:21 286:6,12 326:5,17
knew 278:13 286:4 301:18
knowing 301:20
knowledge 257:23 264:19 265:4 276:23 287:21 318:8 328:11 329:8 338:1, 10
Kyle 263:8 264:7 325:7

**L**

lab 260:24 267:19 268:2,20 271:24 275:6,11 278:15,16, 19,21,22 279:2,6,8, 12,14,18,21 280:2,6, 17,22,24 281:4,5,7 282:9,14,15 283:20 285:6,10,11,21 286:13,16,20,21 287:20,22 288:3,15 290:11,13 291:2,10, 14 294:22 297:1,4 300:17,21 302:9,15, 17 303:3,6,11,14 305:21 306:3 308:24 312:2 317:7,16 319:2 320:10 326:24
labs 287:5 292:16
lack 326:4
language 313:7 320:13
lasted 325:20
latest 306:12 318:8
law 337:20,21
lawyer 274:10 327:20,22

lead 345:1
learn 287:22 288:3
learned 311:6 312:2,4
learning 298:11 300:24 301:4,11 302:2,13 304:10 318:2 325:24
learns 338:10
leaving 344:10
left 257:6 258:19 286:24 347:23
legal 261:9,11,21 262:10 263:12,18,19 264:11,23 265:6,19, 23 266:2 267:4 268:6,8,10 269:23 270:8 271:7,17 272:6,8,14 274:1,5,9 275:1,7, 15,18,19 276:3,5,7, 13 277:2,7,22 294:24 295:19
legally 272:3 275:10
letter 300:5,7,8,11,15 301:22 302:23 309:17,18,21 312:24 315:6,21 316:4,18 318:7,14,23 319:17, 18,24 320:22 321:15
level 283:21
limit 345:5,11
limited 274:20 339:20
list 302:4 339:14,15 347:24
listed 300:19
live 281:19 303:16,18
logistics 292:22
long 275:6 280:17 301:1 315:23 325:19,22 326:8 334:15
longer 315:3 325:13,24 326:11,21 343:23,24 346:11
lot 257:17 285:12 287:4,7 311:6
low 292:21 293:1,12
lower 294:8
lunch 280:19

**M**

made 267:2,6,23 269:16 271:4,9 275:9 277:24 283:20 293:14 304:18 314:24 318:19 320:20 332:8 347:19
Maggie 279:21 335:12

main 269:9 297:24
maintain 334:17
make 271:7 272:6 275:19 292:10 329:5,7 338:7
management 298:11
managing 332:10
manual 303:3,5,7
marked 259:3,6 267:9,12 277:12,15 296:13,16 297:16,19 299:2 300:2 306:17,20 322:4 323:3,6 324:5
master 301:9 327:18
material 334:7
materials 285:21 304:6 305:10 320:15
matter 275:2
means 262:2 302:23
meant 263:7 307:20 310:2
medical 338:24 339:3
meeting 296:19,22 297:3,6,9
meetings 297:12
memo 263:3,5,8,23
memory 282:8 339:12 342:3
mention 327:3
mentioned 263:17 264:11 293:2
mentions 263:15
merger 336:23 340:19
message 322:10,11
met 269:19
methods 283:8
mid 292:24
middle 261:3 277:18
Mike 257:4 334:20 337:7, 8 343:21 344:20 346:9
mind 260:18 262:18 268:23 269:5 286:11 309:7 310:6 314:10
minimum 304:11
minor 309:10
minutes 257:8,12 325:22 330:13 334:21
mistake 322:14,16
moderator 279:7



modified
308:15 313:20
315:19 321:10,13
module
302:5
modules
301:13 304:5
money
298:13,19
months
269:1 316:11,12
morning
340:17
mother
299:21
motion
295:2
move
257:14 289:9 295:20
306:4 311:17 346:3
moved
290:7 310:5 339:4
moving
268:11 272:16
294:10,17,19,21,23,
24 318:12
mutual
310:14

**N**

nature
320:16
needed
271:13 283:2 285:3
308:10 312:19 319:6
neglected
309:24
negotiations
307:7 308:8,15,18,
19 309:5 342:11
nervous
260:11,20,24
newer
314:24 315:24
news
268:5
NIFA
284:11
night
331:13
Nondisclosure
258:20 269:2,4,7,11
270:9,18 288:8,9,10,
17 295:6,13 296:2,5,
9 309:1
note
282:18 309:12
313:18 340:3
notebook
312:15
notes
261:4
notice
258:11 331:10
336:1,10 338:12
346:6 347:12,16
noticed
338:5 345:13
November
307:13 336:19
338:18
numeral
313:24 314:19
315:10
nurse
286:1

**O**

object
273:6 276:16
objected
329:17
Objection
274:1
objections
347:19
obligate
275:1
obligation
331:11 338:6
obligations
271:7 346:14
observe
312:5
observed
282:6
obtain
341:24
obtained
342:5
obvious
321:20
occur
323:20
occurred
289:1 291:23 312:16
323:18 324:3 325:1
333:2
occurrence
347:4
occurs
264:16
October
336:4
offer
290:4,12,17 291:1,
10 293:1,12,18,21
305:24 310:14
offered
289:20 290:23
292:10,18
office
271:20
official
305:14
officially
305:12
oftentimes
264:12
older
313:6 314:7 315:1
on-site
313:5
ongoing
269:18 309:24
online
301:4,8,13 302:10
303:20 304:5,10,14,
16 305:10,15,16,22
310:18 311:19 326:5
open
344:23
opening
309:21
opine
274:9
opinion
264:22 273:23
274:2,6,9,21,24
289:18 310:10
opposed
346:16
order
307:7

organization
271:2 284:12
organizations
284:10
original
307:22 308:19
orthopedic
286:3
orthopedics
286:4
outline
301:10
outlined
318:13
owner
332:7
ownership
332:15

**P**

p.m.
348:5
pages
302:5 303:2
paid
298:13
painful
325:21
paragraph
297:24 301:23 304:9
307:3 309:23 310:8
313:19,23
parking
287:4,7
Parrish
279:21
part
266:22 288:6,11
289:10 300:9 303:5
311:4 322:16 324:19
333:3,5
partial
302:3
participated
311:14
participating
296:21 297:6
parties
264:20 339:4
partner
325:13 326:12,22
partners
264:10
partnership
342:12
party
265:5 336:11 346:20
347:4,8
pass
272:6
passed
260:10 269:1
past
264:9 273:20
pay
288:16
paying
317:9
payment
293:13 294:8
payments
292:5,9
pecuniary
298:10,18
people
264:17 278:20,21
279:17 281:4,5
323:8

perfect
283:19
perform
302:24
performance
283:2,13,22 332:20,
23 333:4 335:17,21
336:24 340:21 341:3
performing
302:20
period
296:24 305:19 345:4
permission
320:19
person
296:22
personal
286:18
personally
260:10 281:15 343:5
perspective
334:4
pertain
302:13
pertained
333:1
pertains
269:6 270:17
phone
291:11,19 304:19
311:6,8,9,11,14,16
319:1 324:17,22
325:1,5,14 326:14,
16
phrase
262:11
pick
344:19
picked
282:9
place
287:17 297:3 298:4
302:2 316:11 320:6
329:3 334:23
plaintiff
329:22 336:2
planned
283:23
play-by-play
309:16
point
268:20 272:12 276:1
281:18,20 284:9
294:14 311:21
312:12 324:22 326:2
328:5 341:4 344:21
pointing
326:24
points
304:9 311:18
policies
334:23
portion
277:19 310:18
portrayed
271:13
position
348:1
possession
328:2
potential
284:8 336:22 340:19
potentially
322:13
practice
312:4
practitioner
286:1
precluded
346:12,19

preparation
338:11
prepare
331:8
prepared
331:15 338:9 346:4
347:14
preparing
331:3
present
273:18,19 278:22
279:14 304:11
324:16,24 332:21
342:6
presented
274:15 289:24
presently
271:18
president
330:4 331:20 332:4,
12 346:1
presume
281:23
pretests
301:13
pretty
280:23 327:19
prevented
274:6
preventing
339:1
previous
261:8 262:9,12,19
321:16
previously
258:15 271:16
322:12 343:6
price
292:18,20 306:15
307:23
primary
335:13
prior
267:19 268:1
271:20,22,23 284:7
331:15
probe
337:24
probed
339:12
procedural
302:5 303:2
procedures
334:23
proceed
326:1
process
263:13,17,18,19
264:20 265:8,11,15,
16 266:22 267:7
310:1 341:24
processes
266:14 276:7 310:10
produce
336:16 338:20
346:14
produced
293:10 294:5
production
297:24
professor
278:13
program
262:21 301:24
302:11 304:16
310:19 311:2 312:14
316:13 319:4 323:11
326:6 327:17 328:24
342:1
programs
316:9 319:9

preparation
338:11

project
298:5
prolong
345:6
proper
274:12
property
320:17
proposal
265:5
proposed
264:12 287:12 316:6
proprietary
320:16
prosecuting
273:22
prospective
264:10
provide
302:7 303:9,23
304:4 313:21 317:20
346:1
provided
327:8 328:20 329:9
provision
315:2 316:10
321:11,13
provisions
275:20 316:2
pulled
330:17
pursue
317:14
purview
276:8
put
307:21 311:24
320:14 345:5,11

**Q**

qualify
282:20,23
question
264:3 266:20
270:17,19 273:2,3,4,
6,7,9,10,16 274:7,8,
12,14 276:15,19,21,
22 285:9 295:5
296:20 297:5
298:17,20 308:22
313:13 319:15 321:8
323:12 329:4 334:8,
10 337:23 342:1,4
343:8 345:9 346:23
347:8
questioning
295:6 334:2,22
339:19 340:23
341:2,14,21 342:4
questions
257:18 268:23
304:15 305:1,10,13,
20,22 306:2 329:15
331:24 332:22
333:15 335:1 339:9
340:1,16 342:4,18,
21 343:2,4,10,12
344:14 345:8
346:20,21,24
quicker
282:10
quote
313:8,9

**R**

radius
318:2
raise
268:22



**raised**
310:17
**Rarely**
266:3
**reaction**
268:4 300:14 320:2, 4 325:23 326:10,13
**read**
264:6 274:19 288:19,22 310:11 314:12,13 317:11 340:8 341:18 346:17
**reading**
302:13 304:6 319:22 320:3
**ready**
289:9
**realize**
288:14
**reask**
264:3
**reason**
314:23 326:3 337:9, 11,14
**recall**
258:22 259:24 262:23 268:6 269:5 277:23 278:1,22 282:24 286:18 287:3,18,24 288:1 290:22 296:3,11,21 297:6,9,11 299:17 300:7,11 306:21 307:9,19 309:7 310:1,16 311:8,13 315:18 319:22 320:2 322:10,11,24 323:12,15,17 324:11 325:7,19 327:5,6,10, 11,15,20,24
**recalling**
325:2
**receive**
306:15
**receiving**
259:24 324:11
**recent**
259:10 267:14 293:7 294:4 307:4 311:6 313:11 315:4 317:22 318:16 336:7
**recollect**
286:9 299:14 300:6
**recollection**
265:24 273:19 283:16,17 298:6,8 308:2 337:24 342:17
**recommendation**
293:14
**record**
257:1 264:5 274:18 288:21 317:10 329:19,21 330:15 331:19 332:19 333:22 344:23 347:20
**red**
309:13,15,22 311:5
**refer**
303:6
**referenced**
295:7
**referred**
267:20 293:22 314:2
**referring**
261:7 273:7,10 289:8 307:8 308:21, 23 314:8
**refers**
315:2
**reflect**
257:1
**regular**
295:15 302:12
**reiterated**
275:6 325:18
**related**
300:23 302:17 311:23 316:8 321:8, 19 344:15
**relating**
264:17 290:10 292:5,9 308:23 312:1
**relationship**
265:9,12 266:16 272:10 275:23 276:10 284:14 295:24 297:10 310:13
**relationships**
265:12 333:8,24
**reliance**
340:10 341:19
**reluctantly**
293:15
**remember**
263:5 266:7 279:22 281:17 285:17 289:6 292:19 299:19 300:14 301:2 302:16 307:19 311:11,16 318:24 319:1,3,11 321:17 322:11 324:13,15 325:5,10, 23
**rep**
258:4 332:5 333:11 339:2 340:6 346:2, 22,24
**repeat**
273:9 317:8
**repeated**
345:9
**rephrase**
274:8,11
**replay**
311:19
**reporter**
257:5
**represent**
270:3,7
**representation**
271:1,8
**representations**
271:5,9 339:17 340:1 341:15,19
**representative**
258:8 329:24 330:6, 8,19,22 331:7,8 332:22 338:9 347:3, 16
**representatives**
296:23 297:7 323:14
**represented**
257:22
**representing**
327:23
**reproduce**
320:18
**reps**
347:6
**request**
336:13
**requested**
264:6 274:19 288:22 317:11
**requests**
335:10
**require**
310:17 331:6,7
**required**
336:16 338:20 344:24 345:3 347:6, 10
**requires**
313:4
**research**
304:7
**researched**
337:20
**respect**
275:13 290:9 292:4 296:2 306:9 308:22
**respond**
337:4
**response**
269:13,16,18 309:12,16,21 311:5, 10 312:22 313:1 315:6,19 318:5 320:21 321:13 322:1,10 334:2
**responses**
312:23
**Responsibilities**
313:2,19,24 319:17 321:7,12
**responsible**
304:11
**rest**
280:15
**result**
341:12
**return**
327:12,17 328:1,12
**returned**
328:6
**returning**
271:20
**review**
263:14 264:12 267:7 269:14 331:2
**reviewed**
265:6 331:4,12 340:4 343:16,20
**reviewing**
259:24 266:10 300:11,15
**revise**
310:21 311:1 312:15
**revision**
310:17
**revisions**
312:17,19
**Rights**
319:17 321:6
**Roche**
257:1,8,10,14,19 258:7,11,13,18 259:1,5 262:3,4,6,23 263:2 264:8 267:11 270:13,16 272:20 273:4,14,17 274:3, 11,13 275:12 276:18,22 277:5,14 288:19,23 296:15 297:18 298:16,21 299:4 300:4 306:19 317:8,12 322:6 323:5 324:7 329:13, 16,22 330:12 331:18,22 332:1,6, 14,19 333:5,8,17,19 334:2,10,14,16,20 335:3,6,16,20,24 336:3,7,10,15 337:3, 7,10,12,19 338:5 339:8,15,19,22 340:3,11 341:1,6,9, 11 342:22,24 343:3, 13,15,19 344:1,3,6, 20,23 345:13,17,22 346:3,8 347:10,18 348:3
**Rockford**
319:11
**Rockville**
319:10
**Roman**
313:24 314:19 315:10
**room**
279:19
**routine**
272:4
**rubber**
262:8,10,11 263:13, 20
**rule**
344:7
**rules**
331:6 337:23 344:24 345:1
**running**
269:23,24

**S**

**sake**
310:12
**sanctions**
338:7 346:3
**save**
327:1
**Scroll**
336:3
**secret**
288:4 335:2
**secrets**
327:7 334:18 343:4, 10,11
**sees**
344:12
**Self-study**
327:24 328:2,3,20 343:16,17
**send**
299:11 308:4,9 336:11
**sending**
299:22 306:21
**sense**
295:2
**sentence**
309:23 314:20 319:23
**September**
323:13,21,23 324:9
**series**
296:18
**serve**
258:4 279:7 330:19 333:11 338:8 340:6
**serves**
282:8
**Services**
336:24 340:20
**set**
331:9
**setting**
283:14
**shareholder**
330:4 331:20 332:4, 7,13 346:1
**show**
263:6 267:12 269:23,24 277:15 281:14 289:12 306:20 307:22 323:6 326:15
**showed**
271:16
**Showing**
296:16 297:19
**shown**
281:10
**shuffled**
344:13
**sic**
261:20 322:17
**side**
294:21 295:1,3 298:1 320:9
**sign**
260:12,21 265:20 267:1 268:15 269:11 270:4,9,22 271:1,10 272:5 273:13 276:1, 12 277:1
**signature**
269:3
**signed**
260:8 267:18,24 269:4,7 271:22,23 286:5
**significant**
302:2
**signing**
267:5 277:21
**similar**
316:8
**simple**
347:5
**simply**
296:18,20 322:9 323:12 329:5 345:22
**simulators**
320:16
**single**
330:9 346:23
**sit**
309:3
**sits**
331:14
**sitting**
285:24
**six-day**
294:22
**skills**
268:2 278:21 279:6, 12 280:6,21,23 281:2 282:10 285:11 286:20 287:20 288:3 297:1 303:11,14 305:21 317:16
**SKYPE**
297:12
**slow**
272:14
**sole**
330:4 331:20 332:3, 6,13 346:1
**Solt**
260:4 289:8 299:9, 22 300:8 322:8 324:9
**sort**
296:21
**sounds**
278:18 324:18
**speak**
287:8
**specific**
264:16 266:7 283:7, 8 302:6,18 304:4 312:1,17 314:23 319:22 321:18 327:22 343:9,10,11
**specifically**
263:21 266:9 271:10 278:1 291:24 296:11 308:10 310:3 311:11 314:12 319:10 323:22 325:14
**speculating**
272:22
**spend**
283:3,12
**spent**
258:1 341:7
**spiral**
300:18
**spoke**
291:20
**spot**
281:13
**spreading**
286:12
**staff**
285:3
**stamp**
261:3 262:8,10,11 263:13,20
**stand**
309:6,9 323:22
**stands**
286:10 331:14
**start**
258:8 280:4 307:7 308:7 316:13 326:9 347:21 348:2
**started**
261:1 268:20 281:5 285:13 288:13 298:2 303:15 319:4 320:10
**state**
263:11,19 269:5 308:13 310:8 311:5 312:13 313:2
**stated**
317:21
**statement**
277:23 306:5 308:17 309:21 310:2 315:15
**statements**
332:8 340:17
**states**
267:18 271:16,18 299:22 307:3 319:18 322:9 330:15
**staying**
334:13
**steam**
294:11
**step**
303:1,4
**step-by-step**
302:4,20
**strike**
279:5 282:11 298:7 319:13 321:10
**strong**
266:21
**student**
282:3 286:4,24 302:3 305:13
**students**
279:20 280:3,24 281:8,22 282:5,17 283:9 286:13 302:8, 16 303:10,24 304:15,18 305:2,11, 23 310:15 312:3
**stuff**
302:14 334:24
**subject**
292:1 321:23 338:7
**subjects**
338:22
**submit**
346:9

**submitted**
268:16 269:1 275:16
276:2
**subpoena**
335:19,23 336:9,11
345:18
**subsequent**
327:15
**substantial**
257:20 310:17
**success**
302:3
**sudden**
300:19
**suffered**
341:12
**sufficient**
257:23
**sun**
346:23
**superior**
281:2,4
**supervisor**
278:9
**supplement**
282:19
**supplemented**
282:23
**supports**
337:21
**supposed**
339:2
**Surely**
262:21
**surgeon**
286:3
**surgery**
280:13
**surgical**
284:13 300:6 303:5
310:18 319:9 323:10
336:23 340:20
341:24
**Surginet**
302:11 303:20 305:1
311:2
**surprise**
326:18
**surrounding**
342:8
**suture**
280:11,14,16
**sworn**
258:16
**syllabi**
327:18
**system**
298:11

**T**

**table**
314:15,16
**takes**
275:6 334:15
**taking**
282:18 286:11 345:8
**talk**
271:18 277:20
278:15 288:24
292:19 333:19
339:12
**talked**
286:15 291:19
**talking**
265:2 292:13 334:21
341:8
**targeting**
298:2

**taught**
302:19 303:11
**teach**
282:14 283:23
290:11,13 291:2,10,
14 308:24
**teacher**
283:13
**teaching**
279:18 281:7 283:8
292:16 302:2 305:21
306:14
**tech**
287:2
**technique**
281:10,14 283:8
**techniques**
281:12 283:7 287:21
288:2 302:19,21
312:1,4
**telephone**
296:20 323:13 324:2
325:19
**telephonic**
296:21
**telling**
284:11 346:8,9
**tells**
277:20
**template**
307:6,8,20 308:2
313:7,20,22
**ten**
280:19 302:1
**term**
315:2,4,8,9,17
316:2,6,9 321:20
**terminate**
297:10
**termination**
316:2,8,12
**terms**
257:17 294:12,13,
16,18 295:13,18
296:4,9 307:22
308:11 313:8 316:24
332:17 336:21
338:16 339:16
340:12
**testified**
258:18 260:13
261:10 263:1 280:10
295:7 330:9,18
331:1 334:5 335:11
338:14,15 339:24
**testify**
257:24 280:12
330:3,8 331:9,16
335:8 336:17
338:11,21 339:3
340:6,15 342:14
343:6 346:4,10,15
347:14
**testifying**
339:1
**testimony**
257:11 258:20,22
290:6 294:15 331:15
333:10 337:22
338:16 342:13
**tests**
301:13
**textbook**
304:6
**thereon**
320:12
**thing**
272:11 283:11
287:15 295:3
**things**
269:16 275:7 283:3

294:23 317:23 326:2
340:12
**thinking**
285:13
**thought**
257:10 259:17 265:1
266:19 278:11,12
285:14 287:2 292:3
301:7 307:17 314:12
328:7
**thread**
259:1 267:14
297:21 299:5 300:9
**threat**
338:7
**time**
257:6 260:7,23
265:10 268:17
269:10,17,22 272:11
276:1 278:3 280:11
282:13 284:3 286:7,
16 287:19 289:24
294:14 296:24 298:7
304:21 308:6 310:16
312:20 316:17 320:6
322:22 324:22
327:23 332:17 341:4
344:12,16,19,22
345:4,8,12 347:19
**times**
263:15,17 283:12
288:13 304:12,16
305:2,3
**today**
257:3 338:6 339:1
341:17 345:14
**today's**
338:19
**told**
261:11 296:4 324:21
**Tom**
261:5 271:19 277:20
278:9 325:3,18
**tools**
302:2,5 303:23
**top**
259:10,21 311:18
312:13
**topics**
257:20,22 258:3,5,
10 330:8,10,11,20,
21 331:9 336:17
338:11 346:5,10
347:11,15
**total**
280:15
**town**
261:4 277:22
**trade**
288:4 327:7 334:18
335:2 343:4,10,11
**train**
291:24
**trained**
284:6,10,15
**training**
280:11 282:20,22
283:19 310:14
326:5,6
**transcripts**
344:12
**transmitted**
265:5 328:10
**travel**
313:4
**true**
257:21 269:21
**turn**
319:16 321:5
**tweaked**
320:13

**tying**
280:15,16
**type**
309:13 334:24

**U**

**Uh-huh**
281:24 282:4 290:3
291:5 292:7 293:6
299:24 316:20
**unable**
330:19 339:3
**undeniably**
345:23
**understand**
271:3 274:14
**understanding**
264:19 265:16
266:15 292:8 306:8
341:23
**unequivocally**
330:15
**unit**
301:13
**unnecessary**
345:7
**untoward**
272:7
**upcoming**
329:23
**update**
280:3
**upset**
292:2
**utilized**
285:21
**utilizing**
283:7

**V**

**valid**
275:19
**verbal**
266:12,18 268:10,13
271:9 288:7,11,12,
24 289:19,21 290:9
291:10,12 292:5,9
295:9 318:19
**verbally**
289:5 290:12,18,19
294:1,2
**verbatim**
314:6
**verified**
329:2
**version**
268:13 314:24
315:24 318:8
**video**
281:15,18,20 296:22
303:6,7,12,16,18,21
312:5
**videos**
310:5,22,23 311:19,
23 312:13
**view**
318:13 335:7 337:21
338:19
**virtue**
332:14 333:10
**visit**
313:5 314:14
**visual**
303:9,21
**visuals**
302:5

**W**

**wait**
316:11
**wanted**
292:21 297:10 319:4
326:1,11,22
**wasting**
347:18
**ways**
302:20
**website**
311:24
**week**
280:3 283:3,19
298:3 304:12,17
305:2,3 338:24
**weekend**
304:13 305:8,9,13
**weeks**
260:10
**whatsoever**
296:23
**witness's**
276:23
**witnesses**
347:10
**word**
262:11 314:6
**wording**
275:19 276:6
**words**
263:21 271:14
322:17 326:15
**work**
265:15,16 281:16
283:2 317:5 323:16
324:20,21
**workbook**
301:16
**working**
265:18 286:2
**wow**
283:21 285:13
**write**
261:9
**writes**
298:1
**writing**
266:13 268:19 282:1
290:18 291:11
294:1,6
**written**
108:22 261:12,17
265:4 268:1,12,15
281:13 282:1
289:23,24 295:18,24
314:11,16,24 315:1
318:20 320:4
**wrong**
261:24 280:9 283:9
322:14,18
**wrote**
315:14

**Y**

**year**
346:17
**years**
283:10 302:1 309:24
312:11 346:18
**yesterday**
257:3,16,22 258:19
261:11 262:15,16
280:10 297:13
330:2,14 331:1,3
332:24 333:10,16
335:4,11 338:13

344:5 345:16,19
**yesterday's**
257:4 347:12
**Youtube**
310:5,22

