1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    AMERICAN CENTER FOR          )
     EXCELLENCE IN SURGICAL       )
6    ASSISTING INC.,              )
              Plaintiff,          )
7      vs.                        )  No. 1:15-CV-07290
     COMMUNITY COLLEGE            )
8    DISTRICT 502, COLLEGE OF     )
     DUPAGE, DR. THOMAS           )
9    CAMERON, DR. KAREN M.        )
     SOLT, and DR. KATHY          )
10   CABAI,                       )
              Defendants.         )

11            The corporate representative deposition of

12   DANIEL BUMP, called for examination pursuant to the

13   Rules of Civil Procedure for the United States

14   District Courts pertaining to the taking of

15   depositions, taken before Patricia L. Wangler,

16   Certified Shorthand Reporter in the State of

17   Illinois, at 180 North Stetson Avenue, Chicago,

18   Illinois, on April 5, 2017, commenced at the hour

19   of 12:49 a.m., and terminated at the hour of

20   2:47 p.m.

21

22

23   Reported By:  Patricia L. Wangler, CSR

24   License No.:  084-002417



1    APPEARANCES:

2        DLG LAW GROUP, by

3        MR. MICHAEL J. DAVIS

4        2777 Finley Road, Suite 12

5        Downers Grove, Illinois  60515

6        (303) 758-5100

7        mdavis@dlglaw.net

8            Representing the Plaintiff,

9

10       SCHUYLER, ROCHE & CRISHAM, P.C., by

11       MR. MICHAEL T. ROCHE

12       180 North Stetson Avenue, Suite 3700

13       Chicago, Illinois  60601

14       (312) 565-2500

15       mtroche@srcattorneys.com

16           Representing the Defendants.

17

18

19

20

21

22

23

24



Daniel Bump 04/05/2017

```
1                    I N D E X
2   WITNESS                          EXAMINATION
3   DANIEL BUMP
4       By Mr. Roche                          6
5
6
7
8
9
10                  E X H I B I T S
11  NUMBER                       MARKED FOR ID
12  D.B. 30(b)(6) Deposition
13      Exhibit No. 1                  38
14      Exhibit No. 2                  68
15
16
17      (Exhibits retained by Mr. Roche.)
18
19
20
21
22
23
24
```



1       MR. ROCHE:  Let the record reflect that this is

2   the corporate representative deposition of

3   plaintiff American Center for Excellence and

4   Surgical Assisting, Inc., taken pursuant to

5   applicable Federal Rules of Civil Procedure

6   including but not limited to Rule 30(b)(6).

7           Could you please -- well, actually before

8   we swear the witness in, please let the record

9   reflect that counsel for ACE and counsel for

10  defendants have spoken and have decided to probe --

11  decided to identify the topics for today's

12  deposition that are listed in the notice of

13  corporate deposition that was issued in this case

14  to the following categories, No. 1, the steps that

15  ACE, plaintiff in this case, took to protect its

16  confidential information trade secrets, the alleged

17  damages suffered by ACE as a result of the conduct

18  complained of in the complaint, ACE's performance

19  under the contract that it alleges COD entered

20  into, ACE's Self-Study which alleges is its trade

21  secret and proprietary information and the

22  textbooks that are offered in connection with the

23  ACE Surgical Assisting Program that remain -- the

24  remaining topics identified in the notice of



Daniel Bump 04/05/2017

1    corporate deposition will be -- excuse me.  The

2    deponent who will be testifying on the remaining

3    topics identified in the notice of corporate

4    deposition will be Keith Bump whose deposition has

5    not presently been scheduled due to a medical issue

6    but hopefully will be completed within 30 days of

7    today's date.

8         MR. DAVIS:  And just to add to the record, this

9    is pursuant to an agreement between the parties

10   after Dan Bump has already testified to many of the

11   areas listed on the Exhibit A to the notice of

12   30(b)(6) deposition and that these are the areas

13   remaining which he can comment on which does not

14   limit counsel from asking Keith Bump the same

15   questions in his individual and in his corporate

16   capacity.

17        MR. ROCHE:  Would you please swear the witness

18   in.

19                    (Witness sworn.)

20

21

22

23

24



```
1                        DANIEL BUMP,
2    called as a witness herein, having been first duly
3    sworn, was examined and testified as follows:
4                        EXAMINATION
5    BY MR. ROCHE:
6         Q.    Dan, you testified yesterday that
7    throughout the entire existence, corporate
8    existence of ACE you have been the 100 percent
9    shareholder and CEO of the corporation; is that
10   accurate?
11        A.    Yes.
12        Q.    I want to discuss the steps that ACE, the
13   corporation, takes to protect the dissemination of
14   the trade secrets and confidential information that
15   ACE considers to be as such and proprietary to ACE.
16             Are there any -- is an employee of ACE
17   required to execute any sort of confidentiality
18   agreement at the time he or she becomes employed by
19   ACE?
20        A.    Not up 'til now.
21        Q.    Does an employee of ACE presently --
22   strike that.
23             Is an employee of ACE -- does ACE ask its
24   employees to sign confidentiality agreements today?
```



Daniel Bump 04/05/2017

1      A.    No.

2      Q.    How about nondisclosure agreements, when

3  an employee is hired by ACE, does ACE require the

4  employee to sign a nondisclosure agreement?

5      A.    Not ordinary employees.  I would have

6  somebody like Keith, for instance, to sign a

7  nondisclosure.  And I believe I did.

8      Q.    Keith would sign a Nondisclosure Agreement

9  on behalf of ACE or -- I'm confused.  I apologize.

10     A.    He would sign an employment agreement.  We

11 don't ordinarily have employees sign an employment

12 agreement, but I believe in that employment

13 agreement there is a nondisclosure clause.

14                     (Whereupon, Mr. Davis exits at

15                      12:59 o'clock p.m.)

16 BY MR. ROCHE:

17     Q.    Has that employment agreement been

18 produced in this case?

19     A.    I don't know if -- I don't believe it was

20 asked for.

21     Q.    Okay.  It was asked in a document request,

22 No. 51 and No. 52 that defendants propounded on

23 plaintiff.  We could probably just get that

24 agreement before we have the corporate rep dep of



1  Keith Bump.

2      A.    I have no objections to that.

3      Q.    But anyway so the employment agreement

4  that Keith signed, I think you just said, contains

5  the nondisclosure clause?

6      A.    I haven't seen it for a long time, but I

7  believe it does.

8      Q.    Do you know if that employment agreement

9  contains a confidentiality clause?

10     A.    I don't know the difference between those

11 two things.  It seems like those are the same thing

12 to me.

13     Q.    Do you know if -- never mind.

14         How about any other ACE employees, are

15 there any other employment agreements between ACE,

16 the corporation, and its employees similar to Keith

17 Bump's employment agreement?

18     A.    No.

19     Q.    Is there -- strike that.

20         Does ACE have an employee handbook?

21     A.    Yes.

22     Q.    Has the employee handbook been produced in

23 this lawsuit?

24     A.    I don't believe so.



1    Q.    Do you know why?

2    A.    No.  I didn't even know it was asked for.

3    Q.    Okay.  Does the employee handbook contain

4    a confidentiality provision?

5    A.    I don't believe so.

6    Q.    Does the employee handbook contain any

7    statement about ACE's confidential information?

8    A.    I would have to review it, but I don't

9    believe so.

10   Q.    Did you review the employee handbook in

11   connection with your testimony today?

12   A.    No.

13   Q.    Do you know if the employee handbook

14   contains any reference to ACE's trade secrets?

15                    (Whereupon, Mr. Davis entered

16                    at 1:01 o'clock p.m.)

17   THE WITNESS:  I don't believe it does.

18   BY MR. ROCHE:

19   Q.    Are there -- aside from the employee

20   handbook, does ACE promulgate any corporate

21   policies pertaining to the confidential information

22   of ACE?

23   A.    No.

24   Q.    And this was in place in 2013 and 2014?



1      A.    The employee handbook?

2      Q.    Yes.

3      A.    I believe so.

4      Q.    Okay.   And in 2013 and 2014 were there any

5  policies of ACE pertaining to the confidentiality

6  of its information?

7      A.    No.

8      Q.    How many employees have left the

9  employment of ACE since 2010?

10      A.    Of their own accord or including people

11  who were fired.

12      Q.    Both.

13      A.    Since 2010 there was Sarah Bump and --

14  since 2010 until now?

15      Q.    Yes.

16      A.    Tina Roswell who was the receptionist,

17  James Bell, John Redmond, Jack Simmons.   I believe

18  that's it.

19      Q.    Were there any exit interviews conducted

20  in connection with the departures of those

21  employees?

22      A.    Not really, no.

23      Q.    Was it ever communicated to the former

24  employees of ACE that they are not allowed -- they



Daniel Bump 04/05/2017

 1    were not allowed or permitted to take ACE's

 2    confidential information when they left ACE?

 3         A.    No.   But they really didn't have access to

 4    it.

 5         Q.    Okay.   Who has -- who had access to ACE's

 6    confidential information in 2013 and 2014?

 7         A.    Just me.

 8         Q.    Just you?

 9         A.    Uh-huh.

10         Q.    Keith did not have access to ACE's

11    confidential information?

12         A.    Well, I mean sales, things they would use

13    in sales, like the catalogue.

14         Q.    And the curriculum, would that also be?

15         A.    He would have to get special permission to

16    use that.

17         Q.    And he would obtain that permission from

18    you --

19         A.    Yes.

20         Q.    -- is that right?

21               Is ACE's confidential information stored

22    electronically, Mr. Bump?

23         A.    Yes.

24         Q.    And can you define for the record what ACE



Daniel Bump 04/05/2017

1   considers its confidential information?

2       A.   Any information that might be utilized by

3   a competitor or somebody we didn't authorize to use

4   to create their own program.

5       Q.   And where exactly is ACE's confidential

6   information electronically stored?  Is it stored in

7   the cloud?

8       A.   It is now.  It was on a server before.

9       Q.   Was it on a server in 2013?

10      A.   It was on a server.

11      Q.   And 2014?

12      A.   Yes.

13      Q.   And the only individual -- if I understand

14  your testimony correctly, the only individual who

15  had access to ACE's confidential information in

16  2013 and 2014 was you?

17      A.   I was the only one that was authorized to

18  access that information.  We didn't really have

19  security measures surrounding those documents.

20      Q.   Any ACE employee could access that

21  information?

22      A.   Conceivably.  They would have been fired

23  if they did so without the proper authorization.

24      Q.   What --



```
 1        A.    There would be no reason why they would be

 2   there.

 3        Q.    Could an ACE employee again in 2013 and

 4   2014 simply access the information stored

 5   electronically on the server by accessing an ACE

 6   computer?

 7        A.    They could if they wanted to commit

 8   industrial espionage.

 9        Q.    Was the --

10        A.    Do we have to strike that answer?

11        MR. DAVIS:  No.  Leave it.

12   BY MR. ROCHE:

13        Q.    Was the employee who wants to commit

14   industrial espionage required to utilize a password

15   to access this information electronically?

16        A.    No.

17        Q.    Simply go onto an ACE computer and an

18   employee could easily access this information?

19        A.    They would have to look for it.  And if

20   they could find it, then they could access it.

21        Q.    Were hard copies of ACE's confidential

22   information kept in 2013 and 2014?

23        A.    No.

24        Q.    It was all electronic?
```



1      A.     Uh-huh.

2      Q.     Did ACE in 2013 and 2014 have any

3   capability to track who accessed ACE's confidential

4   information electronically?

5      A.     Maybe an IT guy could figure it out.   I

6   wouldn't be able to.

7      Q.     Did ACE have an IT guy in 2013 and 2014?

8      A.     Not that we employed.

9      Q.     Let's discuss damages.

10     MR. ROCHE:   Can we go off the record for a

11  quick second?

12                      (Discussion off the record.)

13  BY MR. ROCHE:

14     Q.     Let's turn to what was marked as Exhibit 1

15  to your deposition in your individual capacity.

16  What exhibit -- what is this document, Mr. Bump?

17     A.     This is the complaint.

18     Q.     If you could turn to paragraph 63.   This

19  paragraph alleges that as a proximate result of

20  defendant's acts of conversion, ACE was deprived of

21  their property rights and suffered damages in

22  excess of $500,000 or in an amount to be proved at

23  trial.

24              Now, this paragraph actually was dismissed



1  by virtue of a motion that the college filed in

2  this case.  My question simply to you is is it

3  ACE's position in this litigation that it has

4  suffered damages in excess of $500,000?

5      A.    Yes, that is our allegation.  And it is

6  actually more than that.

7      Q.    What is the amount of damages that ACE is

8  claiming in this litigation?

9      A.    I don't know what's been subsequently

10  discussed after this, but damages were recorded

11  based upon our previous conversation that we had

12  about how many students would -- were promised by

13  COD and how many students we would be empowered to

14  contribute to that based on the fact that CAAHEP

15  accreditation was back now which would be around

16  75, 80 students a year on our part, the 200 -- I

17  mean the 200 students up front on their part.  And

18  I think we considered enrollments coming from COD

19  to be around a 10 to 20 a year area.

20          And our damages would have been $3,680

21  times that amount.  I'm using that figure from the

22  latest Consortium Agreement that's on record.

23      Q.    ACE would be able to provide the

24  College of DuPage with 75 students.  Is that on an



1    annual basis?

2         A.    That's in addition to what we were going

3    to be currently providing.  So we were already

4    enrolling 90 to 100 students a year.  That would

5    have been transferred over to COD.  And we would

6    have been able to contribute 75, 80 more is our

7    estimation based upon what we were doing before we

8    lost CAAHEP accreditation.

9         Q.    Was it ACE's intent in entering into this

10   consortium to send all its enrollees to the College

11   of DuPage?

12        A.    All the ones that qualified under their

13   qualifications that they were outlining.

14        Q.    Those that did not qualify -- meet

15   qualifications under COD's admission standards

16   would still remain students at ACE?

17        A.    Right.  But that would have been like the

18   on-the-job trained techs.  And I don't know if COD

19   wanted the PAs and PEs and the MDs that just took

20   the six-day lab or not.

21        Q.    ACE was aware of the COD's admission

22   standards -- strike that.

23             Was ACE aware of the admission standards

24   that COD intended to utilize before the



1    Consortium Agreement was consummated?

2         A.    The Consortium Agreement took place in --

3    December 9th.  I don't know if we were aware of

4    those before then, but sometime thereafter we

5    became aware that that was going to be it.  And --

6    but I never saw it in writing until I reviewed

7    their submission to the -- to this deposition or

8    their deposition.

9         Q.    Are you referring to the document that was

10   sent to the Illinois State --

11        A.    No, I was reviewing the --

12        Q.    -- the Illinois Community College Board?

13        A.    -- screen shots that they had put together

14   of their organization of their program.

15        Q.    Was ACE aware that COD's admission

16   standards would be more stringent than ACE's

17   admission standards in 2014?

18        A.    Yeah.  When we discovered they really were

19   going to be only enrolling CSTs -- and that might

20   even be people who qualified otherwise but just

21   never got certified, it seems like to me according

22   to my reading of it, and operating room nurses.

23        Q.    Would you agree that COD's admission

24   standards were more stringent, were more limited



1    than ACE's admission standards in 2013 and 2014?

2        A.    I agree that they were more limited, not

3    necessarily better.

4        Q.    Would you agree that because COD's

5    admission standards were more limited, the number

6    of students that ACE would be able to send over to

7    COD as part of the consortium would be under --

8    would be less than ACE's actual enrollment in 2013

9    and 2014?

10        A.    The additional students we would be rope

11    fall directly into the category that they were

12    going to be enrolling.  They would be CSTs who are

13    interested in taking a CAAHEP accredited program

14    and wanted to become CSFAs.

15        Q.    Those students would go to the COD ACE

16    consortium?

17        A.    Yes.

18        Q.    But ACE enrolled in 2013 and 2014 between

19    90 and 100 students per year?

20        A.    And some of those would also qualify to

21    get in there.

22        Q.    But not all -- ACE would be unable due to

23    the admissions, the difference in the admission

24    standards, ACE would not be able to send all its



1    students --

2         A.    Current students.

3         Q.    Current students which you forecasted

4    was -- ranged between 90 and 100 to the ACE COD

5    consortium?

6         A.    We would have been able to send about

7    60 percent of those.

8         Q.    The remaining 40 percent would remain

9    enrolled through the ACE -- the traditional --

10        A.    Yes.

11        Q.    -- ACE Surgical --

12        A.    And some of those would be students who

13   only took the six-day lab.

14        Q.    Do you know when -- well, let me ask this,

15   do you know if the College of DuPage has actually

16   obtained CAAHEP accreditation for its surgical

17   assistant program?

18        A.    According to everything I have looked at

19   they have.

20        Q.    Do you know when the College of DuPage

21   obtained CAAHEP certification?

22        A.    Not the specific date.  But when I first

23   discovered it, it seemed like a very short period

24   of time.  It appeared to me that they had been



1    awarded CAAHEP accreditation like within six months

2    of applying is what I had previously figured out,

3    not based upon the time they were actually awarded

4    it but the time that I discovered it.

5        Q.    If you were to learn that the College of

6    DuPage obtained CAAHEP accreditation in November of

7    last year, November 2016, would that impact the

8    number of students that ACE was able to -- would

9    have been able to send to the College of DuPage in

10   2013 and 2014?

11       A.    Of course.

12       Q.    Would it substantially impact the ability

13   of the -- strike that.

14       A.    We would -- just to elaborate, we would

15   have been able to send them students before they

16   got CAAHEP accredited because in order to get

17   CAAHEP accredited, you have to have students in the

18   program.

19       Q.    Right.  But that statement assumes that a

20   student would go over to the college and ACE

21   consortium because the college was CAAHEP

22   accredited?

23       A.    Well, I don't claim to have a full

24   understanding of exactly how this works, but you



Daniel Bump 04/05/2017

1    are allowed as you are applying for CAAHEP

2    accreditation to start enrolling students.  In

3    fact, it's expected.  I don't understand how that's

4    done because you can't tell a student that you are

5    enrolling in a CAAHEP accredited program.

6              I guess you can tell them you are in the

7    process, but you can't tell them that you have any

8    kind of expectations of actually being awarded

9    CAAHEP accreditation.

10        Q.    Let's move on.  The 75 students I believe

11   you stated that ACE would be able -- the

12   additional -- in addition to the 90 and the 100

13   that were presently enrolled at ACE, I believe you

14   testified ACE would be able to enroll or send to

15   the college an additional 75 to 80 students as

16   well.  And that is -- that calculation is based

17   upon ACE's enrollment figures back when ACE was

18   CAAHEP approved; is that right?

19        A.    Correct -- well, not based upon the actual

20   enrollments but based upon what we lost because of

21   that.  We track that more than the actual

22   enrollments at the time when we were thinking about

23   this.

24        Q.    Okay.  Does that number -- strike that.



1          Would that number be impacted if the

2   College of DuPage was not CAAHEP accredited in 2015

3   when it initially started -- strike that.

4          Would the fact -- strike that.

5          If COD was not CAAHEP accredited in 2013

6   and 2014 to provide a surgical assistant program,

7   would that impact the ability of ACE to recapture

8   and enroll 75 to 80 more students?

9       A.   2013 and 2014 are the period of time when

10  we were still negotiating the amendments to the

11  verbal contract.  They weren't.  We knew at that

12  point that they weren't yet accredited.  So I don't

13  understand the question relating to that.

14      Q.   All right.  Let me ask it this way, the

15  additional enrollments of 75 to 80 students that

16  you testified ACE believes it would have been able

17  to send over to the College of DuPage as part of

18  the consortium is based upon the assumption that

19  the College of DuPage would have been able to have

20  obtained CAAHEP accreditation?

21      A.   Correct.

22      Q.   The 200 number, you discussed this

23  yesterday, just so I understand your testimony

24  correctly, this was a representation that Kathy



Daniel Bump 04/05/2017

1    Cabai made to you; is that right?

2        A.    And Keith was there.  I don't remember who

3    else was there, if anybody.

4        Q.    Aside from that representation -- how many

5    times did Kathy tell you or Keith or anyone else at

6    ACE that she believed -- she had -- whatever your

7    testimony was yesterday, were there any other

8    discussions from -- in which Kathy discussed this

9    projected enrollment of 200 students other than

10   what you testified to yesterday?

11       A.    Well, there was definitely an initial

12   discussion.  I believed we had discussions

13   following that related to the mechanics of how we

14   were going to get those students into the program.

15       Q.    During the discussions about the

16   mechanics, was there ever discussions surrounding

17   how the lab would be taught in light of the

18   increased enrollment?

19       A.    No.  I believe the discussion about Kathy

20   teaching a lab, if that's what you were talking

21   about, occurred after that.

22       Q.    Did anyone else at the College of DuPage

23   ever communicate to ACE projected enrollment

24   figures for the ACE COD consortium?



1      A.    I'm sorry, I didn't hear the first part of

2    your question.

3      MR. ROCHE:    Can you read it back.

4                        (Whereupon, the record was

5                        read as requested.)

6      THE WITNESS:    No.

7    BY MR. ROCHE:

8      Q.    Are there any documents, Mr. Bump, that

9    you have reviewed in this case that substantiate or

10    support or -- well, compound.

11          Are there any documents that you have

12    reviewed in this litigation that relate to the idea

13    that the ACE COD consortium would have an

14    enrollment figure of around 200 students?

15      A.    No.

16      Q.    And this 200 students and the 75 to 80

17    students and the students in the ACE program, those

18    projections were for one year only?

19      A.    The 200 was for one year.    The 75 was for

20    every year.    Plus I believe we mutually agreed that

21    they would probably have enrollments of 20, 10 to

22    20 students a year for their program.

23      Q.    All right.    A perspective student for the

24    ACE program only in 2013 and 2014, that particular



1    student could enroll the following month after

2    being accepted?

3         A.    Correct.

4         Q.    And enrollment in -- well, did ACE ever

5    close its enrollment in 2013 and 2014?

6         A.    No.

7         Q.    A student could enroll at any given point

8    during the calendar year in 2013 to 2014?

9         A.    Yes.

10        Q.    I believe you testified yesterday that ACE

11   was aware, you personally were aware that the COD

12   ACE proposed consortium would be offered on a

13   semester basis?

14        A.    Yes.   That didn't happen right away.   That

15   was sometime later in our discussions.

16        Q.    Do you think the fact that the enrollment

17   for the COD ACE proposed consortium would be a

18   semester basis would impact the ultimate enrollment

19   numbers?

20        A.    I don't believe so.   It would have

21   impacted the convenience of open enrollment to the

22   students.

23        Q.    Why do you not believe so?

24        A.    I mean I think that the student -- the



1   potential students that we have access to, they

2   wanted to enroll in a program.  They chose ours in

3   particular because it was more convenient.  That's

4   one reason they chose ours because it was more

5   convenient than others that they had looked into.

6   They didn't have that option.  I don't think that

7   ours would be any less inconvenient than anybody

8   else's.

9       Q.   Was ACE aware in 2013 and 2014 that a

10  student had to enroll in the first semester, the

11  fall semester to proceed through the course of the

12  proposed ACE COD consortium?

13      A.   In the consortium they would have had to

14  enroll in the first semester and then proceed

15  through the entire program as it is organized; is

16  what you are asking?

17      Q.   Yes.  Was ACE aware of that process?

18      A.   Yes.

19      Q.   And was ACE aware that under the COD's

20  proposed program a student could not take the lab

21  until he or she completed the first two online

22  semester courses of the surgical assisting program?

23      A.   I wasn't familiar when they would be

24  allowed to take the lab.



1     Q.     Would you -- would ACE agree with the idea

2     that prohibiting potential students from

3     handling -- or going to the lab until they

4     completed the online portion impact enrollment

5     figures?

6     A.     Once again I think that that would not be

7     a big issue.  People are excited to sign up for a

8     program because we might be bringing the lab to

9     their area.  If we didn't, I don't think that we

10    would not have enrollments.  That might have

11    delayed a sale.

12           In other words, they might have had to

13    rethink when they would enroll based upon when they

14    can maybe save up money for travel and, you know,

15    stuff like that.

16    Q.     Was ACE aware in 2013 and 2014 that the

17    program promulgated by the College of DuPage

18    provided for one lab per year?

19    A.     No, but I don't understand why that's an

20    issue in this discussion.  They only need one lab

21    per year to cover only ten students per year.

22    Q.     You would agree that the college would

23    need more labs per year to accommodate the

24    enrollment projections that ACE allegations were



1    made?

2        A.    I agree.

3        Q.    And would you also agree that if the

4    program provided for only one lab session per year,

5    per semester, that could impact the ability of the

6    College of DuPage to handle the enrollment

7    projections that ACE alleges were made?

8        A.    The College of DuPage never once expressed

9    that they were going to limit -- no matter how many

10   students were enrolled, that they were going to

11   limit the number of labs that they put on to one a

12   year.

13       Q.    Okay, that wasn't my question.  If you

14   could simply answer my question.  That's all I ask.

15       A.    Can you repeat it?

16   MR. ROCHE:   Can you read it back.

17                        (Whereupon, the record was

18                         read as requested.)

19   THE WITNESS:   The answer would be, yes, if

20   that's what all they were going to do under our

21   agreement.  That wasn't the case.

22   BY MR. ROCHE:

23       Q.    Why not?

24       A.    Under our agreement there was no provision



1    that limited the number of labs that they were

2    going to put on no matter how many students that

3    they had.  Nevertheless, if that's all they were

4    going to put on, we could handle the remaining labs

5    for them.

6         Q.   In the proposal ACE sent to -- and we can

7    look at the exhibit, but in the proposal ACE sent

8    to the College of DuPage, ACE noted that the

9    tuition for the surgical assistant program that the

10   college could charge was approximately $6,900.  Do

11   you recall seeing that in the proposal?

12        A.   I -- I -- I don't know if I would

13   characterize it like that.  We were just offering a

14   potential amount that they could charge.  They

15   could charge more or less than that if they wanted

16   to.  We weren't limiting them as to what they could

17   charge.

18        Q.   Was ACE aware in -- what did Ace -- what

19   was the cost of the ACE Surgical Assistant Program

20   for students in 2013?

21        A.   I believe it was --

22        Q.   Just the basic package.

23        A.   I believe it was 5,495.

24        Q.   5,495.



Daniel Bump 04/05/2017

1    A.    I don't think we have raised our prices
2  since then.
3    Q.    Was it ACE's understanding that the
4  college, if it went ahead with the consortium,
5  would have charged a student, prospective student
6  over $5,400 for the surgical assistant program?
7    A.    I believe that the reason why Keith
8  offered 6,995 as a potential for them to charge was
9  because others in the field, in the -- other
10  competitors were charging that much.
11    Q.    Was it ACE's understanding that if this
12  proposed partnership went forward, the cost a
13  student would incur to go through the program would
14  be in excess of $5,400?
15    A.    We were making allowances for such a thing
16  to happen.  And given the fact that in addition to
17  the kind of training we were offering, they would
18  be able to get CAAHEP accredited.  Instead there
19  was an extra value there.
20    Q.    At an increased cost?
21    A.    Right.
22    Q.    And do you think that increased cost would
23  have impacted the enrollment projections that were
24  discussed between ACE and COD?



1     A.    No.

2     Q.    Why not?

3     A.    Because for the people that were not able

4  to sign up for our program because of lack of

5  CAAHEP accreditation, their motivation and their

6  desire for that was great.  It wouldn't have -- in

7  my mind it wouldn't have affected it.  And even if

8  they were shopping for price, based on price, they

9  would have found that others in the field were

10  charging about that same amount.

11     Q.    Has ACE ever conducted any -- well, let me

12  rephrase.

13          In 2013 and 2014 did ACE conduct any

14  market studies to gauge the demand for a surgical

15  assistant program?

16     A.    We have conducted market studies.  I don't

17  believe that there were any done in that time

18  period.  And part of the market study was just --

19  in our own experience what did we lose when we lost

20  CAAHEP accreditation.  So part of our market study

21  was even studying our own program.

22     Q.    There was a market study conducted to --

23  by ACE to gauge the demand of surgical assistant

24  programs?



1    A.    Like many years before what we are talking

2    about.

3    Q.    Was it one market study or several market

4    studies that ACE conducted?

5    A.    Don't get me wrong, it is not like a

6    formal market study where you do all these things

7    they say you are supposed to do in market studies

8    and such like that.

9         But we did do market studies based upon,

10   for instance, work that was done at the labor [sic]

11   of bureau [sic] statistics and other sources like

12   that and also the AST.

13        Do I need to say who they are again, or we

14   have that on the record?

15   MR. DAVIS:  We have it on the record.

16   MR. ROCHE:  Yes.

17   THE WITNESS:  The AST has done certain market

18   studies that we also took into consideration.

19   BY MR. ROCHE:

20   Q.    And what -- has the demand for surgical

21   assistants changed over the years?

22   A.    No.  It seems to be getting more.  In

23   fact, part of recent -- a more recent study

24   included what's going on with our competitors.  And



1   one of our competitors -- and we can -- this is so

2   good we can hardly believe it's true, but one of

3   our competitors in their publication says they

4   enroll around 600 students a year.  And that --

5   that's partially because they have CAAHEP

6   accreditation.

7       Q.   And so I understand it correctly, it's

8   ACE's view that the demand for surgical assistants

9   has increased in recent years?

10      A.   Based on that.  I mean it hasn't increased

11  for our product.

12      Q.   How has the ACE Surgical Assistant Program

13  done over the last three years in terms of

14  enrollment?

15      A.   It has been pretty steady, around 90 to

16  100 a year.  It's enough to keep us in business but

17  not to flourish or anything.

18      Q.   Were any market studies or the market --

19  has ACE -- in 2013 and 2014 did ACE conduct any

20  market studies for the surgical assistant market in

21  the Chicagoland area?

22      A.   No.

23      Q.   Has ACE ever conducted any market studies

24  to gauge the demand for surgical assistant programs



1    in the Chicagoland area?

2         A.    No.   We -- all our -- all our market

3    studies, informal market studies, are done more on

4    a nationwide level because that's where we provide

5    our service.   In fact, it seems counterintuitive,

6    but in Denver where we live, that's not even really

7    our market.

8         Q.    Did you say yesterday Texas was a hot

9    market?

10        A.    When we were CAAHEP accredited, yes.

11        Q.    Where do you pull the students -- in 2013

12   and 2014 where were the students of ACE's surgical

13   assistant program from?

14        A.    A smattering all over the country, but

15   there are heavy concentrations like in Georgia.

16   They used to have heavy concentrations in Chicago.

17   That seems to have weaned off.   I don't know if it

18   is because competitors are offering it as well.

19   Las Vegas area, California.   Those are things that

20   stand out in my mind.

21        Q.    For the Chicago market, when did ACE start

22   losing surgical assistant students?

23        A.    I think it might have been before the time

24   period that we are talking about.   We used to maybe



daniel Bump 04/05/2017

```
 1    do a couple labs a year in Chicago.  And for
 2    unknown reasons it started petering out.  It is
 3    not -- maybe the market is saturated in Chicago.  I
 4    don't know.  I mean we still get people from
 5    Chicago and the surrounding areas.  It's just it
 6    doesn't seem to be what it was before and that
 7    might be a CAAHEP accreditation thing too.
 8         Q.    Who hires surgical assistants?
 9         A.    Hospitals, doctors, surgical assistant
10    agencies.  And sometimes assistants just become
11    self-employed.
12         Q.    Is ACE aware of the requirements that
13    those hospitals and agencies that you just
14    described -- strike that.
15              Was ACE in 2013 and 2014 aware of the
16    requirements the hospitals and the agency wanted
17    from surgical assistants in terms of what their
18    certifications were?
19         A.    Well, in my experience of hospitals in
20    general is that hospitals in most cases just want a
21    mechanism so that their people can become certified
22    at what they do.
23              And in most cases they -- there is four
24    certifying bodies, and they don't really care which
```



1    one.   There are differences between different

2    hospitals.

3          So if one hospital -- in one hospital they

4    may be a little bit political in their bias, and so

5    they will go with that.   But most cases it's --

6    they just want to know that their people are

7    certified.   It's a liability issue for them.

8         Q.    If hospitals and agencies in 2013 and 2014

9    in the Chicagoland area wanted certified surgical

10   first assistants and not assistants graduating from

11   SA-C programs, would that impact the enrollment

12   projections for the ACE COD consortium?

13        A.    It would impact them for the better

14   because that's what would be provided in that

15   consortium.

16        Q.    But that is the assumption that the

17   ACE COD surgical assistant program would be able to

18   obtain CAAHEP certification?

19        A.    Correct.

20        Q.    Let's discuss costs that would have been

21   incurred, if any, by ACE in connection with the

22   proposed partnership with the College of DuPage.

23   Had the partnership gone as ACE had planned, would

24   ACE have incurred any additional costs on its own



1    part?

2         A.    We would have incurred the costs of

3    Blackboard.  We would have incurred the costs of

4    additional requirements that were being placed.

5    We'd have to produce videos and things like that.

6    We would have had the cost of increased number of

7    people to manage that.  And that's Distance

8    Learning.  I believe that's all the costs that we

9    would have had.

10        I believe as far as the lab is concerned,

11   we would have had to have the costs of creating the

12   simulators for the lab and shipping for those.  And

13   if -- and many more costs if ACE was going to be

14   required to do any of the labs that COD felt that

15   was more than they could handle.

16        Q.    Would you agree that those increased costs

17   that you just testified to would have impacted the

18   overall profit generated by ACE in connection with

19   this proposed program with the college?

20        A.    It would have impacted as compared if

21   there were no costs, but we had built all those

22   costs into the amount that we were -- that was

23   included in the price that was going to be coming

24   to us.



1    Q.    The 3,680 per student?

2    A.    Yes.

3    Q.    That included -- the costs were built into

4    that?

5    A.    Yes.

6    Q.    Are there any other damages that ACE has

7    suffered as a result of the conduct complained of

8    in the complaint other than what you just testified

9    to?

10    A.    I don't believe so.

11    Q.    Okay.  Let's go back to the consortium

12    agreements.  Well, actually a couple more questions

13    about costs.  What about advertising costs, would

14    ACE have incurred increased advertising costs?

15    A.    I don't believe so.  All we had was

16    website and email campaigns.  We had -- I guess the

17    costs would have been to add pages related to our

18    consortium with COD.

19    MR. ROCHE:  Let's mark this.

20                    (Whereupon, D.B. 30(b)(6)

21                    Deposition Exhibit No. 1 was

22                    marked for identification.)

23    BY MR. ROCHE:

24    Q.    Mr. Bump, I -- Mr. Dan Bump, I show you



1    what has been marked as Exhibit 1 to the 30(b)(6)
2    deposition.  Can you identify that document for me.
3        A.   This is a profit/loss statement for 2013,
4    2012.
5        Q.   Could you please turn to the statement --
6    I don't know what page it is because this isn't
7    Bates numbered.  It's the schedule, the general and
8    administrative expenses for the years ending
9    December 31, 2014 and 2013.
10       A.   Yes.
11       Q.   Please go through these lists of itemized
12   expenses that ACE incurred.  My question simply is
13   can you please identify what you believe the costs
14   would have increased had the partnership with the
15   College of DuPage gone forward.
16       A.   Advertising expenses -- actually it
17   wouldn't increase because the reason why those are
18   so high are because at this point we were doing
19   some sales efforts for the product that YEHSS was
20   offering.  So I can't picture that this -- this
21   advertising expense hasn't gone up much.  And it
22   has probably gone down.  And so that's part of
23   that.
24            We have been doing more advertising



1    related to Facebook advertising, Paperclip type

2    advertising.  And we have hired a company that

3    handles that for us and also manages our website,

4    the sales part of our website.

5         Q.   And those costs go into the advertising

6    expense, this line item and this --

7         A.   Yes.

8         Q.   -- schedule?

9         A.   I don't believe we were working with them

10   at this point.  But nevertheless those aren't

11   expenses that would increase much, if any, at all

12   with our collaboration.

13        Q.   Would ACE have updated its website --

14        A.   Yes.

15        Q.   -- had this consortium gone through?

16        A.   Yes.

17        Q.   Do you have any idea how much that would

18   have cost?

19        A.   It would be just developing some graphics

20   and doing an additional page.  So I imagine it

21   would cost maybe a couple thousand dollars, if

22   that.

23        Q.   Would ACE have also engaged in other

24   advertisements had the consortium gone through with



1    the College of DuPage?

2        A.    The only thing I can think of is we would

3    want to inform the public that we now had a

4    CAAHEP accredited program to offer.  And that would

5    be -- that would just be Facebook and website

6    advertising because we don't have like a list of

7    people we can email to inform them of that.

8        Q.    What other line items down there on this

9    schedule would have increased had the partnership

10   with ACE been consummated, partnership with the

11   College of DuPage?  I'm sorry.

12       A.    Lab supplies would have maybe doubled and

13   then the expense of shipping those to the college

14   once they have been developed.  We would probably

15   at least have hired one more person, so under

16   payroll expenses, and that would probably be around

17   35, 40,000.

18       Q.    Would that have been the individual's

19   salary?

20       A.    Yes.

21       Q.    35 to 40,000?

22       A.    Yes.

23       Q.    There would have been other costs incurred

24   by ACE in connection with hiring that employee?



Daniel Bump 04/05/2017

1    A.    So benefits, payroll taxes.

2    Q.    Insurance, medical insurance perhaps?

3    A.    Uh-huh.  Well, I meant that when I said

4  benefits.

5    Q.    Oh, I'm sorry.

6          Any other on this sheet, any other costs

7  here that would have increased?

8    A.    Nothing stands out.  I don't believe so.

9    Q.    Let's discuss the Consortium Agreements.

10  Let's start with Exhibit 11, Mr. Bump.  This

11  exhibit was sent to the college on or about

12  November 21 of 2013.  And you testified yesterday

13  that the college agreed to the terms in this

14  writing --

15    A.    Correct.

16    Q.    -- on or about December 9, 2013?

17    A.    Yes.

18    Q.    Do you recall that testimony?

19    A.    Yes.

20    Q.    Let's just go through the first heading

21  under the -- under Agreement, Roman numeral 1,

22  ACE's Responsibilities, paragraph 1, provide to

23  college an ABSA approved Distance Learning surgical

24  assistant program curriculum that includes all



1    elements of training including SurgiNet Distance

2    Learning, six days surgical skill lab, SurgiEdge

3    clinical internship.  Did ACE provide all the

4    elements of training with respect to the SurgiNet

5    Distance Learning?

6         A.    Yes.

7         Q.    How so?

8         A.    In master curriculum form.

9         Q.    Are you referring to the transmission by

10   ACE to the college of the master curriculum

11   document?

12        A.    Yes.

13        Q.    Did ACE do any other -- did ACE embark on

14   any other measures to train the college on the

15   SurgiNet Distance Learning platform?

16        A.    You mean our website?

17        Q.    Yes.

18        A.    I can't add to the testimony I have

19   already given you about that.  By the way, in our

20   verbal contract all these were included.  That

21   doesn't mean we completed every action that the --

22   that the contract said was going to be implemented

23   because we didn't get to the final stages anyway.

24              So if there were some things that we



1    didn't submit like, for instance, I don't recall

2    submitting the documents related to the clinical

3    internship.  We may have.  I just don't recall it.

4        Q.    Okay.  Did ACE provide all templates of

5    required documentation needed for the student to

6    progress through the program?

7        A.    Yes.

8        Q.    ACE gave the pretests and the unit tests

9    to the College of DuPage for the online modules?

10       A.    No, I don't recall that.  No, that's not

11   listed in here.

12       Q.    Would you agree that that was a

13   responsibility of ACE under paragraph 2?

14       A.    It was our responsibility to handle that

15   part of the program.  Remember, we were going to be

16   handling the Distance Learning.  We were going to

17   get Blackboard so that we could provide Distance

18   Learning in the format they wanted to provide it

19   in.

20       Q.    Did ACE provide -- in paragraph 3 did ACE

21   provide the surgical simulators and presentation

22   materials needed to present the surgical skill lab?

23       A.    We would have if they had presented one.

24       Q.    Other than Kathy Cabai's trip to the



1    Denver Skills Lab in July of 2014, did ACE ever
2    send over a surgical simulator --
3        A.    No.
4        Q.    -- to the College of DuPage?
5        A.    No.
6        Q.    So it was not until July of 2014 when the
7    College of DuPage first had access to the surgical
8    simulators and presentation materials needed to
9    present the surgical skills lab?
10       A.    Correct.
11       Q.    Let's go to paragraph 4, designate a
12   member of the ACE staff to coordinate this program
13   with a designated member of the college staff.  Who
14   did ACE -- strike that.
15             Did ACE designate a member of its staff to
16   coordinate this program with a member of COD staff?
17       A.    That would have been me.
18       Q.    Paragraph 5, appoint quality ACE faculty
19   members to serve as adjunct faculty for the college
20   who have the expertise necessary to successfully
21   implement all aspects of the curriculum for the
22   program.  Did ACE appoint a qualified ACE faculty
23   member to serve as an adjunct faculty member for
24   the college?



Daniel Bump 04/05/2017

 1    A.    I would have been appointed to that
 2   position as soon as we started a program.
 3    Q.    Was that discussed with the College of
 4   DuPage?
 5    A.    Of course.
 6    Q.    Who was that discussed with at the College
 7   of DuPage?
 8    A.    That was with Kathy.
 9    Q.    Did you discuss this with Kathy directly?
10    A.    I believe -- I don't recall a specific
11   conversation.
12    Q.    Do you know if Keith Bump discussed that
13   with Kathy?
14    A.    I don't know.  Who else would Kathy think
15   she is working with that's on the faculty?
16    Q.    Let's go to ACE 1061.
17    A.    Which one?  Oh.
18    Q.    Before we get to that, you just stated
19   that you were the only faculty member of ACE?
20    A.    Uh-huh.
21    Q.    Had this consortium gone forward, would
22   the ability of ACE to service its own students,
23   those who did not go through the ACE COD
24   consortium, be negatively impacted with you



1  devoting time and effort to get the COD consortium
2  up and running?
3      A.    The -- are you asking if all the
4  projections came through, student projections came
5  through as anticipated?  We would have probably had
6  to hire another teaching -- member of the teaching
7  staff.
8      Q.    Did you ever -- did ACE --
9      A.    I mean assuming Kathy didn't do it.
10      Q.    Did ACE in 2013 and 2014 conduct any
11  interviews of prospective faculty members of ACE?
12      A.    No.
13      Q.    Did ACE in 2013 and 2014 ever review any
14  resumés for prospective faculty members?
15      A.    No.
16      Q.    Did ACE in 2013 and 2014 ever attempt to
17  hire an adjunct faculty member for ACE?
18      A.    No.
19      Q.    Did ACE embark in any efforts to hire
20  anyone to become employed at ACE as an instructor
21  or faculty member in 2013 and 2014?
22      A.    In anticipation of the COD ACE consortium
23  going through.
24      Q.    At all?



1    A.    No.

2    Q.    All right.  ACE 1061, the term

3  "termination provision," paragraph 1 here states

4  that this agreement is in effect for a period of

5  24 months from the date above.  Do you see that?

6    A.    Yes.

7    Q.    And then paragraph 2 provides that this

8  paragraph may be terminated by either party with 60

9  days written notice to the other party at any time

10  for any reason.

11    A.    Uh-huh.

12    Q.    Was it ACE's understanding that either ACE

13  or the college could terminate this agreement at

14  any time after it was entered into upon 60 days

15  notice?

16    A.    If it was terminated, then each

17  individual's property would go back to the original

18  owner.

19    Q.    Is that specified in this document?

20    A.    It's what's morally correct.

21    Q.    That wasn't my question.  Is it specified

22  in this document?

23    A.    Not that I believe.

24    Q.    Okay.  Let's go back to the initial



1    question.  Was ACE aware or was it ACE's

2    understanding that after entering into this either

3    ACE or the college could terminate the agreement at

4    any time upon 60 days written notice?

5         A.    Yes.

6         Q.    Would that -- strike that.

7              Paragraph 4 here, college agrees to wait

8    24 months from the termination date to begin

9    offering another surgical assistant program either

10   through the development of their own program or

11   through another consortium or affiliation with

12   another program?

13        A.    Correct.

14        Q.    Did the College of DuPage agree to that

15   term?

16        A.    They agreed to every term.

17        Q.    Let's go to Exhibit 32, the Consortium

18   Agreement dated May 5th, 2013.  And just so we are

19   clear, when you testified that they agreed to every

20   term, you are referring to they agreed to every

21   term because of Miss Solt's December 9th email

22   accepting ACE's offer?

23        A.    Of course.

24        Q.    Got you.  Okay.  Showing you what's been



1    marked as Exhibit 32 to your deposition yesterday,

2    if you could turn to ACE 1102 under the heading

3    Roman numeral 4, Distribution of Tuition Receipts,

4    do you see that, Mr. Bump?

5         A.    Yes.

6         Q.    Paragraph 1 states tuition for this

7    program is set at, and then there is a dollar sign

8    and it's blank.  Do you see that?

9         A.    Yes.

10        Q.    Was there ever an agreement or

11   representation by the College of DuPage as to what

12   the tuition was going to be for the ACE COD

13   consortium?

14        A.    No.

15        Q.    If you go down to No. 2, provides that if

16   surgical skill lab is to be presented by ACE and

17   then there is a parenthetical initial here blank to

18   choose this option, do you see that?

19        A.    Yes.

20        Q.    What was -- was this paragraph in the

21   original Consortium Agreement?

22        A.    I don't believe so.  That came into play

23   when, No. 1, they decided they wanted Kathy to

24   deliver the lab, and, No. 2, just to cover any



1    times where they were not able to cover lab for the
2    number of enrollments.
3        Q.   Do you know --
4        A.   I don't believe that they requested that.
5    We just put that in there to cover that scenario.
6        Q.   Who drafted this agreement?
7        A.   I did.
8        Q.   You did.
9        A.   Based on a Consortium Agreement that I had
10   in my possession from someone else.
11       Q.   And who drafted the November agreement
12   attached to Exhibit 11 to your deposition?
13       A.   Same.
14       Q.   Who drafted the Nondisclosure Agreement we
15   discussed in your deposition?
16       A.   Once again, I utilized another document,
17   another nondisclosure document that I had in my
18   possession and just tailored it to our specific
19   needs.
20       Q.   Did anyone review this contract aside from
21   yourself prior to it being sent to COD in May 2014?
22   I am referring to Exhibit 32.
23       A.   This one?  I don't believe so.
24       Q.   And -- that one.



Daniel Bump 04/05/2017

```
1        A.    I don't believe we passed this by our
2   lawyer.
3        Q.    Do you know if the initial Consortium
4   Agreement was reviewed by counsel?
5        A.    No.
6        Q.    No, it wasn't, or, no, you do not know?
7        A.    No, it was not.
8        Q.    Was -- for Exhibit 32 was the
9   parenthetical here, initial here to choose this
10  option, again, I'm referring to ACE 1102?
11       A.    Yes.
12       Q.    And if you look down on paragraph 3, it
13  has the same parenthetical initial here to choose
14  this option; do you see that?
15       A.    Yes.
16       Q.    Was it ACE's intent to provide COD the
17  option of selecting who -- whether COD is going to
18  teach the lab or whether ACE will teach the lab?
19       A.    Well, the original intention was that if
20  COD could not teach all the labs, then this would
21  be the price if we had to do it.  If we had to take
22  up any of the slack.  And the other would be the
23  price if they did it themselves.
24       Q.    Did COD ever initial these parentheticals
```



1  in paragraphs 2 and 3 under distribution of tuition
2  receipts?
3      A.    No.
4      MR. ROCHE:   Can we take a break.  I think I
5  only have one more group of discussion.
6      MR. DAVIS:   Okay, yes.
7                      (Recess taken.)
8  BY MR. ROCHE:
9      Q.    Mr. Bump, are you aware if the College of
10  DuPage has produced the Self-Study it submitted to
11  CAAHEP in this litigation?
12      A.    No, I am not aware of that.
13      Q.    You are not aware, okay.  So you have not
14  reviewed -- well, have you reviewed the College of
15  DuPage's Self-Study?
16      A.    No.
17      Q.    That was -- have you reviewed ACE's --
18  have you reviewed the College of DuPage's
19  Self-Study that the college submitted to CAAHEP to
20  obtain accreditation?
21      A.    No.
22      Q.    All right.  Have you -- you testified
23  yesterday that you have not reviewed the curriculum
24  that College of DuPage ultimately implemented in



Daniel Bump 04/03/2017

1    its surgical program?

2        A.    No, I did review it last night.

3        Q.    You did?

4        A.    Yeah.

5        Q.    As you sit here today, do you believe you

6    are able to competently testify as to the substance

7    of -- the College of DuPage's curriculum?

8        A.    As it is presented in the documents that

9    were sent to us.

10       Q.    Sent to you?

11       A.    Yes.

12       Q.    Okay.

13       A.    Through Mike.

14       Q.    Understood.   Let's talk about ACE's

15   Self-Study.

16       MR. ROCHE:   And before opposing counsel rolls

17   his eyes, I can represent I reviewed yesterday's

18   transcript and did not find this particular line of

19   questioning was asked of the deponent, ACE's

20   Self-Study.

21       MR. DAVIS:   I didn't say you asked questions.

22   I said you introduced it as a deposition exhibit

23   so --

24



1   BY MR. ROCHE:

2        Q.   Was ACE's Self-Study stored

3   electronically?

4        MR. DAVIS:   And do we want to talk about the

5   exhibit now?  Because it is Exhibit 4.

6        MR. ROCHE:   Sure.  We can look at the exhibit.

7   Yes, we are going to talk about it so we might as

8   well.

9   BY MR. ROCHE:

10       Q.   Was this Self-Study, Mr. Bump, stored

11  electronically at ACE?

12       A.   It was originally not.  I don't know if

13  we -- I don't believe we later copied it and stored

14  it, but I don't believe it was.  It's big.

15       Q.   Was a hard copy of ACE's Self-Study kept

16  at ACE's corporate headquarters?

17       A.   Yes.

18       Q.   Where was ACE's Self-Study kept?

19       A.   In my office.

20       Q.   Where exactly in your office?

21       A.   In the bookshelf.

22       Q.   Could any ACE employee access your office,

23  or did it -- did your office have a door lock to

24  it?



1    A.    Anybody could have got in there.

2    Q.    Okay.  Aside from the College of DuPage,

3  Mr. Bump, are you aware of any non-ACE employees or

4  third parties that possess ACE's Self-Study?

5    A.    No.  Well, let me retract that.  I hired a

6  consultant to help me with this.  He probably has a

7  copy.

8    Q.    Do you know if -- well, let me ask it this

9  way, did the College of DuPage need to have a

10  Self-Study -- did the College of DuPage -- was a

11  requirement of the college to offer a surgical

12  assistant program that it provide a Self-Study?

13    A.    No.  The Self-Study was required to get

14  CAAHEP accreditation.  I'm not familiar with any

15  rule at the college that said they had to have it.

16    Q.    Are you familiar with any rule that the

17  state -- the Illinois Community College Board

18  required the preparation and transmission of a

19  Self-Study in order to obtain approval from the

20  state?

21    A.    I don't believe so.

22    Q.    All right.  Let's turn to ACE 1107.  It's

23  the first page.  That's it.  The bottom of this it

24  states that this Self-Study report was prepared by



1    the National Accreditation Consultants?

2         A.    Correct.

3         Q.    Do you see that?

4               Who is that entity?

5         A.    It was -- I don't know if he was

6    incorporated or not; so I don't know if it is an

7    entity.  It was a person.  His name was Jeff Ware.

8    I don't know if it is a sole proprietorship or what

9    it was.

10        Q.    Why don't you turn to ACE 1111.  This is a

11   letter from you to Jeff Ware authorizing Ware from

12   National Accreditation Consultants to act and speak

13   on behalf of ACE in all matters relating to seeking

14   and achieving CAAHEP accreditation?

15        A.    Correct.

16        Q.    Who prepared this Self-Study report?

17        A.    He prepared it, and I reviewed it for

18   accuracy.

19        Q.    And did Mr. Ware prepare this in 2006?

20        A.    Yes.

21        Q.    How did Mr. Ware obtain the information

22   that is contained in the Self-Study?

23        A.    In collaboration with me he would

24   interview me for certain things, and I would



1    provide him documents for other things.

2        Q.    When you provided him documents that are

3    part of this Self-Study report, did you communicate

4    to Mr. Ware that this information was confidential

5    to ACE?

6        A.    No.

7        Q.    Do you recall if ACE and Mr. Ware and

8    perhaps his entity, if it was, in fact, in

9    existence, entered into any sort of confidentiality

10   agreement concerning the documents that ACE was

11   going to be sending to Ware?

12       A.    It's not in here he did.  This is the only

13   document I remember signing.

14       Q.    Do you recall -- was this Self-Study

15   ultimately submitted to CAAHEP?

16       A.    Yes.

17       Q.    Do you recall --

18       A.    Wait a minute.

19       Q.    Go ahead.

20       A.    It was submitted by a review committee

21   that does all the legwork.  And that review

22   committee is part of AST.  So this committee does

23   all the leg work with, like, receiving and

24   analyzing Self-Study and anything else that might



1    need to be done in order to submit ACE to CAAHEP

2    for accreditation.

3        Q.    Do you know who submitted the Self-Study

4    to the AST wing branch that you just described?

5        A.    Who at AST received it?

6        Q.    No.   Did ACE send the Self-Study to AST or

7    did Mr. Ware?

8        A.    I believe we did.   He submitted it to us,

9    and we then forwarded to them.

10       Q.    When ACE forwarded the Self-Study to AST,

11   did ACE communicate to AST that this information

12   was confidential and proprietary to ACE?

13       A.    I had conversations, informal

14   conversations with people over there that I was

15   worried that the people on the committees, some of

16   which were my -- were my competitors and they were

17   going to be looking over this, I was worried about

18   that.   And I communicated that.   But they weren't

19   going to do anything about it.   If I was going to

20   get CAAHEP accreditation, I had to submit this.

21       Q.    Did you ask that the information contained

22   in this Self-Study be kept confidential to AST?

23       A.    I would have liked to say keep it

24   confidential from my competitors, but that didn't



1    seem to be going over well with them so --

2        Q.    Did you ask them to keep it confidential?

3        A.    Yes.

4        Q.    And did they say no?

5        A.    Yes.

6        Q.    And ACE went ahead and transmitted the

7    Self-Study to AST?

8        A.    We had no choice unless we didn't want to

9    be CAAHEP accredited.

10       Q.    When did ACE become CAAHEP accredited?

11       A.    That was in January of 2009.

12       Q.    It took a while.

13       A.    Yes, it did.

14       Q.    What is the CAAHEP accreditation process?

15       A.    Well, if you look at their website, they

16   say they would expect that the process would only

17   take a year.  And, like I say, they were staffed --

18   half the people that were analyzing our program

19   were either directly or indirectly our competitors.

20            And they took every opportunity to delay

21   that whole process.  Like they would submit that

22   here is one thing that needs to be addressed.  And

23   then we would address it.  We couldn't submit how

24   we addressed it until the next meeting six months



1    later.  And so they milked that for everything they

2    could get out of it.  Finally they had no place to

3    go with it so we got it.

4        Q.    You were approved.  After you were

5    approved, do you know if Jeff Ware was in

6    possession of the ACE Self-Study?

7        A.    If he kept a copy for himself?

8        Q.    Do you know if he actually did?

9        A.    I don't know.  I assumed he did keep a

10   copy for himself, but I don't know.

11       Q.    Did you ever communicate to Jeff Ware

12   after the Self-Study had been completed to return

13   or destroy the ACE Self-Study?

14       A.    We had conversations about the fact that

15   I'm having to submit material that I think it is

16   proprietary and even my competitors are going to

17   see it.  I made it quite well known that I didn't

18   want it distributed any further than it absolutely

19   had to be.

20       Q.    Did you ever ask Mr. Ware to return or

21   destroy the ACE Self-Study once his role in

22   preparing it and help assisting ACE had finished?

23       A.    No.

24       Q.    What about AST, was ACE's Self-Study that



1  was submitted to AST, once it was submitted to AST,

2  did it become publicly available?

3      A.    No.

4      Q.    After ACE received an accreditation,

5  CAAHEP accreditation in January of 2009, did ACE

6  ask AST to return or destroy its Self-Study?

7      A.    It didn't occur to us, that part of the

8  process was they had to keep copies of their work

9  in order to refer back to them if necessary.  So

10 our assumption was it would have been improper to

11 ask for all materials back.

12     Q.    Did you ask to -- for the materials to be

13 returned back?

14     A.    No.

15     Q.    Describe the economic value that ACE

16 derived from the Self-Study.

17     A.    Since it led to -- eventually it leads to

18 CAAHEP accreditation, the economic value is we

19 nearly doubled our enrollments.  And in terms of

20 our labor that we put into it, I spent $7,000 on a

21 consultant to get this done and then the labor I

22 put in on it myself.

23         I don't know what that would add to the

24 value.  But we did the work, and COD benefitted



1    from it however they benefitted from it.

2        Q.    How did COD benefit from this Self-Study?

3        A.    They used it as a template for completing

4    their own Self-Study, at least that's what they

5    told us.  And we were okay with that because we had

6    an agreement with them.

7        Q.    Who told you that COD intended to use the

8    ACE Self-Study as a template?

9        A.    That would be Kathy Cabai.

10       Q.    Did she tell you this verbally?

11       A.    Yes.

12       Q.    Over the phone?

13       A.    I believe so.

14       Q.    Was anyone else on the phone other than

15   you and Kathy Cabai?

16       A.    No.

17       Q.    Do you recall when this telephone

18   conversation occurred?

19       A.    Shortly after we -- shortly before we sent

20   it to them.

21       Q.    As you sit here today, do you know if COD

22   utilized in any way ACE's Self-Study?

23       A.    No.  They just said they were going to.  I

24   don't know what they actually did with it.



1    Q.    Are you aware that in 2008 CAAHEP changed

2    its accreditation standards?

3    A.    Are you talking about the standard where

4    you had to become an accredited institution?

5    Q.    Yes.

6    A.    I was aware of that, yes.  That's why we

7    went to COD.

8    Q.    Do you know if CAAHEP changed any of its

9    other accreditation standards between the time ACE

10   submitted its Self-Study to CAAHEP or AST and

11   November of 2013?

12   A.    I'm not familiar with any further -- or at

13   least any further dramatic changes that they made

14   such as the one we have already talked about.  And

15   after we weren't accredited anymore, I just really

16   didn't see the need to follow it until such point

17   that we were able to work with a college like that

18   or finally get our institutional accreditation.

19   Q.    When you -- when ACE transmitted the

20   Self-Study to the College of DuPage, did ACE

21   communicate to the college that the Self-Study was

22   ACE confidential information?

23   A.    I didn't put it in so many words.

24   Q.    Did you put it in any words?

1      A.     I can't recall that I used any specific

2   words to forward the idea that there was -- it was

3   confidential information.

4      Q.     How about trade secrets, did you -- did

5   ACE notify College of DuPage that the ACE

6   Self-Study was an ACE trade secret?

7      A.     Not that I recall.

8      Q.     After the proposed consortium with COD and

9   ACE terminated, did ACE make any attempts to

10  retrieve this Self-Study from the College of

11  DuPage?

12     A.     No.   Our intents were proceeding with this

13  lawsuit.

14     Q.     All right.  Let's talk about the

15  curriculum, Exhibit 5.   Okay, Mr. Bump, yesterday

16  at your deposition you testified that the master

17  curriculum that was identified in response to

18  Interrogatory No. 4 consisted of the program

19  catalogue and the master syllabi which is included

20  in that exhibit before you which is Exhibit No. 5.

21  Do you recall that testimony?

22     A.     Yes.

23     Q.     Let's just focus not on the program

24  catalogue but the syllabi.   If you could also look



1    at Exhibit 1 to the individual deposition, which is

2    the complaint, and could you turn to Exhibit H in

3    that document.  If you could turn a couple

4    pages in, there you go, beginning with the second

5    page to Exhibit H all the way through the end, if

6    you could review that and just answer the question

7    is the Exhibit H to the complaint that was filed in

8    this action the same -- contain the same

9    information as the master curriculum in Exhibit 5

10   to your deposition?  Is it the same information?

11        A.    Yes.

12        Q.    Could you turn to Exhibit P to the

13   complaint.  And review that exhibit.  My question

14   is is Exhibit P to the complaint the same

15   information, same documents as Exhibit 5 to your

16   deposition?

17        A.    Can you rephrase that.  I'm not sure I

18   understood the question.

19        Q.    That's fine.  Exhibit P to the complaint.

20        A.    I am on there.

21        Q.    All right.  Is the information contained

22   in Exhibit P the same information that is contained

23   in Exhibit 5 to your individual deposition

24   Bates numbered ACE 1108 through -- excuse me,



Daniel Bump 04/05/2017

1    ACE 1008 through ACE 1058?

2        A.    Are you talking about the Bates numbers?

3        Q.    Yes.   Is this information in this exhibit

4    the same information that is Exhibit P to the

5    complaint?

6        A.    It looks the same except up front it looks

7    like it might have been reorganized into different

8    courses whereas Bio Science would have been a whole

9    course and laparoscopic surgery would have been a

10   whole course and so on, they put those all into the

11   course heading of 2501.

12       Q.    Aside from the course heading 2501, is the

13   wording, the paragraphs and the topical discussion

14   the exact same information that's spelled out in

15   Exhibit 5, the master curriculum?

16       A.    Yes.

17       Q.    Are you aware, Mr. Bump, that complaints

18   filed in federal court are publicly available

19   documents?

20       A.    I didn't know that.

21       MR. ROCHE:   Let's just do a group exhibit

22   here.

23

24

1              (Whereupon, D.B. 30(b)(6)

2              Deposition Exhibit No. 2 was

3              marked for identification.)

4    BY MR. ROCHE:

5         Q.   Mr. Bump, I show you what has been marked

6    as Exhibit 2 to your deposition.  Do you recognize

7    this document?

8         A.   No.

9         Q.   I believe that you testified earlier that

10   you reviewed the College of DuPage curriculum last

11   night; is that right?

12        A.   I reviewed the screen shots they had of

13   their website.

14        Q.   Well, the online?

15        A.   Yes.

16        Q.   I'm sorry.  Are you referring to the

17   online screen shots that are published via the

18   Internet?

19        A.   Yes.

20        Q.   Did you review any hard copies of the

21   College of DuPage curriculum that has been produced

22   in this litigation?

23        A.   No.

24        Q.   All right.  A couple questions about the



Daniel Bump 04/05/2017

1   textbooks that ACE believes constitute trade

2   secrets, because we discussed almost all of it

3   yesterday, are students required to return the

4   textbooks they receive upon completion of the ACE

5   program?

6       A.   No.

7       Q.   Are they required to destroy the textbooks

8   upon completion?

9       A.   No.

10      Q.   They can keep them?

11      A.   Yes.  Our claim to -- it being our

12  property aren't the textbooks themselves.  It is

13  our recipe for how we utilize the textbooks and how

14  we combine the reading assignments into an

15  effective learning assignment.

16      Q.   Are students required to return the master

17  syllabi that they receive after they complete the

18  ACE program?

19      A.   They don't receive a master syllabi.

20      Q.   But students do receive syllabi for each

21  online module; is that right?

22      A.   They are available on the website.

23      Q.   Which a student can print if he or she so

24  chooses?



1    A.    Yes.

2    Q.    And the online modules contain what you

3  described as ACE's recipe in connection with the

4  textbooks?

5    A.    Correct.

6    Q.    Are students required to return if they so

7  print the master syllabi -- or the syllabi for the

8  online modules upon completion of the Surgical

9  Assistant Program?

10   A.    No.  We don't even ask them if they

11 printed it or not.

12   Q.    Does ACE or did ACE in 2013 and 2014 ask

13 students to destroy any hard copies of syllabi that

14 they downloaded from the website?

15   A.    No.

16   Q.    And in 2013 and 2014 did ACE ask the

17 students to return any of the syllabi that they may

18 have downloaded --

19   A.    No.

20   Q.    -- and printed?

21        With respect to the ACE book that you

22 authored, would you agree that if the College of

23 DuPage never viewed the contents of the ACE

24 workbook, it did not misappropriate the information

1    contained therein?

2        A.   Of course, if they never reviewed it.

3        Q.   And then would you agree that if COD never

4    misappropriated the contents of the ACE

5    workbook, it did not use the information

6    contained therein?

7        A.   Correct.

8        MR. ROCHE:  I have no further questions.  I

9    would just make one request of counsel for Keith

10   Bump's deposition, if Keith Bump could review

11   College of DuPage's Self-Study and College of

12   DuPage's curriculum which is Exhibit 2 I believe to

13   Mr. Bump's corporate dep.

14       MR. DAVIS:  And the complaint?

15       MR. ROCHE:  And the complaint, yes.  Among

16   other things, yes.

17       THE WITNESS:  I don't know if you know this,

18   but Keith is not a curriculum expert.

19       MR. ROCHE:  Right.  I was hoping when you

20   indicated earlier that you had reviewed the COD

21   curriculum last night, I was hoping that you

22   actually reviewed the curriculum that was produced

23   in this case because I do have questions about

24   COD's curriculum that I need to ask of ACE's



Daniel Bump 04/05/2017

```
1   corporate dep which is why I am asking if Keith

2   could review the curriculum even though he is not a

3   curriculum expert.  You are.  But that's all I

4   have.

5        MR. DAVIS:   Okay.

6            Reserve signature.

7                    (Deposition concluded at

8                     2:47 o'clock p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1           IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    AMERICAN CENTER FOR          )
     EXCELLENCE IN SURGICAL       )
5    ASSISTING INC.,              )
            Plaintiff,            )
6       vs.                       )  No. 1:15-CV-07290
     COMMUNITY COLLEGE            )
7    DISTRICT 502, COLLEGE OF     )
     DUPAGE, DR. THOMAS           )
8    CAMERON, DR. KAREN M.        )
     SOLT, and DR. KATHY          )
9    CABAI,                       )
            Defendants.

10          This is to certify that I have read the

11   transcript of my deposition taken in the

12   above-entitled cause by Patricia L. Wangler,

13   Certified Shorthand Reporter, on April 5, 2017, and

14   that the foregoing transcript accurately states the

15   questions asked and the answers given by me as they

16   now appear.

17        _____

18                    DANIEL BUMP

19

20   SUBSCRIBED AND SWORN TO

21   Before me this _____ day

22   of _____ 2017.

23   _____

24        Notary Public



Daniel Bump 04/05/2017

```
1   STATE OF ILLINOIS  )
2                      )   SS:
3   COUNTY OF COOK     )
4          I, Patricia L. Wangler, an Officer of the
5   Court, do hereby certify that heretofore, to-wit,
6   on April 5, 2017, personally appeared before me, at
7   180 North Stetson Avenue, Chicago, Illinois, DANIEL
8   BUMP, in a cause now pending and undetermined in
9   the United States District Court, Northern District
10  of Illinois, wherein AMERICAN CENTER FOR EXCELLENCE
11  IN SURGICAL ASSISTING INC., is the Plaintiff, and
12  COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE,
13  DR. THOMAS CAMERON, DR. KAREN M. SOLT, and DR.
14  KATHY CABAI, are the Defendants.
15         I further certify that the said witness
16  was first duly sworn to testify the truth, the
17  whole truth and nothing but the truth in the cause
18  aforesaid; that the testimony then given by said
19  witness was reported stenographically by me in the
20  presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.
```



1          I further certify that the signature to

2     the foregoing deposition was not waived by counsel

3     for the respective parties.

4          I further certify that the taking of this

5     deposition was pursuant to Notice, and that there

6     were present at the deposition the attorneys

7     hereinbefore mentioned.

8          I further certify that I am not counsel

9     for nor in any way related to the parties to this

10    suit, nor am I in any way interested in the outcome

11    thereof.

12          IN TESTIMONY WHEREOF: I have hereunto set

13    my verified digital signature this

14    17th day of April, 2017.

15

16

17

18

19    _____

20    ILLINOIS CERTIFIED SHORTHAND REPORTER

21    LIC. NO. 084-002417

22

23

24



1          McCorkle Litigation Services, Inc.
              200 N. LaSalle Street, Suite 2900
2                Chicago, Illinois 60601-1014

3

4   April 17, 2017
    Mr. Michael J. Davis
5   DLG Law Group
    2777 Finley Road, Suite 12
6   Downers Grove, Illinois  60515

7   IN RE:  American Center v. Community College
    COURT NUMBER:  1:15-CV-07290
8   DATE TAKEN:  April 5, 2017
    DEPONENT:  Daniel Bump

9

    Dear Mr. Davis,
10
    Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause.  Also enclosed are additional signature
12  pages, if applicable, and errata sheets.

13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must be
    made on the errata sheets, not on the transcript
15  itself.  All errata sheets should be signed and all
    signature pages need to be signed and notarized.
16
    After the deponent has completed the above, please
17  return all signature pages and errata sheets to me
    at the above address, and I will handle
18  distribution to the respective parties.

19  If you have any questions, please call me at the
    phone number below.
20

21  Sincerely,

22  Cindy Alicea              Patricia L. Wangler
    Signature Department      Court Reporter
23

24  cc:  Mr. Roche.



**$**

**$3,680**
15:20
**$5,400**
30:6,14
**$500,000**
14:22 15:4
**$6,900**
29:10
**$7,000**
62:20

**1**

**1**
14:14 38:21 39:1
42:21,22 48:3 50:6,
23 66:1
**10**
15:19 24:21
**100**
6:8 16:4 18:19 19:4
21:12 33:16
**1008**
67:1
**1058**
67:1
**1061**
46:16 48:2
**11**
42:10 51:12
**1102**
50:2 52:10
**1107**
56:22
**1108**
66:24
**1111**
57:10
**12:59**
7:15
**1:01**
9:16

**2**

**2**
44:13 48:7 50:15,24
53:1 68:2,6 71:12
**20**
15:19 24:21,22
**200**
15:16,17 22:22 23:9
24:14,16,19
**2006**
57:19
**2008**
64:1
**2009**
60:11 62:5
**2010**
10:9,13,14
**2012**
39:4
**2013**
9:24 10:4 11:6 12:9,
16 13:3,22 14:2,7
18:1,8,18 20:10
22:5,9 24:24 25:5,8
26:9 27:16 29:20
31:13 33:19 34:11
35:15 36:8 39:3,9
42:12,16 47:10,13,
16,21 49:18 64:11
70:12,16
**2014**
9:24 10:4 11:6
12:11,16 13:4,22

**14:**2,7 17:17 18:1,9,
18 20:10 22:6,9
24:24 25:5,8 26:9
27:16 31:13 33:19
34:12 35:15 36:8
39:9 45:1,6 47:10,
13,16,21 51:21
70:12,16
**2015**
22:2
**2016**
20:7
**21**
42:12
**24**
48:5 49:8
**2501**
67:11,12
**2:47**
72:8

**3**

**3**
44:20 52:12 53:1
**3,680**
38:1
**30**
5:6
**30(b)(6)**
5:12 38:20 39:1 68:1
**31**
39:9
**32**
49:17 50:1 51:22
52:8
**35**
41:17,21

**4**

**4**
45:11 49:7 50:3 55:5
65:18
**40**
19:8
**40,000**
41:17,21

**5**

**5**
45:18 65:15,20 66:9,
15,23 67:15
**5,495**
29:23,24
**51**
7:22
**52**
7:22
**5th**
49:18

**6**

**6,995**
30:8
**60**
19:7 48:8,14 49:4
**600**
33:4
**63**
14:18

**7**

**75**
15:16,24 16:6 21:10,
15 22:8,15 24:16,19

**8**

**8**
80
15:16 16:6 21:15
22:8,15 24:16

**9**

**9**
42:16
**90**
16:4 18:19 19:4
21:12 33:15
**9th**
17:3 49:21

**A**

**ability**
20:12 22:7 28:5
46:22
**ABSA**
42:23
**absolutely**
61:18
**accepted**
25:2
**accepting**
49:22
**access**
11:3,5,10 12:15,18,
20 13:4,15,18,20
26:1 45:7 55:22
**accessed**
14:3
**accessing**
13:5
**accommodate**
27:23
**accord**
10:10
**accreditation**
15:15 16:8 19:16
20:1,6 21:2,9 22:20
31:5,20 33:6 35:7
53:20 56:14 57:1,12,
14 59:2,20 60:14
62:4,5,18 64:2,9,18
**accredited**
18:13 20:16,17,22
21:5 22:2,5,12 30:18
34:10 41:4 60:9,10
64:4,15
**accuracy**
57:18
**accurate**
6:10
**Ace**
6:8,12,15,16,19,21,
23 7:3,9 8:14,15,20
9:20,22 10:5,9,24
11:2,24 12:20 13:3,
5,17 14:2,7,20 15:7,
23 16:16,21,23
17:15 18:6,15,18,22,
24 19:4,9,11 20:8,20
21:11,13,14,17 22:7,
16 23:6,23,24 24:13,
17,24 25:4,10,12,17
26:9,12,17,19 27:1,
16,24 28:7 29:6,7,8,
18,19 30:24 31:11,
13,23 32:4 33:12,19,
23 34:21 35:12,15
36:12,17,21,23,24
37:13,18 38:6,14
39:12 40:13,23
41:10,24 43:3,10,13
44:4,8,13,20 45:1,
12,14,15,18,22

**46:**16,19,22,23 47:8,
10,11,13,16,17,19,
20,22 48:2,12 49:1,3
50:2,12,16 52:10,18
55:11,22 56:22
57:10,13 58:5,7,10
59:1,6,10,11,12
60:6,10 61:6,13,21,
22 62:4,5,15 63:8
64:9,19,20,22 65:5,
6,9 66:24 67:1 69:1,
4,18 70:12,16,21,23
71:4
**ACE's**
9:7,14 11:1,5,10,21
12:5,15 13:21 14:3
15:3 16:9 17:16
18:1,8 21:17 30:3,11
33:8 34:12 42:22
48:12 49:1,22 52:16
53:17 54:14,19 55:2,
15,16,18 56:4 61:24
63:22 70:3 71:24
**achieving**
57:14
**act**
57:12
**action**
43:21 66:8
**acts**
14:20
**actual**
18:8 21:19,21
**add**
5:8 38:17 43:18
62:23
**addition**
16:2 21:12 30:16
**additional**
18:10 21:12,15
22:15 36:24 37:4
40:20
**address**
60:23
**addressed**
60:22,24
**adjunct**
45:19,23 47:17
**administrative**
39:8
**admission**
16:15,21,23 17:15,
17,23 18:1,5,23
**admissions**
18:23
**advertisements**
40:24
**advertising**
38:13,14 39:16,21,
24 40:1,2,5 41:6
**affected**
31:7
**affiliation**
49:11
**agencies**
35:10,13 36:8
**agency**
35:16
**agree**
17:23 18:2,4 27:1,22
28:2,3 37:16 44:12
49:14 70:22 71:3
**agreed**
24:20 42:13 49:16,
23
**agreement**
5:9 6:18 7:4,8,10,12,
13,17,24 8:3,8,17
15:22 17:1,2 28:21,
24 42:21 48:4,13
49:3,18 50:10,21

**51:**6,9,11,14 52:4
58:10 63:6
**agreements**
6:24 7:2 8:15 38:12
42:9
**agrees**
49:7
**ahead**
30:4 58:19 60:6
**allegation**
15:5
**allegations**
27:24
**alleges**
14:19 28:7
**allowances**
30:15
**allowed**
10:24 11:1 21:1
26:24
**amendments**
22:10
**amount**
14:22 15:7,21 29:14
31:10 37:22
**analyzing**
58:24 60:18
**annual**
16:1
**anticipated**
47:5
**anticipation**
47:22
**anymore**
64:15
**apologize**
7:9
**appeared**
19:24
**applying**
20:2 21:1
**appoint**
45:18,22
**appointed**
46:1
**approval**
56:19
**approved**
21:18 42:23 61:4,5
**approximately**
29:10
**area**
15:19 27:9 33:21
34:1,19 36:9
**areas**
5:11,12 35:5
**aspects**
45:21
**assignment**
69:15
**assignments**
69:14
**assistant**
19:17 22:6 29:9,19
30:6 31:15,23 33:12,
20,24 34:13,22 35:9
36:17 42:24 49:9
56:12 70:9
**assistants**
32:21 33:8 35:8,10,
17 36:10
**assisting**
26:22 61:22
**assumed**
61:9
**assumes**
20:19
**assuming**
47:9

**assumption**
22:18 36:16 62:10
**AST**
32:12,17 58:22 59:4,
5,6,10,11,22 60:7
61:24 62:1,6 64:10
**attached**
51:12
**attempt**
47:16
**attempts**
65:9
**authored**
70:22
**authorization**
12:23
**authorize**
12:3
**authorized**
12:17
**authorizing**
57:11
**awarded**
20:1,3 21:8
**aware**
16:21,23 17:3,5,15
25:11 26:9,17,19
27:16 29:18 35:12,
15 49:1 53:9,12,13
56:3 64:1,6 67:17

**B**

**back**
15:15 21:17 24:3
28:16 38:11 48:17,
24 62:9,11,13
**based**
15:11,14 16:7 20:3
21:16,19,20 22:18
27:13 31:8 32:9
33:10 51:9
**basic**
29:22
**basis**
16:1 25:13,18
**Bates**
39:7 66:24 67:2
**begin**
49:8
**beginning**
66:4
**behalf**
7:9 57:13
**believed**
23:6,12
**believes**
22:16 69:1
**Bell**
10:17
**benefit**
63:2
**benefits**
42:1,4
**benefitted**
62:24 63:1
**bias**
36:4
**big**
27:7 55:14
**Bio**
67:8
**bit**
36:4
**Blackboard**
37:3 44:17
**blank**
50:8,17
**Board**
17:12 56:17



**bodies**
35:24
**book**
70:21
**bookshelf**
55:21
**bottom**
56:23
**branch**
59:4
**break**
53:4
**bringing**
27:8
**built**
37:21 38:3
**Bump**
5:4,10,14 6:1 8:1
10:13 11:22 14:16
24:8 38:24 42:10
46:12 50:4 53:9
55:10 56:3 65:15
67:17 68:5 71:10
**Bump's**
8:17 71:10,13
**bureau**
32:11
**business**
33:16

**C**

**CAAHEP**
15:14 16:8 18:13
19:16,21 20:1,6,16,
17,21 21:1,5,9,18
22:2,5,20 30:18
31:5,20 33:5 34:10
35:7 36:18 41:4
53:11,19 56:14
57:14 58:15 59:1,20
60:9,10,14 62:5,18
64:1,8,10
**Cabai**
23:1 63:9,15
**Cabai's**
44:24
**calculation**
21:16
**calendar**
25:8
**California**
34:19
**called**
6:2
**campaigns**
38:16
**capability**
14:3
**capacity**
5:16 14:15
**care**
35:24
**case**
7:18 15:2 24:9 28:21
71:23
**cases**
35:20,23 36:5
**catalogue**
11:13 65:19,24
**category**
18:11
**CEO**
6:9
**certification**
19:21 36:18
**certifications**
35:18
**certified**
17:21 35:21 36:7,9

**certifying**
35:24
**changed**
32:21 64:1,8
**characterize**
29:13
**charge**
29:10,14,15,17 30:8
**charged**
30:5
**charging**
30:10 31:10
**Chicago**
34:16,21 35:1,3,5
**Chicagoland**
33:21 34:1 36:9
**choice**
60:8
**choose**
50:18 52:9,13
**chooses**
69:24
**chose**
26:2,4
**claim**
20:23 69:11
**claiming**
15:8
**clause**
7:13 8:5,9
**clear**
49:19
**clinical**
43:3 44:2
**close**
25:5
**cloud**
12:7
**COD**
15:13,18 16:5,18,24
18:7,15 19:4 22:5
23:24 24:13 25:11,
17 26:12 30:24
36:12,17 37:14
38:18 45:16 46:23
47:1,22 50:12 51:21
52:16,17,20,24
62:24 63:2,7,21 64:7
65:8 71:3,20
**COD's**
16:15,21 17:15,23
18:4 26:19 71:24
**collaboration**
40:12 57:23
**college**
15:1,24 16:10 17:12
19:15,20 20:5,9,20,
21 21:15 22:2,17,19
23:22 27:17,22 28:6,
8 29:8,10 30:4 36:22
37:19 39:15 41:1,11,
13 42:11,13,23
43:10,14 44:9 45:4,
7,13,19,24 46:3,6
48:13 49:3,7,14
50:11 53:9,14,18,19,
24 54:7 56:2,9,10,
11,15,17 64:17,20,
21 65:5,10 68:10,21
70:22 71:11
**combine**
69:14
**comment**
5:13
**commit**
13:7,13
**committee**
58:20,22
**committees**
59:15

**communicate**
23:23 58:3 59:11
61:11 64:21
**communicated**
10:23 59:18
**Community**
17:12 56:17
**company**
40:2
**compared**
37:20
**competently**
54:6
**competitor**
12:3
**competitors**
30:10 32:24 33:1,3
34:18 59:16,24
60:19 61:16
**complained**
38:7
**complaint**
14:17 38:8 66:2,7,
13,14,19 67:5 71:14,
15
**complaints**
67:17
**complete**
69:17
**completed**
5:6 26:21 27:4 43:21
61:12
**completing**
63:3
**completion**
69:4,8 70:8
**compound**
24:10
**computer**
13:6,17
**Conceivably**
12:22
**concentrations**
34:15,16
**concerned**
37:10
**concluded**
72:7
**conduct**
31:13 33:19 38:7
47:10
**conducted**
10:19 31:11,16,22
32:4 33:23
**confidential**
6:14 9:7,21 11:2,6,
11,21 12:1,5,15
13:21 14:3 58:4
59:12,22,24 60:2
64:22 65:3
**confidentiality**
6:17,24 8:9 9:4 10:5
58:9
**confused**
7:9
**connection**
9:11 10:20 36:21
37:18 41:24 70:3
**consideration**
32:18
**considered**
15:18
**considers**
6:15 12:1
**consisted**
65:18
**consortium**
15:22 16:10 17:1,2
18:7,16 19:5 20:21
22:18 23:24 24:13
25:12,17 26:12,13

30:4 36:12,15 38:11,
18 40:15,24 42:9
46:21,24 47:1,22
49:11,17 50:13,21
51:9 52:3 65:8
**constitute**
69:1
**consultant**
56:6 62:21
**Consultants**
57:1,12
**consummated**
17:1 4:10
**contained**
57:22 59:21 66:21,
22 71:1,6
**contents**
70:23 71:4
**contract**
22:11 43:20,22
51:20
**contribute**
15:14 16:6
**convenience**
25:21
**convenient**
26:3,5
**conversation**
15:11 46:11 63:18
**conversations**
59:13,14 61:14
**conversion**
14:20
**coordinate**
45:12,16
**copied**
55:13
**copies**
13:21 62:8 68:20
70:13
**copy**
55:15 56:7 61:7,10
**corporate**
5:1,3,15 6:7 7:24
9:20 55:16 71:13
72:1
**corporation**
6:9,13 8:16
**correct**
21:19 22:21 25:3
36:19 42:15 45:10
48:20 49:13 57:2,15
70:5 71:7
**correctly**
12:14 22:24 33:7
**cost**
29:19 30:12,20,22
37:6 40:18,21
**costs**
36:20,24 37:2,3,8,
11,13,16,21,22 38:3,
13,14,17 39:13 40:5
41:23 42:6
**counsel**
5:14 52:4 54:16 71:9
**counterintuitive**
34:5
**country**
34:14
**couple**
35:1 38:12 40:21
66:3 68:24
**courses**
26:22 67:8
**court**
67:18
**cover**
27:21 50:24 51:1,5
**create**
12:4

**creating**
37:11
**CSFAS**
18:14
**CSTS**
17:19 18:12
**Current**
19:2,3
**curriculum**
11:14 42:24 43:8,10
45:21 53:23 54:7
65:15,17 66:9 67:15
68:10,21 71:12,18,
21,22,24 72:2,3

**D**

**D.B.**
38:20 68:1
**damages**
14:9,21 15:4,7,10,20
38:6
**Dan**
5:10 6:6 38:24
**DANIEL**
6:1
**date**
5:7 19:22 48:5 49:8
**dated**
49:18
**Davis**
5:8 7:14 9:15 13:11
32:15 53:6 54:21
55:4 71:14 72:5
**days**
5:6 43:2 48:9,14
49:4
**December**
17:3 39:9 42:16
**decided**
50:23
**defendant's**
14:20
**defendants**
7:22
**define**
11:24
**delay**
60:20
**delayed**
27:11
**deliver**
50:24
**demand**
31:14,23 32:20 33:8,
24
**Denver**
34:6 45:1
**dep**
7:24 71:13 72:1
**departures**
10:20
**deponent**
5:2 54:19
**deposition**
5:1,4,12 14:15 17:7,
8 38:21 39:2 50:1
51:12,15 54:22
65:16 66:1,10,16,23
68:2,6 71:10 72:7
**deprived**
14:20
**derived**
62:16
**Describe**
62:15
**designate**
45:11,15

**designated**
45:13
**desire**
31:6
**destroy**
61:13,21 62:6 69:7
70:13
**developed**
41:14
**developing**
40:19
**development**
49:10
**devoting**
47:1
**difference**
8:10 18:23
**differences**
36:1
**directly**
18:11 46:9 60:19
**discovered**
17:18 19:23 20:4
**discuss**
6:12 14:19 36:20 42:9
46:9
**discussed**
15:10 22:22 23:8
30:24 46:3,6,12
51:15 69:2
**discussion**
14:12 23:12,19
27:20 53:5 67:13
**discussions**
23:8,12,15,16 25:15
**dismissed**
14:24
**dissemination**
6:13
**Distance**
37:7 42:23 43:1,5,15
44:16,17
**distributed**
61:18
**distribution**
50:3 53:1
**doctors**
35:9
**document**
7:21 14:16 17:9 39:2
43:11 48:19,22
51:16,17 58:13 66:3
68:7
**documentation**
44:5
**documents**
12:19 24:8,11 44:2
54:8 58:1,2,10 66:15
67:19
**dollar**
50:7
**dollars**
40:21
**door**
55:23
**doubled**
41:12 62:19
**downloaded**
70:14,18
**drafted**
51:6,11,14
**dramatic**
64:13
**due**
5:5 18:22
**duly**
6:2
**Dupage**
15:24 16:11 19:15,
20 20:6,9 22:2,17,19



23:22 27:17 28:6,8
29:8 36:22 39:15
41:1,11 44:9 45:4,7
46:4,7 49:14 50:11
53:10,24 56:2,9,10
64:20 65:5,11 68:10,
21 70:23
**Dupage's**
53:15,18 54:7 71:11,
12

**E**

**earlier**
68:9 71:20
**easily**
13:18
**economic**
62:15,18
**effect**
48:4
**effective**
69:15
**effort**
47:1
**efforts**
39:19 47:19
**elaborate**
20:14
**electronic**
13:24
**electronically**
11:22 12:6 13:5,15
14:4 55:3,11
**elements**
43:1,4
**else's**
26:8
**email**
38:16 41:7 49:21
**embark**
43:13 47:19
**employed**
6:18 14:8 47:20
**employee**
6:16,21,23 7:3,4
8:20,22 9:3,6,10,13,
19 10:1 12:20 13:3,
13,18 41:24 55:22
**employees**
6:24 7:5,11 8:14,16
10:8,21,24 56:3
**employment**
7:10,11,12,17 8:3,8,
15,17 10:9
**empowered**
15:13
**end**
66:5
**ending**
39:8
**engaged**
40:23
**enroll**
21:14 22:8 25:1,7
26:2,10,14 27:13
33:4
**enrolled**
18:18 19:9 21:13
28:10
**enrollees**
16:10
**enrolling**
16:4 17:19 18:12
21:2,5
**enrollment**
18:8 21:17 23:9,18,
23 24:14 25:4,5,16,
18,21 27:4,24 28:6
30:23 33:14 36:11

**enrollments**
15:18 21:20,22
22:15 24:21 27:10
51:2 62:19
**entered**
9:15 48:14 58:9
**entering**
16:9 49:2
**entire**
6:7 26:15
**entity**
57:4,7 58:8
**espionage**
13:8,14
**estimation**
16:7
**eventually**
62:17
**exact**
67:14
**EXAMINATION**
6:4
**examined**
6:3
**excess**
14:22 15:4 30:14
**excited**
27:7
**excuse**
5:1 66:24
**execute**
6:17
**exhibit**
5:11 14:14,16 29:7
38:21 39:1 42:10,11
49:17 50:1 51:12,22
52:8 54:22 55:5,6
65:15,20 66:1,2,5,7,
9,12,13,14,15,19,22,
23 67:3,4,15,21
68:2,6 71:12
**existence**
6:7,8 58:9
**exit**
10:19
**exits**
7:14
**expect**
60:16
**expectations**
21:8
**expected**
21:3
**expense**
39:21 40:6 41:13
**expenses**
39:8,12,16 40:11
41:16
**experience**
31:19 35:19
**expert**
71:18 72:3
**expertise**
45:20
**expressed**
28:8
**extra**
30:19
**eyes**
54:17

**F**

**Facebook**
40:1 41:5
**fact**
15:14 21:3 22:4
25:16 30:16 32:23
34:5 58:8 61:14

**faculty**
45:18,19,22,23
46:15,19 47:11,14,
17,21
**fall**
18:11 26:11
**familiar**
26:23 56:14,16
64:12
**federal**
67:18
**felt**
37:14
**field**
30:9 31:9
**figure**
14:5 15:21 24:14
**figured**
20:2
**figures**
21:17 23:24 27:5
**filed**
15:1 66:7 67:18
**final**
43:23
**finally**
61:2 64:18
**find**
13:20 54:18
**fine**
66:19
**finished**
61:22
**fired**
10:11 12:22
**flourish**
33:17
**focus**
65:23
**follow**
64:16
**forecasted**
19:3
**form**
43:8
**formal**
32:6
**format**
44:18
**forward**
30:12 39:15 46:21
65:2
**forwarded**
59:9,10
**found**
31:9
**front**
15:17 67:6
**full**
20:23

**G**

**gauge**
31:14,23 33:24
**gave**
44:8
**general**
35:20 39:7
**generated**
37:18
**Georgia**
34:15
**good**
33:2
**graduating**
36:10
**graphics**
40:19

**great**
31:6
**group**
53:5 67:21
**guess**
21:6 38:16
**guy**
14:5,7

**H**

**half**
60:18
**handbook**
8:20,22 9:3,6,10,13,
20 10:1
**handle**
28:6 29:4 37:15
44:14
**handles**
40:3
**handling**
27:3 44:16
**happen**
25:14 30:16
**hard**
13:21 55:15 68:20
70:13
**heading**
42:20 50:2 67:11,12
**headquarters**
55:16
**hear**
24:1
**heavy**
34:15,16
**high**
39:18
**hire**
47:6,17,19
**hired**
7:3 40:2 41:15 56:5
**hires**
35:8
**hiring**
41:24
**hoping**
71:19,21
**hospital**
36:3
**hospitals**
35:9,13,16,19,20
36:2,8
**hot**
34:8

**I**

**idea**
24:12 27:1 40:17
65:2
**identification**
38:22 68:3
**identified**
5:3 65:17
**identify**
39:2,13
**Illinois**
17:10,12 56:17
**imagine**
40:20
**impact**
20:7,12 22:7 25:18
27:4 28:5 35:14,23
37:17,20 46:24
**implement**
45:21

**implemented**
43:22 53:24
**improper**
62:10
**included**
32:24 37:23 38:3
43:20 65:19
**includes**
42:24
**including**
10:10 43:1
**inconvenient**
26:7
**incorporated**
57:6
**increase**
39:17 40:11
**increased**
23:18 30:20,22 33:9,
10 37:6,16 38:14
39:14 41:9 42:7
**incur**
30:13
**incurred**
36:21,24 37:2,3
38:14 39:12 41:23
**indirectly**
60:19
**individual**
15:12 13,14 14:15
66:1,23
**individual's**
41:18 48:17
**industrial**
13:8,14
**inform**
41:3,7
**informal**
34:3 59:13
**information**
6:14 9:7,21 10:6
11:2,6,11,21 12:1,2,
6,15,18,21 14:4,15,
18,22 14:4 57:21
58:4 59:11,21 64:22
65:3 66:9,10,15,21,
22 67:3,4,14 70:24
71:5
**initial**
23:11 48:24 50:17
52:3,9,13,24
**initially**
22:3
**instance**
7:6 32:10 44:1
**institution**
64:4
**institutional**
64:18
**instructor**
47:20
**insurance**
42:2
**intended**
16:24 63:7
**intent**
16:9 52:16
**intention**
52:19
**intents**
65:12
**interested**
18:13
**Internet**
68:18
**internship**
43:3 44:3
**Interrogatory**
65:18

**interview**
57:24
**interviews**
10:19 47:11
**introduced**
54:22
**issue**
5:5 27:7,20 36:7
**item**
40:6
**itemized**
39:11
**items**
41:8

**J**

**Jack**
10:17
**James**
10:17
**January**
60:11 62:5
**Jeff**
57:7,11 61:5,11
**John**
10:17
**July**
45:1,6

**K**

**Kathy**
22:24 23:5,8,19
44:24 46:8,9,13,14
47:9 50:23 63:9,15
**Keith**
5:4,14 7:6,8 8:1,4,16
11:10 23:2,5 30:7
46:12 71:9,10,18
72:1
**kind**
21:8 30:17
**knew**
22:11

**L**

**lab**
16:20 19:13 23:17,
20 26:20,24 27:3,8,
18,20 28:4 37:10,12
41:12 43:2 44:22
45:1,9 50:16,24 51:1
52:18
**labor**
32:10 62:20,21
**labs**
27:23 28:11 29:1,4
35:1 37:14 52:20
**lack**
31:4
**laparoscopic**
67:9
**Las**
34:19
**latest**
15:22
**lawsuit**
8:23 65:13
**lawyer**
52:2
**leads**
62:17
**learn**
20:5
**learning**
37:8 42:23 43:2,5,15
44:16,18 69:15



**Leave**
13:11
**led**
62:17
**left**
10:8 11:2
**leg**
58:23
**legwork**
58:21
**letter**
57:11
**level**
34:4
**liability**
36:7
**light**
23:17
**limit**
5:14 28:9,11
**limited**
17:24 18:2,5 29:11
**limiting**
29:16
**list**
41:6
**listed**
5:11 44:11
**lists**
39:11
**litigation**
15:3,8 24:12 53:11
68:22
**live**
34:6
**lock**
55:23
**long**
8:6
**looked**
19:18 26:5
**lose**
31:19
**losing**
34:22
**lost**
16:8 21:20 31:19

**M**

**made**
23:1 28:1,7 61:17
64:13
**make**
65:9 71:9
**making**
30:15
**manage**
37:7
**manages**
40:3
**mark**
38:19
**marked**
14:14 38:22 39:1
50:1 68:3,5
**market**
31:14,16,18,20,22
32:3,6,7,9,17 33:18,
20,23 34:2,3,7,9,21
35:3
**master**
43:8,10 65:16,19
66:9 67:15 69:16,19
70:7
**material**
61:15
**materials**
44:22 45:8 62:11,12

**matter**
28:9 29:2
**matters**
57:13
**MDS**
16:19
**meant**
42:3
**measures**
12:19 43:14
**mechanics**
23:13,16
**mechanism**
35:21
**medical**
5:5 42:2
**meet**
16:14
**meeting**
60:24
**member**
45:12,13,15,16,23
46:19 47:6,17,21
**members**
45:19 47:11,14
**Mike**
54:13
**milked**
61:1
**mind**
8:13 31:7 34:20
**minute**
58:18
**misappropriate**
70:24
**misappropriated**
71:4
**module**
69:21
**modules**
44:9 70:2,8
**money**
27:14
**month**
25:1
**months**
20:1 48:5 49:8 60:24
**morally**
48:20
**motion**
15:1
**motivation**
31:5
**move**
21:10
**mutually**
24:20

**N**

**National**
57:1,12
**nationwide**
34:4
**necessarily**
18:3
**needed**
44:5,22 45:8
**negatively**
46:24
**negotiating**
22:10
**night**
54:2 68:11 71:21
**non-ace**
56:3
**nondisclosure**
7:2,4,7,8,13 8:5
51:14,17

**noted**
29:8
**notice**
5:3,11 48:9,15 49:4
**notify**
65:5
**November**
20:6,7 42:12 51:11
64:11
**number**
16:5 20:8 21:24
22:1,22 28:11 29:1
37:6 51:22
**numbered**
39:7 66:24
**numbers**
25:19 67:2
**numeral**
42:21 50:3
**nurses**
17:22

**O**

**objections**
8:2
**obtain**
11:7 36:18 53:20
56:19 57:21
**obtained**
19:16,21 20:6 22:20
**occur**
62:7
**occurred**
23:21 63:18
**offer**
41:4 49:22 56:11
**offered**
25:12 30:8
**offering**
29:13 30:17 34:18
39:20 49:9
**office**
55:19,20,22,23
**on-the-job**
16:18
**online**
26:21 27:4 44:9
68:14,17 69:21 70:2,
8
**open**
25:21
**operating**
17:22
**opportunity**
60:20
**opposing**
54:16
**option**
26:6 50:18 52:10,14,
17
**order**
20:16 56:19 59:1
62:9
**ordinarily**
7:11
**ordinary**
7:5
**organization**
17:14
**organized**
26:15
**original**
48:17 50:21 52:19
**originally**
55:12
**outlining**
16:13
**owner**
48:18

**P**

**p.m.**
7:15 9:16 72:8
**package**
29:22
**pages**
38:17 66:4
**Paperclip**
40:1
**paragraph**
14:18,19,24 42:22
44:13,20 45:11,18
48:3,7,8 49:7 50:6,
20 52:12
**paragraphs**
53:1 67:13
**parenthetical**
50:17 52:9,13
**parentheticals**
52:24
**part**
15:16,17 18:7 22:17
24:1 31:18,20 32:23
37:1 39:22 40:4
44:15 58:3,22 62:7
**partially**
33:5
**parties**
5:9 56:4
**partnership**
30:12 36:22,23
39:14 41:9,10
**party**
48:8,9
**PAS**
16:19
**passed**
52:1
**password**
13:14
**payroll**
41:16 42:1
**people**
10:10 17:20 27:7
31:3 35:4,21 36:6
37:7 41:7 59:14,15
60:18
**percent**
6:8 19:7,8
**period**
19:23 22:9 31:18
34:24 48:4
**permission**
11:15,17
**permitted**
11:1
**person**
41:15 57:7
**personally**
25:11
**perspective**
24:23
**pertaining**
9:21 10:5
**PES**
16:19
**petering**
35:2
**phone**
63:12,14
**picture**
39:20
**place**
9:24 17:2 61:2
**plaintiff**
7:23
**planned**
36:23

**platform**
43:15
**play**
50:22
**point**
22:12 25:7 39:18
40:10 64:16
**policies**
9:21 10:5
**political**
36:4
**portion**
27:4
**position**
15:3 46:2
**possess**
56:4
**possession**
51:10,18 61:6
**potential**
26:1 27:2 29:14 30:8
**preparation**
56:18
**prepare**
57:19
**prepared**
56:24 57:16,17
**preparing**
61:22
**present**
44:22 45:9
**presentation**
44:21 45:8
**presented**
44:23 50:16 54:8
**presently**
5:5 6:21 21:13
**pretests**
44:8
**pretty**
33:15
**previous**
15:11
**previously**
20:2
**price**
31:8 37:23 52:21,23
**prices**
30:1
**print**
69:23 70:7
**printed**
70:11,20
**prior**
51:21
**proceed**
26:11,14
**proceeding**
65:12
**process**
21:7 26:17 60:14,16,
21 62:8
**produce**
37:5
**produced**
7:18 8:22 53:10
68:21 71:22
**product**
33:11 39:19
**profit**
37:18
**profit/loss**
39:3
**program**
12:4 17:14 18:13
19:17 20:18 21:5
22:6 23:14 24:17,22,
24 26:2,15,20,22
27:8,17 28:4 29:9,19
30:6,13 31:4,15,21

33:12 34:13 36:17
37:19 41:4 42:24
44:6,15 45:12,16,22
46:2 49:9,10,12 50:7
54:1 56:12 60:18
65:18,23 69:5,18
70:9
**programs**
31:24 33:24 36:11
**progress**
44:6
**prohibiting**
27:2
**projected**
23:9,23
**projections**
24:18 27:24 28:7
30:23 36:12 47:4
**promised**
15:12
**promulgate**
9:20
**promulgated**
27:17
**proper**
12:23
**property**
14:21 48:17 69:12
**proposal**
29:6,7,11
**proposed**
25:12,17 26:12,20
30:12 36:22 37:19
65:8
**propounded**
7:22
**proprietary**
6:15 59:12 61:16
**proprietorship**
57:8
**prospective**
30:5 47:11,14
**protect**
6:13
**proved**
14:22
**provide**
15:23 22:6 34:4
42:22 43:3 44:4,17,
18,20,21 52:16
56:12 58:1
**provided**
27:18 28:4 36:14
58:2
**providing**
16:3
**provision**
9:4 28:24 48:3
**proximate**
14:19
**public**
41:3
**publication**
33:3
**publicly**
62:2 67:18
**published**
68:17
**pull**
34:11
**pursuant**
5:9
**put**
17:13 28:11 29:2,4
51:5 62:20,22 64:23,
24 67:10



**Q**

qualifications
16:13,15
qualified
16:12 17:20 45:22
qualify
16:14 18:20
quality
45:18
question
15:2 22:13 24:2
28:13,14 39:12
48:21 49:1 66:6,13,
18
questioning
54:19
questions
5:15 38:12 54:21
68:24 71:8,23
quick
14:11

**R**

raised
30:1
ranged
19:4
read
24:3,5 28:16,18
reading
17:22 69:14
reason
13:1 26:4 30:7 39:17
48:10
reasons
35:2
recall
29:11 42:18 44:1,3,
10 46:10 58:7,14,17
63:17 65:1,7,21
recapture
22:7
receipts
50:3 53:2
receive
69:4,17,19,20
received
59:5 62:4
receiving
58:23
recent
32:23 33:9
receptionist
10:16
recess
53:7
recipe
69:13 70:3
recognize
68:6
record
5:8 11:24 14:10,12
15:22 24:4 28:17
32:14,15
recorded
15:10
Redmond
10:17
refer
62:9
reference
9:14
referring
17:9 43:9 49:20
51:22 52:10 68:16
relate
24:12

related
23:13 38:17 40:1
44:2
relating
22:13 57:13
remain
16:16 19:8
remaining
5:2,13 19:8 29:4
remember
23:2 44:15 58:13
reorganized
67:7
rep
7:24
repeat
28:15
rephrase
31:12 66:17
report
56:24 57:16 58:3
represent
54:17
representation
22:24 23:4 50:11
request
7:21 71:9
requested
24:5 28:18 51:4
require
7:3
required
6:17 13:14 37:14
44:5 56:13,18 69:3,
7,16 70:6
requirement
56:11
requirements
35:12,16 37:4
Reserve
72:6
respect
43:4 70:21
response
65:17
Responsibilities
42:22
responsibility
44:13,14
result
14:19 38:7
resumés
47:14
rethink
27:13
retract
56:5
retrieve
65:10
return
61:12,20 62:6 69:3,
16 70:6,17
returned
62:13
review
9:8,10 47:13 51:20
54:2 58:20,21 66:6,
13 68:20 71:10 72:2
reviewed
17:6 24:9,12 52:4
53:14,17,18,23
54:17 57:17 68:10,
12 71:2,20,22
reviewing
17:11
rights
14:21
ROCHE
5:17 6:5 7:16 9:18
13:12 14:10,13 24:3,

7 28:16,22 32:16,19
38:19,23 53:4,8
54:16 55:1,6,9 67:21
68:4 71:8,15,19
role
61:21
rolls
54:16
Roman
42:21 50:3
room
17:22
rope
18:10
Roswell
10:16
rule
56:15,16
running
47:2

**S**

SA-C
36:11
salary
41:19
sale
27:11
sales
11:12,13 39:19 40:4
Sarah
10:13
saturated
35:3
save
27:14
scenario
51:5
schedule
39:7 40:8 41:9
scheduled
5:5
Science
67:8
screen
17:13 68:12,17
secret
65:6
secrets
6:14 9:14 65:4 69:2
security
12:19
seeking
57:13
selecting
52:17
self-employed
35:11
Self-study
53:10,15,19 54:15,
20 55:2,10,15,18
56:4,10,12,13,19,24
57:16,22 58:3,14,24
59:3,6,10,22 60:7
61:6,12,13,21,24
62:6,16 63:2,4,8,22
64:10,20,21 65:6,10
71:11
semester
25:13,18 26:10,11,
14,22 28:5
send
16:10 18:6,24 19:6
20:9,15 21:14 22:17
45:2 59:6
sending
58:11
serve
45:19,23

server
12:8,9,10 13:5
service
34:5 46:22
session
28:4
set
50:7
shareholder
6:9
sheet
42:6
shipping
37:12 41:13
shopping
31:8
short
19:23
shortly
63:19
shots
17:13 68:12,17
show
38:24 68:5
Showing
49:24
sic
32:10,11
sign
6:24 7:4,6,8,10,11
27:7 31:4 50:7
signature
72:6
signed
8:4
signing
58:13
similar
8:16
Simmons
10:17
simply
13:4,17 15:2 28:14
39:12
simulator
45:2
simulators
37:12 44:21 45:8
sit
54:5 63:21
six-day
16:20 19:13
skill
43:2 44:22 50:16
skills
45:1,9
slack
52:22
smattering
34:14
sole
57:8
Solt's
49:21
sort
6:17 58:9
sources
32:11
speak
57:12
special
11:15
specific
19:22 46:10 51:18
65:1
spelled
67:14
spent
62:20

staff
45:12,13,15,16 47:7
staffed
60:17
stages
43:23
stand
34:20
standard
64:3
standards
16:15,22,23 17:16,
17,24 18:1,5,24
64:2,9
stands
42:8
start
21:2 34:21 42:10
started
22:3 35:2 46:2
state
17:10 56:17,20
stated
21:11 46:18
statement
9:7 20:19 39:3,5
states
48:3 50:6 56:24
statistics
32:11
steady
33:15
steps
6:12
stored
11:21 12:6 13:4
55:2,10,13
strike
6:22 8:19 13:10
16:22 20:13 21:24
22:3,4 35:14 45:14
49:6
stringent
17:16,24
student
20:20 21:4 24:23
25:1,7,24 26:10,20
30:5,13 38:1 44:5
47:4 69:23
students
15:12,13,16,17,24
16:4,16 18:6,10,15,
19 19:1,2,3,12 20:8,
15,17 21:2,10,15
22:8,15 23:9,14
24:14,16,17,22
25:22 26:1 27:2,21
28:10 29:2,20 33:4
34:11,12,22 46:22
69:3,16,20 70:6,13,
17
studies
31:14,16 32:4,7,9,18
33:18,20,23 34:3
study
31:18,20,22 32:3,6,
23
studying
31:21
stuff
27:15
submission
17:7
submit
44:1 59:1,20 60:21,
23 61:15
submitted
53:10,19 58:15,20
59:3,8 62:1 64:10
submitting
44:2

subsequently
15:9
substance
54:6
substantially
20:12
substantiate
24:9
successfully
45:20
suffered
14:21 15:4 38:7
supplies
41:12
support
24:10
supposed
32:7
surgery
67:9
surgical
19:11,16 22:6 26:22
29:9,19 30:6 31:14,
23 32:20 33:8,12,20,
24 34:12,22 35:8,9,
37 36:9,17 42:23
43:2 44:21,22 45:2,
7,9 49:9 50:16 54:1
56:11 70:8
Surgiedge
43:2
Surginet
43:1,4,15
surrounding
12:19 23:16 35:5
swear
5:17
sworn
5:19 6:3
syllabi
65:19,24 69:17,19,
20 70:7,13,17

**T**

tailored
51:18
takes
6:13
taking
18:13
talk
54:14 55:4,7 65:14
talked
64:14
talking
23:20 32:1 34:24
64:3 67:2
taught
23:17
taxes
42:1
teach
52:18,20
teaching
23:20 47:6
techs
16:18
telephone
63:17
template
63:3,8
templates
44:4
ten
27:21
term
48:2 49:15,16,20,21
terminate
48:13 49:3



**terminated**
48:8,16 65:9
**termination**
48:3 49:8
**terms**
33:13 35:17 42:13
62:19
**testified**
5:10 6:3,6 21:14
22:16 23:10 25:10
37:17 38:8 42:12
49:19 53:22 65:16
68:9
**testify**
54:6
**testifying**
5:2
**testimony**
9:11 12:14 22:23
23:7 42:18 43:18
65:21
**tests**
44:8
**Texas**
34:8
**textbooks**
69:1,4,7,12,13 70:4
**thing**
8:11 30:15 35:7 41:2
60:22
**things**
8:11 11:12 32:6
34:19 37:5 43:24
57:24 58:1 71:16
**thinking**
21:22
**thousand**
40:21
**til**
6:20
**time**
6:18 8:6 19:24 20:3,
4 21:22 22:9 31:17
34:23 47:1 48:9,14
49:4 64:9
**times**
15:21 23:5 51:1
**Tina**
10:16
**today**
6:24 9:11 54:5 63:21
**today's**
5:7
**told**
63:5,7
**topical**
67:13
**topics**
5:3
**track**
14:3 21:21
**trade**
6:14 9:14 65:4,6
69:1
**traditional**
19:9
**train**
43:14
**trained**
16:18
**training**
30:17 43:1,4
**transcript**
54:18
**transferred**
16:5
**transmission**
43:9 56:18
**transmitted**
60:6 64:19

**travel**
27:14
**trial**
14:23
**trip**
44:24
**true**
33:2
**tuition**
29:9 50:3,6,12 53:1
**turn**
14:14,18 39:5 50:2
56:22 57:10 66:2,3,
12
**type**
40:1

**U**

**Uh-huh**
11:9 14:1 42:3 46:20
48:11
**ultimate**
25:18
**ultimately**
53:24 58:15
**unable**
18:22
**understand**
12:13 21:3 22:13,23
27:19 33:7
**understanding**
20:24 30:3,11 48:12
49:2
**understood**
54:14 66:18
**unit**
44:8
**unknown**
35:2
**updated**
40:13
**utilize**
13:14 16:24 69:13
**utilized**
12:2 51:16 63:22

**V**

**Vegas**
34:19
**verbal**
22:11 43:20
**verbally**
63:10
**videos**
37:5
**view**
33:8
**viewed**
70:23
**virtue**
15:1

**W**

**wait**
49:7 58:18
**wanted**
13:7 16:19 18:14
26:2 29:15 35:16
36:9 44:18 50:23
**Ware**
57:7,11,19,21 58:4,
7,11 59:7 61:5,11,20
**weaned**
34:17
**website**
38:16 40:3,4,13 41:5
43:16 60:15 68:13

69:22 70:14
**wing**
59:4
**wording**
67:13
**words**
27:12 64:23,24 65:2
**work**
32:10 58:23 62:8,24
64:17
**workbook**
70:24 71:5
**working**
40:9 46:15
**works**
20:24
**worried**
59:15,17
**writing**
17:6 42:14
**written**
48:9 49:4
**wrong**
32:5

**Y**

**year**
15:16,19 16:4 18:19
20:7 24:18,19,20,22
25:8 27:18,21,23
28:4,12 33:4,16 35:1
60:17
**years**
32:1,21 33:9,13 39:8
**YEHSS**
39:19
**yesterday**
6:6 22:23 23:7,10
25:10 34:8 42:12
50:1 53:23 65:15
69:3
**yesterday's**
54:17

