# WITNESS:

## Date: March 13, 2017

## American Center for Excellence v COD

Debbie Tyrrell



**Certified Court Reporters**
*For all your court reporting needs*
*Since 1968*
**www.metroreportingservice.com**

*311 S. County Farm Rd., 2nd Floor, Suite E, Wheaton, IL. 60187*

**630.690.0050** *FAX 630.588.9866*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN CENTER FOR            )
EXCELLENCE IN SURGICAL         )
ASSISTING, INC.,               )
                               )
            Plaintiff,         )  Case No.
                               )  1:15-CV-07290
       -vs-                    )
                               )
COMMUNITY COLLEGE DISTRICT     )
502, et al.,                   )
                               )
            Defendants.        )


        The deposition of KAREN SOLT called by

the Plaintiff for examination, pursuant to notice

and pursuant to the Rules of Civil Procedure for

the United State District Courts pertaining to the

taking of depositions for the purpose of discovery,

taken before DEBBIE TYRRELL, a Certified Shorthand

Reporter and a Notary Public within and for the

County of DuPage and State of Illinois, at 2777

Finley Road, Suite 12, Downers Grove, Illinois, on

March 13, 2017, at the hour of 1:30 p.m.

2

```
 1    APPEARANCES:

 2

 3         DLG Law Group, LLC
           (4100 East Mississippi Avenue
 4          Suite 420
            Denver, Colorado  80246
 5          Telephone:  720-361-6036
            Email:  Mdavis@bknmurraylaw.com)
           BY:  MR. MICHAEL J. DAVIS
 6
           on behalf of the plaintiff;
 7

 8         SCHULYER, ROCHE & CRISHAM
           (180 North Stetson
 9          Chicago, Illinois  60601
            Telephone:  312-565-8333
10          Email:  Mtroche@srcattorneys.com)
           BY:  MR. MICHAEL T. ROCHE
11
           on behalf of the defendants.
12
                           *  *  *  *  *
13

14

15

16

17

18

19

20

21

22

23

24
```

1

2
                              I-N-D-E-X
3

4     WITNESS:
       KAREN SOLT
5
                                        PAGE
6
      Examination by Mr. Davis
7

8

9     EXHIBITS:                    PAGE:

10         No Exhibits were marked.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                        (Witness sworn.)
 2                         KAREN SOLT,
 3    a witness herein, having been first duly sworn, was
 4    examined and testified as follows:
 5                         EXAMINATION
 6                       BY MR. DAVIS:
 7       Q     Would you please state your name?
 8       A     Karen Maloney Solt.
 9       Q     Are you a Doctor or a --
10       A     No, I am not.
11       Q     And you're not a Dean anymore either,
12    right?
13       A     I am retired.
14       Q     So, Ms. Solt, have you ever had your
15    deposition taken before?
16       A     No.
17       Q     And have you discussed the nature of the
18    deposition with your attorney?
19       A     Yes.
20       Q     Do you understand that when a question is
21    asked, if you don't understand the question, you
22    can ask for clarification.  And, also, as your
23    attorney will tell you, you need to finish letting
24    me ask the question before you answer.
```

```
 1        A    Yes.

 2        Q    And if you are asked a question, you need

 3   to state the answer verbally.  Not mmm-hmm or nod

 4   your head or anything like that because the court

 5   reporter can not take that down.

 6        A    Yes.

 7        Q    And is there any reason why you feel you

 8   can not proceed with this deposition today?

 9        A    No.

10        Q    Are you under any medication that may

11   interfere with your ability to testify?

12        A    No.

13        Q    What is your address?

14        A    471 Chasefield Drive, Chasefield is one

15   word, Williams Bay, Wisconsin.

16        Q    And so are you currently employed?

17        A    I am not.

18        Q    Are you married?

19        A    Yes.

20        Q    Do you have children?

21        A    Yes.

22        Q    Could you give me a little bit about your

23   educational background?

24        A    I have a diploma in Dental Hygiene from
```

```
 1    Northwestern University.  I have a Bachelor's of
 2    Science Degree from Loyola University of Chicago.
 3    I have a Master's of Education Degree from Loyola
 4    University in Chicago.
 5         Q    What was the Bachelor's Degree in?
 6         A    Dental Hygiene.
 7         Q    Could you give me a little bit about --
 8    give me your job history.
 9         A    I practiced privately as a Dental
10    Hygienist for approximately 20 years.  I taught at
11    Northwestern University Dental School from 1976
12    until 2001.  I then taught at College of DuPage
13    from 2002 to 2004.  I became an Associate Dean of
14    Health Sciences in 2004 at the College of DuPage.
15    In 2009, I became Associate Dean of Health and
16    Biological Sciences at College of DuPage.
17         Q    Was being a Dean in 2004 and 2009 -- was
18    it in the same department just different names or
19    were they different departments?
20         A    The Health programs were the same.  I
21    added in or I was given responsibility for the
22    Biological Sciences as well.
23         Q    The Health Sciences and the Biological
24    Sciences?
```

1      A      Yes.

2      Q      What are the Biological Sciences?

3      A      **Biology, Anatomy, Physiology,**

4  **Microbiology, Botany, Zoology, and Chemistry.**

5      Q      The Health?

6      A      **There are 20 plus programs.  At the time**

7  **I had all of the Health Programs that were in**

8  **existence at COD.**

9      Q      The Surgical Technical Program was one of

10  those programs, correct?

11      A      **Yes.**

12      Q      And so when there was contemplation of

13  putting on a Surgical Assisting Program together,

14  that would have come under your jurisdiction,

15  correct?

16      A      **Yes.**

17      Q      So the Dean of the school was -- the Dean

18  that you reported to was Thomas Cameron, correct?

19      A      **Yes.**

20      Q      We took his deposition this morning so I

21  am going to kind of describe the process that I

22  just want you to affirm in terms of how the

23  Associate Deans and the Deans function in relation

24  to new programs.  Okay?

1     **A     Okay.**

2     Q     According to Mr. Cameron, there were a

3 variety of steps in regard to establishing new

4 programs.  The first was the faculty member would

5 put together a program, correct?

6          MR. ROCHE:  I don't think that is what

7 Mr. Cameron testified to this morning but go ahead.

8 BY MR. DAVIS:

9     Q     Let me go back.  When a new program was

10 being anticipated is it the faculty member that

11 puts the program together?

12    **A     Yes.**

13    Q     Could you describe the process of how a

14 faculty member goes about putting together a

15 program?

16    **A     The first step would be a Needs Analysis.**

17 **We would determine whether or not the need for this**

18 **particular program would be needed for our**

19 **district.**

20    Q     What is the district?

21    **A     District 502.  Then assuming that that**

22 **was a positive Needs Analysis, showed that it was**

23 **needed, then the curriculum pieces would be put**

24 **together.  They would go through --**

1    Q    Now in terms of the curriculum pieces,

2  would it be the faculty member putting the

3  curriculum pieces together?

4    **A    Yes.**

5    Q    Okay.  Is it more than one faculty member

6  or -- is it more than one faculty member or is it

7  typically just one faculty member that puts the

8  pieces together?

9    **A    It depends on the program.  Frequently it**

10  **is one.**

11    Q    Okay.  In relation to the Surgical

12  Assisting Program was it just one?

13    **A    Yes.**

14    Q    That was Kathy Cabai, correct?

15    **A    Yes.**

16    Q    So the curriculum pieces are put together

17  and then when you say curriculum pieces could you

18  describe what curriculum pieces the faculty member

19  would put together for presentation to the -- what

20  is the next step?

21    **A    The Division Curriculum.**

22    Q    The Division Curriculum.  So what

23  curriculum pieces would the faculty member put

24  together?

1      **A      It's called an Active Course File.  An**

2  **Active Course File is created for each course that**

3  **will be anticipated for the program.  That consists**

4  **of a course description, general course objectives,**

5  **a list of topics to be covered in the course, and**

6  **methods of evaluation of the students.**

7      Q    In relation to the SA Program, that is

8  the Surgical Assisting Program.  We'll call it the

9  SA Program.

10     **A    Yes.**

11     Q    The course description -- so all of these

12 things would have been done by Kathy Cabai, right?

13     **A    Yes.**

14     Q    And this falls something short of a full

15 curriculum, correct?

16          MR. ROCHE:  Objection.  I don't

17 understand that question.

18 BY MR. DAVIS:

19     Q    Would you understand what a full

20 curriculum would be for a course?

21     **A    I am not exactly sure what you mean by**

22 **that.**

23     Q    Why don't you tell me what a course

24 description would consist of?

1          **A      It is approximately three to five**

2   **sentences that describes the general nature of the**

3   **course.**

4          Q     Okay.  Describe to me what the objective

5   -- what an objective is.

6          **A      An objective is a learning outcome.  They**

7   **are described in very broad terms on an Active**

8   **Course File.**

9          Q     What is the list of topics to be taught?

10         **A      Those are the topics that would be**

11  **included in that particular course.**

12         Q     I can probably guess what evaluation

13  would be.

14         **A      Yes.**

15         Q     So the course description -- so the

16  course -- so this course, this Active Course File,

17  it doesn't have the number of courses to be taught?

18  It doesn't have the courses to be taught or how

19  many courses there are going to be or how many

20  hours have to be taken to be able to move forward

21  with this course becoming something that is offered

22  in the College?

23              MR. ROCHE:  I'm sorry.  Can I have that

24  question read back?  I don't understand it.

BY MR. DAVIS:

    Q    Let me break it up.  So this Active Course File doesn't include specific courses that are going to be taken within the course to be offered?

        I am mixing some terms here.  Okay.  So we are talking about -- what is the name for -- what would you call the Surgical Assisting Program? Is it just a program?  Can we agree to call it a program?

    **A    You can call it a program.**

    Q    What would you call it?

    **A    I guess I am not sure what you are asking me.  Are you asking me about curriculum or are you asking me about a program in its entirety or --**

    Q    I am asking about a program in its entirety.

    **A    A program in its entirety consists of the courses that are offered within that program.**

    Q    So an Active Course File does that only relate to one course being given within a program?

    **A    Yes.**

    Q    So let's go back to when you want to put a program together, okay, in its initial phase.  So

```
 1    does a program also have a Needs Analysis
 2    associated with it?
 3         A    Yes.
 4         Q    Does a program also have a positive --
 5    does it also have course descriptions associated
 6    with it?
 7         A    Does a program have -- I believe so, if I
 8    am understanding what you are asking me.
 9         Q    When you want to take a program -- when
10    you want to implement a new program.  For instance,
11    the Surgical Assisting Program.  When you want to
12    take that program to the Division level.
13         A    Yes.
14         Q    Does it have to have all of the course
15    descriptions and all of the elements of the course
16    --
17         A    Yes, it does.
18         Q    -- already put together?
19         A    Yes, it does.
20         Q    Okay.  So the program consists of
21    individual courses, correct?
22         A    That's correct.
23         Q    For each one of these individual courses,
24    you have to have a course description and an
```

1  objective that lists topics and evaluation?

2      **A**    **Correct.**

3      Q    Is there anything that a program has to

4  have in order to be considered?  Does it have to

5  have all of the course descriptions in order to be

6  considered?

7      **A**    **Yes.**

8      Q    Does it have to have all of these other

9  things; the objectives, list of topics and

10  evaluations before it is going to be considered?

11      **A**    **Yes.**

12      Q    For the courses?

13      **A**    **Yes.**

14      Q    What else does a program proposal have as

15  part of it, other than the course description?

16      **A**    **The Needs Analysis.  There would be a**

17  **Budget put together in very rudimentary form so**

18  **that the College would be aware of its financial**

19  **investment into any given program.  Let me think.**

20  **What else?  The Form 20 is the document that is**

21  **used.**

22      Q    Isn't the Form 20 the document that is

23  submitted to the ICCB?

24      **A**    **Yes, it is.**

1    Q   Do you have to have the Form 20 done

2   before you go to the Division Level?

3       **A   Yes.**

4    Q   So let's talk about Kathy Cabai for a

5   second.  No, let's do this.  So Thomas Cameron was

6   your Dean, correct?

7       **A   Yes.**

8    Q   When it came to decisions about a program

9   that was going to be implemented, what was his role

10  in making that decision?

11      **A   He would be the person who would sign --**

12  **well, no.  Let me take that back.  His name goes on**

13  **the Form 20 as the contact person for the College**

14  **when the Form 20 is submitted to the Illinois**

15  **Community College Board.**

16   Q   Okay.  Is there anything that he does in

17  terms of putting the course together or having any

18  input in terms of -- I'm sorry.  The program.  In

19  terms of putting a program together, does he have

20  any input in that?

21      **A   Generally, I would meet with him**

22  **frequently with the faculty member, if he had not**

23  **already done so.  And we would discuss the proposal**

24  **and should or should we not go forward with any**

1    **given program.**

2       Q     Is that decision that is made is it a

3    decision that the faculty member, yourself and Tom

4    Cameron make together?

5       **A     I am not sure how to answer that question**

6    **because we don't -- we -- that team is not the**

7    **final -- the final say so on moving forward with a**

8    **program, but we would have a conversation.**

9       Q     Okay.  Is that the team that would decide

10   whether to go to the next step?

11      **A     Yes.**

12            MR. ROCHE:  What do you mean by the next

13   step?  Go to the Division?  Go to the College?

14   BY MR. DAVIS:

15      Q     Let me ask the question.  The decision to

16   go to the next step after that initial

17   conversation, the next step would be the Division.

18   Is it you, Tom Cameron and Kathy Cabai that would

19   make that decision to go to Division?

20      **A     No.**

21      Q     Who makes that decision?

22      **A     At that time it was the Vice-President of**

23   **Academic Affairs and the Deans.  In a weekly**

24   **meeting, they would discuss the proposal and decide**

1    **whether or not it should move forward.**

2         Q    So would there be a presentation to the

3    Vice-President of Academic Affairs --

4         **A    No.**

5         Q    -- about the program?

6         **A    No, it would be a discussion topic.**

7         Q    It would be a discussion topic.  Who

8    would decide whether to bring it up to the

9    Vice-President of Academic Affairs?

10        **A    The Dean.**

11        Q    Thomas Cameron for you?

12        **A    Yes.**

13        Q    Would there be a discussion with you,

14   Kathy Cabai and Thomas Cameron as to whether to

15   present it to the Vice-President of Academic

16   Affairs?

17        **A    Yes.**

18        Q    And then Thomas Cameron would make the

19   decision to make that presentation?

20        **A    Yes.**

21        Q    And then after presenting it to the

22   Vice-President of Academic Affairs, what would

23   happen next?

24        **A    Tom would let me know whether or not**

1    approval was granted.  It wasn't just the
2    Vice-President.  It was the group.
3        Q    Who is in the group?
4        A    The Deans.  And then if they thought it
5    was a good idea, we would then start the process.
6        Q    Describe to me what the process is.
7        A    The Active Course Files would be created.
8    The Form 20 would be begun.  The Needs Analysis
9    would have been done and the Budget piece would be
10   done and any other components of that form.
11       Q    Who would be in charge of the process as
12   you described it here?  The Active Course Files,
13   the Form 20, the Budget, and the Needs Analysis.
14       A    There is no one person in charge.  Since
15   the faculty member is doing the curriculum part and
16   putting the Form 20 together, but it would come to
17   me as the step after completion of that.
18       Q    So the faculty member would put the
19   Active Course Files, the Form 20, the Budget, and
20   the Needs Analysis together?
21       A    Yes.
22       Q    And then the faculty member would present
23   it to you, correct?
24       A    Yes.

1     Q   Now, at that particular point in time,

2  what decision do you make once you review that

3  materials?

4     **A   I review it for completeness.  I renew it**

5  **for any errors in context or spelling.  That sort**

6  **of thing.**

7     Q   Do you decide then at that point in time

8  to present it or do you have to take another step

9  after that?

10     **A   I don't understand what you mean by**

11  **present it.**

12     Q   The next step would be Division, right?

13     **A   The Division Curriculum Committee.**

14     Q   You have to go to the Division Curriculum

15  Committee with an Active Course Files, the Form 20,

16  the Budget, and the Needs Analysis, correct?

17     **A   Yes.**

18     Q   You indicated that you were reviewing it

19  for completeness.  So once you deem it complete, do

20  you then decide to take it to Division, to present

21  it to Division?

22     **A   No.**

23     Q   What do you do next?

24     **A   The Active Course Files go through the**

1    Curriculum process.  That is separate.  The
2    Division Curriculum Committee will look at the Form
3    20 to make sure that pieces are there.  They don't
4    approve or disapprove the Form 20.  The only thing
5    the Division Curriculum Committee does is the
6    curriculum piece, which are the Active Course
7    Files.
8        Q    What relationship does the Form 20 have
9    to do with the Active Course Files?
10       A    The Active Course Files are part of the
11   Form 20.
12       Q    Do you present the Active Course File and
13   the Form 20 to the Division Curriculum Committee?
14       A    No.  The Active Course Files are what
15   goes through the Curriculum Committee.  They look
16   at them in detail.
17       Q    But before you indicated -- and, you
18   know, let me ask the question.  Don't shake your
19   head yes or no.  I am trying to get the information
20   from her, if you don't mind.  Okay?
21           MR. ROCHE:  Right.  But I believe the
22   witness already testified the answer to these
23   questions, Mike, but go ahead.
24

1    BY MR. DAVIS:

2        Q    I am just trying to understand this

3    process now because it's not native to me.

4        A    I understand.

5        Q    But you indicated that the -- isn't the

6    Form 20 presented to the Division along with the

7    Active Curriculum File?

8        A    It is an attachment.

9        Q    It is an attachment.  Okay.  Once the

10   Division Curriculum Committee gets this, what do

11   they do with it?

12       A    They read the Active Course Files for

13   clarity and being concise.  They make

14   recommendations, if needed, to the faculty sponsor

15   for any changes that might be suggested.

16       Q    If those changes are made is there a need

17   to go back to Division Curriculum?

18       A    If they are minor changes, no.  If it

19   needs a major rewrite, it would go back.

20       Q    Once it gets passed Division Curriculum

21   Committee, then what?

22       A    It goes to the College Curriculum

23   Committee.

24       Q    Okay.  Describe to me what is submitted

1    to the College Curriculum Committee and what the

2    process is in reviewing the materials.

3         **A      The Active Course Files are sent to the**

4    **College Curriculum Committee.   They review them.**

5         Q    Is the Form 20 also sent?

6         **A    It is an attachment.**

7         Q    It is an attachment.   Okay.

8         **A      They review the Active Course Files and**

9    **they either approve them or table them or not**

10   **approve them.**

11        Q    Is that an actual vote that is taken at

12   that point in time?

13        **A    Yes, it is.**

14        Q    And once the College Curriculum Committee

15   approves this, then what happens?

16        **A      The courses are filed with the Illinois**

17   **Community College Board along with the Form 20.**

18        Q    The Active Course Files are filed, right?

19        **A    Yes.**

20        Q    Now you have indicated that the Form 20

21   is an attachment.   Is it an attachment to each one

22   of the course files?

23        **A    I don't know.**

24        Q    You said it was an attachment.

1     **A     It is an attachment somewhere in the**

2     **system.  I have never done this myself so I don't**

3     **know if it is attached to every single Active**

4     **Course File or if it is attached generically.  I**

5     **just don't know.**

6     Q     Would the faculty member that put the

7     course -- put the program together and create the

8     Active Course Files, would they know --

9     **A     Yes.**

10     Q     -- what the Form 20 is in relation to

11     that?

12     **A     Yes.**

13     Q     Have you ever written a Form 20?

14     **A     Yes.**

15     Q     In your experience, what was the -- what

16     did you write a Form 20 for?

17     **A     A Practical Nurse Program.**

18     Q     Did you go through this process for the

19     Practical Nurse Program?

20     **A     No.  I wasn't a faculty member.  Faculty**

21     **members do this work, not Deans.**

22     Q     Okay.  In relation to the SA Program, was

23     Kathy Cabai the one that put the Active Course

24     Programs and the Form 20 together?

1      **A      Yes.**

2      Q    So she was the one that would have gone

3   through this process?

4      **A      Yes.**

5      Q    In terms of whether the Form 20 was an

6   attachment to each Active Course File?

7      **A      Yes.**

8      Q    Or whether it is was just --

9      **A      Yes.**

10      Q    I mean, what I am trying to figure out --

11   I am trying to figure out whether the Form 20 was

12   attached to each Active Course File or whether it

13   is an overall document that describes the program?

14      **A      And I don't know the answer to that never**

15   **having done it myself.**

16      Q    Okay.  Good.  So Kathy Cabai was a

17   faculty member, correct?

18      **A      Correct.**

19      Q    And within the context of her being a

20   faculty member, she reports to you as the Associate

21   Dean, correct?

22      **A      Yes.**

23      Q    And so in addition to the process

24   involved in creating these programs, you would be

1    the party that would -- because you have a

2    responsibility for -- you would be the party that

3    would have the final say in regard to any decisions

4    to be made in regard to programs that she creates,

5    correct?

6         A    A final decision?  What do you mean

7    final?

8         Q    Within the context of this process.  I

9    mean, if Kathy Cabai comes to you with a program

10   and she wants to move it to the next step.  Okay.

11   Now that we know what the next step is.  She has to

12   talk to you to do that, correct?

13        A    Yes.

14        Q    You're the one that has to say -- you are

15   the one that has eyes on this at first that says

16   let's go ahead and take this to the next step?

17        A    Yes.

18        Q    Okay.  Let's look at Exhibit B that is in

19   front of you.  This is an email that is dated

20   November 21, 2013.  It is written by Keith Bump to

21   you.  And it describes a meeting between Keith Bump

22   and Kathy to discuss how our programs would work

23   together.  Do you see that?

24             MR. ROCHE:  Just by point of

1  clarification, Mike, it doesn't say that.  It says,

2  "It was a great pleasure meeting with you and

3  Kathy".  The email is addressed to Karen.

4  BY MR. DAVIS:

5      Q    I'm sorry.  You are right.  Okay.  So

6  this is Keith Bump writing to you and it describes

7  a meeting between you and Kathy to discuss how well

8  our programs would work together, right?

9      **A    Yes.**

10     Q    Could you tell me the content of that

11 meeting?

12     **A    As I best recall it, Kathy arranged a**

13 **meeting with Keith Bump, Kyle Black, myself and**

14 **her, to talk about the possibility of working with**

15 **ACE to develop a Surgical Assisting Program.**

16          **I don't remember the details of the**

17 **meeting now, but they were very broad and general**

18 **in terms of the program that Keith Bump was**

19 **representing and it was an initial meeting just to**

20 **see if we would -- if there was any point in moving**

21 **any further than the first meeting.**

22     Q    So this meeting was something that Kathy

23 initiated, correct?

24          MR. ROCHE:  If you recall.

```
 1              MR. DAVIS:  If you recall.

 2              MR. ROCHE:  I don't believe that is what

 3    the witness testified, but go ahead.

 4              THE WITNESS:  Kathy came to me prior to

 5    this meeting because somehow she had an interaction

 6    with Keith and/or Kyle.  I don't know if it was one

 7    or both of them.  And she suggested that we might

 8    all meet together and I said that would be fine.

 9    Why don't you go ahead and let's find a date when

10    we can have a meeting to discuss this.

11    BY MR. DAVIS:

12        Q    So this email talks about the meeting

13    that followed that, correct?

14        A    Yes.

15        Q    Could you tell me what the content of the

16    meeting was?

17        A    As best I can remember, it was Keith

18    describing the Surgical Assisting Program that ACE

19    has.  That they were -- they meaning ACE as

20    represented by Keith, were looking to partner with

21    a Community College in the area to begin to offer

22    their program.

23        Q    Do you recall why they were looking to

24    partner with a Community College?
```

1      **A     I do not.**

2      Q     Do you recall them talking about whether

3   they were accredited at the time?

4      **A     I can not say for sure that accreditation**

5   **at that point came up.  I don't remember.**

6      Q     Do you recall discussions that they were

7   not accredited at that time?

8      **A     I don't recall.**

9      Q     Okay.  In the second paragraph, it says,

10  "I have attached the full presentation as well as

11  the program catalogue, Consortium Agreement and the

12  syllabus".  Do you see that?

13     **A     Yes.**

14     Q     If you would turn to the next page,

15  second page, which is the Consortium Proposal.

16     **A     Yes.**

17     Q     At the time -- and this was sent to you,

18  correct?

19     **A     Yes.**

20     Q     Did you understand what the concept of a

21  consortium meant when they talked about a

22  consortium?

23     **A     No, I don't remember talking about a**

24  **consortium.  I think it was just a general**

1    **discussion of their program.**

2        Q    Okay.  But was it a discussion about how

3    they -- their program would interact with COD's

4    programs?

5        **A    I don't know remember talking in that**

6    **detail.**

7        Q    But you received this consortium

8    proposal, correct?

9        **A    Yes.**

10       Q    If you will turn to Page 4 of the

11   exhibit.  I'm sorry.  Page 4.  Where it talks about

12   nine online modules.  Do you see that?

13       **A    Yes.**

14       Q    A six day surgical lab, correct?

15       **A    Correct.**

16       Q    And then on the next page, it talks about

17   benefits to the College?

18       **A    I see that.**

19       Q    Would you review that for a second and

20   does this refresh your recollection about any of

21   the elements of why it would be beneficial to do

22   this program with COD?

23       **A    Can you tell me again what you are asking**

24   **me to do?**

```
 1        Q    Review it for a second and I want to know
 2   if that refreshes your recollection about what the
 3   benefits of doing the program with --
 4             MR. ROCHE:  Are you asking the witness if
 5   it refreshes her recollection as to a discussion
 6   that occurred?
 7             MR. DAVIS:  I am going to her ask her
 8   some questions about this.  Why don't we just start
 9   with this.
10             THE WITNESS:  Okay.  I am going to say
11   that I received this so I am sure I read it.
12   BY MR. DAVIS:
13        Q    Okay.  In the first one it talks about
14   instituting an advanced program with zero
15   developmental costs.  Do you see that?
16        A    Yes, I do.
17        Q    Is it your understanding that this meant
18   that COD wouldn't have to put out any developmental
19   costs, any costs to develop this program, because
20   they would be working in conjunction with ACE?
21        A    I never thought that there would be no --
22   that there would be a zero cost to College of
23   DuPage.
24        Q    What would the cost be to College of
```

1    DuPage?

2         **A     It would be the cost of our faculty**

3    **member.  It would be any associated costs that**

4    **would come along with a new program.**

5         Q     Would the costs be greater or less if you

6    worked with ACE?

7         **A     Greater or less than what?**

8         Q     Than if you had to do it yourself.

9         **A     I don't know.**

10        Q     The second benefit where it talks about

11   it illuminates the 9 to 12 time period that you

12   would be in the developmental stage with zero

13   enrollment income.  Do you see that?

14        **A     Yes.**

15        Q     So would the developmental cost of

16   working with ACE result in eliminating the 9 to 12

17   month time period?

18        **A     Is this supposed to be eliminates?  I**

19   **don't even understand it.  Is it supposed to be**

20   **eliminate?**

21             MR. ROCHE:  It says what it says.  I

22   didn't write it.

23   BY MR. DAVIS:

24        Q     I think you can assume that it means

1   eliminates.

2       A    All right.  I did not think that there

3   would be a period of time when we would have --

4   wait a minute.  With zero enrollment income.  Yes.

5   Okay.  I understand that.

6       Q    Okay.  Would that be an advantage to

7   doing this with ACE?

8       A    Potentially, yes.

9       Q    The third benefit is enlist the highest

10  quality hands-on skills curriculum and veteran

11  instructors available with absolutely no employment

12  cost.  So ACE was willing to assist with a skills

13  curriculum at no cost, correct?

14      A    Yes.

15      Q    And, in fact, that is exactly what they

16  did, isn't it?

17          MR. ROCHE:  I object.  This line of

18  questioning, Mike, first of all is argumentative.

19          Second of all, are you trying to ask the

20  witness if she recollects discussions about the

21  benefits that ACE represented to COD or --

22          MR. DAVIS:  I'm asking her two questions.

23  I am asking her whether she recalls and I am asking

24  her whether it was a benefit.

1          MR. ROCHE:  You're not asking her if she

2    recalls.  You are arguing with her as to whether or

3    not this would have been a benefit.

4          MR. DAVIS:  She indicated she received

5    it.  Okay?  Now I am asking her what she understood

6    about what it is that she received.

7          MR. ROCHE:  I think you need to lay more

8    foundation.  Ask her if she recalls reviewing this.

9          MR. DAVIS:  What other foundation can I

10   layout, except for this was something that she was

11   sent by ACE.  And the question then becomes when

12   you received this and after that was it a benefit

13   to COD?  That is the whole topic here.  So do you

14   want me to ask -- she received the document, that

15   is the foundation.

16         MR. ROCHE:  Mike, first of all, you are

17   arguing with her.  You're not asking the witness

18   what she specifically recollects as to whether or

19   not these bullet points were actually discussed.

20   You're trying to get her to agree that enlisting

21   veteran instructors at no employment costs is a

22   benefit to the College.

23         MR. DAVIS:  I can ask her that question.

24         MR. ROCHE:  You can ask her that.

```
 1            MR. DAVIS:  I think I just did ask her
 2    that question.
 3            MR. ROCHE:  That is not even what
 4    happened in this case, but go ahead and answer.
 5    You can answer.
 6    BY MR. DAVIS:
 7       Q    So the question that I asked that -- so
 8    you received this document, correct?
 9       A    Yes.
10       Q    And you received this document that had
11    these lists of benefits on it, correct?
12       A    Yes.
13       Q    So now back to the question, which I
14    think you already answered, which was according to
15    what you said, you said that developing a skills
16    curriculum at no employment costs would be a
17    benefit to COD, correct?
18       A    It would be.
19       Q    Let's go to the last page of the exhibit.
20    Just to make sure, you got this.  This was sent to
21    you, correct?
22       A    Yes.
23       Q    And this is the proposed cost of the SA
24    Program with ACE providing you certain services,
```

1    correct?

2        **A    Yes.**

3        Q    So is it true that the cost of the

4    program would be $6,900 for the student, correct?

5        **A    I don't know.  That is what they are**

6    **saying it is.  I assume that is what it is.**

7        Q    Their fee would be $4,400, correct?

8        **A    Yes.**

9        Q    And then that would result in COD making

10   $2,500 per student, correct?

11       **A    Yes.**

12       Q    And that was the initial proposal that

13   they made to you at the time that this email was

14   sent, correct?

15       **A    Yes.**

16       Q    Exhibit C.  So I'd like you to turn to

17   Page 2.  Let's look at Page 1 first.  It provides a

18   little context.  So this is an email that was sent

19   by you to Keith Bump on November 21st.  And in the

20   first sentence it says, "Kathy and I met with the

21   Dean this morning and he had several questions most

22   of which I think we answered".  Do you recall what

23   those questions were --

24       **A    No, I don't.**

```
 1        Q    -- that the Dean asked?
 2        A    No, I don't.
 3        Q    But at the time do you recall answering
 4    those questions satisfactorily?
 5        A    I really don't.
 6        Q    It says you did, though.
 7        A    Well, then I did.  You have your answer.
 8    I don't remember it but it is there.
 9        Q    Okay.  Then let's turn to Page 2.  This
10    is a December 9th email from you to Keith Bump
11    indicating that "I think our discussion was a great
12    one".  Now on the CC it lists Kyle Black, Thomas
13    Cameron and Kathy Cabai are copied on that.  Do you
14    see that?
15        A    Yes.
16        Q    So your statement was "I think our
17    discussion was a great one".  Is that the
18    discussion that was had on the conference call with
19    Thomas Cameron and Kathy Cabai and Keith Bump?
20        A    I don't remember but probably.
21        Q    Do you have any reason to think that the
22    discussion you had wasn't a great one?
23        A    I don't remember the timing of the call.
24    I mean, that is what I don't remember.  If -- I
```

1    **don't remember.**

2        Q    The reason why I pointed out the email to

3    you, the first e-mail was November 21, 2013.  And

4    so this discussion was some time between November

5    21, 2013 and December 9, 2013.  Correct?

6        **A    Most likely correct.**

7        Q    So do you recall anything that would have

8    contradicted that the conversation was a great one?

9        **A    No.**

10        Q    And then it follows up with "we are at

11    this point ready to move forward on our part".  Do

12    you see that?

13        **A    Yes.**

14        Q    Now was that move forward on our part in

15    relation to the proposal that they had given you in

16    the November 21st email?

17        **A    No.**

18        Q    Tell me what that meant.

19        **A    It meant that we were ready to begin**

20    **putting the Active Course Files together and put**

21    **through the Curriculum process.**

22        Q    It indicates that you met with Kathy so

23    that you would have a better idea of how long it

24    would take, correct?

1    A    I see that, yes.

2    Q    Was it your understanding at this

3    particular point in time that ACE was going to

4    assist you in doing all of the things that they

5    talked about in their proposal in putting this

6    course together?

7    A    No.

8    Q    What was your understanding of what they

9    were supposed to do?

10   **A    My understanding was that they were going**

11   **to provide information to Kathy so that she could**

12   **write the Active Course Files.**

13   Q    Okay.  Were they going to get anything

14   out of that?

15   **A    I don't know.  You'd have to ask them.  I**

16   **don't know.**

17   Q    Let's look at Exhibit D.  So this is a

18   December 12th email that discusses the actions on

19   our end relative to the classroom management system

20   issue we may have with the SA Program.

21       Were you involved in discovering or

22   framing what the classroom management system issue

23   was in relation to ACE?

24   **A    Was I -- could you say that again?  Was I**

1    **responsible?  Is that what you just asked me?**

2          Q    No.  Well, so you indicate in here that

3    Tom Cameron has spoken further with the VP, Jean

4    Kartje.  And then you summarize it in the third

5    paragraph.  "In essence, we want to be able to use

6    Blackboard for this course for a number of reasons,

7    not the least of which is service to our students".

8              So the Blackboard issue is -- you are

9    informing ACE that the Blackboard issue is now on

10   the table, correct?

11         **A    Correct.**

12         Q    Did you have any follow-up with that or

13   did you have anything to do with seeing whether it

14   was implemented correctly?  Anything along those

15   lines in relation to Blackboard?

16         **A    I recall some email exchanges.  If I**

17   **remember correctly -- I don't remember if it was**

18   **Keith Bump or Dan bump, but one of them stated that**

19   **they had not used Blackboard.  That they -- it was**

20   **not anything that they were familiar with.  I don't**

21   **know what their delivery system was for their**

22   **course but...**

23         Q    Did you ever find out what it was?

24         **A    You know, it may have come up.  I don't**

1    remember what it was.  Kathy may have been a little

2    more involved in that in particular.  But they were

3    not familiar with Blackboard.  They did not use

4    Blackboard, but that is the system that we used.

5    So it must have come up at some point.  I don't

6    remember how it came up.

7         Q    If you don't remember, that is -- I mean,

8    you know, the question is beyond this email.  Were

9    you in charge of implementing it or following up to

10   see whether it was implemented or anything along

11   those lines?

12        A    I wasn't in charge of implementing it.

13   It would have been my responsibility, if we were

14   going to use ACE, that they were able to use

15   Blackboard and teach online.

16        Q    In Exhibit B, where they talked about --

17   they indicated that on Page 3 of Exhibit B -- I'm

18   sorry.  On Page 4 of Exhibit B, they indicated that

19   they had online modules, correct?  Page 4.  World

20   Class Surgical Assisting Program at the top.

21        A    Yes.

22        Q    They said they had online modules, right?

23        A    Yes, they did.

24        Q    Was that one of the synergies that ACE

1    and COD had in terms of teaching this course is

2    that they taught it online and COD was going to

3    teach online?

4        A    Yes, we needed to be able to use

5    Blackboard to teach online.

6        Q    Okay.  At that time did you ask them --

7    strike that.  Just to clarify, you didn't have

8    anything to do with following up on that or

9    implementing it or anything like that?  That was

10   somebody else's department, correct?

11       A    Yes.

12       Q    I mean, Jean Kartje or the online IT

13   person would have had more to do with that?

14       A    Yes.

15       Q    I am trying to find out what you know and

16   don't know.

17       A    That is okay.

18       Q    Let's look at Exhibit F.  Now this is an

19   email from Kathy to Keith Bump.  You are not copied

20   on this email.  So is it safe to say that at this

21   point in time Kathy is the one that is in charge of

22   getting this program put together and presented?

23       A    What do you mean by in charge?

24       Q    Well, she is the one that is putting the

```
 1    course descriptions and the Form 20 and the Needs
 2    Analysis together, right?
 3         A    Yes, she is.
 4         Q    So, in this email, in the third sentence,
 5    it says, "I went to Division Curriculum Committee
 6    last week Thursday.  Was raked over the coals but
 7    that piece is complete.  I will to go Collegewide
 8    Curriculum the first day in March".  Do you see
 9    that?
10         A    Yes.
11         Q    So is she the one that is going to
12    Division Curriculum and then Collegewide
13    Curriculum?
14         A    Yes.
15         Q    Do you go with her when she does that?
16         A    Occasionally I go with faculty.
17    Especially if they have never done it before.
18         Q    Had she done it before?
19         A    She had.
20         Q    So she didn't need you there?
21         A    I usually would go to the College
22    Curriculum Committee.  Not often to the Division
23    Curriculum Committee meeting.
24         Q    So was Kathy a highly skilled faculty
```

1    member?

2    **A    Yes, in my opinion.**

3    Q    Had she done these Form 20's before?

4    **A    Yes.**

5    Q    I want you to take a look at Exhibit A.

6    This is the Form 20 that was put together for the

7    Surgical Assistant Certificate.  And it is signed

8    -- it is noted by -- the contact person is Tom

9    Cameron.

10         I don't want you to you look through all

11    this, but I guess the first question I have is --

12    this was a document that was turned over by your

13    counsel.  Why was this document dated September,

14    2013?  Do you know?

15    **A    It's not dated September, 2013.  That is**

16    **the --**

17    Q    That is the form that is dated?

18    **A    The form.  The time when the form was**

19    **revised or put together the first time.**

20    Q    So this is the Form 20 that Kathy Cabai

21    would have put together to submit to the -- to

22    everybody -- let me just say everybody.  That would

23    be Division, College, the Board, and ICCB.

24    **A    Yes.**

1    Q    Had you ever seen this document before?

2    **A    Yes.**

3    Q    You didn't have any input into it,

4    correct?

5    **A    I had input.**

6    Q    You weren't the author of the document?

7    **A    No, I was not the author.**

8    Q    You reviewed the document?

9    **A    Yes.**

10   Q    When you reviewed the document, did you

11   make any corrections?

12   **A    I probably did.  I almost always do.**

13   Q    You don't specifically recall any of the

14   corrections you made on this one?

15         MR. ROCHE:  Go through the document, Ms.

16   Solt.  See if you recollect making any changes.

17         THE WITNESS:  I probably would have had

18   some corrections on -- I don't know what page

19   number it is, but the second to last paper.  Starts

20   Part B Supportive Documentation and Data.

21   Occupational Demand.  And then below the second

22   table is Enrollment Chart.  I probably would have

23   had some input and made some changes on the

24   enrollment numbers.

BY MR. DAVIS:

    Q   Are the changes that you would have made indicated there?  I mean is this after the changes or before?

    **A   This is the final document as far as I can recall that would have been submitted so none of the changes that I would have made would be on here.  That is the only thing I can think of off the top of my head.**

    Q   Are you aware of whether ACE had any input into the information on that document?

    **A   I am not aware.**

    Q   Let's take a look at Exhibit F1.  On Bullet Point Number 1, it says that, "Karen and I meet.  We discuss the upcoming SA programs".  That is Karen you, correct?

    **A   Yes.**

    Q   "Can you folks call Karen or Tom to discuss the final amount of money that COD will be charged per student with me teaching the Suture Lab"?  Do you see that?

    **A   Yes.**

    Q   So was that conversation -- was that call ever made?

1     A     Not to my recollection.

2     Q     And so what is the difference between the

3  final amount of money that COD would have been paid

4  and the final amount of money that COD would be

5  paid with Kathy Cabai teaching the Suture Lab?  Do

6  you understand the question?

7     A     I believe I do.  Let me see if I can

8  rephrase it.  You are asking me the price

9  differential if ACE were to do the program in its

10  entirety versus Kathy doing the piece of the Suture

11  Lab.  Is that what you are asking me?

12     Q     Correct.

13     A     And what do you want to know about that?

14     Q     Was that discussion ever had?

15     A     I don't believe that I had a discussion

16  with ACE or anybody about that.  I just don't

17  remember it.

18     Q     When they talk about Tom here?

19     A     Yes.

20     Q     Is that Tom Cameron?

21     A     Yes.

22     Q     It is not the other --

23     A     Yes.

24     Q     Because Tom Cameron in his deposition

1    indicated that there was another come Tom who would

2    be in charge of the legal document -- signing the

3    legal document.  He is the --

4         **A    Oh, the Vice-President of Finance.**

5         Q    Right.

6         **A    Yeah.**

7         Q    It's not that Tom?

8         **A    No, it's not.**

9         Q    Okay.  This email is dated February 27th

10   and according to Tom Cameron this would be just

11   about the time that everybody is putting Budgets

12   together, correct?

13        **A    Yes.**

14        Q    Number 6 says, "I need any potential

15   Budget items.  We are currently working on next

16   year's Budget and they are due quickly".

17             You are the one that is in charge of

18   putting the Budget together for your department?

19        **A    My subdivision.  Yes, I am.**

20        Q    Help me with this terminology.

21        **A    It is okay.**

22        Q    So did you put together a Budget for the

23   Surgical Assisting Program for that year?

24        **A    I don't remember absolutely one way or**

1    **the other but most likely I would have.**

2        Q    It indicates in Number 7 that she

3    informed you that you are working on providing me

4    with textbooks.  Meaning ACE was going to provide

5    the textbooks.  Do you see that?

6        **A    I see that.**

7        Q    So was there -- did COD have textbooks on

8    a Surgical Assisting Program at this time?

9        **A    I don't know.**

10       Q    You weren't in charge of gathering those

11   textbooks together?  That would have been Kathy

12   Cabai's responsibility, right?

13       **A    Yes.**

14       Q    You were a Dental Hygienist, not a nurse,

15   right?

16       **A    Well, I was a Dean at that point but yes.**

17       Q    I mean before.

18       **A    Yes.**

19       Q    Let's move to Exhibit K.  Actually, let's

20   do Exhibit J.  This is the College of DuPage

21   Program Advisory Committee Minutes.  What is the

22   Program Advisory Committee?

23       **A    Program Advisory Committees are mandated**

24   **for all career and technical education programs in**

1    Illinois.  They are a group of usually employers,

2    perhaps past graduates, sometimes community

3    members, frequently some of the faculty, former

4    students, current students, whose role is to

5    support and advise a given program.

6         Q    You did not attend this, correct?  I

7    don't see your name on here.

8         A    Then I did not attend.

9         Q    Would you normally attend these?

10        A    No.

11        Q    These would be just for individual

12   programs, correct?

13        A    Yes.

14        Q    Exhibit K.  Have you ever seen this?

15        A    Yes.

16        Q    Let's turn to Page 4, Paragraph B.  It

17   says, "College of DuPage pays $3,680 immediately

18   upon receiving tuition funds for enrolling a new

19   student".

20             So there's a difference between this

21   price and the price that was originally quoted by

22   ACE of 4,400, correct?

23        A    Yes.

24        Q    So would this reflect the difference

50

1    between ACE teaching the lab and Kathy Cabai

2    teaching the lab?

3        **A    I don't know for sure.  My guess is**

4    **probably yes.**

5        Q    Do you recall negotiating that?

6        **A    No.**

7        Q    Do you recall negotiating -- do you

8    recall any discussions that went into putting this

9    Consortium Agreement together?

10       **A    I remember some email communication about**

11   **it.**

12       Q    But I am talking about the specific terms

13   of the Consortium Agreement.

14       **A    Yes, I think it was this one.  I don't**

15   **recall, but if this is what they are calling their**

16   **contract, then, yes, we had some email discussion**

17   **about the terms.**

18       Q    And this contract says it is dated May 5,

19   2013.

20       **A    Yes.  On Page 1.**

21       Q    But that is a mistake, correct?  It

22   should May 5, 2014?

23       **A    That is what it says down here.**

24       Q    Okay.  Let's look at Page 1.  Under ACE

```
 1    responsibilities, Number 1 says, "To provide to
 2    College an ABSA Approved Distance Learning Surgical
 3    Assisting Program Curriculum".  Do you recall
 4    having discussions with them about this term?
 5         A    No.
 6         Q    And who would have been -- who would have
 7    had these conversations with ACE about this
 8    particular term?
 9         A    Well, it probably would have been a
10    combination of Tom Cameron and myself initially.
11         Q    About term Number 1?
12         A    Yes.
13         Q    Do you recall having that conversation
14    with him?
15         A    I do not.
16         Q    Would Kathy Cabai have any input on that
17    conversation?
18         A    She might have had input.
19         Q    Number 2, "Provide all templates of
20    required documentation needed for the student to
21    progress through the program".  Do you see that?
22    Do you recall negotiating that term?
23         A    No.
24         Q    Would that also have been one that you
```

1   and Tom Cameron would have been responsible for

2   negotiating?

3        **A    I mean, I don't know how to answer that.**

4             MR. ROCHE:  If you don't understand the

5   question.

6             MR. DAVIS:  Please say I don't

7   understand.

8             THE WITNESS:  I don't know.

9             MR. ROCHE:  Don't speculate.

10  BY MR. DAVIS:

11       Q    Is this a term that would be important

12  for this program to move forward?

13       **A    I don't know.**

14       Q    Okay.  If you don't know that, how could

15  you have been the one to negotiate these terms?

16       **A    I didn't negotiate anything.**

17            MR. ROCHE:  Objection.

18  BY MR. DAVIS:

19       Q    Oh, you didn't.

20            MR. ROCHE:  Hold on.  Objection.  The

21  witness testified she did not negotiate the terms

22  of the contract.

23            MR. DAVIS:  That is not what she said.

24  She said Tom Cameron and her did it because she did

```
 1    it with Number 1.  She said Tom Cameron and her
 2    would have negotiated that term.  Now I am going
 3    through each term and find out if she and Tom
 4    Cameron negotiated that term.
 5              THE WITNESS:  Then I misunderstood you
 6    because I thought what you were asking me is if we
 7    were at the point of signing any contract who would
 8    negotiate.
 9              Tom and I certainly would have input, but
10    we would have not negotiated a contract.  That
11    would have gone through our legal process at the
12    College.
13    BY MR. DAVIS:
14         Q    But in relation to the specific terms as
15    far as what would have to be in this agreement for
16    the SA Program to move forward, who would be the
17    person to put each one of these terms in here that
18    ACE would have had to fulfill to put this program
19    on for COD?  Would it have been you and Tom or
20    would it have been Kathy Cabai?
21         A    Kathy, Tom and I would have had input,
22    but we would not do the negotiation.  That would be
23    through our Legal Department at the College.
24         Q    Let's move off from the term negotiation.
```

1    Okay.  And just each one of these responsibilities

2    is something that ACE would have had to do to put

3    this program on.  Who would have put this list

4    together?  Would it have been you and Tom or would

5    it have been Kathy Cabai?

6         A    **Well, they put it together.  We wouldn't**

7    **have put anything together.**

8         Q    Who would have talked to them about it?

9    Do you know?

10        A    **I don't know.**

11        Q    Did you talk to them about it?

12        A    **No, I did not.  I never talked to them**

13   **about this.**

14        Q    Who would have talked to them about this?

15        A    **Frankly, I don't know.  We never got to**

16   **that point.**

17        Q    Exhibit L.  The Nondisclosure Agreement.

18        A    **Yes.**

19        Q    Did you ever see this?

20        A    **Yes.**

21        Q    Who would have signed this on College of

22   DuPage's behalf?

23        A    **It would have been the Vice-President of**

24   **Finance and I am not sure his exact title.**

```
 1        Q    Did you have any input as to whether to
 2   sign this or not?
 3        A    Yes.
 4        Q    What input would you have had?
 5        A    My opinion would have been asked.
 6        Q    Okay.  What was your opinion about
 7   signing this?
 8        A    I was not willing to sign anything.
 9   Well, I wouldn't have signed anything.  I was not
10   willing to recommend that anything be signed.
11        Q    What about a Nondisclosure Agreement?
12   Does that include not signing a Nondisclosure
13   Agreement?
14        A    I don't understand what you are asking
15   me.
16        Q    You said you wouldn't have recommended
17   signing anything.  So there are two documents.  One
18   is a Consortium Agreement and one is a
19   Nondisclosure Agreement.
20        A    Okay.
21        Q    Those are two different documents.
22        A    Okay.
23        Q    I am trying to distinguish between the
24   two.
```

1      A     Okay.

2      Q     Would you have recommended not signing a

3   Nondisclosure Agreement?

4      A    I do not remember having any discussions

5   about nondisclosure.  Any and all discussions that

6   we had among ourselves, meaning Tom, Kathy, myself,

7   related to what we call the contract.  I don't

8   believe we ever discussed this.

9      Q     The contract being the Consortium

10  Agreement?

11     A     Yes.

12           MR. ROCHE:   Exhibit K.

13  BY MR. DAVIS:

14     Q     Exhibit K.

15     A     Yes.

16     Q     You don't recall having a discussion

17  about the Nondisclosure Agreement?

18     A    I do not recall anything about a

19  Nondisclosure Agreement.

20     Q     Let's look at Exhibit N.  This is an

21  email from Keith to you where it indicates, "When

22  we spoke to Blackboard, they told us they needed 90

23  days but we don't want to wait until the 90 day

24  mark.  We have the Blackboard project scheduled for

```
 1    mid August".  Do you see that?
 2         A    Yes.
 3         Q    Why would they have been sending this to
 4    you, if you recall?
 5         A    I don't know.
 6              MR. ROCHE:  I am going to object to the
 7    extent it is asking the witness what the state of
 8    the mind of the sender was.  In this instance Keith
 9    Bump.
10    BY MR. DAVIS:
11         Q    Okay.  Were you having any conversations
12    with Keith Bump about Blackboard being a problem at
13    this point in time?
14         A    Not that I remember.
15         Q    Do you recall having any conversations
16    other than the initial conversation that was held
17    in regard to needing to have Blackboard?
18         A    Not that I remember.
19         Q    Did not have having Blackboard
20    subsequently become a problem in terms of
21    implementing the program with ACE?
22         A    It probably -- it would have, if they
23    were not able to utilize it.
24         Q    Okay.  This email says that they were
```

1    implementing it, correct?

2         A    That is what it says.

3         Q    Let's take a look at Exhibit O.  So this

4    email chain is sent on July 8th.  Actually begins

5    on -- if you look on Page 2, it begins on June 2nd.

6    Keith Bump is emailing Kathy to confirm that they

7    received the Consortium Agreement from Dan.  This

8    is June 2nd and the initial Consortium Agreement

9    was dated May 5th.  And then they are having this

10   conversation with Kathy.  Is there anybody else

11   they should have been having this conversation

12   with?

13        A    They could have asked me.

14        Q    Okay.  If you will turn to Page 1, it

15   says, "I did talk to Tom.  He's not comfortable

16   signing anything without having legal approval or

17   nor with Karen out-of-town".  That was written July

18   8th.

19             Did Kathy Cabai have a conversation with

20   you about this time about signing the Consortium

21   Agreement?

22        A    No.  I was out-of-town.

23        Q    Did she have it with you before you went

24   out-of-town?

```
 1        A    May have.  I don't --

 2        Q    You don't recall?

 3        A    I don't remember.

 4        Q    Do you recall her having it with you

 5   after you came back from being out-of-town?

 6        A    Yes, we did have a conversation then.

 7        Q    Tell me what the conversation was.

 8        A    Kathy was concerned because she was

 9   getting push back from Keith about having this

10   Consortium Agreement signed before she participated

11   in the lab.  And my recollection is she wanted to

12   see how the lab was run and to interact with Dan

13   Bump before we made any kind of agreement with

14   anyone.

15        Q    At this particular point in time Kathy

16   Cabai had received help with the Form 20,

17   textbooks, the self-study program, that told her to

18   how to get accredited and the lab would have been

19   the final piece to what she needed to do to put

20   together an SA Program, correct?

21             MR. ROCHE:  Objection.  It

22   mischaracterizes the witness' testimony.

23             MR. DAVIS:  You can answer it anyway.

24             MR. ROCHE:  Go ahead and answer.
```

```
 1              THE WITNESS:  I don't know what you are
 2    asking me.  I don't understand.
 3              MR. ROCHE:  Would you like to have the
 4    question read back?
 5              THE WITNESS:  Yes, please.
 6              (Read back as requested.)
 7              THE WITNESS:  I don't know if they
 8    received the textbooks.  She would have done the
 9    Form 20.  I mean, I don't know how to answer the
10    question.
11    BY MR. DAVIS:
12         Q    Do you know what all those elements are?
13    Do ou know what the self-study program is?
14         A    I know what a self-study is.  I never saw
15    it.
16         Q    Isn't it correct that you would need to
17    have a self-study -- if you hadn't tried to get
18    accredited with a SA Program, you would have had to
19    have a self-study to get accredited?
20         A    A self-study must be done before
21    accreditation.  That's correct.
22         Q    If you had a model of a self-study
23    program it would have aided you in getting
24    accredited?
```

 1      **A      Not necessarily.**

 2      Q      If you had seen a self-study that had

 3  been submitted to the organization that accredits

 4  SA Programs before you had to do your own, that

 5  wouldn't help you?

 6      **A      If it was the same organization.  I don't**

 7  **believe it was going to be the same organization.**

 8      Q      Okay.  It was.

 9      **A      I don't -- well, I don't know.**

10      Q      You weren't in charge of that, right?

11      **A      I was not.**

12              MR. ROCHE:  The witness testified she

13  never received the self-study so...

14              MR. DAVIS:  This witness?

15              THE WITNESS:  This witness.  I never

16  received the self-study.

17              MR. DAVIS:  I don't think I asked her

18  that question.

19              MR. ROCHE:  In one of her answers, she

20  commented that she never received the self-study.

21              THE WITNESS:  I never saw a self-study so

22  I can't say that Kathy did.

23  BY MR. DAVIS:

24      Q      Exhibit U.  Do you recall this email?

1       **A      Yes.**

2       Q      So in this e-mail you are discussing a

3   conference call to discuss the concerns expressed

4   in an email that was sent, correct?

5       **A      Yes.**

6       Q      And as stated during the call, it says,

7   "Our major concerns include the lack of preparation

8   for you to be in teaching this program for us in an

9   online format".  Do you see that?

10      **A      Yes.**

11      Q      So were you the one that came up with

12  that assessment that there were major concerns

13  about the lack of preparation to teach an online

14  format?

15      **A      Not me alone, no.**

16      Q      Who was the primary one that came up with

17  that?  The primary person.

18      **A      There wasn't a primary one.  It was Kathy**

19  **was there.  I was there.  I asked the Associate**

20  **Dean of Learning Technologies to sit in on the call**

21  **because he's very familiar with online teaching and**

22  **what is required.  There might have been a fourth**

23  **person.  It was not Tom Cameron.  I know the three**

24  **of us were present and we had this conversation**

63

1    with Dan Bump.

2         Q    But are you the person that assesses

3    whether somebody can qualify to teach an online

4    format?

5         A    Am I the person?

6         Q    Mmm-hmm.

7         A    Not only me.

8         Q    Is there a primary person that would make

9    that decision?  Would do that assessment?

10        A    I was the messenger.  The discussion was

11   held among the three of us and I was the messenger.

12        Q    Okay.  So the next sentence where it

13   says, "All offerings at the Collage have the same

14   quality and rigor no matter the delivery format".

15   Was that something that the group as a consensus

16   came up with?

17        A    Yes.

18        Q    And then it was followed up with, "It

19   would take at the very" something "a full semester

20   for Dan or anyone new to online teaching to have

21   sufficient preparation for this delivery mode".  So

22   who decided it would take a full semester to do

23   that?

24        A    I believe the three of us did.

1    Q    Then, in the third paragraph, you

2    indicate the other issue of a contemporary

3    curriculum in this discipline is also something

4    that would take a fair amount of time to revise and

5    then prepare, correct?

6         **A    Yes, it says that.**

7    Q    Who came up with that assessment about a

8    contemporary curriculum in this discipline?

9         **A    Kathy had a discussion with me.**

10   Q    What did you say?

11        **A    She felt that the program that was being**

12   **offered to us through ACE was not something that**

13   **she felt was contemporary.**

14   Q    Let's look at Exhibit V.  This looks like

15   a memo dated October 1st from Kathy Cabai.

16   "Justification for Revision of Surgical Assisting

17   and Courses 2501 and 2503".

18        **A    That is probably a typo.  It should have**

19   **been 2502.**

20   Q    "This letter is to inform you that

21   College of DuPage has decided not to offer the

22   Surgical Assisting Program in conjunction with ACE

23   because they are not accredited through the

24   Commission on Allied Health Education Program".

```
 1          So is it because they didn't have a
 2   contemporary curriculum or is it because they
 3   weren't accredited?
 4          This says that they weren't accredited.
 5   So was there a discussion after this that said that
 6   the reason we're not doing this with ACE is because
 7   they are not accredited?
 8      A   I don't know to whom this is even
 9   addressed.
10      Q   Well, in the next paragraph, it says,
11   "With that being said, initial accreditation has
12   been received".
13          Were you aware that there was -- shortly
14   after the termination of ACE that COD would apply
15   for initial accreditation with CAHEB?
16          MR. ROCHE:  I am going to object that it
17   mischaracterizes the witness' previous statement.
18   I don't think there was any discussion about when
19   ACE was quote terminated.  You can go ahead and
20   answer.
21          THE WITNESS:  Well, I didn't write this
22   and so it's hard for me to say what Kathy meant or
23   to whom she was writing this.
24
```

1  BY MR. DAVIS:

2      Q      Would it have been within her

3  jurisdiction, for lack of a better term, to write

4  an announcement like this about accreditation and

5  when the program would start?

6      **A      I don't know that this is an**

7  **announcement.  You will have to ask her to whom**

8  **this was written and why.**

9          **She does say that many of our programs**

10 **are CAHEB accredited and that is what we would be**

11 **seeking for this program were we to offer it.  They**

12 **were not CAHEB accredited.**

13     Q      Right.  Did you ever have any discussions

14 with ACE or anybody with ACE about the fact that

15 they would be able to offer students to COD because

16 COD would be accredited?

17     **A      I remember reading something about that.**

18 **I don't know if we discussed it verbally.  I**

19 **remember reading something about that.**

20     Q      It was in the initial consortium

21 proposal.

22     **A      That is probably where I read it then.**

23          MR. ROCHE:  What was in the initial

24 consortium proposal?

```
 1            MR. DAVIS:  That they would be offering

 2   students to COD because COD could get accredited.

 3   ACE can't get accredited with CAHEB because they

 4   won't accredit anybody that is not a school.  That

 5   is not actually a school.

 6            THE WITNESS:  Right.

 7            MR. DAVIS:  What they do is they align

 8   with other schools and get accredited.

 9            MR. ROCHE:  I don't remember that.

10            MR. DAVIS:  Then they are able to offer

11   their students to the school that they are

12   accredited with because they want -- because some

13   states require that accreditation.  Some states do.

14            MR. ROCHE:  I just don't remember that in

15   the consortium proposal.  That is all.

16   BY MR. DAVIS:

17        Q    Last one.  Last one.

18        A    Okay.

19        Q    Initial Request For Accreditation

20   Services.  CEO signature.  Kathy Cabai.  This is

21   dated October 2, 2004.  Were you aware that --

22        A    2004?

23        Q    I'm sorry.  2014.  Were you aware they

24   applied for accreditation?
```

1      A      You know, I probably was.  But I see so

2    many of these things, that I couldn't say off the

3    top of my head did they do it or not.  They did,

4    obviously.  So I guess I was aware.

5                MR. DAVIS:  No further questions.

6                MR. ROCHE:  If I could just have a minute

7    or two to go through my notes and see if I have any

8    follow-up questions.

9                (Whereupon, there was a brief recess

10                in the deposition.)

11                MR. ROCHE:  No further questions.

12                Signature reserved.

13

14

15                (FURTHER DEPONENT SAITH NOT.)

16

17

18

19

20

21

22

23

24

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   AMERICAN CENTER FOR              )
     EXCELLENCE IN SURGICAL           )
 4   ASSISTING, INC.,                 )
                                      )
 5              Plaintiff,            )   Case No.
                                      )   1:15-CV-07290
 6              -vs-                   )
                                      )
 7   COMMUNITY COLLEGE DISTRICT,      )
     502, et al.,                     )
 8                                    )
                Defendants.           )
 9

10           This is to certify that I have read the

11   transcript of my deposition taken in the

12   above-entitled cause, consisting of Pages 1 through

13   68, inclusive, and that the foregoing transcript

14   accurately states the questions asked and the

15   answers given by me as they now appear.

16      Please check one:

17             I have submitted errata sheets

18             No corrections were noted.

19

20                     KAREN SOLT

21   SUBSCRIBED AND SWORN TO
     before me this      day
22   of          , 20      .

23
     NOTARY PUBLIC
24
```

```
 1    STATE OF ILLINOIS  )
                         ) SS.
 2    COUNTY OF DU PAGE  )

 3              I, DEBORAH TYRRELL, CSR, a notary public

 4    within and for the County of DuPage and State of

 5    Illinois, do hereby certify that KAREN SOLT was by

 6    me first duly sworn to testify to the truth, the

 7    whole truth and nothing but the truth, and that the

 8    above deposition was recorded stenographically be

 9    me, in the presence of said witness, and afterwards

10    reduced to typewriting under my personal direction.

11              I further certify that the said foregoing

12    transcript of the said deposition is a true,

13    correct and complete transcript of the testimony so

14    given by said witness at the time and place

15    specified as aforesaid.

16              I further certify that the signature of

17    the witness to the forgoing deposition was

18    reserved.

19              I further certify that the taking of this

20    deposition was in pursuance of notice and

21    agreement; and that there were present at the

22    taking of this deposition the appearances as

23    heretofore noted.

24              I further certify that I am not a
```

1    relative or employee or attorney or counsel of any

2    of the parties hereto, nor a relative or employee

3    of such attorney or counsel; nor do I have any

4    interest directly or indirectly in the outcome or

5    events of this action.

6            In witness whereof, I have hereunto set

7    my hand and affixed my notarial seal this 7th day

8    of month, 2017.

9

10

11

12

13



14   _____
     DEBBIE TYRRELL

15   CERTIFIED SHORTHAND REPORTER
     LICENSE NO. 084-001078
     NOTARY PUBLIC

16   DU PAGE COUNTY, ILLINOIS

17

18

19

20

21

22

23

24