Page 1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4   AMERICAN CENTER FOR          )

5   EXCELLENCE IN SURGICAL       )

6   ASSISTING, INC.,             )

7           Plaintiff,           )

8      vs.                       ) No. 15 CV 7290

9   COMMUNITY COLLEGE DISTRICT   )

10  502, et al.,                 )

11          Defendants.          )

12      The deposition of KEITH BUMP, called for

13  examination pursuant to Notice and the Rules of

14  Civil Procedure for the United States District

15  Courts pertaining to the taking of depositions,

16  taken before Elizabeth L. Vela, an Illinois

17  Certified Shorthand Reporter, at 180 North Stetson,

18  Chicago, Illinois, on the 16th day of May, 2017, at

19  the time of 11:23 a.m.

20  (Proceedings concluded at 6:03 p.m.)

21

22

23  Reported by:  Elizabeth L. Vela, CSR

24  License No.:  084-003650

```
                                                      Page 2

 1       APPEARANCES:

 2             DLG LAW GROUP, LLC, by

 3             MR. MICHAEL J. DAVIS,

 4             4100 East Mississippi Avenue, Suite 420

 5             Denver, CO 80246

 6             (720) 361-6036

 7             mdavis@dlglaw.net

 8                   Representing the Plaintiff,

 9

10             SCHUYLER, ROCHE & CRISHAM, P.C., by

11             MR. MICHAEL T. ROCHE,

12             Two Prudential Plaza

13             180 North Stetson Avenue, Suite 3700

14             Chicago, IL 60601

15             (312) 565-8333

16             mtroche@srcattorneys.com

17                   Representing the Defendants.

18

19

20

21

22

23

24
```

```
                                            Page 3

 1                   I N D E X
    WITNESS                          EXAMINATION
 2  KEITH BUMP
         BY MR. ROCHE                     7
 3
                   E X H I B I T S
 4  NUMBER                          MARKED FOR ID
    KB Deposition
 5
    Exhibit 1 - Notice of 30(b)(6)
 6  Deposition of Plaintiff              10
 7  Exhibit 2 - Complaint Filed by ACE    12
 8  Exhibit 3 - ACE's Response to COD's
    First Request for Production of Documents  22
 9
    Exhibit 4 - ACE's Response to COD's First
10  Set of Interrogatories              22
11  Exhibit 5 - ACE's Self-Study         24
12  Exhibit 6 - ACE's Program Catalog    25
13  Exhibit 7 - ACE's Resonses to The College of
    DuPage's Requests to Admit           40
14
    Exhibit 8 - November 29, 2013 E-mail   50
15
    Exhibit 9 - January 26, 2014 E-mail    55
16
    Exhibit 10 - February 10, 2014 E-mail  57
17
    Exhibit 11 - February 28, 2014 E-mail  57
18
    Exhibit 12 - Walk-Through of Things That
19  Happened                            68
20  Exhibit 13 - Consortium Agreement    83
21  Exhibit 14 - Consortium Proposal     83
22  Exhibit 15 - November 21, 2013 E-mail  95
23  Exhibit 16 - December 9, 2013 E-mail   96
24  Exhibit 17 - December 11, 2013 E-mail  98
```

Page 4

Exhibit 18 - Application for Permanent Approval
Career & Technical Education Curriculum    103

Exhibit 19 - May 6, 2014 E-mail              117

Exhibit 20 - February 21, 2014 E-mail        120

Exhibit 21 - February 21, 2014 E-mail        122

Exhibit 22 - February 21, 2014 E-mail        124

Exhibit 23 - February 24, 2014 E-mail        127

Exhibit 24 - February 24, 2014 E-mail        131

Exhibit 25 February 24, 2014 E-mail          132

Exhibit 26 - February 24, 2014 E-mail        133

Exhibit 27 - March 17, 2014 E-mail           135

Exhibit 28 - March 21, 2014 E-mail           137

Exhibit 29 - April 23, 2014 E-mail           138

Exhibit 30 - April 30, 2014 E-mail           142

Exhibit 31 - May 5, 2014 E-mail              144

Exhibit 32 - Consortium Agreement            152

Exhibit 33 - June 26, 2014 E-mail            153

Exhibit 34 - June 26, 2014 E-mail            162

Exhibit 35 - July 8, 2014 E-mail             166

Exhibit 36 - July 18, 2014 E-mail            169

Exhibit 37 - August 12, 2014 E-mail          175

Exhibit 38 - August 13, 2014 E-mail          177

Exhibit 39 - August 13, 2014 E-mail          182

Exhibit 40 - August 14, 2014 E-mail          183

Page 5

1    Exhibit 41 - September 8, 2014 E-mail     185

2    Exhibit 42 - Comparison & Analysis        206

3    Exhibit 43 - (Retained by Mr. Roche)      217

4    Exhibit 44 - May 8, 2014 E-mail           217

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    (Witness sworn.)

 2          MR. ROCHE:  Mr. Bump, could you please spell

 3     your name for the record?

 4          THE WITNESS:  K-e-i-t-h, B-u-m-p.

 5          MR. ROCHE:  And what is your home address?

 6          THE WITNESS:  11453 Abbots, A-b-b-o-t-s,

 7     Cross Lane, Glen Allen, Virginia 23059.

 8          MR. ROCHE:  And have you ever been deposed

 9     before, Mr. Bump?

10          THE WITNESS:  No.

11          MR. ROCHE:  Okay.  A couple -- just a couple

12     rules of the road, if you will.

13          THE WITNESS:  Sure.

14          MR. ROCHE:  If you don't understand the

15     question I'll be asking you -- and I will be asking

16     you a series of questions.  And if you don't

17     understand the question, Mr. Bump, if you could

18     please just tell me.

19          THE WITNESS:  Okay.

20          MR. ROCHE:  And -- because if you do go ahead

21     and answer, I'm going to assume that you understood

22     the question.

23          THE WITNESS:  Sure.

24          MR. ROCHE:  Another suggestion is to wait for
```

1   me to finish my question.  In many instances, you

2   may know where -- the question I'm going to ask.

3       THE WITNESS:  Right.

4       MR. ROCHE:  And there is a tendency among

5   witnesses --

6       THE WITNESS:  Sure.

7       MR. ROCHE:  -- to go ahead and just answer the

8   question.  If you could just simply wait for the

9   court reporter so the record is clear until I

10   finish my question, and then, provide your answer.

11       THE WITNESS:  Sure.

12       MR. ROCHE:  The last kind of tip would be,

13   please don't nod your head or say uh-oh --

14       THE WITNESS:  Right.

15       MR. ROCHE:  -- because obviously, the court

16   reporter won't be able to transcribe it.

17       THE WITNESS:  Right.

18               KEITH BUMP,

19   called as a witness herein, having been first duly

20   sworn, was examined and testified as follows:

21               EXAMINATION

22   BY MR. ROCHE:

23     Q.   What is your date of birth?

24     A.   12-10-64.

1      Q.    What is your highest level of education?

2      A.    High school.

3      Q.    Did you attend college?

4      A.    I did some college.

5      Q.    What college?

6      A.    It's in Panama City, Florida.  It's --

7    now, it's a different name.  It used to be

8    Gulf Coast Community College.

9      Q.    What years was that, Mr. Bump?

10     A.    1983.

11     Q.    Do you have any certificates or other

12   certifications in the medical field, Mr. Bump?

13     A.    No.

14     Q.    Have you been convicted of any crime,

15   other than a misdemeanor or a traffic offense?

16     A.    No.

17     Q.    Are you presently taking any medications

18   today that could affect your ability to testify

19   truthfully and accurately?

20     A.    No.

21     Q.    Have you ever been -- personally, have you

22   ever been a party to a lawsuit, Mr. Bump?

23     A.    Personally or business?

24     Q.    Personally.

Page 9

1      A.    No.

2      Q.    Aside from this lawsuit, have you ever

3  professionally been a party to a lawsuit?

4      A.    For a business that I owned.

5      Q.    Okay.  What was the name of that business?

6      A.    ATA Black Belt Academy.

7      Q.    I'm sorry.  What --

8      A.    ATA Black Belt Academy.

9      Q.    Black Belt Academy?

10     A.    Yes.

11     Q.    What was that lawsuit -- what did that

12  lawsuit involve?

13     A.    It was a personal injury and it was

14  dismissed.

15     Q.    Were you a defendant in that --

16     A.    Yes.

17     Q.    Was --

18     A.    The academy was a defendant.

19     Q.    Okay.  What year was that, approximately,

20  Mr. Bump?

21     A.    1986 maybe.

22     Q.    Did you ever testify at trial in that

23  matter?

24     A.    No.  It never went to trial.

Page 10

1      Q.    What is your present position at American

2   Center for Excellence in Surgical Assisting, Inc.?

3      A.    Vice president of sales and marketing.

4      Q.    Have you ever held any other position

5   at -- we'll call it ACE from now on.

6      A.    Okay.

7      Q.    Have you ever held any other position at

8   ACE, other than vice president of sales and

9   marketing?

10     A.    Well, I just started off as the sales

11  manager.

12     Q.    And when did you first become employed at

13  ACE?

14     A.    2012.

15     Q.    Do you recall the month?

16     A.    April.

17     MR. ROCHE:  Okay.  Let's mark this as

18  Exhibit 1.

19                     (Whereupon, KB Deposition

20                     Exhibit 1 was marked for

21                     identification.)

22  BY MR. ROCHE:

23     Q.    Do you see what's been marked as Exhibit 1

24  to your deposition, Mr. Bump?

Page 11

1      A.   Yes, sir.

2      Q.   This is a notice of 30(b)(6) deposition of

3 plaintiff, American Center for Excellence in

4 Surgical Assisting, Inc.  Do you see that in the

5 middle of the first page?

6      A.   Yes.

7      Q.   I just want to direct your attention to

8 Exhibit A, which is the third page on this

9 document.

10          And I just want to discuss the steps you

11 took to prepare for your corporate representative

12 deposition today.

13     A.   Okay.

14     Q.   Did you meet with counsel in connection

15 with today's deposition?

16     A.   No.

17     Q.   Did you have any -- and I don't want to

18 know the substance of the communications.  I simply

19 want to know, did you have any communications with

20 your counsel in connection with today's deposition?

21     A.   Other than scheduling, no.

22     Q.   Did you speak with Dan Bump about today's

23 deposition?

24     A.   Vaguely.

Page 12

1    Q.   What did you discuss?

2    A.   Just, you know, how the deposition --

3    how -- the process of the deposition, and you know,

4    how questions were asked, things like that, not

5    substance-wise.

6    Q.   Were there -- did Dan Bump tell you what

7    to testify to?

8    A.   No.

9    Q.   Did you speak with Tabitha Bump about

10   today's deposition?

11   A.   No.

12   Q.   Did you speak with Maggie Parrish about

13   your deposition today?

14   A.   No.

15   Q.   Did you speak to anyone other -- anyone

16   else at ACE about your testimony today?

17   A.   No.

18   MR. ROCHE:  Mark this as Exhibit 2.

19              (Whereupon, KB Deposition

20              Exhibit 2 was marked for

21              identification.)

22   BY MR. ROCHE:

23   Q.   Mr. Bump, what has been marked as

24   Exhibit 2 to your deposition is the complaint filed

Page 13

1  in this action by ACE.

2          My question is, did you review this

3  complaint in connection with preparing for today's

4  deposition?

5      A.   I did, yes.

6      Q.   Did you -- do you recall -- no.  Strike

7  that.

8          Did you review the complaint, Mr. Bump,

9  before it was filed in this case?

10     A.   Yes.

11     Q.   You'll notice that there's a series of

12  exhibits --

13     A.   Yes.

14     Q.   -- to this complaint.  Did you review the

15  exhibits to the complaint before it was filed in

16  this lawsuit?

17     A.   Yes.

18     Q.   Did you approve the allegations in the

19  complaint and the -- well, strike that.

20          Did you approve the allegations in the

21  complaint before it was filed --

22     A.   Yes.

23     Q.   -- in this matter?  Okay.  Let's discuss

24  e-mail communications.

Page 14

1          Did you review, Mr. Bump -- in connection

2    with today's deposition, did you review e-mail

3    communications that have been produced in this

4    case?

5          A.   I did.

6          Q.   Okay.  Do you recall which e-mail

7    communications you reviewed?

8          A.   All of them.

9          Q.   E-mail -- that was a bad question.  Good

10   answer, bad question.

11          Did you review the e-mails that were

12   produced by plaintiff, ACE, in this case?

13          A.   Yes.

14          Q.   Did you review the e-mails produced by the

15   defendant -- we'll call it College of DuPage, COD

16   in this case?

17          A.   I did not.

18          Q.   Are you aware that an entity by the name

19   of Your Extra Hands Surgical Services, Inc.

20   produced e-mail communications in this matter?

21          A.   I did not.  I did not know that.  Sorry.

22          Q.   So you didn't -- you did not review

23   those --

24          A.   No.

1    Q.   -- e-mail communications in connection

2  with your testimony today?

3    A.   No.

4    Q.   Did you review ACE's self-study in

5  preparation for today's deposition?

6    A.   I reviewed a comparison of the two

7  studies, not each one individual but a comparison.

8    Q.   Was this comparison prepared by your

9  counsel?

10    A.   No.  It was prepared by our program

11  director.

12    Q.   Who's your program director?

13    A.   Dan Bump.  He would be the one that's the

14  expert on curriculum.

15    Q.   Was this a document that was provided to

16  you by Dan?

17    A.   Yes.

18    Q.   How many pages was this document?

19    A.   Five pages.

20    Q.   Is that the document that --

21    A.   Yes.

22    MR. ROCHE:  May I take a look at it?

23    THE WITNESS:  I'm fine with it.

24    MR. DAVIS:  Yeah.  It will probably help you

Page 16

1    along.

2         THE WITNESS:  Actually, here's my notes as far

3    as the matching.

4              And I highlighted the -- everything that's

5    highlighted here is things that match, basically,

6    word for word.  And everything highlighted here is

7    things that the curriculum matches, but they

8    changed the wording and made a more wordier

9    description.

10        MR. ROCHE:  Let's just get right to it.

11        MR. DAVIS:  I like that.  I like the sound of

12   that.

13        THE WITNESS:  Sorry if you can't read my

14   handwriting.

15   BY MR. ROCHE:

16        Q.   Is there -- Mr. Bump, this is a document

17   that has not been produced in this litigation.

18              Just please -- before I ask to make copies

19   of it, can you just please confirm that there's no

20   privileged attorney-client information or other

21   information that I ought not to see?

22        A.   No.  I think you have a copy of our

23   curriculum and a copy of theirs.  This is just a --

24        Q.   We do, yep.

Page 17

1      A.   So I'm fine with that.

2      MR. DAVIS:  Uh-huh.

3      MR. ROCHE:  Okay.  Can we go off the record

4   while I make copies?

5                    (A short break was taken.)

6   BY MR. ROCHE:

7      Q.   Are there any other documents, Mr. Bump,

8   that you brought with you today that have not been

9   produced in this case?

10      A.   I don't know.  Was this a time line?  Did

11   we produce this, the walk-through that we provided

12   that had all the e-mails attached?

13      MR. DAVIS:  Yeah.  Let me clarify.

14      MR. ROCHE:  Sure.

15      MR. DAVIS:  These were notes that he made in

16   preparation for this deposition.

17      MR. ROCHE:  Right.

18      MR. DAVIS:  So there was -- they were -- they

19   didn't even exist before his preparation for the

20   deposition.  So --

21      THE WITNESS:  So I guess the answer is no.

22   BY MR. ROCHE:

23      Q.   May I see your notes?

24      A.   This is a walk-through of everything that

1   happened from beginning to end.

2        Q.   Who prepared this document?

3        A.   That was originally prepared by

4   Maggie Parrish when -- so when we started putting

5   all the e-mails together, we wanted to attach an

6   e-mail to a date and this is what happened at this

7   date and here's the e-mail that goes with it, and

8   then, this date, this happened, and here's the

9   e-mail that goes with it.

10            And so that's basically that walk-through

11  for us, for our purposes.  I also have one that I

12  prepared in addition to that that if this was open

13  in a document, I could click on these PDFs and

14  those are the e-mails that substantiate the --

15       Q.   So for example, this is a description of

16  what occurred on November 19, 2013.

17       A.   Right.

18       Q.   You click on this --

19       A.   That's the e-mail.

20       Q.   -- and that's the e-mail?

21       A.   That's the e-mail -- it's --

22  1november.doc, that's the e-mail that was sent in

23  relation to that.

24       MR. DAVIS:  And we can produce that for you

1   electronically, too, so you can click on the

2   e-mails and see them.

3        THE WITNESS:  I can do that for you today.

4   I've got my laptop here.  I can --

5        MR. ROCHE:  That would be great.

6        MR. DAVIS:  And just for the record, these were

7   not -- I've never seen these documents.  They were

8   not prepared by me and they are prepared by them

9   and they are not -- there's no privilege attached

10  to them.  They're prepared by Keith and Dan.  So --

11       THE WITNESS:  I wouldn't think there's anything

12  in there any different than what's in the

13  complaint.

14           It's just my way of being able to go

15  through it and go, here's what happened on this

16  date, here's the e-mail that's -- and that's how I

17  prepared for today.

18       MR. ROCHE:  Let's make copies of these --

19       MR. DAVIS:  Sure.

20       MR. ROCHE:  -- as well.

21       MR. DAVIS:  Sure.

22                    (A short break was taken.)

23  BY MR. ROCHE:

24       Q.   Mr. Bump, did you review the College of

Page 20

1    DuPage's self-study that was produced in this case?

2         A.    I also attached to the -- I didn't

3    personally review it.  Again, it was reviewed by

4    our program director.

5              And the page that I gave you with the

6    curriculum had a sixth page that was the comparison

7    of College of DuPage's self-study and ours.

8              We didn't find a lot of significant

9    similarities.  So all we can assume is that she

10   asked for that so that, you know, she could be -- I

11   don't know what you might call it.

12             Inspired by that, find out what kind of

13   questions there might be -- she might be asked so

14   that they could prepare the self-study for

15   College of DuPage, because there is going to be

16   significant differences in theirs, because they're

17   a college and we're a school -- a single-program

18   school.  They're a multi-program college.  So there

19   should be significant differences.

20        Q.    Who's she?

21        A.    Oh.  Kathy Cabai.

22        Q.    So I understand you correctly, Keith,

23   there was a sixth page to this document, as well?

24        A.    It's -- yeah.  It's the -- is that the

Page 21

1    back page?  Is that 6 or 5?

2         Q.   We have 1 through 5, and then, we have

3    this.

4         A.   That's the --

5         Q.   The analysis --

6         A.   -- analysis.

7         Q.   -- of the COD self-study?

8         A.   Yes, sir.

9         Q.   All right.  Here.  You can have that back,

10   actually.

11            Did you review the other self -- or excuse

12   me.  The other trade secrets that ACE claims were

13   misappropriated by the College of DuPage in this

14   matter?

15        A.   I didn't.

16        Q.   Did you review ACE's program catalog?

17        A.   Yes.

18        Q.   Did you review ACE's master curriculum?

19        A.   That was -- that review was done by Dan.

20   And it's part of how he made his comparison for the

21   comparison of the two curriculums.

22        Q.   Did you --

23        A.   I didn't specifically review it.

24        Q.   Did you review -- we'll get to it.  Okay.

Page 22

```
 1   ACE -- let's just look at the exhibits.  Let's just
 2   go through the exhibits.
 3                        (Whereupon, KB Deposition
 4                        Exhibit 3 was marked for
 5                        identification.)
 6   BY MR. ROCHE:
 7      Q.   I'll show you what's been marked as
 8   Exhibit 3.
 9           Mr. Bump, what's been marked as Exhibit 3
10   to your deposition is ACE's written response to
11   COD's first request for production of documents.
12           Did you review this document in connection
13   with preparing for today's deposition?
14      A.   I don't remember reviewing this.
15                        (Whereupon, KB Deposition
16                        Exhibit 4 was marked for
17                        identification.)
18   BY MR. ROCHE:
19      Q.   I'll show you what's been marked as
20   Exhibit 4 to your deposition.  This is ACE's
21   response to COD's first set of interrogatories in
22   this matter.
23           Do you recall reviewing ACE's
24   interrogatory answers in connection with today's
```

Page 23

1   deposition?

2       A.   No.

3       Q.   If you don't mind turning to the third --

4   or the last page in this document.

5            You'll see that verification.  Is that

6   your signature there, Keith?

7       A.   On this page?

8       Q.   Yes.  No, I'm sorry.  The page before --

9       A.   Oh.

10      Q.   No, the last page.  There you go.

11      A.   Yes.

12      Q.   Do you recall signing and executing this

13  document called a verification in connection with

14  submitting ACE's answers to COD's interrogatories?

15      A.   Yes, I do.

16      Q.   And were you authorized at the time you

17  executed this by ACE to sign this verification?

18      A.   Yes.

19      Q.   Let's just turn, Keith, to Interrogatory

20  No. 4.

21           You'll note here that this requests ACE to

22  identify all documents or other materials ACE

23  provided to COD that it believes constituted trade

24  secrets, and then, there's some answers to that.

Page 24

1    Do you see that?

2         A.   Yes, I do.

3         Q.   The answers are in bold, Keith.  Are there

4    any other documents, as you sit here right now, or

5    other materials that ACE claims are trade secrets

6    that are not listed here?

7         A.   No, sir.

8         Q.   So the record is clear, I'm going to have

9    you just identify what these documents are, Keith.

10        A.   Just read the bold --

11        Q.   I'll actually be just showing you a

12   series --

13        A.   Okay.

14        Q.   -- of documents.

15                   (Whereupon, KB Deposition

16                    Exhibit 5 was marked for

17                    identification.)

18   BY MR. ROCHE:

19        Q.   Mr. Bump, I show you what's been marked as

20   Exhibit 5 to your deposition.  Is this ACE's

21   self-study?

22        A.   Yes, it is.

23

24

Page 25

1          (Whereupon, KB Deposition

2          Exhibit 6 was marked for

3          identification.)

4    BY MR. ROCHE:

5        Q.   I show you what's been marked as Exhibit

6    No. 6 to your deposition, Mr. Bump.

7             The question is, if you look at the first

8    12 pages of this document, you'll notice -- just to

9    backpedal real fast, Keith, on the bottom of the

10   first page, you'll see a Bates stamp.  That's what

11   it's called.  ACE1001.  Do you see that?

12       A.   Yes.

13       Q.   If you go through to ACE1012, my question

14   is, are the documents in between -- is that ACE's

15   program catalog?

16       A.   Yes.

17       Q.   From ACE1013 to ACE1058, are those

18   materials ACE's curricula -- or strike that.

19            Do those materials constitute what ACE

20   claims is its master curriculum?

21       A.   Yes.

22       Q.   And both the program catalog and master

23   curriculum, which we'll call going forward, those

24   are both trade secrets that ACE alleges were

Page 26

1 misappropriated in this matter, is that right?

2    A.   Yes.

3    Q.   If you'll look going back to the

4 interrogatory answers, which I believe is

5 Exhibit 4 --

6    MR. ROCHE:  Is that right, Liz?

7 BY MR. ROCHE:

8    Q.   It is Exhibit 4.  If you'd turn to

9 Interrogatory No. 7, Keith, it asks state the date

10 of the contract between ACE and COD.  Do you see

11 that, Keith?

12    A.   Am I looking at the wrong --

13    Q.   You are, actually.  I'm sorry.  It's this

14 one right there.

15    A.   Yes.

16    Q.   The answer is December 9, 2013.  Do you

17 see that, Mr. Bump?

18    A.   Yes.

19    Q.   Is that the date of the contract between

20 ACE and the College of DuPage?

21    A.   So I don't understand the question.  So

22 are we talking about when they received the

23 contract or are we talking about when we feel a

24 verbal contract was --

Page 27

1    Q.   Interrogatory No. 7 asks to state the date

2    of the contract.  The answer is December 9, 2013.

3    Is that accurate?

4    A.   Well, it could be.  There's several -- as

5    far as a verbal contract, there's several dates

6    when we feel like -- that it was in place.

7    Q.   When was the first date it was -- this

8    verbal contract was in place?

9    A.   December 9th.  And that's the date that's

10   listed, which is when we received an e-mail from

11   Karen, which is the associate dean of the

12   department.  And it said we're ready to move

13   forward.

14        So that's why the December 9th is, because

15   that's the first time that they had made a

16   statement that there was a contract in place.

17   Q.   Now, for just December 9th, what was --

18   what were the terms of the first verbal contract,

19   as you described it?

20   A.   So it would be the terms that we had given

21   them in a written contract, that they would take

22   our program as a College of DuPage program in a

23   consortium with us.

24        They would -- we would basically do

Page 28

1  everything.  They would just have to provide a

2  certificate and keep records for their students and

3  that we would also take students that needed a

4  college program and put them through their program,

5  as well.

6      Q.   What were -- what was the price that was

7  agreed upon --

8      A.   The original price --

9      Q.   -- in the first verbal contract?

10     A.   It was 4,400.  So the original proposal is

11 that they would charge 6,900 for the program, we

12 would keep 4,400, and the difference would be

13 theirs.

14         What we would get out of that was that the

15 students, because they're going through a college,

16 could get financial aid.  And there are certain

17 states that require those college-type programs for

18 students to get licensed in that state.  There's

19 very few of those.

20     Q.   It's your testimony today that the

21 College of DuPage agreed to those -- that pricing

22 structure on December 9th, 2013?

23     A.   According to their e-mail, yes, and

24 their --

Page 29

1      Q.   What were their -- what were the -- well,

2   what was the date of the second verbal contract?

3      A.   The second one was on December the 11th,

4   when the VP of IT for the College -- his name is

5   Charles Currier.

6          He sent an e-mail that says given this

7   appears to be an agreement.  When we're speaking

8   about using Blackboard, in that e-mail, he says

9   given this appears to be an agreement for

10  College of DuPage to produce a certificate for this

11  program.

12     Q.   What were the terms of the December 11th,

13  2013 contract?

14     A.   Same terms.  There was no discussion of

15  any change in the terms.

16     Q.   What document are you looking at?

17     A.   This is just my notes.  It's my notes I

18  made for today.

19     Q.   Is it this document, Keith?

20     A.   No.  This is additional notes that I made.

21  I can give you the e-mail number.  Now, the e-mail

22  is probably listed in that document.

23     Q.   Have these notes been -- these are

24  notes -- are these notes you --

Page 30

1      A.    I made these like last week.

2      Q.    -- prepared in connection with today's

3  deposition?

4      A.    Yes.

5      Q.    Okay.  Can I see them?

6      A.    I don't have a problem with that.

7      THE WITNESS:  Do you have a problem with it?

8      MR. DAVIS:  No.

9      THE WITNESS:  I'll just -- can I tell you what

10  they -- what all they include?

11  BY MR. ROCHE:

12     Q.    Of course.

13     A.    So this is, basically, did Kathy Cabai

14  have the ability to create this program on her own.

15  And it's basically just talking points for me.

16         Was the College of DuPage -- the program

17  that they submitted to the State, was it ACE's.

18  And this is the exhibit that shows that the -- what

19  they submitted to the State suggests it was ACE,

20  because it was in the document -- 30 times, it said

21  ACE.

22         And then, it's -- this is talking about

23  did we have a verbal contract.  There's five

24  e-mails that prove that we did.  And this is

Page 31

1    talking about did they breach the contract.

2            And then, I -- this is could they have the

3    program they have in place right now without ACE.

4    And it talks about how they could not.

5        Q.   Why couldn't -- why could College of

6    DuPage not have the program --

7        A.   So --

8        Q.   -- in place --

9        A.   So it took --

10       Q.   -- without ACE?

11       A.   Okay.  So it took us -- using our existing

12   program, alongside with College of DuPage, it took

13   14 months to get the program written -- not written

14   but changed around, because I don't know if you've

15   seen where they had to change the program around,

16   because we present it on nine one-month modules,

17   where they're a semester system.

18           So they had to take it and take chunks of

19   what we had and put it in a semester.  So that was

20   the shifting of the program, not necessarily the

21   rewriting of the program.

22           It took 14 months to get it written,

23   approved by the College, approved by the State, and

24   then, ready to prepare -- ready to present to

Page 32

1   students.

2          And according to Kathy, that was record

3   time.  They had never seen a program approved by

4   the College, much less the State in that amount of

5   time.

6          So then, once they broke off ties with us,

7   they were able to start from scratch, rewrite a new

8   program, get it approved by the State, get it

9   approved by the College, do a new self-study so

10  that they could get it approved by CAAHEP.  They

11  were able to do that in less than 11 months.

12         So it's impossible.  In her own words, it

13  was record time.  It never happened before for

14  14 months with our help.

15     Q.   What was the date of the third verbal

16  contract?

17     A.   April the 23rd.

18     Q.   What were the terms of the April 23rd

19  contract?

20     A.   It was still the same.  No changes.

21     Q.   Why do you believe this was a new contract

22  then?

23     A.   Well, it was not really a new contract,

24  just a confirmation of the wording that confirms

Page 33

1    the -- so I don't agree that there's additional

2    contracts.

3              I would say, this is just a confirmation

4    of the first contract.  And so this was Kathy Cabai

5    on April 23rd, an e-mail saying all classes are

6    approved and we're ready to go.

7              She said, you guys owe me big time,

8    because this is the fastest anything has ever been

9    approved by the College of DuPage, let alone the

10   State.  So to me, viewing the contract, why would

11   we owe her big time?

12        Q.   When you referenced in your answer the

13   first contract, are you referring to the contract

14   that was dated December 9, 2013?

15        A.   Yes.  So I don't see there being any

16   second or third contract.  I just see these as

17   being confirmation points of a contract.

18        Q.   Dated December 9, 2013?

19        A.   Correct.

20        Q.   What was the -- are there any other

21   confirmations --

22        A.   Yes.

23        Q.   -- as you described?

24        A.   So May 6th, Kathy sends an e-mail saying

1   excited times for College of DuPage.  I couldn't

2   think of three better guys to be on this train

3   with.  I'm sure you've seen that.

4          And she said, it's too bad it took Keith

5   and Kyle to make it happen, Kyle being Kyle Black,

6   I think, from Your Extra Hands Surgical Services.

7       Q.   Okay.

8       A.   And then, do you want to hear the final

9   one?

10      Q.   Yes, please.

11      A.   The final one was when Kathy attended the

12  surgical skill lab at no charge, knowing that she

13  was doing that as part of her instructor training.

14      Q.   Did Kathy make --

15      A.   That was in July.

16      Q.   -- any representations to you or in an

17  e-mail reaffirming the December 9th, 2013 contract?

18      A.   Yeah, these exciting times at College of

19  DuPage.

20      Q.   I'm referring to the last one.

21      A.   No, after that --

22      Q.   The skills lab.

23      A.   No.  It was just her attendance.  I mean,

24  she did confirm her attendance.  So --

Page 35

1      Q.   You just -- you previously testified that
2  the terms of the December 9th contract were the
3  terms that were in a written document that was sent
4  to the College of DuPage, is that --
5      A.   Correct.
6      Q.   -- your testimony?
7      A.   Yes.
8      Q.   And is that the initial consortium
9  agreement --
10     A.   Yes.
11     Q.   -- that we'll get to in a second?
12     A.   Yes.
13     Q.   Did ACE ever sign that initial consortium
14  agreement?
15     A.   I'm not sure about that it, because I --
16  it may have been Dan that would have signed that.
17          And I do believe that he did sign it -- I
18  don't think it was signed on the first time we sent
19  it, but I think we resent it again, as we asked
20  them for it again, and we resent it signed by Dan,
21  because I believe there's an e-mail -- and I can't
22  remember the exact date, but I believe there's an
23  e-mail saying here's the agreement signed by me.
24          Once you've signed it, it will be a fully

Page 36

```
 1    executed agreement, if you'll send it back to us,
 2    and then, we'll -- we will -- and I don't know what
 3    the terms were, because we did change the amount,
 4    because --
 5         Q.    What do you mean by amount?
 6         A.    The 4,400 that we would receive.  And the
 7    reason being is that at some point, Kathy asked if
 8    she could be the instructor for the lab.
 9              So because the students were going to be
10    there at College of DuPage, the original thing was
11    that Dan would travel to College of DuPage to teach
12    the six-day surgical skill lab, because he wanted
13    to -- because it was proprietary information, he
14    wanted to hold onto that pretty tight.
15              But at some point, it was agreed to that
16    Kathy wanted to teach it, but she would have to do
17    this instructor training first.  And then, if she
18    did that, then that amount would go down to what --
19    I believe we came to an agreement would be 3,600.
20         Q.    Did you ever sign any contract on behalf
21    of ACE --
22         A.    I didn't.
23         Q.    -- in connection with the --
24         A.    Not with that.
```

Page 37

1     Q.   -- consortium with COD?

2     A.   No.   That was signed by Dan.   And I

3  believe that the second -- the one that was sent,

4  the second one that they -- I think they requested

5  it because of the change in the amount of money.

6  It was signed by Dan.   I believe that had the 3,600

7  in it.

8     Q.   Do you know if the College of DuPage ever

9  signed the initial consortium agreement that was

10  sent in 2013?

11     A.   No.   It was our understanding that it was

12  being put through legal for the lang -- to look at

13  the language.

14     Q.   Right.   Do you know if the College of

15  DuPage ever signed that contract?

16     A.   If they did, they never returned it to us.

17     Q.   Do you know if the College of DuPage ever

18  signed the second contract?

19     A.   If they did, they never returned it to us.

20     Q.   Could I make a copy of that, Keith?

21     A.   I think you already have these.   So you

22  don't need these, right?

23          These are the attachments -- the e-mails

24  in here, I just made copy of those so I could have

1   quick access to them, but I think you probably

2   already have those.

3        Q.   Yeah, but you know what?  Do you mind if I

4   just keep it consistent?

5                     (A short break was taken.)

6   BY MR. ROCHE:

7        Q.   Mr. Bump, are there any other documents

8   that you have with you today that have not been

9   exchanged --

10       A.   No.

11       Q.   -- or produced in this case?

12       A.   No.

13       MR. DAVIS:  Well, I'm going to object to not

14   been produced.

15            These are documents that were made in

16   preparation for this deposition.  So there was --

17   they've never existed prior to a few days before

18   today.

19       MR. ROCHE:  Okay.

20       MR. DAVIS:  So we're turning them over today.

21       MR. ROCHE:  Okay.

22       MR. DAVIS:  And they're just notes.  They're

23   just compilations of documents that already exist.

24       THE WITNESS:  I don't think the information in

Page 39

1    the documents changed anything.  It just helps me

2    to be able to speak on the information that you're

3    asking about.

4         MR. DAVIS:  In an organized fashion.

5    BY MR. ROCHE:

6         Q.   Keith, what other documents did you review

7    in connection with today's deposition?

8         A.   My -- because it was three years ago,

9    three and a half maybe, my biggest thing was

10   reviewing the e-mail conversations, because I mean,

11   I don't have an identic memory.

12             I told my wife -- I said, I wish I did, I

13   wouldn't have to be going through all this work

14   but -- so I just wanted to review it to make sure I

15   was familiar with it and the time line, because I

16   can't sometimes remember what happened yesterday,

17   much less three and a half years ago.  So --

18        Q.   What other efforts -- aside from reviewing

19   the documents that you discussed, what other

20   efforts did you embark on in preparing for today's

21   deposition?

22        A.   That's all.

23

24

Page 40

1                    (Whereupon, KB Deposition

2                    Exhibit 7 was marked for

3                    identification.)

4    BY MR. ROCHE:

5        Q.   I'll show you what's been marked as

6    Exhibit No. 7 to your deposition.  This is ACE's

7    responses to the College of DuPage's requests to

8    admit.

9            My question is, do you have any reason to

10   disagree with the answers provided in ACE's

11   answers?

12       A.   No.

13       Q.   Mr. Bump, you previously testified that

14   you became employed -- first became employed at ACE

15   in April of 2012.

16           What did you do prior to your employment

17   with ACE?

18       A.   Do you want the whole list?

19       Q.   Yes.

20       A.   So I owned a martial arts school for

21   30 years.

22           I worked -- in 2008, the economy kind of

23   took a downturn.  So I took on a second job with

24   Philip Morris installing cigarette fixtures in

Page 41

1    7-Elevens, places like that.

2          And then, that was only a contract.  So it

3    ran out after a period of time.  And then, I worked

4    with Aflac for a little while.

5          Q.   Prior to your employment with ACE, had you

6    had any previous dealings in the surgical assisting

7    field?

8          A.   No.  It was just -- the reason they

9    brought me on was my sales experience.

10         Q.   Prior to your employment with ACE, had you

11   had any previous dealings in the medical field?

12         A.   Other than needing a doctor every once in

13   a while, no.

14         Q.   All right.  Let's -- this must be the

15   original.  Is this what --

16         A.   Yes.

17         Q.   Okay.

18         A.   Can I elaborate on the last question?

19         Q.   Go ahead.

20         A.   So I was brought on not to have any

21   association or involvement in the training of

22   the -- or creation of curriculum.  I was brought on

23   basically to do sales.

24               So that was -- my first role was as a

Page 42

1  salesperson, and then, I moved up to VP of sales

2  and marketing.

3      Q.   Prior to your employment with ACE, had you

4  had any previous dealings with academic

5  institutions?

6      A.   No.

7      Q.   Have you ever had an ownership interest in

8  ACE?

9      A.   No.

10     Q.   Have you ever served as a corporate

11 officer of ACE?

12     A.   No.

13     Q.   When did you become vice president of

14 sales and marketing?

15     A.   About two years ago.  I don't know the

16 exact date.  It's been about two years.

17     Q.   Sometime in 2015?

18     A.   Yes.

19     Q.   Dan is your brother, is that right?

20     A.   Yes.

21     Q.   And prior to your ACE employment, Keith,

22 did you -- were you familiar with the nature of

23 ACE's business?

24     A.   Yes.

1      Q.   And describe for me your knowledge of

2  ACE's business prior to your employment with ACE.

3      A.   Well, I mean, other -- just basically what

4  he would tell us on family visits, because it's not

5  like I converged with Dan on a daily basis at that

6  time.  It was an annual get-together.

7           And it was just that he took -- he trained

8  OR nurses and surgical techs to become first

9  assists in surgery.  And at that point, I didn't

10 really know what a first assist was.  That all came

11 about once he needed a new salesperson and I needed

12 a new position.  So we kind of met in a meeting of

13 the minds for that reason.

14     Q.   In April 2012, when you joined ACE as a --

15 salesman?

16     A.   Yes.

17     Q.   What were your duties and

18 responsibilities?

19     A.   Well, at first, it was just sales and to

20 create -- because what I did -- I went -- when I

21 worked for -- or I had my own company, American --

22 ATA Black Belt Academy, we would do -- we went to

23 all kinds of sales programs.

24           And so I learned a lot about how to write

Page 44

1    sales scripts.  And that was attractive to Dan,

2    because they didn't really have good sales scripts.

3    So --

4        Q.   What is a sales script?

5        A.   You know, when someone calls in, this

6    is -- you need to stay within this script.

7            So what that does is, it helps us to track

8    how people are enrolling.  If one person says this

9    thing and another person says this thing, and then,

10   this person is doing well, but this person is not,

11   we don't know whether it's because he's just got a

12   better -- he said something better or he's better

13   at saying the same thing.

14           So we just need -- we needed that kind of

15   continuity in the sales approach.  So that's the

16   main reason I was brought on.

17           And actually, I worked for about three

18   months on a trial basis.  And then, after that,

19   they wanted me to move out to Denver, but I didn't

20   want to move to Denver.  So they let me just

21   continue my work in Virginia and just travel back

22   and forth when I needed to.

23       Q.   How else were you going to increase ACE's

24   sales, aside from working on the sales scripts?

Page 45

1      A.   Well, we did several things.  We worked on

2   the sales scripts.  We had an employee that needed

3   to be trained.

4           So we did a lot of training on the sales

5   scripts, coaching them during their phone calls --

6   or not during the phone call, but after they

7   finished the call, I would listen to it and be able

8   to coach them on that.

9           The second thing is, we put some things in

10  place that they didn't have.  Like they had -- if a

11  person called in, they'd take their information,

12  and the only way to communicate with that person

13  would be through individual e-mails or to call

14  them.

15          And so we put in Infusion software.  I

16  don't know if you've ever heard of that.

17     Q.   I have not.

18     A.   So what that does is, it gives you a

19  database.  And you can put together an e-mail and

20  send it to everybody at one time, rather than

21  having to type out 500 individual e-mails.

22          So we made it where it was a lot more

23  user-friendly.  So you know, if we can reach out to

24  500 people in a day, rather than 50, we should be a

1    lot more -- get a lot more success with that.

2         Q.   When you became vice president of sales

3    and marketing in -- sometime in 2015, what new

4    responsibilities did you have with ACE?

5         A.   Just -- I handled all the website.  So we

6    created a new website.  I work with the company

7    that handles the website.  Any issues with that, I

8    handle that.  I do all the layouts for the e-mails

9    that we send out.

10        So basically, I -- instead of just doing

11   sales myself, I oversee -- and of course, right

12   now, there's nobody to oversee, but we put that in

13   place, because we feel like we're going to be

14   creating a department.

15        And so I handle the website.  I handle all

16   the Infusionsoft e-mails, creation of those.  I

17   handle all the leads that come in, getting those

18   into the Infusionsoft.  I create campaigns.

19        So another thing that Infusionsoft does

20   is, when -- instead of me having to create an

21   e-mail and hit send for every one that comes in,

22   now, with Infusionsoft, I can create a campaign.  I

23   tag that and a series of things happen based on how

24   that person responds.

1      Q.   During the course of your employment, has

2   ACE ever entered into consortium agreements with

3   academic institutions?

4      A.   No, but we were on -- when we met with

5   College of DuPage, we had -- within the same

6   weekend, in the same area, we had met with four

7   other -- three other colleges, one of them being

8   College of the Lake.  Do you know College of the

9   Lake?  It's about 30 miles from COD.

10           And I don't even think we've ever even

11   discussed this, but they were interested in moving

12   forward, but then, we met with College of DuPage,

13   and things moved so quickly with College of

14   DuPage -- we met with them on November the 19th.

15           Before we left the parking lot, they

16   called and said we want you to meet with the

17   associate dean tomorrow.  Within a month, we were

18   having a Skype call.

19           And one of the things with -- in this --

20   the meeting with the associate dean was, if they

21   were going to move forward, they wanted a 50-mile

22   radius exclusivity, because -- and the reason being

23   was not that they didn't want to compete with other

24   colleges, but they didn't want to have to compete

Page 48

1    with other colleges for clinical space for their

2    students to get spaces in hospitals.

3            So based on that communication, we didn't

4    follow up with College of the Lake.

5        Q.   Your -- the discussion you just testified

6    to about the 50-mile radius --

7        A.   Yes.

8        Q.   -- that was -- that pertained to College

9    of the Lake?

10       A.   College of DuPage asked for a 50-mile

11   radius.  So we didn't -- we stopped communicating

12   with College of the Lake.

13       Q.   Did -- after the proposed ACE/COD

14   consortium fell apart, did ACE -- did you or anyone

15   at ACE reach back out to College of the Lake about

16   a proposed consortium?

17       A.   No, because 14 -- what was it?  It wasn't

18   14 months.  It was 10 months later.

19            I didn't think that they would be

20   interested, since we dropped them.  We said no, we

21   don't want to do business with you, because we've

22   got this other college that's bigger that we feel

23   is -- it's more in our interest to work with that

24   wants exclusivity.

1          And the reason I never brought that up in

2    the past is because it didn't affect -- it didn't

3    affect what they did.  It didn't affect how we

4    reacted to it.  So --

5      Q.   You just testified that there -- you met

6    with -- well, ACE met with three or four other

7    colleges.  You identified College of the Lake as

8    being one of those colleges.

9          Was Illinois Community College another

10   college in Illinois?

11     A.   I don't think so.  Rockville College was

12   one of the other ones.  That's in Rockville.

13     Q.   Rockford?

14     A.   Rockford, yeah.

15     Q.   In Rockford, Illinois?

16     A.   It's been so long, I'm sorry, but I don't

17   have all my presentations from back then.

18     Q.   Do you recall any other colleges' --

19     A.   I couldn't think of --

20     Q.   -- names?

21     A.   -- any of the other names.  That's why I

22   didn't --

23     Q.   All right.  Well, let's break it down.

24

Page 50

1                    (Whereupon, KB Deposition

2                    Exhibit 8 was marked for

3                    identification.)

4    BY MR. ROCHE:

5        Q.   Keith, I show you what's been marked as

6    Exhibit 8 to your deposition.  Do you recognize

7    that e-mail?

8        A.   Yes.

9        Q.   Can you describe it for me?

10       A.   So this is a conversation, I think, that

11   happened back and forth between Kyle Black and I,

12   because his team was setting up the appointments to

13   work with colleges.  And I --

14       Q.   Who is Kyle Black?

15       A.   Kyle Black was the executive director of

16   Your Extra Hands Surgical Services.

17       Q.   What was the nature of Your Extra Hands

18   Surgical Services' business?

19       A.   They have a couple of different models.

20   They had a group of surgical assistants that

21   would -- they would outsource to hospitals.  So do

22   you want me to explain how that works?

23       Q.   No.  I know what it --

24       A.   Okay.

Page 51

1     Q.   I know how it works.

2     A.   So -- and they had a new model, which is

3   called end-sourcing; whereas, a lot of times,

4   hospitals like to keep control of the surgical

5   assistants -- they like the financial side of

6   outsourcing, because they don't have to pay those

7   employees, but they don't have a lot of control.

8          If a -- if they have a case that

9   outsourcing -- outsourced surgical assistants work

10  on, those people just show up, they work the case,

11  and they go home; whereas, if they're in-sourced,

12  they're still hospital employees, and then, Your

13  Extra Hands Surgical Services -- can I just say

14  YEHSS?

15    Q.   Yes.

16    A.   So YEHSS --

17    Q.   Y-E-H-S-S, we'll use as the acronym for

18  Your Extra Hands Surgical Services, Inc.

19    A.   So on the in-sourcing model, the hospital

20  still retained employment of the surgical techs

21  slash surgical assistants -- and the reason I say

22  that is because they can be used in a dual role

23  then.

24          When they need them as a surgical tech,

1    they can use them as a surgical tech.  When they

2    need them as a surgical assistant, they can put

3    them in there for that.

4        Q.    Do you know how YEHSS and ACE came about

5    to form a potential partnership?

6        A.    So Dan had done some training for the

7    ACE -- I'm sorry.  I should say ACE had done some

8    training for the surgeon-owned YEHSS.  So he had a

9    relationship with the surgeon that owned YEHSS.

10       Q.    Is the surgeon John Atwater?

11       A.    Yes.  And through that relationship, he

12   had done training.

13            Now, they came upon a situation, where as

14   they start in-sourcing these people, the hospitals

15   have a lot of surgical techs but need surgical

16   assistants.  So he needed somebody to go in, and

17   once they get that in-sourcing contract, to train

18   the surgical assistants.

19            He started paying ACE to do that.  And he

20   decided -- or Dan and he decided together that it

21   would be a great relationship to, instead of him

22   having to pay for that training, that ACE would do

23   it at no charge but would get a piece of the back

24   end.

1      Q.   Do you remember, Keith, when you first met

2  Kyle Black?

3      A.   I don't remember the exact date, but it

4  was shortly -- I mean, right there when I started

5  working, because that was one of my first trips out

6  to Denver was that I met Dan in Bloomington to meet

7  Dr. Atwater and Kyle Black.  I couldn't even guess

8  at what that date was, though.

9      Q.   Let's go back to the exhibit with Illinois

10  Community College.

11        Do you recall how -- well, how ACE came to

12  interact with Illinois Community College?

13      A.   So Kim Watterson was a YEHSS employee.  So

14  once -- we already had this other agreement for us

15  to receive a piece of their business if we trained

16  any of their people.

17        So they wanted another agreement that

18  says, if they get us a consortium or if they even

19  introduce us to somebody, and then, I go do the

20  sales part of it, then they would get that same

21  amount on consortiums for future business.

22        So Kim Watterson was very good at going

23  out and speaking to people and gaining interest in

24  ACE.

Page 54

1          And I think it was like four or five
2    appointments over a week -- over a two or three-day
3    period that we did.
4          I don't know -- I'm not sure if this one
5    happened at the same time.  I think I had to go
6    back for this one, if I'm -- I'm starting to
7    remember that the guy that was in charge of this
8    program was also a surgical assistant, if I'm
9    remembering correctly.  And that's how they knew
10   him.
11      Q.   Did you ever meet, Keith, with anyone at
12   the Illinois Central College about a proposed
13   consortium?
14      A.   I don't believe I did.  I think Kyle might
15   have.  And here's why.
16          I went out there as -- the same trip when
17   we went to College of DuPage, if I'm remembering
18   correctly, if this is the same one I'm thinking
19   of -- I mean, I wouldn't swear to it, but if I
20   remember correctly, his mother died or something
21   happened and he couldn't be there.
22          So Kyle ended up doing this presentation
23   on his own.  And that's why I couldn't remember
24   this --

Page 55

1      Q.   Do you recall ever speaking with someone

2   over the phone from --

3      A.   I did.

4      Q.   -- the Illinois Central College?

5      A.   I do remember speaking with this gentleman

6   over the phone.

7      Q.   Do you recall when it was?  Was it on or

8   about or around the time of November of 2013?

9      A.   I couldn't even guess.  I didn't look at

10  this to prepare for today.  So I don't know.

11     Q.   How many times did you speak with this

12  gentleman?

13     A.   I think twice.

14                    (Whereupon, KB Deposition

15                    Exhibit 9 was marked for

16                    identification.)

17  BY MR. ROCHE:

18     Q.   I show you what's been marked as

19  Exhibit 9.  To help refresh your recollection,

20  Keith, why don't you just take a look and read that

21  e-mail?

22          It is an e-mail dated January 26, 2014.

23  Do you recall what ultimately happened between

24  ACE's relationship or proposed consortium with the

Page 56

1    Illinois Central College?

2         A.   I know something happened and it didn't go

3    through.  And it may have been they wanted CAAHEP

4    accreditation.  It may have been that they wanted

5    us to be CAAHEP accredited.

6              I think that that was an issue for this

7    guy, because the AST really -- which is Association

8    of Surgical Technologists really pushes for CAAHEP

9    accreditation.

10             AST, ASA, CAAHEP, they're all kind of like

11   brother/sister organizations.  And this guy was, I

12   think, a board member -- not a board member but

13   like a -- like an officer of the AST.  So it was a

14   personal thing for him that it be CAAHEP

15   accredited.

16        Q.   I believe you testified you spoke to this

17   individual twice over the phone?

18        A.   Yes.

19        Q.   Do you recall -- well, strike that.

20   During either of these conversations, was there

21   ever a discussion as to what the approval process

22   would be for Illinois Central College to enter into

23   a proposed consortium with ACE?

24        A.   No, because it had to get past him first,

Page 57

```
 1   and he wasn't all that interested, if I remember
 2   correctly.  I mean, it's three years ago.  So I'm
 3   just doing my best to try to pull those memories
 4   out.
 5                      (Whereupon, KB Deposition
 6                      Exhibit 10 was marked for
 7                      identification.)
 8   BY MR. ROCHE:
 9       Q.   Just real quickly, was the individual --
10   well, I show you what's been marked as Exhibit
11   No. 10, Keith, to your deposition.
12            Was the individual that you're referring
13   to Bill Hammer?
14       A.   Yes.
15       Q.   Got you.  Okay.
16                      (Whereupon, KB Deposition
17                      Exhibit 11 was marked for
18                      identification.)
19   BY MR. ROCHE:
20       Q.   Back to Illinois Central College real
21   fast.
22            Do you recall if you met with Illinois
23   Central College or Bill Hammer -- strike that.
24            Do you recall if you spoke with
```

Page 58

1   Bill Hammer at Illinois Central College before you

2   communicated with anyone at the College of DuPage?

3       A.   No.  I believe that was after.

4       Q.   Okay.  Exhibit No. 11, Keith, do you

5   recall how the potential consortium with -- well,

6   strike that.

7            Do you recall this e-mail, this e-mail

8   communication?

9       A.   Which one are you looking at?

10      Q.   The one dated February 28, 2014.

11      A.   Okay.  Can you ask the question --

12      Q.   Do you remember this e-mail at the bottom

13  half of the first page from Mary Sullivan to you

14  discussing the results from the board meeting?

15      A.   I don't recall this, but obviously, it

16  happened.  And I wouldn't expect to recall

17  everything from back then.  So I'm --

18      Q.   Do you recall ever trying to enter into a

19  proposed consortium with an entity called The

20  Southern Illinois Collegiate Common Market?

21      A.   No.

22      Q.   Do you recall who Mary Sullivan was

23  affiliated with?

24      A.   Oh.  Now, I remember when you say

Page 59

1   Mary Sullivan.  She was a consortium herself.  So I

2   just didn't recognize the name that you said.

3          So what they were is a consortium of

4   school -- of other schools.  She wasn't a school.

5   She was a consortium of schools that had like five

6   other schools in her consortium.

7          So we did speak to her about almost like

8   joining her consortium and being able to provide --

9   because she did surgical tech programs in the other

10  schools.  And she may have done some other types of

11  programs, too, but she did several surgical tech

12  programs.

13         So it's a natural progression for surgical

14  techs to go on to become surgical assistants at

15  some point.

16         And it may even develop her program

17  further, because some people may not go to school

18  to become a surgical tech and have an outcome of,

19  say, $42,000 a year, which is the national average,

20  but they may enter into a surgical tech program,

21  knowing that they can go on to a surgical assisting

22  program and make upwards of $200,000 a year.

23     Q.   Back to Mary Sullivan, she was a con -- I

24  think you said she was a consortium?

Page 60

```
 1      A.   Yes.

 2      Q.   Was she --

 3      A.   She owned the consortium.

 4      Q.   Was she the equivalent of Dan Bump for

 5   surgical techs?  Did she have her own corporate

 6   entity that --

 7      A.   I don't remember.

 8      Q.   -- provided surgical tech programs to

 9   academic institutions?

10      A.   So if I'm remembering right, she would go

11   to -- it would be like our original -- with

12   College of DuPage, the original idea that they

13   would have a program for surgical assistants that

14   would be run by ACE.

15           Well, that's what she did.  Different

16   colleges had surgical tech programs that was run by

17   her.  So they didn't have to have any staff to

18   teach the course.  She had staff that did that.

19      Q.   Okay.  Do you remember having any

20   communications with Mary Sullivan?

21      A.   Yeah, on several occasions.  I know there

22   was -- we originally spoke with her on the phone --

23   we never met with her in person.  It was all over

24   the phone.
```

1       We originally spoke with her on the phone.

2  She really liked the idea.  I really don't know --

3  I don't remember why -- I mean, I know that there

4  was a reason why that she didn't want to move

5  forward.

6       I don't know if the individual colleges

7  didn't want a surgical assisting program or she

8  thought that was going to be too much for her, but

9  I know there was some discussion around those two

10  issues.

11      Q.   Do you remember when you first spoke with

12  Mary Sullivan?

13      A.   I don't.

14      Q.   Do you remember if it was before any --

15      A.   It was after.

16      Q.   -- interaction with College of DuPage or

17  afterwards?

18      A.   It was after.

19      Q.   It was after?  All right.  In connection

20  with the discussions, Mr. Bump, between ACE and the

21  Illinois Central College, did ACE supply Illinois

22  Central College with ACE's curriculum?

23      A.   Like the master curriculum or the -- I'm

24  pretty sure we provided them with the program

1  catalog but not the master curriculum.

2      Q.   All right.  And do you recall if ACE

3  required a confidentiality agreement to be entered

4  into with the Illinois Central College before ACE

5  transmitted the program catalog?

6      A.   No.

7      Q.   Did ACE ever communicate to the Illinois

8  Central College that the program catalog was

9  confidential to ACE?

10      A.   No.  I didn't.  Kyle Black may have, but

11  he was communicating with them.

12      Q.   Was Kyle Black an employee of ACE?

13      A.   No.

14      Q.   Do you recall any instances in which ACE

15  communicated to the Illinois Central College that

16  the program catalog was confidential ACE

17  information?

18      A.   Not that I recall.

19      Q.   Do you recall if ACE transmitted its

20  self-study to the Illinois Central College?

21      A.   We did not.

22      Q.   You did not.  Did ACE transmit any

23  information relating to budgetary information to

24  the Illinois Central College?

Page 63

1     A.   We did not.

2     Q.   Did ACE transmit the ACE workbook to

3  Illinois Central College?

4     A.   We did not.

5     Q.   Did ACE grant on-line access to ACE's

6  web-based platform to the Illinois Central College?

7     A.   No.

8     Q.   How about communications with

9  Mary Sullivan?

10     Did ACE transmit the program catalog to

11  Ms. Sullivan?

12     A.   The catalog, yes.

13     Q.   Did ACE require a confidentiality

14  agreement be in place before transmitting the

15  program catalog?

16     A.   No, not that I recall.

17     Q.   Did ACE communicate in any way that the

18  information in the pro -- contained in ACE's

19  program catalog was confidential information to

20  ACE?

21     A.   Not that I recall.

22     Q.   Did ACE transmit the master curriculum to

23  Mary Sullivan?

24     A.   No.

Page 64

1        Q.   Did ACE transmit ACE's self-study to
2   Mary Sullivan?
3        A.   No.
4        Q.   Did ACE transmit any information -- any
5   budgetary information to Mary Sullivan?
6        A.   No.
7        Q.   Did ACE transmit ACE -- or the ACE
8   workbook to Mary Sullivan?
9        A.   No.
10       Q.   Do you -- did ACE grant on-line access to
11  ACE's web-based platform to Mary Sullivan so she
12  could view it?
13       A.   No.
14       Q.   Do you recall how ACE first came into
15  contact with the College of DuPage?
16       MR. ROCHE:  Well, actually, let's take a break.
17                   (A short break was taken.)
18  BY MR. ROCHE:
19       Q.   Keith, prior to the proposed -- well,
20  prior to the first meeting with the College of
21  DuPage, aside from Illinois Central College and
22  Mary Sullivan and her consortium, and then, the
23  other institution you referenced earlier, had ACE
24  been involved in any discussions with any academic

Page 65

1   institution about entering into a proposed

2   consortium?

3        A.   Not since I had been there.  I know that

4   they may have talked to other colleges before I had

5   been there but not since I had been there.

6        Q.   Not since April -- approximately April of

7   2012?

8        A.   Is it April 2 --

9        Q.   When you first joined ACE.

10       A.   Oh.  Correct.  Yes.  I'm sorry.  I take

11  that back.  My memory lapse just fixed itself.

12            I was talking with -- in Virginia,

13  Fortis -- Fortis College, but it was a back and

14  forth.  It never came to anything either.  So --

15       Q.   Can you spell it?

16       A.   F-o-r-t-i-s.

17       Q.   And you were in communications with

18  individuals at Fortis prior to the first

19  interaction with --

20       A.   Correct.

21       Q.   -- the College of DuPage?

22       A.   Yes.

23       Q.   During any of those communications,

24  Mr. Bump, were there ever any discussions of the

Page 66

1   approval process that Fortis would have to go

2   through to enter into a consortium with ACE?

3       A.   They had set up a meeting for me to meet

4   with the campus president.

5            And then, there were some staff changing

6   at the lower level.  So the person that I was

7   talking with wasn't in charge of that anymore.  So

8   it just kind of fell through.

9       Q.   And was that the extent of --

10      A.   That was --

11      Q.   -- your communications with Fortis?

12      A.   The only thing I ever communicated with

13  them was that proposal that you saw for Illinois.

14  There was never any like program catalog or

15  anything that got sent to them.  So it was very

16  early stage conversation.

17      Q.   Was there ever any discussion about the

18  internal approval process that Fortis would have to

19  embark upon if it were to enter into --

20      A.   Other than --

21      Q.   -- consortium with ACE?

22      A.   I'm sorry.  Other than that I would need

23  to meet with the president next.

24           The person that I spoke with liked the

1  concept, but he would put me in touch with the

2  president.  And there was an appointment set up,

3  again, but it kind of fell through.

4      Q.   Let's discuss ACE's relationship with COD.

5  How did ACE first come -- become aware that COD was

6  interested in a surgical assistant program?

7      A.   Well -- so there was never any awareness

8  that they were interested in a program.

9          It was because we were involved with

10  YEHSS, Kyle Black put Kim Watterson -- go out and

11  meet with some people at colleges and find out if

12  there's any interest.  You know, here's what we're

13  trying to do.  See if you can make some

14  appointments and Keith and I will meet with them.

15          And she's the one that got all the

16  appointments with those colleges that we met with

17  in the central Illinois area.

18      Q.   What was Kim's role at YEHSS again?

19      A.   She was one of the outsourced surgical

20  assistants, but I guess she had some -- I mean, she

21  had grown up there.  She knew a lot of people in

22  the area.

23          So she had some contacts that were able to

24  get her in touch with the right people.  I don't

Page 68

1    know who those contacts are.  So --

2         Q.   Did you and Kyle travel and meet with

3    Kathy Cabai in November 2013?

4         A.   Yes.

5         Q.   Prior to the meeting with Kathy Cabai, had

6    you had any communications with Kathy?

7         A.   Not other than what the -- when Kim

8    reached out to her.

9         Q.   You, personally?

10        A.   No.

11        Q.   No?

12        A.   No.  I didn't know who she was.

13        Q.   Any communications via e-mail?

14        A.   No.

15        Q.   Telephone?

16        A.   No.

17        Q.   Okay.  Describe to me this meeting -- do

18   you recall the date?

19        A.   November 19th.

20                    (Whereupon, KB Deposition

21                    Exhibit 12 was marked for

22                    identification.)

23   BY MR. ROCHE:

24        Q.   Keith, this is Exhibit 12.  Did you

Page 69

1   prepare this document?

2       A.   No.  This was actually prepared by

3   Maggie Parrish, but with all -- she wrote it, but

4   with all the -- with some direction from me and all

5   the e-mails that I had forwarded to her at the time

6   when we started on this.

7       Q.   Describe this document for me.

8       A.   It's basically a walk-through -- a time

9   line of important things that happened, when they

10  happened, and e-mails that we should look at on our

11  server if we needed to look back to or remind

12  ourselves of that incident.

13      Q.   The third col -- the third line -- the

14  third row, I guess, is 1-3nov.doc?

15      A.   Right.

16      Q.   Do you see that?

17      A.   Yes.

18      Q.   What does 1- -- what does that stand for?

19      A.   So we just numbered the documents.  And

20  now, looking back at it, I wish we'd numbered it

21  like the date, because those are not the dates.

22      Q.   So the 1-3november.doc, that doesn't

23  reference a communication or anything on

24  November 3rd --

Page 70

1      A.    No.

2      Q.    -- is that right?

3      A.    No.

4      Q.    Okay.  Let's go back.  The first meeting,

5   I believe you testified, was November 19, 2013?

6      A.    Yes.

7      Q.    Who was present during this meeting?

8      A.    Kathy Cabai, myself, and Kyle Black.

9      Q.    Do you recall where this meeting occurred?

10      A.    So she gave -- when we first arrived, she

11   gave us a tour of the surgical tech kind of area

12   where they teach the surgical techs.

13            And then, we went into -- I believe it was

14   like one of their teaching rooms.  It wasn't her

15   office, because it was too small.  One of the

16   teaching rooms.  So it had equipment set up that

17   they would use to teach their surgical techs.

18      Q.    The meeting occurred at College of

19   DuPage's --

20      A.    Yes.

21      Q.    -- campus?

22      A.    Yes.

23      Q.    What was discussed?

24      A.    So it's -- basically, we just went through

Page 71

1    the presentation that you saw for Illinois State

2    College.  We just walked right through it and

3    talked about --

4         Q.   Are you referring to the proposal?

5         A.   Yes.  So that was set up as a presentation

6    on my laptop, as well, or on my iPad.  I don't

7    remember which one I used, but we basically walked

8    through there, the benefits of -- and she already

9    knew the benefits of a surgical assisting program,

10   because she was an RNFA.  And so she knew the

11   benefits.

12             She liked the idea of not having to come

13   up with it from scratch, that they can take an

14   existing program and be able to use that, rather

15   than having to -- I mean, it's a monumental task to

16   start from scratch and build a program.

17             And then, the end result was that she was

18   going to schedule an appointment with the associate

19   dean, Karen -- I can't remember Karen's last name

20   off the top of my head but --

21        Q.   Was it Karen Solt, S-o-l-t?

22        A.   Yeah, Solt.  Yes.  And so that was

23   something she was going to do.  And I was probably

24   going to have to come back, because I live in

Page 72

1    Virginia, and of course, it's in Illinois.

2           And before we even left the parking lot,

3    she called me and said, hey, we got you an

4    appointment tomorrow so that you can meet with her.

5           So we shifted our schedule around, because

6    we had some other meetings that next day.  So we

7    shifted around to be able to meet with them the

8    next morning.

9        Q.   For the November 19th meeting, was there

10   any discussion about the approval process that the

11   College of DuPage -- that Kathy would have to

12   obtain in order to enter into a consortium with

13   ACE?

14       A.   Typically, on a first meeting, you don't

15   talk about the whole approval process.  You talk

16   about next steps.  And so the next step was the

17   meeting with the associate dean.

18       Q.   On November 20th?

19       A.   Yes.  That wasn't set when we left her

20   office, but she called us before we left the

21   parking lot and said we're meeting tomorrow.

22       Q.   Was -- during the November 20th meeting

23   with Karen Solt, Kathy Cabai, yourself, and

24   Kyle Black, was there a discussion about the

Page 73

1    approval process that Kathy Cabai would have to go

2    embark upon in order to have this consortium go

3    forward?

4        A.   Well, the only other step would be to get

5    it approved by the dean, and then, of course,

6    putting the -- putting it through the College

7    system to get the -- now, are we talking about

8    getting the curriculum approved or are we talking

9    about getting the idea to move forward approved?

10       Q.   Both.

11       A.   There's two different things there.

12       Q.   Both.  And my question is, were there

13   any -- do you recall any discussions during the

14   November 20th meeting about getting the curriculum

15   approved and getting also the internal approvals

16   necessary?

17       A.   So the internal approvals necessary would

18   be -- the only thing next would be getting it

19   approved by Tom, the dean.

20            So you've got Kathy, which is the program

21   director, and you've got Karen, which is the

22   associate dean, and then, you've got Tom -- I can't

23   remember his name off the top of my head, but he's

24   the dean.

Page 74

1          So after the meeting -- we talked about

2     getting the meeting with Tom.  And then, after

3     that, if I can look at my -- there was a Skype

4     call --

5          Q.   Yes.

6          A.   -- that was going to be arranged.

7          Q.   Yes.

8          A.   So that was the next piece of the

9     approval.

10         Q.   Was there -- just focus on the question,

11    if you don't mind, but during the November 20th

12    meeting, was there a discussion about --

13         A.   The whole approval?

14         Q.   -- Kathy Cabai needing to obtain approval

15    from Tom Cameron to move forward with the ACE

16    program?

17         A.   Yes.

18         Q.   During -- and that discussion did not

19    occur at the November 19th meeting, is that right?

20         A.   No.

21         Q.   The first time any discussions about any

22    approval requirements, that occurred during the

23    November 20th meeting?

24         A.   Other than the next step being meeting

Page 75

1   with the -- correct.

2        Q.   With Karen?

3        A.   Correct.

4        Q.   Okay.  So let's now go discuss the

5   November 20th meeting.  Who was present at that

6   meeting?

7        A.   All I remember, as far as who was present,

8   were probably the people that spoke.  And I don't

9   know if there was any -- because it didn't end up

10  being a Skype call.  So nobody was on face-to-face.

11  So it ended up being just a conference call.

12            So the only people I remember would be

13  myself, Kyle Black, Dan Bump, Kathy Cabai,

14  Karen Solt, and Tom.  And I believe there was -- it

15  seems like there was someone else.

16       Q.   Are you referring to the conference call?

17  I'm -- or is this what happened on November 20th?

18       A.   No, no, no.  I'm sorry.  I thought you had

19  asked --

20       Q.   No.  I want to know about --

21       A.   -- who was present --

22       Q.   -- everything about the November 20th

23  meeting.

24       A.   Okay.  I'm sorry.

Page 76

1     Q.   So let's --

2     A.   I thought we had moved forward.

3     Q.   No, I apologize.  I apologize.  So

4  November 20th, did you meet at the College of

5  DuPage again?

6     A.   Yes.

7     Q.   Who did you meet with?

8     A.   Karen -- it was Kyle Black, Karen Solt,

9  myself, and Kathy Cabai.

10     Q.   What was discussed?

11     A.   Basically, the same thing.  So we just

12  reiterated everything that we spoke about in the

13  19th meeting so that the associate dean could hear

14  the same information.

15     Q.   Did you present the proposal --

16     A.   Yes.

17     Q.   -- to Karen Solt?

18     A.   Yes.

19     Q.   What was her reaction?

20     A.   She loved the idea, but it needed to be

21  discussed with Tom.

22     Q.   Did -- do you recall -- strike that.  Were

23  there any discussions about obtaining approval from

24  the board of trustees at the College in order to

Page 77

1    move -- in order to enter into a consortium with

2    ACE?

3        A.   We didn't get -- we didn't have that

4    discussion that day.

5            I remember there being a discussion

6    about -- from Kathy Cabai about a board of trustees

7    meeting.  And Kyle Black and I were going to be

8    there for that, but that was later in -- a little

9    bit later in the process.  I'd have to look here

10   and see.  Do you want to move to that or --

11       Q.   No.

12       A.   Okay.

13       Q.   During the November 20th meeting, were

14   there any discussions about the College needing to

15   obtain approval from the legal department to enter

16   into a consortium with ACE?

17       A.   No, only on language.  So --

18       Q.   What do you mean by that?

19       A.   They need -- the legal department would

20   look at the language of the contract, just to

21   protect and make sure that we're not putting any

22   language in that would hurt the College, not

23   that -- that Tom was the approval for the actual

24   program and legal just has to approve the language

Page 78

1    of the contract.

2        Q.    That discussion occurred during the

3    November 20th meeting?

4        A.    No.  No.  I don't --

5        Q.    It didn't?  Did it occur --

6        A.    They really just said we have to run it

7    through legal.

8        Q.    Did it occur at some point in time?

9        A.    I think the only time that it occurred was

10   when we asked for the contract.

11       Q.    When was that, if you remember?

12       A.    Well, we sent -- I sent it to them

13   originally on -- right after the first meeting,

14   because they asked for all that stuff.  And then --

15   I don't remember the date.  Dan resent it to them.

16            And then, we asked for the contract before

17   Kathy was coming to the lab.  And the two things

18   that -- it was still going through legal and that

19   Karen was out of town was the reason they weren't

20   going to be able to get it to us before the lab.

21       Q.    Back to the November 20th conversation, do

22   you recall anything else that was discussed?

23       A.    No, it was just that proposal.  That's why

24   I have those things, so that I can go back and

Page 79

1    remember -- you know, I don't like to discuss

2    things like that without any bullet points, so I

3    know what I discussed, I don't go off of the script

4    for that.

5        Q.   Let's go back to the complaint in this

6    case, which is Exhibit 2.  And if you could turn to

7    Exhibit A.

8             Do you recall sending that e-mail on or

9    about November 21st --

10       A.   Yes.

11       Q.   -- 2013, Keith?

12       A.   Yes.

13       Q.   And what -- you'll notice that there were

14   some attachments to this e-mail you sent?

15       A.   Correct.

16       Q.   Can you identify what those attachments

17   were?

18       A.   It was the proposal, the consortium

19   agreement, and I'm trying to remember what else.

20   The non-disclosure and the ACE master curriculum

21   and the program catalog.

22       Q.   Where does it identify the

23   non-disclosure --

24       A.   I --

Page 80

1      Q.    -- PDF?

2      A.    As far as -- I know it's in the wording.

3    So I didn't -- when I re-looked at the e-mails, I

4    saw that there was a non-disclosure attached to

5    this, but I didn't have that attachment.  Does it

6    not say that in the e-mail or --

7      Q.    No, it does not.  The e-mail attached as

8    Exhibit A to the complaint has collegeofdupage.pdf.

9    Do you see that?

10     A.    Okay.  Yes.

11     Q.    Do you know what document that was?

12     A.    That's the proposal.

13     Q.    If you turn to the next page, is that the

14   document --

15     A.    It is.

16     Q.    -- you're referring to?

17     A.    Yes.

18     Q.    The next PDF is the consortium agreement.

19   Do you see that?

20     A.    Yes.

21     Q.    Is that the written contract that we've

22   discussed?

23     A.    Well, I think probably because the

24   non-disclosure might have been included in the

Page 81

1    consortium agreement, like a non-compete.

2            I haven't reviewed that.  So I'm not

3    100 percent sure on that.  I'm just looking at the

4    walk-through.  It says consortium agreement,

5    non-disclosure, ACE master curriculum, and

6    ACE program catalog.

7        Q.   You're referring to Exhibit 12?

8        A.   Yes.

9        Q.   So Keith, is it your testimony as you sit

10   here today that the non -- that a non-disclosure

11   agreement was part of this attachment that was sent

12   on or about November 21, 2013?

13       A.   That's what are in my notes.  I can't

14   remember that far back.  So we have notes.  So I'm

15   assuming that the notes are correct.  And it would

16   be a standard practice to send that at the time

17   when we're sending the information that we sent.

18       Q.   Well, you testified earlier that the --

19   when you sent the program catalog to the Illinois

20   Central College, you did not request a

21   confidentiality agreement or a non-disclosure

22   agreement.  Do you recall that testimony?

23       A.   I do.

24       Q.   Do you also recall the testimony that when

Page 82

1   you sent the program catalog to Mary Sullivan, you

2   did not request a non-disclosure agreement?

3        A.   I do.

4        Q.   I'd have to show you -- give me a second

5   here.  Could you turn to Exhibit 3, Keith?

6        A.   Could you remind me what that is?

7        Q.   Yeah.  It's your -- or it's ACE's response

8   to College of DuPage's first request for production

9   of documents.

10            If you'd turn to Page 3, Request No. 9,

11   that's all attachments to the e-mail attached as

12   Exhibit A to the complaint.  Do you see that?

13       A.   Give me a second.

14       Q.   Sure.

15       A.   Okay.

16       Q.   Do you see the answer, ACE1001 through

17   1068?

18       A.   Yes.

19       Q.   Okay.  If you could look at Exhibit 6 to

20   your deposition, Keith, which is the program

21   catalog and the master curriculum and just identify

22   at the bottom of the page the Bates label.

23       A.   At the front?  In the front?

24       Q.   Yeah, the first page through the end.

Page 83

1      A.    ACE0001, ACE 0 -- excuse me.  1058.

2      Q.    Is there a non-disclosure agreement

3  anywhere in those documents?

4      A.    No.

5                         (Whereupon, KB Deposition

6                         Exhibit 13 was marked for

7                         identification.)

8  BY MR. ROCHE:

9      Q.    I'll show you what's been marked as

10 Exhibit 13.

11          Is there a non-disclosure agreement in

12 those doc -- in that exhibit?

13     A.    Can you give me a minute?

14     Q.    Sure.

15                        (Whereupon, KB Deposition

16                        Exhibit 14 was marked for

17                        identification.)

18     THE WITNESS:  No.

19 BY MR. ROCHE:

20     Q.    Let's look at Exhibit No. -- well, what is

21 that document?  Do you recognize that document?

22     A.    The consortium agreement.

23     Q.    Why don't you take a look at Exhibit --

24 and can you identify the Bates numbers for that for

Page 84

1 the record?

2     A.   That is ACE1059 through ACE1062.

3     Q.   I'll show you what's been marked as

4 Exhibit 14. Do you recognize that document?

5     A.   Yes. It's the consortium proposal.

6     Q.   And can you identify it by Bates number,

7 the contents -- or the range of the consortium

8 proposal?

9     A.   ACE1063 through ACE1068.

10     Q.   Is there a non-disclosure agreement within

11 that consortium proposal?

12     A.   No, there is not.

13     Q.   Let's go back to Exhibit A to the

14 complaint, Keith.

15        In this e-mail, do you state that the

16 material contained in the attachments is

17 confidential information to ACE?

18     A.   Yes.

19     Q.   And where is that?

20     A.   Do I -- oh. Do I state it in the e-mail.

21 I'm sorry. I didn't understand the question.

22     Q.   I'm sorry.

23     A.   No, I do not.

24     Q.   Did you communicate it on or around the

Page 85

1    time you sent this e-mail, Keith, to Kathy and

2    Karen that the information contained in the

3    attachments was confidential ACE information?

4         A.   I don't recall whether I did or not.

5         Q.   All right.  Back to the November 20th

6    meeting.  Just a few questions.

7              During this meeting, do you recall, Keith,

8    if you gave any ACE -- strike that.

9              Do you recall during the November 20th

10   meeting if you provided to Kathy or Karen any

11   hard-copy materials of any ACE documents?

12        A.   I don't believe I did.  And that's why I

13   followed up with this e-mail, so they could have

14   the information that they -- the additional

15   information that they wanted.

16        Q.   Do you recall Kyle Black ever providing

17   hard copies or handouts of --

18        A.   On the 20th?

19        Q.   During the November 20th meeting, yes.

20        A.   The only handouts we would have -- now, I

21   believe I did have a consortium agreement with me.

22   So they probably did get a consortium agreement and

23   this consortium proposal.  So those are the only

24   two things we would have given them hard copies of.

Page 86

1     Q.   At the November 20th meeting?

2     A.   Yes.

3     Q.   How about the November 19th meeting?  Do

4  you recall giving any hard-copy materials of any

5  ACE documents during that meeting?

6     A.   I don't have exact recollection, but I

7  believe we would have given them the consortium

8  proposal.

9     Q.   Do you remember if Kyle gave any ACE

10  hard-copy documents, other than the proposal,

11  during the November 19th meeting?

12     A.   No, he wouldn't have given them anything,

13  other than what I would have given them.

14     Q.   During the November 19th meeting, do you

15  recall Kathy Cabai telling you her position at the

16  College of DuPage?

17     A.   Yes.

18     Q.   And what did she tell you?

19     A.   She's the program director for the

20  surgical tech program.

21     Q.   During the November 20th meeting, do you

22  remember Karen Solt telling you what her position

23  at the College of DuPage was?

24     A.   I don't know if she told me -- us directly

1  or Kathy told us that she was the associate dean

2  for the health science department.

3      Q.   During the November 19th meeting with

4  Kathy Cabai, was there any discussion about who

5  would actually be teaching the lab for the ACE/COD

6  consortium?

7      A.   The original proposal included Dan.  So we

8  did discuss that, that ACE would do basically

9  everything and all they would do is keep records

10  for their students and present a certificate at the

11  end of the program.

12      Q.   What about the November 20th meeting?  Was

13  there ever any discussion about who would be

14  teaching the lab?

15      A.   I think it didn't change.  Nothing changed

16  between November 19th and November 20th.  I don't

17  know at what point that discussion started taking

18  place that she wanted to teach the lab.

19      Q.   Let's move on to the third time you were

20  in contact with the College of DuPage.

21          And I think you testified that was --

22  occurred on a conference call with Karen, yourself,

23  Kathy, Kyle, Tom Cameron, and another person, whose

24  name --

Page 88

1      A.   Yeah, I don't --

2      Q.   -- I don't believe you recall?

3      A.   I don't remember who that other person

4    would have been.

5      Q.   Would that person have been Jean Kartje?

6      A.   That name doesn't sound familiar.

7      Q.   Do you recall what --

8      A.   It's possible but --

9      Q.   Sure.  Do you recall whether it was a male

10   or a female?

11     A.   I don't.

12     Q.   Do you recall what position he or she held

13   at the College of DuPage?

14     A.   No.  It just seemed like there was another

15   person that I couldn't remember.

16     Q.   Do you remember the date when this

17   telephone conference call occurred?

18     A.   I'm trying to look for that walk-through.

19   Here it is.  December the 5th.

20     Q.   You're going back to Exhibit 12, right?

21   Is that what --

22     A.   Yes.

23     Q.   -- you're using as a reference?

24     A.   Yes.

Page 89

1      Q.   Do you recall what was discussed during

2   this call?

3      A.   There was discussion of -- and I have a

4   vague recollection of that, but it seems to me the

5   delivery of the on-line program was the biggest

6   discussion.

7      Q.   What do you mean by that?

8      A.   Because we have a -- we have a

9   custom-built delivery system that we use for our

10  students.  And the college uses Blackboard.

11         So if I remember correctly, that was --

12  the biggest part of that discussion was how we were

13  going to integrate with their Blackboard.

14         I'm not 100 percent sure, because it

15  was -- again, it was over three years ago so -- and

16  I know that there was going to be more

17  after-discussion.

18         So we discussed some things, and then,

19  they were going to -- you know, after we hung up,

20  they were going to continue the meeting to discuss

21  some -- discuss further.

22     Q.   Did they identify what they were intending

23  to discuss further?

24     A.   I don't remember, but I do remember

Page 90

1    sending an e-mail to Karen to ask how the

2    after-discussion went.  And she said their

3    discussion was great and they were ready to move

4    forward on their side.

5        Q.   Was this the first time that you ever

6    interfaced with Tom Cameron?

7        A.   Yes.

8        Q.   Did Tom Cameron tell you what his position

9    was at COD?

10       A.   I don't know if he -- I think there were

11   some introductions.

12            So it may have happened at that time, but

13   I think we already knew that through the

14   conversation with Karen and Kathy, because they

15   said that we were going to have to have Tom in the

16   conversation, because he was the dean of the health

17   science department.

18       Q.   Were the terms outlined in the written

19   consortium agreement discussed during this

20   conversation?

21       A.   I don't recall.  I don't recall whether it

22   was or not.

23       Q.   Did ACE make an offer during this

24   conference call?

Page 91

1      A.    I think the offer had already been made.

2      Q.    What did the offer consist of?

3      A.    What we had discussed earlier, that they

4   would charge the $6,900 for the program, and then,

5   ACE would be doing basically all the work and we

6   would get 4,400 of that.

7      Q.    Do you recall any other terms of the -- of

8   ACE's offer?

9      A.    No.

10     Q.    Was there ever a discussion about this --

11  whether the enrollment would be on a semester basis

12  or a monthly basis?

13     A.    Well, I think we knew it was going to be

14  on a semester basis, because they're set up that

15  way.

16          I'm sure there was discussion.  I don't

17  know when that happened, but it probably happened

18  prior to December, because Kathy was restructuring

19  the curriculum over Christmas break.  So it had to

20  have happened before that so -- but I don't know

21  the exact date or if it was in this conference

22  call.

23     Q.    Okay.  Let's go to Exhibit 13, which is

24  the consortium agreement, Keith.  If you could look

Page 92

1    at the second page, 1060, which is the Bates

2    number.

3            Was there any discussion during this

4    conference call on December 5th about the number --

5    if you look at -- under Heading 3, Paragraph 2, was

6    there any discussion about agreement on the number

7    of students to enroll during the December 5th

8    conference?

9        A.   So I don't really understand the question.

10   The number of students to enroll or what the

11   expectation was?  I'm not sure --

12       Q.   Was there ever a discussion -- just a

13   discussion on whether -- you know, the number of

14   students that would enroll during the November --

15   December 5th conference call?

16       A.   I don't think, at that point, no.

17       Q.   Was there any discussion about what's set

18   forth in Paragraph 5 concerning ACE's right to

19   contract with other colleges during this

20   December 5th conference call?

21       A.   I'm not sure if -- there was a discussion,

22   but I'm not sure if it was in the December 5th

23   conference call or if it was in a later follow-up

24   call.

Page 93

1          The discussion was about their concern

2    that if we had other colleges in the area on -- in

3    an agreement that there would be not enough

4    clinical space to handle that.

5          And when I say clinical space, as part of

6    the program, the students have to do clinicals in a

7    hospital.  So they didn't want to be fighting over

8    that with another college that was -- they didn't

9    want us to create competition for them for clinical

10   space.

11      Q.   If you look at Paragraph -- or Heading 4,

12   Paragraph 2, it states that the College will pay

13   ACE the amount of 4,380.  Do you see that?

14      A.   I do.

15      Q.   Okay.  Was there any discussion about that

16   amount being charged to COD during the December 5th

17   conference call?

18      A.   I don't know that it was in the conference

19   call, but the only time that that discussion

20   started taking place was after Kathy wanted to

21   teach the lab, which is understandable, because if

22   she's going to be doing the work, then we should

23   receive less.  If we're doing all the work, then we

24   should receive what the original agreement was.

Page 94

1      So I don't remember if that was during

2   that call or at an earl -- we may have touched on

3   it in an earlier or later discussion, but I don't

4   know if it was on this call or not.

5      Q.   Okay.  If you look at Paragraph -- well,

6   Heading 5, was there any discussion during the

7   December 5th, 2013 telephone call about any

8   paragraphs in the term and termination provision of

9   this consortium agreement?

10     A.   Not that I remember.  I don't remember

11  even being involved in any conversation that had to

12  do with that.

13     Q.   Was there any discussion during the

14  December 5th, 2013 conference call about the

15  approval process that COD had to embark upon in

16  order to get the ACE consortium up and running?

17     A.   I don't think, at that point, no.

18     Q.   Were you aware or did you become aware at

19  the -- during this December 5th conference call

20  that the College of DuPage was partly funded by the

21  State of Illinois?

22     A.   I guess I don't know that that was ever

23  discussed, but I assume -- it was assumed, because

24  they're a State college.

Page 95

1      Q.   Was there any discussion during this

2  December 5th conference call that the College of

3  DuPage had to obtain approval from the Illinois

4  State Regulatory Authorities, the Illinois

5  Community College Board in order to get the ACE/COD

6  consortium program in place?

7      A.   I don't think that it was at that point,

8  but in an e-mail about the after-discussion, it was

9  stated that we're good to go on our side, we're

10  just going to have Kathy run the curriculum through

11  the -- I think it's the ICCB.  It's the State.

12          Well, they have to run it through the

13  College first.  And once it's approved by the

14  College Board, then it goes to the State Board.

15      Q.   All right.  Let's look at the next

16  exhibit.

17                      (Whereupon, KB Deposition

18                      Exhibit 15 was marked for

19                      identification.)

20  BY MR. ROCHE:

21      Q.   Actually, just a little bit -- one

22  question on this.  I'll show you what's been marked

23  as Exhibit 15, Keith.  It's an e-mail thread dated

24  November 21st, 2013.

Page 96

1          I'd simply direct your attention to the

2    e-mail from Kathy to you in the middle of the first

3    page.  And then, she concludes the e-mail by saying

4    can you please tell me what the credentials are of

5    the folks teaching the on-line course portions.

6          Did you tell Kathy Cabai that a teacher

7    would be teaching the on-line course for the

8    ACE/COD consortium?

9       A.   I don't think I -- I don't think that was

10   ever discussed.

11                       (Whereupon, KB Deposition

12                       Exhibit 16 was marked for

13                       identification.)

14   BY MR. ROCHE:

15      Q.   I'll show you what's been marked as

16   Exhibit 16 to your deposition.

17          Do you consider the date of contract to be

18   December 9th, 2013 because of what Karen Solt said

19   in this e-mail at the top of the first page of this

20   exhibit?

21      A.   I believe so, yes.

22      Q.   Would you agree that Karen Solt in this

23   e-mail notes that the College of DuPage needs to

24   obtain additional approvals in order to get the

Page 97

1   ACE/COD consortium agree -- or surgical assistant

2   program in place?

3      A.   So I would agree that the contract date

4   that was -- that I assume is dated November the 9th

5   would be contingent upon that approval.

6      Q.   That wasn't my question.  My question was,

7   were you aware on December 9, 2013 that the College

8   of DuPage had to obtain additional approvals in

9   order to get the ACE/COD surgical assistant program

10  approved?

11     A.   Yeah, she made me aware of that in this

12  e-mail.

13     Q.   Ms. Solt states that -- in the second

14  sentence that that consists of putting the

15  curriculum through our College process.

16          Do you have an understanding of what

17  Karen Solt meant by the phrase College process --

18  putting the curriculum through the College process?

19  Do you know what she meant by that?

20     A.   Just the approval process.  I don't know

21  what their --

22     Q.   What was -- at this time, in the best of

23  your recollection, what do you recall that approval

24  process being?

Page 98

1    A.   Getting it approved by the -- I don't

2  know.  The powers that be at the College.  I don't

3  know whether that's the board or -- Tom had already

4  approved it at that point.  So --

5    Q.   Did the College ever communicate to you

6  that there were a series -- at this time, there

7  were a series of committees that had to approve the

8  curriculum in the surgical assistant program before

9  it could be offered to the students?

10    A.   A series?

11    Q.   Different committees had to approve the

12  surgical assistant program in order to have it

13  offered to students?  Do you recall any discussions

14  about that?

15    A.   I don't know of the specifics about that.

16  They just said the College approval process.

17                    (Whereupon, KB Deposition

18                    Exhibit 17 was marked for

19                    identification.)

20  BY MR. ROCHE:

21    Q.   Before we look at this exhibit, let's go

22  back to Exhibit 16.

23    A.   If you can remind me what that is.

24    Q.   That was the Karen Solt December 9th

Page 99

1    e-mail.

2         Did the College of DuPage and ACE reach an

3    agreement on whether -- at this point in time, the

4    date of the contract, was there an agreement

5    between ACE and the College of DuPage as to whether

6    the enrollment would be on a monthly basis or a

7    semester basis?

8         A.   I think we had -- I think we had agreed

9    that they're a semester system.  So it would have

10   to be enrolled on a semester basis.

11        Q.   That was the agreement that was struck

12   December 9th, 2013?

13        A.   I don't know if we specifically --

14        Q.   That was part of the agreement that was

15   struck on December 9th, 2013?

16        A.   I don't think I could say that definitely.

17        Q.   Was there an agreement on December 9th,

18   2013 as to the fee ACE would receive per student

19   who enrolled in the ACE/COD surgical assistant

20   program?

21        A.   There wasn't any discussion of changing

22   what was in the consortium agreement that we gave

23   them.

24        Q.   And that consortium agreement called for

Page 100

1    ACE to receive a fee of $4,380, is that right?

2        A.    Correct.

3        Q.    And is it ACE's position that the College

4    of DuPage on December 9th, 2013 agreed to that fee?

5        A.    Yes.

6        Q.    Was it -- was there an agreement reached

7    on December 9th, 2013 as to who would be teaching

8    the surgical skills lab?

9        A.    At that time, it was still Dan Bump who

10   was going to be teaching.

11       Q.    The College --

12       A.    To the best of my recollection.

13       Q.    And the College of DuPage agreed to that?

14       A.    They hadn't discussed changing it yet.

15       Q.    Did the College of DuPage agree to

16   allowing Dan Bump to teach the skills lab on

17   December 9th, 2013?

18       A.    Yes.

19       Q.    Was there an agreement reached at this

20   time, Keith, as to the digital platform through

21   which the ACE/COD on-line portion of the surgical

22   assistant program would be taught?

23       A.    No.   No.   That discussion came later, I

24   believe.

Page 101

1    Q.  On December 9th, 2013, was there an

2  agreement as to the admission standards to

3  participate in the ACE/COD surgical assistant

4  program?

5    A.  The same as our admissions standards.

6  They'd have to be a surgical tech, formally

7  trained, OR nurse with two years experience.

8      We even discussed that she was going to

9  put together a perioperative nursing program, which

10  might do away with the two years of operating room

11  experience, because they could get that training.

12    Q.  Is it ACE's position that an agreement was

13  reached on December 9th, 2013 as to what the

14  admission standards for prospective students would

15  be for the ACE/COD surgical assistant program?

16    A.  Yes.

17    Q.  Okay.  Exhibit 17 -- actually, we don't

18  even need to -- I don't need to ask you any

19  questions about that.

20    MR. ROCHE:  What time have we got here?  Anyone

21  getting hungry?  Do you want to order in?

22    MR. DAVIS:  Yeah.

23    MR. ROCHE:  Let's get some menus.

24                  (A short break was taken.)

Page 102

1    BY MR. ROCHE:

2        Q.    Prior to the date of acceptance,

3    December 9th, 2013, did anyone at the College of

4    DuPage communicate to ACE that the legal department

5    had to approve any contract between ACE and COD?

6        A.    No.

7        Q.    Prior to the date of acceptance, at least

8    as ACE alleges, December 9th, 2013, did anyone

9    communicate to ACE that the board of trustees had

10   to approve the surgical assistant program between

11   ACE and the College of DuPage?

12       A.    Not specifically.

13       Q.    Was -- did anyone allude to the idea that

14   the board of trustees would need to approve the

15   ACE/COD surgical assistant program prior to

16   December 9th, 2013?

17       A.    No.

18       Q.    Prior to December 9th, 2013, did anyone at

19   the College of DuPage communicate to ACE that the

20   board of trustees had to approve any contract

21   between ACE and the College of DuPage?

22       A.    No.

23       Q.    Prior to December 9th, 2013, did anyone on

24   behalf of the College of DuPage communicate to ACE

Page 103

1    that the State of Illinois had to approve any

2    ACE/COD surgical assistant program?

3        A.   No.

4                      (Whereupon, KB Deposition

5                      Exhibit 18 was marked for

6                      identification.)

7    BY MR. ROCHE:

8        Q.   Showing you what's been marked as

9    Exhibit 18 to your deposition, do you recognize

10   this document, Keith?

11       A.   No, I don't believe I've ever seen this,

12   unless it was part of -- I might have looked at it

13   when we first filed, but I don't remember looking

14   at this.

15       Q.   This was a document that was initially

16   submitted to the Illinois Community College Board

17   by College of DuPage.

18            Do you recall any discussions you had with

19   anyone at College of DuPage about documents that

20   College of DuPage needed to submit to the Illinois

21   Community College Board?

22       A.   Yes.

23       Q.   And what were those discussions -- when

24   did those -- how many discussions were there, if

Page 104

1    you remember?

2         A.   I don't know that they said specific

3    documents, but they had to submit the program to

4    the State of Illinois.

5              And we got an e-mail about that from

6    Kathy, because there were some issues with the

7    amount of credits that were going to be associated

8    with Semester 1 and Semester 2 and Semester 3 and

9    they weren't even.

10             So she sent us an e-mail that they were

11   being questioned about that and -- with the

12   curriculum that had been submitted to the State and

13   wanted Dan to help her formulate an answer.

14             And the curriculum that was attached that

15   had been restructured for the college system and

16   the semesters mentioned ACE 30 times in the

17   curriculum.

18             And so because it was an ACE program, she

19   wanted Dan to help answer those questions as to why

20   there was 18 credits associated with Semester 1, I

21   believe it was 12 credits with Semester 2, and

22   then, a smaller amount with Semester 3, which was

23   their clinical rotations.

24        Q.   All right.  Let's just turn -- if you

Page 105

1  could scroll to -- it's Bates numbered 2304 in this

2  document, Keith.

3      A.   Am I looking -- I don't -- okay.  Got it.

4      Q.   If you look at Paragraph D, it says

5  accreditation for programs.  Do you see that?

6      A.   Yes.

7      Q.   It provides that the College will be

8  pursuing program accreditation through the

9  Commission on Accreditation of Allied Health

10 Education Programs?

11     A.   Yes.

12     Q.   CAAHEP?

13     A.   Yes.

14     Q.   At this time, was ACE accredited with

15 CAAHEP?

16     A.   No.  And it really didn't determine

17 whether -- even if we were CAAHEP accredited, it

18 wouldn't determine whether the College's program is

19 CAAHEP accredited, because it doesn't transfer.

20          Because they're a different institution,

21 they would have to seek their own CAAHEP

22 accreditation.

23     Q.   In December or November of 2013, do you

24 recall any discussions you had with the College of

Page 106

1    DuPage about CAAHEP?

2         A.   I recall an e-mail.  And I recall -- are

3    you asking -- what was the date range again?

4         Q.   In November and December of 2013.

5         A.   So I discussed it with Kathy on the first

6    meeting, because it's in the presentation.  We

7    talked about ABS approval versus CAAHEP

8    accreditation.

9              And she knew we weren't CAAHEP accredited

10   at that time.  And that's the reason we were

11   seeking out -- what do you call it?  Consortiums,

12   because there's some down-fall to being CAAHEP

13   accredited, because we wouldn't be able to teach

14   surgical techs that are on-the-job trained and we

15   wouldn't be able to teach foreign medical

16   graduates.

17             So we were kind of, you know, do we get

18   CAAHEP accredited and lose that piece and gain a

19   little bit more or is it better to do a consortium,

20   where they can be CAAHEP accredited, we can gain

21   that piece, and not lose this other piece.

22             So that discussion -- maybe not that much

23   in-depth as to why we were looking for a

24   consortium, but the discussion of we were ABS

Page 107

1    approved nationally but not CAAHEP accredited was

2    in the first meeting.

3         Q.   Was ACE previously accredited with CAAHEP?

4         A.   Yes.

5         Q.   Do you recall the years?

6         A.   It was before I came.  It seems like

7    they -- I don't even know.  Even if somebody asks

8    me now, I refer them to Maggie, because she's got

9    all that documentation.

10        Q.   When --

11        A.   Because we do have students that are still

12   graduating from our program that are graduating

13   from a CAAHEP accredited program, because they

14   started before that date.

15        Q.   When ACE was accredited with CAAHEP, do

16   you know if its enrollment -- or the types of

17   students it could enroll was limited to certain

18   categories of medical professionals?

19        A.   Yeah, I think that we did not -- weren't

20   able to accept medical graduates then.

21             Now, we could teach anybody we wanted to

22   in the surgical skill lab, but they couldn't

23   graduate from a CAAHEP accredited program.  So it

24   was limited.

Page 108

1      Q.    I'm sorry.  What?

2      A.    So we could teach anybody we wanted to in

3  just the stand-alone surgical skill lab.

4           So we could teach the medical -- we could

5  teach PAs, nurse practitioners, foreign medical

6  graduates how to do the surgical skills, but they

7  could not do the on-line training and have a place

8  to do their clinicals under the guidance of a

9  CAAHEP accredited program.

10     Q.    When ACE lost its CAAHEP accreditation,

11 was it then able to enroll foreign medical students

12 and I guess medical students and the other types of

13 medical services professionals that you just

14 identified --

15     A.    Yes.

16     Q.    -- into their -- into the full program,

17 the full ACE program?

18     A.    In some cases, some instances.  So a

19 foreign medical graduate would have to be working

20 at a hospital in order to do the full program,

21 unless they could find a place to do their clinical

22 rotations, because we don't provide those sites.

23          They're provided by the student, because

24 it's typically somebody working at a hospital.  So

Page 109

1   they already have the surgeons and the hospital

2   behind them so -- PAs, nurse practitioners, yes.

3       Q.   Okay.  If you could scroll to 2308,

4   please.

5           At the bottom of this page, do you see the

6   chart styled enrollment chart?

7       A.   Yes.

8       Q.   And it asks COD to provide an estimate of

9   enrollments and completions over the first three

10  years of the program?  Do you see that?

11      A.   I do.

12      Q.   And do you see the figure full-time

13  enrollments for first year, 8 to 10; second year,

14  10 to 12; third year, 12 to 15?

15      A.   Yes.

16      Q.   And do you see under the row completions

17  the same numbers?

18      A.   Yes.

19      Q.   Were there any discussions, Keith, in

20  November or December as to the projected amount of

21  students who would enroll in an ACE/COD approved

22  surgical assistant program?

23      A.   Not at that time.  It was at a later date.

24      Q.   When was that?  When did that -- when did

Page 110

1    those discussions occur?

2         A.    I'd have to find the e-mail.  There was an

3    e-mail from Kathy.  Let me see.

4              We discussed the number 200.  And part of

5    that discussion was, we were going to be sending

6    them people, not just they were going to be getting

7    their past graduates, because without being CAAHEP

8    accredited, we lost that piece of business.

9              So for -- we may get six, seven phone

10   calls a month of people that can't enroll in our

11   program, because they're in Texas.  Texas requires

12   CAAHEP accreditation for the licensure for surgical

13   assisting.

14             So we're just turning those people away.

15   Part of the reason we did this was so that we'd

16   have a place to put those people.

17             But here's the e-mail I was going to tell

18   you about.  It's here.  We have sent out e-mails to

19   the last two years' worth of graduates and e-mails

20   are streaming back inquiring when this is

21   happening.  So I mean, there was --

22        Q.    Okay.  Hold on.  Let's -- we'll discuss

23   that e-mail in a minute.

24        A.    Okay.

Page 111

1      Q.   You just testified that when ACE lost its

2    CAAHEP accreditation, it was turning students away

3    from Texas --

4      A.   Yes.

5      Q.   -- I think you alluded to?  A student in

6    Texas would still qual -- well, let me ask it this

7    way.

8           Was a student from Texas who met the --

9    you know, the credentials, whether it was an

10   on-the-job tech or foreign medical students or

11   whoever, who otherwise met the admission standards

12   to participate in the ACE program, could that

13   student still participate and take the ACE program

14   and graduate from the ACE program?

15     A.   Yes.

16     Q.   The difference being that the student

17   would be unable, however, with the ACE certificate

18   to sit to become a certified first surgical

19   assistant?

20     A.   They could get certified, but Texas is

21   unique, because they have a license.  So the State

22   offers a license to surgical first assists that are

23   certified and have an associates degree.

24           So there were two pieces there that the

Page 112

1    College of DuPage would have been able to help

2    with.  They would have been able to provide an

3    associates degree by giving them additional classes

4    that the normal first assist class wouldn't have

5    and --

6        Q.   Did -- go ahead.  I'm sorry.

7        A.   And they would have a CAAHEP accredited

8    program.  So we could drive those Texas students

9    into their program.

10            If Texas people didn't want to go to

11   Chicago to go to the surgical skill lab, they could

12   pick one of our other surgical skill labs to do it

13   that we do throughout the country that might be

14   more convenient to them.  We could administer that

15   part there, and then, they could graduate from the

16   College of DuPage program.

17       Q.   After ACE lost its accreditation with

18   CAAHEP, do you recall instances in which ACE denied

19   admission to prospective students because they were

20   seeking CAAHEP -- because they were in a

21   jurisdiction that required CAAHEP approval?

22       A.   I don't know that denied would be the word

23   but lost that potential student, because they

24   needed a CAAHEP accredited program, whether it's

Page 113

1   because -- so it's not required in the state to

2   have it, the licensure, but many -- not many, but

3   some hospitals require that for their surgical

4   techs.  And a lot of -- excuse me.  Surgical

5   assistants.

6           But a lot of the insurance companies also

7   require it to bill.  So if they're billing

8   separately for their services -- maybe they're an

9   independent surgical assistant and they're working

10  for a couple surgeons at this hospital and they

11  bill for themselves.  It's much easier to get paid

12  if you have that license.

13      Q.   Do you recall any instance, Keith, when a

14  student applied to be -- to participate, to become

15  a student in the ACE surgical assistant program and

16  was denied admission because ACE was not CAAHEP

17  approved?

18      A.   We don't deny them admission.  We advise

19  them that -- do you need the license.  If they say

20  yes, we need the license, then we recommend that

21  they find -- go to the CAAHEP website and find a

22  CAAHEP program.

23      Q.   Okay.  Let's go back to the discussions

24  about the enrollment -- prospective enrollment with

Page 114

1    the ACE/COD surgical assistant program.

2          You discussed this e-mail, and we'll pull

3    that e-mail in a second, but were there -- I

4    believe -- and I may be mistaken, but I believe you

5    indicated that there was another discussion about

6    enrolling 200 people -- prospective students, is

7    that right?

8        A.   Yes.  That was just a phone discussion.

9    It was nothing I can back up with an e-mail.

10       Q.   Who was on that phone conversation?

11       A.   Kathy Cabai.

12       Q.   And yourself?

13       A.   Yes.

14       Q.   Were there any other people on that

15   telephone call?

16       A.   I think Kyle Black might have been on it.

17       Q.   Do you remember when that discussion

18   occurred?

19       A.   It was around the same time of this May 6

20   e-mail.

21       Q.   What, specifically, did Kathy Cabai tell

22   you, to the best of your recollection?

23       A.   We talked about how many students that

24   they have had run through their program in the past

Page 115

1    and how many of those people had asked about

2    surgical assisting and that they wanted to move

3    forward and because she -- that was kind of her

4    track, she felt like she could get a lot of those

5    people to take that same track.

6        Q.   Did she specifically tell you that she

7    would be able to get 200 former COD --

8        A.   She didn't -- I'm sorry.

9        Q.   COD students?

10       A.   She didn't guarantee that, no, but she

11   indicated that.

12       Q.   How so?

13       A.   By just what I just said.  She felt like

14   there was this number of students that had been

15   through the program.

16            Many of them asked this question, maybe

17   because that was my track and that's what I did,

18   and you know, they want to follow in her footsteps.

19       Q.   Aside from the telephone call and the

20   e-mail that we'll get to in a second, do you

21   remember any other discussions about enrollment

22   projections for the ACE/COD surgical assistant

23   program?

24       A.   Other than what we could put through

Page 116

1    there.  I mean, we were talking 72 people a year

2    that we could put through their program for people

3    that we had to turn away because we weren't CAAHEP

4    accredited.

5        Q.   But are you referring to discussions only

6    between you and Dan?

7        A.   No.  No.  That was with Kathy, too.

8        Q.   Okay.  All right.  So I understand your

9    testimony correctly, ACE did discuss with Kathy the

10   number of students ACE could send over to the

11   college under the COD/ACE surgical assistant

12   program --

13       A.   Yes.

14       Q.   -- is that right?

15       A.   Yes.

16       Q.   And how many students was that, Keith?

17       A.   We turn away about six people a month.  So

18   that's 72 people a year.

19       Q.   Do you remember if you told Kathy specific

20   numbers as to the number of students that you could

21   send over to the College of DuPage?

22       A.   I'm pretty sure that we told her that

23   we're turning away about six people a year.

24       MR. DAVIS:  A year?

Page 117

1       THE WITNESS:  I'm sorry.  A month.  Sorry.  My

2   fault.  Glad you caught me on that.

3       MR. ROCHE:  All right.  Can we go off the

4   record real fast?

5                       (Discussion off the record.)

6                       (Whereupon, KB Deposition

7                       Exhibit 19 was marked for

8                       identification.)

9   BY MR. ROCHE:

10      Q.   Keith, I'll show you what's been marked as

11  Exhibit 19 to your deposition.

12           Is this the e-mail that you are referring

13  to about discussions between you and Kathy about

14  enrollment projections?

15      A.   Partial discussion, yes.

16      Q.   Partial.  The other one occurring over the

17  phone?

18      A.   Correct.

19      Q.   Okay.  Where in the body of this e-mail

20  are there -- is there a reference to enrollment

21  projections?

22      A.   So like I had said, that we discussed the

23  enrollment projections as far as how many people

24  had been through the program, a high percentage of

1   those people wanted to move on to first assisting,

2   and then, this follows up on that.

3          I've sent e-mails out to the last two

4   years' worth of graduates and the e-mails are

5   coming back inquiring -- or e-mail stream coming

6   back inquiring -- I think that she meant is this

7   happening.

8      Q.   It says is happening --

9      A.   Yeah.

10     Q.   -- right?  Okay.

11     A.   I'm not sure --

12     Q.   Is there any -- any other portion of this

13  e-mail relate to enrollment?

14     A.   No.

15     Q.   Back to Exhibit 18, which is the Form 20.

16  If you go back, Keith, to 2308 -- and I'm just

17  looking at that enrollment chart that we previously

18  discussed.

19     A.   Right.

20     Q.   Do you recall any discussions with the

21  College of DuPage about the enrollment projections

22  identified in 2308; namely, the ACE/COD surgical

23  assistant program would be enrolling anywhere

24  between 8 to 10 students in the first year, 10 to

Page 119

1    12 in the second year, and 12 to 15 in the third

2    year?

3         A.    No, there was no discussion about that.

4         Q.    January 2014, Keith, do you recall what

5    was happening in regards to the process -- or of

6    the propos -- well, strike that.

7              In January of 2014, do you recall what was

8    going on between the ACE/COD proposed surgical

9    assistant program?

10        A.    I don't think a lot happened in January.

11   I think there was -- I think she was still in the

12   process of restructuring the program at that time.

13   So there wasn't a lot of communication.

14             I don't even know if there was any

15   communication in January.  I don't recall seeing

16   any e-mails when I was going back looking over

17   the -- so I don't think there was any

18   communication.

19             And then, I tried to follow -- I followed

20   up -- in February was the next communication.  So

21   nothing in January.

22        Q.    By this time, the contract, as ACE posits,

23   had been in place and agreed to by College of

24   DuPage for at least a month, at least as of

Page 120

1  January 9th of 2014?

2      A.   Right.

3      Q.   Had you asked -- strike that.  Had ACE

4  asked for the signed contract at any time after

5  December 9th up through the time in February when

6  you reached back out to Kathy?

7      A.   I don't believe so.

8      Q.   Why not?

9      A.   I know that it does take legal departments

10 a good bit of time.  So I mean, one month wouldn't

11 be unusual for the legal department to have to look

12 over the language and make sure there's nothing

13 that would be out of place.

14     Q.   Do you recall any telephone calls or

15 anything in January of 2014, any communications

16 other than e-mail communications, between ACE and

17 the College?

18     A.   I don't recall anything at that time.

19                    (Whereupon, KB Deposition

20                    Exhibit 20 was marked for

21                    identification.)

22 BY MR. ROCHE:

23     Q.   I'll show you what's been marked as

24 Exhibit 20 to your deposition, Keith.  Do you

Page 121

1    remember -- do you recall receiving this?

2         A.   I do.

3         Q.   Were you aware that Kyle was going to --

4    was meeting with Kathy Cabai on or about

5    February 21st, 2014?

6         A.   For a business follow-up or was it just

7    for a meeting?  I'm not sure -- I don't remember

8    the details.  I know that he did meet with her

9    and -- but I think it was just for a coffee.

10        Q.   Did Kyle tell you that he was going to

11   meet with Kathy before he met with her on

12   February 21st?

13        A.   Yes.

14        Q.   Did you discuss with Kyle what to talk

15   about with the meeting with --

16        A.   I don't think it was --

17        Q.   -- Kathy?  I'm sorry.

18        A.   I don't think it was a formal meeting.  I

19   think it was just, hey, I'm going to be in that

20   area anywhere, I'm going to stop by and just have a

21   coffee or breakfast or something.

22        MR. ROCHE:  Okay.  Do you guys want to eat?

23        MR. DAVIS:  Sure.

24                      (A lunch break was taken.)

Page 122

1   BY MR. ROCHE:
2      Q.   I think, Mr. Bump, you testified that you
3   did discuss -- or you were aware that Kyle Black
4   was meeting with Kathy Cabai on or about
5   February 21st, 2014, is that right?
6      A.   Yes.
7      Q.   Did you have any discussions with Kyle
8   about what to discuss with Kathy?
9      A.   No.
10                        (Whereupon, KB Deposition
11                        Exhibit 21 was marked for
12                        identification.)
13  BY MR. ROCHE:
14     Q.   I'll show you what's been marked as
15  Exhibit 21.  My question, Keith, is -- take a
16  minute to read the e-mail.
17          My question is, as of February 21st, 2014,
18  was Dan under the impression that he would be
19  teaching the surgical skills lab?
20     A.   I think Dan was under the impression he
21  was going to be teaching the skill lab, but there
22  might have been discussion about Kathy teaching the
23  skill lab and what that would -- we were trying to
24  determine what that would take based on her

Page 123

1    previous experience and education.

2         Q.   What was agreed to as to who would teach

3    the skills lab as of February 21, 2014?

4         A.   Well, Dan would be the one making -- the

5    only one being able to make that agreement, because

6    of course, it's his company.

7              And he was -- he really wanted to be the

8    one teaching the lab, because there was lots of

9    proprietary information that we would have to share

10   with her to -- and train her to do the -- to teach

11   it, and then, therefore, sometime in the future,

12   she would be able to branch out and do that on her

13   own.

14             So there was lots of discussion between

15   Kyle, Dan, and I about what it would take -- Dan

16   never really -- didn't really know Kathy.  So he

17   thought it would take more than what Kyle and I

18   thought it would take to get her up and running and

19   ready to do that.

20        Q.   As of February 21, 2014, who did you

21   believe was going to teach the surgical skills lab?

22        A.   I believed it would be Kathy at some

23   point.  There was no agreement coming to that, but

24   that was my belief, that we were going to work

Page 124

1    towards preparing Kathy to do that.

2         Q.   What was your belief based on?

3         A.   Some discussion with Dan about it.  And he

4    was lightening up on his tight hold on him wanting

5    to do it himself and Kathy's desire to -- she's a

6    born -- maybe not a born teacher, but that's her

7    background.  She loves to teach.

8              And so her wanting to take students that

9    she already had and continue on with them would

10   just seem, to me, like a natural progression.

11        Q.   Had Kathy -- prior to February 21, 2014,

12   had Kathy told you that she wanted to teach the

13   skills lab?

14        A.   I don't remember the dates when she -- I

15   don't know if it was prior or shortly after this

16   conversation.

17        Q.   At some point, Kathy did tell you that she

18   wanted to be the one who would teach the lab?

19        A.   Yes.

20                      (Whereupon, KB Deposition

21                      Exhibit 22 was marked for

22                      identification.)

23   BY MR. ROCHE:

24        Q.   I'll show you what's been marked as

Page 125

1    Exhibit 22.  This is an e-mail from you to Dan,

2    dated February 21.

3            It provides, Dan, I thought that we

4    already agreed that Kathy would be able to learn

5    how to teach the lab and she would teach the COD

6    labs.

7            Why did you say that you thought that you

8    and Dan had already agreed that Kathy would teach

9    the labs?  Do you remember why you wrote that?

10       A.   Well -- so the discussion must have taken

11   place before February 21st based on this e-mail,

12   because Dan is saying he didn't remember that

13   discussion.

14           So it may have been that we touched on it

15   previously and he wasn't focused on our

16   conversation.  Maybe he was focused on something

17   else.  So it got brought -- I don't know if it was

18   three days previous that we discussed it or if it

19   was a week or two previous.

20       Q.   It was around that time frame, though,

21   around February 21st, 2014 when you and Dan had

22   discussed who would teach the skills lab?

23       A.   Yes.

24       Q.   The e-mail goes on to provide -- you

Page 126

1   write, I agree that we need to get Joe to draw up a

2   non-compete confidentiality agreement for all COD

3   parties to sign, as well as some term contract.

4          Did -- would you agree that as of

5   February 21, 2014, ACE had not had a non-compete or

6   a confidentiality agreement for the COD/ACE

7   surgical assistant consortium?

8       A.   Not signed.  And even if COD had one, I

9   think that what I was getting to here is that Kathy

10  should sign one, too, because should she not be

11  employed with College of DuPage, I felt like she

12  might not be held -- have to be held to the College

13  of DuPage agreement.

14      Q.   Had ACE sent the College of DuPage a

15  confidentiality agreement prior to February 21,

16  2014?

17      A.   Obviously, I thought that they did because

18  of my notes, but according to the attachments to

19  the e-mail that you showed me previously, I guess

20  it was just the consortium agreement, not a

21  non-disclosure.

22      Q.   And the notes you're referring to, those

23  are the notes -- Exhibit 12 that you prepared in

24  connection with today's deposition, right?

Page 127

1     A.   That Maggie prepared previously, yes.

2     Q.   Prior to February 21, 2014, had anyone

3  from ACE asked College of DuPage to keep the

4  curriculum in the program catalog confidential?

5     A.   Not that I specifically remember.

6     Q.   Your e-mail concludes by saying the

7  parties to sign, as well as some term contract.

8          My question simply is, do you remember

9  what you meant by some term contract?

10    A.   So when -- my thought, and I'm not an

11 attorney, is that if College of DuPage had a

12 contract, it doesn't mean previous employees would

13 have.

14         So Karen, Kathy, those people should have

15 to sign a non-compete, non-disclosure with, once

16 they're terminated, they have three years that they

17 can't do -- or once they're terminated or they

18 leave the college, within a three-year period, they

19 can't use anything that they learned from this

20 program to benefit themselves.

21                     (Whereupon, KB Deposition

22                     Exhibit 23 was marked for

23                     identification.)

24

Page 128

1    BY MR. ROCHE:

2        Q.    Do you remember receiving this e-mail,

3    Keith?  You're cc'd on it.

4        A.    Yes.

5        Q.    It's an e-mail from Kyle to Dan.  Do you

6    recall --

7        A.    I don't remember reviewing this one, but I

8    vaguely remember receiving it.

9        Q.    This is an e-mail from Kyle -- or at least

10   the top half of the e-mail is an e-mail from

11   Kyle Black to Dan.  You're copied on it.

12            It states, Dan, my understanding from our

13   first conversation with the College of DuPage was

14   that ACE was going to charge the college $4,400 and

15   Kathy was going to teach the lab.

16            Were you involved in Kyle's first

17   conversation with the College of DuPage?

18       A.    I was.  And I don't recall it going that

19   way but --

20       Q.    What do you recall?

21       A.    I recall the presentation was us teaching

22   everything and them charging -- us charging $4,400.

23            And you know, I -- my understanding or my

24   recollection is, we started discussing a different

Page 129

1    amount other than 4,400 when Kathy teaching the lab

2    came into play.

3        Q.   Kyle goes on to say, we need to figure

4    this out quickly, in the event the College calls

5    and wants to move the contract forward.

6            Did you have any communications with Kyle

7    concerning what he meant by the College wanting to

8    move the contract forward?

9        A.   No.

10       Q.   Did you become aware at this time, Keith,

11   that there was a possibility that the College of

12   DuPage would not want to move the contract forward?

13       A.   No.

14       Q.   Did you believe that at this time, the

15   College of DuPage had the right to not push the

16   contract forward?

17       A.   At this time, what I think could have

18   cancelled the contract -- the verbal contract would

19   be if the State or the College didn't approve the

20   curriculum, but they did.  So that continued moving

21   a verbal agreement forward.

22       Q.   Did -- the verbal agreement you're

23   referring to is the one that was entered into

24   December 9th, 2013?

Page 130

1    A.   Correct.

2    Q.   Prior to the college entering into the

3 verbal agreement, did Kathy Cabai ever tell you

4 that she had the authority to agree to the

5 contract?

6    A.   Not specifically, no.

7    Q.   Did she ever, in any way, communicate to

8 you that she had the authority to enter into a

9 contract with ACE?

10    A.   No.

11    Q.   Did Karen Solt, prior to December 9th,

12 2013, ever communicate to you or to ACE that she

13 had the authority to enter into a contract on

14 behalf of the College of DuPage?

15    A.   She didn't come right out and say that

16 but --

17    Q.   What -- did she say anything?

18    A.   She said we're ready to move forward.

19    Q.   Did Tom Cameron ever communicate to you,

20 prior to December 9th, 2013, that Tom had the

21 authority to enter into a contract with ACE on

22 behalf of the College of DuPage?

23    A.   No.  We -- Kathy and Karen had indicated

24 that that was -- he had the final say.

Page 131

1      Q.    They told you that Tom had the final say?

2      A.    Right.

3      Q.    Did Tom ever tell you that he had the

4  final say?

5      A.    No.

6                        (Whereupon, KB Deposition

7                        Exhibit 24 was marked for

8                        identification.)

9  BY MR. ROCHE:

10     Q.    Exhibit 24 is an e-mail from Dan, in which

11 you're copied.  It's an e-mail from Dan to Kyle.

12            If you notice, the second -- well, I guess

13 the last full paragraph in this e-mail from Dan, he

14 states, once they know how to teach the lab, all

15 they need is the AST core curriculum for surgical

16 assisting and they can create their own program

17 that is the equivalent to ours.  Do you see that --

18     A.    Yes, he --

19     Q.    -- Keith?

20     A.    Yes.

21     Q.    Was the AST core curriculum for surgical

22 assisting publicly available at that time?

23     A.    I don't know.  I don't know if that was

24 something that you had to start the CAAHEP

Page 132

1    accredited process to receive the core curriculum

2    or if that was something that is published.

3                        (Whereupon, KB Deposition

4                        Exhibit 25 was marked for

5                        identification.)

6    BY MR. ROCHE:

7        Q.    I show you what's been marked as

8    Exhibit 25 to your deposition.  It's an e-mail

9    thread, Keith.  If you could turn to ACE0479 for a

10   quick second.

11           In the middle of this document, it's an

12   e-mail from you to Dan, dated February 24, 2014 in

13   red.  Take a look at it.

14           My question is, as of February 24, 2014,

15   had ACE and the College of DuPage reached an

16   agreement as to the price or -- that -- well, the

17   fee ACE would receive for its role in the surgical

18   assisting program with COD?

19       A.    No, I think this was -- no.  So I think

20   this was some back-discussion as to what should we

21   reduce the fee to if Kathy was going to teach the

22   lab.

23           So it was my feeling and Kyle's feeling

24   that we need to communicate to Dan that it wouldn't

Page 133

1  be fair, if they're going to take on the cost of

2  having an instructor teach the lab, for us to just

3  charge them the same thing.  So we should amend the

4  contract and charge the $500 less per student for

5  the lab.

6      Q.   Did ACE ultimately offer to the College of

7  DuPage a price other than the 4,400 that was

8  initially agreed to allegedly on December 9, 2013?

9      A.   Yes.

10                      (Whereupon, KB Deposition

11                      Exhibit 26 was marked for

12                      identification.)

13  BY MR. ROCHE:

14      Q.   I show you what has been marked as

15  Exhibit 26 to your deposition.

16              Keith, this is an e-mail from Kyle to

17  Kathy.  You are copied on it, dated February 24th.

18              In the second full paragraph, it states --

19  actually, let's go up to the first paragraph.  I

20  hope you had a lovely weekend.  I wanted to confirm

21  with you that Keith Bump and I are both planning on

22  attending the advisory committee meeting on

23  March 20 at 7:00 a.m.

24              Did you ever obtain -- did you ever attend

Page 134

1  that meeting, the advisory committee meeting on

2  March 20, 2014?

3       A.   I did not.  I believe Kyle went or there

4  were some schedule changes.  I don't remember

5  everything that happened around that, but there was

6  a reason that I didn't go.  I don't know if it got

7  rescheduled.

8            I think there were some follow-up e-mails

9  that talked about how the meeting went, but I did

10 not attend that.

11      Q.   You believe Kyle did?

12      A.   I believe he did.  I wouldn't swear to

13 that.  So --

14      Q.   Do you know if -- strike that.  Did you

15 send -- well, strike that.

16           Did ACE send Kyle an ACE non-disclosure,

17 non-compete agreement for the March 20th meeting?

18      A.   Yes, I believe we did.

19      Q.   How did ACE send that ACE non-disclosure,

20 non-compete agreement to Kyle?

21      A.   I don't remember if Dan mailed it or

22 e-mailed it.

23

24

Page 135

1                    (Whereupon, KB Deposition

2                    Exhibit 27 was marked for

3                    identification.)

4    BY MR. ROCHE:

5        Q.   I'll show you what's been marked as

6    Exhibit 27.

7              This is an e-mail in which Kathy informed

8    you and Kyle that COD wrote the program as follows

9    and the first semester is 18 credits, so on and so

10   forth.  Do you see that?

11       A.   Yes.

12       Q.   What did you mean -- where she states

13   first semester is 18 credits, summer session is 12,

14   fall session is two classes, one is for the suture

15   lab and the other clinical internship is eight, for

16   a total of 42, what was your understanding as to

17   what she meant by that?

18       A.   So remember, they had to take our program

19   and change it from a monthly program to a semester

20   program.

21             So we give credits in our program based on

22   the amount of time that it should take an average

23   person to finish that course.

24             And that's the way the State of Colorado

Page 136

1    expects us to do that.  That's what our approval is

2    based on.  So they had to take chunks of the

3    program and put it into first semester and another

4    chunk of the program and put it in the second

5    semester and so on and so forth.

6            Well -- so what she meant by that, because

7    we discussed it, was that they were -- the State

8    wasn't liking that one was credit-heavy.  So first

9    semester was credit-heavy.

10           And so they were just asking for an

11   explanation.  So she was asking Dan for his

12   thought -- well, she asked me, but then, I had to

13   turn around and forward that to Dan and have him

14   answer the question, because he's the curriculum

15   specialist.

16           He answered just the way I answered you,

17   that it's based on the amount of time it takes

18   somebody to complete the reading assignments,

19   test-taking, and so forth and that's why they're --

20   it's top-heavy.

21      Q.   Did the December 9th, 2013 verbal contract

22   provide enrollment would be on a semester basis?

23      A.   I don't know that that was even discussed

24   in the contract.

Page 137

1      Q.   Were the credit numbers -- the credit

2   hours identified in Kathy's e-mail, dated

3   March 17th, 2014, were those the same credit hours

4   that a student participating solely in the ACE

5   program would obtain?

6      A.   I believe they were.

7                     (Whereupon, KB Deposition

8                     Exhibit 28 was marked for

9                     identification.)

10  BY MR. ROCHE:

11     Q.   I show you what's been marked as

12  Exhibit 28 to your deposition.

13          Did Kathy Cabai ever discuss with you how

14  the advisory board meeting went, do you remember?

15     A.   I don't remember.  I don't remember

16  whether she did or not.

17     Q.   Had you -- it's March 21st.  So we're

18  nearly four months into the verbal contract --

19  three and a half months into the verbal contract.

20          Had you, by this time, asked for a signed

21  contract from the College of DuPage?

22     A.   I don't remember having done that on -- by

23  March 21st, but we've been in discuss -- in this

24  kind of situation before and it's taken more than

Page 138

1   four months to have it get back from legal.

2       Q.   With what --

3       A.   With hospitals.

4       Q.   With what entity?  I'm sorry.

5       A.   With hospitals.

6       Q.   Hospitals?

7       A.   Yes.

8                    (Whereupon, KB Deposition

9                    Exhibit 29 was marked for

10                   identification.)

11  BY MR. ROCHE:

12      Q.   Exhibit 29, Keith, the second paragraph,

13  Kathy Cabai is talking about looking forward to

14  Denver in July.

15           Is she referring to attending the skills

16  lab --

17      A.   Yes.

18      Q.   -- to the best of your under --

19  recollection?

20      A.   Yes.

21      Q.   Prior to December 9th, 2013, what was

22  discussed about the skills lab?

23           Dan had -- Dan testified that the skills

24  lab was basically the creme de la creme, the magic

Page 139

1    part of the ACE surgical assistant program.

2         A.   Right.

3         Q.   So I want to know, to the best of your

4    recollection, the discussions that occurred prior

5    to the College of DuPage agreeing to enter into a

6    contract with ACE -- I want to probe your

7    recollection as to what was discussed about the

8    actual skills lab and how it worked prior to

9    December 9th, 2013.  You had --

10        A.   I don't believe --

11        Q.   You met with Kathy on November 19th,

12   November 20th, and a conference call on

13   December 5th.

14             Do you recall any discussion on the skills

15   lab during those meetings?

16        A.   I don't -- other than a basic outline,

17   154 different surgical skills, you know, it's

18   everything from incision to closure, everything

19   that's included in between that.

20             It's 27 different suturing and tying

21   techniques.  We do simulated surgeries on our ACE

22   surgical simulators.  Other than that, there was

23   nothing that I recall giving her any more details

24   than that.

Page 140

1       Q.   Did you show Kathy any pictures of the
2   skill lab?
3       A.   She may have asked -- I don't know if it
4   was her.  I know somebody -- I can't recall.  I
5   mean, I could speculate.  I don't remember doing
6   that.
7       Q.   No, I just -- do you remember ever
8   providing pictures of the ACE skills lab to anyone
9   at the College of DuPage prior to December 9th,
10  2013?
11      A.   I don't remember doing that, no.
12      Q.   Do you recall any discussions about the
13  skills lab and how many students would participate
14  in the lab?
15      A.   At that time --
16      Q.   Prior to December 9th, 2013.
17      A.   I don't recall.  I could have.
18      Q.   Do you recall discussing with the
19  College of DuPage prior to December 9th, 2013 the
20  format of the skills lab?
21      A.   Other than what I just told you as far as
22  what we -- the basic outline, no.
23      Q.   There was -- was there any discussions as
24  to how the actual lab was taught --

Page 141

1      A.    No.

2      Q.    -- prior to December 9th, 2013?

3      A.    Unless Dan had those conversations with

4    her, but I don't think he did, because I was pretty

5    much involved in all of those conversations.  So I

6    don't think so.

7      Q.    In this e-mail, Kathy states, back to

8    Exhibit 29, that she received a message that all

9    the classes had passed the Illinois Community

10   College Board, period.  We are ready to go, period.

11          What was your understanding as to her

12   sentence, we are ready to go?

13     A.    That everything is approved and we're

14   ready -- the program is ready to present to

15   students.

16     Q.    Had you reached an agreement -- or had ACE

17   reached an agreement -- I keep using you.

18          It's the ACE corporate representative

19   deposition.  So I guess when I say you, in the

20   right context --

21     A.    Right.

22     Q.    -- obviously, I'm referring, actually, to

23   ACE --

24     A.    Sure.

Page 142

1      Q.   -- because it's the 30(b)(6) corporate

2   deposition.

3           Had ACE reached an agreement as of

4   April 23rd, 2014 on the fee it would receive for

5   its role in the ACE/COD surgical assisting program?

6      A.   I think, by then -- and I'm -- without

7   looking back, I can't say exactly, but I think, by

8   then, Dan had sent them an updated amendment to the

9   original agreement that stated the 3,600.

10     Q.   Are you referring -- when you mean

11  amendment, are you referring to the second

12  consortium agreement that was sent --

13     A.   Yes.

14     Q.   -- to COD by Dan?

15     A.   Yes.

16                      (Whereupon, KB Deposition

17                      Exhibit 30 was marked for

18                      identification.)

19  BY MR. ROCHE:

20     Q.   I'll show you what's been marked as

21  Exhibit 30 to your deposition.  Take a look at it,

22  Keith.

23          My question simply is, do you recall

24  participating in a conference call on or about

Page 143

1    May 1st with Kathy and Karen?

2         A.   I recall a conference call, because -- and

3    the reason that it comes to mind is because Dan and

4    I were waiting on the line for like 15 minutes

5    after the time, and then, they said they were also

6    waiting.

7              I don't know what happened, but they were

8    waiting for 15 minutes, we were waiting for -- so I

9    called her, and then, we rescheduled it.  So I

10   recall this.  I don't recall --

11        Q.   Unfortunately, there's more exhibits I'm

12   going to show you where it looks like, you know,

13   the right hand didn't know what the left hand --

14        A.   A miscommunication.

15        Q.   Yeah, some miscommunication --

16        A.   Yeah.

17        Q.   -- on that.  And that may be this

18   conference call.  I'm not exactly sure.  Do you --

19   I guess let me ask it this way.

20             Do you remember participating in a

21   conference call with the College of DuPage shortly

22   after Kathy's April 23rd e-mail stating that we are

23   ready to go?

24        A.   I remember a conference call.  I don't

Page 144

1  remember the details of it.

2     Q.   Do you recall who was on the -- who

3  participated on the conference call?

4     A.   I'm thinking that one was just -- because

5  Kathy and Karen were waiting on the other end and

6  Dan and I were on this.  So I think it was just the

7  four of us.

8     Q.   Okay.  You don't recall what was

9  discussed?

10    A.   No.

11                   (Whereupon, KB Deposition

12                   Exhibit 31 was marked for

13                   identification.)

14  BY MR. ROCHE:

15    Q.   I'll show you what's been marked as

16  Exhibit 31 to your deposition, Keith.

17           Was this the first time ACE sent a

18  non-disclosure agreement to the College of DuPage?

19    A.   I don't recall.  Other than my notes being

20  wrong here, I don't recall anything sooner than

21  that.

22    Q.   Do you recall -- in your review of the

23  documents that have been produced in this

24  litigation; in particular, the e-mail

1    communications, do you recall any e-mail before

2    May 5th that had a non-disclosure agreement

3    attached as a PDF?

4        A.   I don't recall seeing that in my review.

5        Q.   Do you have any reason to believe that --

6    aside from what is Exhibit 12, the notes prepared

7    by Maggie Parrish, aside from that exhibit, do you

8    have any reason to believe that ACE transmitted a

9    non-disclosure agreement to the College of DuPage

10   prior to this May 5th, 2014 e-mail?

11       A.   No.

12       Q.   Okay.  I just want to go over briefly some

13   of the terms in this non-disclosure agreement.

14            Did anyone at the College of DuPage sign

15   this agreement?

16       A.   If they did, they didn't return it to us.

17       Q.   In connection with your employment at ACE,

18   did you ever sign a non-disclosure agreement?

19       A.   I don't think so.

20       Q.   Did you ever -- were you ever required as

21   a condition of your employment to sign a

22   confidentiality agreement?

23       A.   I think that was included in the student

24   handbook.  You sign the end of -- not the student

Page 146

1   handbook.  The employee handbook.

2        So I did sign an employee handbook, which

3   included that I couldn't compete or share the

4   information with anybody that wasn't --

5      MR. ROCHE:  Has the employee handbook been

6   produced in this litigation, Mike?

7      MR. DAVIS:  I don't know.  It seems like you

8   asked a question about that in the last dep, but

9   maybe it was that you asked if there was an

10  employee handbook that talked about whether -- so

11  I'll have to check.

12     MR. ROCHE:  Okay.  If you don't mind.

13     MR. DAVIS:  Yeah.

14     MR. ROCHE:  And if there is one and if Keith

15  signed it, I'd like it to be produced.

16     MR. DAVIS:  Yeah.  I think we did produce it,

17  but let me check.

18     MR. ROCHE:  Okay.

19  BY MR. ROCHE:

20     Q.   In the second paragraph, Keith, it states;

21  whereas, ACE has created curriculum and other

22  materials for the purpose of presenting the ACE

23  surgical assistant program at the College, which

24  contains certain confidential and proprietary

Page 147

1    information.

2              What other materials are referred to in

3    this paragraph, aside from the curriculum?

4         A.   It could be the ACE workbook, the

5    self-study, and then, the curriculum.  Other than

6    that, I --

7         Q.   Do you know if, as of May 5th, 2014, ACE

8    had provided to the College of DuPage ACE's

9    self-study?

10        A.   Let me see when that case was.

11        Q.   Why don't you turn, actually, to the

12   e-mail?

13        A.   The one --

14        Q.   Yeah, Page 1 on -- the first page of

15   Exhibit 31, that e-mail.

16        A.   Okay.

17        Q.   That one states that Dan will be getting

18   Kathy a copy of ACE's self-study.  Do you see that?

19        A.   Yes.

20        Q.   Do you have any reason to believe that ACE

21   sent this self-study to the College of DuPage --

22        A.   No.

23        Q.   -- any time before May 5th, 2014?

24        A.   No.

Page 148

1       Q.   The ACE workbook, how -- do you know if
2   the College of DuPage ever viewed the ACE workbook?
3       A.   I don't know.  I mean, I don't have a way
4   of seeing if they opened the PDF that was attached
5   to the --
6       Q.   Do you know if the ACE -- that was a bad
7   question.  Do you know if the ACE workbook was ever
8   transmitted to the College of DuPage?
9       A.   As far as I know, it was.
10      Q.   What's your basis for that belief?
11      A.   I was told it was by --
12      Q.   By who?
13      A.   I think Dan told me that.
14      Q.   Do you recall if the College of DuPage
15  ever had access to the on-line platform that ACE
16  had?
17      A.   That, I don't remember.  I don't remember
18  whether they were or not.
19           It seems like Kyle Black had asked for a
20  password for Kathy and -- I mean, I could check on
21  that, because Maggie would know that answer,
22  because she would have been the one to give him the
23  password to give her access to the on-line
24  materials.

Page 149

1      MR. ROCHE:  If -- Mike, if we could have Keith

2  ask Maggie.

3      MR. DAVIS:  Okay.  As to whether they accessed

4  it?

5      MR. ROCHE:  Whether ACE ever provided the

6  college with access to its on-line platform.

7  BY MR. ROCHE:

8      Q.   Keith, do you remember ever -- do you

9  remember if ACE sent a hard copy of the ACE

10  workbook to anyone at the College of DuPage?

11      A.   I think the only thing we sent hard copy

12  or in a zip drive would have been the self-study,

13  because it was too big to e-mail.  I think

14  everything else would have been e-mailed.

15      Q.   All right.  Okay.  I direct your

16  attention -- let's go back -- just one final

17  question on the non-disclosure agreement,

18  Paragraph 4, which is on the second page of the

19  non-disclosure agreement.

20          It refers to the obligations of

21  Paragraph 3, which is -- describes what the

22  signatory to the non-disclosure agreement can and

23  cannot do with the confidential information.

24      A.   Correct.

Page 150

1       Q.   That's Paragraph 3.  Paragraph 4 says the

2   obligations of Paragraph 3 shall not apply,

3   however, to any information which is already in the

4   public domain at the time of disclosure or becomes

5   available to the public through no breach of this

6   agreement by the recipient.

7            Keith, I believe you testified earlier

8   that the Form 20 that the College of DuPage sent to

9   the ICCB contained several references to the ACE

10  workbook, because the curriculum was part of the

11  Form 20.  Do you recall that testimony?

12      A.   I don't think I said it was part of the

13  Form 20, but as they attach to that e-mail that we

14  received, there was an attachment that says here's

15  what we presented to the State.  And it had -- it's

16  basically like their catalog --

17      Q.   Which --

18      A.   -- where they changed it to --

19      Q.   Which e-mail are you referring to, Keith?

20  I just want to -- so I understand --

21      A.   I think it was a May -- let me look.  It's

22  the one where she was saying, hey, they kicked all

23  this stuff back.  We were just looking at it.

24      Q.   The one about the credit hours --

Page 151

1       A.    Yes.

2       Q.    -- and the format?

3       A.    So there was an attachment to -- yes.

4    Right here.

5       Q.    Hold on.  Let's get the --

6       A.    Exhibit 27.

7       Q.    Okay.  The folks we wrote the program as

8    follows?

9       A.    Yes.

10      Q.    Did you testify that there was an

11   attachment to this e-mail?

12      A.    Yes.

13      Q.    Turn to the complaint, if you don't mind,

14   and go to Exhibit H.

15      A.    I believe it was -- Exhibit H was the

16   attachment.  Yes.

17      Q.    This is the attachment that was attached

18   to this March 17th, 2014 e-mail from Kathy to you?

19      A.    Correct.

20      Q.    Was it your -- was it ACE's understanding

21   that Kathy had sent this attachment to the Illinois

22   Community College Board in connection with

23   obtaining State approval?

24      A.    It was either that she did that or she

Page 152

1   used this to formulate the form that she sent to

2   the Board.

3       Q.   Going back to the non-disclosure

4   agreement, would you agree, based on what you just

5   testified to, that if Kathy and the College of

6   DuPage submitted the ACE curriculum to the Illinois

7   Community College Board that it would have been

8   then in the public domain and publicly avail -- or

9   it would have been avail -- it would have become

10  available to the public?

11      A.   I wouldn't know that.  I don't know if

12  that's something that they keep private or if it's

13  public record.

14      Q.   All right.  Just a few final questions on

15  this May 5th e-mail.

16           Dan -- well, the e-mail indicates that

17  there were two attachments.  One was the

18  non-disclosure agreement that we just discussed and

19  the other one was an ACE/COD consortium agreement,

20  a PDF, is that right?

21      A.   Yes.

22                    (Whereupon, KB Deposition

23                    Exhibit 32 was marked for

24                    identification.)

Page 153

1    BY MR. ROCHE:

2        Q.    What I have just shown you is Exhibit 32.

3    Is that the ACE/COD consortium agreement PDF that

4    was attached to the May 5th, 2014 e-mail?

5        A.    I didn't send that and I didn't open this

6    when it was sent.  So when I was copied on it, I

7    didn't open it.  So I can't state with 100 percent

8    certainty that this is the one that was sent in

9    that e-mail.

10                        (Whereupon, KB Deposition

11                         Exhibit 33 was marked for

12                         identification.)

13   BY MR. ROCHE:

14       Q.    I show you what's been marked as

15   Exhibit 33 to your deposition, Keith.

16            I direct your attention to the bottom

17   part, the initial e-mail here on this thread.  It's

18   from you to Kathy and Karen, dated June 25th, 2014.

19            Provided -- you provide in this e-mail

20   that you want to follow up on two items; number

21   one, the consortium agreement that we sent over,

22   any idea when we might expect the executed copy

23   back.  Do you see that, Keith?

24       A.    Yes.

Page 154

1    Q.   Which consortium agreement are you

2    referring to, to the best of your recollection?

3    A.   I don't -- the most recent one that was

4    sent from Dan.

5    Q.   The --

6    A.   The one that was sent in this e-mail on

7    May 5th, the attachment.

8    Q.   Nearly six weeks have passed between the

9    time the second consortium agreement was sent and

10   your e-mail dated June 25th.

11        Were you getting nervous that the College

12   wasn't going to sign that contract?

13   A.   I don't think so, because everything was

14   still moving forward and she was still planning on

15   coming to the instructor training in July, the

16   surgical skill lab, which was her first piece of

17   her instructor training.

18        And why would they not sign it if they

19   were still moving forward?

20   Q.   Kathy responds on June 26.  She notes that

21   among other things, I know legal here can sometimes

22   take a little while.  I will forward your e-mail to

23   Tom and see if you can get a better answer.

24        Were you aware, Keith -- or strike that.

Page 155

1    Was ACE aware that Kathy Cabai did not have the

2    authority to sign the contract until the legal

3    department had approved the contract as of June 26,

4    2014?

5         A.    No, I wasn't aware of that, but it was

6    my -- not assumption, but I believe, based on

7    what -- the information that I was given that

8    between Tom, Karen, and Kathy that they could

9    approve a contract.

10             And legal -- the purpose of legal is to

11   approve the language, not approve whether they can

12   take on another program or not.

13        Q.    What do you mean by language?  Are you

14   referring --

15        A.    The language.

16        Q.    -- to the terms of the contract?

17        A.    No.  Any --

18        Q.    Okay.  What are you referring to?

19        A.    Any language that might tip the scales in

20   our favor, such as, you know, we might be able to

21   sue you if this happens or -- you know, that kind

22   of language, where it tips the scales in the favor

23   of ACE versus College of DuPage, not -- legal

24   doesn't come back and say we're not letting you do

Page 156

1   a surgical assisting program.

2        Q.    It was your -- it was ACE's understanding

3   that legal lacked the ability to terminate the

4   proposed consortium surgical assisting program

5   between ACE and the College of DuPage?

6        A.    Well, it's our understanding that that's

7   not the function of the legal department.

8             The function of the legal department is to

9   look at a contract and see if it's a legal contract

10  and if the language is something that's going to

11  hurt the College, not to decide whether a surgical

12  assisting program can be put into place.  That's

13  the department's function.

14       MR. DAVIS:  It offends him as a lawyer to hear

15  that.

16  BY MR. ROCHE:

17       Q.    So I understand your testimony correctly,

18  it's ACE's understanding that the College of

19  DuPage's legal department lacked the authority to

20  terminate the surgical assisting program between

21  ACE and the College of DuPage?

22       A.    It was our understanding that that is the

23  function of a legal department versus the function

24  of the education department.

Page 157

1          The education department brings on a

2    program based on what the dean of their department

3    want -- the direction they want to move.

4          Then, they hand the contract off to the

5    legal department to make sure that they're not

6    going to get hurt by this -- the wording of this

7    contract.

8      MR. ROCHE:  Can you just read back the question

9    for me, Liz, please?

10                    (Whereupon, the record was read.)

11     THE WITNESS:  That wasn't my testimony.  I was

12   giving you our understanding as to what the

13   function of the legal department is versus the

14   function of the education department.

15         So I'll give you an example.  If Dan

16   wanted to bring on a nursing program, he could

17   decide that 100 percent on his own.

18         He would then take a contract from the

19   nursing program, and then, send it to his attorney

20   to make sure, hey, is this going to hurt me, not --

21   and the attorney wouldn't come back and say, the

22   language is not going to hurt you, but I'm not

23   letting you do this nursing program.

24

Page 158

1    BY MR. ROCHE:

2        Q.   What was your understanding as to how the

3    educational department at the College of DuPage and

4    the legal department at the College of DuPage, as

5    you just testified to -- what was that

6    understanding based on?

7        A.   Based on my knowledge of how departments

8    work.  So I've worked with a lot of hospitals

9    trying to get contracts for Your Extra Hands

10   Surgical Services through our contract with them.

11            And so we met with a lot of hospitals.

12   The hospital would decide yes, we want to do this,

13   but let me send the contract over to legal to have

14   them read through it so we can decide based -- that

15   that contract is not going to hurt us.

16            And then, legal might make some changes in

17   the contract and send it back to us so we could

18   send it to our attorney, but they wouldn't say no,

19   we're not letting you move forward with this

20   contract, because the CEO already made that

21   decision.

22       Q.   And that experience that you just

23   described with YEHSS and hospitals and ACE, that

24   had been -- that had happened to you prior to this

Page 159

1  situation --

2      A.   Yes.

3      Q.   -- between ACE and the College of DuPage?

4      A.   Yes.

5      Q.   Were there ever any instances, Keith, in

6  which the hospital had agreed to the YEHSS offer,

7  if you will, and then, the legal department within

8  their particular hospital subsequently terminated

9  the proposed relationship?

10     A.   There was never any instances where they

11 said legal turned this down.

12     Q.   Were there ever any instances where the

13 contract ultimately wasn't agreed to, despite the

14 fact that the individuals at the hospital had

15 agreed to partner with YEHSS?

16     A.   Can you state that again?

17     Q.   Were there ever any instances in which

18 YEHSS and a hospital had agreed to do business and

19 the legal department ultimately terminated the

20 relationship?

21     A.   No.

22     Q.   No?  Okay.  Now, are you referring -- when

23 you're talking about this -- these instances

24 between YEHSS and hospitals, are you referring to

Page 160

1    the ACE/YEHSS partnership, and then, ACE and YEHSS

2    reach out to the hospital or is this specifically

3    just amongst -- between YEHSS and the hospital?

4         A.   So these were instances where -- the

5    reason YEHSS wanted to do business with ACE is

6    because we have 300 hospitals that we work with

7    across the United States.

8              So I was able to reach out to those

9    hospitals and get our foot in the door, where

10   Kyle Black wasn't able to do that.

11        Q.   Was there ever a deal?  Did a deal ever

12   occur between the YEHSS/ACE partnership and a

13   hospital?

14        A.   No, but there was an instance that a

15   hospital really wanted to do this and they were

16   putting it through legal and they decided they were

17   going to do it on their own.

18        Q.   Did -- are you aware if YEHSS took any

19   legal action?

20        A.   YEHSS was going to take legal action, but

21   their attorney advised them against it because --

22   he said you got a case, but they're going to fight

23   you and it's going to be really expensive.

24        Q.   Do you remember the name of YEHSS'

Page 161

1    attorney?

2        A.    I think Kyle Black might have brought -- I

3    don't know if he brought him with him or not but --

4        Q.    Greg Hunziker?

5        A.    Hunziker, yeah.  I couldn't remember his

6    name, but he's the one that wrote all the legal

7    documents for YEHSS.

8        Q.    And that was -- what you just described,

9    that was a situation in which the hospital agreed

10   to the YEHSS/ACE insourcing program and the legal

11   department ultimately killed the deal?

12       A.    No.  They did it on their own.  The legal

13   department didn't kill anything.  They said, hey,

14   we can take this and do it ourselves.

15             So what they did is, they opened a

16   separate company and did the same thing YEHSS was

17   doing and insourced the employees at the hospital.

18       Q.    But it was the legal department in this --

19       A.    No.

20       Q.    -- instance that ultimately --

21       A.    No.  It was the program director that we

22   were working with -- not the -- the surgical

23   director that decided, hey, there's no reason we

24   can't do this on our own.

Page 162

1      Now, she may have gotten that advice from

2 the legal department.  I don't know.

3      Q.   And this --

4      A.   I don't know the back side of it.

5      Q.   What was the name of the hospital, out of

6 curiosity?

7      A.   Henrico Doctors'.  It was three hospitals

8 in Richmond, Virginia.

9      Q.   Correct me if I'm wrong, but it sounds

10 similar to what ACE is alleging happened in this

11 case with respect to COD --

12     A.   It is similar.

13     Q.   -- and the COD surgical assisting program.

14     A.   It is similar.

15                    (Whereupon, KB Deposition

16                    Exhibit 34 was marked for

17                    identification.)

18 BY MR. ROCHE:

19     Q.   Keith, this e-mail thread marked as

20 Exhibit 34 is dated July 8th, 2014.

21          It begin -- well, the second thread is

22 from you to Kathy, in which you, again, ask about

23 the consortium contract.

24          And then, Kathy responds that the contract

Page 163

1   will not be signed prior to her coming to the lab.

2   Do you see that, Keith?

3       A.   Yes.

4       Q.   Okay.  Kathy goes on to note at the top

5   that she's beginning to get concerned, because she

6   has things booked and needs to know if she needs to

7   cancel.

8            Had you, by this time, Keith, to the best

9   of your recollection, asked Kathy or anyone at the

10  College of DuPage about the signed non-disclosure

11  agreement?

12      A.   I don't believe so.

13      Q.   Why not?

14      A.   I don't recall why I didn't ask.

15      Q.   Kathy ultimately attended the lab in

16  Denver, is that right?

17      A.   Yes.

18      Q.   Sometime in July --

19      A.   Yes.

20      Q.   -- of 2014?  Did you -- were -- did you

21  attend that lab?

22      A.   No.

23      Q.   You were in Virginia?

24      A.   Correct.

Page 164

1      Q.   Did you have any discussions with Dan

2   about Kathy's attendance in July of 2014 prior to

3   Kathy actually attending the lab?

4      A.   So -- I think so.  And I think that's what

5   stim -- the conversation between Dan and I

6   stimulated my, you know, push for the consortium

7   agreement and -- because there is a lot of -- even

8   more proprietary things in the skill lab versus the

9   on-line material -- or the outline of the on-line

10  material.

11        So we -- you know, we just wanted to

12  strengthen our contract by having it in writing

13  prior to the lab.

14        Now, the reason we let her continue to

15  come is, I mean, that's another piece of our belief

16  that there was a contract, because she attended the

17  lab at no charge, not out of the kindness of our

18  heart because we wanted to train a college to

19  compete against us but because that was part of her

20  instructor training.

21      Q.   Kathy commun -- did Kathy communicate in

22  this e-mail that a signed contract is not going to

23  be in place prior to her attending the Denver lab?

24      A.   A signed written contract, yes.

Page 165

1    Q.   Kathy notified ACE that a signed written

2  contract was not going to be in place prior to her

3  attending the Denver lab?

4    A.   But only because it was still in legal and

5  Karen was out of town.

6    Q.   That wasn't my question.

7    A.   Yes.  Yes.

8    Q.   ACE still allowed Kathy to attend the lab?

9    A.   Yes.

10    Q.   And Kathy ultimately attended the lab.  Do

11  you know if Kathy ever signed any non-disclosure

12  agreement in connection with attending the Denver

13  skills lab?

14    A.   I don't think so.

15    Q.   Do you know if Kathy was asked to sign any

16  sort of non-disclosure agreement as a condition on

17  attending the Denver skills lab?

18    A.   I don't think so.  Oh.  If she was asked.

19  I believe I asked her.  And she consulted with Tom.

20  And as an employee of the College, they advised her

21  against it.  So --

22    Q.   Do you remember when that conversation

23  occurred between you and --

24    A.   It was a follow-up conversation.

Page 166

1      Q.   -- Kathy?

2      A.   It was a follow-up from this e-mail.  It

3  was a phone conversation.

4      Q.   Did Kathy communicate to you during this

5  phone conversation that she was not going to sign a

6  non-disclosure agreement?

7      A.   I believe she did.  I mean, it's been

8  three years, again.  So I'm just trying to remember

9  a phone conversation.

10                    (Whereupon, KB Deposition

11                     Exhibit 35 was marked for

12                     identification.)

13  BY MR. ROCHE:

14      Q.   Exhibit 35, in the middle of the first

15  page of this e-mail thread -- or this exhibit,

16  which is an e-mail thread, Kathy Cabai says to you,

17  I did talk to Tom and he is not comfortable signing

18  anything without having legal approve, nor with

19  Karen out of town, Kathy.  Do you see that, Keith?

20      A.   Yes.

21      Q.   Was it your understanding at this time,

22  Keith, that the legal department had to approve the

23  terms of the contract?

24      A.   Not the terms.  The language.

Page 167

1     Q.  Was it your understanding at this time

2  that Tom Cameron did not have the authority to sign

3  the contract, absent approval from the legal

4  department?

5     A.  He wasn't comfortable with signing

6  something with Karen out of town or the legal --

7  legal's approval.

8     Q.  Was it your understanding that Tom Cameron

9  could not sign the contract until the legal

10  department approved?

11     A.  Not necessarily.  He wasn't comfortable

12  doing it.  I mean, he could have but wasn't

13  comfortable.

14     Q.  At this point in time, were you aware --

15  was ACE aware that Karen Solt reported to

16  Tom Cameron?

17     A.  Yes.  And looking back on that, it seemed

18  like a funny con -- a funny answer that he would

19  need Karen to be there.  I didn't think of it at

20  the time, but looking back on it, it did seem a

21  little strange.

22     Q.  Was it your understanding at this time

23  that Tom Cameron had to approve what Karen Solt

24  agreed to in connection with the ACE/COD surgical

Page 168

1    assisting program?

2         A.   Yes.

3         Q.   And that is -- was that un -- was your

4    understanding -- ACE's understanding based on the

5    conversations that you and Kyle had with Kathy and

6    Karen and Tom in November and on December 5th,

7    2013?

8         A.   Yes.

9         Q.   I believe Kathy test -- or Kathy Cabai

10   attended the Denver lab, I think, July 14th through

11   the 19th of 2014 --

12        A.   That sounds right.

13        Q.   -- is that right?

14        A.   Somewhere in that time frame.

15        Q.   Okay.  Somewhere in that time period?  Did

16   you have any conversations with Dan while Kathy was

17   at the lab about the ACE/COD proposed consortium?

18        A.   No, I don't think we did.  I think we

19   talked afterwards.

20        Q.   And do you recall what discussions -- what

21   was discussed between you and Dan?

22        A.   I think she had a few concerns that she

23   brought up.  I don't remember the specifics of

24   those.  It was just minor things.  And then, they

Page 169

1    talked it out.

2           And I know she was having some family

3    problems at that time.  I think her father and

4    mother were both ill.  And she may have even had to

5    leave a day early.  I'm not 100 percent sure on

6    that, but I think she did have to leave a day

7    early, because her father was in intensive care.

8    So there was some emotional issues involved there,

9    too.  So --

10       Q.   Do you recall if Dan told you or

11   communicated to you that the College of DuPage

12   potentially would not enter into the consortium

13   with ACE?

14       A.   No, he didn't at that time.

15                      (Whereupon, KB Deposition

16                      Exhibit 36 was marked for

17                      identification.)

18   BY MR. ROCHE:

19       Q.   Okay.  Exhibit 36, Keith, is a series of

20   e-mails trying to, I think, put together a go-to

21   meeting --

22       A.   Right.

23       Q.   -- or some sort of conference call?

24       A.   Yes.

Page 170

1          Q.    And my question is, do you remember
2    participating -- and I'm -- this e-mail is
3    basically -- or this exhibit is basically trying to
4    just jog your memory.
5          A.    Sure.
6          Q.    And do you remember participating in a
7    conference call between Kathy or anyone else at the
8    College of DuPage between July 19th, 2014 and
9    August 12th of 2014?
10         A.    Yes.
11         Q.    Okay.  And how many conversations -- how
12   many conference calls were there, if you remember?
13         A.    I just remember this one.
14         Q.    Okay.  This one?
15         A.    Yes.
16         Q.    Do you remember the approximate date that
17   this conversation occurred?
18         A.    I don't.
19         Q.    Who is --
20         A.    Let me see if I can pull it up in that
21   Exhibit 12, if you want me to.
22         Q.    Sure.
23         A.    It doesn't really -- I don't see a
24   specified date here, but I mean, I'll stipulate

Page 171

1  that there was a --

2      Q.   Sometime during that time period --

3      A.   There was a conference call, yeah.

4      Q.   July 19th --

5      A.   Yeah.

6      Q.   -- through August 12th --

7      A.   Yes.

8      Q.   -- at some point in time, there was a

9  conference call?

10     A.   Yes.

11     Q.   Who was present?

12     A.   I believe three parties on their side.  It

13 was Tom, Karen, Kathy, and then, Dan and myself,

14 and I don't remember if Kyle was on that call or

15 not.

16     Q.   What was discussed?

17     A.   So there was some -- her concerns in the

18 lab were that --

19     Q.   Kathy's?

20     A.   Yes.  Was that there was -- it was too

21 advanced almost.  There was more surgeon-like

22 performance.

23          So basically, our philosophy is that the

24 surgical assistant should replace a second surgeon

Page 172

1    in the room, because that's traditionally who did

2    that job.

3            And some schools teach that person wound

4    care and suturing and that's it.  And so we're kind

5    of unique in the industry, in that we teach

6    somebody to replace that second surgeon.

7            And she thought there was maybe too much

8    emphasis on surgeries.  And Dan explained it to

9    them on that call that, you know, if we just spent

10   three, four, five days on just practicing suturing,

11   then there wouldn't be any like practical

12   application of that.

13           So what we do is, we teach them how to

14   suture, and then, we practically apply that to a

15   surgery.  And then, we teach them how to do this

16   suture, and then, we practically apply that to a

17   surgery, so the student actually knows how to

18   perform better in the operating room when they go

19   back and work under their surgeons.

20           So in an e-mail conversation with Kathy,

21   he explained that to her.  And she seemed to feel

22   better about it and explained that, you know, she

23   wasn't trying to be too critical and maybe some of

24   the emotional things that were going on with her

Page 173

1  dad and mom kind of fell over into that.

2       So that was all discussed in the

3  conference call, as well as the fact that Dan has

4  been teaching surgical assisting since 1995 and is

5  the longest running on-line surgical assistant

6  instructor, wasn't ever formally trained to teach

7  on-line programs and wasn't certified.

8       So we agreed that we would put him in the

9  next available certification program.  And so they

10 seemed to be okay with that at the end of that

11 conference call.  So they gave us a few concerns.

12 We met their concerns.

13    Q.   Once this conference call ended, were you

14 optimistic that the consortium would continue to

15 move forward?

16    A.   Yes.

17    Q.   Were you concerned at all that the

18 consortium would not go forward?

19    A.   If I was to give you a percentage, I would

20 say I was 90 percent confident and I had that

21 little 10 percent that it might --

22    Q.   Aside from the lab being too advanced and

23 Dan not being formally trained on -- to teach on an

24 on-line platform, did -- do you recall any other

Page 174

1    concerns the College expressed to ACE?

2         A.    No.

3         Q.    Did Karen Solt at all partic -- speak

4    during this conference call --

5         A.    I think --

6         Q.    -- to the best of your recollection?

7         A.    I'm pretty sure Kathy did -- Kathy Cabai

8    did most of the talking.

9         Q.    And was Tom Cameron on this call?

10        A.    Yeah, but I don't remember him

11   participating in a big way anyway.

12             I think the reason being was that Kathy

13   had the most experience with us, now that she had

14   been to the lab and she did all the writing of

15   the -- or not the writing but the rewriting of the

16   structure of the program.  She was basically their

17   mouthpiece for that conversation.

18        Q.    Was there any discussion on the

19   non-disclosure agreement?

20        A.    No.

21        Q.    Did ACE at all -- well, strike -- so you

22   did not ask anyone at -- you did not ask Karen,

23   Kathy, or Tom to sign the non-disclosure agreement

24   during this conference call?

Page 175

1       A.    No.

2       Q.    Nor did Dan?

3       A.    No, not that I remember.

4       Q.    Was there any discussion about executing

5   the signed written contract?

6       A.    I don't think so.  I think the purpose of

7   that conference call was to discuss their concerns.

8   And so that's what we did.

9                       (Whereupon, KB Deposition

10                      Exhibit 37 was marked for

11                      identification.)

12  BY MR. ROCHE:

13      Q.    I'll show you what's been marked as

14  Exhibit 37 to your deposition, Keith.

15          This is an e-mail thread between Karen and

16  you.  And if you look at the bottom, it states good

17  morning, Keith and Dan.  Kathy is having some

18  family health concerns right now, so in the event

19  she is not able to send you the attached, I am

20  forwarding to you our concerns about the

21  collaboration.  And that is the letter dated

22  July 30, 2014.

23          My question is, do you recall Karen Solt

24  sending you an attachment that is that letter dated

Page 176

1   July 30, 2014?

2       A.   Yes.

3       Q.   And do you recall reviewing the letter

4   dated July 30, 2014?

5       A.   I don't.

6       Q.   You don't remember reviewing it?

7       A.   For this -- for the purposes of this --

8   like recently or back --

9       Q.   Just in your -- ever.

10      A.   I'm sure I looked at it back three years

11  ago -- or two and a half years ago.

12      Q.   I'm just trying to get the chronology

13  correct.

14           Was that conference call you testified

15  about a few minutes ago -- did that conference call

16  occur after that letter was sent to ACE?

17      A.   Yes, but I don't believe -- the answer is

18  yes, but I don't believe that all of this was

19  discussed in the conference call, because Dan had

20  e-mailed her back to already -- so you could see

21  the ACE response -- or ACE responses, or maybe

22  that's not in this, but he had e-mailed her back to

23  answer all of these concerns.

24      Q.   Yeah, I know what e-mail you're referring

Page 177

1   to, the one that --

2       A.   Right.

3       Q.   The lengthy --

4       A.   It's got the -- in red is the ACE

5   response.  So I don't think we had to discuss all

6   of this on the conference call.

7            And that's maybe why I'm not as familiar

8   with this as I am with what we -- because I was

9   involved in the conference call.  I wasn't involved

10  in the back and forth on the letter.

11                      (Whereupon, KB Deposition

12                      Exhibit 38 was marked for

13                      identification.)

14  BY MR. ROCHE:

15      Q.   I'll show you what's been marked as

16  Exhibit 38 to your deposition, Keith.

17           Are you -- is this exhibit what you just

18  testified to that you remember with the red and

19  blue --

20      A.   Yes.

21      Q.   -- the e-mail?  Okay.  So this is an

22  e-mail from Dan to Karen.  You're copied on it.

23      A.   Uh-huh.

24      Q.   There's two attachments.

Page 178

1    COD concerns.pdf, and then, ACE COD consortium

2    agreement.pdf.

3           In the body of the e-mail, Dan writes in

4    the second paragraph, I have attached the most

5    recent consortium agreement.

6           Let's just stop there.  Is this a

7    different consortium agreement than the one that

8    was sent on May 5th, 2014?

9       A.   I don't recall.

10      Q.   Dan goes on to note that it appears that

11   some of your concerns may have come from a template

12   agreement we sent to you in order to start our

13   negotiations.

14          Do you know what template agreement

15   Dan Bump was referring to?

16      A.   I think he might have resent the tem --

17   the first template the second time, even though we

18   had discussed changing the price.

19      Q.   What template agreement is Dan referring

20   to?

21      A.   A template that he created.  So he created

22   the original template for the consortium agreement

23   for them, and then, instead of changing the price

24   on the second one, I think he might have just sent

Page 179

1    the template with the same price, because the two

2    that you gave me both had the same amount for --

3    that ACE gets paid.

4           And I think he probably meant -- because

5    that was after the discussions that we had about

6    her teaching and us charging less.  So I think one

7    of their concerns was the amount that they were

8    going to be charged.

9           And so that's the only reason that he

10   would have attached this revised agreement.  So if

11   you look at both of those, they both had 4,380 on

12   them.

13       Q.   Exhibit 32, is that the template agreement

14   Dan Bump is referring to?

15       A.   Yes.

16       Q.   Can I just see it real fast?  Dan goes on

17   to write, we said to you in order to start our

18   negotiations.  What did Dan mean by that?

19       A.   So when we first met with them --

20       Q.   In November 2013?

21       A.   Right.  We -- I thought that we had sent

22   them the template agreement at that time with the

23   4,400 on there based on notes here.  And I'm

24   assuming Dan thought that, too.

Page 180

1          So then, he resent the template agreement

2     the second time, which was Exhibit 32.

3          Q.   And that's Exhibit -- that's the

4     attachment as Exhibit A to your -- to ACE's

5     complaint, correct?

6          A.   Well, it's not -- the template agreement

7     is not in here.  The --

8          Q.   No, but --

9          A.   -- consortium proposal is, but in the

10    e-mail, we thought we had sent the template

11    agreement with that.  It may have been --

12         Q.   Yes.

13         A.   -- my mistake that it didn't get included.

14         Q.   It wasn't included in the actual --

15         A.   In the e-mail?

16         Q.   -- complaint, but the template

17    agreement --

18         A.   Was not included --

19         Q.   Was the template agreement sent as part of

20    this e-mail on November 21, 2013 that's attached as

21    Exhibit A to the complaint?

22         A.   No.

23         Q.   No?  That's not the template agreement?

24         A.   It's not on there.

Page 181

1     Q.   Is that --

2     A.   There's no template agreement in the

3  attachment.

4     Q.   No.  It states consortium agreement.

5     A.   Right.

6     Q.   I guess --

7     A.   Oh, I'm sorry.

8     Q.   Is it --

9     A.   I'm thinking non-disclosure.  My mind's --

10    Q.   It's been a long day.

11    A.   So yes, that is the template agreement.  I

12  apologize.

13    Q.   That's the attachment as Exhibit A to the

14  complaint?

15    A.   Correct.

16    Q.   All right.  Dan goes on to state in this

17  e-mail, Keith, the attached agreement is the one

18  that was modified to take our negotiations into

19  account and sent to you later for your

20  consideration.

21         What did Dan mean by -- well, strike that.

22  I'm sure I asked Dan a gazillion questions about

23  this.

24    A.   Yeah, I don't know if I can testify as to

Page 182

1    what Dan meant.

2                        (Whereupon, KB Deposition

3                        Exhibit 39 was marked for

4                        identification.)

5    BY MR. ROCHE:

6        Q.   Exhibit 39, Keith, you were apparently

7    copied on this.

8             Do you have any recollection as to why

9    Dan Bump wanted to recall the message in response

10   to COD concerns?

11       A.   I don't know.

12       Q.   Did you have any conversations with Dan

13   about his e-mail that was Exhibit 38?

14       A.   Again?  Sorry.  Could you repeat that?

15       Q.   Did you have any discussions with Dan

16   about the e-mail that Dan sent, which is

17   Exhibit 38?  It's the red and the blue --

18       A.   Oh, I'm sure I did, but I don't

19   remember -- he had stated he had -- these are all

20   things that he could answer.  So he didn't need

21   really any input from me on that, because it was

22   all stuff to do with the program.  So --

23       Q.   Do you recall the substance of the

24   discussions --

Page 183

1      A.    No.

2      Q.    -- with Dan about Exhibit 38?

3      A.    No.

4                   (Whereupon, KB Deposition

5                    Exhibit 40 was marked for

6                    identification.)

7  BY MR. ROCHE:

8      Q.    Exhibit 40, Keith, is another compilation

9  of various e-mails that appear to indicate that ACE

10 and COD representatives are trying to participate

11 in another conference call.

12     A.    Uh-huh.

13     Q.    My question is, do you recall

14 participating in a conference call around this time

15 period, the end of August, early September?

16     A.    Yes.

17     Q.    Who was --

18     A.    I think I'm confusing this one with the

19 conference call that we spoke about earlier,

20 because this was -- this would be the one where

21 they talked about Dan not having certification for

22 on-line training and -- so --

23     Q.    The College of DuPage ultimately notified

24 ACE that it was no longer going to proceed with the

Page 184

1    ACE/COD surgical assisting program in September of
2    2014, is that accurate?
3         A.   Yes.
4         Q.   Between the time that ACE received
5    notification that the College was no longer going
6    to move forward and the time Kathy Cabai attended
7    the Denver skills lab in July of 2014, how many
8    discussions, conference calls do you remember
9    participating in with the College of DuPage?
10        A.   I remember Dan having those e-mails, and
11   then, that conference call.
12        Q.   One con -- okay.
13        A.   Yeah.  Correct.
14        Q.   You recall one -- you believe, as you sit
15   here today, that there was one conference call
16   between the Denver skills lab and September 2014?
17        A.   Yes.
18        Q.   And that was the conference call in which
19   the COD -- in which, yeah, the College expressed
20   concerns with Dan's -- with the skills lab and
21   Dan's on-line resume?
22        A.   Certification, yes.
23        Q.   Certification.  All right.
24

Page 185

1                    (Whereupon, KB Deposition

2                    Exhibit 41 was marked for

3                    identification.)

4    BY MR. ROCHE:

5        Q.   I'll show you what's been marked as

6    Exhibit 41 to your deposition, Keith.  Do you

7    recall receiving that e-mail?

8        A.   Yes.

9        Q.   What was your reaction when you received

10   it?

11       A.   Disappointment maybe.  I put a lot of time

12   into this, and now, they're -- my feeling was, they

13   weren't going to do a surgical assisting program,

14   that this was -- I mean, they decided just not to

15   do it.

16            Surprised, because I don't necessarily get

17   that feeling from the conference call, felt like we

18   had met all their concerns on the conference call.

19            There were classes that Dan could have

20   taken that he could have been ready for the January

21   2015 certification -- to be certified.  The program

22   has already been in place.  We've been teaching it

23   since -- or he had been teaching it since 1995.

24       Q.   Did anyone at the College of DuPage tell

Page 186

1    you -- communicate to ACE that the College was not

2    going to move forward with a surgical assistant

3    program?

4        A.    I don't think so.  I think it was just my

5    assumption that we brought this to them.  They

6    weren't in the process of building one on their

7    own.  It's our -- it was our program.  How can they

8    all of a sudden just turn around and take it and

9    use it?

10       Q.    She -- she, being Karen Solt, in the

11   middle of this e-mail notes -- states that the

12   other issue of a contemporary curriculum in this

13   discipline is also something that would take a fair

14   amount of time to revise, and then, prepare.

15            Do you remember during that conference

16   call we've discussed, in which Dan -- COD expressed

17   its concerns, was one of the concerns that was

18   discussed during that call the issue of the ACE

19   curriculum?

20       A.    Just -- the only thing I can recall is

21   that it was going to be Dan presenting it and he

22   wasn't certified.

23            Now, they had -- they had our curriculum

24   for -- since November.  They restructured it,

Page 187

1    presented it to the College for approval and got

2    approval, presented it to the State and got

3    approval, and then -- so our feeling, when we found

4    out they were actually doing a program on their

5    own, was that they had all that, got it approved,

6    never complained about the on-line curriculum at

7    all until they got the last piece of what they

8    needed from us, which was the surgical skill lab,

9    and now -- now that they've got everything, here

10   come concerns.

11       Q.   Had the College -- prior to Kathy

12   attending the lab, had the College of DuPage

13   expressed any concerns with the curriculum to ACE?

14       A.   No.

15       Q.   Had the College of DuPage expressed any

16   issues concerning the on-line SurgiNet program

17   prior to Kathy attending the skills lab in July in

18   2014?

19       A.   Only that it needed to be Blackboard.  It

20   needed to be able to be presented through

21   Blackboard.

22       Q.   Did ACE ever invest any money or pay any

23   money to Blackboard in connection with starting a

24   language -- or learning management system?

Page 188

1    A.   So we spoke to Blackboard way ahead of

2    time.  They said, you just need to contact us

3    within 90 days of your delivery date so we'll have

4    that amount of time to get you integrated with the

5    College of DuPage's system.

6         So we expressed that to them.  And we even

7    said, you know, we're going to start -- we're going

8    to do it in the middle of August, because we know

9    how things happen.  They say 90 days and it takes

10   100 days.  So we don't want to put it right up to

11   that point.

12        So it was our plan that we would start in

13   the middle of August with Blackboard.  It was only

14   a $2,000 investment and --

15   Q.   Did ACE ever pay Blackboard any sum of

16   money?

17   A.   No, because we never got to the point

18   where it was time to start that.

19   Q.   For the ACE SurgiNet program, Dan Bump

20   testified that each student, when they would start

21   their -- the latest on-line module, they would

22   first take a pretest, depending on how they did,

23   and then, there would ultimately be a unit test?

24   A.   Right.

```
                                        Page 189

 1      Q.   Who drafted the questions for the pretest

 2   for each on-line module?

 3      A.   Dan wrote all of it.

 4      Q.   Dan wrote the pretest questions?

 5      A.   Pretest, yes.

 6      Q.   Did Dan also write the unit test

 7   questions?

 8      A.   Yes.

 9      MR. ROCHE:  Okay.  I think now is a good time

10   to break.  I have about another hour.

11                  (A short break was taken.)

12   BY MR. ROCHE:

13      Q.   Keith, you testified earlier about

14   instances in which ACE would interact with various

15   hospitals.

16      A.   Yes.

17      Q.   Do you recall that testimony?

18      A.   Yes.

19      Q.   Did ACE ever enter into any written

20   contracts with hospitals to provide the ACE

21   surgical assistant program?

22      A.   Yes.  We have over 300.

23      Q.   Contracts with hospitals?

24      A.   Yes, for -- because we have to have a
```

Page 190

1   clinical affiliation agreement for the student to

2   be able to do their clinicals at the hospital.

3           So they're not able to just come do the

4   on-line training and six-day surgical skill lab,

5   and then, just go off on their own.

6           We do an affiliation agreement with the

7   hospital that makes them an extension of the

8   school.  And we also do agreements with the

9   surgeons that makes them basically adjunct faculty

10  so that they can do the clinicals under their

11  direction.

12      Q.   These agreements with the hospitals that

13  you just referred to, they're memorialized in

14  writing?

15      A.   Yes.

16      Q.   And prior to ACE's involvement with the

17  College of DuPage, had these written agreements

18  with hospitals?

19      A.   Yes, since we were open in 2003.

20      Q.   Describe the process with respect to the

21  hospital as to how it would enter into agreements

22  with ACE.

23      A.   So the student enrolls in the program.

24  They give us the contact information for the person

Page 191

1    who would be our point of contact with -- at the

2    hospital.

3            The program director, Dan, then

4    communicates with that person to find out who he

5    should send the contract to.  Sometimes, it's the

6    education director.  Sometimes, it's the -- it

7    could even be the VP of nursing.  So it's different

8    at every hospital.  There's no standard.

9            And then, there's typical -- two types of

10   contracts that we can use.  We can send them ours

11   and they can send it through legal, or a lot of

12   times, we'll accept theirs, because it's already

13   approved by their legal department.

14           So -- and that being the case, they send

15   us theirs, Dan looks over it, and if there's

16   anything that he doesn't like, he would let the

17   attorney look at it, sign off on it, send it back

18   to them for their signature, and then, they'd send

19   it back to us.

20       Q.    In the instances where ACE, through Dan,

21   would send the ACE draft contract, were there

22   instances in which the hospital would come back

23   with modifications --

24       A.    Yes.

```
                                            Page 192
 1       Q.   -- or changes to the particular contract?
 2       A.   Yes.
 3       Q.   Prior to ACE's relationship with the
 4   College of DuPage, were there ever any instances
 5   with the hospitals in which the hospitals would
 6   reject ACE's contract, just summarily --
 7       A.   No.
 8       Q.   -- reject the contract?
 9       A.   No.
10       Q.   No?
11       A.   It's standard practice in our industry.
12       Q.   Would ACE -- in connection with trying to
13   enter into these affiliation agreements or whatever
14   types of contracts with the hospitals you're
15   describing, would ACE send any informational
16   material about the ACE surgical assisting program
17   to these hospitals?
18       A.   No.  It was basically just an e-mail
19   saying your employee, stating their name, has
20   enrolled in our surgical assisting program.  As
21   part of that program, it includes clinicals done at
22   your hospital.
23            And most of the people that we're talking
24   to know how it works, because they've had multiple
```

Page 193

1    people go through either our program or another one
2    like it previously.

3              And a lot of times, a student will enroll
4    and will already have a clinical affiliation
5    agreement with the hospital, because we have so
6    many.

7              So we're talking with people who kind of
8    know how it works.  If it's a new OR director that
9    maybe has not had that situation, they might ask
10   questions about it, but it's never been rejected.

11       Q.   It was not ACE's --

12       A.   Not that I know of.

13       Q.   It's not ACE's custom and practice to send
14   hospitals ACE's curriculum in connection with
15   trying to enter into affiliations?

16       A.   Not unless they ask for it, but I mean,
17   it's very few and far between.

18       Q.   Were there -- but there were instances in
19   which a hospital would ask for the ACE curriculum?

20       A.   The only instance would be if the hospital
21   is initiating the enrollment.

22              So Henrico Doctors' wants to enroll three
23   people.  So the OR director calls me directly, and
24   instead of sending the student the information, I

Page 194

1   send that enrollment information directly to the OR

2   director, and then, they handle everything.

3           That's typically when they would receive

4   the information rather than the student.

5       Q.   Would they -- in certain instances, would

6   they receive the ACE curriculum?  Would you send it

7   to them?

8       A.   Not the curriculum.  The catalog.  I would

9   send them the catalog.

10      Q.   The program catalog, is that --

11      A.   Correct.

12      Q.   -- what you're referring to?

13      A.   But not the master curriculum.  We'd never

14  send that out.

15      Q.   Okay.  And in connection with sending the

16  hospitals the program catalog, would you ask for

17  any sort of confidentiality agreement with the

18  hospital?

19      A.   No.

20      Q.   Let's move on.  Let's go back to the

21  complaint, which I think is Exhibit 2.

22          I wanted to discuss ACE's fraud count

23  that's been brought against all defendants.  So

24  let's turn to Page 8 of this -- of your -- of the

Page 195

1    ACE complaint, Keith.

2         Count III states fraud as to all

3    defendants.  And there's five defendants,

4    Karen Solt, Tom Cameron, Kathy Cabai, the College

5    of DuPage, and the School District -- Community

6    College District 502.

7         Aside from Mr. Cameron, Ms. Solt, and

8    Ms. Cabai, were there any other representatives of

9    the College of DuPage who made fraudulent

10   statements to ACE?

11      A.   No.

12      Q.   I'm sorry?

13      A.   Not that I know of.

14      Q.   Okay.  All right.  Thomas Cameron.  What

15   false statement of fact did Thomas Cameron ever

16   communicate to ACE?

17      A.   On Tom's part, it may have been

18   implication -- implied that there was a -- that

19   they were moving forward to present our program to

20   their students in a consortium agreement.

21         I don't know that I ever heard that

22   directly from him, though.  Most of my

23   communications, other than those two calls, he

24   wasn't involved in.

Page 196

1      Q.   And were those the only -- aside from

2   being maybe, perhaps, copied on some e-mails that

3   we've looked at, were the only other times you

4   communicated with Tom were on -- was when he

5   participated on these two conference calls?

6      A.   Correct.

7      Q.   You never met Tom personal --

8      A.   No.

9      Q.   -- in person?

10     A.   No.

11     Q.   During the two times that Tom was on the

12  conference calls, do you recall Tom Cameron making

13  any false statements of fact --

14     A.   I don't.

15     Q.   -- to ACE?

16     A.   I don't.

17     Q.   Okay.  Karen Solt.  What false statements

18  of fact did Karen Solt make to ACE?

19     A.   Statements?

20     Q.   Yes.

21     A.   Well, if they -- if she said they're ready

22  to move forward, and then, they're not, and they

23  move forward -- this is my perspective now.  I'm

24  not a lawyer.  So --

Page 197

1      Q.   But you are -- be aware you are

2   testifying --

3      A.   Sure.

4      Q.   -- as a corporate representative for ACE.

5      A.   Sure.  So if she states in an e-mail,

6   we're ready to move forward, which we feel like

7   that constitutes a verbal contract, and then, they

8   continue to take pieces of our program until they

9   get the last piece, and then, all of a sudden, we

10  don't want to move forward anymore.

11     Q.   When you're testifying move forward, are

12  you referring to the December 9th, 2013 e-mail --

13     A.   Yes.

14     Q.   -- from Karen?

15     A.   Yes.

16     Q.   Aside from that e-mail, Keith, are there

17  any other false statements of fact that Karen Solt

18  made to ACE?

19     A.   Not that I can recall at the time.

20     Q.   Kathy Cabai.  What false statements of

21  fact did Kathy Cabai communicate to ACE?

22     A.   Statements -- I can't pull a specific

23  statement, other than when she talked about

24  everything's approved, we're ready to move forward,

Page 198

1    can't think about -- can't think of three better

2    guys to be on track with -- on track to do this

3    with, couldn't have done it without Keith and Kyle,

4    and then, coming to our lab with false pretenses.

5    Other than those, I can't think of anything.

6         MR. ROCHE:  Can you read the answer back?

7                   (Whereupon, the record was read.)

8    BY MR. ROCHE:

9         Q.   When you testified that Kathy Cabai told

10   you everything's approved, are you referring to the

11   April 23rd, 2014 e-mail from Kathy, which is

12   Exhibit 29?

13        A.   Yes.

14        Q.   Keith, in Exhibit 29, Kathy doesn't state

15   that everything has been approved.  She does state

16   that all of the classes passed ICCB.  Do you see

17   that?

18        A.   Which was the last stage of approval.  I

19   do see that.

20        Q.   Right.

21        A.   Yes, I'm -- I was just going from memory.

22        Q.   Sure.  Of course.  So I understand it

23   correctly, though, when you stated that one of the

24   false statements of fact she said was everything

Page 199

1    was approved, you're referring to Exhibit 29?

2        A.    Yes.   Correct.

3        Q.    You also said that a false statement of

4    fact Kathy made was that COD was ready to move

5    forward?

6        A.    Let me pull out that --

7        Q.    Are you also referring to the statement in

8    Exhibit 29 in which Kathy states we are good to go?

9        A.    Getting ready to go.

10       Q.    What does it say, actually?

11       A.    It says we are ready to go.

12       Q.    And that's what you're referring to --

13       A.    Yes.

14       Q.    -- when you've stated that she said we're

15   ready to move forward?

16             The statement three better guys to work

17   with, do you recall what you're referencing there?

18       A.    I thought that was in the same e-mail.

19   Where are my -- it was in the notes in the attached

20   copy that I gave you in the beginning of today's --

21       Q.    We marked it as an exhibit, didn't we?

22       A.    Exhibit 19, I think.

23   MR. DAVIS:  Yep.

24   THE WITNESS:  Do you want me to read it for

Page 200

1   you?

2   BY MR. ROCHE:

3        Q.   Please.

4        A.   I think this is an exciting time for COD.

5   It's taken me five years to get them to approve.

6   The day Keith and Kyle walked into my lab was a

7   wonderful day for me.  I'm sad that this is what it

8   took for College of DuPage to finally say okay, but

9   the outcome is all that matters.  It's here.

10            I sent the e-mails out to the last two

11   years' worth of graduates and the e-mails are

12   streaming back.  Exciting time for COD.  I cannot

13   ask for three better guys to be on this train with.

14       Q.   What about those statements is false?

15       A.   Because that constituted a contract.  They

16   moved forward with the contract in place until they

17   get all the pieces of the program, and then, under

18   false pretenses, backed out after -- so if they had

19   planned to back out all along and needed to get all

20   the information, this could have been false.

21       Q.   As you sit here today, Keith, you had

22   several interactions with Kathy throughout a

23   nine-month period, right?

24            Do you truly believe that Kathy, at this

1  point in time when she wrote this e-mail, was

2  intending to misappropriate and steel and commit

3  fraud on ACE?

4      A.   I don't know.  I didn't think the outcome

5  would be what it was either.

6      Q.   Is it possible that Kathy -- the

7  statements in this were genuine and truthful at the

8  time they were made?

9      A.   It's possible, but it's possible that they

10  weren't, too.

11     Q.   What do you believe as you sit here now?

12     A.   At that time, I believed what she said,

13  but when you look back on things, the way it turned

14  out and how it turned out, there's some things that

15  start to make a little sense, that it could have

16  been that they were just milking us for all the

17  pieces of our program, so that eventually, they

18  could just take and run with it.

19     Q.   When you testified that another false

20  statement made by Kathy Cabai was that she or we or

21  COD couldn't have done it without you, what are you

22  referring to there when you make that statement?

23     A.   That she had been trying to get College of

24  DuPage to do this for five years, and Keith and

Page 202

1    Kyle walked into my lab that day and it was a

2    wonderful day for me, I'm sad that that's what it

3    took to get College of DuPage to finally say okay.

4        Q.    You're referring to what is -- what Kathy

5    writes in Exhibit 19 --

6        A.    Yes.

7        Q.    -- to your deposition?

8        A.    Yes.

9        Q.    Okay.  And the last one was, you testified

10   that Kathy came to the Denver lab with false

11   pretenses.

12            What -- why do you believe Kathy Cabai

13   came to the lab with false pretenses?

14       A.    Because everything was moving along

15   smoothly.  They never had any objections to the

16   on-line curriculum.  They asked for our help in

17   multiple situations to help get it passed through

18   the State.

19            And then, once they come to the lab, not

20   did they just have concerns about the lab, but they

21   had concerns about something that they've had in

22   their possession for months.

23       Q.    What?

24       A.    The curriculum.  And Dan being certified

Page 203

1   as a -- I mean, they -- it's not something that

2   they couldn't have asked before they came to the

3   lab, which tells me that maybe they knew that they

4   were not going to -- they just needed that last

5   piece.

6       Q.   Did anyone at the College of DuPage have

7   access to the unit tests that Dan Bump created?

8       A.   I don't have the answer to that.  We were

9   going to look into that, remember?

10      Q.   That's right.

11      A.   As far as --

12      Q.   That's right.  And whether anyone at the

13  College of DuPage had access --

14      A.   The password to get in.

15      Q.   Had the password to access the pretests?

16      A.   Right.

17      Q.   I'll direct your attention to

18  Paragraph 45.

19           Paragraph 45 alleges COD, Cabai, Solt, and

20  Cameron initially proposed to ACE that COD would

21  work with ACE based upon -- based on the

22  proprietary information that ACE provided as to how

23  to organize the program to allow ACE to promote and

24  run the program at COD.

Page 204

1        When ACE states that the defendants

2   initially proposed to ACE that COD would work with

3   ACE, was -- is this in reference to the

4   communications that occurred in November and

5   December of 2013?

6        A.   Yes.

7        Q.   Is this more specifically -- does this

8   paragraph refer to communications that occurred

9   prior to December 9, 2013?

10       A.   I guess the word initially would refer to

11  those discussions, but there were ongoing

12  discussions that continued that same statement.

13       Q.   At the time -- well, strike that.

14  Paragraph 48 states that the representations of

15  defendants were part of a scheme, in which they

16  used ACE's knowledge and expertise, so on and so

17  forth.  Please just take a minute to read that

18  paragraph.

19       My question is, what was the scheme

20  referred to in this paragraph?

21       A.   So like I said, they got all of our --

22  they led us to believe that we were going to be in

23  a consortium.

24       They got every piece of our program a

Page 205

1    little bit at a time.  We consulted with them on

2    how to restructure the program for the semester

3    system.

4            Then, when they finally -- when they

5    finally got the last piece of the program, all the

6    concerns popped up, concerns about things that they

7    have had forever.  So I mean, that would be a

8    textbook definition of a scheme, I would think.

9        Q.   Paragraph 52 on the next page, in reliance

10   on defendants' representations, ACE provided the

11   defendants with the proprietary information, then

12   executed a new note calling for 3,000 per month

13   payments instead of $5,000 per month.

14           What is that -- the second part of that

15   sentence, executing a new note, do you know what

16   that --

17       A.   I don't know.

18       Q.   -- is referring to?

19       A.   I don't know what that's referring to.

20       Q.   Does that have anything to do with this

21   case?

22       A.   Again, I don't know what that's referring

23   to.

24

```
                                            Page 206

 1                      (Whereupon, KB Deposition

 2                      Exhibit 42 was marked for

 3                      identification.)

 4   BY MR. ROCHE:

 5       Q.   I show you what's been marked as

 6   Exhibit 42 to your deposition, Keith.

 7            Is this a document that you gave me

 8   earlier in your deposition this morning?

 9       A.   It is.

10       Q.   Describe the document for me.

11       A.   It's a comparison between the ACE surgical

12   assisting program and the College of DuPage

13   surgical assisting program.

14       Q.   Who prepared this document?

15       A.   Dan Bump.

16       Q.   I haven't had a chance to --

17       A.   Sure.

18       Q.   -- review this document in depth, Keith.

19   My question is, is this everything that relates

20   to -- has everything been produced in this

21   litigation relating to the ACE curriculum and the

22   COD curriculum?

23       A.   As far as I know.

24       Q.   Okay.  And -- okay.  This is all?
```

```
                                          Page 207
```

1    A.   Yes.

2    Q.   This is everything?

3    A.   Yes.

4    Q.   Page 2, if you look just in the middle, in

5 the column COD, there's some N/A.

6    A.   Right.

7    Q.   What does that stand for?

8    A.   So on the lab -- we present a six-day

9 surgical skill lab.  The first day of the lab is

10 suturing and tying.  And then, subsequent days are

11 simulated surgeries on those surgical simulators to

12 help reinforce the suture and tie techniques that

13 they learn.

14       The reason it's N/A under College of

15 DuPage is, now that they're not in a consortium

16 with ACE, they're doing their own program, they

17 would not be able to present the other six days

18 because of the surgical simulators that we would

19 have been providing for them under the consortium

20 agreement.  So they're only able to teach the first

21 day, which is the suturing and tying day.

22       Now, we have a colleague in Chicago that

23 teaches a cadaver lab.  He has a cadaver lab.  He

24 called me and said that College of DuPage had

Page 208

1  recently reached out to him to see if he could

2  teach some of the surgery stuff to make up for what

3  they weren't going to be able to teach because of

4  the missing parts of our lab.

5      Q.   What is his name?

6      A.   John Kane.

7      Q.   Can you spell his last name?

8      A.   K-a-n-e.

9      Q.   What does the N/A stand for?

10     A.   That means that that's not available in

11  their curriculum.  So it's not that they changed

12  anything.  They deleted the parts that would --

13  that they wouldn't have the expertise or the

14  materials to teach.

15     Q.   And the N/A is referring to the lab --

16     A.   Correct.

17     Q.   -- that's put on by --

18     A.   Right.  So we --

19     Q.   -- COD?

20     A.   Yeah.  We do a total abdominal

21  hysterectomy.  They're not able to do that, because

22  they don't have the simulator.

23          They don't do the second day of basic and

24  advanced suturing and tying.  They only do the

Page 209

1    first day.  So they're leaving out -- I mean,

2    there's a lot that's been deleted, which doesn't

3    mean that they didn't take the first day -- you

4    know, take the first day of our lab.  I mean, if

5    you got a cat and you shave it, it's still a cat.

6        Q.   Are the labs the same?

7        A.   The first day of the lab is the same as

8    our -- the first day of our lab.

9        Q.   Okay.  What about the remaining days of

10   the --

11       A.   They just deleted it.

12       Q.   What about the remaining days of the labs?

13   Are --

14       A.   They don't --

15       Q.   Are they the same format and same

16   topics --

17       A.   They didn't --

18       Q.   -- covered?

19       A.   They don't do it at all.  They deleted it.

20       Q.   That wasn't my question.  Are they the

21   same?

22       A.   How can they be the same if they're not

23   doing it?

24       Q.   They're not the same then?  You would

Page 210

1   agree with that?

2       A.   The first day of the lab is exactly the

3   same day as the first day of our lab.

4       Q.   But Day 2 through the completion of the

5   lab, both -- are different between the College of

6   DuPage and ACE, correct?

7       A.   Well, if one has a lab and the other one

8   is not even there, I guess it is -- it's different.

9   It's just -- it's not that they're teaching

10  something different.  They're just not teaching a

11  piece of what they learned from us.

12      Q.   College of DuPage, the curriculum -- the

13  column ST2501, MOD1, do you see that?

14      A.   200 or 201?  Are we on the first page?

15      Q.   I'm on Page 1.  ST --

16      A.   Okay.  Yes.

17      Q.   -- 2501, MOD1?

18      A.   Correct.

19      Q.   Do you know what that stands for?

20      A.   That's the section and the module.

21      Q.   What documents did Dan Bump review in

22  connection with preparing this summary analysis

23  that he did of College of DuPage's curriculum?

24      A.   Our master curriculum and their master

Page 211

1    curriculum.

2         Q.   Do you know -- can you identify by Bates

3    label the College of DuPage's master curriculum

4    that Dan Bump reviewed in connection with preparing

5    this analysis?

6         A.   I can't.

7         Q.   Is the curriculum that's necessary to

8    institute a surgical assistant program available

9    on-line?

10        A.   I wouldn't know that.

11        Q.   Are you aware if the curriculum necessary

12   to institute a surgical assistant program can be --

13   is available from the AST?

14        A.   I don't know if it's the AST.  It may be

15   available from CAAHEP.

16        Q.   Are you aware if it's available from the

17   ABSA?

18        A.   No, it's not.  I do know our curriculum is

19   not available -- readily available on-line without

20   us giving somebody our master curriculum.

21        Q.   Students --

22        A.   No, they don't get -- they log on and they

23   don't get that master curriculum outline, like we

24   would give to College of DuPage.

Page 212

1      Q.   Students are available to access and

2  download the syllabi --

3      A.   Correct.

4      Q.   -- for each on-line module?

5      A.   Correct.

6      Q.   And if you take each on-line module that

7  ACE offers and put it all together in one document,

8  that constitutes the master curriculum, does it

9  not?

10     A.   Okay.  I would agree to that.

11     Q.   Did you review, in connection with

12  preparing for today's deposition, Dan Bump's

13  deposition testimony?

14     A.   No.

15     Q.   Dan Bump testified that the ACE curriculum

16  comprised 50 percent or so of the AST curriculum.

17          Do you know if Dan Bump, in preparing this

18  comparison and analysis study, separated what the

19  A -- what the ACE curriculum identified in this

20  document was taken from the AST curriculum?

21     A.   I do not know.

22     Q.   Okay.  I think the last two -- the last

23  exhibit -- so we're going to do a comparison of the

24  ACE self-study and the College of DuPage

Page 213

1    self-study.  Here's ACE's self-study.  There's a

2    lot here.

3        A.   Sorry.

4        Q.   It's a big exhibit.

5        MR. DAVIS:  I actually have a PDF copy of it.

6    Is this the -- this is the COD --

7        MR. ROCHE:  Right.

8        MR. DAVIS:  That's COD.

9        THE WITNESS:  This one is ACE.

10       MR. DAVIS:  Oh, okay.  You produced COD's.

11       MR. ROCHE:  Uh-huh.

12       MR. DAVIS:  Yeah.

13       MR. ROCHE:  Yeah.

14       MR. DAVIS:  I have it on my computer.

15       MR. ROCHE:  All right.

16       MR. DAVIS:  Do you have ACE's on -- in a PDF?

17       MR. ROCHE:  You might.  You produced ACE's.

18       MR. DAVIS:  I produced ACE's.  So --

19       MR. ROCHE:  It's got to be -- I could send you

20    a PDF.  Do you want me to do it now or --

21       MR. DAVIS:  No, no.  I've got a PDF of their --

22       MR. ROCHE:  Oh, all right.

23       MR. DAVIS:  So --

24

Page 214

1  BY MR. ROCHE:

2      Q.   All right, Keith.  I'm not sure what

3  exhibit.  We've looked at it, the ACE self-study.

4      A.   I have it 42, the sixth page of 42.  It's

5  on the back -- the last page of the curriculum

6  comparison.  You just had it out.

7      Q.   What do you mean?  What are you referring

8  to?  The last page, what is it?

9      A.   It's the self-study comparison.  Is that

10  what you were looking for?  It looks like that.

11  It's on the back page of this.

12      Q.   Yeah, let me -- oh, here we go.  Hold on.

13  Keith, what -- tell me, what are -- going through

14  College of DuPage's self-study and comparing it

15  with the ACE self-study, what did the College of

16  DuPage copy within ACE's self-study?

17      A.   So we didn't find any significant things

18  that like were copied and pasted.

19      Q.   Did you find anything?

20      A.   I didn't do the review.  Dan did.  He

21  didn't -- he said he -- the only thing might have

22  been that they got inspiration from ours to know

23  what kind of questions would be asked in their

24  self-study.

1          Now, their self-study should be different

2     from ours.  They're a different institution.  They

3     had to restructure the program so it would be -- it

4     should be different than ours.

5          Q.   ACE alleges in this -- in its complaint

6     that among other things, College of DuPage used

7     ACE's self-study to prepare its own self-study.

8          A.   Well, that could be --

9          Q.   Hold on.

10         A.   I'm sorry.

11         Q.   There's no question --

12         A.   Sorry.

13         Q.   -- all right?  I believe you just

14    testified that there's nothing specific from the

15    ACE self-study that is incorporated into this

16    exhibit, the College of DuPage self-study, is that

17    accurate?

18         A.   It wasn't copied.  There was no

19    significant exact matches.

20         Q.   Was anything copied -- based on your

21    review and Dan's review, was -- did the College of

22    DuPage copy anything from the ACE self-study?

23         A.   No.  It doesn't mean they didn't use our

24    self-study to prepare themselves to write their

Page 216

1    own.  Otherwise, why would she have asked for it?

2    She didn't ask for it just so she would have some

3    light reading for the weekend.

4        Q.   How do you know she asked for the

5    ACE self-study?  What's your basis for that

6    statement?

7        A.   She asked us for it.

8        Q.   Did she ask you personally?

9        A.   I'm pretty sure it's in e-mails that she

10   asked for the --

11       Q.   Can you point to an e-mail?

12       MR. DAVIS:  Do you want me to point to an

13   e-mail?

14       MR. ROCHE:  Sure.

15       THE WITNESS:  I'm pretty sure --

16       MR. ROCHE:  If you can point to the e-mail --

17       MR. DAVIS:  Sure.

18       MR. ROCHE:  -- that Keith is referring to,

19   that's great.

20       THE WITNESS:  And she asked for it to be mailed

21   to her house and gave us the address.

22       MR. DAVIS:  It's an e-mail dated Monday,

23   May 5th, 2014.

24            Is there any way you have a high-speed

Page 217

1    scanner that you can just scan the self-study?  If

2    you don't own one, you need to buy one.  All the

3    additional help you can provide me will make my

4    life easier.

5         THE WITNESS:  And there should be a subsequent

6    e-mail that gives us her home address to mail it

7    to.

8         MR. ROCHE:  Mike, can you tell me what time of

9    day that e-mail was sent?

10        MR. DAVIS:  It was sent at 4:57 p.m.  Subject,

11   consortium contract.  It was Exhibit J to the

12   defendant's -- the deps that I took of the

13   defendant.

14        MR. ROCHE:  Right.  We need to go off the

15   record for a minute.

16                     (Discussion off the record.)

17                     (Whereupon, KB Deposition

18                     Exhibit 43 and Exhibit 44 were

19                     marked for identification.)

20   BY MR. ROCHE:

21        Q.   Keith, I show you what's been marked as

22   Exhibit 44 to your deposition.

23             At the bottom portion of this first page,

24   Kathy Cabai to Dan Bump at 4:57 p.m., is it your

Page 218

1    testimony that this e-mail from Kathy to Dan is

2    where she requests ACE send her the -- ACE's

3    self-study?

4        A.   Yes.  And then, there should be a

5    subsequent e-mail that sends Maggie an e-mail

6    stating get this started for her.

7             And then, she send -- Maggie sends Kathy

8    an e-mail saying where do you want the self-study

9    sent.  And then, she replied with her home address.

10       Q.   Look at the first e-mail on this thread,

11   Keith.  It's an e-mail from Dan to Kathy, in which

12   Dan states in the third sentence, I will also be

13   getting you a copy of our self- study.

14            That is a big copying job and I don't know

15   if I can delegate that to my staff.  They are

16   pretty busy already.  Do you see that?

17       A.   Yes.

18       Q.   Would you agree that Kathy's e-mail to Dan

19   was in response to Dan's initial e-mail stating

20   that he is sending Kathy the self-study?

21       A.   I'm not sure that he would have just

22   offered to do that, because he -- even in this

23   e-mail, he's saying what a big job it is.  I don't

24   think he would have offered to do that without her

Page 219

1    asking for it.

2        Q.   Do you know when ACE tendered the

3    self-study -- its self-study to CAAHEP for

4    accreditation purposes?  Do you recall the year?

5        A.   That was before I started with ACE.  I

6    don't know.

7        Q.   Do you recall if, between the time period

8    of when ACE submitted its self-study to CAAHEP and

9    the College of DuPage submitted its self-study to

10   CAAHEP, the standards for accreditation from CAAHEP

11   changed?

12       A.   I wouldn't know that.  I wouldn't be

13   involved in that.  Can I comment on that further?

14       Q.   Sure.

15       A.   So if I was to say, hey, I'm going to send

16   you this 500-page document and it was something

17   that you didn't need or want, would you advise me

18   on how I could scan that in and send it to you or

19   would you say I don't need that?

20       Q.   Do you know when ACE actually sent the

21   self-study to Kathy?

22       A.   I can get those dates for you.  I don't

23   have it readily available to me.

24       Q.   Okay.  Please do.

Page 220

1    A.   Okay.

2    THE WITNESS:  Are you going to make a note of

3  that or do you want me to?

4    MR. DAVIS:  Say it again.

5    THE WITNESS:  Provide the date for this -- when

6  we sent them the self-study.

7    MR. DAVIS:  Did you ask Dan -- you asked Dan

8  questions about the self-study.

9    MR. ROCHE:  Yeah, I did.  And I --

10    MR. DAVIS:  You asked Dan questions about when

11  he -- when the ACE self-study was filed.  It was

12  2008, 2009.

13    MR. ROCHE:  I think it was 2006, but yeah.

14    MR. DAVIS:  Yeah.  So when the self-study was

15  sent to Kathy?

16    THE WITNESS:  Correct.

17  BY MR. ROCHE:

18    Q.   I guess that -- and the only follow-up

19  issue is if ACE could identify if the College of

20  DuPage ever had access to ACE's pretests, quizzes,

21  unit tests.

22    A.   Right.

23    Q.   The ACE workbook authored by Dan Bump.

24    A.   Okay.

Page 221

1    Q.   If it turns out, based on the follow-up

2  investigation, that the College of DuPage never had

3  access to Dan Bump's ACE workbook, would you agree

4  that the College of DuPage did not misappropriate

5  the information contained within the ACE workbook?

6    A.   If they didn't have it, they wouldn't be

7  able to do that.

8    Q.   You would agree with the idea that if the

9  College of DuPage never had access to the ACE

10  workbook, it did not misappropriate whatever

11  information is contained within the ACE workbook?

12    A.   Yes, unless -- and I don't know how the

13  curriculum is laid out.  Unless that was involved

14  in another piece of e-mail, like if maybe that was

15  involved in the master curriculum, but I wouldn't

16  think it would be but --

17    MR. DAVIS:  Are you talking about the on-line

18  workbook?

19    THE WITNESS:  There's a workbook that goes --

20    MR. DAVIS:  Yeah.

21    THE WITNESS:  -- I think with the lab.

22    MR. DAVIS:  Yeah.  You asked him about that.

23    THE WITNESS:  She may have it, because she got

24  it --

Page 222

1      MR. DAVIS:  You asked --

2      MR. ROCHE:  And I'm not going to.  There's a

3  workbook that's part of the ACE curriculum.

4      MR. DAVIS:  No.  You asked Dan about that.  You

5  totally asked Dan about that.

6      MR. ROCHE:  Yeah.

7      THE WITNESS:  I don't know about the

8  curriculum.  That's his area of expertise.  So --

9  BY MR. ROCHE:

10     Q.   One question about -- well, just a few

11  quick questions.  Lawyers can never confine

12  themselves to one question.

13     MR. DAVIS:  Some lawyers do.

14  BY MR. ROCHE:

15     Q.   With respect to retrieving e-mails in

16  connection with this litigation, Keith, did you

17  search your personal e-mail address at Gmail for

18  responsive documents?

19     A.   I did.

20     Q.   Okay.  And have all those e-mails -- are

21  you aware of -- that a protocol for e-mail searches

22  was entered into between counsel of record in this

23  case?

24     A.   Yes.

Page 223

1      Q.   And did you abide by and follow that

2   e-mail protocol in connection with searching your

3   Gmail account?

4      A.   Yes.

5      MR. ROCHE:   I have no further questions.

6      MR. DAVIS:  He wants to read the dep.

7           (FURTHER DEPONENT SAITH NOT)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 224

1    STATE OF ILLINOIS  )

2                       )  SS:

3    COUNTY OF C O O K  )

4        I, Elizabeth L. Vela, an Illinois Certified

5    Shorthand Reporter, do hereby certify that

6    heretofore, to-wit, on the 16th day of May, 2017,

7    personally appeared before me, at 180 North

8    Stetson, Chicago, Illinois, KEITH BUMP, in a cause

9    now pending and undetermined in the United States

10   District Court, wherein AMERICAN CENTER FOR

11   EXCELLENCE IN SURGICAL ASSISTING, INC. is the

12   Plaintiff, and COMMUNITY COLLEGE DISTRICT 502,

13   et al. are the Defendants.

14       I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in the

19   presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to the

Page 225

1  foregoing deposition was reserved by counsel for

2  the respective parties.

3      I further certify that the taking of this

4  deposition was pursuant to Notice, and that there

5  were present at the deposition the attorneys

6  hereinbefore mentioned.

7      I further certify that I am not counsel for nor

8  in any way related to the parties to this suit, nor

9  am I in any way interested in the outcome thereof.

10      IN TESTIMONY WHEREOF:  I have hereunto set my

11  hand this 7th day of June, 2017.

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 226

1                   Veritext Legal Solutions
              1 North Franklin Street - Suite 3000

2                  Chicago, Illinois 60606
               Phone: 312-442-9087

3

4

   June 7, 2017

5

   To: Michael J. Davis

6

   Case Name: American Center For Excellence In Surgical Assisting, Inc.

7   v. Community College, District 502, Et Al.

8   Veritext Reference Number: 2618109

9   Witness: Keith Bump     Deposition Date: 5/16/2017

10

   Dear Sir/Madam:

11

   Enclosed please find a deposition transcript. Please have the witness

12

   review the transcript and note any changes or corrections on the

13

   included errata sheet, indicating the page, line number, change, and

14

   the reason for the change. Have the witness' signature at the bottom

15

   of the sheet notarized and forward errata sheet back to us at the

16

   address shown above, or email to production-midwest@veritext.com.

17

18

   If the errata is not returned within thirty days of your receipt of

19

   this letter, the reading and signing will be deemed waived.

20

21

22   Sincerely,

23

24   Production Department

Page 227

```
 1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
            ASSIGNMENT NO: 2618109
 3          CASE NAME: American Center For Excellence In Surgical
     Assisting, Inc. v. Community College, District 502, Et Al.
            DATE OF DEPOSITION: 5/16/2017
 4          WITNESS' NAME: Keith Bump
 5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7          I have made no changes to the testimony
     as transcribed by the court reporter.
 8

 9   _____          _____
        Date                         Keith Bump
10          Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
                  Statement; and
14          Their execution of this Statement is of
                  their free act and deed.
15
            I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Page 228

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT NO: 2618109
 3        CASE NAME: American Center For Excellence In Surgical
     Assisting, Inc. v. Community College, District 502, Et Al.
          DATE OF DEPOSITION: 5/16/2017
 4        WITNESS' NAME: Keith Bump
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____       _____
          Date                     Keith Bump
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18             in the appended Errata Sheet;
          They signed the foregoing Sworn
19             Statement; and
          Their execution of this Statement is of
20             their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
                   Notary Public
24
          _____
25                 Commission Expiration Date
```

Page 229

1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 2618109
3      PAGE/LINE(S) /       CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20       Date                    Keith Bump
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                       _____
                         Notary Public
24
                         _____
25                       Commission Expiration Date

**[& - 2017]**                                                                 Page 1

| | | | |
|---|---|---|---|
| **&** | | | |

**&** 2:10 4:1 5:2

**0**

**0** 83:1
**084-003650** 1:24

**1**

**1** 3:5 10:18,20,23
21:2 69:18 104:8
104:20 147:14
210:15 226:1
**1-3nov.doc** 69:14
**1-3november.doc**
69:22
**10** 3:6,16,16 48:18
57:6,11 109:13,14
118:24,24 173:21
**100** 81:3 89:14
153:7 157:17
169:5 188:10
**103** 4:1
**1058** 83:1
**1060** 92:1
**1068** 82:17
**11** 3:17,24 32:11
57:17 58:4
**11453** 6:6
**117** 4:2
**11:23** 1:19
**11th** 29:3,12
**12** 3:7,18 4:20
25:8 68:21,24
81:7 88:20 104:21
109:14,14 119:1,1
126:23 135:13
145:6 170:21
**12-10-64** 7:24
**120** 4:3
**122** 4:4
**124** 4:5

**127** 4:6
**12th** 170:9 171:6
**13** 3:20 4:21,22
83:6,10 91:23
**131** 4:7
**132** 4:8
**133** 4:9
**135** 4:10
**137** 4:11
**138** 4:12
**14** 3:21 4:23 31:13
31:22 32:14 48:17
48:18 83:16 84:4
**142** 4:13
**144** 4:14
**14th** 168:10
**15** 1:8 3:22 95:18
95:23 109:14
119:1 143:4,8
**152** 4:15
**153** 4:16
**154** 139:17
**16** 3:23 96:12,16
98:22
**162** 4:17
**166** 4:18
**169** 4:19
**16th** 1:18 224:6
**17** 3:24 4:10 98:18
101:17
**175** 4:20
**177** 4:21
**17th** 137:3 151:18
**18** 4:1,19 103:5,9
104:20 118:15
135:9,13
**180** 1:17 2:13
224:7
**182** 4:22
**183** 4:23

**185** 5:1
**19** 4:2 18:16 70:5
117:7,11 199:22
202:5
**1983** 8:10
**1986** 9:21
**1995** 173:4 185:23
**19th** 47:14 68:19
72:9 74:19 76:13
86:3,11,14 87:3,16
139:11 168:11
170:8 171:4
**1november.doc**
18:22
**1st** 143:1

**2**

**2** 3:7 12:18,20,24
65:8 79:6 92:5
93:12 104:8,21
194:21 207:4
210:4
**2,000** 188:14
**20** 4:3 118:15
120:20,24 133:23
134:2 150:8,11,13
227:16 228:22
229:22
**200** 110:4 114:6
115:7 210:14
**200,000** 59:22
**2003** 190:19
**2006** 220:13
**2008** 40:22 220:12
**2009** 220:12
**201** 210:14
**2012** 10:14 40:15
43:14 65:7
**2013** 3:14,22,23,24
18:16 26:16 27:2
28:22 29:13 33:14
33:18 34:17 37:10

**55:8 68:3 70:5**
79:11 81:12 94:7
94:14 95:24 96:18
97:7 99:12,15,18
100:4,7,17 101:1
101:13 102:3,8,16
102:18,23 105:23
106:4 129:24
130:12,20 133:8
136:21 138:21
139:9 140:10,16
140:19 141:2
168:7 179:20
180:20 197:12
204:5,9
**2014** 3:15,16,17
4:2,3,4,5,6,7,8,9
4:10,11,12,13,14
4:16,17,18,19,20
4:21,22,23 5:1,4
55:22 58:10 119:4
119:7 120:1,15
121:5 122:5,17
123:3,20 124:11
125:21 126:5,16
127:2 132:12,14
134:2 137:3 142:4
145:10 147:7,23
151:18 153:4,18
155:4 162:20
163:20 164:2
168:11 170:8,9
175:22 176:1,4
178:8 184:2,7,16
187:18 198:11
216:23
**2015** 42:17 46:3
185:21
**2017** 1:18 224:6
225:11 226:4

**[206 - 8th]**

**206** 5:2
**20th** 72:18,22
73:14 74:11,23
75:5,17,22 76:4
77:13 78:3,21
85:5,9,18,19 86:1
86:21 87:12,16
134:17 139:12
**21** 3:22 4:3,4,4,5
4:11 81:12 122:11
122:15 123:3,20
124:11 125:2
126:5,15 127:2
180:20
**217** 5:3,4
**21st** 79:9 95:24
121:5,12 122:5,17
125:11,21 137:17
137:23
**22** 3:8,10 4:5
124:21 125:1
**23** 4:6,12 127:22
**2304** 105:1
**23059** 6:7
**2308** 109:3 118:16
118:22
**23rd** 32:17,18 33:5
142:4 143:22
198:11
**24** 3:11 4:6,7,7,8,9
131:7,10 132:12
132:14
**24th** 133:17
**25** 3:12 4:8 132:4
132:8
**2501** 210:17
**25th** 153:18
154:10
**26** 3:15 4:9,16,17
55:22 133:11,15
154:20 155:3

**2618109** 226:8
227:2 228:2 229:2
**27** 4:10 135:2,6
139:20 151:6
**28** 3:17 4:11 58:10
137:8,12
**29** 3:14 4:12 138:9
138:12 141:8
198:12,14 199:1,8

**3**

**3** 3:8 22:4,8,9 82:5
82:10 92:5 104:8
104:22 149:21
150:1,2
**3,000** 205:12
**3,600** 36:19 37:6
142:9
**30** 3:5 4:13,13
11:2 30:20 40:21
47:9 104:16 142:1
142:17,21 175:22
176:1,4
**300** 160:6 189:22
**3000** 226:1
**31** 4:14 144:12,16
147:15
**312** 2:15
**312-442-9087**
226:2
**32** 4:15 152:23
153:2 179:13
180:2
**33** 4:16 153:11,15
**34** 4:17 162:16,20
**35** 4:18 166:11,14
**36** 4:19 169:16,19
**361-6036** 2:6
**37** 4:20 175:10,14
**3700** 2:13
**38** 4:21 177:12,16
182:13,17 183:2

**39** 4:22 182:3,6
**3rd** 69:24

**4**

**4** 3:9 22:16,20
23:20 26:5,8
93:11 149:18
150:1
**4,380** 93:13 100:1
179:11
**4,400** 28:10,12
36:6 91:6 128:14
128:22 129:1
133:7 179:23
**40** 3:13 4:23 183:5
183:8
**41** 5:1 185:2,6
**4100** 2:4
**42** 5:2 135:16
206:2,6 214:4,4
**42,000** 59:19
**420** 2:4
**43** 5:3 217:18
**44** 5:4 217:18,22
**45** 203:18,19
**48** 204:14
**4:57** 217:10,24

**5**

**5** 3:11 4:14 21:1,2
24:16,20 92:18
94:6
**5,000** 205:13
**5/16/2017** 226:9
227:3 228:3
**50** 3:14 45:24
47:21 48:6,10
212:16
**500** 45:21,24 133:4
219:16
**502** 1:10 195:6
224:12 226:7

227:3 228:3
**52** 205:9
**55** 3:15
**565-8333** 2:15
**57** 3:16,17
**5th** 88:19 92:4,7
92:15,20,22 93:16
94:7,14,19 95:2
139:13 145:2,10
147:7,23 152:15
153:4 154:7 168:6
178:8 216:23

**6**

**6** 3:5,12 4:2 11:2
21:1 25:2,6 82:19
114:19 142:1
**6,900** 28:11 91:4
**60601** 2:14
**60606** 226:2
**68** 3:19
**6:03** 1:20
**6th** 33:24

**7**

**7** 3:2,13 26:9 27:1
40:2,6 41:1 226:4
**72** 116:1,18
**720** 2:6
**7290** 1:8
**7:00** 133:23
**7th** 225:11

**8**

**8** 3:14 4:18 5:1,4
50:2,6 109:13
118:24 194:24
**80246** 2:5
**83** 3:20,21
**8th** 162:20

**[9 - ace's]**                                                                                    Page 3

**9**

**9** 3:15,23 26:16
27:2 33:14,18
55:15,19 82:10
97:7 133:8 204:9
**90** 173:20 188:3,9
**95** 3:22
**96** 3:23
**98** 3:24
**9th** 27:9,14,17
28:22 34:17 35:2
96:18 97:4 98:24
99:12,15,17 100:4
100:7,17 101:1,13
102:3,8,16,18,23
120:1,5 129:24
130:11,20 136:21
138:21 139:9
140:9,16,19 141:2
197:12

**a**

**a.m.** 1:19 133:23
**abbots** 6:6
**abdominal** 208:20
**abide** 223:1
**ability** 8:18 30:14
156:3
**able** 7:16 19:14
32:7,11 39:2 45:7
59:8 67:23 71:14
72:7 78:20 106:13
106:15 107:20
108:11 112:1,2
115:7 123:5,12
125:4 155:20
160:8,10 175:19
187:20 190:2,3
207:17,20 208:3
208:21 221:7

**abs** 106:7,24
**absa** 211:17
**absent** 167:3
**academic** 42:4
47:3 60:9 64:24
**academy** 9:6,8,9
9:18 43:22
**accept** 107:20
191:12
**acceptance** 102:2
102:7
**access** 38:1 63:5
64:10 148:15,23
149:6 203:7,13,15
212:1 220:20
221:3,9
**accessed** 149:3
**account** 181:19
223:3
**accreditation** 56:4
56:9 105:5,8,9,22
106:8 108:10
110:12 111:2
112:17 219:4,10
**accredited** 56:5,15
105:14,17,19
106:9,13,18,20
107:1,3,13,15,23
108:9 110:8 112:7
112:24 116:4
132:1
**accurate** 27:3
184:2 215:17
**accurately** 8:19
**ace** 3:7 10:5,8,13
12:16 13:1 14:12
21:12 22:1 23:17
23:21,22 24:5
25:19,24 26:10,20
30:19,21 31:3,10
35:13 36:21 40:14

40:17 41:5,10
42:3,8,11,21 43:2
43:14 46:4 47:2
48:13,14,15 49:6
52:4,7,7,19,22
53:11,24 56:23
60:14 61:20,21
62:2,4,7,9,12,14
62:16,19,22 63:2,2
63:5,10,13,17,20
63:22 64:1,4,7,7,7
64:10,14,23 65:9
66:2,21 67:5
72:13 74:15 77:2
77:16 79:20 81:5
81:6 83:1 84:17
85:3,8,11 86:5,9
87:5,8 90:23 91:5
93:13 94:16 95:5
96:8 97:1,9 99:2,5
99:18,19 100:1,21
101:3,15 102:4,5,8
102:9,11,15,19,21
102:24 103:2
104:16,18 105:14
107:3,15 108:10
108:17 109:21
111:1,12,13,14,17
112:17,18 113:15
113:16 114:1
115:22 116:9,10
116:11 118:22
119:8,22 120:3,16
126:5,6,14 127:3
128:14 130:9,12
130:21 132:15,17
133:6 134:16,16
134:19,19 137:4
139:1,6,21 140:8
141:16,18,23
142:3,5 144:17

145:8,17 146:21
146:22 147:4,7,20
148:1,2,6,7,15
149:5,9,9 150:9
152:6,19 153:3
155:1,23 156:5,21
158:23 159:3
160:1,1,5,12
161:10 162:10
165:1,8 167:15,24
168:17 169:13
174:1,21 176:16
176:21,21 177:4
178:1 179:3 183:9
183:24 184:1,4
186:1,18 187:13
187:22 188:15,19
189:14,19,20
190:22 191:20,21
192:12,15,16
193:19 194:6
195:1,10,16
196:15,18 197:4
197:18,21 201:3
203:20,21,22,23
204:1,2,3 205:10
206:11,21 207:16
210:6 212:7,15,19
212:24 213:9
214:3,15 215:5,15
215:22 216:5
218:2 219:2,5,8,20
220:11,19,23
221:3,5,9,11 222:3
**ace's** 3:8,9,11,12
3:13 15:4 21:16
21:18 22:10,20,23
23:14 24:20 25:14
25:18 30:17 40:6
40:10 42:23 43:2
44:23 55:24 61:22

63:5,18 64:1,11
67:4 82:7 91:8
92:18 100:3
101:12 147:8,18
151:20 156:2,18
168:4 180:4
190:16 192:3,6
193:11,13,14
194:22 204:16
213:1,16,17,18
214:16 215:7
218:2 220:20
**ace0001** 83:1
**ace0479** 132:9
**ace1001** 25:11
82:16
**ace1012** 25:13
**ace1013** 25:17
**ace1058** 25:17
**ace1059** 84:2
**ace1062** 84:2
**ace1063** 84:9
**ace1068** 84:9
**acknowledge**
227:11 228:16
**acronym** 51:17
**act** 227:14 228:20
**action** 13:1 160:19
160:20
**actual** 77:23 139:8
140:24 180:14
**addition** 18:12
**additional** 29:20
33:1 85:14 96:24
97:8 112:3 217:3
**address** 6:5
216:21 217:6
218:9 222:17
226:16
**adjunct** 190:9

**administer** 112:14
**admission** 101:2
101:14 111:11
112:19 113:16,18
**admissions** 101:5
**admit** 3:13 40:8
**advanced** 171:21
173:22 208:24
**advice** 162:1
**advise** 113:18
219:17
**advised** 160:21
165:20
**advisory** 133:22
134:1 137:14
**affect** 8:18 49:2,3
49:3
**affiliated** 58:23
**affiliation** 190:1,6
192:13 193:4
**affiliations** 193:15
**affixed** 227:15
228:21
**aflac** 41:4
**aforesaid** 224:17
224:23
**ago** 39:8,17 42:15
57:2 89:15 176:11
176:11,15
**agree** 33:1 96:22
97:1,3 100:15
126:1,4 130:4
152:4 210:1
212:10 218:18
221:3,8
**agreed** 28:7,21
36:15 99:8 100:4
100:13 119:23
123:2 125:4,8
133:8 159:6,13,15
159:18 161:9

167:24 173:8
**agreeing** 139:5
**agreement** 3:20
4:15 29:7,9 35:9
35:14,23 36:1,19
37:9 53:14,17
62:3 63:14 79:19
80:18 81:1,4,11,21
81:22 82:2 83:2
83:11,22 84:10
85:21,22 90:19
91:24 92:6 93:3
93:24 94:9 99:3,4
99:11,14,17,22,24
100:6,19 101:2,12
123:5,23 126:2,6
126:13,15,20
129:21,22 130:3
132:16 134:17,20
141:16,17 142:3,9
142:12 144:18
145:2,9,13,15,18
145:22 149:17,19
149:22 150:6
152:4,18,19 153:3
153:21 154:1,9
163:11 164:7
165:12,16 166:6
174:19,23 178:5,7
178:12,14,19,22
179:10,13,22
180:1,6,11,17,19
180:23 181:2,4,11
181:17 190:1,6
193:5 194:17
195:20 207:20
**agreement.pdf.**
178:2
**agreements** 47:2
190:8,12,17,21
192:13

**ahead** 6:20 7:7
41:19 112:6 188:1
**aid** 28:16
**aided** 224:20
**al** 1:10 224:13
226:7 227:3 228:3
**allegations** 13:18
13:20
**allegedly** 133:8
**alleges** 25:24
102:8 203:19
215:5
**alleging** 162:10
**allen** 6:7
**allied** 105:9
**allow** 203:23
**allowed** 165:8
**allowing** 100:16
**allude** 102:13
**alluded** 111:5
**alongside** 31:12
**amend** 133:3
**amendment** 142:8
142:11
**american** 1:4 10:1
11:3 43:21 224:10
226:6 227:3 228:3
**amount** 32:4 36:3
36:5,18 37:5
53:21 93:13,16
104:7,22 109:20
129:1 135:22
136:17 179:2,7
186:14 188:4
**analysis** 5:2 21:5,6
210:22 211:5
212:18
**annual** 43:6
**answer** 6:21 7:7
7:10 14:10 17:21
26:16 27:2 33:12

82:16 104:13,19
136:14 148:21
154:23 167:18
176:17,23 182:20
198:6 203:8
**answered** 136:16
136:16
**answers** 22:24
23:14,24 24:3
26:4 40:10,11
**anybody** 107:21
108:2 146:4
**anymore** 66:7
197:10
**anyway** 174:11
**apart** 48:14
**apologize** 76:3,3
181:12
**apparently** 182:6
**appear** 183:9
227:11 228:15
**appearances** 2:1
**appeared** 224:7
**appears** 29:7,9
178:10
**appended** 228:11
228:18
**application** 4:1
172:12
**applied** 113:14
**apply** 150:2
172:14,16
**appointment** 67:2
71:18 72:4
**appointments**
50:12 54:2 67:14
67:16
**approach** 44:15
**approval** 4:1
56:21 66:1,18
72:10,15 73:1

74:9,13,14,22
76:23 77:15,23
94:15 95:3 97:5
97:20,23 98:16
106:7 112:21
136:1 151:23
167:3,7 187:1,2,3
198:18
**approvals** 73:15
73:17 96:24 97:8
**approve** 13:18,20
77:24 98:7,11
102:5,10,14,20
103:1 129:19
155:9,11,11
166:18,22 167:23
200:5
**approved** 31:23
31:23 32:3,8,9,10
33:6,9 73:5,8,9,15
73:19 95:13 97:10
98:1,4 107:1
109:21 113:17
141:13 155:3
167:10 187:5
191:13 197:24
198:10,15 199:1
**approximate**
170:16
**approximately**
9:19 65:6
**april** 4:12,13
10:16 32:17,18
33:5 40:15 43:14
65:6,6,8 142:4
143:22 198:11
**area** 47:6 67:17,22
70:11 93:2 121:20
222:8
**arranged** 74:6

**arrived** 70:10
**arts** 40:20
**asa** 56:10
**aside** 9:2 39:18
44:24 64:21
115:19 145:6,7
147:3 173:22
195:7 196:1
197:16
**asked** 12:4 20:10
20:13 35:19 36:7
48:10 75:19 78:10
78:14,16 115:1,16
120:3,4 127:3
136:12 137:20
140:3 146:8,9
148:19 163:9
165:15,18,19
181:22 202:16
203:2 214:23
216:1,4,7,10,20
220:7,10 221:22
222:1,4,5
**asking** 6:15,15
39:3 106:3 136:10
136:11 219:1
**asks** 26:9 27:1
107:7 109:8
**assignment** 227:2
228:2 229:2
**assignments**
136:18
**assist** 43:10 112:4
**assistant** 52:2 54:8
67:6 97:1,9 98:8
98:12 99:19
100:22 101:3,15
102:10,15 103:2
109:22 111:19
113:9,15 114:1
115:22 116:11

118:23 119:9
126:7 139:1
146:23 171:24
173:5 186:2
189:21 211:8,12
**assistants** 50:20
51:5,9,21 52:16,18
59:14 60:13 67:20
113:5
**assisting** 1:6 10:2
11:4 41:6 59:21
61:7 71:9 110:13
115:2 118:1
131:16,22 132:18
142:5 156:1,4,12
156:20 162:13
168:1 173:4 184:1
185:13 192:16,20
206:12,13 224:11
226:6 227:3 228:3
**assists** 43:9 111:22
**associate** 27:11
47:17,20 71:18
72:17 73:22 76:13
87:1
**associated** 104:7
104:20
**associates** 111:23
112:3
**association** 41:21
56:7
**assume** 6:21 20:9
94:23 97:4
**assumed** 94:23
**assuming** 81:15
179:24
**assumption** 155:6
186:5
**ast** 56:7,10,13
131:15,21 211:13
211:14 212:16,20

**ata** 9:6,8 43:22
**attach** 18:5 150:13
**attached** 17:12
19:9 20:2 80:4,7
82:11 104:14
145:3 148:4
151:17 153:4
175:19 178:4
179:10 180:20
181:17 199:19
228:7
**attachment** 80:5
81:11 150:14
151:3,11,16,17,21
154:7 175:24
180:4 181:3,13
**attachments** 37:23
79:14,16 82:11
84:16 85:3 126:18
152:17 177:24
**attend** 8:3 133:24
134:10 163:21
165:8
**attendance** 34:23
34:24 164:2
**attended** 34:11
163:15 164:16
165:10 168:10
184:6
**attending** 133:22
138:15 164:3,23
165:3,12,17
187:12,17
**attention** 11:7
96:1 149:16
153:16 203:17
**attorney** 16:20
127:11 157:19,21
158:18 160:21
161:1 191:17

**attorneys** 225:5
**attractive** 44:1
**atwater** 52:10
53:7
**august** 4:20,21,22
4:23 170:9 171:6
183:15 188:8,13
**authored** 220:23
**authorities** 95:4
**authority** 130:4,8
130:13,21 155:2
156:19 167:2
**authorize** 228:11
**authorized** 23:16
**avail** 152:8,9
**available** 131:22
150:5 152:10
173:9 208:10
211:8,13,15,16,19
211:19 212:1
219:23
**avenue** 2:4,13
**average** 59:19
135:22
**aware** 14:18 67:5
94:18,18 97:7,11
121:3 122:3
129:10 154:24
155:1,5 160:18
167:14,15 197:1
211:11,16 222:21
**awareness** 67:7

**b**

**b** 3:3,5 6:4,6,6
11:2 142:1
**back** 21:1,9 26:3
36:1 44:21 48:15
49:17 50:11 52:23
53:9 54:6 57:20
58:17 59:23 65:11
65:13 69:11,20

70:4 71:24 78:21
78:24 79:5 81:14
84:13 85:5 88:20
98:22 110:20
113:23 114:9
118:5,6,15,16
119:16 120:6
132:20 138:1
141:7 142:7
149:16 150:23
152:3 153:23
155:24 157:8,21
158:17 162:4
167:17,20 172:19
176:8,10,20,22
177:10 191:17,19
191:22 194:20
198:6 200:12,19
201:13 214:5,11
226:15
**backed** 200:18
**background** 124:7
**backpedal** 25:9
**bad** 14:9,10 34:4
148:6
**based** 46:23 48:3
63:6 64:11 122:24
124:2 125:11
135:21 136:2,17
152:4 155:6 157:2
158:6,7,14 168:4
179:23 203:21,21
215:20 221:1
**basic** 139:16
140:22 208:23
**basically** 16:5
18:10 27:24 30:13
30:15 41:23 43:3
46:10 69:8 70:24
71:7 76:11 87:8
91:5 138:24

150:16 170:3,3
171:23 174:16
190:9 192:18
**basis** 43:5 44:18
91:11,12,14 99:6,7
99:10 136:22
148:10 216:5
**bates** 25:10 82:22
83:24 84:6 92:1
105:1 211:2
**beginning** 18:1
163:5 199:20
**behalf** 36:20
102:24 130:14,22
**belief** 123:24
124:2 148:10
164:15
**believe** 26:4 32:21
35:17,21,22 36:19
37:3,6 54:14
56:16 58:3 70:5
70:13 75:14 85:12
85:21 86:7 88:2
96:21 100:24
103:11 104:21
114:4,4 120:7
123:21 129:14
134:3,11,12,18
137:6 139:10
145:5,8 147:20
150:7 151:15
155:6 163:12
165:19 166:7
168:9 171:12
176:17,18 184:14
200:24 201:11
202:12 204:22
215:13
**believed** 123:22
201:12

**believes** 23:23
**belt** 9:6,8,9 43:22
**benefit** 127:20
**benefits** 71:8,9,11
**best** 57:3 97:22
100:12 114:22
138:18 139:3
154:2 163:8 174:6
**better** 34:2 44:12
44:12,12 106:19
154:23 172:18,22
198:1 199:16
200:13
**big** 33:7,11 149:13
174:11 213:4
218:14,23
**bigger** 48:22
**biggest** 39:9 89:5
89:12
**bill** 57:13,23 58:1
113:7,11
**billing** 113:7
**birth** 7:23
**bit** 77:9 95:21
106:19 120:10
205:1
**black** 9:6,8,9 34:5
43:22 50:11,14,15
53:2,7 62:10,12
67:10 70:8 72:24
75:13 76:8 77:7
85:16 114:16
122:3 128:11
148:19 160:10
161:2
**blackboard** 29:8
89:10,13 187:19
187:21,23 188:1
188:13,15
**bloomington** 53:6

**blue** 177:19
182:17
**board** 56:12,12
58:14 76:24 77:6
95:5,14,14 98:3
102:9,14,20
103:16,21 137:14
141:10 151:22
152:2,7
**body** 117:19 178:3
**bold** 24:3,10
**booked** 163:6
**born** 124:6,6
**bottom** 25:9 58:12
82:22 109:5
153:16 175:16
217:23 226:14
**branch** 123:12
**breach** 31:1 150:5
**break** 17:5 19:22
38:5 49:23 64:16
64:17 91:19
101:24 121:24
189:10,11
**breakfast** 121:21
**briefly** 145:12
**bring** 157:16
**brings** 157:1
**broke** 32:6
**brother** 42:19
56:11
**brought** 17:8 41:9
41:20,22 44:16
49:1 125:17 161:2
161:3 168:23
186:5 194:23
**budgetary** 62:23
64:5
**build** 71:16
**building** 186:6

**built** 89:9
**bullet** 79:2
**bump** 1:12 3:2 6:2
6:9,17 7:18 8:9,12
8:22 9:20 10:24
11:22 12:6,9,23
13:8 14:1 15:13
16:16 17:7 19:24
22:9 24:19 25:6
26:17 38:7 40:13
60:4 61:20 65:24
75:13 100:9,16
122:2 133:21
178:15 179:14
182:9 188:19
203:7 206:15
210:21 211:4
212:15,17 217:24
220:23 224:8
226:9 227:4,9
228:4,13 229:20
**bump's** 212:12
221:3
**business** 8:23 9:4
9:5 42:23 43:2
48:21 50:18 53:15
53:21 110:8 121:6
159:18 160:5
**busy** 218:16
**buy** 217:2

**c**

**c** 224:3
**caahep** 32:10 56:3
56:5,8,10,14
105:12,15,17,19
105:21 106:1,7,9
106:12,18,20
107:1,3,13,15,23
108:9,10 110:7,12
111:2 112:7,18,20
112:21,24 113:16

113:21,22 116:3
131:24 211:15
219:3,8,10,10
**cabai** 20:21 30:13
33:4 68:3,5 70:8
72:23 73:1 74:14
75:13 76:9 77:6
86:15 87:4 96:6
114:11,21 121:4
122:4 130:3
137:13 138:13
155:1 166:16
168:9 174:7 184:6
195:4,8 197:20,21
198:9 201:20
202:12 203:19
217:24
**cadaver** 207:23,23
**call** 10:5 14:15
20:11 25:23 45:6
45:7,13 47:18
74:4 75:10,11,16
87:22 88:17 89:2
90:24 91:22 92:4
92:15,20,23,24
93:17,19 94:2,4,7
94:14,19 95:2
106:11 114:15
115:19 139:12
142:24 143:2,18
143:21,24 144:3
169:23 170:7
171:3,9,14 172:9
173:3,11,13 174:4
174:9,24 175:7
176:14,15,19
177:6,9 183:11,14
183:19 184:11,15
184:18 185:17,18
186:16,18

called   1:12 7:19
  23:13 25:11 45:11
  47:16 51:3 58:19
  72:3,20 99:24
  143:9 207:24
calling   205:12
calls   44:5 45:5
  110:10 120:14
  129:4 170:12
  184:8 193:23
  195:23 196:5,12
cameron   74:15
  87:23 90:6,8
  130:19 167:2,8,16
  167:23 174:9
  195:4,7,14,15
  196:12 203:20
campaign   46:22
campaigns   46:18
campus   66:4
  70:21
cancel   163:7
cancelled   129:18
care   169:7 172:4
career   4:1
case   13:9 14:4,12
  14:16 17:9 20:1
  38:11 51:8,10
  79:6 147:10
  160:22 162:11
  191:14 205:21
  222:23 226:6
  227:3 228:3
cases   108:18
cat   209:5,5
catalog   3:12 21:16
  25:15,22 62:1,5,8
  62:16 63:10,12,15
  63:19 66:14 79:21
  81:6,19 82:1,21
  127:4 150:16

194:8,9,10,16
categories   107:18
caught   117:2
cause   224:8,16
cc'd   128:3
center   1:4 10:2
  11:3 224:10 226:6
  227:3 228:3
central   54:12 55:4
  56:1,22 57:20,23
  58:1 61:21,22
  62:4,8,15,20,24
  63:3,6 64:21
  67:17 81:20
ceo   158:20
certain   28:16
  107:17 146:24
  194:5
certainty   153:8
certificate   28:2
  29:10 87:10
  111:17 228:11
certificates   8:11
certification   173:9
  183:21 184:22,23
  185:21 227:1
  228:1
certifications   8:12
certified   1:17
  111:18,20,23
  173:7 185:21
  186:22 202:24
  224:4
certify   224:5,14
  224:24 225:3,7
chance   206:16
change   29:15
  31:15 36:3 37:5
  87:15 135:19
  226:13,14 228:8
  229:3

changed   16:8
  31:14 39:1 87:15
  150:18 208:11
  219:11
changes   32:20
  134:4 158:16
  192:1 226:12
  227:7 228:7,9
changing   66:5
  99:21 100:14
  178:18,23
charge   28:11
  34:12 52:23 54:7
  66:7 91:4 128:14
  133:3,4 164:17
charged   93:16
  179:8
charging   128:22
  128:22 179:6
charles   29:5
chart   109:6,6
  118:17
check   146:11,17
  148:20
chicago   1:18 2:14
  112:11 207:22
  224:8 226:2
christmas   91:19
chronology
  176:12
chunk   136:4
chunks   31:18
  136:2
cigarette   40:24
city   8:6
civil   1:14 227:5
  228:5
claims   21:12 24:5
  25:20
clarify   17:13

class   112:4
classes   33:5 112:3
  135:14 141:9
  185:19 198:16
clear   7:9 24:8
click   18:13,18 19:1
client   16:20
clinical   48:1 93:4
  93:5,9 104:23
  108:21 135:15
  190:1 193:4
clinicals   93:6
  108:8 190:2,10
  192:21
closure   139:18
coach   45:8
coaching   45:5
coast   8:8
cod   14:15 21:7
  23:23 26:10 37:1
  47:9 48:13 67:4,5
  87:5 90:9 93:16
  94:15 95:5 96:8
  97:1,9 99:19
  100:21 101:3,15
  102:5,15 103:2
  109:8,21 114:1
  115:7,9,22 116:11
  118:22 119:8
  125:5 126:2,6,8
  132:18 135:8
  142:5,14 152:19
  153:3 162:11,13
  167:24 168:17
  178:1,1 182:10
  183:10 184:1,19
  186:16 199:4
  200:4,12 201:21
  203:19,20,24
  204:2 206:22
  207:5 208:19

213:6,8
cod's 3:8,9 22:11
  22:21 23:14
  213:10
coffee 121:9,21
col 69:13
collaboration
  175:21
colleague 207:22
college 1:9 3:13
  8:3,4,5,8 14:15
  19:24 20:7,15,17
  20:18 21:13 26:20
  27:22 28:4,15,17
  28:21 29:4,10
  30:16 31:5,12,23
  32:4,9 33:9 34:1
  34:18 35:4 36:10
  36:11 37:8,14,17
  40:7 47:5,8,8,12
  47:13 48:4,8,10,12
  48:15,22 49:7,9,10
  49:11 53:10,12
  54:12,17 55:4
  56:1,22 57:20,23
  58:1,2 60:12
  61:16,21,22 62:4,8
  62:15,20,24 63:3,6
  64:15,20,21 65:13
  65:21 70:18 71:2
  72:11 73:6 76:4
  76:24 77:14,22
  81:20 82:8 86:16
  86:23 87:20 88:13
  89:10 93:8,12
  94:20,24 95:2,5,13
  95:14 96:23 97:7
  97:15,17,18 98:2,5
  98:16 99:2,5
  100:3,11,13,15
  102:3,11,19,21,24

103:16,17,19,20
103:21 104:15
105:7,24 112:1,16
116:11,21 118:21
119:23 120:17
126:11,12,14
127:3,11,18
128:13,14,17
129:4,7,11,15,19
130:2,14,22
132:15 133:6
137:21 139:5
140:9,19 141:10
143:21 144:18
145:9,14 146:23
147:8,21 148:2,8
148:14 149:6,10
150:8 151:22
152:5,7 154:11
155:23 156:5,11
156:18,21 158:3,4
159:3 163:10
164:18 165:20
169:11 170:8
174:1 183:23
184:5,9,19 185:24
186:1 187:1,11,12
187:15 188:5
190:17 192:4
195:4,6,9 200:8
201:23 202:3
203:6,13 206:12
207:14,24 210:5
210:12,23 211:3
211:24 212:24
214:14,15 215:6
215:16,21 219:9
220:19 221:2,4,9
224:12 226:7
227:3 228:3

college's 105:18
collegeofdupage...
  80:8
colleges 47:7,24
  48:1 49:7,8,18
  50:13 60:16 61:6
  65:4 67:11,16
  92:19 93:2
collegiate 58:20
colorado 135:24
column 207:5
  210:13
come 46:17 67:5
  71:12,24 130:15
  155:24 157:21
  164:15 178:11
  187:10 190:3
  191:22 202:19
comes 46:21 143:3
comfortable
  166:17 167:5,11
  167:13
coming 78:17
  118:5,5 123:23
  154:15 163:1
  198:4
comment 219:13
commission 105:9
  227:19 228:25
  229:25
commit 201:2
committee 133:22
  134:1
committees 98:7
  98:11
common 58:20
commun 164:21
communicate
  45:12 62:7 63:17
  84:24 98:5 102:4
  102:9,19,24 130:7

130:12,19 132:24
164:21 166:4
186:1 195:16
197:21
communicated
  58:2 62:15 66:12
  169:11 196:4
communicates
  191:4
communicating
  48:11 62:11
communication
  48:3 58:8 69:23
  119:13,15,18,20
communications
  11:18,19 13:24
  14:3,7,20 15:1
  60:20 63:8 65:17
  65:23 66:11 68:6
  68:13 120:15,16
  129:6 145:1
  195:23 204:4,8
community 1:9
  8:8 49:9 53:10,12
  95:5 103:16,21
  141:9 151:22
  152:7 195:5
  224:12 226:7
  227:3 228:3
companies 113:6
company 43:21
  46:6 123:6 161:16
comparing 214:14
comparison 5:2
  15:6,7,8 20:6
  21:20,21 206:11
  212:18,23 214:6,9
compete 47:23,24
  81:1 126:2,5
  127:15 134:17,20
  146:3 164:19

competition   93:9
compilation   183:8
compilations
38:23
complained   187:6
complaint   3:7
12:24 13:3,8,14,15
13:19,21 19:13
79:5 80:8 82:12
84:14 151:13
180:5,16,21
181:14 194:21
195:1 215:5
complete   136:18
completion   210:4
completions   109:9
109:16
comprised   212:16
computer   213:14
224:20
con   59:23 167:18
184:12
concept   67:1
concern   93:1
concerned   163:5
173:17
concerning   92:18
129:7 187:16
concerns   168:22
171:17 173:11,12
174:1 175:7,18,20
176:23 178:11
179:7 182:10
184:20 185:18
186:17,17 187:10
187:13 202:20,21
205:6,6
concerns.pdf
178:1
concluded   1:20

concludes   96:3
127:6
condition   145:21
165:16
conference   75:11
75:16 87:22 88:17
90:24 91:22 92:4
92:8,15,20,23
93:17,18 94:14,19
95:2 139:12
142:24 143:2,18
143:21,24 144:3
169:23 170:7,12
171:3,9 173:3,11
173:13 174:4,21
175:7 176:14,15
176:19 177:6,9
183:11,14,19
184:8,11,15,18
185:17,18 186:15
196:5,12
confident   173:20
confidential   62:9
62:16 63:19 84:17
85:3 127:4 146:24
149:23
confidentiality
62:3 63:13 81:21
126:2,6,15 145:22
194:17
confine   222:11
confirm   16:19
34:24 133:20
confirmation
32:24 33:3,17
confirmations
33:21
confirms   32:24
confusing   183:18
connection   11:14
11:20 13:3 14:1

15:1 22:12,24
23:13 30:2 36:23
39:7 61:19 126:24
145:17 151:22
165:12 167:24
187:23 192:12
193:14 194:15
210:22 211:4
212:11 222:16
223:2
consider   96:17
consideration
181:20
consist   91:2
consistent   38:4
consists   97:14
consortium   3:20
3:21 4:15 27:23
35:8,13 37:1,9
47:2 48:14,16
53:18 54:13 55:24
56:23 58:5,19
59:1,3,5,6,8,24
60:3 64:22 65:2
66:2,21 72:12
73:2 77:1,16
79:18 80:18 81:1
81:4 83:22 84:5,7
84:11 85:21,22,23
86:7 87:6 90:19
91:24 94:9,16
95:6 96:8 97:1
99:22,24 106:19
106:24 126:7,20
142:12 152:19
153:3,21 154:1,9
156:4 162:23
164:6 168:17
169:12 173:14,18
178:1,5,7,22 180:9
181:4 195:20

204:23 207:15,19
217:11
consortiums   53:21
106:11
constitute   25:19
constituted   23:23
200:15
constitutes   197:7
212:8
consulted   165:19
205:1
contact   64:15
87:20 188:2
190:24 191:1
contacts   67:23
68:1
contained   63:18
84:16 85:2 150:9
221:5,11
contains   146:24
contemporary
186:12
contents   84:7
context   141:20
contingent   97:5
continue   44:21
89:20 124:9
164:14 173:14
197:8
continued   129:20
204:12
continuity   44:15
contract   26:10,19
26:23,24 27:2,5,8
27:16,18,21 28:9
29:2,13 30:23
31:1 32:16,19,21
32:23 33:4,10,13
33:13,16,17 34:17
35:2 36:20 37:15
37:18 41:2 52:17

77:20 78:1,10,16
80:21 92:19 96:17
97:3 99:4 102:5
102:20 119:22
120:4 126:3 127:7
127:9,12 129:5,8
129:12,16,18,18
130:5,9,13,21
133:4 136:21,24
137:18,19,21
139:6 154:12
155:2,3,9,16 156:9
156:9 157:4,7,18
158:10,13,15,17
158:20 159:13
162:23,24 164:12
164:16,22,24
165:2 166:23
167:3,9 175:5
191:5,21 192:1,6,8
197:7 200:15,16
217:11
**contracts** 33:2
158:9 189:20,23
191:10 192:14
**control** 51:4,7
**convenient** 112:14
**converged** 43:5
**conversation**
50:10 66:16 78:21
90:14,16,20 94:11
114:10 124:16
125:16 128:13,17
164:5 165:22,24
166:3,5,9 170:17
172:20 174:17
**conversations**
39:10 56:20 141:3
141:5 168:5,16
170:11 182:12

**convicted** 8:14
**copied** 128:11
131:11 133:17
153:6 177:22
182:7 196:2
214:18 215:18,20
**copies** 16:18 17:4
19:18 85:17,24
**copy** 16:22,23
37:20,24 85:11
86:4,10 147:18
149:9,11 153:22
199:20 213:5
214:16 215:22
218:13
**copying** 218:14
**core** 131:15,21
132:1
**corporate** 11:11
42:10 60:5 141:18
142:1 197:4
**correct** 33:19 35:5
65:10,20 75:1,3
79:15 81:15 100:2
117:18 130:1
149:24 151:19
162:9 163:24
176:13 180:5
181:15 184:13
194:11 196:6
199:2 208:16
210:6,18 212:3,5
220:16 224:22
**corrections** 226:12
228:17
**correctly** 20:22
54:9,18,20 57:2
89:11 116:9
156:17 198:23
**cost** 133:1

**counsel** 11:14,20
15:9 222:22 225:1
225:7
**count** 194:22
195:2
**country** 112:13
**county** 224:3
227:10 228:15
**couple** 6:11,11
50:19 113:10
**course** 30:12
46:11 47:1 60:18
72:1 73:5 96:5,7
123:6 135:23
198:22
**court** 1:1 7:9,15
224:10 227:7
**courts** 1:15
**covered** 209:18
**create** 30:14 43:20
46:18,20,22 93:9
131:16
**created** 46:6
146:21 178:21,21
203:7
**creating** 46:14
**creation** 41:22
46:16
**credentials** 96:4
111:9
**credit** 136:8,9
137:1,1,3 150:24
**credits** 104:7,20
104:21 135:9,13
135:21
**creme** 138:24,24
**crime** 8:14
**crisham** 2:10
**critical** 172:23
**cross** 6:7

**csr** 1:23
**curiosity** 162:6
**curricula** 25:18
**curriculum** 4:1
15:14 16:7,23
20:6 21:18 25:20
25:23 41:22 61:22
61:23 62:1 63:22
73:8,14 79:20
81:5 82:21 91:19
95:10 97:15,18
98:8 104:12,14,17
127:4 129:20
131:15,21 132:1
136:14 146:21
147:3,5 150:10
152:6 186:12,19
186:23 187:6,13
193:14,19 194:6,8
194:13 202:16,24
206:21,22 208:11
210:12,23,24
211:1,3,7,11,18,20
211:23 212:8,15
212:16,19,20
214:5 221:13,15
222:3,8
**curriculums** 21:21
**currier** 29:5
**custom** 89:9
193:13
**cv** 1:8

| **d** |
|---|

**d** 3:1 105:4
**dad** 173:1
**daily** 43:5
**dan** 11:22 12:6
15:13,16 19:10
21:19 35:16,20
36:11 37:2,6
42:19 43:5 44:1

52:6,20 53:6 60:4
75:13 78:15 87:7
100:9,16 104:13
104:19 116:6
122:18,20 123:4
123:15,15 124:3
125:1,3,8,12,21
128:5,11,12
131:10,11,13
132:12,24 134:21
136:11,13 138:23
138:23 141:3
142:8,14 143:3
144:6 147:17
148:13 152:16
154:4 157:15
164:1,5 168:16,21
169:10 171:13
172:8 173:3,23
175:2,17 176:19
177:22 178:3,10
178:15,19 179:14
179:16,18,24
181:16,21,22
182:1,9,12,15,16
183:2,21 184:10
185:19 186:16,21
188:19 189:3,4,6
191:3,15,20
202:24 203:7
206:15 210:21
211:4 212:12,15
212:17 214:20
217:24 218:1,11
218:12,18 220:7,7
220:10,23 221:3
222:4,5
**dan's**  184:20,21
215:21 218:19
**database**  45:19

**date**  7:23 18:6,7,8
19:16 26:9,19
27:1,7,9 29:2
32:15 35:22 42:16
53:3,8 68:18
69:21 78:15 88:16
91:21 96:17 97:3
99:4 102:2,7
106:3 107:14
109:23 170:16,24
188:3 220:5 226:9
227:3,9,19 228:3
228:13,25 229:20
229:25
**dated**  33:14,18
55:22 58:10 95:23
97:4 125:2 132:12
133:17 137:2
153:18 154:10
162:20 175:21,24
176:4 216:22
**dates**  27:5 69:21
124:14 219:22
**davis**  2:3 15:24
16:11 17:2,13,15
17:18 18:24 19:6
19:19,21 30:8
38:13,20,22 39:4
101:22 116:24
121:23 146:7,13
146:16 149:3
156:14 199:23
213:5,8,10,12,14
213:16,18,21,23
216:12,17,22
217:10 220:4,7,10
220:14 221:17,20
221:22 222:1,4,13
223:6 226:5
**day**  1:18 36:12
45:24 54:2 72:6

77:4 169:5,6
181:10 190:4
200:6,7 202:1,2
207:8,9,21,21
208:23 209:1,3,4,7
209:8 210:2,3,3,4
217:9 224:6
225:11 227:16
228:22 229:22
**days**  38:17 125:18
172:10 188:3,9,10
207:10,17 209:9
209:12 226:18
**de**  138:24
**deal**  160:11,11
161:11
**dealings**  41:6,11
42:4
**dean**  27:11 47:17
47:20 71:19 72:17
73:5,19,22,24
76:13 87:1 90:16
157:2
**dear**  226:10
**december**  3:23,24
26:16 27:2,9,14,17
28:22 29:3,12
33:14,18 34:17
35:2 88:19 91:18
92:4,7,15,20,22
93:16 94:7,14,19
95:2 96:18 97:7
98:24 99:12,15,17
100:4,7,17 101:1
101:13 102:3,8,16
102:18,23 105:23
106:4 109:20
120:5 129:24
130:11,20 133:8
136:21 138:21
139:9,13 140:9,16

140:19 141:2
168:6 197:12
204:5,9
**decide**  156:11
157:17 158:12,14
**decided**  52:20,20
160:16 161:23
185:14
**decision**  158:21
**deed**  227:14
228:20
**deemed**  226:19
**defendant**  9:15,18
14:15 217:13
**defendant's**
217:12
**defendants**  1:11
2:17 194:23 195:3
195:3 204:1,15
205:10,11 224:13
**definitely**  99:16
**definition**  205:8
**degree**  111:23
112:3
**delegate**  218:15
**deleted**  208:12
209:2,11,19
**delivery**  89:5,9
188:3
**denied**  112:18,22
113:16
**denver**  2:5 44:19
44:20 53:6 138:14
163:16 164:23
165:3,12,17
168:10 184:7,16
202:10
**deny**  113:18
**dep**  146:8 223:6
**department**  27:12
46:14 77:15,19

[department - discussions]

87:2 90:17 102:4
120:11 155:3
156:7,8,19,23,24
157:1,2,5,13,14
158:3,4 159:7,19
161:11,13,18
162:2 166:22
167:4,10 191:13
226:24
**department's**
156:13
**departments**
120:9 158:7
**depending** 188:22
**deponent** 223:7
**deposed** 6:8
**deposition** 1:12
3:4,6 10:19,24
11:2,12,15,20,23
12:2,3,10,13,19,24
13:4 14:2 15:5
17:16,20 22:3,10
22:13,15,20 23:1
24:15,20 25:1,6
30:3 38:16 39:7
39:21 40:1,6 50:1
50:6 55:14 57:5
57:11,16 68:20
82:20 83:5,15
95:17 96:11,16
98:17 103:4,9
117:6,11 120:19
120:24 122:10
124:20 126:24
127:21 131:6
132:3,8 133:10,15
135:1 137:7,12
138:8 141:19
142:2,16,21
144:11,16 152:22
153:10,15 162:15

166:10 169:15
175:9,14 177:11
177:16 182:2
183:4 185:1,6
202:7 206:1,6,8
212:12,13 217:17
217:22 225:1,4,5
226:9,11 227:1,3
228:1,3
**depositions** 1:15
**deps** 217:12
**depth** 106:23
206:18
**describe** 43:1 50:9
68:17 69:7 190:20
206:10
**described** 27:19
33:23 158:23
161:8
**describes** 149:21
**describing** 192:15
**description** 16:9
18:15
**desire** 124:5
**despite** 159:13
**details** 121:8
139:23 144:1
**determine** 105:16
105:18 122:24
**develop** 59:16
**died** 54:20
**difference** 28:12
111:16
**differences** 20:16
20:19
**different** 8:7 19:12
50:19 60:15 73:11
98:11 105:20
128:24 139:17,20
178:7 191:7 210:5
210:8,10 215:1,2,4

**digital** 100:20
**direct** 11:7 96:1
149:15 153:16
203:17
**direction** 69:4
157:3 190:11
**directly** 86:24
193:23 194:1
195:22
**director** 15:11,12
20:4 50:15 73:21
86:19 161:21,23
191:3,6 193:8,23
194:2
**disagree** 40:10
**disappointment**
185:11
**discipline** 186:13
**disclosure** 79:20
79:23 80:4,24
81:5,10,21 82:2
83:2,11 84:10
126:21 127:15
134:16,19 144:18
145:2,9,13,18
149:17,19,22
150:4 152:3,18
163:10 165:11,16
166:6 174:19,23
181:9
**discuss** 11:10 12:1
13:23 67:4 75:4
79:1 87:8 89:20
89:21,23 110:22
116:9 121:14
122:3,8 137:13,23
175:7 177:5
194:22
**discussed** 39:19
47:11 70:23 76:10
76:21 78:22 79:3

80:22 89:1,18
90:19 91:3 94:23
96:10 100:14
101:8 106:5 110:4
114:2 117:22
118:18 125:18,22
136:7,23 138:22
139:7 144:9
152:18 168:21
171:16 173:2
176:19 178:18
186:16,18
**discussing** 58:14
128:24 140:18
**discussion** 29:14
48:5 56:21 61:9
66:17 72:10,24
74:12,18 77:4,5
78:2 87:4,13,17
89:3,6,12,17 90:2
90:3 91:10,16
92:3,6,12,13,17,21
93:1,15,19 94:3,6
94:13 95:1,8
99:21 100:23
106:22,24 110:5
114:5,8,17 117:5
117:15 119:3
122:22 123:14
124:3 125:10,13
132:20 139:14
174:18 175:4
217:16
**discussions** 61:20
64:24 65:24 73:13
74:21 76:23 77:14
98:13 103:18,23
103:24 105:24
109:19 110:1
113:23 115:21
116:5 117:13

118:20 122:7
139:4 140:12,23
164:1 168:20
179:5 182:15,24
184:8 204:11,12
**dismissed** 9:14
**district** 1:1,2,9,14
195:5,6 224:10,12
226:7 227:3 228:3
**division** 1:3
**dlg** 2:2
**dlglaw.net** 2:7
**doc** 83:12
**doctor** 41:12
**doctors** 162:7
193:22
**document** 11:9
15:15,18,20 16:16
18:2,13 20:23
22:12 23:4,13
25:8 29:16,19,22
30:20 35:3 69:1,7
80:11,14 83:21,21
84:4 103:10,15
105:2 132:11
206:7,10,14,18
212:7,20 219:16
**documentation**
107:9
**documents** 3:8
17:7 19:7 22:11
23:22 24:4,9,14
25:14 38:7,15,23
39:1,6,19 69:19
82:9 83:3 85:11
86:5,10 103:19
104:3 144:23
161:7 210:21
222:18
**doing** 34:13 44:10
46:10 54:22 57:3

91:5 93:22,23
140:5,11 161:17
167:12 187:4
207:16 209:23
**domain** 150:4
152:8
**door** 160:9
**download** 212:2
**downturn** 40:23
**dr** 53:7
**draft** 191:21
**drafted** 189:1
**draw** 126:1
**drive** 112:8 149:12
**dropped** 48:20
**dual** 51:22
**duly** 7:19 224:15
**dupage** 14:15
20:15 21:13 26:20
27:22 28:21 29:10
30:16 31:6,12
33:9 34:1,19 35:4
36:10,11 37:8,15
37:17 47:5,12,14
48:10 54:17 58:2
60:12 61:16 64:15
64:21 65:21 72:11
76:5 86:16,23
87:20 88:13 94:20
95:3 96:23 97:8
99:2,5 100:4,13,15
102:4,11,19,21,24
103:17,19,20
106:1 112:1,16
116:21 118:21
119:24 126:11,13
126:14 127:3,11
128:13,17 129:12
129:15 130:14,22
132:15 133:7
137:21 139:5

140:9,19 143:21
144:18 145:9,14
147:8,21 148:2,8
148:14 149:10
150:8 152:6
155:23 156:5,21
158:3,4 159:3
163:10 169:11
170:8 183:23
184:9 185:24
187:12,15 190:17
192:4 195:5,9
200:8 201:24
202:3 203:6,13
206:12 207:15,24
210:6,12 211:24
212:24 214:16
215:6,16,22 219:9
220:20 221:2,4,9
**dupage's** 3:13
20:1,7 40:7 70:19
82:8 156:19 188:5
210:23 211:3
214:14
**duties** 43:17

**e**

**e** 3:1,3,14,15,16,17
3:22,23,24 4:2,3,4
4:5,6,7,8,9,10,11
4:12,13,14,16,17
4:18,19,20,21,22
4:23 5:1,4 6:4
13:24 14:2,6,9,11
14:14,20 15:1
17:12 18:5,6,7,9
18:14,19,20,21,22
19:2,16 27:10
28:23 29:6,8,21,21
30:24 33:5,24
34:17 35:21,23
37:23 39:10 45:13

45:19,21 46:8,16
46:21 50:7 51:17
55:21,22 58:7,7,12
68:13 69:5,10
79:8,14 80:3,6,7
82:11 84:15,20
85:1,13 90:1 95:8
95:23 96:2,3,19,23
97:12 99:1 104:5
104:10 106:2
110:2,3,17,18,19
110:23 114:2,3,9
114:20 115:20
117:12,19 118:3,4
118:5,13 119:16
120:16 122:16
125:1,11,24
126:19 127:6
128:2,5,9,10,10
131:10,11,13
132:8,12 133:16
134:8,22 135:7
137:2 141:7
143:22 144:24
145:1,10 147:12
147:15 149:13,14
150:13,19 151:11
151:18 152:15,16
153:4,9,17,19
154:6,10,22
162:19 164:22
166:2,15,16
169:20 170:2
172:20 175:15
176:20,22,24
177:21,22 178:3
180:10,15,20
181:17 182:13,16
183:9 184:10
185:7 186:11
192:18 196:2

197:5,12,16
198:11 199:18
200:10,11 201:1
208:8 216:9,11,13
216:16,22 217:6,9
218:1,5,5,8,10,11
218:18,19,23
221:14 222:15,17
222:20,21 223:2
**earl** 94:2
**earlier** 64:23
81:18 91:3 94:3
150:7 183:19
189:13 206:8
**early** 66:16 169:5
169:7 183:15
**easier** 113:11
217:4
**east** 2:4
**eastern** 1:3
**eat** 121:22
**economy** 40:22
**education** 4:1 8:1
105:10 123:1
156:24 157:1,14
191:6
**educational** 158:3
**efforts** 39:18,20
**eight** 135:15
**either** 56:20 65:14
151:24 193:1
201:5
**elaborate** 41:18
**electronically** 19:1
**elevens** 41:1
**elizabeth** 1:16,23
224:4
**email** 226:16
**embark** 39:20
66:19 73:2 94:15

**emotional** 169:8
172:24
**emphasis** 172:8
**employed** 10:12
40:14,14 126:11
**employee** 45:2
53:13 62:12 146:1
146:2,5,10 165:20
192:19
**employees** 51:7,12
127:12 161:17
**employment** 40:16
41:5,10 42:3,21
43:2 47:1 51:20
145:17,21
**enclosed** 226:11
**ended** 54:22 75:11
173:13
**enroll** 92:7,10,14
107:17 108:11
109:21 110:10
193:3,22
**enrolled** 99:10,19
192:20
**enrolling** 44:8
114:6 118:23
**enrollment** 91:11
99:6 107:16 109:6
113:24,24 115:21
117:14,20,23
118:13,17,21
136:22 193:21
194:1
**enrollments** 109:9
109:13
**enrolls** 190:23
**enter** 56:22 58:18
59:20 66:2,19
72:12 77:1,15
130:8,13,21 139:5
169:12 189:19

190:21 192:13
193:15
**entered** 47:2 62:3
129:23 222:22
228:9
**entering** 65:1
130:2
**entire** 227:5 228:5
**entity** 14:18 58:19
60:6 138:4
**equipment** 70:16
**equivalent** 60:4
131:17
**errata** 226:13,15
226:18 228:7,10
228:18 229:1
**estimate** 109:8
**et** 1:10 224:13
226:7 227:3 228:3
**event** 129:4
175:18
**eventually** 201:17
**everybody** 45:20
**everything's**
197:24 198:10
**exact** 35:22 42:16
53:3 86:6 91:21
215:19
**exactly** 142:7
143:18 210:2
**examination** 1:13
3:1 7:21
**examined** 7:20
**example** 18:15
157:15
**excellence** 1:5
10:2 11:3 224:11
226:6 227:3 228:3
**exchanged** 38:9
**excited** 34:1

**exciting** 34:18
200:4,12
**exclusivity** 47:22
48:24
**excuse** 21:11 83:1
113:4
**executed** 23:17
36:1 153:22
205:12 228:10
**executing** 23:12
175:4 205:15
**execution** 227:14
228:19
**executive** 50:15
**exhibit** 3:5,7,8,9
3:11,12,13,14,15
3:16,17,18,20,21
3:22,23,24 4:1,2,3
4:4,5,6,7,8,9,10,11
4:12,13,14,15,16
4:17,18,19,20,21
4:22,23 5:1,2,3,4
10:18,20,23 11:8
12:18,20,24 22:4,8
22:9,16,20 24:16
24:20 25:2,5 26:5
26:8 30:18 40:2,6
50:2,6 53:9 55:15
55:19 57:6,10,17
58:4 68:21,24
79:6,7 80:8 81:7
82:5,12,19 83:6,10
83:12,16,20,23
84:4,13 88:20
91:23 95:16,18,23
96:12,16,20 98:18
98:21,22 101:17
103:5,9 117:7,11
118:15 120:20,24
122:11,15 124:21
125:1 126:23

127:22 131:7,10
132:4,8 133:11,15
135:2,6 137:8,12
138:9,12 141:8
142:17,21 144:12
144:16 145:6,7
147:15 151:6,14
151:15 152:23
153:2,11,15
162:16,20 166:11
166:14,15 169:16
169:19 170:3,21
175:10,14 177:12
177:16,17 179:13
180:2,3,4,21
181:13 182:3,6,13
182:17 183:2,5,8
185:2,6 194:21
198:12,14 199:1,8
199:21,22 202:5
206:2,6 212:23
213:4 214:3
215:16 217:11,18
217:18,22
**exhibits** 13:12,15
22:1,2 143:11
**exist** 17:19 38:23
**existed** 38:17
**existing** 31:11
71:14
**expect** 58:16
153:22
**expectation** 92:11
**expects** 136:1
**expensive** 160:23
**experience** 41:9
101:7,11 123:1
158:22 174:13
**expert** 15:14
**expertise** 204:16
208:13 222:8

**expiration** 227:19
228:25 229:25
**explain** 50:22
**explained** 172:8
172:21,22
**explanation**
136:11
**expressed** 174:1
184:19 186:16
187:13,15 188:6
**extension** 190:7
**extent** 66:9
**extra** 14:19 34:6
50:16,17 51:13,18
158:9

---

**f**

**f** 65:16
**face** 75:10,10
**fact** 159:14 173:3
195:15 196:13,18
197:17,21 198:24
199:4
**faculty** 190:9
**fair** 133:1 186:13
**fall** 106:12 135:14
**false** 195:15
196:13,17 197:17
197:20 198:4,24
199:3 200:14,18
200:20 201:19
202:10,13
**familiar** 39:15
42:22 88:6 177:7
**family** 43:4 169:2
175:18
**far** 16:2 27:5 75:7
80:2 81:14 117:23
140:21 148:9
193:17 203:11
206:23

**fashion** 39:4
**fast** 25:9 57:21
117:4 179:16
**fastest** 33:8
**father** 169:3,7
**fault** 117:2
**favor** 155:20,22
**february** 3:16,17
4:3,4,5,6,7,8,9
58:10 119:20
120:5 121:5,12
122:5,17 123:3,20
124:11 125:2,11
125:21 126:5,15
127:2 132:12,14
133:17
**fee** 99:18 100:1,4
132:17,21 142:4
**feel** 26:23 27:6
46:13 48:22
172:21 197:6
**feeling** 132:23,23
185:12,17 187:3
**fell** 48:14 66:8
67:3 173:1
**felt** 115:4,13
126:11 185:17
**female** 88:10
**field** 8:12 41:7,11
**fight** 160:22
**fighting** 93:7
**figure** 109:12
129:3
**filed** 3:7 12:24
13:9,15,21 103:13
**final** 34:8,11
130:24 131:1,4
149:16 152:14
**finally** 200:8 202:3
205:4,5

**financial** 28:16
51:5
**find** 20:8,12 67:11
108:21 110:2
113:21,21 191:4
214:17,19 226:11
**fine** 15:23 17:1
**finish** 7:1,10
135:23
**finished** 45:7
**first** 3:8,9 7:19
10:12 11:5 22:11
22:21 25:7,10
27:7,15,18 28:9
33:4,13 35:18
36:17 40:14 41:24
43:8,10,19 53:1,5
56:24 58:13 61:11
64:14,20 65:9,18
67:5 70:4,10
72:14 74:21 78:13
82:8,24 90:5
95:13 96:2,19
103:13 106:5
107:2 109:9,13
111:18,22 112:4
118:1,24 128:13
128:16 133:19
135:9,13 136:3,8
144:17 147:14
154:16 166:14
178:17 179:19
188:22 207:9,20
209:1,3,4,7,8
210:2,3,14 217:23
218:10 224:15
**five** 15:19 30:23
54:1 59:5 172:10
195:3 200:5
201:24

**fixed** 65:11
**fixtures** 40:24
**florida** 8:6
**focus** 74:10
**focused** 125:15,16
**folks** 96:5 151:7
**follow** 48:4 92:23
115:18 119:19
121:6 134:8
153:20 165:24
166:2 220:18
221:1 223:1
**followed** 85:13
119:19
**follows** 7:20 118:2
135:8 151:8
**foot** 160:9
**footsteps** 115:18
**foregoing** 224:21
225:1 227:13
228:18
**foreign** 106:15
108:5,11,19
111:10
**forever** 205:7
**form** 52:5 118:15
150:8,11,13 152:1
**formal** 121:18
**formally** 101:6
173:6,23
**format** 140:20
151:2 209:15
**former** 115:7
**formulate** 104:13
152:1
**forth** 44:22 50:11
65:14 92:18
135:10 136:5,19
177:10 204:17
**fortis** 65:13,13,18
66:1,11,18

**forward** 25:23
27:13 47:12,21
61:5 73:3,9 74:15
76:2 90:4 115:3
129:5,8,12,16,21
130:18 136:13
138:13 154:14,19
154:22 158:19
173:15,18 184:6
186:2 195:19
196:22,23 197:6
197:10,11,24
199:5,15 200:16
226:15
**forwarded** 69:5
**forwarding**
175:20
**found** 187:3
**four** 47:6 49:6
54:1 137:18 138:1
144:7 172:10
**frame** 125:20
168:14
**franklin** 226:1
**fraud** 194:22
195:2 201:3
**fraudulent** 195:9
**free** 227:14 228:20
**friendly** 45:23
**front** 82:23,23
**full** 108:16,17,20
109:12 131:13
133:18
**fully** 35:24
**function** 156:7,8
156:13,23,23
157:13,14
**funded** 94:20
**funny** 167:18,18
**further** 59:17
89:21,23 219:13

223:5,7 224:14,24
225:3,7
**future** 53:21
123:11

**g**

**gain** 106:18,20
**gaining** 53:23
**gazillion** 181:22
**gentleman** 55:5,12
**genuine** 201:7
**getting** 46:17 73:8
73:9,14,15,18 74:2
98:1 101:21 110:6
126:9 147:17
154:11 199:9
218:13
**give** 29:21 82:4,13
83:13 135:21
148:22,23 157:15
173:19 190:24
211:24
**given** 27:20 29:6,9
85:24 86:7,12,13
155:7 224:17,22
**gives** 45:18 217:6
**giving** 86:4 112:3
139:23 157:12
211:20
**glad** 117:2
**glen** 6:7
**gmail** 222:17
223:3
**go** 6:20 7:7 17:3
19:14,15 22:2
23:10 25:13 33:6
36:18 41:19 51:11
52:16 53:9,19
54:5 56:2 59:14
59:17,21 60:10
66:1 67:10 70:4
73:1,2 75:4 78:24

79:3,5 84:13
91:23 95:9 98:21
112:6,10,11
113:21,23 117:3
118:16 133:19
134:6 141:10,12
143:23 145:12
149:16 151:14
169:20 172:18
173:18 190:5
193:1 194:20
199:8,9,11 214:12
217:14
**goes** 18:7,9 95:14
125:24 129:3
163:4 178:10
179:16 181:16
221:19
**going** 6:21 7:2
20:15 24:8 25:23
26:3 28:15 36:9
38:13 39:13 44:23
46:13 47:21 53:22
61:8 71:18,23,24
74:6 77:7 78:18
78:20 88:20 89:13
89:16,19,20 90:15
91:13 93:22 95:10
100:10 101:8
104:7 110:5,6,17
119:8,16 121:3,10
121:19,20 122:21
123:21,24 128:14
128:15,18 132:21
133:1 143:12
152:3 154:12
156:10 157:6,20
157:22 158:15
160:17,20,22,23
164:22 165:2
166:5 172:24

179:8 183:24
184:5 185:13
186:2,21 188:7,7
198:21 203:4,9
204:22 208:3
212:23 214:13
219:15 220:2
222:2
**good** 14:9 44:2
53:22 95:9 120:10
175:16 189:9
199:8
**gotten** 162:1
**graduate** 107:23
108:19 111:14
112:15
**graduates** 106:16
107:20 108:6
110:7,19 118:4
200:11
**graduating** 107:12
107:12
**grant** 63:5 64:10
**great** 19:5 52:21
90:3 216:19
**greg** 161:4
**group** 2:2 50:20
**grown** 67:21
**guarantee** 115:10
**guess** 17:21 53:7
55:9 67:20 69:14
94:22 108:12
126:19 131:12
141:19 143:19
181:6 204:10
210:8 220:18
**guidance** 108:8
**gulf** 8:8
**guy** 54:7 56:7,11
**guys** 33:7 34:2
121:22 198:2

199:16 200:13

**h**

**h** 3:3 6:4 51:17
151:14,15
**half** 39:9,17 58:13
128:10 137:19
176:11
**hammer** 57:13,23
58:1
**hand** 143:13,13
157:4 225:11
**handbook** 145:24
146:1,1,2,5,10
**handle** 46:8,15,15
46:17 93:4 194:2
**handled** 46:5
**handles** 46:7
**handouts** 85:17,20
**hands** 14:19 34:6
50:16,17 51:13,18
158:9
**handwriting**
16:14
**happen** 34:5 46:23
188:9
**happened** 3:19
18:1,6,8 19:15
32:13 39:16 50:11
54:5,21 55:23
56:2 58:16 69:9
69:10 75:17 90:12
91:17,17,20
119:10 134:5
143:7 158:24
162:10
**happening** 110:21
118:7,8 119:5
**happens** 155:21
**hard** 85:11,17,24
86:4,10 149:9,11

**head** 7:13 71:20
73:23
**heading** 92:5
93:11 94:6
**health** 87:2 90:16
105:9 175:18
**hear** 34:8 76:13
156:14
**heard** 45:16
195:21
**heart** 164:18
**heavy** 136:8,9,20
**held** 10:4,7 88:12
126:12,12
**help** 15:24 32:14
55:19 104:13,19
112:1 202:16,17
207:12 217:3
**helps** 39:1 44:7
**henrico** 162:7
193:22
**hereinbefore**
225:6
**heretofore** 224:6
**hereunto** 225:10
**hey** 72:3 121:19
150:22 157:20
161:13,23 219:15
**high** 8:2 117:24
216:24
**highest** 8:1
**highlighted** 16:4,5
16:6
**hit** 46:21
**hold** 36:14 110:22
124:4 151:5
214:12 215:9
**home** 6:5 51:11
217:6 218:9
**hope** 133:20

**hospital** 51:12,19
93:7 108:20,24
109:1 113:10
158:12 159:6,8,14
159:18 160:2,3,13
160:15 161:9,17
162:5 190:2,7,21
191:2,8,22 192:22
193:5,19,20
194:18
**hospitals** 48:2
50:21 51:4 52:14
113:3 138:3,5,6
158:8,11,23
159:24 160:6,9
162:7 189:15,20
189:23 190:12,18
192:5,5,14,17
193:14 194:16
**hour** 189:10
**hours** 137:2,3
150:24
**house** 216:21
**huh** 17:2 177:23
183:12 213:11
**hung** 89:19
**hungry** 101:21
**hunziker** 161:4,5
**hurt** 77:22 156:11
157:6,20,22
158:15
**hysterectomy**
208:21

**i**

**iccb** 95:11 150:9
198:16
**idea** 60:12 61:2
71:12 73:9 76:20
102:13 153:22
221:8

**identic** 39:11
**identification**
10:21 12:21 22:5
22:17 24:17 25:3
40:3 50:3 55:16
57:7,18 68:22
83:7,17 95:19
96:13 98:19 103:6
117:8 120:21
122:12 124:22
127:23 131:8
132:5 133:12
135:3 137:9
138:10 142:18
144:13 152:24
153:12 162:17
166:12 169:17
175:11 177:13
182:4 183:6 185:3
206:3 217:19
**identified** 49:7
108:14 118:22
137:2 212:19
**identify** 23:22
24:9 79:16,22
82:21 83:24 84:6
89:22 211:2
220:19
**iii** 195:2
**il** 2:14
**illinois** 1:2,16,18
49:9,10,15 53:9,12
54:12 55:4 56:1
56:22 57:20,22
58:1,20 61:21,21
62:4,7,15,20,24
63:3,6 64:21
66:13 67:17 71:1
72:1 81:19 94:21
95:3,4 103:1,16,20
104:4 141:9

151:21 152:6
224:1,4,8 226:2
**implication**
195:18
**implied** 195:18
**important** 69:9
**impossible** 32:12
**impression** 122:18
122:20
**incident** 69:12
**incision** 139:18
**include** 30:10
**included** 80:24
87:7 139:19
145:23 146:3
180:13,14,18
226:13
**includes** 192:21
**incorporated**
215:15 228:12
**increase** 44:23
**independent** 113:9
**indicate** 183:9
**indicated** 114:5
115:11 130:23
**indicates** 152:16
**indicating** 226:13
**individual** 15:7
45:13,21 56:17
57:9,12 61:6
**individuals** 65:18
159:14
**industry** 172:5
192:11
**information** 16:20
16:21 36:13 38:24
39:2 45:11 62:17
62:23,23 63:18,19
64:4,5 76:14
81:17 84:17 85:2
85:3,14,15 123:9

146:4 147:1
149:23 150:3
155:7 190:24
193:24 194:1,4
200:20 203:22
205:11 221:5,11
**informational**
192:15
**informed** 135:7
**infusion** 45:15
**infusionsoft** 46:16
46:18,19,22
**initial** 35:8,13 37:9
153:17 218:19
**initially** 103:15
133:8 203:20
204:2,10
**initiating** 193:21
**injury** 9:13
**input** 182:21
**inquiring** 110:20
118:5,6
**insourced** 161:17
**insourcing** 161:10
**inspiration** 214:22
**inspired** 20:12
**installing** 40:24
**instance** 113:13
160:14 161:20
193:20
**instances** 7:1
62:14 108:18
112:18 159:5,10
159:12,17,23
160:4 189:14
191:20,22 192:4
193:18 194:5
**institute** 211:8,12
**institution** 64:23
65:1 105:20 215:2

**institutions** 42:5
47:3 60:9
**instructor** 34:13
36:8,17 133:2
154:15,17 164:20
173:6
**insurance** 113:6
**integrate** 89:13
**integrated** 188:4
**intending** 89:22
201:2
**intensive** 169:7
**interact** 53:12
189:14
**interaction** 61:16
65:19
**interactions**
200:22
**interest** 42:7 48:23
53:23 67:12
**interested** 47:11
48:20 57:1 67:6,8
225:9
**interfaced** 90:6
**internal** 66:18
73:15,17
**internship** 135:15
**interrogatories**
3:10 22:21 23:14
**interrogatory**
22:24 23:19 26:4
26:9 27:1
**introduce** 53:19
**introductions**
90:11
**invest** 187:22
**investigation**
221:2
**investment** 188:14
**involve** 9:12

**involved** 64:24
67:9 94:11 128:16
141:5 169:8 177:9
177:9 195:24
219:13 221:13,15
**involvement** 41:21
190:16
**ipad** 71:6
**issue** 56:6 186:12
186:18 220:19
**issues** 46:7 61:10
104:6 169:8
187:16
**items** 153:20

**j**

**j** 2:3 217:11 226:5
**january** 3:15
55:22 119:4,7,10
119:15,21 120:1
120:15 185:20
**jean** 88:5
**job** 40:23 106:14
111:10 172:2
218:14,23
**joe** 126:1
**jog** 170:4
**john** 52:10 208:6
**joined** 43:14 65:9
**joining** 59:8
**july** 4:18,19 34:15
138:14 154:15
162:20 163:18
164:2 168:10
170:8 171:4
175:22 176:1,4
184:7 187:17
**june** 4:16,17
153:18 154:10,20
155:3 225:11
226:4

**jurisdiction**
112:21

**k**

**k** 6:4 208:8 224:3
**kane** 208:6
**karen** 27:11 71:19
71:21 72:23 73:21
75:2,14 76:8,8,17
78:19 85:2,10
86:22 87:22 90:1
90:14 96:18,22
97:17 98:24
127:14 130:11,23
143:1 144:5
153:18 155:8
165:5 166:19
167:6,15,19,23
168:6 171:13
174:3,22 175:15
175:23 177:22
186:10 195:4
196:17,18 197:14
197:17
**karen's** 71:19
**kartje** 88:5
**kathy** 20:21 30:13
32:2 33:4,24
34:11,14 36:7,16
68:3,5,6 70:8
72:11,23 73:1,20
74:14 75:13 76:9
77:6 78:17 85:1
85:10 86:15 87:1
87:4,23 90:14
91:18 93:20 95:10
96:2,6 104:6
106:5 110:3
114:11,21 116:7,9
116:19 117:13
120:6 121:4,11,17
122:4,8,22 123:16

123:22 124:1,11
124:12,17 125:4,8
126:9 127:14
128:15 129:1
130:3,23 132:21
133:17 135:7
137:13 138:13
139:11 140:1
141:7 143:1 144:5
147:18 148:20
151:18,21 152:5
153:18 154:20
155:1,8 162:22,24
163:4,9,15 164:3
164:21,21 165:1,8
165:10,11,15
166:1,4,16,19
168:5,9,9,16 170:7
171:13 172:20
174:7,7,12,23
175:17 184:6
187:11,17 195:4
197:20,21 198:9
198:11,14 199:4,8
200:22,24 201:6
201:20 202:4,10
202:12 217:24
218:1,7,11,20
219:21 220:15
**kathy's** 124:5
137:2 143:22
164:2 171:19
218:18
**kb** 3:4 10:19 12:19
22:3,15 24:15
25:1 40:1 50:1
55:14 57:5,16
68:20 83:5,15
95:17 96:11 98:17
103:4 117:6
120:19 122:10

124:20 127:21
131:6 132:3
133:10 135:1
137:7 138:8
142:16 144:11
152:22 153:10
162:15 166:10
169:15 175:9
177:11 182:2
183:4 185:1 206:1
217:17
**keep** 28:2,12 38:4
51:4 87:9 127:3
141:17 152:12
**keith** 1:12 3:2 7:18
19:10 20:22 23:6
23:19 24:3,9 25:9
26:9,11 29:19
34:4 37:20 39:6
42:21 50:5 53:1
54:11 55:20 57:11
58:4 64:19 67:14
68:24 79:11 81:9
82:5,20 84:14
85:1,7 91:24
95:23 100:20
103:10 105:2
109:19 113:13
116:16 117:10
118:16 119:4
120:24 122:15
128:3 129:10
131:19 132:9
133:16,21 138:12
142:22 144:16
146:14,20 149:1,8
150:7,19 153:15
153:23 154:24
159:5 162:19
163:2,8 166:19,22
169:19 175:14,17

177:16 181:17
182:6 183:8 185:6
189:13 195:1
197:16 198:3,14
200:6,21 201:24
206:6,18 214:2,13
216:18 217:21
218:11 222:16
224:8 226:9 227:4
227:9 228:4,13
229:20
**kicked** 150:22
**kill** 161:13
**killed** 161:11
**kim** 53:13,22
67:10 68:7
**kim's** 67:18
**kind** 7:12 20:12
40:22 43:12 44:14
56:10 66:8 67:3
70:11 106:17
115:3 137:24
155:21 172:4
173:1 193:7
214:23
**kindness** 164:17
**kinds** 43:23
**knew** 54:9 67:21
71:9,10 90:13
91:13 106:9 203:3
**know** 7:2 11:18,19
12:2,3 14:21
17:10 20:10,11
31:14 36:2 37:8
37:14,17 38:3
42:15 43:10 44:5
44:11 45:16,23
47:8 50:23 51:1
52:4 54:4 55:10
56:2 60:21 61:2,3
61:6,9 65:3 67:12

68:1,12 75:9,20
79:1,3 80:2,11
86:24 87:17 89:16
89:19 90:10 91:17
91:20 92:13 93:18
94:4,22 97:19,20
98:2,3,15 99:13
104:2 106:17
107:7,16 111:9
112:22 115:18
119:14 120:9
121:8 123:16
124:15 125:17
128:23 131:14,23
131:13 134:6,14
136:23 139:3,17
140:3,4 143:7,12
143:13 146:7
147:7 148:1,3,6,7
148:9,21 152:11
152:11 154:21
155:20,21 161:3
162:2,4 163:6
164:6,11 165:11
165:15 169:2
172:9,22 176:24
178:14 181:24
182:11 188:7,8
192:24 193:8,12
195:13,21 201:4
205:15,17,19,22
206:23 209:4
210:19 211:2,10
211:14,18 212:17
212:21 214:22
216:4 218:14
219:2,6,12,20
221:12 222:7
**knowing** 34:12
59:21

**knowledge** 43:1
158:7 204:16
**knows** 172:17
**kyle** 34:5,5,5
50:11,14,15 53:2,7
54:14,22 62:10,12
67:10 68:2 70:8
72:24 75:13 76:8
77:7 85:16 86:9
87:23 114:16
121:3,10,14 122:3
122:7 123:15,17
128:5,9,11 129:3,6
131:11 133:16
134:3,11,16,20
135:8 148:19
160:10 161:2
168:5 171:14
198:3 200:6 202:1
**kyle's** 128:16
132:23

**l**

**l** 1:16,23 71:21
224:4
**la** 138:24
**lab** 34:12,22 36:8
36:12 78:17,20
87:5,14,18 93:21
100:8,16 107:22
108:3 112:11
122:19,21,23
123:3,8,21 124:13
124:18 125:5,22
128:15 129:1
131:14 132:22
133:2,5 135:15
138:16,22,24
139:8,15 140:2,8
140:13,14,20,24
154:16 163:1,15
163:21 164:3,8,13

164:17,23 165:3,8
165:10,13,17
168:10,17 171:18
173:22 174:14
184:7,16,20 187:8
187:12,17 190:4
198:4 200:6 202:1
202:10,13,19,20
203:3 207:8,9,9,23
207:23 208:4,15
209:4,7,8 210:2,3
210:5,7 221:21
**label** 82:22 211:3
**labs** 112:12 125:6
125:9 209:6,12
**lacked** 156:3,19
**laid** 221:13
**lake** 47:8,9 48:4,9
48:12,15 49:7
**lane** 6:7
**lang** 37:12
**language** 37:13
77:17,20,22,24
120:12 155:11,13
155:15,19,22
156:10 157:22
166:24 187:24
**lapse** 65:11
**laptop** 19:4 71:6
**latest** 188:21
**law** 2:2
**lawsuit** 8:22 9:2,3
9:11,12 13:16
**lawyer** 156:14
196:24
**lawyers** 222:11,13
**layouts** 46:8
**leads** 46:17
**learn** 125:4 207:13
**learned** 43:24
127:19 210:11

| | | | m |
|---|---|---|---|
| learning 187:24 | liking 136:8 | 88:18 91:24 92:5 | |
| leave 127:18 169:5 | limited 107:17,24 | 93:11 94:5 95:15 | m 6:4 |
| 169:6 | line 17:10 39:15 | 98:21 105:4 | madam 226:10 |
| leaving 209:1 | 63:5 64:10 69:9 | 120:11 132:13 | maggie 12:12 18:4 |
| led 204:22 | 69:13 89:5 96:5,7 | 142:21 150:21 | 69:3 107:8 127:1 |
| left 47:15 72:2,19 | 100:21 108:7 | 156:9 175:16 | 145:7 148:21 |
| 72:20 143:13 | 143:4 148:15,23 | 179:11 191:17 | 149:2 218:5,7 |
| legal 37:12 77:15 | 149:6 164:9,9 | 201:13 203:9 | magic 138:24 |
| 77:19,24 78:7,18 | 173:5,7,24 183:22 | 207:4 218:10 | mail 3:14,15,16,17 |
| 102:4 120:9,11 | 184:21 187:6,16 | looked 80:3 | 3:22,23,24 4:2,3,4 |
| 138:1 154:21 | 188:21 189:2 | 103:12 176:10 | 4:5,6,7,8,9,10,11 |
| 155:2,10,10,23 | 190:4 202:16 | 196:3 214:3 | 4:12,13,14,16,17 |
| 156:3,7,8,9,19,23 | 211:9,19 212:4,6 | looking 26:12 | 4:18,19,20,21,22 |
| 157:5,13 158:4,13 | 221:17 226:13 | 29:16 58:9 69:20 | 4:23 5:1,4 13:24 |
| 158:16 159:7,11 | 228:7 229:3 | 81:3 103:13 105:3 | 14:2,6,9,20 15:1 |
| 159:19 160:16,19 | list 40:18 | 106:23 118:17 | 18:6,7,9,19,20,21 |
| 160:20 161:6,10 | listed 24:6 27:10 | 119:16 138:13 | 18:22 19:16 27:10 |
| 161:12,18 162:2 | 29:22 228:7,17 | 142:7 150:23 | 28:23 29:6,8,21,21 |
| 165:4 166:18,22 | listen 45:7 | 167:17,20 214:10 | 33:5,24 34:17 |
| 167:3,6,9 191:11 | listing 228:7 | looks 143:12 | 35:21,23 39:10 |
| 191:13 226:1 | litigation 16:17 | 191:15 214:10 | 45:19 46:21 50:7 |
| 229:1 | 144:24 146:6 | lose 106:18,21 | 55:21,22 58:7,7,12 |
| legal's 167:7 | 206:21 222:16 | lost 108:10 110:8 | 68:13 79:8,14 |
| lengthy 177:3 | little 41:4 77:8 | 111:1 112:17,23 | 80:6,7 82:11 |
| letter 175:21,24 | 95:21 106:19 | lot 20:8 43:24 45:4 | 84:15,20 85:1,13 |
| 176:3,16 177:10 | 154:22 167:21 | 45:22 46:1,1 | 90:1 95:8,23 96:2 |
| 226:19 | 173:21 201:15 | 47:15 51:3,7 | 96:3,19,23 97:12 |
| letting 155:24 | 205:1 | 52:15 67:21 72:2 | 99:1 104:5,10 |
| 157:23 158:19 | live 71:24 | 72:21 113:4,6 | 106:2 110:2,3,17 |
| level 8:1 66:6 | liz 26:6 157:9 | 115:4 119:10,13 | 110:23 114:2,3,9 |
| license 1:24 | llc 2:2 | 158:8,11 164:7 | 114:20 115:20 |
| 111:21,22 113:12 | log 211:22 | 185:11 191:11 | 117:12,19 118:5 |
| 113:19,20 | long 49:16 181:10 | 193:3 209:2 213:2 | 118:13 120:16 |
| licensed 28:18 | longer 183:24 | lots 123:8,14 | 122:16 125:1,11 |
| licensure 110:12 | 184:5 | loved 76:20 | 125:24 126:19 |
| 113:2 | longest 173:5 | lovely 133:20 | 127:6 128:2,5,9,10 |
| life 217:4 | look 15:22 22:1 | loves 124:7 | 128:10 131:10,11 |
| light 216:3 | 25:7 26:3 37:12 | lower 66:6 | 131:13 132:8,12 |
| lightening 124:4 | 55:9,20 69:10,11 | lunch 121:24 | 133:16 135:7 |
| liked 61:2 66:24 | 74:3 77:9,20 | | 137:2 141:7 |
| 71:12 | 82:19 83:20,23 | | 143:22 144:24 |

145:1,10 147:12
147:15 149:13
150:13,19 151:11
151:18 152:15,16
153:4,9,17,19
154:6,10,22
162:19 164:22
166:2,15,16 170:2
172:20 175:15
176:24 177:21,22
178:3 180:10,15
180:20 181:17
182:13,16 185:7
186:11 192:18
197:5,12,16
198:11 199:18
201:1 216:11,13
216:16,22 217:6,6
217:9 218:1,5,5,8
218:10,11,18,19
218:23 221:14
222:17,21 223:2
**mailed** 134:21,22
149:14 176:20,22
216:20
**mails** 14:11,14
17:12 18:5,14
19:2 30:24 37:23
45:13,21 46:8,16
69:5,10 80:3
110:18,19 118:3,4
119:16 134:8
169:20 183:9
184:10 196:2
200:10,11 216:9
222:15,20
**main** 44:16
**making** 123:4
196:12
**male** 88:9

**management**
187:24
**manager** 10:11
**march** 4:10,11
133:23 134:2,17
137:3,17,23
151:18
**mark** 10:17 12:18
**marked** 3:4 10:20
10:23 12:20,23
22:4,7,9,16,19
24:16,19 25:2,5
40:2,5 50:2,5
55:15,18 57:6,10
57:17 68:21 83:6
83:9,16 84:3
95:18,22 96:12,15
98:18 103:5,8
117:7,10 120:20
120:23 122:11,14
124:21,24 127:22
131:7 132:4,7
133:11,14 135:2,5
137:8,11 138:9
142:17,20 144:12
144:15 152:23
153:11,14 162:16
162:19 166:11
169:16 175:10,13
177:12,15 182:3
183:5 185:2,5
199:21 206:2,5
217:19,21
**market** 58:20
**marketing** 10:3,9
42:2,14 46:3
**martial** 40:20
**mary** 58:13,22
59:1,23 60:20
61:12 63:9,23
64:2,5,8,11,22

82:1
**master** 21:18
25:20,22 61:23
62:1 63:22 79:20
81:5 82:21 194:13
210:24,24 211:3
211:20,23 212:8
221:15
**match** 16:5
**matches** 16:7
215:19
**matching** 16:3
**material** 84:16
164:9,10 192:16
**materials** 23:22
24:5 25:18,19
85:11 86:4 146:22
147:2 148:24
208:14
**matter** 9:23 13:23
14:20 21:14 22:22
26:1
**matters** 200:9
**mdavis** 2:7
**mean** 34:23 36:5
39:10 43:3 53:4
54:19 57:2 61:3
67:20 71:15 77:18
89:7 110:21 116:1
120:10 127:12
135:12 140:5
142:10 148:3,20
155:13 164:15
166:7 167:12
170:24 179:18
181:21 185:14
193:16 203:1
205:7 209:1,3,4
214:7 215:23
**means** 208:10

**meant** 97:17,19
118:6 127:9 129:7
135:17 136:6
179:4 182:1
**medical** 8:12
41:11 106:15
107:18,20 108:4,5
108:11,12,13,19
111:10
**medications** 8:17
**meet** 11:14 47:16
53:6 54:11 66:3
66:23 67:11,14
68:2 72:4,7 76:4,7
121:8,11
**meeting** 43:12
47:20 58:14 64:20
66:3 68:5,17 70:4
70:7,9,18 72:9,14
72:17,21,22 73:14
74:1,2,12,19,23,24
75:5,6,23 76:13
77:7,13 78:3,13
85:6,7,10,19 86:1
86:3,5,11,14,21
87:3,12 89:20
106:6 107:2 121:4
121:7,15,18 122:4
133:22 134:1,1,9
134:17 137:14
169:21
**meetings** 72:6
139:15
**member** 56:12,12
**memorialized**
190:13
**memories** 57:3
**memory** 39:11
65:11 170:4
198:21

**mentioned** 104:16
225:6
**menus** 101:23
**message** 141:8
182:9
**met** 43:12 47:4,6
47:12,14 49:5,6
53:1,6 57:22
60:23 67:16 111:8
111:11 121:11
139:11 158:11
173:12 179:19
185:18 196:7
**michael** 2:3,11
226:5
**middle** 11:5 96:2
132:11 166:14
186:11 188:8,13
207:4
**midwest** 226:16
229:1
**mike** 146:6 149:1
217:8
**mile** 47:21 48:6,10
**miles** 47:9
**milking** 201:16
**mind** 23:3 38:3
74:11 143:3
146:12 151:13
**mind's** 181:9
**minds** 43:13
**minor** 168:24
**minute** 83:13
110:23 122:16
204:17 217:15
**minutes** 143:4,8
176:15
**misappropriate**
201:2 221:4,10
**misappropriated**
21:13 26:1

**miscommunicati...**
143:14,15
**misdemeanor** 8:15
**missing** 208:4
**mississippi** 2:4
**mistake** 180:13
**mistaken** 114:4
**mod1** 210:13,17
**model** 51:2,19
**models** 50:19
**modifications**
191:23
**modified** 181:18
**module** 188:21
189:2 210:20
212:4,6
**modules** 31:16
**mom** 173:1
**monday** 216:22
**money** 37:5
187:22,23 188:16
**month** 10:15
31:16 47:17
110:10 116:17
117:1 119:24
120:10 200:23
205:12,13
**monthly** 91:12
99:6 135:19
**months** 31:13,22
32:11,14 44:18
48:18,18 137:18
137:19 138:1
202:22
**monumental**
71:15
**morning** 72:8
175:17 206:8
**morris** 40:24
**mother** 54:20
169:4

**mouthpiece**
174:17
**move** 27:12 44:19
44:20 47:21 61:4
73:9 74:15 77:1
77:10 87:19 90:3
115:2 118:1 129:5
129:8,12 130:18
157:3 158:19
173:15 184:6
186:2 194:20
196:22,23 197:6
197:10,11,24
199:4,15
**moved** 42:1 47:13
76:2 200:16
**moving** 47:11
129:20 154:14,19
195:19 202:14
**mtroche** 2:16
**multi** 20:18
**multiple** 192:24
202:17

**n**

**n** 3:1 207:5,14
208:8,9,15
**name** 6:3 8:7 9:5
14:18 29:4 59:2
71:19 73:23 87:24
88:6 160:24 161:6
162:5 192:19
208:5,7 226:6
227:3,4,15 228:3,4
228:21
**names** 49:20,21
**national** 59:19
**nationally** 107:1
**natural** 59:13
124:10
**nature** 42:22
50:17

**nearly** 137:18
154:8
**necessarily** 31:20
167:11 185:16
**necessary** 73:16
73:17 211:7,11
**need** 37:22 44:6,14
51:24 52:2,15
66:22 77:19
101:18,18 102:14
113:19,20 126:1
129:3 131:15
132:24 167:19
182:20 188:2
217:2,14 219:17
219:19
**needed** 28:3 43:11
43:11 44:14,22
45:2 52:16 69:11
76:20 103:20
112:24 187:8,19
187:20 200:19
203:4
**needing** 41:12
74:14 77:14
**needs** 96:23 163:6
163:6
**negotiations**
178:13 179:18
181:18
**nervous** 154:11
**never** 9:24 19:7
32:3,13 37:16,19
38:17 49:1 60:23
65:14 66:14 67:7
123:16 159:10
187:6 188:17
193:10 194:13
196:7 202:15
221:2,9 222:11

**new** 32:7,9,21,23
43:11,12 46:3,6
51:2 193:8 205:12
205:15
**nine** 31:16 200:23
**nod** 7:13
**non** 79:20,23 80:4
80:24 81:1,5,10,10
81:21 82:2 83:2
83:11 84:10 126:2
126:5,21 127:15
127:15 134:16,17
134:19,20 144:18
145:2,9,13,18
149:17,19,22
152:3,18 163:10
165:11,16 166:6
174:19,23 181:9
**normal** 112:4
**north** 1:17 2:13
224:7 226:1
**northern** 1:2
**notarized** 226:15
**notary** 227:10,18
228:15,23 229:23
**note** 23:21 163:4
178:10 205:12,15
220:2 226:12
**notes** 16:2 17:15
17:23 29:17,17,20
29:23,24,24 38:22
81:13,14,15 96:23
126:18,22,23
144:19 145:6
154:20 179:23
186:11 199:19
**notice** 1:13 3:5
11:2 13:11 25:8
79:13 131:12
225:4

**notification** 184:5
**notified** 165:1
183:23
**november** 3:14,22
18:16 47:14 55:8
68:3,19 69:24
70:5 72:9,18,22
73:14 74:11,19,23
75:5,17,22 76:4
77:13 78:3,21
79:9 81:12 85:5,9
85:19 86:1,3,11,14
86:21 87:3,12,16
87:16 92:14 95:24
97:4 105:23 106:4
109:20 139:11,12
168:6 179:20
180:20 186:24
204:4
**number** 3:4 29:21
84:6 92:2,4,6,10
92:13 110:4
115:14 116:10,20
153:20 226:8,13
**numbered** 69:19
69:20 105:1
**numbers** 83:24
109:17 116:20
137:1 228:7
**nurse** 101:7 108:5
109:2
**nurses** 43:8
**nursing** 101:9
157:16,19,23
191:7

**o**

**o** 6:6 65:16 71:21
224:3,3
**object** 38:13
**objections** 202:15

**obligations** 149:20
150:2
**obtain** 72:12 74:14
77:15 95:3 96:24
97:8 133:24 137:5
**obtaining** 76:23
151:23
**obviously** 7:15
58:15 126:17
141:22
**occasions** 60:21
**occur** 74:19 78:5,8
110:1 160:12
176:16
**occurred** 18:16
70:9,18 74:22
78:2,9 87:22
88:17 114:18
139:4 165:23
170:17 204:4,8
**occurring** 117:16
**offends** 156:14
**offense** 8:15
**offer** 90:23 91:1,2
91:8 133:6 159:6
**offered** 98:9,13
218:22,24
**offers** 111:22
212:7
**office** 70:15 72:20
**officer** 42:11
56:13
**official** 227:15
228:21
**oh** 7:13 20:21 23:9
58:24 65:10 84:20
165:18 181:7
182:18 213:10,22
214:12
**okay** 6:11,19 9:5
9:19 10:6,17

11:13 13:23 14:6
17:3 21:24 24:13
30:5 31:11 34:7
38:19,21 41:17
50:24 57:15 58:4
58:11 60:19 68:17
70:4 75:4,24
77:12 80:10 82:15
82:19 91:23 93:15
94:5 101:17 105:3
109:3 110:22,24
113:23 116:8
117:19 118:10
121:22 144:8
145:12 146:12,18
147:16 149:3,15
151:7 155:18
159:22 163:4
168:15 169:19
170:11,14 173:10
177:21 184:12
189:9 194:15
195:14 196:17
200:8 202:3,9
206:24,24 209:9
210:16 212:10,22
213:10 219:24
220:1,24 222:20
**once** 32:6 35:24
41:12 43:11 52:17
53:14 95:13
127:15,17 131:14
173:13 202:19
**ones** 49:12
**ongoing** 204:11
**open** 18:12 153:5
153:7 190:19
**opened** 148:4
161:15
**operating** 101:10
172:18

**optimistic** 173:14
**order** 72:12 73:2
  76:24 77:1 94:16
  95:5 96:24 97:9
  98:12 101:21
  108:20 178:12
  179:17
**organizations**
  56:11
**organize** 203:23
**organized** 39:4
**original** 28:8,10
  36:10 41:15 60:11
  60:12 87:7 93:24
  142:9 178:22
**originally** 18:3
  60:22 61:1 78:13
**ought** 16:21
**outcome** 59:18
  200:9 201:4 225:9
**outline** 139:16
  140:22 164:9
  211:23
**outlined** 90:18
**outsource** 50:21
**outsourced** 51:9
  67:19
**outsourcing** 51:6
  51:9
**oversee** 46:11,12
**owe** 33:7,11
**owned** 9:4 40:20
  52:8,9 60:3
**ownership** 42:7

**p**

**p** 6:4
**p.c.** 2:10
**p.m.** 1:20 217:10
  217:24
**page** 11:5,8 20:5,6
  20:23 21:1 23:4,7

23:8,10 25:10
58:13 80:13 82:10
82:22,24 92:1
96:3,19 109:5
147:14,14 149:18
166:15 194:24
205:9 207:4
210:14,15 214:4,5
214:8,11 217:23
219:16 226:13
228:7 229:3
**pages** 15:18,19
  25:8
**paid** 113:11 179:3
**panama** 8:6
**paragraph** 92:5
  92:18 93:11,12
  94:5 105:4 131:13
  133:18,19 138:12
  146:20 147:3
  149:18,21 150:1,1
  150:2 178:4
  203:18,19 204:8
  204:14,18,20
  205:9
**paragraphs** 94:8
**parking** 47:15
  72:2,21
**parrish** 12:12 18:4
  69:3 145:7
**part** 21:20 34:13
  53:20 81:11 89:12
  93:5 99:14 103:12
  110:4,15 112:15
  139:1 150:10,12
  153:17 164:19
  180:19 192:21
  195:17 204:15
  205:14 222:3
  228:9

**partial** 117:15,16
**partic** 174:3
**participate** 101:3
  111:12,13 113:14
  140:13 183:10
**participated** 144:3
  196:5
**participating**
  137:4 142:24
  143:20 170:2,6
  174:11 183:14
  184:9
**particular** 144:24
  159:8 192:1
**parties** 126:3
  127:7 171:12
  225:2,8
**partly** 94:20
**partner** 159:15
**partnership** 52:5
  160:1,12
**parts** 208:4,12
**party** 8:22 9:3
**pas** 108:5 109:2
**passed** 141:9
  154:8 198:16
  202:17
**password** 148:20
  148:23 203:14,15
**pasted** 214:18
**pay** 51:6 52:22
  93:12 187:22
  188:15
**paying** 52:19
**payments** 205:13
**pdf** 80:1,18 145:3
  148:4 152:20
  153:3 213:5,16,20
  213:21
**pdfs** 18:13

**pending** 224:9
**people** 44:8 45:24
  51:10 52:14 53:16
  53:23 59:17 67:11
  67:21,24 75:8,12
  110:6,10,14,16
  112:10 114:6,14
  115:1,5 116:1,2,17
  116:18,23 117:23
  118:1 127:14
  192:23 193:1,7,23
**percent** 81:3 89:14
  153:7 157:17
  169:5 173:20,21
  212:16
**percentage** 117:24
  173:19
**perform** 172:18
**performance**
  171:22
**period** 41:3 54:3
  127:18 141:10,10
  168:15 171:2
  183:15 200:23
  219:7
**perioperative**
  101:9
**permanent** 4:1
**person** 44:8,9,10
  44:10 45:11,12
  46:24 60:23 66:6
  66:24 87:23 88:3
  88:5,15 135:23
  172:3 190:24
  191:4 196:9
**personal** 9:13
  56:14 196:7
  222:17
**personally** 8:21,23
  8:24 20:3 68:9
  216:8 224:7

227:11 228:15
**perspective**
196:23
**pertained** 48:8
**pertaining** 1:15
**philip** 40:24
**philosophy** 171:23
**phone** 45:5,6 55:2
55:6 56:17 60:22
60:24 61:1 110:9
114:8,10 117:17
166:3,5,9 226:2
**phrase** 97:17
**pick** 112:12
**pictures** 140:1,8
**piece** 52:23 53:15
74:8 106:18,21,21
110:8 154:16
164:15 187:7
197:9 203:5
204:24 205:5
210:11 221:14
**pieces** 111:24
197:8 200:17
201:17
**place** 27:6,8,16
31:3,8 45:10
46:13 63:14 87:18
93:20 95:6 97:2
108:7,21 110:16
119:23 120:13
125:11 156:12
164:23 165:2
185:22 200:16
**places** 41:1
**plaintiff** 1:7 2:8
3:6 11:3 14:12
224:12
**plan** 188:12
**planned** 200:19

**planning** 133:21
154:14
**platform** 63:6
64:11 100:20
148:15 149:6
173:24
**play** 129:2
**plaza** 2:12
**please** 6:2,18 7:13
16:18,19 34:10
96:4 109:4 157:9
200:3 204:17
219:24 226:11,11
**point** 36:7,15 43:9
59:15 78:8 87:17
92:16 94:17 95:7
98:4 99:3 123:23
124:17 167:14
171:8 188:11,17
191:1 201:1
216:11,12,16
**points** 30:15 33:17
79:2
**popped** 205:6
**portion** 100:21
118:12 217:23
**portions** 96:5
**position** 10:1,4,7
43:12 86:15,22
88:12 90:8 100:3
101:12
**posits** 119:22
**possession** 202:22
**possibility** 129:11
**possible** 88:8
201:6,9,9
**potential** 52:5
58:5 112:23
**potentially** 169:12
**powers** 98:2

**practical** 172:11
**practically** 172:14
172:16
**practice** 81:16
192:11 193:13
**practicing** 172:10
**practitioners**
108:5 109:2
**preparation** 15:5
17:16,19 38:16
**prepare** 11:11
20:14 31:24 55:10
69:1 186:14 215:7
215:24
**prepared** 15:8,10
18:2,3,12 19:8,8
19:10,17 30:2
69:2 126:23 127:1
145:6 206:14
**preparing** 13:3
22:13 39:20 124:1
210:22 211:4
212:12,17
**presence** 224:19
**present** 10:1 31:16
31:24 70:7 75:5,7
75:21 76:15 87:10
141:14 171:11
195:19 207:8,17
225:5
**presentation**
54:22 71:1,5
106:6 128:21
**presentations**
49:17
**presented** 150:15
187:1,2,20
**presenting** 146:22
186:21
**presently** 8:17

**president** 10:3,8
42:13 46:2 66:4
66:23 67:2
**pretenses** 198:4
200:18 202:11,13
**pretest** 188:22
189:1,4,5
**pretests** 203:15
220:20
**pretty** 36:14 61:24
116:22 141:4
174:7 216:9,15
218:16
**previous** 41:6,11
42:4 123:1 125:18
125:19 127:12
**previously** 35:1
40:13 107:3
118:17 125:15
126:19 127:1
193:2
**price** 28:6,8
132:16 133:7
178:18,23 179:1
**pricing** 28:21
**prior** 38:17 40:16
41:5,10 42:3,21
43:2 64:19,20
65:18 68:5 91:18
102:2,7,15,18,23
124:11,15 126:15
127:2 130:2,11,20
138:21 139:4,8
140:9,16,19 141:2
145:10 158:24
163:1 164:2,13,23
165:2 187:11,17
190:16 192:3
204:9
**private** 152:12

privilege  19:9
privileged  16:20
pro  63:18
probably  15:24
  29:22 38:1 71:23
  75:8 80:23 85:22
  91:17 179:4
probe  139:6
problem  30:6,7
problems  169:3
procedure  1:14
  227:5 228:5
proceed  183:24
proceedings  1:20
process  12:3 56:21
  66:1,18 72:10,15
  73:1 77:9 94:15
  97:15,17,18,20,24
  98:16 119:5,12
  132:1 186:6
  190:20
produce  17:11
  18:24 29:10
  146:16
produced  14:3,12
  14:14,20 16:17
  17:9 20:1 38:11
  38:14 144:23
  146:6,15 206:20
  213:10,17,18
production  3:8
  22:11 82:8 226:16
  226:24
professionally  9:3
professionals
  107:18 108:13
program  3:12
  15:10,12 20:4,17
  20:18 21:16 25:15
  25:22 27:22,22
  28:4,4,11 29:11

30:14,16 31:3,6,12
31:13,15,20,21
32:3,8 54:8 59:16
59:20,22 60:13
61:7,24 62:5,8,16
63:10,15,19 66:14
67:6,8 71:9,14,16
73:20 74:16 77:24
79:21 81:6,19
82:1,20 86:19,20
87:11 89:5 91:4
93:6 95:6 97:2,9
98:8,12 99:20
100:22 101:4,9,15
102:10,15 103:2
104:3,18 105:8,18
107:12,13,23
108:9,16,17,20
109:10,22 110:11
111:12,13,14
112:8,9,16,24
113:15,22 114:1
114:24 115:15,23
116:2,12 117:24
118:23 119:9,12
127:4,20 131:16
132:18 135:8,18
135:19,20,21
136:3,4 137:5
139:1 141:14
142:5 146:23
151:7 155:12
156:1,4,12,20
157:2,16,19,23
161:10,21 162:13
168:1 173:9
174:16 182:22
184:1 185:13,21
186:3,7 187:4,16
188:19 189:21
190:23 191:3

192:16,20,21
193:1 194:10,16
195:19 197:8
200:17 201:17
203:23,24 204:24
205:2,5 206:12,13
207:16 211:8,12
215:3
programs  28:17
  43:23 59:9,11,12
  60:8,16 105:5,10
  173:7
progression  59:13
  124:10
projected  109:20
projections  115:22
  117:14,21,23
  118:21
promote  203:23
propos  119:6
proposal  3:21
  28:10 66:13 71:4
  76:15 78:23 79:18
  80:12 84:5,8,11
  85:23 86:8,10
  87:7 180:9
proposed  48:13,16
  54:12 55:24 56:23
  58:19 64:19 65:1
  119:8 156:4 159:9
  168:17 203:20
  204:2
proprietary  36:13
  123:9 146:24
  164:8 203:22
  205:11
prospective
  101:14 112:19
  113:24 114:6
protect  77:21

protocol  222:21
  223:2
prove  30:24
provide  7:10 28:1
  59:8 108:22 109:8
  112:2 125:24
  136:22 153:19
  189:20 217:3
  220:5
provided  15:15
  17:11 23:23 40:10
  60:8 61:24 85:10
  108:23 147:8
  149:5 153:19
  203:22 205:10
provides  105:7
  125:3
providing  85:16
  140:8 207:19
provision  94:8
prudential  2:12
public  150:4,5
  152:8,10,13
  227:10,18 228:15
  228:23 229:23
publicly  131:22
  152:8
published  132:2
pull  57:3 114:2
  170:20 197:22
  199:6
purpose  146:22
  155:10 175:6
purposes  18:11
  176:7 219:4
pursuant  1:13
  225:4
pursuing  105:8
push  129:15 164:6
pushes  56:8

**put** 28:4 31:19
37:12 45:9,15,19
46:12 52:2 67:1
67:10 101:9
110:16 115:24
116:2 136:3,4
156:12 169:20
173:8 185:11
188:10 208:17
212:7
**putting** 18:4 73:6
73:6 77:21 97:14
97:18 160:16

**q**

**qual** 111:6
**question** 6:15,17
6:22 7:1,2,8,10
13:2 14:9,10 25:7
25:13 26:21 40:9
41:18 58:11 73:12
74:10 84:21 92:9
95:22 97:6,6
115:16 122:15,17
127:8 132:14
136:14 142:23
146:8 148:7
149:17 157:8
165:6 170:1
175:23 183:13
204:19 206:19
209:20 215:11
222:10,12
**questioned** 104:11
**questions** 6:16
12:4 20:13 85:6
101:19 104:19
152:14 181:22
189:1,4,7 193:10
214:23 220:8,10
222:11 223:5

**quick** 38:1 132:10
222:11
**quickly** 47:13 57:9
129:4
**quizzes** 220:20

**r**

**r** 65:16
**radius** 47:22 48:6
48:11
**ran** 41:3
**range** 84:7 106:3
**reach** 45:23 48:15
99:2 160:2,8
**reached** 68:8
100:6,19 101:13
120:6 132:15
141:16,17 142:3
208:1
**reacted** 49:4
**reaction** 76:19
185:9
**read** 16:13 24:10
55:20 122:16
157:8,10 158:14
198:6,7 199:24
204:17 223:6
227:5,6,12 228:5,6
228:17
**readily** 211:19
219:23
**reading** 136:18
216:3 226:19
**ready** 27:12 31:24
31:24 33:6 90:3
123:19 130:18
141:10,12,14,14
143:23 185:20
196:21 197:6,24
199:4,9,11,15
**reaffirming** 34:17

**real** 25:9 57:9,20
117:4 179:16
**really** 32:23 43:10
44:2 56:7,8 61:2,2
78:6 92:9 105:16
123:7,16,16
160:15,23 170:23
182:21
**reason** 36:7 40:9
41:8 43:13 44:16
47:22 49:1 51:21
61:4 78:19 106:10
110:15 134:6
143:3 145:5,8
147:20 160:5
161:23 164:14
174:12 179:9
207:14 226:14
228:8 229:3
**recall** 10:15 13:6
14:6 22:23 23:12
49:18 53:11 55:1
55:7,23 56:19
57:22,24 58:5,7,15
58:16,18,22 62:2
62:14,18,19 63:16
63:21 64:14 68:18
70:9 73:13 76:22
78:22 79:8 81:22
81:24 85:4,7,9,16
86:4,15 88:2,7,9
88:12 89:1 90:21
90:21 91:7 97:23
98:13 103:18
105:24 106:2,2
107:5 112:18
113:13 118:20
119:4,7,15 120:14
120:18 121:1
128:6,18,20,21
139:14,23 140:4

140:12,17,18
142:23 143:2,10
143:10 144:2,8,19
144:20,22 145:1,4
148:14 150:11
163:14 168:20
169:10 173:24
175:23 176:3
178:9 182:9,23
183:13 184:14
185:7 186:20
189:17 196:12
197:19 199:17
219:4,7
**receipt** 226:18
**receive** 36:6 53:15
93:23,24 99:18
100:1 132:1,17
142:4 194:3,6
**received** 26:22
27:10 141:8
150:14 184:4
185:9
**receiving** 121:1
128:2,8 185:7
**recipient** 150:6
**recognize** 50:6
59:2 83:21 84:4
103:9
**recollection** 55:19
86:6 89:4 97:23
100:12 114:22
128:24 138:19
139:4,7 154:2
163:9 174:6 182:8
**recommend**
113:20
**record** 6:3 7:9
17:3 19:6 24:8
32:2,13 84:1
117:4,5 152:13

157:10 198:7
217:15,16 222:22
228:9
**records** 28:2 87:9
**red** 132:13 177:4
177:18 182:17
**reduce** 132:21
**reduced** 224:20
**refer** 107:8 204:8
204:10
**reference** 69:23
88:23 117:20
204:3 226:8
**referenced** 33:12
64:23 227:11
228:15
**references** 150:9
**referencing**
199:17
**referred** 147:2
190:13 204:20
**referring** 33:13
34:20 57:12 71:4
75:16 80:16 81:7
116:5 117:12
126:22 129:23
138:15 141:22
142:10,11 150:19
154:2 155:14,18
159:22,24 176:24
178:15,19 179:14
194:12 197:12
198:10 199:1,7,12
201:22 202:4
205:18,19,22
208:15 214:7
216:18
**refers** 149:20
**refresh** 55:19
**regards** 119:5

**regulatory** 95:4
**reinforce** 207:12
**reiterated** 76:12
**reject** 192:6,8
**rejected** 193:10
**relate** 118:13
**related** 225:8
**relates** 206:19
**relating** 62:23
206:21
**relation** 18:23
**relationship** 52:9
52:11,21 55:24
67:4 159:9,20
192:3
**reliance** 205:9
**remaining** 209:9
209:12
**remember** 22:14
35:22 39:16 53:1
53:3 54:7,20,23
55:5 57:1 58:12
58:24 60:7,19
61:3,11,14 71:7,19
73:23 75:7,12
77:5 78:11,15
79:1,19 81:14
86:9,22 88:3,15,16
89:11,24,24 94:1
94:10,10 103:13
104:1 114:17
115:21 116:19
121:1,7 124:14
125:9,12 127:5,8
128:2,7,8 134:4,21
135:18 137:14,15
137:15,22 140:5,7
140:11 143:20,24
144:1 148:17,17
149:8,9 160:24
161:5 165:22

166:8 168:23
170:1,6,12,13,16
171:14 174:10
175:3 176:6
177:18 182:19
184:8,10 186:15
203:9
**remembering** 54:9
54:17 60:10
**remind** 69:11 82:6
98:23
**repeat** 182:14
**replace** 171:24
172:6
**replied** 218:9
**reported** 1:23
167:15 224:18
**reporter** 1:17 7:9
7:16 224:5 227:7
**representations**
34:16 204:14
205:10
**representative**
11:11 141:18
197:4
**representatives**
183:10 195:8
**representing** 2:8
2:17
**request** 3:8 22:11
81:20 82:2,8,10
228:9,11
**requested** 37:4
**requests** 3:13
23:21 40:7 218:2
**require** 28:17
63:13 113:3,7
**required** 62:3
112:21 113:1
145:20

**requirements**
74:22
**requires** 110:11
**rescheduled** 134:7
143:9
**resent** 35:19,20
78:15 178:16
180:1
**reserved** 225:1
**resonses** 3:13
**respect** 162:11
190:20 222:15
**respective** 225:2
**responds** 46:24
154:20 162:24
**response** 3:8,9
22:10,21 82:7
176:21 177:5
182:9 218:19
**responses** 40:7
176:21
**responsibilities**
43:18 46:4
**responsive** 222:18
**restructure** 205:2
215:3
**restructured**
104:15 186:24
**restructuring**
91:18 119:12
**result** 71:17
**results** 58:14
**resume** 184:21
**retained** 5:3 51:20
**retrieving** 222:15
**return** 145:16
**returned** 37:16,19
226:18
**review** 13:2,8,14
14:1,2,11,14,22
15:4 19:24 20:3

21:11,16,18,19,23
21:24 22:12 39:6
39:14 144:22
145:4 206:18
210:21 212:11
214:20 215:21,21
226:12 227:1
228:1
**reviewed** 14:7
15:6 20:3 81:2
211:4
**reviewing** 22:14
22:23 39:10,18
128:7 176:3,6
**revise** 186:14
**revised** 179:10
**rewrite** 32:7
**rewriting** 31:21
174:15
**richmond** 162:8
**right** 7:3,14,17
16:10 17:17 18:17
21:9 24:4 26:1,6
26:14 31:3 37:14
37:22 41:14 42:19
46:11 49:23 53:4
60:10 61:19 62:2
67:24 69:15 70:2
71:2 74:19 78:13
85:5 88:20 92:18
95:15 100:1
104:24 114:7
116:8,14 117:3
118:10,19 120:2
122:5 126:24
129:15 130:15
131:2 139:2
141:20,21 143:13
149:15 151:4
152:14,20 163:16
168:12,13 169:22

175:18 177:2
179:21 181:5,16
184:23 188:10,24
195:14 198:20
200:23 203:10,12
203:16 207:6
208:18 213:7,15
213:22 214:2
215:13 217:14
220:22
**rnfa** 71:10
**road** 6:12
**roche** 2:10,11 3:2
5:3 6:2,5,8,11,14
6:20,24 7:4,7,12
7:15,22 10:17,22
12:18,22 15:22
16:10,15 17:3,6,14
17:17,22 19:5,18
19:20,23 22:6,18
24:18 25:4 26:6,7
30:11 38:6,19,21
39:5 40:4 50:4
55:17 57:8,19
64:16,18 68:23
83:8,19 95:20
96:14 98:20
101:20,23 102:1
103:7 117:3,9
120:22 121:22
122:1,13 124:23
128:1 131:9 132:6
133:13 135:4
137:10 138:11
142:19 144:14
146:5,12,14,18,19
149:1,5,7 153:1,13
156:16 157:8
158:1 162:18
166:13 169:18
175:12 177:14

182:5 183:7 185:4
189:9,12 198:6,8
200:2 206:4 213:7
213:11,13,15,17
213:19,22 214:1
216:14,16,18
217:8,14,20 220:9
220:13,17 222:2,6
222:9,14 223:5
**rockford** 49:13,14
49:15
**rockville** 49:11,12
**role** 41:24 51:22
67:18 132:17
142:5
**room** 101:10
172:1,18
**rooms** 70:14,16
**rotations** 104:23
108:22
**row** 69:14 109:16
**rules** 1:13 6:12
227:5 228:5
**run** 60:14,16 78:6
95:10,12 114:24
201:18 203:24
**running** 94:16
123:18 173:5

**s**

**s** 3:3 6:6 51:17,17
65:16 71:21 228:8
228:8 229:3
**sad** 200:7 202:2
**saith** 223:7
**sales** 10:3,8,10
41:9,23 42:1,14
43:19,23 44:1,2,4
44:15,24,24 45:2,4
46:2,11 53:20
**salesman** 43:15

**salesperson** 42:1
43:11
**saw** 66:13 71:1
80:4
**saying** 33:5,24
35:23 44:13 96:3
125:12 127:6
150:22 192:19
218:8,23
**says** 29:6,8 44:8,9
53:18 81:4 105:4
118:8 150:1,14
166:16 199:11
**scales** 155:19,22
**scan** 217:1 219:18
**scanner** 217:1
**schedule** 71:18
72:5 134:4
**scheduling** 11:21
**scheme** 204:15,19
205:8
**school** 8:2 20:17
20:18 40:20 59:4
59:4,17 190:8
195:5
**schools** 59:4,5,6
59:10 172:3
**schuyler** 2:10
**science** 87:2 90:17
**scratch** 32:7 71:13
71:16
**script** 44:4,6 79:3
**scripts** 44:1,2,24
45:2,5
**scroll** 105:1 109:3
**seal** 227:15 228:21
**search** 222:17
**searches** 222:21
**searching** 223:2
**second** 29:2,3
33:16 35:11 37:3

37:4,18 40:23
45:9 82:4,13 92:1
97:13 109:13
114:3 115:20
119:1 131:12
132:10 133:18
136:4 138:12
142:11 146:20
149:18 154:9
162:21 171:24
172:6 178:4,17,24
180:2 205:14
208:23
**secrets** 21:12
23:24 24:5 25:24
**section** 210:20
**see** 10:23 11:4
16:21 17:23 19:2
23:5 24:1 25:10
25:11 26:10,17
30:5 33:15,16
67:13 69:16 77:10
80:9,19 82:12,16
93:13 105:5 109:5
109:10,12,16
110:3 131:17
135:10 147:10,18
153:23 154:23
156:9 163:2
166:19 170:20,23
176:20 179:16
198:16,19 208:1
210:13 218:16
**seeing** 119:15
145:4 148:4
**seek** 105:21
**seeking** 106:11
112:20
**seen** 19:7 31:15
32:3 34:3 103:11

**self** 3:11 15:4 20:1
20:7,14 21:7,11
24:21 32:9 62:20
64:1 147:5,9,18,21
149:12 212:24
213:1,1 214:3,9,14
214:15,16,24
215:1,7,7,15,16,22
215:24 216:5
217:1 218:3,8,13
218:20 219:3,3,8,9
219:21 220:6,8,11
220:14
**semester** 31:17,19
91:11,14 99:7,9,10
104:8,8,8,20,21,22
135:9,13,19 136:3
136:5,9,22 205:2
**semesters** 104:16
**send** 36:1 45:20
46:9,21 81:16
116:10,21 134:15
134:16,19 153:5
157:19 158:13,17
158:18 175:19
191:5,10,11,14,17
191:18,21 192:15
193:13 194:1,6,9
194:14 213:19
218:2,7 219:15,18
**sending** 79:8
81:17 90:1 110:5
175:24 193:24
194:15 218:20
**sends** 33:24 218:5
218:7
**sense** 201:15
**sent** 18:22 29:6
35:3,18 37:3,10
66:15 78:12,12
79:14 81:11,17,19

82:1 85:1 104:10
110:18 118:3
126:14 142:8,12
144:17 147:21
149:9,11 150:8
151:21 152:1
153:6,8,21 154:4,6
154:9 176:16
178:8,12,24
179:21 180:10,19
181:19 182:16
200:10 217:9,10
218:9 219:20
220:6,15
**sentence** 97:14
141:12 205:15
218:12
**separate** 161:16
**separated** 212:18
**separately** 113:8
**september** 5:1
183:15 184:1,16
**series** 6:16 13:11
24:12 46:23 98:6
98:7,10 169:19
**served** 42:10
**server** 69:11
**services** 14:19
34:6 50:16,18
51:13,18 108:13
113:8 158:10
**session** 135:13,14
**set** 3:10 22:21 66:3
67:2 70:16 71:5
72:19 91:14 92:17
225:10
**setting** 50:12
**seven** 110:9
**share** 123:9 146:3
**shave** 209:5

**sheet** 226:13,15,15
228:7,10,18 229:1
**shifted** 72:5,7
**shifting** 31:20
**short** 17:5 19:22
38:5 64:17 101:24
189:11
**shorthand** 1:17
224:5
**shortly** 53:4
124:15 143:21
**show** 22:7,19
24:19 25:5 40:5
50:5 51:10 55:18
57:10 82:4 83:9
84:3 95:22 96:15
117:10 120:23
122:14 124:24
132:7 133:14
135:5 137:11
140:1 142:20
143:12 144:15
153:14 175:13
177:15 185:5
206:5 217:21
**showed** 126:19
**showing** 24:11
103:8
**shown** 153:2
226:16
**shows** 30:18
**side** 51:5 90:4 95:9
162:4 171:12
**sign** 23:17 35:13
35:17 36:20 126:3
126:10 127:7,15
145:14,18,21,24
146:2 154:12,18
155:2 165:15
166:5 167:2,9
174:23 191:17

signatory 149:22
signature 23:6
 191:18 224:24
 225:22 226:14
signed 35:16,18,20
 35:23,24 37:2,6,9
 37:15,18 120:4
 126:8 137:20
 146:15 163:1,10
 164:22,24 165:1
 165:11 175:5
 227:13 228:18
significant 20:8,16
 20:19 214:17
 215:19
signing 23:12
 166:17 167:5
 226:19
similar 162:10,12
 162:14
similarities 20:9
simply 7:8 11:18
 96:1 127:8 142:23
simulated 139:21
 207:11
simulator 208:22
simulators 139:22
 207:11,18
sincerely 226:22
single 20:17
sir 11:1 21:8 24:7
 226:10
sister 56:11
sit 24:4 81:9
 111:18 184:14
 200:21 201:11
sites 108:22
situation 52:13
 137:24 159:1
 161:9 193:9

situations 202:17
six 36:12 110:9
 116:17,23 154:8
 190:4 207:8,17
sixth 20:6,23
 214:4
skill 34:12 36:12
 107:22 108:3
 112:11,12 122:21
 122:23 140:2
 154:16 164:8
 187:8 190:4 207:9
skills 34:22 100:8
 100:16 108:6
 122:19 123:3,21
 124:13 125:22
 138:15,22,23
 139:8,14,17 140:8
 140:13,20 165:13
 165:17 184:7,16
 184:20 187:17
skype 47:18 74:3
 75:10
slash 51:21
small 70:15
smaller 104:22
smoothly 202:15
software 45:15
solely 137:4
solt 71:21,22 72:23
 75:14 76:8,17
 86:22 96:18,22
 97:13,17 98:24
 130:11 167:15,23
 174:3 175:23
 186:10 195:4,7
 196:17,18 197:17
 203:19
solutions 226:1
 229:1

somebody 52:16
 53:19 107:7
 108:24 136:18
 140:4 172:6
 211:20
sooner 144:20
sorry 9:7 14:21
 16:13 23:8 26:13
 49:16 52:7 65:10
 66:22 75:18,24
 84:21,22 108:1
 112:6 115:8 117:1
 117:1 121:17
 138:4 181:7
 182:14 195:12
 213:3 215:10,12
sort 165:16 169:23
 194:17
sound 16:11 88:6
sounds 162:9
 168:12
sourced 51:11
sourcing 51:3,19
 52:14,17
southern 58:20
space 48:1 93:4,5
 93:10
spaces 48:2
speak 11:22 12:9
 12:12,15 39:2
 55:11 59:7 174:3
speaking 29:7
 53:23 55:1,5
specialist 136:15
specific 104:2
 116:19 197:22
 215:14
specifically 21:23
 99:13 102:12
 114:21 115:6
 127:5 130:6 160:2

204:7
specifics 98:15
 168:23
specified 170:24
speculate 140:5
speed 216:24
spell 6:2 65:15
 208:7
spent 172:9
spoke 56:16 57:24
 60:22 61:1,11
 66:24 75:8 76:12
 183:19 188:1
srcattorneys.com
 2:16
ss 224:2
st 210:15
st2501 210:13
staff 60:17,18 66:5
 218:15
stage 66:16 198:18
stamp 25:10
stand 69:18 108:3
 207:7 208:9
standard 81:16
 191:8 192:11
standards 101:2,5
 101:14 111:11
 219:10
stands 210:19
start 32:7 52:14
 71:16 131:24
 178:12 179:17
 188:7,12,18,20
 201:15
started 10:10 18:4
 52:19 53:4 69:6
 87:17 93:20
 107:14 128:24
 218:6 219:5

starting   54:6
187:23
state   26:9 27:1
28:18 30:17,19
31:23 32:4,8
33:10 71:1 84:15
84:20 94:21,24
95:4,11,14 103:1
104:4,12 111:21
113:1 129:19
135:24 136:7
150:15 151:23
153:7 159:16
181:16 187:2
198:14,15 202:18
224:1 227:10
228:15
stated   95:9 142:9
182:19 198:23
199:14
statement   27:16
195:15 197:23
199:3,7,16 201:20
201:22 204:12
216:6 227:13,14
228:19,19
statements   195:10
196:13,17,19
197:17,20,22
198:24 200:14
201:7
states   1:1,14 28:17
93:12 97:13
128:12 131:14
133:18 135:12
141:7 146:20
147:17 160:7
175:16 181:4
186:11 195:2
197:5 199:8 204:1
204:14 218:12

224:9
stating   143:22
192:19 218:6,19
stay   44:6
steel   201:2
stenographically
224:18
step   72:16 73:4
74:24
steps   11:10 72:16
stetson   1:17 2:13
224:8
stim   164:5
stimulated   164:6
stipulate   170:24
stop   121:20 178:6
stopped   48:11
strange   167:21
stream   118:5
streaming   110:20
200:12
street   226:1
strengthen   164:12
strike   13:6,19
25:18 56:19 57:23
58:6 76:22 85:8
119:6 120:3
134:14,15 154:24
174:21 181:21
204:13
struck   99:11,15
structure   28:22
174:16
student   99:18
108:23 111:5,8,13
111:16 112:23
113:14,15 133:4
137:4 145:23,24
172:17 188:20
190:1,23 193:3,24
194:4

students   28:2,3,15
28:18 32:1 36:9
48:2 87:10 89:10
92:7,10,14 93:6
98:9,13 101:14
107:11,17 108:11
108:12 109:21
111:2,10 112:8,19
114:6,23 115:9,14
116:10,16,20
118:24 124:8
140:13 141:15
195:20 211:21
212:1
studies   15:7
study   3:11 15:4
20:1,7,14 21:7
24:21 32:9 62:20
64:1 147:5,9,18,21
149:12 212:18,24
213:1,1 214:3,9,14
214:15,16,24
215:1,7,7,15,16,22
215:24 216:5
217:1 218:3,8,13
218:20 219:3,3,8,9
219:21 220:6,8,11
220:14
stuff   78:14 150:23
182:22 208:2
styled   109:6
subject   217:10
submit   103:20
104:3
submitted   30:17
30:19 103:16
104:12 152:6
219:8,9
submitting   23:14
subscribed   227:10
228:14 229:21

subsequent   207:10
217:5 218:5
subsequently
159:8
substance   11:18
12:5 182:23
substantiate   18:14
success   46:1
sudden   186:8
197:9
sue   155:21
suggestion   6:24
suggests   30:19
suit   225:8
suite   2:4,13 226:1
sullivan   58:13,22
59:1,23 60:20
61:12 63:9,11,23
64:2,5,8,11,22
82:1
sum   188:15
summarily   192:6
summary   210:22
summer   135:13
supply   61:21
sure   6:13,23 7:6
7:11 17:14 19:19
19:21 34:3 35:15
39:14 54:4 61:24
77:21 81:3 82:14
83:14 88:9 89:14
91:16 92:11,21,22
116:22 118:11
120:12 121:7,23
141:24 143:18
157:5,20 169:5
170:5,22 174:7
176:10 181:22
182:18 197:3,5
198:22 206:17
214:2 216:9,14,15

216:17 218:21
219:14
**surgeon** 52:8,9,10
171:21,24 172:6
**surgeons** 109:1
113:10 172:19
190:9
**surgeries** 139:21
172:8 207:11
**surgery** 43:9
172:15,17 208:2
**surgical** 1:5 10:2
11:4 14:19 34:6
34:12 36:17 41:6
43:8 50:16,18,20
51:4,9,13,18,20,21
51:24 52:1,2,15,15
52:18 54:8 56:8
59:9,11,13,14,18
59:20,21 60:5,8,13
60:16 61:7 67:6
67:19 70:11,12,17
71:9 86:20 97:1,9
98:8,12 99:19
100:8,21 101:3,6
101:15 102:10,15
103:2 106:14
107:22 108:3,6
109:22 110:12
111:18,22 112:11
112:12 113:3,4,9
113:15 114:1
115:2,22 116:11
118:22 119:8
122:19 123:21
126:7 131:15,21
132:17 139:1,17
139:22 142:5
146:23 154:16
156:1,4,11,20
158:10 161:22

162:13 167:24
171:24 173:4,5
184:1 185:13
186:2 187:8
189:21 190:4
192:16,20 206:11
206:13 207:9,11
207:18 211:8,12
224:11 226:6
227:3 228:3
**surginet** 187:16
188:19
**surprised** 185:16
**suture** 135:14
172:14,16 207:12
**suturing** 139:20
172:4,10 207:10
207:21 208:24
**swear** 54:19
134:12
**sworn** 6:1 7:20
224:15 227:10,13
228:14,18 229:21
**syllabi** 212:2
**system** 31:17 73:7
89:9 99:9 104:15
187:24 188:5
205:3

---

**t**

---

**t** 2:11 3:3 6:4,6
65:16 71:21
**tabitha** 12:9
**tag** 46:23
**take** 15:22 27:21
28:3 31:18,18
45:11 55:20 64:16
65:10 71:13 83:23
111:13 115:5
120:9 122:15,24
123:15,17,18
124:8 132:13

133:1 135:18,22
136:2 142:21
154:22 155:12
157:18 160:20
161:14 181:18
186:8,13 188:22
197:8 201:18
204:17 209:3,4
212:6
**taken** 1:16 17:5
19:22 38:5 64:17
101:24 121:24
125:10 137:24
185:20 189:11
200:5 212:20
**takes** 136:17 188:9
**talk** 72:15,15
121:14 166:17
**talked** 65:4 71:3
74:1 106:7 114:23
134:9 146:10
168:19 169:1
183:21 197:23
**talking** 26:22,23
30:15,22 31:1
65:12 66:7 73:7,8
116:1 138:13
159:23 174:8
192:23 193:7
221:17
**talks** 31:4
**task** 71:15
**taught** 100:22
140:24
**teach** 36:11,16
60:18 70:12,17
87:18 93:21
100:16 106:13,15
107:21 108:2,4,5
123:2,10,21 124:7
124:12,18 125:5,5

125:8,22 128:15
131:14 132:21
133:2 172:3,5,13
172:15 173:6,23
207:20 208:2,3,14
**teacher** 96:6 124:6
**teaches** 207:23
**teaching** 70:14,16
87:5,14 96:5,7
100:7,10 122:19
122:21,22 123:8
128:21 129:1
173:4 179:6
185:22,23 210:9
210:10
**team** 50:12
**tech** 51:24 52:1
59:9,11,18,20 60:8
60:16 70:11 86:20
101:6 111:10
**technical** 4:1
**techniques** 139:21
207:12
**technologists** 56:8
**techs** 43:8 51:20
52:15 59:14 60:5
70:12,17 106:14
113:4
**telephone** 68:15
88:17 94:7 114:15
115:19 120:14
**tell** 6:18 12:6 30:9
43:4 86:18 90:8
96:4,6 110:17
114:21 115:6
121:10 124:17
130:3 131:3
185:24 214:13
217:8
**telling** 86:15,22

**tells** 203:3
**tem** 178:16
**template** 178:11
 178:14,17,19,21
 178:22 179:1,13
 179:22 180:1,6,10
 180:16,19,23
 181:2,11
**tendency** 7:4
**tendered** 219:2
**term** 94:8 126:3
 127:7,9
**terminate** 156:3
 156:20
**terminated** 127:16
 127:17 159:8,19
**termination** 94:8
**terms** 27:18,20
 29:12,14,15 32:18
 35:2,3 36:3 90:18
 91:7 145:13
 155:16 166:23,24
**test** 136:19 168:9
 188:23 189:6
**testified** 7:20 35:1
 40:13 48:5 49:5
 56:16 70:5 81:18
 87:21 111:1 122:2
 138:23 150:7
 152:5 158:5
 176:14 177:18
 188:20 189:13
 198:9 201:19
 202:9 212:15
 215:14
**testify** 8:18 9:22
 12:7 151:10
 181:24 224:15
**testifying** 197:2,11
**testimony** 12:16
 15:2 28:20 35:6

 81:9,22,24 116:9
 150:11 156:17
 157:11 189:17
 212:13 218:1
 224:17,22 225:10
 227:6,7 228:6,9,12
**tests** 203:7 220:21
**texas** 110:11,11
 111:3,6,8,20 112:8
 112:10
**textbook** 205:8
**theirs** 16:23 20:16
 28:13 191:12,15
**thereof** 225:9
**thing** 36:10 39:9
 44:9,9,13 45:9
 46:19 56:14 66:12
 73:18 76:11 133:3
 149:11 161:16
 186:20 214:21
**things** 3:18 12:4
 16:5,7 45:1,9
 46:23 47:13,19
 69:9 73:11 78:17
 78:24 79:2 85:24
 89:18 154:21
 163:6 164:8
 168:24 172:24
 182:20 188:9
 201:13,14 205:6
 214:17 215:6
**think** 16:22 19:11
 34:2,6 35:18,19
 37:4,21 38:1,24
 47:10 48:19 49:11
 49:19 50:10 54:1
 54:5,14 55:13
 56:6,12 59:24
 78:9 80:23 87:15
 87:21 90:10,13
 91:1,13 92:16

 94:17 95:7,11
 96:9,9 99:8,8,16
 107:19 111:5
 114:16 118:6
 119:10,11,11,17
 121:9,16,18,19
 122:2,20 126:9
 129:17 132:19,19
 134:8 141:4,6
 142:6,7 144:6
 145:19,23 146:16
 148:13 149:11,13
 150:12,21 154:13
 161:2 164:4,4
 165:14,18 167:19
 168:10,18,18,22
 169:3,6,20 174:5
 174:12 175:6,6
 177:5 178:16,24
 179:4,6 183:18
 186:4,4 189:9
 194:21 198:1,1,5
 199:22 200:4
 201:4 205:8
 212:22 218:24
 220:13 221:16,21
**thinking** 54:18
 144:4 181:9
**third** 11:8 23:3
 32:15 33:16 69:13
 69:13,14 87:19
 109:14 119:1
 218:12
**thirty** 226:18
**thomas** 195:14,15
**thought** 61:8
 75:18 76:2 123:17
 123:18 125:3,7
 126:17 127:10
 136:12 172:7
 179:21,24 180:10

 199:18
**thread** 95:23
 132:9 153:17
 162:19,21 166:15
 166:16 175:15
 218:10
**three** 34:2 39:8,9
 39:17 44:17 47:7
 49:6 54:2 57:2
 89:15 109:9
 125:18 127:16,18
 137:19 162:7
 166:8 171:12
 172:10 176:10
 193:22 198:1
 199:16 200:13
**tie** 207:12
**ties** 32:6
**tight** 36:14 124:4
**time** 1:19 17:10
 23:16 27:15 32:3
 32:5,13 33:7,11
 35:18 39:15 41:3
 43:6 45:20 54:5
 55:8 69:5,8 74:21
 78:8,9 81:16 85:1
 87:19 90:5,12
 93:19 97:22 98:6
 99:3 100:9,20
 101:20 105:14
 106:10 109:12,23
 114:19 119:12,22
 120:4,5,10,18
 125:20 129:10,14
 129:17 131:22
 135:22 136:17
 137:20 140:15
 143:5 144:17
 147:23 150:4
 154:9 163:8
 166:21 167:1,14

**[time - ultimately]**

167:20,22 168:14
168:15 169:3,14
171:2,8 178:17
179:22 180:2
183:14 184:4,6
185:11 186:14
188:2,4,18 189:9
197:19 200:4,12
201:1,8,12 204:13
205:1 217:8 219:7
**times**  30:20 34:1
34:18 51:3 55:11
104:16 191:12
193:3 196:3,11
**tip**  7:12 155:19
**tips**  155:22
**today**  8:18 11:12
12:13,16 15:2
17:8 19:3,17
28:20 29:18 38:8
38:18,20 55:10
81:10 184:15
200:21
**today's**  11:15,20
11:22 12:10 13:3
14:2 15:5 22:13
22:24 30:2 39:7
39:20 126:24
199:20 212:12
**told**  39:12 86:24
87:1 116:19,22
124:12 131:1
140:21 148:11,13
169:10 198:9
**tom**  73:19,22 74:2
74:15 75:14 76:21
77:23 87:23 90:6
90:8,15 98:3
130:19,20 131:1,3
154:23 155:8
165:19 166:17

167:2,8,16,23
168:6 171:13
174:9,23 195:4
196:4,7,11,12
**tom's**  195:17
**tomorrow**  47:17
72:4,21
**top**  71:20 73:23
96:19 128:10
136:20 163:4
**topics**  209:16
**total**  135:16
208:20
**totally**  222:5
**touch**  67:1,24
**touched**  94:2
125:14
**tour**  70:11
**town**  78:19 165:5
166:19 167:6
**track**  44:7 115:4,5
115:17 198:2,2
**trade**  21:12 23:23
24:5 25:24
**traditionally**
172:1
**traffic**  8:15
**train**  34:2 52:17
123:10 164:18
200:13
**trained**  43:7 45:3
53:15 101:7
106:14 173:6,23
**training**  34:13
36:17 41:21 45:4
52:6,8,12,22
101:11 108:7
154:15,17 164:20
183:22 190:4
**transcribe**  7:16

**transcribed**  227:7
**transcript**  224:22
226:11,12 227:5
227:12 228:5,11
228:17
**transcription**
224:21
**transfer**  105:19
**transmit**  62:22
63:2,10,22 64:1,4
64:7
**transmitted**  62:5
62:19 145:8 148:8
**transmitting**
63:14
**travel**  36:11 44:21
68:2
**trial**  9:22,24 44:18
**tried**  119:19
**trip**  54:16
**trips**  53:5
**true**  224:21
**truly**  200:24
**trustees**  76:24
77:6 102:9,14,20
**truth**  224:15,16,16
**truthful**  201:7
**truthfully**  8:19
**try**  57:3
**trying**  58:18 67:13
79:19 88:18
122:23 158:9
166:8 169:20
170:3 172:23
176:12 183:10
192:12 193:15
201:23
**turn**  23:19 26:8
79:6 80:13 82:5
82:10 104:24
116:3,17 132:9

136:13 147:11
151:13 186:8
194:24
**turned**  159:11
201:13,14
**turning**  23:3 38:20
110:14 111:2
116:23
**turns**  221:1
**twice**  55:13 56:17
**two**  2:12 15:6
21:21 42:15,16
54:2 61:9 73:11
78:17 85:24 101:7
101:10 110:19
111:24 118:3
125:19 135:14
152:17 153:20
176:11 177:24
179:1 191:9
195:23 196:5,11
200:10 212:22
**tying**  139:20
207:10,21 208:24
**type**  28:17 45:21
**types**  59:10 107:16
108:12 191:9
192:14
**typewriting**
224:20
**typical**  191:9
**typically**  72:14
108:24 194:3

**u**

**u**  6:4
**uh**  7:13 17:2
177:23 183:12
213:11
**ultimately**  55:23
133:6 159:13,19
161:11,20 163:15

Case: 1:15-cv-07290 Document #: 101 Filed: 08/31/17 Page 267 of 270 PageID #:1277

165:10 183:23 188:23
**un** 168:3
**unable** 111:17
**understand** 6:14 6:17 20:22 26:21 84:21 92:9 116:8 150:20 156:17 198:22
**understandable** 93:21
**understanding** 37:11 97:16 128:12,23 135:16 141:11 151:20 156:2,6,18,22 157:12 158:2,6 166:21 167:1,8,22 168:4,4
**understood** 6:21
**undetermined** 224:9
**unfortunately** 143:11
**unique** 111:21 172:5
**unit** 188:23 189:6 203:7 220:21
**united** 1:1,14 160:7 224:9
**unusual** 120:11
**updated** 142:8
**upwards** 59:22
**use** 51:17 52:1 70:17 71:14 89:9 127:19 186:9 191:10 215:23
**user** 45:23
**uses** 89:10

**v**

**v** 226:7 227:3 228:3
**vague** 89:4
**vaguely** 11:24 128:8
**various** 183:9 189:14
**vela** 1:16,23 224:4
**verbal** 26:24 27:5 27:8,18 28:9 29:2 30:23 32:15 129:18,21,22 130:3 136:21 137:18,19 197:7
**verification** 23:5 23:13,17
**veritext** 226:1,8 229:1
**veritext.com.** 226:16
**versus** 106:7 155:23 156:23 157:13 164:8
**vice** 10:3,8 42:13 46:2
**view** 64:12
**viewed** 148:2
**viewing** 33:10
**virginia** 6:7 44:21 65:12 72:1 162:8 163:23
**visits** 43:4
**vp** 29:4 42:1 191:7
**vs** 1:8

**w**

**wait** 6:24 7:8
**waiting** 143:4,6,8 143:8 144:5
**waived** 226:19
**walk** 3:18 17:11 17:24 18:10 69:8 81:4 88:18
**walked** 71:2,7 200:6 202:1
**want** 11:7,10,17 11:19 34:8 40:18 44:20 47:16,23,24 48:21 50:22 61:4 61:7 75:20 77:10 93:7,9 101:21 112:10 115:18 121:22 129:12 139:3,6 145:12 150:20 153:20 157:3,3 158:12 170:21 188:10 197:10 199:24 213:20 216:12 218:8 219:17 220:3
**wanted** 18:5 36:12 36:14,16 39:14 44:19 47:21 53:17 56:3,4 85:15 87:18 93:20 104:13,19 107:21 108:2 115:2 118:1 123:7 124:12,18 133:20 157:16 160:5,15 164:11 164:18 182:9 194:22
**wanting** 124:4,8 129:7
**wants** 48:24 129:5 193:22 223:6
**watterson** 53:13 53:22 67:10
**way** 19:14 45:12 63:17 91:15 111:7 128:19 130:7 135:24 136:16 143:19 148:3 174:11 188:1 201:13 216:24 225:8,9
**we've** 47:10 48:21 80:21 137:23 185:22 186:16 196:3 214:3
**web** 63:6 64:11
**website** 46:5,6,7 46:15 113:21
**week** 30:1 54:2 125:19
**weekend** 47:6 133:20 216:3
**weeks** 154:8
**went** 9:24 43:20 43:22 54:16,17 70:13,24 90:2 134:3,9 137:14
**whereof** 225:10
**wife** 39:12
**wise** 12:5
**wish** 39:12 69:20
**wit** 224:6
**witness** 3:1 6:1,4,6 6:10,13,19,23 7:3 7:6,11,14,17,19 15:23 16:2,13 17:21 19:3,11 30:7,9 38:24 83:18 117:1 157:11 199:24 213:9 216:15,20 217:5 220:2,5,16 221:19,21,23 222:7 224:14,18

224:19,23 226:9
226:11 227:1,4,11
228:1,4,15
**witnesses** 7:5
**witness'** 226:14
**wonderful** 200:7
202:2
**word** 16:6,6
112:22 204:10
**wordier** 16:8
**wording** 16:8
32:24 80:2 157:6
**words** 32:12
**work** 39:13 44:21
46:6 48:23 50:13
51:9,10 91:5
93:22,23 123:24
158:8 160:6
172:19 199:16
203:21 204:2
**workbook** 63:2
64:8 147:4 148:1
148:2,7 149:10
150:10 220:23
221:3,5,10,11,18
221:19 222:3
**worked** 40:22 41:3
43:21 44:17 45:1
139:8 158:8
**working** 44:24
53:5 108:19,24
113:9 161:22
**works** 50:22 51:1
192:24 193:8
**worth** 110:19
118:4 200:11
**wound** 172:3
**write** 43:24 126:1
179:17 189:6
215:24

**writes** 178:3 202:5
**writing** 164:12
174:14,15 190:14
**written** 22:10
27:21 31:13,13,22
35:3 80:21 90:18
164:24 165:1
175:5 189:19
190:17
**wrong** 26:12
144:20 162:9
**wrote** 69:3 125:9
135:8 151:7 161:6
189:3,4 201:1

| x |
|---|

**x** 3:1,3

| y |
|---|

**y** 51:17
**yeah** 15:24 17:13
20:24 34:18 38:3
49:14 60:21 71:22
82:7,24 88:1
97:11 101:22
107:19 118:9
143:15,16 146:13
146:16 147:14
161:5 171:3,5
174:10 176:24
181:24 184:13,19
208:20 213:12,13
214:12 220:9,13
220:14 221:20,22
222:6
**year** 9:19 59:19,22
109:13,13,14
116:1,18,23,24
118:24 119:1,2
127:18 219:4
**years** 8:9 39:8,17
40:21 42:15,16

57:2 89:15 101:7
101:10 107:5
109:10 110:19
118:4 127:16
166:8 176:10,11
200:5,11 201:24
**yehss** 51:14,16
52:4,8,9 53:13
67:10,18 158:23
159:6,15,18,24
160:1,1,3,5,12,18
160:20,24 161:7
161:10,16
**yep** 16:24 199:23
**yesterday** 39:16

| z |
|---|

**zip** 149:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.