**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING, INC. | ) ) ) | |
| Plaintiff, | ) ) | No. 1:15-cv-07290 |
| v. | ) ) | Judge Gary Feinerman |
| COMMUNITY COLLEGE DISTRICT 502, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In late November 2013, representatives of ACE and the College of DuPage (the "College") met to discuss a possible partnership for a surgical assisting program through the College. The discussion was largely devoid of specifics: the parties did not discuss pricing, the term of any partnership, or the roles and responsibilities of the parties. At the conclusion, Cabai and Solt informed ACE they would discuss a potential partnership with others at the College and determine whether such a partnership made sense.

The next day, ACE voluntarily sent a master curriculum and program catalog – which it now claims are trade secrets – to Cabai and Solt. Months later, ACE provided Cabai with textbooks (which were not written by ACE) and invited her to attend ACE's Surgical SkillLab – without requiring a non-disclosure agreement. However, Cabai's attendance at the ACE Surgical SkillLab confirmed what the College suspected: ACE was unprepared to put on a surgical assisting course. Accordingly, in September 2014, the College declined to proceed any further.

ACE responded by claiming (for the very first time) that: (1) the parties had already entered into a contract on December 9, 2013; (2) Defendants had misappropriated trade secrets;

1

and (3) Defendants had engaged in fraud. However, the undisputed facts demonstrate that no contract existed, and that ACE's fraud and trade secret claims are meritless.

*First,* the College never accepted or executed any agreement. ACE contends that it entered into a contract on December 9, 2013. However, the undisputed evidence shows that, as of that date: (1) no agreement was executed or accepted; (2) ACE was uncertain whether it could integrate its program into the College's online platform; and (3) key terms (such as pricing and who would teach the lab component) were unresolved. The parties never reached agreement on those points. In fact, in May 2014, ACE sent the College a revised agreement with two options for pricing. The College never selected either option.

*Second,* no one from the College made any false statements to ACE. No one ever told ACE that the College accepted the terms of any contract or that the College would sign a contract. Moreover, even if someone *had* made such statements, the College is immune from liability under the Illinois Tort Immunity Act, and any reliance by ACE on statements by College employees is *per se* unjustified.

*Third,* surgical assisting programs are subject to certain standards. Thus, accredited surgical assisting programs will necessarily have similar, if not identical, content. Moreover, ACE voluntarily provided its "confidential" information to students, prospective business partners, and hospitals. ACE filed its "trade secrets" as part of the record in this case and never designated as confidential any "trade secret" information produced in discovery.

## ARGUMENT

### I.  The College Is Entitled To Summary Judgment On Count I.

Count I is a breach of contract claim against the College only. To prevail on a breach of contract claim, a plaintiff must allege and prove: (1) the existence of a valid and enforceable

contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff. *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015). No contract exists if the agreement lacks definite and certain terms. Nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance. *Ass'n Benefit Servs. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007). Whether a contract exists is a matter of law for the court's determination. *Id.* at 849.

### A. The College And ACE Did Not Enter Into A Contract On December 9, 2013.

ACE contends that the parties entered into a contract on December 9, 2013. That contention is based on a single email from Solt that states: "I think our discussion was a great one, and we are ready at this point to move forward on our part. That consists of putting the curriculum through our college process and then on to the state's approval process." ((Def. Statement of Undisputed Facts ("SOF") ¶¶ 32-33) That email does not create a contract between the parties. Rather, it simply states that any new program at the College must go through a lengthy, multi-level review process before it could be approved. There was no guarantee that the program would make it through that approval process. Thus, the December 9, 2013 email can hardly be called an "acceptance." ACE's claims about the December 9, 2013 email become even weaker if the Court (as it must) considers the other undisputed facts that provide the context for that email.

*First,* the College did not ever sign a consortium agreement. (SOF ¶¶ 31, 33, 43, 48)

*Second,* the November 2013 Draft Consortium Agreement was silent as to certain material terms, *e.g.*, the amount of tuition to be charged to College students and the identity of the instructor for the lab component of the program. (SOF ¶¶ 28, 38-39) The latter was the subject of multiple discussions in early 2014. (SOF ¶¶ 38-39)

**Third,** by December 9, 2013, the College had made clear to ACE that it would require the use of Blackboard, an online learning platform. As of that date, ACE had never used Blackboard and did not know whether its program could interface with Blackboard. (SOF ¶¶ 30, 53)

**Fourth,** as of December 9, 2013, the parties had not agreed on price. The College never accepted the pricing in the November 2013 Draft Consortium Agreement. (SOF ¶¶ 27-29, 35) Nor did the College accept ACE's subsequently reduced price. (SOF ¶¶ 35, 42-43)

In short, in the absence of an executed agreement, and in the absence of agreement on several material terms, there cannot be a contract between the parties.

### B.    Cabai, Solt And Cameron Did Not Have Authority To Bind The College.

"Illinois courts presume a party doing business with a government entity knows two things: (1) he cannot enforce a contract unless the applicable statutory method of executing the contract has been followed; and (2) statutes and ordinances limit an official's authority to bind a government entity to a contract." *U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 331 (7th Cir. 2009) (citing *D.S.A Fin. Corp. v. Cty. of Cook*, 801 N.E.2d 1075, 1081 (Ill. App. Ct. 2003)). Thus, a party contracting with a government entity is "charged with knowing the level of authority [the government entity contact] actually possessed." *Id.* at 330. Where a contract with a government entity does not follow the statutory method of acceptance and execution, it is unenforceable. *Id.* at 331.

Here, the Individual Defendants did not have authority to enter into a contract on behalf of the College, a local public entity. Under the Illinois Public Community College Act, 110 ILCS 805/1, *et seq.* (the "Community College Act"), only the ***Board of Trustees of the College*** (the "Board") could enter into a contract with ACE. See 110 ILCS 805/3-11; *Hedlund & Hanley, LLC v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 876 N.E.2d 1, 7 (Ill. App. Ct. 2007).

4

Under the Community College Act, the Board must apply to the Illinois Community College Board ("ICCB") for the approval of majors and curricula in any field of instruction not previously provided by the College. 110 ILCS 805/3-25.1. The Board is also charged with "award[ing] all contracts…involving an expenditure in excess of $25,000 or a lower amount as required by board policy[.]" 110 ILCS 805/3-27.1. Finally, the Board has the power to "enter into contracts with any…organization…for providing or securing educational services." 110 ILCS 805/3-40. Thus, the *Board* had the sole power to contract for educational services.

## II.    Defendants Are Entitled To Summary Judgment On Count III.

Count III is a fraud claim. In Count III, ACE alleges that: (1) the Individual Defendants represented that ACE would conduct the surgical assisting program at the College; (2) ACE would perform the program for compensation; (3) ACE provided their alleged trade secrets to the College as a result; and (4) the representations were made with the intent to defraud ACE and "trick" ACE into providing the "trade secrets" to the College. (Dkt. No. 1 at Count III) A claim of common-law fraud under Illinois law requires proof of five elements: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reasonable reliance on the statement; and (5) plaintiff's damages resulting from the reliance on the statement." *Massuda v. Panda Express, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014).

### A.    The College Is Immune From Liability On The Fraud Claim.

The Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101, *et seq*. ("Tort Immunity Act") shields the College from ACE's claim. 745 ILCS 10/1-206; *see also Valentino v. Hilquist*, 785 N.E.2d 891, 900 (Ill. App. Ct. 2003). Section 2-106 of the Tort Immunity Act provides: "A local public entity is not liable for an injury caused by an

oral promise or misrepresentation of its employee, whether or not such promise or misrepresentation is negligent or intentional." 745 ILCS 10/2-106. The College is thus immune from liability on ACE's claim for fraud. *Sheikh v. Lichtman*, 2012 WL 1378668, at *5 (N.D. Ill. Apr. 19, 2012), *aff'd sub nom. Sheikh v. Rabin*, 565 F. App'x 512 (7th Cir. 2014).

### B. Any Reliance By ACE Was Not Justified.

Even assuming that the Individual Defendants made the representations, any reliance by ACE was not justified. Whether reliance was justified may be considered on summary judgment. *D.S.A. Finance Corp.*, 801 N.E.2d at 1081. "To find justifiable reliance, the court considers whether the party was reasonable in relying on his adversary's representations in light of the facts within his actual knowledge and any he might have discovered by ordinary prudence." *Id.*. "If the party's reliance is unreasonable in light of the information open to him, the loss is considered his own responsibility." *Id.*

As set forth in Section II(B) above, under Illinois law, a party doing business with a government entity is presumed to know that there are limitations on a government employee's authority to bind a government entity to a contract. *U.S. Neurosurgical*, 572 F.3d at 331. This principle applies with equal force to fraud claims. *D.S.A. Finance Corp.* 801 N.E.2d at 1081. In *D.S.A. Finance*, the court held that:

> The affirmative acts which induce reliance by a party must be the acts of the municipality itself…rather than merely the unauthorized act of a ministerial officer or a ministerial misinterpretation. A person who deals with a governmental body takes the risk of having accurately ascertained that he who purports to act for it stays within the bounds of his authority and that is so even though the agent himself may have been unaware of the limitations on his authority.

*D.S.A. Finance* at 1082 (internal quotations omitted). *D.S.A. Finance* is fatal to ACE's claims because the Community College Act provides that the ***Board*** – not an employee of the College – has the power to enter into contracts such as the one here. 110 ILCS 805/3-27.1, 3-40.

**C.** **There Is No Evidence That The Individual Defendants Made Any Misrepresentations To ACE.**

The undisputed facts show that **none** of the Individual Defendants made any actionable statements to ACE. ***First,*** "Illinois does not allow a recovery for promissory fraud, that is, fraud based on a false representation of future conduct." *Stamatakis Indus., Inc. v. King*, 520 N.E.2d 770, 772 (Ill. App. Ct. 1987). A broken promise is not, without more, actionable. *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). Because the alleged representations all relate to future conduct, ACE cannot prevail on a fraud claim.

***Second,*** there is absolutely no evidence of a scheme to defraud ACE. *Stamatakis,* 520 N.E.2d at 772. The undisputed evidence shows that: (1) no one from the College promised the College would enter into an agreement with ACE; (2) the College did not use the Self Study or textbooks; (3) ACE voluntarily provided the College with the master curriculum one day after an initial meeting and without a non-disclosure agreement; (4) ACE voluntarily gifted certain textbooks to Cabai; (5) ACE insisted that Cabai attend the Lab after she offered to cancel because a contract had not yet been signed; and (6) the College ultimately rewrote the curriculum it offered to comply with CAAHEP's publicly available accreditation standards. (SOF ¶¶ 25-28, 31, 36, 43-48, 52, 74-76)

***Third,*** Cameron did not make any misrepresentations to ACE. Cameron was involved in two conversations regarding ACE: (1) a December 5, 2013 telephone conference with ACE; and (2) a July 2014 conversation with Cabai regarding her experience at the Lab. (SOF ¶ 54) ACE has not identified a single specific false statement made by Cameron.

***Fourth,*** Solt did not any misrepresentations to ACE. The December 9 Email is not a "misrepresentation." By its plain terms, that email states that a new program had to go through a lengthy, multi-level review process before it could be offered at the College. (SOF ¶¶ 32-33)

That is not a false statement – the proposed surgical assisting program *was* required go through that review. (SOF ¶¶ 7-12, 33, 37) ACE has not identified any other "false" statements by Solt.

*Fifth,* Cabai made no misrepresentations. Rather, Cabai stated that she did not have the authority to enter into a contract. (SOF ¶ 47) Cabai told ACE on several occasions that someone else at the College would have to review and sign off on any contract with ACE. (SOF ¶¶ 45-47)

**III.    Defendants Are Entitled To Summary Judgment On Count IV.**

**A.    The Test For Determining Whether Information Is A "Trade Secret."**

The Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.* ("ITSA") defines a "trade secret" as information that "is sufficiently secret to derive economic value…from not being generally known [and] is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See Stenstrom Petroleum Serv. Group, Inc. v. Mesch*, 874 N.E.2d 959, 971 (Ill. App. Ct. 2007); 765 ILCS 1065/2(d). Courts consider several factors in determining whether something is a trade secret: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which it is known by the employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Alpha Sch. Bus Co., v. Wagner*, 910 N.E.2d 1134, 1152 (Ill. App. Ct. 2009).

To qualify as a trade secret, the information must be *both* secret and valuable, and there must be a causal nexus between the two (*i.e.*, the information is valuable *because* it is secret). *See Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998). Information that is "within the realm of general skills and knowledge in the industry cannot be a trade secret."

*System Development Services, Inc. v. Haarmann*, 907 N.E.2d 63, 73 (Ill. App. Ct. 2009). The relevant test is whether the information is generally known in a particular industry – not whether it is known to the general public. *Id.* at 78. Two cases illustrate the application of those factors. *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462 (9th Cir. 1990) and *Electrology Laboratory, Inc. v. Kunze*, 169 F. Supp. 3d 1119 (D. Colo. 2016) ("*Kunze*").

*Kunze* involved an occupational school that trained students to use lasers to perform cosmetic surgeries. The school's laser education course used a curriculum approved and regulated by the State of Colorado. *Id.* at 1152-53. The school sued a former owner, and alleged that he had misappropriated the school's curriculum. *Id.* The district court found that the curriculum was not a trade secret. *Id.* Applying the same six factors used in Illinois, the Court found the school's curriculum was readily available and generally known, there was no evidence that a competitor would need to invest time or resources to acquire and duplicate the information, and that there was no evidence that the curriculum gave the occupational school a competitive advantage. *Id.*

In *Self Directed Placement*, the plaintiff, SDP, was in the business of providing training courses to unemployed and underemployed individuals. *Self Directed,* 908 F. 2d at 463-64. The program used materials that were presented by instructors according to SDP's instruction manual. *Id.* at 464. The instructors executed non-disclosure agreements, and the instruction manual was not publicly available. *Id.* SDP enrolled more than 30,000 students in its program, none of whom was required to sign confidentiality agreements. *Id.* One of SDP's instructors left her employment and went to work directly for Control Data. *Id.*

SDP and its founder (Charles Hoffman) brought suit, alleging that Control Data misappropriated SDP's program and instruction techniques. *Id.* The trial court rejected that

argument, ruled that the materials were not trade secrets, and granted summary judgment in favor of Control Data.  The court found that the claimed trade secrets were "either already a matter of common public knowledge or completely disclosed to students taking the SDP course.  It would be absurd to permit [the plaintiff's founder] to appropriate as his own 'secrets' common…techniques which would be used in any…course."  *Id.* at 465 (noting that "any student taking the course would have access to them.").  The Ninth Circuit affirmed.  *Id.*

### B.    ACE Did Not Protect Its "Trade Secrets."

The "requirement that the plaintiff take reasonable efforts to maintain the secrecy of the information, prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection."  *Learning Curve Toys*, *Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).  Here, ACE took **no steps whatsoever** to generally protect its "trade secrets" from disclosure or use.  ACE did not (and does not) require its employees to sign confidentiality or non-disclosure agreements, and it did not have any policies or procedures relating to trade secret or confidential information.  (SOF ¶¶ 56-58, 71-72, 75)  ACE stored its claimed trade secrets on a server to which any employee had access, and did not password-protect its electronically stored information.  (SOF ¶ 57)  ACE shared its allegedly confidential information with students, consultants and potential business partners, but did not require them to sign confidentiality or non-disclosure agreements.  (SOF ¶¶ 58-59, 61, 70-71, 73, 76)

With respect to the four claimed trade secrets at issue here, ACE did not take any additional, specific measures to protect the information.

***First,*** ACE stored a copy of the Self Study on a bookshelf in Dan Bump's unlocked office.  (SOF ¶ 60)  "Anyone" could have walked into his office and accessed the Self Study.

(*Id.*).  The Self Study was compiled by a consultant.  (SOF ¶ 59)  ACE did not require the consultant to sign a confidentiality agreement, the consultant retained a copy of the Self Study, and ACE never asked him to return the Self Study.  (*Id.*)  ACE voluntarily provided the Self Study to Cabai without requiring her to execute a confidentiality agreement.  (SOF ¶ 61)

**Second,** ACE voluntarily provided both the program catalog and the master curriculum to the College one day after an initial meeting and without any confidentiality agreement in place. (SOF ¶¶ 25-27, 46, 48, 58)  ACE also provides the curriculum to students enrolling in its program without advising them that it is confidential.  (SOF ¶¶ 70-71)  ACE provides prospective students and partner institutions with copies of the program catalog, and all students have the ability to print out the syllabi and course materials and "do whatever they want with the information."  (*Id.*)  ACE also filed the master curriculum as a publicly-available exhibit to its complaint, and has never taken any steps to correct the record.  (SOF ¶ 69)

**Third,** ACE purchased the textbooks from Amazon and gave them to Cabai as a gift. (SOF ¶ 76)  ACE never provided Cabai with the ACE Workbook.  (SOF ¶¶ 52, 76)

**Fourth,** ACE voluntarily provided Cabai with a list of materials that she would need to produce the surgical assisting courses (without any pricing information).  (SOF ¶ 40)

**Fifth,** ACE voluntarily permitted (and, indeed, encouraged) Cabai to attend the Lab even after Cabai expressly informed ACE that she would not sign a non-disclosure agreement.  (SOF ¶¶ 45-48)  Cabai offered to cancel her attendance, but ACE declined that offer.  (*Id.*)  In addition, ACE does not require students participating in the Lab to sign non-disclosure agreements, and the students are free to use information learned at the Lab.  (SOF ¶¶ 70-71, 73, 75, 77)  Indeed, the purpose of the Lab is to train students in techniques to allow students to use those skills in real world applications.

C.    ACE's Claimed "Trade Secrets" Are Not Trade Secrets.

    1.    The Self Study Is Not A Trade Secret, And There Is No Evidence That Defendants Used The Self Study.

A Self Study is a document that must be provided to CAAHEP for a program to be considered for accreditation.  (SOF ¶¶ 17, 44)  A Self Study is institution and program specific, and it must contain data and information regarding the institution, the program, the proposed curriculum, and the facilities.  (SOF ¶ 17)  The Self Study is disclosed to, at a minimum, CAAHEP.  (SOF ¶¶ 17, 44, 59)

The undisputed evidence shows that the Self Study is not a trade secret. Even if ACE had taken steps to keep the Self Study secret (and it did not), there is no evidence that any of the information contained in the Self Study provides ACE with a competitive advantage *because* it is secret.  Moreover, Cabai never reviewed the Self Study, and she did not use the ACE Self Study to draft the College's own Self Study.  (SOF ¶ 44)  ACE admits that there are significant, material differences between the College's self study and the ACE Self Study.  (SOF ¶¶ 61, 65-68)

    2.    The Master Curriculum Is Not A Trade Secret.

The master curriculum consists of three components: (1) the syllabi; (2) the program catalog; and (3) the textbooks.  The master curriculum is not a trade secret because, like the program materials in *Electrology* and *Self Directed Placement*, those materials are generally known in the industry and they are provided to and known by any student taking the ACE program.

*First,* all CAAHEP-accredited programs must comply with the Standards and Guidelines for the Accreditation of Educational Programs in Surgical Assisting and must adhere to the Core Curriculum for Surgical Assisting.  (SOF ¶¶ 16, 62)  The Core Curriculum for Surgical Assisting

12

is available to the general public. (SOF ¶ 16) In addition, CAAHEP provides a very specific curriculum content map to any surgical assisting program seeking CAAHEP accreditation. (SOF ¶ 17) A surgical assisting program must follow that curriculum content map to receive CAAHEP accreditation. (*Id.*) Thus, if one were to compare two CAAHEP-accredited programs, one would find very similar, if not identical, topics, word phrasing, subject matter and instructional content. (SOF ¶ 18) That makes sense, because employers want assurance that entry level employees will have the same basic skills and knowledge regardless of where they obtained their education and training. (SOF ¶ 19)

*Second,* the master curriculum consists of information that is generally known in the surgical health sciences education industry. (SOF ¶¶ 16-18, 62-64, 69) Cabai, a nurse and educator with over 25 years of experience, testified that she was able to draft the surgical assisting syllabi for the College using a surgical technology book and "knowledge in [her] head." (SOF ¶¶ 36, 44) There is no evidence that another experienced nurse and educator could not have written a substantially similar course – particularly where that person had access to the CAAHEP requirements. (SOF ¶ 36)

*Third,* the syllabi are generally available to every student who takes ACE's program, and the program catalog is generally available to any ***prospective*** student or institution who expresses an interest in ACE's program. (SOF ¶¶ 70-71, 73) ACE admits that those who obtain the syllabi and program catalog can do "whatever they want with the information." (SOF ¶ 70) There is no evidence that the information in those documents is not generally known in the industry or is somehow unique from those for other surgical assisting programs.

*Fourth,* the textbooks (none of which were produced in discovery) were written by third parties, and ACE did not contribute to or edit those textbooks. (SOF ¶¶ 74, 76) Moreover, ACE

13

does not have any licensing rights, copyrights, trademarks, or other legal interest in the textbooks. (SOF ¶ 74)  Rather, all of those textbooks are publicly available for purchase through Amazon. (SOF ¶ 76)

### 3. The "Budgeting Information" Is Not A Trade Secret.

The only "budgeting information" that ACE provided to the College was a list of classroom supplies and instruments (that did not contain pricing information). (SOF ¶ 40)  ACE claims that list is a trade secret.  ACE's claim is nonsense.  There is no evidence that the College (which developed its own surgical assisting program and several other health sciences programs) was incapable of deducing the list of supplies necessary for conducting the program.  Rather, the undisputed evidence shows that Cabai had significant experience teaching surgical technology programs, and that the College required annual program budgets to be submitted. (SOF ¶¶ 8, 36)

### 4. The Surgical SkillLab Is Not A Trade Secret.

The Surgical SkillLab is not a trade secret for the reason identified by the *Self Directed Placement* court: "any student taking the course would have access to [it]."  *Self Directed Placement*, 908 F.2d at 465.  Here, the entire purpose of the Lab was for students to learn skills to use in real world applications.  Thus, it was intended **and** expected that techniques and skills learned at the Lab would be disclosed.  Cabai was exposed to the same instruction and observed the same techniques as the seven other students attending that Lab. (SOF ¶ 77)

### D. Claims Against Individual Defendants.

ACE asserts that Cameron and Solt, individually, have misappropriated its "trade secrets."  The claims fail for the reasons set forth above.  They also fail because there is no evidence that Cameron or Solt had any involvement with the development of the College's surgical assisting program beyond general oversight of Cabai.  Moreover, neither Cameron nor

14

Solt received the Self Study, textbooks, or budgeting information, and Cameron or Solt did not attend the Lab. (SOF ¶¶ 40, 44, 76-77) With respect to Cameron, there is no evidence that he ever received the ACE syllabi or program catalog. (*Id.*) With respect to Solt, while she did receive those materials, there is no evidence that she used or disclosed those materials to anyone else. (*Id.*) As such, to the extent that any portion of ACE's trade secret claim survives, Cameron and Solt are entitled to summary judgment on that claim.

## CONCLUSION

WHEREFORE, for the foregoing reasons and in their concurrently-filed Motion For Summary Judgment and Local Rule 56.1 Statement Of Undisputed Material Facts, Defendants Community College District No. 502, College of DuPage, Thomas Cameron, Karen Solt, and Kathy Cabai respectfully move this Court, pursuant to Federal Rule of Civil Procedure 56, to: (1) enter summary judgment in favor of them and against Plaintiff American Center for Excellence in Surgical Assisting, Inc. on all remaining counts of Plaintiff's complaint; (2) award Defendants their reasonable attorneys' fees, costs and expenses; and (3) award Defendants any other such relief as this Court deems just and necessary.

Dated: August 31, 2017                                Respectfully submitted,

                                                     s/ Emily A. Shupe_____
                                                     Timothy D. Elliott
                                                     telliott@rathjewoodward.com
                                                     Emily A. Shupe
                                                     eshupe@rathjewoodward.com
                                                     Michael P. Adams
                                                     madams@rathjewoodward.com
                                                     Rathje & Woodward, LLC
                                                     300 E. Roosevelt Rd., Suite 300
                                                     Wheaton, IL 60187
                                                     Tel. 630-668-8500

                                                     *Attorneys for Defendants*