UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 1:15-cv-07290 |
| COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE, DR. THOMAS CAMERON, DR. KAREN M. SOLT, and DR. KATHY CABAI, | ) ) Judge Gary Feinerman ) ) ) |
| Defendants. | ) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Community College District 502, College of DuPage, Thomas Cameron, Karen M. Solt, and Dr. Kathy Cabai (collectively, "Defendants") respectfully present the following statement of undisputed material facts to the Court in connection with their Motion For Summary Judgment on the claims alleged by Plaintiff American Center for Excellence in Surgical Assisting, Inc. ("ACE"):

**I.     Jurisdiction, Venue, And The Parties.**

1.     Jurisdiction and venue are proper in this matter because the parties are of diverse citizenship, the amount in controversy alleged exceeds $75,000, and the events allegedly occurred in the Northern District of Illinois. (Dkt. No. 1 (Compl.) at ¶¶ 7-10; Dkt. No. 46 (Defs. Ans.) at ¶¶ 7-10; Dkt. No. 47 (Cameron Ans.) at ¶¶ 7-10; Dkt. No. 48 (Cabai Ans.) at ¶¶ 7-10; Dkt. No. 49 (Solt Ans.) at ¶¶ 7-10)

2.     ACE was incorporated in 2002, and since that time, ACE has marketed itself as a provider of training for surgical assistants. From 2002 through the present, Dan Bump ("Dan

1

Bump") has been the sole shareholder of ACE, and he is the president, CEO, and program director of ACE. (Ex. 29 (Cabai Aff.) at ¶ 6; *see also* Dkt. No. 96 (D. Bump Dep.) at 44-46, 63-64; Ex. 5 (ACE Consortium Proposal))

3. The College is a public community college located in Glen Ellyn, Illinois that is governed by a Board of Trustees (the "Board") and its Policy Manual. (Dkt. No. 46 (Defs. Ans.) at ¶¶ 2-3)

4. Cabai is the Coordinator of the Surgical Assisting Program and the Codirector of the Anesthesia Technology Program at the College, has several degrees in education and in nursing, and worked as an operating room nurse, scrub nurse, and anesthesia technician for 25 years before becoming an instructor at the College in late 2001. Since then, she has continued to work part-time as an operating room nurse and surgical assistant. (Ex. 29 (Cabai Aff.) at ¶ 10; *see also* Dkt. No. 100 (Cabai Dep.) at 6-7, 12)

5. As Associate Dean of Health and Biological Sciences at the College[1] from 2009 until her retirement in 2017, Solt oversaw more than 20 programs in the health sciences field at the College, including a surgical technology program, and, later, the surgical assisting program. (Dkt. No. 99 (Solt Dep.) at 6-7)

6. As the Dean of Health and Sciences at the College[2] from 2004 until his retirement in 2017, Cameron's duties and responsibilities included making recommendations for the hiring and firing of faculty to the Board, reviewing the paperwork and curricula for new programs, and general operational oversight of the Health and Sciences division, including Solt and Cabai.

---

[1] Solt began her employment at the College in 2004, and her title from 2004-2009 was Associate Dean of Health Sciences. Her title and role expanded in 2009. (Dkt. No. 99 (Solt Dep.) at 6-7)

[2] When Cameron first started with the College, his title was Dean of Health, Social, and Behavioral Sciences. (Dkt. No. 103 (Cameron Dep.) at 7)

(Dkt. No. 47 (Cameron Ans.) at ¶ 4; Dkt. No. 99 (Solt Dep.) at 7; Dkt. No. 103 (Cameron Dep.) at 4-5, 8-10)

## II. The College's Process For Approval Of New Educational Programs.

7. The College's approval process for new degree or certificate programs has several steps. ***First,*** the Associate Dean, Dean, and the Vice President of Academic Affairs review a faculty member's proposal for a new program and determine whether the proposal should proceed through the College approval process. If so, the faculty member proposing the program conducts a Needs Analysis to determine whether the district has a demand for the proposed program. (Dkt. No. 99 (Solt Dep.) at 8, 15-16; Dkt. No. 103 (Cameron Dep.) at 8-9)

8. ***Second,*** if the results of the Needs Analysis are positive, the faculty member puts together the curriculum, including: (1) an "Active Course File" for each course in the proposed program, which consists of a course description, general course objectives, a list of topics to be covered in the course, and methods of evaluation of the students; (2) a Form 20, the document used by the Illinois Community College Board ("ICCB") for reviewing proposed community college programs; and (3) budget information. (Ex. 29 (Cabai Aff.) at ¶ 22; *See also* Dkt. No. 99 (Solt Dep.) at 8-15, 18; Ex. 25 (Active Course Files))

9. ***Third,*** the proposed program and curriculum, including the Active Course Files and the Form 20, are reviewed by the Division Curriculum Committee, which votes on whether the proposed program should advance to the next stage of approval. (Dkt. No. 99 (Solt Dep.) at 19-20; Dkt. No. 103 (Cameron Dep.) at 8-9, 24-25)

10. ***Fourth,*** if the Division Curriculum Committee votes to advance, the proposed program and curriculum are reviewed by the College Curriculum Committee, which is comprised of faculty members and College administrators who interview the proposing faculty

member, identify potential ICCB concerns with a proposed program, and make suggestions for improving the final package to be submitted to the ICCB. (Dkt. No. 103 (Cameron Dep.) at 26-27)

11. *Fifth,* if the College Curriculum Committee approves the program, it then goes before the Board, which must approve the new program. (Dkt. No. 99 (Solt Dep.) at 22; Dkt. No. 103 (Cameron Dep.) at 9)

12. *Sixth,* if the Board approves, the ICCB reviews the final versions of the Active Course Files, Form 20, and other required submissions and approves the program before the College may begin offering enrollment to students. (Dkt. No. 103 (Cameron Dep.) at 9)

### III. Accreditation Of Surgical Assisting Educational Programs.

13. Most educational/training programs are regulated by accreditation requirements. These requirements define the content to be delivered, the instructor credentials, and the educational delivery methods, so as to assure that entry level employees will have the same basic skills and knowledge regardless of where they obtained their education. (Ex. 30 (Crews Aff.) at ¶ 9)

14. The Commission on Accreditation of Allied Health Education Programs ("CAAHEP") is the largest programmatic accreditor of the health sciences professions, and reviews and accredits over 2,100 individual education programs in 30 health science occupations. (Dkt. No. 96 (D. Bump Dep.) at 66-69, 75-76; Ex. 30 (Crews Aff.) at ¶¶ 3, 10)

15. The CAAHEP Accreditation Review Council for Surgical Technology and Surgical Assisting ("ARC") is a non-profit accreditation services agency providing national recognition for higher education programs in surgical technology and surgical assisting, in collaboration with CAAHEP. (Ex. 30 (Crews Aff.) at ¶ 4)

16. Surgical assisting programs that are accredited through CAAHEP must comply with the Standards and Guidelines for the Accreditation of Educational Programs in Surgical Assisting, which includes adherence to the publicly available Core Curriculum for Surgical Assisting. (Ex. 30 (Crews Aff.) at ¶¶ 11-12)

17. In addition, ARC provides a very specific curriculum content map (the "Curriculum Comparison Form") that is made available to all programs seeking CAAHEP accreditation, and that programs seeking accreditation must submit to demonstrate compliance with the Core Curriculum for Surgical Assisting. (Ex. 30 (Crews Aff.) at ¶¶ 13-15)

18. As a result, the syllabi of programs that have gone through the CAAHEP accreditation process necessarily contain very similar, if not identical, topics, word phrasing, subject matter, and instructional content across the programs. (Ex. 30 (Crews Aff.) at ¶ 16)

19. CAAHEP accreditation is an important consideration for prospective surgical assisting students. Students who graduate from non-CAAHEP-accredited surgical assisting programs are not eligible to sit for the National Board of Surgical Technology and Surgical Assisting ("NBSTSA") Certified Surgical First Assistant exam, and hospitals demonstrate a strong preference for hiring graduates of CAAHEP-accredited programs. (*See* Dkt. No. 96 (D. Bump Dep.) at 67-69, 75-78; Ex. 30 (Crews Aff.) ¶ 9)

### IV. The History Of ACE's Business

20. From January 2009 until February 2012, ACE's surgical assisting program (the "ACE Program") was accredited by CAAHEP. (Dkt. No. 96 (D. Bump Dep.) at 66-67)

21. In early 2012, CAAHEP changed its accreditation standards. After those changes, CAAHEP would not provide accreditation for a surgical assisting program unless that program

both: (1) met CAAHEP's accreditation standards; ***and*** (2) was provided through an accredited institution such as a community college. (Dkt. No. 96 (D. Bump Dep.) at 70-71)

22.     As a result of the rule change, the ACE Program lost its CAAHEP accreditation status in February 2012, and, consequently, enrollment in the ACE program dropped by approximately 50%. (Dkt. No. 96 (D. Bump Dep.) at 69-71; Dkt. No. 101 (K. Bump Dep.) at 111-13)

23.     Following that rule change, at least two other insitutions declined to enter into partnerships with ACE because of concerns regarding ACE's program and lack of CAAHEP accreditation. (Dkt. No. 101 (K. Bump Dep.) at 55-61)

24.     ACE provided those institutions with ACE's program catalog, and did not require the institutions to execute a confidentiality agreement. Nor did ACE otherwise communicate that the program catalog was confidential. (Dkt. No. 101 (K. Bump Dep.) at 61-63)

**V.     The History Of ACE And the College's Relationship And Negotiations.**

25.     On November 20, 2013, Keith Bump, ACE's Vice President of Marketing and Sales, and Kyle Black met with Cabai and Solt at the College for a preliminary discussion regarding ACE's business, whether demand existed for a surgical assisting program, and whether ACE and the College could work together to present a surgical assisting program at the College. (Ex. 29 (Cabai Aff.) at ¶ 6; Dkt. No. 96 (D. Bump Dep.) at 137-138; Dkt. No. 100 (Cabai Dep.) at 13-14; Dkt. No. 101 (K. Bump Dep.) at 10, 75-85; Dkt. No. 102 (Black Dep.) at 35-36; Ex. 6 (11/21/13 Email Thread))

26.     At the November 20 meeting, Cabai and Solt told Keith Bump and Black that any proposed surgical assistant program had to go through several levels of review, and that "all of those hurdles had to be cleared before [the consortium] business was good to go." (Ex. 29

(Cabai Aff.) at ¶ 8; *see also* Dkt. No. 96 (D. Bump Dep.) at 168-169; Dkt. No. 101 (K. Bump Dep.) at 74, 76, 96-97; Dkt. No. 102 (Black Dep.) at 42-45; Ex. 7 (12/9/13 Email Thread); Ex. 8 (12/9/13 Email Thread))

27. The day after that meeting, without any confidentiality agreement from Defendants, Keith Bump sent the following documents to Cabai and Solt: (1) a consortium proposal; (2) the ACE Program Catalog; (3) the ACE Master Curriculum; and (4) and a draft consortium agreement (the "November 2013 Draft Agreement"). Nothing in his email stated that the materials were trade secrets or confidential, and no one from ACE ever informed Defendants of same. (Ex. 29 (Cabai Aff.) at ¶ 6; *see also* Dkt. No. 96 (D. Bump Dep.) at 142-43, 146-48; Dkt. No. 99 (Solt Dep.) at 28-29; Dkt. No. 100 (Cabai Dep.) at 43; Dkt. No. 101 (K. Bump Dep.) at 25-26, 79-85; Ex. 3 (November 2013 Draft Agreement); Ex. 4 (ACE Program Catalog and Master Curriculum)[3]; Ex. 5 (ACE Consortium Proposal); Ex. 6 (11/21/13 Email Thread); Ex. 28 (Resp. to Req. for Prod.) at No. 9)

28. The November 2013 Draft Agreement was silent as to certain terms, such as the tuition to be charged for the surgical assistant program. No agreement was ever reached on that term. (Ex. 29 (Cabai Aff.) at ¶ 6; *see also* Dkt. No. 98 (ACE Corp. Rep. Dep.) at 50; Ex. 3 (November 2013 Draft Agreement))

29. The November 2013 Draft Agreement called for new students to be enrolled by the College on a monthly basis. However, the College operates on a semester basis, and the

---

[3] Defendants have sought leave to file Exhibits 4 and 17 under seal. Those documents were produced by ACE in discovery without any confidentiality designation under the prodective order entered by this Court. (Dkt. No. 55-1) However, those materials were specifically identified by ACE as its "trade secrets." While defendants dispute that those materials are trade secrets, and they believe ACE has waived an objection to their public filing by failing to designate them as "confidential," Defendants have sought leave to file under seal out of an abundance of caution.

parties never reached agreement regarding the enrollment term of students. (Ex. 29 (Cabai Aff.) at ¶ 6; *see also* Dkt. No. 101 (K. Bump Dep.) at 99; Ex. 3 (November 2013 Draft Agreement) at § III(1))

30. On December 5, 2013, Dan Bump, Keith Bump, Black, Cabai, Cameron, Solt and others from the College participated in a telephone conference call. During that call, the College stated that use of Blackboard (a web-based student interface) was a requirement for any College program, and ACE was uncertain whether its program could interface with Blackboard. (Ex. 29 (Cabai Aff.) at ¶¶ 7, 9; *see also* Dkt. No. 96 (D. Bump Dep.) at 154-55, 168-169; Dkt. No. 101 (K. Bump Dep.) at 187-188; Dkt. No. 103 (Cameron Dep.) at 42-47; Ex. 8 (12/9/13 Email Thread); Ex. 9 (12/11/13 Email Thread))

31. During the December 5, 2013 call, the terms of the November 2013 Draft Agreement were not discussed, and no one from the College accepted the terms of the November 2013 Draft Agreement. (Dkt. No. 96 (D. Bump Dep.) at 156; Dkt. No. 103 (Cameron Dep.) at 65-66)

32. On December 9, 2013, Solt sent an email to Keith Bump, Dan Bump, Black, Cameron, and Cabai, informing them that the College was ready to begin putting together Active Course files and beginning the multi-step curriculum review process:

> I think our discussion was a great one, and we are ready at this point to move forward on our part. That consists of putting the curriculum through our college process and then on to the state's approval system. I am meeting with Kathy later this morning, so should have a better idea of how long that will take.

(Ex. 29 (Cabai Aff.) at ¶ 8; Ex. 7 (12/9/13 Email Thread); (Dkt. No. 99 (Solt Dep.) at 36-37)

33. As of December 9, 2013, ACE knew that additional approvals were required for the November 2013 Draft Agreement. (Dkt. No. 102 (Black Dep.) at 41; *see also* Dkt. No. 101

8

(K. Bump Dep.) at 22-23, 27, 35-37, 40, 96-97; Ex. 2 (Resp. to Req. Admit Facts) at Nos. 2-3; Ex. 1 (Ans. Interrogs.) at No. 7)

34. As of December 9, 2013 parties had not agreed upon the identity of the instructors for the lab component of the surgical assisting program. (*See* Ex. 10 (2/24/14 Email); Dkt. No. 96 (D. Bump Dep.) at 223-224; Ex. 11 (2/24/14 Email Thread); Ex. 29 (Cabai Aff.) at ¶ 15; *see also* Ex. 18A (May 2014 Draft Consortium Agreement))

35. The parties never agreed upon the compensation to be paid to ACE. (Dkt. No. 100 (Cabai Dep.) at 28-29; *see also* Ex. 10 (2/24/14 Email); Dkt. No. 96 (D. Bump Dep.) at 223-224; Ex. 11 (2/24/14 Email Thread); Ex. 29 (Cabai Aff.) at ¶ 15; Ex. 18A (May 2014 Draft Consortium Agreement))

36. In late December 2013, Cabai wrote the syllabi, Form 20 and Active Course Files for the proposed surgical assisting program. She did so using the surgical technology program textbooks and her knowledge gained through 35 years of surgical nursing experience, 10 years of education experience, and previous surgical assisting certificate courses. (Ex. 29 (Cabai Aff.) at ¶ 10; Dkt. No. 100 (Cabai Dep.) at 24-26; 37)

37. On February 17, 2014, Cabai informed ACE that the surgical assisting program had passed the first level of internal College review (the Division Curriculum Committee). She stated, however, that the Division Curriculum Committee had a number of concerns regarding the coursework, and questioned whether there had been approval to work with an outside organization to teach the course. (Dkt. No. 100 (Cabai Dep.) at 23-24)

38. During February 2014, Cabai and representatives of ACE had a number of discussions regarding whether Cabai or Dan Bump would teach the lab component of the program, and what ACE's total compensation would be if Cabai taught the lab component. (Dkt.

No. 100 (Cabai Dep.) at 40; Ex. 10 (2/24/14 Email); Dkt. No. 96 (D. Bump Dep.) at 223-224; Ex. 11 (2/24/14 Email Thread))

39. As late as March 2014, ACE had its own internal disagreements as to the identity of the person teaching the lab component and what it thought the final compensation to ACE should be. (*See* Ex. 10 (2/24/14 Email); Dkt. No. 96 (D. Bump Dep.) at 223-224; Ex. 11 (2/24/14 Email Thread))

40. In March 2014, Cabai asked that ACE provide a list of materials that she would need to purchase for the suture lab. In response, ACE sent Cabai a list of materials without pricing information. (Ex. 29 (Cabai Aff.) at ¶ 14; Ex. 17 (3/5/14 Email Thread))

41. On May 5, 2014, Dan Bump sent a revised draft Consortium Agreement (the "May 2014 Draft Agreement") and Non-Disclosure Agreement ("NDA") to Cabai and informed her that he would "be getting [her] a copy of our self study." (Ex. 29 (Cabai Aff.) at ¶ 15; Ex. 18 (5/5/14 Email Thread); Ex. 18A (May 2014 Draft Agreement); Ex. 18B (NDA); Dkt. No. 1 (Compl.) at Ex. S)

42. The May 2014 Draft Agreement contained several changes from the November 2013 Draft Agreement. Those changes included the addition of two options for pricing depending on whether the College or ACE taught the lab component. The May 2014 Draft Agreement required the College to select an option by initialing the contract. (Dkt. No. 1 (Compl.) at Ex. S; *see also* Ex. 29 (Cabai Aff.) at ¶¶ 6, 15; *compare* Ex. 18A (May 2014 Draft Agreement) *with* Ex. 3 (November 2013 Draft Agreement))

43. No one from the College ever executed the May 2014 Draft Agreement or selected a pricing option. (Dkt. No. 101 (K. Bump Dep.) at 40; Ex. 2 (Resp. Req. Admit Facts) at 2-3; Dkt. No. 98 (ACE Corp. Rep. Dep.) at 52-53)

10

44. ACE subsequently provided Cabai with the ACE Self Study. However, Cabai never reviewed it, and the College did not use the ACE Self Study in preparing the College's own self study for the surgical assisting program. (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 63; Dkt. No. 100 (Cabai Dep.) at 45-46; Ex. 29 (Cabai Aff.) at ¶ 16; *see also* Dkt. No. 98 (ACE Corp. Rep. Dep.) at 63)

45. On July 8, 2014, Keith Bump asked Cabai about the status of the consortium agreement. In response, Cabai told him that no one could sign the agreement without the appropriate approval, and she told him that ACE could cancel her attendance at the ACE Surgical SkillLab (the "Lab"):

> As I explained to you prior, Karen is out of town. It will not be signed prior to me coming to the lab. If you are going to cancel my attendance then you need to let me know in a hurry. I sent you a message back about a week and a half ago and have not heard back from you. If I need to cancel arrangements, I must do it now.

(Dkt. No. 100 (Cabai Dep.) at 47-50; Ex. 29 (Cabai Aff.) at ¶ 17; Ex. 19 (7/8/14 Email Thread); Ex. 20 (7/8/14 Email Thread))

46. Cabai also told Keith Bump that she would not sign the NDA before attending the Lab. (Ex. 29 (Cabai Aff.) at ¶ 17)

47. Cabai never told ACE that she had the authority or ability to contractually bind the College or sign the consortium agreement. (Dkt. No. 97 (D. Bump Dep.) at 270-71; Ex. 29 (Cabai Aff.) at ¶¶ 23-27)

48. Despite the fact that the College and Cabai had not executed a consortium agreement or the NDA, ACE permitted Cabai to attend (and, in fact, Keith Bump insisted that Cabai attend) the Lab on July 14 through July 19, 2014. (Dkt. No. 100 (Cabai Dep.) at 27, 30; Ex. 29 (Cabai Aff.) at ¶ 17, 24-27; Ex. 20 (7/8/14 Email Thread))

11

49. After her attendance at the Lab, Cabai expressed a number of concerns with the ACE program. Specifically, Cabai was concerned that certain subject matters were not adequately or appropriately covered during the lab. (Dkt. No. 100 (Cabai Dep.) at 60; Ex. 29 (Cabai Aff.) at ¶ 18; Ex. 21 (Cabai Lab Evaluation); *see also* Dkt. No. 97 (D. Bump Dep.) at 285-87)

50. Thereafter, on July 30, 2014, Solt sent Dan and Keith Bump a list of the College's concerns. Specifically, Solt expressed concern that there was not enough instructor presence in an online format course, and that the ACE program lacked significant teaching and learning tools. Solt also expressed concerns with particular provisions of the proposed consortium agreement, including the pricing structure. (Ex. 29 (Cabai Aff.) at ¶ 19; Dkt. No. 97 (D. Bump Dep.) at 300; Ex. 22 (7/30/14 Solt Letter); Ex. 23 (8/13/14 Email Thread))

51. The parties had several additional communications in an effort to resolve those concerns, but were unable to do so. The College informed ACE on September 8, 2014 that it would not proceed any further. Thereafter, ACE never requested that Defendants return any of the materials provided to it by ACE. (Dkt. No. 97 (D. Bump Dep.) at 327-29; Ex. 29 (Cabai Aff.) at ¶¶ 19-20; Ex. 23 (8/13/14 Email Thread); Ex. 24 (9/8/14 Email Thread))

52. After the College terminated its discussions with ACE, Cabai rewrote the surgical assisting curriculum to comply with all CAAHEP requirements so that the College could seek CAAHEP accreditation. To do so, Cabai purchased the CAAHEP Core Curriculum from Amazon, and used the modules, objectives, and course content in that book to structure the modules for the College's current, CAAHEP-accredited surgical assisting program. Cabai did not use any material that she received from ACE because ACE was not a CAAHEP-accredited

program. (Ex. 29 (Cabai Aff.) ¶ 21; Ex. 25 (Active Course Files); Dkt. No. 100 (Cabai Dep.) at 53-57)

53. ACE never invested any money into integrating the ACE Program with Blackboard. (Dkt. No. 97 (D. Bump Dep.) at 298)

54. Cameron was involved in only two substantive conversations regarding the ACE consortium: (1) the December 5, 2014 telephone conference between the College and ACE; and (2) a conversation with Cabai (but no one from ACE) after she returned from the July 2014 Lab, during which Cabai expressed her concerns regarding ACE. (Dkt. No. 103 (Cameron Dep.) at 33-34)

### III. Analysis Of ACE's Claimed "Trade Secrets."

55. In this case, ACE has identified four alleged trade secrets: (1) the Self Study; (2) the curricula for the Surgical Assistant program, which consists of the syllabi, catalog for the surgical assisting program, and textbooks; (3) unspecified "budgetary information"; and (4) the Denver-based Surgical SkillLab course. (Dkt. No. 101 (K. Bump Dep.) at 22-23; Ex. 1 (Ans. Interrog.) at No. 4)

#### A. ACE's general efforts to protect its "confidential" information.

56. ACE has never required its employees to sign confidentiality or nondisclosure agreements, does not have any policies relating to confidential or trade secret information, and its employee handbook does not contain any confidentialty provisions or references to trade secrets. (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 6-7, 9-10; Dkt. No. 96 (D. Bump Dep.) at 85-86)

57. In 2013 and 2014, ACE stored its "confidential" information on a server, to which any ACE employee had access, and its electronically stored "confidential" information was not password protected. (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 11-14)

58. ACE provided its "trade secrets" to Defendants without requiring them to execute a non-disclosure agreement, and ACE permitted Cabai to attend the Lab even after she expressly stated that she would not sign an NDA. (Dkt. No. 101 (K. Bump Dep.) at 40; Ex. 2 (Ans. Req. Admit Facts) at No. 4-6; Ex. 29 (Cabai Aff.) at ¶¶ 26-27)

### B. ACE's Self Study.

59. ACE retained a consultant, Jeff Ware, to prepare the ACE Self Study (a required submission to CAAHEP), in 2006. ACE did not require Ware to sign a confidentiality agreement or to return Ware's copy of the ACE Self Study to ACE. (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 57-61; *see also* Dkt. No. 100 (Cabai Dep.) at 44)

60. ACE stored its Self Study in hard copy on a bookshelf in Dan Bump's unlocked office, and "[a]nybody could have got in there." (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 55-56)

61. ACE sent a copy of the ACE Self Study to Cabai, and did not tell her the ACE Self Study was confidential or require her to sign a confidentiality agreement. ACE admits there are significant differences between the ACE Self Study and the College's self study. (Dkt. No. 100 (Cabai Dep.) at 45-46; Dkt. No. 98 (ACE Corp. Rep. Dep.) at 64-65; *see also* Ex. 29 (Cabai Aff.) at ¶ 16; Ex. 2 (Ans. Req. Admit Facts) at Nos. 1-6)); Dkt. No. 101 (K. Bump Dep) at 40, 84, 214-215)

### C. ACE and The College's Respective Surgical Assisting Program Curricula.

#### 1. The Master Curricula.

62. CAAHEP-accredited surgical assisting programs must comply with the Standards and Guidelines for the Accreditation of Educational Programs in Surgical Assisting and must adhere to the Core Curriculum for Surgical Assisting. Thus, CAAHEP-accredited programs are

14

consistent in the topics and subject matters that they deliver. (Ex. 30 (Crews Aff.) at ¶¶ 10, 12, 16)

63. CAAHEP-approved programs include very similar, if not identical, topics, word phrasing, subject matter, and instructional content. (Ex. 30 (Crews Aff.) at ¶¶ 13, 16)

64. The ACE Curriculum had gone through the CAAHEP accreditation process, and its program content is substantively similar to other CAAHEP-accredited programs, including the College's Curriculum. (Ex. 30 (Crews Aff.) at ¶¶ 6-8)

65. Although the ACE Curriculum and College Curriculum contain similar content, there are a number of differences between the two Curricula such that the two programs do not mirror one another. (Ex. 30 (Crews Aff.) at ¶¶ 17-20)

66. *First,* the ACE Curriculum is designed as a 16 month self-study program in which the student moves through the didactic courses (also called "modules") over a nine-month period, or through a self-paced option at an extra charge. The College Curriculum is designed as a cohort learning model, which is a traditional academic institution delivery, and the College grants academic credit for courses. (Ex. 30 (Crews Aff.) at ¶¶ 18-19; *see also* Dkt. No. 96 (D. Bump Dep.) at 64-66)

67. *Second,* the ACE Curriculum includes nine didactic courses, one research course, a skills lab, and a clinical internship. The College Curriculum includes two didactic courses, one research and skills lab course, and one clinical internship course. (Ex. 30 (Crews Aff.) at ¶¶ 18-19, 21-38; *see also* Dkt. No. 101 (K. Bump Dep.) at 25; Ex. 29 (Cabai Aff.) at ¶ 6; Ex. 4 (ACE Program Catalog and Master Curriculum))

68.     ***Third,*** only 85% of the CAAHEP accreditation requirements are met in the ACE Curriculum.  100% of the CAAHEP accreditation requirements are met in the College Curriculum.  (Ex. 30 (Crews Aff.) at ¶ 37; *see also* Ex. 30 (Crews Aff.) at Table 1)

69.     ACE filed its master curriculum in the public record with its complaint and has never moved this Court to order that document sealed.  (Dkt. No. 1-17; Dkt. No. 98 (ACE Corp. Rep. Dep.) at 65-67; Dkt. No. 96 (D. Bump Dep.) at 28-29)

70.     All students enrolled in the ACE program have the ability to print the syllabi from the ACE website and transmit the syllabi to others, and can "do whatever they want with the information" contained in the syllabi.  (Dkt. No. 96 (D. Bump Dep.) at 82; 117-21)

71.     ACE does not communicate to its students that the syllabi are confidential, does not monitor whether students print the syllabi, and does not require students to return or destroy printed copies of the syllabi.  (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 69-70; Dkt. No. 96 (D. Bump Dep.) at 117-21)

### 2. The Program Catalog.

72.     ACE stored the program catalog on a shelf in Dan Bump's unlocked office and electronically without password protection or other restrictions, and all ACE employees had access to the program catalog.  (Dkt. No. 96 (D. Bump Dep.) at 85-90; *see also* Dkt. No. 101 (K. Bump Dep.) at 25; Ex. 29 (Cabai Aff.) at ¶ 6; Ex. 4 (Program Catalog and Master Curriculum))

73.     ACE sent the program catalog to any prospective student who requested a copy, to potential hospital partners, and to potential partnering institutions without requiring a confidentiality agreement.  (Dkt. No. 96 (D. Bump Dep.) at 84-86, 88-89)

16

### 3. The Textbooks.

74. No one connected with ACE wrote, contributed to, or edited Moore's Anatomy, Surgical Technology for the Surgical Technologist, and an ACE Workbook, (collectively, the "Textbooks"), and ACE does not have licensing rights, copyright, or other legal interest in the Textbooks. (Dkt. No. 101 (K. Bump Dep.) at 22-23; Ex. 1 (Ans. Interrog.) at No. 4; Dkt. No. 96 (D. Bump Dep.) at 30-34)

75. ACE does not require that students in the ACE program return or destroy the Textbooks upon completion of the ACE Course. (Dkt. No. 98 (ACE Corp. Rep. Dep.) at 69)

76. ACE provided Cabai with copies of the Moore's Anatomy and Surgical Technology Textbooks that it ordered from Amazon as a gift in February 2014, but never provided Cabai with the ACE Workbook. (Ex. 12 (2/24/15); Ex. 13 (2/24/14 Email Thread between D. Bump and M. Parrish); Ex. 14 (2/25/15 Email); Ex. 15 (3/4/14 Email Thread); Dkt. No. 97 (D. Bump Dep.) at 301; Dkt. No. 98 (ACE Corp. Rep. Dep.) at 70-71)

### D. SkillLab

77. Cabai was not the only person in attendance at the July 2014 Lab. Approximately 7 other students participated in the Lab, and Cabai did not believe that the Lab and corresponding instruction met CAAHEP standards. (Ex. 29 (Cabai Aff.) at ¶ 18; Dkt. No. 100 (Cabai Dep.) at 60; Dkt. No. 97 (D. Bump Dep.) at 278-79)

Dated:  August 31, 2017                                  Respectfully submitted,


                                                         s/ Emily A. Shupe_____
                                                         Timothy D. Elliott
                                                         telliott@rathjewoodward.com
                                                         Emily A. Shupe
                                                         eshupe@rathjewoodward.com
                                                         Michael P. Adams
                                                         madams@rathjewoodward.com
                                                         Rathje & Woodward, LLC
                                                         300 E. Roosevelt Rd., Suite 300
                                                         Wheaton, IL 60187
                                                         Tel. 630-668-8500

                                                         Attorneys for Defendants

**CERTIFICATE OF SERVICE**

On August 31, I, Emily A. Shupe, an attorney caused the foregoing Statement of Undisputed Material Facts to be filed and served upon all counsel of record via the Court's ECF system.

s/ Emily A. Shupe
Emily A. Shupe