# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 15 CV 7290<br>) |
| COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE, DR. THOMAS CAMERON, DR. KAREN M. SOLT, and DR. KATHY CABAI, | ) Judge Gary Feinerman<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiff, American Center for Excellence in Surgical Assisting Inc. ("ACE"), through undersigned counsel, respectfully submits this response to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment:

**DENIAL OF DEFENDANTS' MATERIAL FACTS**

Plaintiff denies and responds to the following material facts, identified by paragraph:

18. Schools are allowed to supplement the Commission on Accreditation of Allied Health Education Programs ("CAAHEP") -approved curriculum, which ACE did when it was accredited. As a result, ACE's curriculum includes the CAAHEP-approved curriculum in addition to original ACE material. (ECF no. 96 (D. Bump Dep.) at 64:13-18, 222:14-223:13)

22. Specifically, ACE lost CAAHEP accreditation because it was not an accredited institution such as a community college. (ECF no. 96 (D. Bump Dep.) at 70:16-71:14)

25. Kathy Cabai ("Cabai) expressed to Your Extra Hands Surgical Services

("YEHSS") employee Kim Watterson she was interested in starting surgical assistant program. (ECF no. 102 (Black Dep.) at 18:2-6, 18:18-19:3; 20:18-21:3) Kyle Black at YEHSS then reached out to ACE because YEHSS knew that ACE wanted a relationship with an accredited institution. (ECF no. 102 (Black Dep.) at 20:18-21:3, 21:8-14)

26. The November 2013 meetings between representatives of ACE and the College of DuPage ("College" or "COD") were for the purpose of creating a mutual consortium or relationship. (ECF no. 102 (Black Dep.) at 36:12-15) Cabai and the other individual defendants did not identify levels of contractual review for ACE; they only expressed that the curriculum had to go through the "college system" to get program approved. (ECF no. 101 (K. Bump Dep.) at 72:22-73:24; 102:2-103:3; ECF no. 101 (K. Bump Dep.) at 130:19-131:2) ACE therefore understood that hurdles needed to be cleared before a program could be started, but not before an agreement could be reached. (ECF no. 102 (Black Dep.) 43:9-13; ECF no. 101 (K. Bump Dep.) at 72:22-73:24)

27. Dan Bump indicated to Cabai that certain material was proprietary. (ECF no. 101 (K. Bump Dep.) at 164:1-13; ECF no. 100 (Cabai Dep.) at 47:23-48:8) The Consortium Agreement contains a provision stating that "curriculum and associated materials and simulators are proprietary in nature and are the property of ACE." (ECF no. 107-1, Ex. 3. § III.8) ACE later sent a Nondisclosure Agreement to the College. (ECF no. 107-1, Exs. 18, 18A, 18B)

28. The Consortium Agreement was not a draft, it was an offer. (ECF no. 101 (K. Bump Dep.) at 90:23-91:9; ECF nos. 96-97 (D. Bump Dep.) at 156:9-19; ECF no. 99 (Solt Dep.) at 35:3-15) The Consortium Agreement contained a term that the tuition for the program would be set at the discretion of the college. (ECF no. 107-1, Ex. 3) The parties later understood that

the College would charge $6,900 per student. (ECF no. 101 (K. Bump Dep.) at 28:6-13)

29. The parties did reach agreement on the enrollment term of students. ACE knew it would be semesters at COD. (ECF no. 101 (K. Bump Dep.) at 99:2-10)

30. ACE agreed to interface with Blackboard and was told by Blackboard representatives that it would only take only ninety days and would be a $2,000 investment. (ECF no. 101 (K. Bump Dep.) at 188:1-14; ECF nos. 96-97 (D. Bump Dep.) at 171:9-15; ECF no. 107-1, Ex. 8)

32. Karen Solt's ("Solt") December 9, 2013, email indicated general acceptance of ACE's offer. Sold didn't communicate any exact steps for moving forward. (ECF no. 101 (K. Bump Dep.) at 72:22-73:24; ECF no. 107-1, Ex. 7)

33. As of December 9, 2013, ACE believed that COD had accepted its offer in the form of the Consortium Agreement and believed that it had a contract. (ECF no. 101 (K. Bump Dep.) at 27:7-28:23; ECF nos. 96-97 (D. Bump Dep.) at 161:24-162:10, 162:16-22; ECF nos. 96-97 (D. Bump Dep.) at 209:21-210:12; ECF no. 107-1, Ex. 1 (Ans. Interrogs.) at No. 7)

34. As of December 9, 2013, ACE believed that COD had accepted its proposal, which included Dan Bump teaching the Surgical SkillLab™ ( "lab"). (ECF no. 101 (K. Bump Dep.) at 87:3-11; 100:6-18) Only later did COD suggest Cabai teach the lab. (ECF no. 101 (K. Bump Dep.) at 93:11-94:4; 124:11-19; ECF nos. 96-97 (D. Bump Dep.) at 148:5-16)

35. As of December 9, 2013, ACE believed that COD accepted the initial proposal amount of $4,380 per student. (ECF no. 101 (K. Bump Dep.) at 99:17-100:5; ECF no. 107-1, Ex. 3) ACE later offered an amendment to the contract whereby ACE reduced its price per student to $3,680 to reflect the option of Cabai teaching the lab. This was reflected in the second

3

Consortium Agreement, which ACE understood COD to have accepted (ECF no. 101 (K. Bump Dep.) at 132:14-133:9; ECF no. 101 (K. Bump Dep.) at 142:6-15; ECF nos. 96-97 (D. Bump Dep.) at 165:1-7; ECF nos. 96-97 (D. Bump Dep.) at 255:10-22; ECF nos. 96-97 (D. Bump Dep.) at 236:20-237:3; ECF nos. 96-97 (D. Bump Dep.) at 293:12-23; ECF no. 99 (Solt Dep.) at 49:16-23; ECF no. 107-1, Ex. 18A)

36. Cabai used ACE materials to write the syllabi form 20 and active course files. (ECF no. 101 (K. Bump Dep.) at 15:4-16:9; Exhibit A)

37. Cabai requested assistance Dan Bump's assistance to respond to the Illinois Community College Board's ("ICCB") concerns regarding credit hours for the COD program. (ECF no. 101 (K. Bump Dep.) at 104:2-23; Exhibit B)

40. Cabai's March 2014 email asking for materials was in conjunction with writing her budget. (ECF nos. 96-97 (D. Bump Dep.) at 37:3-15; ECF nos. 96-97 (D. Bump Dep.) at 231:4-14; ECF no. 103 (Cameron Dep.) at 50:17-21; ECF no. 117 (Ex. 17))

42. The only material change between the first Consortium Agreement and the second was the pricing option depending on who would teach the lab. (ECF no. 107-1, Exs. 3, 18-A)

43. The college agreed to accept the reduced price if Cabai taught the lab. (ECF no. 101 (K. Bump Dep.) at 132:14-133:9; ECF no. 101 (K. Bump Dep.) at 142:6-15; ECF nos. 96-97 (D. Bump Dep.) at 165:1-7; ECF nos. 96-97 (D. Bump Dep.) at 255:10-22; ECF nos. 96-97 (D. Bump Dep.) at 236:20-237:3; ECF nos. 96-97 (D. Bump Dep.) at 293:12-23; ECF no. 99 (Solt Dep.) at 49:16-23)

44. Cabai requested the self-study because she thought it would make her life easier and because she intended to use it in completing her own self-study for CAAHEP accreditation.

4

(ECF no. 101 (K. Bump Dep.) at 215:20-216:7; ECF nos. 96-97 (D. Bump Dep.) at 239:2-12; ECF no. 98 (ACE Dep.) at 63:2-9; ECF no. 100 (Cabai Dep.) at 44:15-45:1)

47. Cabai indicated she had the authority to bind the College. (ECF nos. 96-97 (D. Bump Dep.) at 270:19-271:14)

48. Prior to her attendance, Dan Bump communicated to Cabai that the lab contained confidential information. (ECF no. 101 (K. Bump Dep.) at 164:1-13; ECF no. 100 (Cabai Dep.) at 47:23-48:8). ACE sent a non-disclosure agreement to COD and asked for it to be signed. (ECF no. 102 (Black Dep.) 67:9-68:6) Dan Bump considered the Consortium Agreement to include the Nondisclosure Agreement. (ECF nos. 96-97 (D. Bump Dep.) at 288:10-18) Keith Bump expressed to Cabai that "as you know we are going to be sharing proprietary information in the lab and should really have the written agreement in place before we do that." (ECF no. 107-1, Ex. 19)

52. After September 2014, Cabai rewrote the approved curriculum so it didn't include ACE's materials. (ECF no. 112 (Ex.25)) ACE's curriculum already met CAAHEP standards for its content. (ECF no. 96 (D. Bump Dep.) at 70:16-71:14)

54. Tom Cameron ("Cameron") was copied on many of the important emails exchanged between ACE and the College. (ECF no. 101 (K. Bump Dep.) at 195-196; ECF no. 103 (Cameron Dep.) at 34:1-24)

56. ACE requires certain employees, depending on their position, to sign a handbook that includes a nondisclosure clause. (ECF no. 101 (K. Bump Dep.) at 145:20-146:4)

57. ACE has only a handful of employees, and none of them had permission to access ACE's confidential information without permission from Dan Bump. (ECF no. 96 (D. Bump

Dep.) at 49:8-50:7; ECF no. 98 (ACE Dep.) at 10:23-11:19)

58. See response to 48 above. Cabai communicated only that the contracts were going through the College's legal review—not that they wouldn't be agreed to. (ECF nos. 96-97 (D. Bump Dep.) at 210:19-211:1)

61. See response to 48 and 58 above.

62. See response to 18 above.

63. See response to 18 and 62 above.

64. The ACE master curriculum is approximately half CAAHEP core curriculum and half original ACE material. (ECF no. 96 (D. Bump Dep.) at 222:14-223:13)

65. Review of the COD curriculum shows that it largely overlapped with ACE master curriculum. (ECF no. 110 (Ex. 4); <u>Exhibit A</u>) There are over thirty references to ACE in the syllabi, Form 20 and Active Course Files Cabai prepared to submit to the ICCB. (ECF no. 101 (K. Bump Dep.) at 104:10-17) The first day of the COD lab is the same as the first day of ACE lab. (ECF no. 101 (K. Bump Dep.) at 209:6-8)

70. ACE requires its students to login to gain access to its syllabi, which if put together make up the master curriculum. (ECF nos. 96-97 (D. Bump Dep.) at 117:1-11)

71. See response to 70 above.

74. Dan Bump edited the ACE Workbook with entries from students; those students assigned their intellectual property rights to him. (ECF no. 96 (D. Bump Dep.) at 30:22-32:7)

77. Something changed in the relationship between COD and ACE after Cabai returned from the lab. (ECF no. 102 (Black Dep.) 69:9-71:5; ECF nos. 96-97 (D. Bump Dep.) at 320:5-10; ECF no. 103 (Cameron Dep.) at 55:6-14) Cabai expressed concern that the ACE lab

was not sufficiently high-tech and was not focused on the right subject—not that it didn't meet CAAHEP standards. (ECF no. 101 (K. Bump Dep.) at 171:2-22; ECF nos. 96-97 (D. Bump Dep.) at 286:18-287:2; ECF no. 103 (Cameron Dep.) at 58:7-17; 63:6-11)

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Over the course of their ten month relationship, ACE worked hard to provide COD with everything its representatives asked for. (ECF no. 102 (Black Dep.) 59:14-21)

2. In initial discussions, COD represented that they wanted exclusive territory of fifty miles. As a result, ACE didn't follow up with other schools they had been in discussions with about forming a consortium. (ECF no. 101 (K. Bump Dep.) at 47:19-48:4; ECF nos. 96-97 (D. Bump Dep.) at 319:3-12)

3. A December 11, 2013 email from Charles Currier, Vice President Information Technology at College of DuPage, states "given this appears to be an agreement for a program that would have the College of DuPage conferring a certificate. . . ." (ECF no. 101 (K. Bump Dep.) at 29:3-15; ECF no. 107-1, Ex. 9)

4. Cabai communicated final approval of the curriculum on April 23, 2014, saying that ICCB approved the program and classes are ready to go. (ECF no. 102 (Black Dep.) 69:9-71:5; ECF no. 101 (K. Bump Dep.) at 33:3-11; ECF no. 100 (Cabai Dep.) at 32:15-17, 33:1-24; <u>Exhibit C</u>) ACE interpreted this as the final step to get the program started in fall (ECF no. 102 (Black Dep.) 64:15-65:9; ECF no. 101 (K. Bump Dep.) at 129:10-21; ECF no. 101 (K. Bump Dep.) at 141:7-15; ECF no. 101 (K. Bump Dep.) at 198:14-19; ECF nos. 96-97 (D. Bump Dep.) at 163:15-164:5)

5. Cabai communicated that COD could enroll 200 prospective students. (ECF no. 101 (K. Bump Dep.) at 114:2-115:15; ECF nos. 96-97 (D. Bump Dep.) at 175:22-176:5) Cabai did not communicate the lower numbers that she wrote in official documents. (ECF no. 101 (K. Bump Dep.) at 118:20-119:3)

6. The second Consortium Agreement included one price option for Cabai teaching lab and one for Dan Bump teaching lab because, depending on how many students enrolled, COD wouldn't have capacity to teach the lab to all students internally and would have to direct students to Dan Bump's lab. (ECF no. 98 (ACE Dep.) at 52:16-23)

7. COD continued working with ACE after transmission of the second Consortium Agreement. ACE sent its Self Study and allowed Cabai to attend the lab for free. (ECF no. 101 (K. Bump Dep.) at 34:11-13; ECF no. 101 (K. Bump Dep.) at 164:14-20)

8. In an email on May 6, 2014, Cabai indicated that "I think this is an exciting time for COD, one that has taken me years to get them to approve. . . . I am sad that this is what it took for COD to finally say ok, but, the outcome is all that matters. It is here." Exhibit D.

9. ACE believed based on representations from Cabai that legal review of the Consortium Agreement and Nondisclosure Agreement was required but that it was only a formality. (ECF nos. 96-97 (D. Bump Dep.) at 210:19-211:1; Exhibit E)

10. Until Cabai returned from the lab, ACE believed that everything was on track, and that the contracts were just waiting on legal review and final signature. (ECF no. 101 (K. Bump Dep.) at 119:22-120:13; ECF nos. 96-97 (D. Bump Dep.) at 166:11-18; ECF nos. 96-97 (D. Bump Dep.) at 272:11-17). This was true when Cabai came to the lab. (ECF no. 101 (K. Bump Dep.) at 154:8-19; 165:1-5; ECF nos. 96-97 (D. Bump Dep.) at 275:3-11; Exhibit F)

11. ACE didn't believe the legal department had authority to decline to enter into a contract approved by faculty and administrators—only to review the contract language. (ECF no. 101 (K. Bump Dep.) at 155:1-156:1; 166:21-24; ECF nos. 96-97 (D. Bump Dep.) at 272:4-10)

12. ACE believed that Cabai, Solt, and Cameron had authority to contract with ACE. (ECF no. 101 (K. Bump Dep.) at 155:1-9; ECF nos. 96-97 (D. Bump Dep.) at 140:13-23; ECF nos. 96-97 (D. Bump Dep.) at 274:24-275:2)

13. Prior to attending the lab, Cabai sent an email to Keith Bump stating that she "did talk to Tom" who "is not comfortable singing anything without having legal approve nor with Karen out of town." (ECF no. 107-1, Ex. 19) Cabai testified she was referring to Tom Cameron. (ECF no. 100 (Cabai Dep.) at 48:16-24)

14. Cameron testified he doesn't recall speaking to Cabai about this and that the "Tom" in her email was probably Tom Glaser, Vice President of Finances, who had authority to sign contracts. (ECF no. 103 (Cameron Dep.) at 56:1-24)

15. Solt testified Cabai wanted to wait to see the lab before signing any agreement. (ECF no. 99 (Solt Dep.) at 59:4-14)

16. Solt communicated that the college was ready to move forward with ACE. (ECF no. 101 (K. Bump Dep.) at 196-197) Solt later communicated that the College's concerns included Dan Bump's lack of preparation to teach an online course. (ECF no. 99 (Solt Dep.) at 62:2-63:11)

17. ACE thought it had met all of COD's concerns during the post-lab conference call. (ECF no. 101 (K. Bump Dep.) at 184:3-23; 185:16-23)

18. In October 2014, Cabai applied for initial certification from CAAHEP. (ECF no.

103 (Cameron Dep.) at 65:21-24)

19. CAAHEP accreditation doesn't transfer; COD would have needed to apply even if ACE were CAAHEP accredited. (ECF no. 101 (K. Bump Dep.) at 105:14-22)

20. ACE's Self Study was valuable because it allowed it to get accreditation with the CAAHEP. (ECF no. 98 (ACE Dep.) at 62:15-22)

21. ACE's master curriculum includes unique assignments from textbooks that are combined into an effective learning assignment unique to ACE's program. (ECF nos. 96-97 (D. Bump Dep.) at 33:3-10; 34:9-12; ECF no. 98 (ACE Dep.) at 69:11-15)

22. ACE doesn't distribute its master curriculum (ECF no. 101 (K. Bump Dep.) at 194:5-14; 211:18-20; ECF nos. 96-97 (D. Bump Dep.) at 120:13-20). Dan Bump considers the curriculum it to be copyrighted and would pursue students who misappropriate the materials. (ECF nos. 96-97 (D. Bump Dep.) at 82:16-24)

23. The ACE surgical skills lab is unique in the way that it is taught, what is covered, and the performance. (ECF nos. 96-97 (D. Bump Dep.) at 38:5-17; ECF nos. 96-97 (D. Bump Dep.) at 187:24-188:9)

24. Cabai represented to ACE that she couldn't have done it without them. (ECF no. 101 (K. Bump Dep.) at 197-198; Exhibit D)

25. ACE believes that the College withdrew their agreement to work with ACE after it had everything it needed to start a program and had received all academic approvals. (ECF no. 101 (K. Bump Dep.) at p.202:12-203:5)

Dated October 9, 2017.                    Respectfully submitted,

<span style="margin-left: 3em;">*s/ Michael J. Davis*</span>
Michael J. Davis
DLG Law Group LLC
2777 Finley Rd.
Suite 12
Downers Grove, IL 60515
630-915-3999
Email: mdavis@dlglaw.net

*Attorney for American Center For Excellence In Surgical Assisting Inc.*