UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC., ) ) ) Plaintiff, ) ) v. ) ) COMMUNITY COLLEGE DISTRICT 502, ) COLLEGE OF DUPAGE, DR. THOMAS ) CAMERON, DR. KAREN M. SOLT, and ) DR. KATHY CABAI, ) ) Defendants. ) | Case No. 15 CV 7290  Judge Gary Feinerman |

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, American Center for Excellence in Surgical Assisting Inc. ("ACE"), through undersigned counsel, respectfully submits this Memorandum of Law in Response to Defendants' Motion for Summary Judgment ("Response"):

**BACKGROUND[1]**

In November 2013, representatives of ACE and the College of DuPage ("COD" or "College") met for the purpose of creating a mutual consortium around a surgical assistant program. DDMF ¶ 26.[2] After these initial meetings, Keith Bump, ACE's Vice President of

---

[1] The Court helpfully summarized the allegations in Plaintiff's Complaint, which included supporting materials, in its Order dated June 7, 2016, granting in part and denying in part Defendants' Motion to Dismiss (ECF no. 40 at 1-5).

[2] The following abbreviations will be utilized to refer to the record: Defendants' Motion for Summary Judgment ("Mot."); Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("MOL"); Local Rule 56.1 Statement Of Undisputed Material Facts ("SOF"); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts – Denial of Defendants' Material Facts ("DDMF"); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts – Statement of Additional Material Facts ("SAMF").

Marketing and Sales, sent a Consortium Agreement to COD describing the main responsibilities of each party, including the price per student that COD would pay ACE. SOF ¶ 27; SOF Ex. 3; DDMF ¶ 35. On December 9, 2013, Karen Solt ("Solt"), Associate Dean of Health and Biological Sciences at the College, replied to the participants of the November meetings stating "I think our discussion was a great one, and we are ready at this point to move forward on our part." SOF ¶ 32. Between December 2013 and April 2014, Kathy Cabai ("Cabai"), using course materials provided by ACE, drafted a surgical assistant curriculum that passed all levels of administrative review including final approval with the Illinois Community College Board ("ICCB"). DDMF ¶¶ 36-37; SAMF ¶ 4. At that point, Cabai sent an email to ACE stating "we are ready to go." SAMF ¶ 4.

    The terms of the contract remained those in the original Consortium Agreement with one exception. DDMF ¶ 42. At some point, COD requested that Cabai be allowed to teach a portion of the course, which would reduce the total amount COD paid to ACE. DDMF ¶ 35. ACE responded with a second Consortium Agreement signaling this change and a new price, which was accepted by COD. *Id.* Thereafter, the parties continued moving forward in partnership; ACE provided COD with free books, a copy of the Self Study ACE used to get accreditation with the Commission on Accreditation of Allied Health Education Programs ("CAAHEP"), and free attendance for Cabai at ACE's Surgical SkillLab™ ("lab"). DDMP ¶ 44; SAMF ¶ 7.

    In June 2014, Cabai indicated to ACE that the Consortium Agreement and Nondisclosure Agreement ACE sent would not be signed prior to her attendance at the lab, because the legal department had not yet approved it and Solt was out of town. SAMF ¶ 13. Solt testified that Cabai wanted to attend the lab before signing any agreement. SAMF ¶ 15. Once Cabai returned

2

from the lab, COD backed out of its contract with ACE. SOF ¶ 51. Shortly thereafter, COD implemented its own surgical assistant program. SOF ¶ 52.

## SUMMARY OF ARGUMENT

Summary judgment is not appropriate unless there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law. *Egger v. Phillips*, 669 F.2d 497, 502 (7th Cir. 1982). There are numerous genuine issues of material fact that make entry of summary judgment improper in this case.

*First*, there is a material fact dispute as to whether ACE and COD entered into a contract that is clear as to its material terms. Defendants have not established as a matter of law that the Board needed to approve this contract and that the individual Defendants' authority—whether real or apparent—was insufficient to create a binding agreement.

*Second*, there is a material fact dispute as to whether ACE's reliance on Defendants' representations to move ahead with the agreement was reasonable. There is another issue of material fact as to whether COD or any of the individual Defendants made these representations falsely, knowing they did not intend to fulfil their contractual obligations.

*Third*, there are questions of material fact concerning ACE's trade secret claim. Defendants have not established as a matter of law that ACE failed to take reasonable steps to protect its trade secrets; that it did not own trade secrets; and that Defendants did not misappropriate those trade secrets for their benefit.

## ARGUMENT

**I.  There Is A Genuine Issue Of Material Fact With Regard To Whether The Parties Entered Into A Contract.**[3]

*A. There is a material fact dispute as to whether ACE and COD entered into a contract that is clear as to its material terms.*

Whether a contract exists, its terms and the intent of the parties are questions of fact to be determined by the trier of fact. *In re Marriage of Gibson-Terry*, 325 Ill.App.3d 317, 322 (2001); *but see Coldwell Banker Real Estate Corp. v. L.T.R.C., LLC, No*. 05 C 2492 (N.D. Ill. Jan. 11, 2007) ("Under Illinois law, the existence of a valid and enforceable contract is a question of law when the basic facts are not in dispute").

There is ample support in the record to indicate that Solt's December 9, 2013 email formed a contract between the parties. First, the language of the December 9, 2013 contract indicates acceptance. DDMF ¶ 32. Second, the parties operated as thought they had a contract. *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc*., 873 F.2d 155, 157 (7th Cir. 1989) ("Under Illinois law, courts focus on the parties' intention to determine whether an enforceable contract comes into being during the course of negotiations, or whether some type of formalization of the agreement is required before it becomes binding.").

Throughout the ten months between November 2013 and September 8, 2014, the College made numerous demands of ACE. DDMF ¶¶ 37, 40, 44. The College also kept ACE abreast of developments in the approval process for the program, seeking input along the way. SAMF ¶ 4. ACE provided information when requested or required and pursued related initiatives, including Blackboard. DDMF ¶ 30. Between December 2013 and August 2014, Defendants never

---

[3] The College does not challenge the other elements of Plaintiffs breach of contract claim on Summary Judgment.

indicated disagreement with terms, aside from whether Cabai or Dan Bump would teach lab. DDMF ¶¶ 34, 42; SAMF ¶ 10. After Cabai attended the ACE SkillLab, COD communicated concerns about implementation to ACE, which ACE addressed. SAMF ¶ 17.

On the other hand, none of Defendants' arguments demonstrate as a matter of law that there was no contract. In fact, there are numerous disputed facts related to the issue.

*First*, Defendants challenge that COD did not sign the contract. Whether a writing constitutes a binding contract, even though it is not signed, usually depends upon the intention of the parties. *Lynge v. Kunstmann*, 94 Ill.App.3d 689, 694 (1981); *see also* 17 C.J.S. Contracts § 62 (1963); 12 Ill. L. & Prac. Contracts § 65 (1955). As discussed above, the parties' actions indicated consent to enter into an agreement with one another.

*Second*, Defendants assert that the Consortium Agreement was silent as to material terms. "Under Illinois law, a contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Association Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007) (internal quotation marks omitted). Contrary to what Defendants claim, the parties' essential performance obligations were clear. The prices per student were established by the first Consortium Agreement, and Amended by the second. DDMF ¶ 35. The Consortium Agreement laid out other obligations of each party. (ECF no. 107-1, Exs. 3, 18-A) Ace would provide programming, documentation, presentation materials, and teaching staff and staff to coordinate with COD. (*Id.*) COD would process applications, maintain student records, grant certificates, collect tuition and fees, provide program space, assign a program director, secure contractual relationships for the clinical

5

experience, and ensure approval/accreditation. (*Id.*) In addition, ACE agreed on the semester delivery system. DDMF ¶ 29. The amount COD would charge students—though it was decided, DDMF ¶ 28—wasn't a material term of the contract because it didn't affect the obligations of one party vis-a-vis the other.

*Third*, Defendants assert that ACE never agreed to Blackboard. In fact, ACE consented to the use of Blackboard and took steps to get set up with the interface. DDMF ¶ 30.

*Fourth*, Defendants assert that ACE and COD hadn't agreed on price. This is false. The parties had consented on the terms of the second Consortium Agreement. SOF ¶ 35; DDMF ¶ 35. Prices and who would teach the lab were as set as they could be without knowing enrollment numbers. SAMF ¶ 6.

### B. *Defendants have not established as a matter of law that the Board needed to approve this contract and that the individual Defendants' authority—whether real or apparent—was insufficient to create a binding agreement.*

There is also a factual dispute regarding whether Defendants indicated they had approval to enter into a contract. ACE believed that Cabai acted with apparent authority. DDMF ¶ 47. ACE also believed that Cameron and Solt had authority to enter into contracts. SAMF ¶ 12. None of the College's arguments demonstrate as a matter of law that the individual Defendants were without authority to contract on behalf of the college.

First, COD's case law regarding doing business with a government entity applies to municipal corporations, not community colleges. *See U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 331 (7th Cir. 2009) (citing *D.S.A Fin. Corp. v. Cty. of Cook*, 801 N.E.2d 1075, 1081 (Ill. App. Ct. 2003)). Furthermore, even if it did apply to COD, Defendants have not established that any statutory requirements were violated. The statutes cited by Defendants do

not establish that the Board of Trustees has <u>exclusive</u> ability to enter into contracts. 110 ILCS 805/3-11, cited by Defendants, gives authority to the Board to sue or be sued. It says nothing about a right to contract, much less an exclusive right to contract. 110 ILCS 805/3-40 also doesn't give exclusive right to the Board to enter into contracts.

110 ILCS 805/3-27.1 refers to contracts for "supplies, materials or work…" and contains an exception for "(a) contracts for the services of individuals possessing a high degree of professional skill where the ability or fitness of the individual plays an important part." *Hedlund & Hanley, LLC v. Bd. of Trustees of Cmty. Coll. Dist. No.* 508, 876 N.E.2d 1, 7 (Ill. App. Ct. 2007), is contrary to Defendants' position. It states that nowhere in the statute does it require Board approval to enter into contracts for the services of individuals possessing a high degree of professional skill and applies this to a contract with a law firm for legal services. The logic would be equally applicable in the case of an agreement with Plaintiff.

The open question over who has authority to enter into contracts on behalf of the college is even demonstrated by the disparate deposition testimony of Defendants. Cabai testified that the legal department would have had to sign off on the contract, which Tom Cameron could then sign. SAMF ¶ 13. On the other hand, Tom Cameron, the Dean, testified that the Vice President of Finance had the authority. SAMF ¶ 14.

Thus, COD has not established as a matter of law that individual Defendants could not bind COD to a contract.

**II.     There Is A Genuine Issue Of Material Fact With Regard To Whether Defendants Made Fraudulent Representations.**

Defendants induced ACE to provide its knowledge and expertise to help build the College's own surgical assistance program while representing that it would partner with ACE.

7

In short, Defendants relied on ACE to build a surgical assistant program and then terminated their relationship with ACE when they could offer the program themselves. There is a material fact dispute as to whether ACE's reliance on Defendants' representations to move ahead with the agreement was reasonable. There is another issue of material fact as to whether COD or any of the individual Defendants made these representations falsely, knowing they did not intend to fulfil their contractual obligations.[4]

### A. Reliance by ACE was reasonable and is a matter of fact for the fact finder to determine.

"Typically, justifiable reliance is a question of fact…" *D.S.A Finance Corp. v. County of Cook,* 345 Ill.App.3d 554, 560 (2003). As discussed above, COD has not demonstrated that the Board needed to sign off on the contract with ACE. Also as discussed above, the parties took multiple steps in furtherance of the agreement in place.

While COD communicated that approval of new academic program was a long process, that was not referring to approval of the contract. For instance, in Solt's December 9, 2013 email, she states that moving forward "consists of putting the curriculum through our college process and then onto the state's approval system." SOF ¶ 32. This refers to stages of review of the curriculum, not the contract. On the other hand, Cabai communicated to ACE that legal review was a formality. SAMF ¶ 9.

Therefore, it is a question of material fact whether Plaintiff's reliance was reasonable.

### B. It is an open question of fact whether Defendants made misrepresentations.

---

[4] COD did not plead a defense of governmental immunity in its Answer. (ECF no. 50) Furthermore, the cases it cites do not support its claimed immunity. *Valentino v. Hilquist*, 785 N.E.2d 891, 900 (Ill. App. Ct. 2003) doesn't support COD's claim because it does not discuss the same provision of the statute. *Sheikh v. Lichtman*, 2012 WL 1378668, at *5 (N.D. Ill. Apr. 19, 2012), only cites the governmental immunity statute, it doesn't apply or interpret it.

*Stamatakis Indus., Inc. v. King,* 520 N.E.2d 770, 772 (Ill. App. Ct. 1987) is also contrary to Defendants' position and states that a promise made without intent to keep it may be fraud. In that case, court found that protracted negotiations between parties show that a scheme was alleged and that it is a question of fact for the trier of fact to determine the ultimate issue.

Similar evidence exists in this case. Prior to attending the lab, Keith Bump asked Cabai about the status of the signed agreements. She told him that it was not going to be signed before the lab because Solt was out of town and the legal department was moving slowly. SOF ¶¶ 45-48; SAMF ¶ 13. In fact, Solt testified in her deposition that Cabai had told her she had no intent to sign the agreements until she returned from the lab. SAMF ¶ 15. In reality, once Cabai returned from the lab, COD cancelled its contract with ACE.

Contrary to what Defendants claim, there are numerous factual disputes that go to ACE's fraud claims, including whether (1) the college represented it would enter into an agreement with ACE (see Section 1, above); (2) whether Cabai intended to go to the lab to determine what it was like and then withdraw participation with COD (see immediately above); and (3) whether Cabai rewrote the curriculum to remove ACE material or to comply with CAAHEP accreditation, SOF ¶ 52; DDMF ¶ 52.

Cameron and Solt's misrepresentations were in the form of inaction to correct the information, if the College truly didn't want to enter into a contract. Cameron was copied on many of the important emails between the parties and didn't correct the record. DDMF ¶ 54. In addition, Cameron was on one phone call with Cabai when she returned from the lab and expressed her concerns. SOF ¶ 54. Therefore, Cameron knew Cabai's expressed reasons for not

9

wanting to continue working with ACE. Solt also affirmatively represented the reason for cancelling contract was Dan's unwillingness to teach online, when really it was Cathy's decision regarding the lab. SOF ¶¶ 49-50; SAMF ¶ 15.

The relevant question is not whether representations were made, but whether they were false. If there was no contract, as Defendants claim, then the representations by COD appear clearly false. If there was a contract, and COD breached it, then the majority of Defendants' representations may not have been false. This question must be resolved by the factfinder.

**III.    There Is A Genuine Issue Of Material Fact With Regard To Whether COD Misappropriated ACE's Trade Secrets.**

There are disputed facts with regard to whether COD misappropriated ACE's trade secrets. Defendants cannot establish as a matter of law that ACE did not protect its trade secrets, that it does not have trade secrets, and that the individual Defendants did not misappropriate those trade secrets.

   *A. There is a material fact dispute as to whether ACE took reasonable steps to protect its trade secrets.*

The requirement that an owner take reasonable efforts to maintain the secrecy of his information "prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) (emphasis added). "Typically, what [protective] measures are reasonable in a given [trade secret] case is an issue for a jury." *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007); *see also Learning Curve*, 342 F.3d at 725 ("[O]nly in an extreme case can what is a 'reasonable' precaution be determined as a matter of law, because the answer depends on a balancing of costs

10

and benefits that will vary from case to case.").

In this case, ACE has taken reasonable steps to protect its trade secrets. Dan Bump is sole shareholder of ACE (SOF ¶ 2) and his limited number of employees need permission to require access to proprietary information. ACE required students had to have password to access the curriculum materials, which are not otherwise publicly available. Dan Bump testified that the curriculum is shared with students for a particular purpose and they are not allowed to do whatever they like with it. *See also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) ("The mere fact that Rockwell gave piece part drawings to vendors—that is, disclosed its trade secrets to a limited number of outsiders for a particular purpose—did not forfeit trade secret protection.") (internal quotation marks omitted).

ACE is not a plaintiff who took "no affirmative measures" to protect its trade secrets. To the contrary, it took several reasonable steps to protect its trade secrets, in particular during its course of dealings with COD. In November 2013, when Keith Bump sent COD its master curriculum, it attached the first Consortium Agreement, which included a provision that states "curriculum and associated materials and simulators are propriety in nature and are the property of ACE." DDMF ¶ 27. In addition, ACE sent COD a Nondisclosure Agreement that Dan Bump and Keith Bump both indicated interest in having signed prior to Cabai's attendance at the lab.

ACE's precautions must have been effective, since COD multiple times had to request information from ACE directly—about the curriculum, budgeting for the program, and the Self-Study. This information was not publicly available. Given the circumstances, ACE's efforts were reasonable. *See Jones v. Ulrich*, 95 N.E.2d 113, 117-18 (Ill. App. 1950) (precautions reasonable for an inventor who shared drawings of a phosphate spreader upon the defendant's

11

request, explaining that "[w]hile there was no express agreement that defendant was to hold the information so disclosed as a confidential matter … such an agreement was implied").

### B. There is also a material fact dispute as to whether ACE has trade secrets.

Defendants also challenge whether ACE's claimed "trade secrets" are in fact trade secrets. This is another matter over which there is a dispute of fact.

*First,* ACE's Self Study was trade secret. It was unique and valuable to ACE, which paid a consultant to draft it. ACE gained value from the Self Study when it was accredited with CAAHEP from 2009 to 2012. SOF ¶ 20; DDMF ¶ 20. ACE only kept one copy of the Self Study and it was not widely available. Cabai recognized this value when she requested that Dan Bump provide her with a copy of the Self Study to make her life easier when drafting her own. DDMF ¶ 44.

*Second*, ACE's Master Curriculum is trade secret. ACE's curriculum had gone through CAAHEP's accreditation requirements, SOF ¶ 64, but also is comprised of original ACE material. DDMF ¶ 64. Dan Bump testified that half of the master curriculum is ACE's original material. *Id.* As discussed above, the Master Curriculum is not available without a password or permission from Dan Bump. DDMF ¶ 70; SAMF ¶ 22. Cabai also recognized the value of this material when she used the master curriculum to create the Form 20 and Active Course Files for curriculum approval. DDMF ¶ 65.

*Third,* ACE's textbook assignments are trade secrets. ACE's master curriculum includes assignments from textbooks that are combined into an effective learning assignments unique to ACE's program. SAMF ¶ 21. It is not the textbooks themselves but this combination of reading materials with its curriculum that ACE claims are trade secrets. *Id.* COD gained the benefit of

12

these textbook assignments when it utilized ACE's master curriculum.

*Fourth*, ACE's budget information was unique to ACE's lab. Cabai requested this information, DDMF 40, which is evidence that it was not widely available or publicly known. Dan Bump responded by providing Cabai a list of materials unique to the lab.

*Fifth,* the lab is a trade secret. The lab is unique in the way that it is taught, what is covered, and the performance of teaching methods. SAMF ¶ 23. Prior to Cabai's attendance, ACE communicated that the lab contained confidential information and asked Cabai to return the Nondisclosure Agreement. DDMF ¶ 48. Compared to the "common pedagogical and job search techniques which would be used in any job placement course" that the Court in *Self-Directed Placement* failed to recognize as trade secrets, ACE's curriculum and lab are based on highly specialized and technical knowledge. *Cf. Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465 (Cir. 1990).

Unlike the case in *Kunze*, ACE spent significant effort and money obtaining and developing the information in the self study, curriculum, and lab. *Cf. Electrology Laboratory, Inc. v. Kunze*, 169 F.Supp.3d 1119, 1153 (2016). It would take a great deal of time and expense for a competitor to acquire and duplicate the information, thus indicating its value as a trade secret. *Id.* COD apparently recognized this value when it requested or accepted and used copies of these materials for its benefit to design the surgical assistant program.

### C. There is a material fact dispute concerning Cameron and Solt's liability.

Finally, Defendants fail to establish that Cameron and Solt escape liability on Plaintiff's trade secret claim as a matter of law. In his capacity as Dean, Cameron reviewed the paperwork and curricula for new programs, and had general operational oversight of the Health and

Sciences division, including employees Solt and Cabai. SOF ¶ 6. He would necessarily have known the similarities between ACE's master curriculum and COD's. Solt, in her role as Associate Dean, oversaw the surgical assisting program and was aware of the development of COD's program. SOF ¶ 5. Both Cameron and Solt supervised Cabai, were copied on important communications, and were involved in the decision to stop working with ACE and to move forward with a COD surgical assisting program. Therefore, there are many questions of material fact regarding Solt and Cameron's involvement in any misappropriation of ACE's proprietary information, and judgment as a matter of law would be inappropriate at this stage.

## CONCLUSION

For these reasons, together with the facts set forth in Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment on all counts and deny Defendants' request for attorney fees, costs and expenses.

Dated October 9, 2017.                                Respectfully submitted,

*s/ Michael J. Davis*
Michael J. Davis
DLG Law Group LLC
2777 Finley Rd.
Suite 12
Downers Grove, IL 60515
630-915-3999
Email: mdavis@dlglaw.net

*Attorney for American Center For Excellence In Surgical Assisting Inc.*

## CERTIFICATE OF SERVICE

On October 9, 2017, I certify that I served a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment on all counsel of record via the Court's ECF System.

*s/ Michael J. Davis*
Michael J. Davis
DLG Law Group LLC
