UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN CENTER FOR EXCELLENCE IN SURGICAL ASSISTING INC., | ) ) |
| | ) 15 C 7290 |
| Plaintiff, | ) |
| | ) Judge Gary Feinerman |
| vs. | ) |
| | ) |
| COMMUNITY COLLEGE DISTRICT 502, COLLEGE OF DUPAGE, THOMAS CAMERON, KAREN M. SOLT, and KATHY CABAI, | ) ) ) |
| | ) |
| Defendants. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

American Center for Excellence in Surgical Assisting Inc. ("ACE") brought this diversity

suit against Community College District 502, College of DuPage ("College" or "COD"), and

College officials Thomas Cameron, Karen Solt, and Kathy Cabai for matters arising from the

College's efforts to establish an accredited surgical assistant certification program. Doc. 1. The

court dismissed some of ACE's claims at the pleading stage. Docs. 39-40 (reported at 190 F.

Supp. 3d 812 (N.D. Ill. 2016)). Discovery has concluded, and a bench trial is set for September

24, 2018. Doc. 145. Defendants now move for summary judgment on the remaining claims:

breach of contract against the College, and misappropriation of trade secrets under the Illinois

Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*., and fraud against all Defendants. Doc.

104. The motion is granted.

**Background**

The following facts are stated as favorably to ACE as permitted by the record and Local

Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering

Defendants' motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

ACE markets itself as a provider of surgical assistant training programs. Doc. 107 at ¶ 2. (Where, as here, ACE's Local Rule 56.1(b)(3)(B) response, Doc. 125, does not dispute a fact asserted in Defendants' Local Rule 56.1(a)(3) statement, Doc. 107, only the Local Rule 56.1(a)(3) statement is cited and the fact is deemed admitted. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) ("[R]ules like 56.1 provide the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court.") (alteration and internal quotation marks omitted); *Perez v. Town of Cicero*, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (citing cases).) Dan Bump is ACE's sole shareholder and president. Doc. 107 at ¶ 2. District 502 is an Illinois community college district created by the Illinois Public Community College Act, 110 ILCS 805/1 *et seq*. Doc. 50 at ¶ 2. The College, located in Glen Ellyn, Illinois, is a public community college within the District. Doc. 46 at ¶ 3. At all relevant times, Cameron was the College's Dean of Health and Sciences, Solt was the Associate Dean of Health and Biological Sciences, and Cabai was the Coordinator of the Surgical Assisting Program and Co-Director of the Anesthesia Technology Program. Doc. 107 at ¶¶ 4-6.

In November 2013, ACE became aware through non-party Your Extra Hands Surgical Services ("YEHSS") that the College was interesting in starting a surgical assistant training program. Doc. 125 at pp. 1-2, ¶ 25. To that end, on November 20, Cabai and Solt met with Keith Bump, ACE's Vice President of Marketing and Sales, and Kyle Black, a YEHSS employee. Doc. 107 at ¶¶ 25-26; Doc. 125 at pp. 1-2, ¶¶ 25-26. Cabai and Solt told Keith Bump

and Black that the proposed program would need to pass through several administrative layers of approval—the "college system"—before it could be implemented.  Doc. 125 at p. 2, ¶ 26.

The next day, Keith Bump e-mailed Cabai and Solt several documents: (1) a consortium proposal; (2) the ACE Program Catalog; (3) the ACE Master Curriculum; and (4) a draft consortium agreement.  Doc. 107 at ¶ 27; Doc. 125 at p. 2, ¶ 27; Doc. 107-1 at 23.[*]  Section III.8 of the draft consortium agreement stated: "It is agreed that the curriculum and associated materials and simulators are proprietary in nature and are the property of ACE.  College shall not copy or reproduce anything of a proprietary nature for any reason."  Doc. 107-1 at 11.  However, Keith Bump did not ask Cabai or Solt to sign a confidentiality agreement before sending them the materials, nor did Keith Bump indicate—apart from the language in Section III.8—that the materials were confidential.  Doc. 107 at ¶ 27; Doc. 125 at p. 2, ¶ 27; Doc. 107-1 at 23.

On December 5, 2013, Dan Bump, Keith Bump, Black, Cabai, Cameron, and Solt had a conference call.  Doc. 107 at ¶ 30; Doc. 125 at p. 3, ¶ 30.  On December 9, Solt sent Keith Bump, Dan Bump, Black, Cameron, and Cabai an email stating:

> I think our discussion was a great one, and we are at this point ready to move forward on our part.  That consists of putting the curriculum through our

---

[*] ACE's Local Rule 56.1(b)(3)(B) objection to this fact asserts that Dan Bump "indicated to Cabai" that the "material was proprietary"; in support, ACE cites Keith Bump's and Cabai's deposition testimony.  Doc. 125 at p. 2, ¶ 27.  But the cited testimony concerns an entirely different issue—whether Cabai would have to sign a written agreement acknowledging that she would be privy to ACE's proprietary information when attending ACE's Surgical SkillLab months later in July 2014.  Doc. 100 at 48-49 (Cabai); Doc. 101 at 164 (Keith Bump).  Accordingly, the court overrules ACE's objection to this fact.  *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."); *Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014) ("[T]he court will disregard any of Schwab's assertions … that are not supported with specific record citations.").

college process and then on to the state's approval system.  I am meeting with
Kathy [Cabai] later this morning, so should have a better idea of how long that
will take.

Doc. 107 at ¶ 32; Doc. 125 at p. 3, ¶ 32; Doc. 107-1 at 26.  The draft consortium agreement was

never formally executed.  Doc. 107 at ¶ 31; Doc. 125 at p. 3, ¶¶ 32-33.[†]  Nevertheless, based on

Solt's email, ACE believed that the College had accepted its proposal (the draft consortium

agreement) and that it therefore had a contract with the College to assist in setting up and

running the surgical assistant training program.  Doc. 125 at p. 3, ¶¶ 33-35.

On February 17, 2014, Cabai told Keith Bump that the proposed program had passed the

first level of internal College review, the Division Curriculum Committee.  Doc. 107 at ¶ 37;

Doc. 125 at p. 4, ¶ 37.  The next month, Cabai asked ACE for a list of materials necessary for the

proposed program's lab component.  Doc. 107 at ¶ 40; Doc. 125 at p. 4, ¶ 40.  ACE responded

with the requested materials.  Doc. 107 at ¶ 40; Doc. 125 at p. 4, ¶ 40; Doc. 111.

On April 23, 2014, Cabai emailed Keith Bump and Black to say: "Just letting you know,

after a long day today of a health care collaborative simulation on a trauma case, I received a

---

[†] Defendants' Local Rule 56.1(a)(3) statement asserts that "no one from the College accepted the
terms of the [draft consortium agreement]" during the December 5 conference call.  Doc. 107 at
¶ 31.  ACE's Local Rule 56.1(b)(3)(B) response objects to this assertion, maintaining that the
draft consortium agreement was an offer and the December 9 email from Solt "indicated general
acceptance."  Doc. 125 at p. 3, ¶ 32.  But "offer" and "acceptance" are legal conclusions, and so
the court disregards those aspects of the parties' Local Rule 56.1 statements and responses.  *See
Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir.
2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts. … The
district court was correct that by labeling the charts 'fraudulent transfers,' Judson Atkinson made
an improper legal argument since whether or not any transfers were fraudulent is a legal
conclusion.  In striking the exhibits, the court acted within its discretion in interpreting its own
local rules."); *Cady v. Sheahan*, 467 F.3d 1057, 1060-61 (7th Cir. 2006) (holding that the district
court did not abuse its discretion in disregarding the plaintiff's statement of material facts
because it "did not comply with Rule 56.1 as it failed to adequately cite the record and was filled
with irrelevant information, legal arguments, and conjecture"); *J & J Sports Prods., Inc. v.
Pantchev*, 2013 WL 6050168, at *1 (N.D. Ill. Nov. 15, 2013) (similar).

message that all of the classes passed ICCB [the Illinois Community College Board].  We are ready to go.  The certificate will be presented in October but because we can offer the first classes without it we are fine."  Doc. 125 at p. 7, ¶ 4; Doc. 125-3.  ACE understood this to be the "final step to get the program started in [the] fall."  Doc. 125 at p. 7, ¶ 4.

Two weeks later, on May 5, Dan Bump sent Cabai a revised draft consortium agreement and a nondisclosure agreement.  Doc. 107 at ¶ 41; Doc. 125-4 at 2.  The revised draft consortium agreement was never formally executed.  Doc. 107 at ¶ 43, Doc. 125 at p. 4, ¶ 43.  The next day, Cabai emailed Dan Bump: "I think this is an exciting time for COD, one that has taken me 5 years to get them to approve.  The day Keith and Kyle walked into my lab was a wonderful day for me.  I am sad that this is what it took for COD to finally say ok, but, the outcome is all that matters.  It is here."  Doc. 125-4 at 1.  Sometime later, in response to a request from Cabai, ACE sent her its "Self Study"—the materials a student would use to move independently through the proposed program.  Doc. 107 at ¶¶ 44, 66; Doc. 125 at pp. 4-5, ¶ 44, p. 8, ¶ 7.  A self study is a requirement for accreditation by the Commission on Accreditation of Allied Health Education Programs ("CAAHEP"), a large health sciences professions accreditor.  Doc. 107 at ¶¶ 14, 59.

At some point prior to July 2014, Cabai and ACE discussed the possibility of Cabai's attending ACE's "Surgical SkillLab" training—scheduled for mid-July 2014 in Denver—without charge.  Doc. 46 at ¶¶ 19, 24; Doc. 125 at p. 5, ¶ 48, p. 8, ¶ 7; Doc 125-3.  On July 8, Keith Bump asked Cabai about the status of the revised draft consortium agreement, noting that ACE "really want[ed] to have [the agreement] in place before the lab.  As you know we are going to be sharing proprietary information in the lab and should really have the written agreement in place before we do that."  Doc. 107 at ¶ 45; Doc. 107-1 at 74-75.  Cabai responded: "As I explained to you prior, Karen [Solt] is out of town.  [The agreement] will not be signed prior to

me coming to the lab.  If you are going to cancel my attendance then you need to let me know in a hurry. … If I need to cancel arrangements, I must do it now."  Doc. 107 at ¶ 45; Doc. 107-1 at 74.  Cabai also told Keith Bump that she would not sign the nondisclosure agreement before attending the SkillLab.  Doc. 107 at ¶ 46.

After receiving another email from Keith Bump, Cabai told him that "Tom" had told her "that nothing would be happening prior to [Solt] returning to the office."  Doc. 107-1 at 74. (ACE asserts that the person referred to in the email was not Tom Cameron, but rather Tom Glaser, the College's Vice President of Finance.  Doc. 125, p. 9 at ¶ 14.  Because the identity of the person with whom Cabai spoke is immaterial, he will be referred to as "Tom.")  Cabai indicated that she was "beginning to get concerned because I have things booked and need to know if I need to cancel."  Doc. 107-1 at 74.  Later that day, Cabai followed up with Keith Bump, indicating that Tom "was not comfortable signing anything without having legal approve nor with [Solt] out of town."  Doc. 125 at p. 9, ¶ 13; Doc. 107-1 at 77.  Bump responded: "That's OK Kathy. … We will see you in Denver next week."  Doc. 107 at ¶¶ 46, 48; Doc. 125 at p. 5, ¶ 48; Doc. 107-1 at 77.

From July 14-19, Cabai attended ACE's Surgical SkillLab in Denver.  Doc. 46 at ¶¶ 19, 24; Doc. 107 at ¶ 48; Doc. 125 at p. 5, ¶ 48.  After returning, Cabai expressed concern that certain important subject matters were not adequately covered by ACE's curriculum.  Doc. 107 at ¶¶ 49, 77; Doc. 125 at pp. 6-7, ¶ 77; Doc. 107-1 at 80-81.  Cabai's written evaluation of the Surgical SkillLab noted "many concerns with curriculum, things/concepts covered and concepts not addressed.  Honestly feel that many [surgical assisting] concepts were not addressed."  Doc. 107-1 at 80.  On July 30, Solt emailed Dan and Keith Bump about those concerns.  Doc. 107 at ¶ 50; Doc. 107-1 at 83-85.  Dan Bump responded on August 13.  Doc. 107-1 at 87-95.

After further discussions, Doc. 107 at ¶ 51; Doc. 125 at p. 9, ¶¶ 16-17, Solt emailed Dan and Keith Bump on September 8 to say that the College had "deci[ded] … to decline to partner with ACE."  Doc. 107-1 at 97; *see also* Doc. 107 at ¶ 51.  Solt's email listed "concerns includ[ing] the lack of preparation … for you to begin teaching this program for us in an on-line format" and the time it would take to prepare "a contemporary curriculum."  Doc. 107-1 at 97.  Cabai then rewrote the surgical assistant training program's curriculum to comply with all CAAHEP requirements, as ACE was not at that point CAAHEP-accredited.  Doc. 107 at ¶ 52; Doc. 125 at p. 5, ¶ 52.  (ACE's Local Rule 56.1(b)(3)(B) response objects to this asserted fact, maintaining that Cabai's purpose was to ensure that the curriculum no longer included materials from ACE; in support, ACE cites materials from the College's active course file for the training program.  Doc. 125 at p. 5, ¶ 52.  But the cited materials do not support ACE's objection, and so the court overrules ACE's objection to this asserted fact.)

It is undisputed that neither the ICCB nor the Illinois Board of Higher Education ("IBHE") approved either the draft consortium agreement or the revised draft consortium agreement.  Doc. 106 at 4-5; Doc. 126 at 6-7; Doc. 128 at 6.

In December 2014, having learned that the College planned to offer a surgical assistant training program, ACE sent a demand letter and claim notice asserting that the College's proposed curriculum used ACE's proprietary information.  Doc. 46 at ¶ 28.  The College responded in March 2015, denying ACE's claim and contending that its "surgical assistant training program … is based on its own original curriculum and materials."  *Id*. at ¶ 29.  Several months later, ACE filed this suit.

**Discussion**

## I.      Breach of Contract Claim

ACE alleges that the College breached its contract with ACE to develop and administer a surgical assistant training program—the terms of which were reflected in the draft consortium agreement and the revised draft consortium agreement—by terminating their relationship in September 2014.  Doc. 1 at ¶¶ 30-35.  Under Illinois law, an ordinary "breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff."  *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach-of-contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [the defendant] breached the contract by failing to adhere to its terms.").  Contracting with a public university imposes additional requirements.  As pertinent here, Illinois law provided during the relevant time period that, in "enter[ing] into contracts with any person, organization, association, educational institution, or governmental agency *for providing or securing educational services*[, a]ny initial contract with a public university … *shall have prior approval* of the [ICCB] and the [IBHE]."  110 ILCS 805/3-40 (1985) (emphasis added), *amended by* 2016 Ill. Legis. Serv. P.A. 99-655 (H.B. 6009) (effective July 28, 2016).

The parties dispute the meaning of that statutory provision.  Doc. 106 at 4-5; Doc. 126 at 6-7.  Because it is an Illinois statute, Illinois rules of statutory construction govern.  *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1089 (7th Cir. 2016) ("Because the question before us involves the interpretation of an Illinois statute, we apply Illinois's rules of statutory construction.").  "In construing a statute or rule, [the] primary objective is to ascertain and give

8

effect to the drafters' intent. The drafters' intent is best indicated by the language of a statute or rule, given its plain and ordinary meaning." *People v. Geiler*, 57 N.E.3d 1221, 1224 (Ill. 2016) (citation omitted); *see also People v. Marshall*, 950 N.E.2d 668, 673 (Ill. 2011) (same). Furthermore, "[i]t is well established that, by employing the word 'shall,' the legislature evinces a clear intent to impose a mandatory obligation." *People v. Ramirez*, 824 N.E.2d 232, 236 (Ill. 2005); *see also Vill. of Winfield v. Ill. State Labor Relations Bd.*, 678 N.E.2d 1041, 1046 (Ill. 1997) (same); *Taylor v. Dart*, 81 N.E.3d 1, 6 (Ill. App. 2017) (same) (citing *Newkirk v. Bigard*, 485 N.E.2d 321 (Ill. 1985)); *In re Lance H.*, 931 N.E.2d 734, 740 (Ill. App. 2010) (same).

Applying these principles, the Supreme Court of Illinois held that 725 ILCS 5/115-4.1(a)—which provides that when a court sets a criminal case for trial in absentia, "the clerk *shall* send to the defendant, by certified mail … notice of the new date which has been set for trial"—renders "the clerk's obligation to send notice by certified mail … *mandatory*." *Ramirez*, 824 N.E.2d at 236-37. Similarly, observing that the statute further provides that "such notification *shall be required* when the defendant was not personally present in open court at the time when the case was set for trial," *Ramirez* held that "the requirement that such notice be sent to any defendant who was not personally present in open court when the case was set for trial is *mandatory*." *Id*. at 237 (brackets omitted). Similarly, the Supreme Court of Illinois held that 75 ILCS 5/3-5—which provides that "library taxes … *shall be levied by the corporate authorities in the amounts determined by*" a municipality's board of library trustees—establishes a "mandatory duty to levy a tax for the establishment and maintenance of the library in the amount determined by the library board." *Vill. of Winfield*, 678 N.E.2d at 1046; *see also People v. O'Malley*, 828 N.E.2d 376, 381 (Ill. App. 2005) (holding that a statute providing that a police officer "driving a vehicle" and signaling a motorist to stop "*shall display* illuminated oscillating, rotating or

flashing red or blue lights" requires that "the signal to stop in [that] situation *must*, at minimum, be in the form of 'illuminated oscillating, rotating or flashing red or blue lights'") (emphasis added) (quoting 625 ILCS 5/11-204(a)).

The then-operative version of the statute at issue here—Section 805/3-40—contained (and still contains) similarly mandatory language. As noted, it provided that, as to "contracts … for providing or securing educational services[, a]ny initial contract with a public university … *shall have prior approval* of the [ICCB] and the [IBHE]." 110 ILCS 805/3-40 (emphasis added). Moreover, the statute did not include "other language … indicat[ing] that the legislature did not intend for [it] to be mandatory." *Goldberg v. Astor Plaza Condo. Ass'n*, 971 N.E.2d 1, 12 (Ill. App. 2012); *see also Fleischer v. Bd. of Cmty. Coll. Dist. No. 519*, 471 N.E.2d 213, 216 (Ill. App. 1984) ("Illinois law is clear that when the legislature gives a community college board of trustees discretionary powers, such as whether to rehire or dismiss a nontenured teacher, the power may not be delegated.") (citation omitted).

Thus, even if in another context the draft consortium agreement and/or the revised draft consortium agreement would have constituted an offer and the actions of Cabai or other College employees would have constituted acceptance, Doc. 126 at 4, Section 805/3-40 barred the formation of a valid and enforceable contract between the College and ACE without the ICCB's and IBHE's approval. Because there is no dispute here that (1) neither the ICCB nor the IBHE approved the draft consortium agreement or the revised consortium agreement, (2) both agreements concerned "providing or securing educational services," 110 ILCS 805/3-40, and (3) ACE and the College had not previously contracted over the proposed program and therefore their discussions concerned an "initial contract" between ACE and the College, there is no valid and enforceable contract. *See U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 330

(7th Cir. 2009) ("Here, the purported agreement that Lenihan entered into with Global on the City's behalf exceeds the limits of the City's power to contract. That is to say, even if Lenihan reached agreement with Global that the scanning implementation was additional work requiring additional compensation, the agreement did not comply with the provisions of the Municipal Purchasing Act or the Municipal Code of Chicago. Lenihan was not the City's procurement officer and had no statutory authority to bind the City in contract."); *Cannizzo v. Berwyn Twp. 708 Cmty. Mental Health Bd.*, 741 N.E.2d 1067, 1074 (Ill. App. 2000) (holding "ultra vires and void ab initio" a contract because the defendant, an "appointed community mental health board, … [did] not have the authority to enter into employment contracts with administrative personnel that extend[ed] beyond the term of the township supervisor holding office at the time the contract [was] executed"); *Lindahl v. City of Des Plaines*, 568 N.E.2d 1306, 1312 (Ill. App. 1991) ("A municipality cannot be obligated to honor an 'alleged implied contract which is ultra vires, contrary to statutes or charter provisions, or contrary to public policy.'") (emphasis omitted) (quoting *S. Suburban Safeway Lines, Inc. v. Reg'l Transp. Auth.*, 519 N.E.2d 1005, 1009 (Ill. App. 1988)).

In pressing the opposite conclusion, ACE contends that the parties formed a valid and enforceable contract because Cabai acted with apparent authority to bind the College and ACE reasonably believed that she or one of the other individual defendants could do so. Doc. 126 at 6. That argument fails. "Illinois courts presume a party doing business with a government entity knows two things: (1) he cannot enforce a contract unless the applicable statutory method of executing the contract has been followed; and (2) statutes and ordinances limit an official's authority to bind a government entity to a contract." *U.S. Neurosurgical*, 572 F.3d at 331. A party seeking to contract with an Illinois governmental entity is therefore "charged with knowing

the level of authority … actually possessed" by the official with whom it is negotiating. *Id.* at 330. Accordingly, it was ACE's responsibility to know that, regardless of any representations made by the individual defendants, Section 805/3-40 required the ICCB's and IBHE's approval to make valid and enforceable any agreement between ACE and the College.

ACE contends that *U.S. Neurological*'s holding is limited to municipalities and does not apply to other government entities. Doc. 126 at 6. Not so. For one thing, the principle that *U.S. Neurological* sets forth applies explicitly to "government entit[ies]," 572 F.3d at 331, a category to which the College surely belongs, *see Bd. of Trs. of Cmty. Coll. Dist. No. 502 v. Dep't of Prof'l Regulation*, 842 N.E.2d 1255, 1266 (Ill. App. 2006) (holding that "a community college district is a 'unit of local government' and therefore a 'political subdivision' subject to the Local Government Selection Act"). For another, like municipalities, public community colleges are creatures of state statute*, see* Illinois Public Community College Act, 110 ILCS 805/1 *et seq.* (establishing and governing Illinois community colleges), and thus are subject to the same underlying principles governing when and how they may be contractually bound. *See U.S. Neurosurgical*, 572 F.3d at 330-31; *cf. Patrick Eng'g, Inc. v. City of Naperville*, 976 N.E.2d 318, 330 (Ill. 2012) ("[A]nyone dealing with a governmental body takes the risk of having accurately ascertained that he who purports to act for it stays within the bounds of his authority, and this is so even though the agent himself may have been unaware of the limitations on his authority.") (alteration and internal quotation marks omitted).

In sum, under Section 805/3-40, the ICCB's and IBHE's approval was required to form a valid and enforceable contract between ACE and the College. Absent such approval, there was no enforceable contract, thereby entitling the College to summary judgment on the contract claim. *See Schultze v. ABN AMRO, Inc.*, 83 N.E.3d 1053, 1059 (Ill. App. 2017) ("This court has

recognized that a plaintiff must prove the existence of a valid and enforceable contract to recover

under a breach of contract claim … .") (emphasis omitted); *Oliva v. Amtech Reliable Elevator

Co.*, 851 N.E.2d 256, 260 (Ill. App. 2006) ("In order to state a cause of action for breach of

contract, plaintiffs must allege the existence of a valid and enforceable contract … .").

## II.     Fraud Claim

ACE's fraud claim alleges that Defendants lured it into providing its confidential

curricular materials by promising a partnership and then reneging on the deal once they had

obtained the materials they needed to offer their own independent surgical assistant training

program.  Doc. 1 at ¶¶ 44-53.  The elements of common law fraud under Illinois law are: "(1) a

false statement of material fact; (2) known or believed to be false by the person making it; (3) an

intent to induce the plaintiff to act; (4) action by the plaintiff *in justifiable reliance* on the truth of

the statement; and (5) damage to the plaintiff resulting from such reliance."  *Newman v. Metro.

Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018) (emphasis added); *see also Toulon v. Cont'l

Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (same).

Even assuming that Defendants knowingly made material misrepresentations to ACE

with the intent to induce it to give up its proprietary materials, ACE cannot show that its reliance

on those misrepresentations was justified.  *See D.S.A. Fin. Corp. v. Cnty. of Cook*, 801 N.E.2d

1075, 1083 (Ill. App. 2003).  "To find justifiable reliance, the court considers whether the party

was reasonable in relying on his adversary's representation in light of the facts within his actual

knowledge and any he might have discovered by the exercise of ordinary prudence."  *Id*. at 1081

(citing *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599 (Ill. 1980)).  "A person may not enter into a

transaction with his eyes closed to available information and then charge that he has been

deceived by another.  If the party's reliance is unreasonable in light of the information open to

him, the loss is considered his own responsibility." *Ibid*. (citation, alterations, and internal quotation marks omitted). "Typically, justifiable reliance is a question of fact; however, the court may dispose of the issue on summary judgment if the facts are undisputed and only one conclusion is apparent." *Ibid*.

*D.S.A. Financial*, which presented circumstances closely analogous to those here, resolved the justifiable reliance issue on summary judgment. The circumstances were these: an employee of defendant Cook County told plaintiff D.S.A. that D.S.A.'s invoice "was correct and the county would pay it"; the Cook County employee knew the representation was false; and D.S.A. "detrimentally relied" on the representation in purchasing the right to the payment from another company. *Id*. at 1080. But a Cook County ordinance "mandate[d]" that an expenditure of more than $10,000 required a two-thirds vote of the County's Board of Commissioners. *Id*. at 1081. Because D.S.A. "was charged with knowing" that, due to the ordinance, the invoice merely "purported to create a Cook County obligation" and was not a bona fide "debt to be incurred or paid" by the County, the court held that D.S.A. "presented no fact issue concerning its justifiable reliance on [the employee's] statements." *Id*. at 1083.

The same result obtains here. It was ACE's responsibility to know that, under Section 805/3-40, a contract with the College to provide educational services required explicit approval from the ICCB and IBHE, regardless of whatever representations Defendants made concerning their intent to partner with ACE. *See ibid*. (explaining that "someone who plans to seek payment of a substantial amount of public funds should first determine that the obligation exists"). Put otherwise, ACE proceeded at its own risk in providing Defendants with its materials in the absence of the approvals that Section 805/3-40 required. As a result, ACE cannot show justifiable reliance, and Defendants may not be held liable for fraud. *See Capital City Fin. Grp.*

*v. Cnty. of Cook*, 2004 WL 1243948, at *8 (N.D. Ill. June 3, 2004) ("The Cook County Purchasing Ordinance at issue in this case prohibits a finding of justifiable reliance based solely on representations made by a person unauthorized to commit Cook County financially for services or goods that exceed $10,000.00, unless the County Board of Commissioners first authorizes that transaction.") (citing *D.S.A. Fin.*, 801 N.E.2d at 1081-83); *cf. Patrick Eng'g*, 976 N.E.2d at 331 (holding that, to "apply equitable estoppel against a municipality," the plaintiff must show that her "reliance [was] detrimental and reasonable. That is, the private party must have not only substantially changed its position … but also justifiably done so, based on its own inquiry into the municipal official's authority") (citing *D.S.A. Fin.*, 801 N.E.3d 1075).

## III. ITSA Trade Secret Misappropriation Claim

"To prevail on a claim for misappropriation of a trade secret under" the ITSA, ACE "must demonstrate that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). ACE's ITSA claim fails because it cannot show on the summary judgment record that the materials it provided to Defendants contained trade secrets.

The ITSA defines "trade secret" as follows:

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). "Both of the Act's statutory requirements focus fundamentally on the secrecy of the information sought to be protected." *Learning Curve Toys*, 342 F.3d at 721.

"However, the requirements emphasize different aspects of secrecy. The first requirement, that the information be sufficiently secret to impart economic value because of its relative secrecy, 'precludes trade secret protection for information generally known or understood within an industry even if not to the public at large.'" *Id*. at 722 (quoting *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. 1998)). "The second requirement, that the plaintiff take reasonable efforts to maintain the secrecy of the information, prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Ibid*. (citing *Jackson v. Hammer*, 653 N.E.2d 809, 816 (Ill. App. 1995)); *see also Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*, 874 N.E.2d 959, 971 (Ill. App. 2007) (same).

Both requirements must be met for information to be a trade secret, so the failure to satisfy even one defeats an ITSA claim. *See Ho v. Taflove*, 648 F.3d 489, 504 (7th Cir. 2011) (holding that the plaintiffs' failure to "show, in their summary judgment papers, that the expressions of the [statistical model in question] had the status of secrecy" eliminated the need to consider its "economic value"). In addition,

> [a] court should consider the following factors in determining whether a trade secret exists : (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which it is known by the employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Of these factors, the most important is whether and how an employer acts to keep the information secret.*

*Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1152 (Ill. App. 2009) (emphasis added) (citation omitted); *see also Learning Curve Toys*, 342 F.3d at 722.

ACE asserts that the following materials constitute trade secrets under the ITSA: (1) ACE's Self Study; (2) curricular materials ACE prepared for the proposed program, including

the "master curriculum," program catalog, syllabi, and textbooks; (3) budget information; and (4) the Surgical SkillLab. Doc. 107 at ¶ 55; Doc. 107-1 at 3. ACE is wrong as to all four.

As to the Self Study, it is undisputed that an outside consultant prepared it and that, in the course of the consultant's work, ACE did not require him to sign a confidentiality agreement or return to ACE a copy of the finalized or draft materials. Doc. 107 at ¶ 59. ACE also concedes that the Self Study was "valuable because it allowed it to get accreditation with the CAAHEP," Doc. 125 at p. 10, ¶ 21, which presumably entailed disclosure of its contents. (CAAHEP accredited ACE in 2009; ACE lost its accreditation in 2012. Doc. 96 at 67, 70.) Moreover, ACE sent the Self Study to Cabai in electronic form, permitting easy distribution, without telling her that it was confidential and without requiring her to sign a confidentiality agreement. Doc. 107 at ¶ 61; Doc. 125 at p. 6, ¶ 61; Doc. 107-1 at p. 123, ¶ 16.

It is true that Section III.8 of the draft consortium agreement specified that ACE's "curriculum and assigned materials and simulators are proprietary in nature" and further provided that the "College shall not copy or reproduce anything of a proprietary nature for any reason." Doc. 107-1 at 11. But even putting aside that section's lack of prominence, *see U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 625-26 (N.D. Ill. 2007) ("[D]eclarations of confidentiality and nondisclosure should be more prominent than the examples provided by [the plaintiff], which included "contract provisions contained in the middle of lengthy documents"), ACE did not insist on having an executed version of the agreement in place before sending Cabai the Self Study, Doc. 107 at ¶ 61; Doc. 125 at p. 6, ¶ 61.

On this record, no reasonable juror could find that ACE satisfied either the secrecy prong or the reasonable efforts prong of 765 ILCS 1065/2(d) as to the Self Study. Not only did the Self Study's value consist in part in it being shared with CAAHEP, but ACE did not take the kinds of

affirmative measures courts have recognized as secrecy-preserving under Illinois law, such as "limit[ing] access to the information to certain employees only, keep[ing] the information encrypted, password-protected, or locked, prevent[ing] copying of the protected information, or requir[ing] employees to sign confidentiality agreements." *Duberville v. WMG, Inc.*, 2015 WL 186834, at *15 (N.D. Ill. Jan. 13, 2015) (citing *Multiut Corp. v. Draiman*, 834 N.E.2d 43 (Ill. App. 2005), and *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209 (Ill. App. 1995)). To the contrary, ACE itself sent the Self Study to Cabai without first ensuring that she (or anyone else) would maintain its confidentiality. *See Ho*, 648 F.3d at 504 (holding on summary judgment that a statistical model presented in a public conference paper was not a trade secret under the ITSA, explaining that "[o]nce the possessor of information intentionally releases that information, the possessor can no longer make a successful trade secrets misappropriation claim because the information is not subject to reasonable efforts to maintain secrecy").

As to the curricular materials, approximately half was original ACE content and the other half was derived from the CAAHEP core curriculum. Doc. 125 at p. 6, ¶ 64. Although ACE does not publicly distribute the master curriculum, which is comprised of "unique assignments from textbooks that are combined into an effective learning assignment unique to ACE's program," Doc. 125 at p. 10, ¶¶ 21-22, ACE filed the master curriculum as an attachment to its complaint in this case, Doc. 1-17, and has never moved to place it under seal, Doc. 107 at ¶ 69. Having publicly released the master curriculum, ACE cannot now claim that it is secret. *See Dryco, LLC v. ABM Indus., Inc.*, 2009 WL 3401168, at *6 (N.D. Ill. Oct. 16, 2009) (granting summary judgment where the plaintiffs "d[id] not dispute [the defendant's] assertions that [they] required no confidentiality agreements with [two non-employees whose actions were central to the case] (nor did they have confidentiality agreements with their own employees), did not label

any of their documents as confidential, and did not seek any protective order in this litigation"); *see also Ho*, 648 F.3d at 504 (affirming summary judgment where the plaintiffs "intentionally release[d]" the allegedly confidential information); *Alpha Sch. Bus Co.*, 910 N.E.2d at 1153 ("Plaintiffs' attempt to claim as a trade secret their customer list, *i.e.*, the names of the school districts, is patently false because this information is glaringly nonsecret.  In fact, it and the school district contract and bid date information are publicly available.") (internal quotation marks omitted); *Delta Med. Sys. v. Mid-Am. Med. Sys.*, *Inc.*, 772 N.E.2d 768, 781 (Ill. App. 2002) ("[I]t was an abuse of discretion for the trial court to bar Mid America from using or disclosing to any person the model numbers and identification numbers of Delta customer equipment, as such information was proven to be in the public domain and therefore not a trade secret.").

The same holds for the syllabi and program catalog.  Although ACE required students to log in before accessing the syllabi, ACE distributed them to any student enrolled in its programs without informing the student that they were confidential, and it did not further restrict their distribution or require students to destroy copies once they had finished the course.  Doc. 107 at ¶¶ 70-71; Doc. 125 at p. 6, ¶¶ 70-71.  Similarly, ACE shared the program catalog with prospective students and potential partnering institutions without first putting in place a confidentiality agreement or otherwise indicating that the material was confidential.  Doc. 107 at ¶ 73.  Accordingly, the record evidence would not permit a reasonable juror to find that ACE took affirmative measures to keep the syllabi and program catalog confidential.  *See Ho*, 648 F.3d at 504 (holding that a statistical model was not a trade secret once it was published because, at that point, "the information is not subject to reasonable efforts to maintain secrecy"); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 923 (Ill. App. 2005) (holding that the plaintiff's customer lists

were not trade secrets because, although the plaintiff "assign[ed] employees passwords on a need-to-know basis," it did not "require employees to sign confidentiality agreements, advise employees that its records were confidential, or label the information as confidential"); *Delta Med. Sys.*, 772 N.E.2d at 782 (holding that the plaintiff's "service history [on a particular piece of equipment] was not a secret" because "the only evidence presented with respect to sharing service history is that [the plaintiff] would provide it to the customer if requested, and the only customer who testified at the hearing stated that she would share this information if she wanted to work with a particular provider").

Of the three textbooks used in the surgical assistant training course, ACE claims authorship over only one—a workbook that Dan Bump edited.  Doc. 107 at ¶ 74; Doc. 125 at p. 6, ¶ 74.  As with the master curriculum, syllabi, and program catalog, however, the "economic value" of a textbook or workbook (or an "assignment[] from [a] textbook[]," Doc. 126 at 12) consists in it being read and distributed, not in its being kept secret from "other persons who can obtain economic value from its disclosure or use."  765 ILCS 1065/2(d)(1); *see Sys. Dev. Servs., Inc. v. Haarmann*, 907 N.E.2d 63, 73 (Ill. App. 2009) ("The plaintiff must prove that the real value of the information lies in the fact that it is not generally known to others who could benefit [from] using it.") (alteration in original, internal quotation marks omitted).  Nor does the summary judgment record reflect that ACE took any steps to indicate that the textbooks were confidential or to maintain their confidentiality.  *See Jackson*, 653 N.E.2d at 817 ("Here, plaintiff's customer lists were not kept under lock and key, defendants (plaintiff's competitor) knew many of plaintiff's customers, and the record contains no evidence that plaintiff took steps to explain the secrecy or confidentiality of the lists to his employees.  Therefore, plaintiff is not entitled to trade secret protection under the Act, and all issues pertaining to the Act were

properly resolved against him."). All told, ACE has failed to show that any of its curricular materials were trade secrets.

As to the budgetary information, nothing in the parties' Local Rule 56.1 submissions describes the budgetary information ACE believes to be a trade secret or the steps (if any) that ACE took to keep it confidential. Accordingly, no reasonable juror on this record could find that the budgetary information was a trade secret. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (internal quotation marks omitted); *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 673 (N.D. Ill. 2016) (same, citing *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993)).

Finally, as to the Surgical SkillLab, it is undisputed that Cabai attended the lab without signing a nondisclosure agreement and that she offered to cancel her trip if ACE conditioned her attendance on signing such an agreement. Doc. 107 at ¶¶ 46, 48; Doc. 125 at p. 5, ¶ 48; Doc. 107-1 at 77. Moreover, ACE's Local Rule 56.1 submissions do not describe any affirmative steps that it took to preserve the confidentiality of the information conveyed at the SkillLab. The record evidence therefore would not permit a reasonable juror to find that the SkillLab was a trade secret. *Compare Learning Curve Toys*, 342 F.3d at 725 (reinstating a jury verdict and holding that the plaintiff had made reasonable efforts to protect the secrecy of its information where the evidence showed that the parties "entered into an oral confidential agreement," which allowed the jury to infer that the plaintiff would not have disclosed the relevant confidential information "in the absence of … [that] agreement"); *Huawei Techs. Co. v. Motorola, Inc.*, 2011 WL 612722, at *9 (N.D. Ill. Feb. 22, 2011) (granting a preliminary injunction and describing the

reasonable steps the plaintiff took to maintain secrecy under the ITSA as including "marking any printed documents containing [confidential] information with the legend 'Internal Use' or 'Highly Confidential' and providing this information only under a non-disclosure agreement"), *with Liebert*, 827 N.E.2d at 923 (holding that "sensitive information" was not a trade secret where the plaintiff did not "require employees to sign confidentiality agreements, advise employees that its records were confidential, or label the information as confidential"); *Dryco*, 2009 WL 3401168, at *6 (same, where the plaintiffs "d[id] not dispute [defendant's] assertions that [they] required no confidentiality agreements … [and] did not label any of their documents as confidential").

## Conclusion

Defendants' summary judgment motion is granted. With all claims having been resolved, judgment will be entered in favor of Defendants and against ACE.

May 29, 2018

_____

United States District Judge